UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MICAH CROFFORD BROWN, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 3:19-cv-2301-L-BN |
| | § | |
| DIRECTOR, Texas Department of Criminal | § | |
| Justice, Correctional Institutions Division, | § | CASE INVOLVING THE DEATH |
| | § | PENALTY |
| Respondent. | § | |
| | § | |

**PETITION FOR WRIT OF HABEAS CORPUS BY A PRISONER IN STATE CUSTODY PURSUANT TO 28 U.S.C. § 2254 *et seq.***

MAUREEN SCOTT FRANCO
Federal Public Defender

TIVON SCHARDL
Capital Habeas Unit Chief

TIMOTHY P. GUMKOWSKI
Texas Bar No. 24104788
Office of the Federal Public Defender
Western District of Texas
Capital Habeas Unit
919 Congress Ave., Suite 950
Austin, Texas 78701
(737) 207-3007 (phone)
(512) 499-1584 (fax)
tim_gumkowski@fd.org

September 11, 2020

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES.......................................................................................vi

INTRODUCTION .........................................................................................................1

STATEMENT OF JURISDICTION AND GROUNDS FOR RELIEF .......................2

PROCEDURAL HISTORY AND FACTS ....................................................................2

    A.    Procedural history................................................................................2

    B.    Statement of facts ...............................................................................3

RELEVANT HABEAS LAW .......................................................................................5

    A.    Statement regarding procedural defenses ..........................................5

        1.    Exhaustion .............................................................................5

        2.    Procedural default .................................................................6

    B.    Request for procedures available under the relevant statutes and rules...................6

    C.    Application of AEDPA.........................................................................7

    D.    The state court decision cannot be afforded deference .........................8

        1.    Brown's claims presented to the state habeas court were not adjudicated on the merits.................9

        2.    Brown was denied due process of law when the state habeas court denied his ability to adequately develop material facts in support of his claims........10

        3.    A claim that fundamentally alters the facts or law in support of a claim presented in state court is not an adjudicated claim ........................11

        4.    The presumption of adjudication may be rebutted for other reasons. .......12

    E.    Section 2254(d)(1) & (d)(2)....................................................................12

        1.    Review under § 2254(d)(1). .....................................................13

        2.    Review under § 2254(d)(2). .....................................................13

CLAIMS FOR RELIEF................................................................................................14

CLAIM 1.    Brown received ineffective assistance of counsel at the guilt phase of his capital trial because counsel failed to investigate, develop, and present critical evidence that would have undermined the capital murder charge, among other significant errors ...............................14

    A.    Introduction ........................................................................................15

    B.    Background on Brown's capital trial proceedings .................................15

        1.    Deficient representation from the beginning.................................18

2.    Failure to identify clear red flags and obvious leads ................................... 25

C.    Because Brown's counsel failed to conduct an adequate investigation before settling on a risky and insupportable defense, counsel's representation at trial was deficient ................................................................................................ 29

    1.    Failure to contest the State's case ............................................................. 30

    2.    Failure to mount a coherent defense ........................................................ 35

    3.    The "whydunnit" the jury never heard ..................................................... 41

D.    Because of their individual and cumulative failures to investigate, consult appropriate experts, and present a coherent defense to the capital charges, Brown's attorneys' actions constituted deficient performance .............................. 45

    1.    Trial counsel performed deficiently by failing to conduct a reasonable investigation that resulted in them settling on a legally unsound and ill-considered guilt-phase strategy ......................................... 47

    2.    Trial counsel's performance fell well below the standards required under prevailing professional norms governing capital representation and their decisions should not be afforded deference ....... 49

    3.    Testimony from Brown's trial attorneys at the state evidentiary hearing clearly illustrated the prevailing professional norms for representation were not met .................................................................... 51

E.    Trial counsels' deficient performance prejudiced Brown ....................................... 58

F.    Trial counsel's numerous error, individually and cumulatively, undermined the reliability of Brown's guilt-phase proceedings .................................................... 61

G.    Conclusion ................................................................................................................ 62

CLAIM 2.    Brown received ineffective assistance of counsel at the punishment phase of his capital trial because counsel failed to investigate and present powerful mitigating evidence, among other significant errors ................................................. 62

A.    A capital defendant must receive an individualized sentencing after a full and fair consideration by the jury ......................................................................... 62

B.    Brown's life history contained highly compelling mitigation that counsel never presented ......................................................................................................... 65

    1.    The Brown home ......................................................................................... 68

    2.    The broken home into which Micah was born ........................................... 69

    3.    The Gafford home ...................................................................................... 69

    4.    A home filled with secrets and sexual abuse ............................................. 70

    5.    Support systems breaking down ................................................................ 72

    6.    Micah's difficult inheritance ...................................................................... 73

    7.    Early drug exposure .................................................................................... 73

        8.     Micah's relationship with Stella Ray ........................................................ 74

        9.     Spiraling down – addiction, mental health, and suicidality ........................ 75

C.    A defendant's right to a constitutionally valid capital sentence requires a full mitigation investigation and presentation, and necessitates effective counsel at the sentencing phase of trial .................................................................... 77

        1.     Lead counsel's derogation of his duties and the resulting team dysfunction led to a deficient mitigation investigation and inadequate presentation ...................................................................................... 80

        2.     Brown's counsel had no strategy for responding to the State's penalty-phase presentation, as the bulk of the State's aggravating evidence had been introduced by the defense during the guilt phase ........ 82

D.    Because of their failure to investigate, Brown's counsel failed to present substantial mitigation evidence to the jury, denying Brown of an individualized sentencing determination .............................................................. 85

        1.     Counsel failed to investigate the numerous avenues of mitigation and yet again adopted an insupportable strategy ........................................ 86

        2.     Counsel's unreasonable investigation led to a failure to provide experts with critical information and a lack of lay witness testimony to support those expert opinions, and resulted in the jury hearing a constitutionally inadequate mitigation presentation .............................. 90

        3.     Counsel provided ineffective assistance for failing to adequately investigate, prepare for, and address the State's evidence regarding aggravating evidence.................................................................................. 100

        4.     Counsel's failure to investigate, discover, and explain ASD for the jury allowed the State to argue Brown showed no remorse and no mercy and thus deserved a death sentence; as such, counsel's deficient performance that prejudiced Brown.......................................... 103

        5.     Counsel provided ineffective assistance when they failed to object to aspects of the State's closing argument ..................................................... 107

E.    Brown was prejudiced by his counsel's individual and cumulative failures, and the mitigation evidence that was not presented is sufficiently substantial to undermine the reliability of the death sentence in this case .............................. 110

F.    Conclusion ...................................................................................................... 113

CLAIM 3.    Brown's counsel were ineffective due to a conflict of interest on the Defense Team, denying Brown his Constitutional right to competent and un-conflicted representation........................................................................................ 113

A.    Lead counsel resolved a conflict between Brown and the fact investigator on Brown's case against Brown.................................................................................. 114

        1.     Introduction ............................................................................................. 114

2.　　Trial counsel protected the interests of his investigator over those of his client ......................................................................................... 115

B.　　Counsel's conflict prejudiced Brown ......................................................... 118

CLAIM 4.　　Due to pervasive and extremely prejudicial pre-trial and trial publicity, Brown's trial was conducted in an atmosphere that rendered it inherently unfair, and trial counsel was ineffective for failing to move for a change of venue ................................................................................................................. 121

A.　　Introduction ................................................................................................ 122

B.　　Counsel rendered ineffective assistance by failing to move for a change of venue ............................................................................................................. 123

C.　　Counsel's deficient performance prejudiced Brown ................................. 124

D.　　In the interest of fairness, it was incumbent for the trial court to relocate the trial to protect Brown's constitutional right to due process ...................... 126

CLAIM 5.　　Brown's Constitutional rights were violated due to prosecutorial misconduct during the penalty phase of his capital trial ............................................... 128

A.　　The prosecutor's comments infringed upon Brown's constitutional rights .......... 129

1.　　The prosecution committed misconduct in urging the jury to sentence Brown to death because he failed to testify in his punishment stage proceedings in violation of the Fifth Amendment ...... 129

2.　　The prosecution committed misconduct by making improper comments attempting to limit the scope of mitigation the jury could consider in violation of Brown's Eighth Amendment rights ................... 131

B.　　The prosecution's comments violated due process ................................. 134

1.　　Burden shifting to prove *not* a future danger ........................... 134

2.　　Improper references to religiously motivated punishment ..................... 135

3.　　Inflammatory comments and conduct ..................................... 138

C.　　Brown is entitled to relief ....................................................................... 140

CLAIM 6.　　Brown's Constitutional rights were violated by permitting the State to introduce statements obtained from him in violation of *Miranda* and *Edwards*, and Brown's counsel were ineffective for failing to move to exclude the statements ................................................................................... 142

A.　　The state court permitted the prosecution to admit statements obtained in violation of *Miranda v. Arizona* and *Edwards v. Arizona* at Brown's capital trial ................................................................................................................. 142

1.　　Brown invoked his right to counsel ....................................... 144

2.　　Brown did not knowingly, intelligently, or voluntarily waive his right to counsel ................................................................................... 145

iv

3.     Brown's news interview was obtained and then used as evidence against him in violation of his constitutional rights ................................... 146

4.     The admission of these statements fatally infected Brown's trial ............. 148

B.     Brown's counsel were ineffective for failing to file meritorious motions to suppress Brown's police interrogation and statement to the news ; he was thereby prejudiced ............................................................................................... 149

CLAIM 7.     Juror misconduct at Brown's guilt- and penalty-phase proceedings deprived Brown of his rights to a fair and impartial jury, the assistance of counsel, confrontation, equal protection, and a fair trial ...................................................... 151

CLAIM 8.     Brown was tried and sentenced to death under an unconstitutional statutory scheme; the trial court erred in denying the defense motion to declare Texas Code of Criminal Procedure article 37.071 unconstitutional .................... 153

A.     Texas's special issue as to "future dangerousness" is unconstitutionally vague under the eighth and fourteenth amendments ............................................. 153

B.     The Texas mitigation special issue fails to adequately define "mitigation evidence," creating a reasonable probability that the jury would construe mitigating evidence narrowly, requiring a nexus to the crime................................ 155

C.     Brown's constitutional rights were violated because the trial court was prohibited from instructing the jury that a vote by one juror would result in a life sentence ..................................................................................................................... 157

CLAIM 9.     Because Brown's sentence was imposed under a sentencing scheme that that does not narrow the class of death-eligible defendants and is arbitrarily and disproportionately applied, his sentence is unconstitutional .......................... 160

CLAIM 10.     Brown was deprived due process and effective assistance in his state habeas proceedings .............................................................................................................. 164

CLAIM 11.     Brown's conviction and sentence must be vacated because of the cumulative prejudicial effect of all the errors in this case ........................................................ 168

VERIFICATION ....................................................................................................................... 171

CERTIFICATE OF SERVICE ................................................................................................ 172

## TABLE OF AUTHORITIES

**Federal Cases**..................................................................................................... **Page(s)**

*Adams v. Quarterman,*
   324 F. App'x 340 (5th Cir. 2009) ......................................................... 51, 64

*Anderson v. Butler,*
   858 F.2d 16 (1st Cir. 1988) ............................................................. 29, 119

*Anderson v. Johnson,*
   338 F.3d 382 (5th Cir. 2003)..................................................................... 49

*Anderson v. Nelson,*
   390 U.S. 523 (1968) ................................................................................ 129

*Andres v. United States,*
   333 U.S. 740 (1948) ................................................................................ 159

*Andrus v. Texas,*
   140 S. Ct. 1875 (U.S. 2020) ....................................................... 51, 52, 78

*Arizona v. Fulminante,*
   499 U.S. 279 (1991) ........................................................................ 148, 150

*Atkins v. Virginia,*
   536 U.S. 304 (2002) .......................................................................... 16, 26

*Barefoot v. Estelle,*
   463 U.S. 880 (1983) ................................................................................ 106

*Barrientes v. Johnson,*
   221 F.3d 741 (5th Cir. 2000)................................................................... 134

*Bates v. Bell,*
   402 F.3d 635 (6th Cir. 2005)................................................... 109, 138, 141

*Battenfield v. Gibson,*
   236 F.3d 1215 (10th Cir. 2001)............................................................... 112

*Bedford v. Collins,*
   567 F.3d 225 (6th Cir. 2009)................................................................... 140

*Beets v. Scott,*
   65 F.3d 1258 (5th Cir. 1995)................................................................... 114

*Bennett v. Superintendent Graterford SCI,*
   886 F.3d 268 (3d Cir. 2018)...................................................................... 12

*Berger v. United States,*
    295 U.S. 78 (1935) ............................................................ 128, 129, 141, 142

*Bobby v. Van Hook,*
    558 U.S. 4 (2009) ...................................................................................... 18

*Boyde v. California,*
    494 U.S. 370 (1990) ................................................................................. 85

*Bracy v. Gramley,*
    520 U.S. 899 (1997) ................................................................................... 6

*Brecht v. Abrahamson,*
    507 U.S. 619 (1993) ....................................................................... *passim*

*Brumfield v. Cain,*
    576 U.S. 305 (2015) ................................................................................. 13

*Buchanan v. Angelone,*
    522 U.S. 269 (1988) ............................................................................... 133

*Caldwell v. Mississippi,*
    472 U.S. 320 (1985) ....................................................................... *passim*

*California v. Brown,*
    479 U.S. 538 (1987) ............................................................................... 109

*Chambers v. Mississippi,*
    410 U.S. 284 (1973) ............................................................................... 169

*Cobb v. Wainwright,*
    609 F.2d 754 (5th Cir.1980) ........................................................... 137, 140

*Coleman v. Thompson,*
    501 U.S. 722 (1991) ............................................................................... 169

*Cullen v. Pinholster,*
    563 U.S. 170 (2011) ....................................................................... 8, 11, 12

*Cunningham v. Wong,*
    704 F.3d 1143 (9th Cir. 2013) ................................................................. 37

*Cuyler v. Sullivan,*
    446 U.S. 335 (1980) ............................................................................... 114

*Darks v. Mullin,*
    327 F.3d 1001 (10th Cir. 2003) .............................................................. 169

*Davila v. Davis,*
   137 S. Ct. 2058 (2017) .......................................................................................... 168

*Davis v. United States,*
   512 U.S. 452 (1994) ...................................................................................... 143, 144

*DePew v. Anderson,*
   311 F.3d 742 (6th Cir. 2002)................................................................................ 134

*Dickerson v. United States,*
   530 U.S. 428 (2000) ...................................................................................... 145, 147

*District Attorney's Office for Third Judicial Dist. v. Osborne,*
   557 U.S. 52 (2009) ............................................................................................... 165

*Dobbert v. Florida,*
   432 U.S. 282 (1977) ............................................................................................. 127

*Dodson v. Stephens,*
   611 F. App'x 168 (5th Cir. 2015) ........................................................................... 61

*Donnelly v. DeChristoforo,*
   416 U.S. 637 (1974) ............................................................................. 129, 140, 142

*Duncan v. Louisiana,*
   391 U.S. 145 (1968) ............................................................................................. 122

*Eaton v. Wilson,*
   No. 09-CV-261-J, 2014 WL 6622512 (D. Wyo. Nov. 20, 2014) ............................. 60

*Eddings v. Oklahoma,*
   455 U.S. 104 (1982) ....................................................................................... *passim*

*Edwards v. Arizona,*
   451 U.S. 477 (1981) ....................................................................................... *passim*

*Escamilla v. Stephens,*
   602 F. App'x 939 (5th Cir. 2015) ........................................................................ 110

*Escamilla v. Stephens,*
   749 F.3d 380 (5th Cir. 2014).................................................................................. 50

*Estelle v. Smith,*
   451 U.S. 454 (1981) ...................................................................................... 131, 147

*Evitts v. Lucey,*
   469 U.S. 387 (1985) ...................................................................................... 142, 165

*Faretta v. California,*
    422 U.S. 806 (1975) ................................................................................. 104

*Ford v. Wainwright,*
    477 U.S. 399 (1986) ................................................................................. 165

*Foy v. Donnelly,*
    959 F.2d 1307 (5th Cir. 1992) ................................................................ 129

*Francis v. Franklin,*
    471 U.S. 307 (1985) ................................................................................. 159

*Fratta v. Quarterman,*
    536 F.3d 485 (5th Cir. 2008) ..................................................................... 13

*Freeney v. Davis,*
    737 F. App'x 198 (5th Cir. 2018) ............................................................... 10

*Furman v. Georgia,*
    408 U.S. 238 (1972) ................................................................ 109, 160, 167

*Gallow v. Cooper,*
    570 U.S. 933 (June 27, 2013) ....................................................................... 7

*Glossip v. Gross,*
    135 S. Ct. 2726 (2015) ............................................................................. 162

*Godfrey v. Georgia,*
    446 U.S. 420 (1980) ................................................................ 138, 160, 161

*Goldberg v. Kelly,*
    397 U.S. 254 (1970) ........................................................................... 11, 166

*Gray v. Branker,*
    529 F.3d 220 (4th Cir. 2008) ..................................................................... 51

*Green v. Thaler,*
    699 F.3d 404 (5th Cir. 2012) ..................................................................... 10

*Gregg v. Georgia,*
    428 U.S. 153 (1976) ......................................................................... *passim*

*Griffin v. California,*
    380 U.S. 609 (1965) ......................................................................... 129, 131

*Guidry v. Dretke,*
    397 F.3d 306 (5th Cir. 2005) ..................................................................... 13

*United States ex. rel. Hampton v. Leibach,*
    347 F.3d 219 (7th Cir. 2003) ............................................................ 118, 119

*Harrington v. Richter,*
    562 U.S. 86 (2011) ............................................................................ 9, 57

*Haynes v. Cain,*
    272 F.3d 757 (5th Cir.2001) .................................................................. 114

*Herrera v. Collins,*
    506 U.S. 390 (1993) ................................................................................ 77

*Hicks v. Oklahoma,*
    447 U.S. 343 (1980) ...................................................................... 164, 166

*Hinton v. Alabama,*
    571 U.S. 263 (2014) ................................................................................ 25

*Irvin v. Dowd,*
    366 U.S. 717 (1961) .................................................................. 123, 151, 152

*Jenkins v. Anderson,*
    447 U.S. 231 (1980) .................................................................................. 7

*Jenkins v. United States,*
    380 U.S. 445 (1965) .............................................................................. 159

*Johnson v. Williams,*
    568 U.S. 289 (2013) ........................................................................ *passim*

*Jurek v. Estelle,*
    623 F.2d 929 (5th Cir. 1980) .................................................................. 145

*Kimmelman v. Morrison,*
    477 U.S. 365 (1986) ........................................................................ 47, 150

*Lafler v. Cooper,*
    566 U.S. 156 (2012) ................................................................................ 13

*Lambright v. Schriro,*
    490 F.3d 1103 (9th Cir 2007) ............................................................ 85, 90

*Lesko v. Lehman,*
    925 F.2d 1527 (3d Cir. 1991) ................................................................ 130

*Lewis v. Dretke,*
    355 F.3d 364 (5th Cir. 2003) .................................................................. 57

*Lindh v. Murphy,*
  521 U.S. 320 (1997) ............................................................................................ 8

*Lockett v. Anderson,*
  230 F.3d 695 (5th Cir. 2000) ............................................................................ 18

*Lockett v. Ohio,*
  438 U.S. 586 (1978) ................................................................................... *passim*

*Lockyer v. Andrade,*
  538 U.S. 63 (2003) .............................................................................................. 8

*Lonchar v. Thomas,*
  517 U.S. 314 (1996) ............................................................................................ 6

*Lowenfield v. Phelps,*
  484 U.S. 231 (1988) ................................................................................. 161, 163

*Malloy v. Hogan,*
  378 U.S. 1 (1964) ............................................................................................. 146

*Martinez v. Ryan,*
  566 U.S. 1 (2012) ..................................................................................... *passim*

*Mattox v. United States,*
  146 U.S. 140 (1892) ......................................................................................... 151

*Maynard v. Cartwright,*
  486 U.S. 356 (1988) ......................................................................................... 160

*McKinney v. Ryan,*
  813 F.3d 798 (9th Cir. 2015) .......................................................................... 134

*McManus v. Neal,*
  779 F.3d 634 (7th Cir. 2015) ............................................................................ 13

*Michigan v. Harvey,*
  494 U.S. 344 (1990) ......................................................................................... 143

*Miller v. Dretke,*
  420 F.3d 356 (5th Cir. 2005) ............................................................................ 49

*Miller-El v. Cockrell* (*Miller-El I*),
  537 U.S. 322 (2003) ................................................................................. *passim*

*Miller-El v. Dretke* (*Miller-El II*),
  545 U.S. 231 (2005) ............................................................................................ 13

*Mills v. Maryland,*
    486 U.S. 367 (1988) ........................................................................ 159

*Miranda v. Arizona,*
    384 U.S. 436 (1966) ...................................................................... *passim*

*Montoya v. Collins,*
    955 F.2d 279 (5th Cir. 1992) ................................................... 130, 131

*Moore v. Johnson,*
    194 F.3d 586 (5th Cir. 1999) ....................................................... 57, 64

*Moore v. Quarterman,*
    491 F.3d 213 (5th Cir. 2007) .............................................................. 11

*Moran v. Burbine,*
    475 U.S. 412 (1986) ........................................................................ 145

*Mullaney v. Wilbur,*
    421 U.S. 684 (1975) ........................................................................ 135

*Nealy v. Cabana,*
    764 F.2d 1173 (5th Cir. 1985) ............................................................ 48

*Nichols v. Scott,*
    69 F.3d 1255 (5th Cir. 1995) .............................................................. 10

*Nickleson v. Stephens,*
    803 F.3d 748 (5th Cir. 2015) ............................................................ 168

*Nickleson v. Stephens*
    803 f3d 748 (5th Cir. 2015) .............................................................. 14

*Padilla v. Kentucky,*
    559 U.S. 356 (2010) ................................................................... 18, 57

*Panetti v. Quarterman,*
    551 U.S. 930 (2007) ................................................................... 12, 13

*Penry v. Lynaugh,*
    492 U.S. 302 (1989) ...................................................................... *passim*

*Perillo v. Johnson,*
    205 F.3d 775 (5th Cir. 2000) ........................................................... 114

*Perillo v. Johnson,*
    79 F.3d 441 (5th Cir. 1996) ............................................................. 119

*Proffitt v. Florida,*
    428 U.S. 242 (1976) ........................................................................................ 162

*Profitt v. Waldron,*
    831 F.2d 1245 (5th Cir. 1987) ........................................................................ 47

*Pulley v. Harris,*
    465 U.S. 37 (1984) .......................................................................................... 162

*Remmer v. United States,*
    347 U.S. 227 (1954) ........................................................................................ 151

*Rhines v. Weber,*
    544 U.S. 269 (2005) .................................................................................. 14, 168

*Rhode Island v. Innis,*
    446 U.S. 291 (1980) ........................................................................................ 147

*Richards v. Quarterman,*
    566 F.3d 553 (5th Cir. 2009) ................................................................... 59, 111

*Rideau v. Louisiana,*
    373 U.S. 723 (1963) .......................................................................... 122, 126, 127

*Romine v. Head,*
    253 F.3d 1349 (11th Cir. 2001) ...................................................................... 138

*Rompilla v. Beard,*
    545 U.S. 374 (2005) ........................................................................ 12, 47, 57, 64

*Ruiz v. Stephens,*
    728 F.3d 416, 424 (5th Cir. 2013) .................................................................. 110

*Sandoval v. Calderon,*
    241 F.3d 765 (9th Cir. 2000) .......................................................................... 137

*Sandstrom v. Montana,*
    442 U.S. 510 (1979) ........................................................................................ 135

*Satterwhite v. Texas,*
    486 U.S. 249 (1988) ........................................................................................ 169

*Schlup v. Delo,*
    513 U.S. 298 (1995) .......................................................................................... 7

*Schriro v. Landrigan,*
    550 U.S. 465 (2007) .......................................................................................... 6

*Sears v. Upton*,
    561 U.S. 945 (2010) ................................................................ 64, 80, 110

*Sheppard v. Maxwell*,
    384 U.S. 333 (1966) .......................................................................... 122

*Skilling v. United States*,
    561 U.S. 358 (2010) ........................................................ 123, 125, 127

*Skipper v. South Carolina*,
    476 U.S. 1 (1986) ............................................................................. 112

*Smith v. Illinois*,
    469 U.S. 91 (1984) .................................................................. 144, 145

*Smith v. Texas*,
    543 U.S. 37 (2004) .................................................................. 132, 157

*Spence v. Johnson*,
    80 F.3d 989 (5th Cir. 2004) ............................................................ 169

*Stone v. Powell*,
    428 U.S. 465 (1976) .......................................................................... 142

*Strickland v. Washington*,
    466 U.S. 668 (1984) ................................................................... *passim*

*Taylor v. Kentucky*,
    436 U.S. 478 (1978) .......................................................................... 169

*Taylor v. Maddox*,
    366 F.3d 992 (9th Cir. 2004) ............................................................. 13

*Tennard v. Dretke*,
    542 U.S. 274 (2004) ................................................................... *passim*

*Townsend v. Sain*,
    372 U.S. 293 (1963) .................................................................... 6, 165

*Trevino v. Thaler*,
    569 U.S. 413 (2013) ...................................................... 7, 127, 164

*Tuilaepa v. California*,
    512 U.S. 967 (1994) .......................................................................... 133

*Turner v. Louisiana*,
    379 U.S. 466 (1965) .................................................................. 151, 152

*Turner v. Quarterman,*
    A–08–CA–811–SS, 2009 WL 2406203 (W.D.Tex. Aug. 3, 2009) ........................................ 137

*United States v. Barragan,*
    871 F.3d 689 (9th Cir. 2017) ........................................................................................... 109, 125

*United States v. Blocker,*
    104 F.3d 720 (5th Cir. 1997) .......................................................................................... 147, 148

*United States v. Cartagena-Carrasquillo,*
    70 F.3d 706 (1st Cir. 1995) ................................................................................................. 136

*United States v. Chavira,*
    614 F.3d 127 (5th Cir. 2010) ............................................................................................... 148

*United States. v. Cronic,*
    466 U.S. 648 (1984) ........................................................................................... 45, 46, 58

*United States v. Darden,*
    688 F.3d 382 (8th Cir. 2012) .......................................................................................... 108, 140

*United States v. Drones,*
    218 F.3d 496 (5th Cir. 2000) ................................................................................................. 51

*United States v. Hasting,*
    461 U.S. 499 (1983) ........................................................................................................... 130

*United States v. Iglesias,*
    915 F.2d 1524 (11th Cir. 1990) ........................................................................................... 138

*United States v. Ince,*
    21 F.3d 576 (4th Cir. 1994) ................................................................................................. 150

*United States v. Mendoza,*
    522 F.3d 482 (5th Cir. 2008) ............................................................................................... 104

*United States v. Mercedes-De La Cruz,*
    787 F.3d 61 (1st Cir. 2015) ................................................................................................. 150

*United States v. Mooney,*
    315 F.3d 54 (1st Cir. 2002) ................................................................................................. 139

*United States v. Newell,*
    315 F.3d 510 (5th Cir. 2002) ................................................................................. 114, 117, 120

*United States v. Robinson,*
    485 U.S. 25 (1988) ............................................................................................................. 129

*United States v. Salcido,*
    342 F. App'x 976 (5th Cir. 2009) ......................................................... 135

*United States v. Sanchez,*
    176 F.3d 1214 (9th Cir. 1999) ............................................................. 139

*United States v. Weatherspoon,*
    410 F.3d 1142 (9th Cir. 2005) ............................................................. 139

*United States v. Wharton,*
    320 F.3d 526 (5th Cir. 2003) ............................................................... 131

*United States v. Wright,*
    489 F.2d 1181 (D.C.Cir. 1973) ............................................................ 104

*Valdez v. Cockrell,*
    274 F.3d 941 (5th Cir. 2001) ................................................................. 10

*Vazquez v. Hillery,*
    474 U.S. 254 (1986) ............................................................................... 11

*Walbey v. Quarterman,*
    309 F. App'x 795 (5th Cir. 2009) .......................................... 51, 63, 82, 163

*Walker v. Johnston,*
    312 U.S. 275 (1941) ................................................................................. 6

*Washington v. Smith,*
    219 F.3d 620 (7th Cr. 2000) ................................................................ 119

*Weeden v. Johnson,*
    854 F.3d 1063 (9th Cir. 2017) ............................................................... 47

*Wellons v. Hall,*
    558 U.S. 220 (2010) ................................................................................. 6

*White v. Thaler,*
    610 F.3d 890 (5th Cir. 2010) ................................................. 58, 111, 121

*Wiggins v. Smith,*
    539 U.S. 510 (2003) ...................................................................... *passim*

*Williams (Terry) v. Taylor,*
    529 U.S. 362 (2000) ...................................................................... *passim*

*Williams v. Allen,*
    542 F.3d 1326 (11th Cir. 2008) ............................................................. 51

*Wilson v. Mazzuca,*
    570 F.3d 490 (2d Cir. 2009) ................................................................................ 29

*Wilson v. Sellers,*
    138 S. Ct. 1188 (2018) ................................................................................ 7, 12

*Wilson v. U.S.,*
    149 U.S. 60 (1893) ................................................................................ 129

*In re Winship,*
    397 U.S. 358 (1970) ................................................................................ 135

*Withrow v. Williams,*
    507 U.S. 680 (1993) ................................................................................ 142

*Woodfox v. Cain,*
    772 F.3d 358 (5th Cir. 2014) ................................................................................ 7

*Woodson v. North Carolina,*
    428 U.S. 280 (1976) ................................................................ 78, 111, 112, 155

*Zant v. Stephens,*
    462 U.S. 862 (1983) ................................................................ 107, 126, 133, 162

**State Cases**

*Berry v. State,*
    233 S.W.3d 847 (Tex. Crim. App. 2007) ................................................................ 155

*Brown v. State,*
    No. AP-77,019, 2015 WL 5453765 (Tex. Crim. App. Sept. 16, 2015) ...................................... 3

*Fuller v. State,*
    253 S.W.3d 220 (Tex. Crim. App. 2008) ................................................................ 153

*Ex parte Gonzales,*
    204 S.W.3d 391 (Tex. Crim. App. 2006) ................................................................ 19

*Granviel v. State,*
    552 S.W.2d 107 (Tex. Crim. App. 1976) ................................................................ 154

*Jurek v. State,*
    522 S.W.2d 934 (Tex. Crim. App. 1975) ................................................................ 154

*Martinez v. State,*
    327 S.W.3d 727 (Tex. Crim. App. 2010) ................................................................ 155

*Ex parte Micah Crofford Brown,*
    WR-85,341-01, 2019 WL 4317041 (Tex. Crim. App. Sept. 11, 2019) ............................ 3, 9, 10

*Renteria v. State,*
    206 S.W.3d 689 (Tex. Crim. App. 2006) ............................................................... 154

**Federal Statutes**

28 U.S.C. § 2241 ................................................................................................................ 2

28 U.S.C. § 2243 ..................................................................................................... 6, 170

28 U.S.C. § 2243, ¶ 5 ................................................................................................ 170

28 U.S.C. § 2243, ¶¶ 6 and 7 ...................................................................................... 6

28 U.S.C. § 2254 ................................................................................................... 2, 6, 7

28 U.S.C. § 2254(a) ........................................................................................................ 7

28 U.S.C. § 2254(b)(1)(A) .......................................................................................... 5

28 U.S.C. § 2254(d) ............................................................................................. *passim*

28 U.S.C. § 2254(d)(1) ...................................................................................... 7, 12, 13

28 U.S. C. § 2254(d)(2) .............................................................................................. 13, 14

28 U.S. C. § 2254(e)(1) ........................................................................................... 7, 8, 14

**State Statutes**

Tex. Code Crim. Proc. Article 11.071, § 5 .......................................................... 127

Tex. Code Crim. Proc. Article 11.071 § 9(a), (b) ............................................ 11, 165

Tex. Code Crim. Proc. Article 37.071 § 2 ........................................................... 159

Tex. Code Crim. Proc. Article 37.071 § 2(a) ...................................................... 158

Tex. Code Crim. Proc. Article 37.071 § 2(b)(1) ......................................... 134, 153

Tex. Code Crim. Proc. Article 37.071 § 2(b)(2) ................................................ 158

Tex. Code Crim. Proc. Article 37.071 § 2(d)(2) ................................................ 158

Tex. Code Crim. Proc. Article 37.071 § 2(e)(2) ................................................ 158

Tex. Code Crim. Proc. Article 37.071 § 2(f)(2) ................................................. 158

Tex. Code Crim. Proc. Article 37.071 § 2(f)(4) ........................................ 156, 162

Tex. Code Crim. Proc. Article 37.071 § 2(g) ...................................................... 158

Tex. Penal Code § 19.01 ................................................................................ 161

Tex. Penal Code § 19.02 ................................................................................ 161

Tex. Penal Code § 19.03 ................................................................................ 161

Tex. Penal Code § 19.03(a)(2) .................................................................. 17, 30

**Rules**

Fed. R. Civ. P. 15(a)(2) ................................................................................ 170

Habeas Rule 4 .............................................................................................. 170

Habeas Rule 5(e) ...................................................................................... 6, 170

Habeas Rule 6 .......................................................................................... 6, 170

Habeas Rule 7 .................................................................................................. 6

Habeas Rule 7 .............................................................................................. 170

Habeas Rule 7(a) .............................................................................................. 6

Habeas Rule 8 .......................................................................................... 6, 170

Habeas Rule 8(a) .............................................................................................. 6

**Constitutional Provisions**

U.S. Const. amend. I .................................................................................... 136

U.S. Const. amend. V ................................................................................ passim

U.S. Const. amend. VI ............................................................................... passim

U.S. Const. amend. VIII .............................................................................. passim

U.S. Const. amend. XIV ............................................................................. passim

**Other Authorities**

*ABA Guidelines for the Appointment and Performance in Death Penalty Cases*, 31
    Hofstra L. Rev. 913 (2003) ................................................................... passim

*ABA Standards for Criminal Justice* § 3-6.7(c) (4th ed. 2015) ....................... 18, 138, 139

George W. Woods et al., *Neurobehavioral Assessment in Forensic Practice*, 35
    Int'l J. of L. & Psychiatry 432 (2012) ............................................................. 90

Randy Hertz & James Liebman, *Federal Habeas Corpus Practice and Procedure* § 32.3 (7th ed. 2017) ................................................................................................ 8

Russell Stetler, *Mental Health Evidence and the Capital Defense Function: Prevailing Norms*, 82 UMKC L. Rev. 407 (2014) ................................................... 90

Russell Stetler, *The Past, Present, and Future of the Mitigation Profession*, 46 Hofstra L. Rev. 1161 (2018) ...................................................................... 162, 163

Scott E. Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 Va. L. Rev. 1109 (1997) ..................... 96, 97

Stephen B. Bright, *Advocate in Residence: The Death Penalty As the Answer to Crime: Costly, Counterproductive and Corrupting*, 36 Santa Clara L. Rev. 1069, 1085-86 (1996) .............................................................................. 112

Stephen Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 Colum. L. Rev. 1538, 1543 (Oct. 1998) ............................................ 60

## INTRODUCTION

It has never been disputed that Micah Brown shot and killed his ex-wife, Stella "Doc" Ray. Even so, a capital murder conviction and a death sentence were far from a foregone conclusion. Proving that Brown shot and killed his ex-wife would not be enough to convict him of capital murder. Rather, the State had to prove that Brown intentionally caused Ray's death while in the course of committing or attempting to commit the offense of obstruction or retaliation, or terroristic threat. And, even if the State were able to prove these aggravating factors beyond a reasonable doubt, a death sentence should not have been the default penalty. The State would then have to prove beyond a reasonable doubt that, despite having no history of violence, Brown was a "future danger," and convince the jury that whatever Brown offered for mitigation, was not enough to warrant a penalty less than death.

The State had much to prove, and Brown had much to offer to fend off a capital conviction and a death sentence. Ineffective, incompetent, and conflicted counsel, however, cleared the way for the prosecution to reach its goal—a death sentence—and prevented Brown from presenting the jury with the information that could have saved his life. Similarly, overzealous prosecutors took full advantage of counsel's deficits and steamrolled their way to a capital murder conviction and death sentence, in part by misleading and inflaming the jury. As a result, Brown's capital murder conviction and death sentence were the product multiple constitutional violations.

At the time of the killing, Brown was laboring under severe mental illness, untreated trauma and sexual abuse, suicidality, emotional dysregulation and decompensation, and a complete lack of coping mechanisms due to a dysfunctional childhood in a violent home. All of this had an amplified effect on Brown due to his undiagnosed and untreated Autism Spectrum Disorder ("ASD"), Attention Deficit Hyperactivity Disorder ("ADHD"), and polysubstance drug addiction as a result of attempts to self-medicate his congenital neurodevelopmental disorders.

To fully understand Brown's conduct, it was necessary for his counsel to explain his background and history, including his mental health issues, and contextualize his actions, words and even appearance. Unfortunately, the individuals charged with saving Brown's life unreasonably failed to investigate, discover and present crucial, readily available information that would have had a reasonable probability of changing the outcome of the proceedings. Instead, Brown's trial counsel opted for the not only risky and offensive, but also legally and factually insupportable defense that, "the bitch deserved it." Due to incompetence and conflicting interests, State prosecutors that were willing to resort to improper argument and inflammatory remarks, and a denial of process at the state appellate levels, Brown's conviction and death sentence are constitutionally infirm and must be overturned.

## STATEMENT OF JURISDICTION AND GROUNDS FOR RELIEF

This Petition for Writ of Habeas Corpus ("Petition") is submitted pursuant to 28 U.S.C. § 2254, and this Court has jurisdiction under 28 U.S.C. §§ 2241 and 2254. Mr. Brown is confined under a sentence of death pursuant to the judgment of the 354th District Court of Hunt County, Texas, and is in the custody of Respondent at the Texas Department of Criminal Justice ("TDCJ"), Polunsky Unit in Livingston, Texas.

By this Petition, Brown asserts that his conviction and sentence violate the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution. For the reasons set forth in the Petition, Brown asks that this Court grant the writ and any other appropriate relief.

## PROCEDURAL HISTORY AND FACTS

### A.  PROCEDURAL HISTORY

Petitioner, Micah Brown, was indicted for capital murder for the intentional or knowing killing of Stella "Doc" Ray, his ex-wife, while in the course of committing obstruction, retaliation, or terroristic threat on July 20, 2011. Brown pleaded not guilty to the charge in cause number 27,742.

Following a jury trial, at which he testified, Brown was found guilty of capital murder and was sentenced to death on June 3, 2013.

An appeal was automatic and on September 16, 2015, the Texas Court of Criminal Appeals ("CCA") affirmed the judgement of the trial court. *Brown v. State*, No. AP-77,019, 2015 WL 5453765 (Tex. Crim. App. Sept. 16, 2015). No petition for writ of certiorari was filed.

On January 15, 2015, Brown properly filed an initial application for a writ of habeas corpus in the trial court. Following an evidentiary hearing, the trial court entered Findings of Fact and Conclusions of Law ("FFCL"), virtually identical to those proposed by the State, which recommended that relief be denied. On September 11, 2019, the CCA adopted the trial court's findings of fact and conclusions of law and denied relief. *Ex parte Micah Crofford Brown*, WR-85,341-01, 2019 WL 4317041 (Tex. Crim. App. Sept. 11, 2019). Brown has not filed any other state or federal challenges to the validity of his conviction or sentence.

### B. STATEMENT OF FACTS

Micah Brown and the Stella "Doc" Ray, were married in 2007. 43 RR 82.[1] Ray had a son from a previous marriage with Tracy Williams, Wesley Williams, who was born in 1995. 40 RR 121. Brown and Ray divorced in 2010. 43 RR 87. During the marriage, Brown and Ray had two children, Colten, a boy, and Willow, a girl. 43 RR 7. Pursuant to the divorce decree, Brown Ray were named joint managing conservators of the children. 53RR (Def's Ex. 3). After the divorce, Ray received her doctoral degree, 45 RR 38, found a job as a professor in Marshall, Texas, and planned to move there with the children. 40 RR 170.

---

[1] Record citations are as follows: trial reporter's record (vol) RR (pg); trial clerk's record (vol) CR (pg); state habeas reporter's record from hearings (vol) WRR (pg); state habeas clerk's record (vol) WCR (pg).

A couple weeks before Ray's death, her ex-husband, Tracy Williams, moved into Ray's home. 43 RR 94. On July 15, 2011, less than a week before Ray was killed, Brown got into an argument with Williams in Ray's home. 43 RR 96. The argument resulted in Williams grabbing Brown, placing him in a choke hold, and "chok[ing him] out." 43 RR 97. Brown was humiliated because this occurred in front of his children, and felt hurt that Ray did nothing to stop it. 43 RR 98-99. After getting choked out by Williams in front of his kids, Brown stopped going to work, stopped sleeping, and became visibly depressed. 43 RR 107-08; 45 RR 57-59. He would stay up all night—doing meth and fishing until the sun came up. 43 RR 107.

On July 16, Brown was feeling suicidal and told Ray that he was going to take his own life. 43 RR 100. Ray called emergency services to request a welfare check on Brown. 43 RR 178. When officers responded to Brown's house, they observed a sawed-off shotgun in plain sight and arrested Brown for possession of an illegal weapon. 41 RR 73-77. Brown was released the next day. 43 RR 72.

On the evening of July 19, Brown went to Ray's house to pick up his kids. 43 RR 109. Brown and Ray got into an argument about the prior incident when Williams choked Brown, *id.,* and as a result, Ray stopped Brown from taking their son, Colton. 43 RR 110. After Brown left, the police came to the house, 40 RR 129, and Ray filed a report of family violence. 40 RR 225-26. Ray claimed Brown hit her and their son, Colten. 40 RR 128-30. Brown admitted to "flicking" Ray's nose, but denied hitting her or Colten. 43 RR 112. The family violence report had not been assigned to an officer at the time of the murder, nor had Brown been notified of the report by the police or Ray. 41 RR 30; 43 RR 112.

On July 20, Brown decided to commit suicide. 43 RR 115-18. Brown went to Ray's house to see the children one last time, but Ray was not home. 43 RR 120. Brown entered the house to take Ray's stash of marijuana, and he also took Wesley's shotgun. 43 RR 119-23. He frantically

continued to try to get ahold of Ray so he could see his children before he killed himself. 43 RR 118-19. Brown sawed off the shotgun to use for his suicide. 43 RR 123-25.

That evening, Brown saw Ray's car drive by his house. 43 RR 128. Brown followed in his car and had Ray pull over. 39 RR 39. He could see that she was on the phone. 43 RR 133. Brown kept asking her, "Where are the kids?" 40 RR 37-42; 43 RR 131. As a police car pulled up behind them, Brown pointed the sawed-off shotgun at Ray and shot her. 43 RR 134. The flash from the shotgun was captured on the responding officer's dashboard video camera. 39 RR 71. The officer found Ray in the driver's seat, shot in the head. Colten and Willow were in the back seat. 40 RR 47- 54.

After the shooting, Brown fled the scene and spent the night hiding from police. 43 RR 144-49. The next morning he went to a saddlery and asked an employee for a drink of water. 43 RR 151-52. Another employee called the police. 41 RR 144. Brown was then peaceably taken into custody. 41 RR 152; 42 RR 29.

Following his arrest, Brown gave an uncounseled statement to Detective Felicia White of the Greenville Police Department ("GPD"). 40 RR 196-206. The day after that, Brown was interviewed in the county jail by a Dallas television station, again without counsel. 40 RR 215.

## RELEVANT HABEAS LAW

### A.  STATEMENT REGARDING PROCEDURAL DEFENSES

#### 1.  Exhaustion

Federal habeas petitioners are generally required to exhaust state court remedies in order to obtain relief in federal court. 28 U.S.C. § 2254(b)(1)(A). Brown submits that each of his claims is either exhausted or falls within the exceptions to the exhaustion requirement as permitted by law.

### 2.  Procedural default

Because procedural default—like non-exhaustion—is a defense subject to waiver and forfeiture rules, Brown reserves his right to respond on reply or traverse to any arguments that State may assert. *See* 28 U.S.C. § 2243; Rule 5(e), Rules Governing § 2254 Cases in the District Courts ("Habeas Rules").

### B.  REQUEST FOR PROCEDURES AVAILABLE UNDER THE RELEVANT STATUTES AND RULES

The habeas corpus statutes and rules, and the cases applying them, "reduce uncertainty, avoid unfair surprise, minimize disparate treatment of similar cases, and thereby help all litigants, including the State, whose interests in 'finality' such rules often further." *Lonchar v. Thomas*, 517 U.S. 314, 324 (1996). That is, the statutes and rules provide for due process in habeas proceedings. Ad hoc departures from those processes for purposes of expediency may violate due process. *See id.* at 320-22. Brown requests this Court afford him the procedures set forth in 28 U.S.C. § 2243, paragraphs 6 and 7, and Habeas Rules 5(e), 6, 7, and 8. Filing the traverse or reply under § 2243 and Habeas Rule 5(e) completes the pleading stage, *Walker v. Johnston*, 312 U.S. 275, 284 (1941) ("petition and traverse ... should be [treated] as together constituting the application for the writ"), and this Court will be able to determine whether discovery is required because Brown has placed specific allegations before the Court that may entitle him to relief if they are fully developed. *Bracy v. Gramley*, 520 U.S. 899, 908-909 (1997). After that determination, the Court will be in a position to determine whether the record should be expanded, Habeas Rule 7(a), after which point Habeas Rule 8(a) requires a habeas court to consider whether, in light of "any materials submitted under Rule 7 ... an evidentiary hearing is warranted." *See Wellons v. Hall*, 558 U.S. 220, 226 (2010) (per curiam); *Townsend v. Sain*, 372 U.S. 293, 312-19 (1963), *overruled in part on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5 (1992); *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).

To the extent this Court may find the State met its pleading burden related to procedural defenses such as non-exhaustion, the application of 28 U.S.C. § 2254(d)(1) or (d)(2) to specific items of evidence, or procedural default, this Court should grant a hearing so that Brown can present evidence in support of avoidance, traverse, or exceptions to those defenses. *See Jenkins v. Anderson*, 447 U.S. 231, 234 n.1 (1980); *see also Trevino v. Thaler*, 569 U.S. 413, 428-29 (2013); *Schlup v. Delo*, 513 U.S. 298, 332 (1995); *Gallow v. Cooper*, 570 U.S. 933 (June 27, 2013) (Breyer, J.) (statement regarding denial of certiorari).

### C. APPLICATION OF AEDPA

Title 28, Section 2254 of the U.S. Code governs this Petition. It empowers this Court to grant a writ of habeas corpus if it finds a "violation of the Constitution" in Brown's conviction and sentence. 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") creates a constraint on that authority "with respect to any claim that was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). If that condition is satisfied, relief

> shall not be granted . . . unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

To make a determination under § 2254(d), this Court must look to "the last reasoned state court decision." *Woodfox v. Cain*, 772 F.3d 358, 369 n.46 (5th Cir. 2014); *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

Brown does not have the burden to prove that § 2254(d)'s bar is inapplicable or satisfied. On its face, § 2254(d) allocates no burden to the parties. By contrast, other AEDPA provisions do, including § 2254(d)'s companion provision § 2254(e)(1). The repeated, explicit allocation of

burdens of proof to the petitioner in other parts of AEDPA, and especially § 2254(e)(1), shows Congress's intent not to assign a burden to petitioners. *Lindh v. Murphy*, 521 U.S. 320, 330 (1997); *see also id.* at 344.

AEDPA imposes a "highly deferential standard for evaluating state-court rulings." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). However, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (*Miller-El I*).

"AEDPA does not require a federal habeas court to adopt any one methodology." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). However, the Supreme Court has consistently considered the merits of the petitioner's constitutional claim first and then proceeded to a close reading of the state court's decision. *See* Randy Hertz & James Liebman, *Federal Habeas Corpus Practice and Procedure* § 32.3 at 1930-31 (7th ed. 2017).

Thus, Brown respectfully requests this Court exercise its discretion to use a similar methodology.

### D.  THE STATE COURT DECISION CANNOT BE AFFORDED DEFERENCE

The threshold question for application of § 2254(d) is whether the state court has "adjudicated" a federal claim "on the merits." A claim is "adjudicated on the merits" only when a "'court ... [has] heard and *evaluated* the evidence and the parties' substantive arguments'" and ruled "based on the intrinsic right and wrong of the matter." *Johnson v. Williams*, 568 U.S. 289, 302-03 (2013) (quoting Adjudication, Black's Law Dictionary (9th ed. 2009)) (emphasis added). Where a state court has adjudicated "some but not all claims" on the merits, federal courts may presume that the state court adjudicated the unaddressed claims, but this presumption is rebuttable. *Id.* at 298, 300-01.

The presumption applies only "in the absence of any indication or state-law procedural principles to the contrary." *Williams*, 568 U.S. at 298 (quoting *Harrington v. Richter*, 562 U.S. 86, 99 (2011)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Richter*, 562 U.S. at 99-100.

### 1. Brown's claims presented to the state habeas court were not adjudicated on the merits.

Brown's claims presented in state habeas proceedings were denied without the benefit of a judge-made decision on the merits. The state habeas court signed off on the State's proposed findings nearly verbatim without making an independent determination of facts.[2] Moreover, the findings are contrary to the record and internally contradictory. *See* Pet. Ex. 1 (*Ex parte Micah Brown,* Motion to Remand) at 14-17. Similarly, the state habeas court failed to make the necessary findings to resolve the issues Brown presented. *Id.* at 11-14.

The CCA wholly adopted the state habeas court's (i.e., the State's) factual findings and legal conclusions. If the state courts' wholesale adoption of the prosecutors' findings and conclusions is treated as an adjudication on the merits, as a practical matter this Court would have to defer to the prosecutor in evaluating constitutional challenges to Brown's conviction and sentence. *See* 28 U.S.C. § 2254(d). Such a result undermines the adversarial system on which this nation's criminal justice system rests, is incompatible with due process and the heightened scrutiny required of capital cases, and indeed with AEDPA itself. *See, e.g., Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (emphasizing the importance of federal habeas review after AEDPA and denouncing "abandonment or abdication of judicial review").

---

[2] The state habeas court's findings contained only approximately a dozen words that were added or changed from the State's proposal. *See* Pet. Ex. 1 (*Ex parte Micah Brown,* Motion to Remand) at 23.

Because the state habeas court's signed order adopted the State's proposed order uncritically and nearly verbatim, this Court should conclude that the claims fairly presented to the state habeas court were not adjudicated on the merits within the meaning of § 2254(d).[3]

Further, though the CCA stated it conducted its own "review," it failed to give any reasoned decision or analysis contrary to the requirement it do so. *See Ex parte Brown*, 2019 WL 4317041 *1 (Tex. Crim. App. Sept. 11, 2019). Without any additional discussion or analysis, there can be no assurance the CCA considered the additional facts that the trial court improperly excluded that were outside of those contained in the severely curtailed and incomplete record, as discussed immediately below. Without a "last reasoned decision" to look to, this court may review these claims de novo.

As the state court's factual findings were not supported by the record and its legal findings were contrary to federal law, this Court should consider the claims below de novo. The state decision below cannot be afforded the deference that AEDPA assumes in federal habeas proceedings for the following reasons.

### 2. Brown was denied due process of law when the state habeas court denied his ability to adequately develop material facts in support of his claims

The state habeas court denied Brown the right to full process in his evidentiary hearing by denying him the right to fully develop the facts that supported his claims and then ruling against him on those very claims. *See* Pet. Ex. 1 at 10-11. Brown has been diagnosed with Autism Spectrum Disorder ("ASD"). The State never contested Brown's ASD diagnosis in its answer or in the Order

---

[3] Brown acknowledges that the Fifth Circuit has adhered to its pre-*Johnson* interpretation of "adjudication on the merits" as any state court ruling that does not decide a claim on procedural grounds without regard to "the quality of the process." *Freeney v. Davis*, 737 F. App'x 198, 204-05 (5th Cir. 2018) (denying COA and adhering to *Valdez v. Cockrell*, 274 F.3d 941, 952 (5th Cir. 2001)). The Circuit has also applied § 2254(d) to state court factual findings that adopt verbatim prosecution-drafted proposed orders. *See, e.g., Green v. Thaler*, 699 F.3d 404, 416 (5th Cir. 2012); *Nichols v. Scott*, 69 F.3d 1255, 1277 (5th Cir. 1995). That precedent is wrongly decided.

Designating Contested Issues. However, at the evidentiary hearing the State argued the diagnosis was incorrect and invalid. When Brown's counsel tried to call an additional expert to respond to the State's new claims and corroborate the ASD diagnosis, the State filed a motion to exclude the testimony for lack of notice, despite Brown's counsel only just having received notice of the State's new contentions. After a short hearing, 6 WRR 5-25, the State's motion was granted and Brown's counsel were denied the opportunity to respond to the State's allegations, for which the State had no expert testimony and no basis in fact. And after denying Brown's counsel the ability to adequately respond to the allegations Brown did not have ASD, the court found that Brown did not sufficiently demonstrate that he had ASD. 14 WCR 5732 (Finding of Fact #122).

The State of Texas failed to ensure Brown received adequate post-conviction process in compliance with its own law, in violation of Brown's Fifth and Fourteenth Amendment rights. *See* CLAIM 10. Under Texas law, the trial court was required to admit evidence that would resolve the disputed factual issues, whether in the form of an evidentiary hearing, affidavit, deposition, interrogatory, live testimony, or the court's personal recollection. Tex. Code Crim. Proc. art. 11.071 § 9(a), (b); *see also Goldberg v. Kelly*, 397 U.S. 254, 268 (1970) ("The fundamental requisite of due process of law is the opportunity to be heard.") (internal citations omitted).

### 3. A claim that fundamentally alters the facts or law in support of a claim presented in state court is not an adjudicated claim

A claim raised in a federal petition has not been adjudicated on the merits if the claim differs from that presented to the state courts. *Johnson*, 568 U.S. at 302–03. For example, where the federal petition "fundamentally alter[s]" the claim actually adjudicated by the state court. *See Vazquez v. Hillery*, 474 U.S. 254, 257-58 (1986); *Pinholster*, 563 U.S. at 187 n.11 (2011); *Moore v. Quarterman*, 491 F.3d 213, 220 (5th Cir. 2007). In these circumstances, the claim is "new" and unexhausted as pleaded in federal court, and not subject to § 2254(d).

11

#### 4.   The presumption of adjudication may be rebutted for other reasons.

In addition, *Johnson* provided a "non-exhaustive list" of explanations that would serve to rebut the presumption of adjudication, including, where a state court: (1) may have "inadvertently overlooked" the federal claim, 568 U.S. at 303; (2) applied a state standard that is "in at least some circumstances . . . *less* protective" or "quite different from the federal standard," *Id.* at 301 (emphasis in original); (3) or disregarded the federal claim based upon a belief that the federal claim was not fairly presented, *Id.* at 302–03. *See Bennett v. Superintendent Graterford SCI*, 886 F.3d 268, 282-83 (3d Cir. 2018). If a petitioner shows that one of these reasons explains the failure to address the claim, then § 2254(d) no longer applies to the claim.

### E.   SECTION 2254(d)(1) & (d)(2).

If § 2254(d) applies, it does not sink Brown's claims. The Supreme Court has cautioned that § 2254(d) "does not preclude relief." *Miller-El I*, 537 U.S. at 324.

"Deciding whether [the] state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of fact requires the federal habeas court to 'train its attention on the particular reasons— both legal and factual—why state courts rejected [the] state prisoner's federal claims.'" *Wilson*, 138 S. Ct. at 1191-92. The federal habeas court "reviews the specific reasons given by the state court," *id.* at 1192, and should not "imagine what might have been the state court's supportive reasoning," *id.* at 1195. A federal court may not apply deference to the many reasons the state court did not use. *E.g., Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

For claims governed by multi-prong rules, a state court's unreasonable application of federal law on any one prong of the rule is sufficient to satisfy section 2254(d)(1) for state court rulings on any other prongs. *See Panetti v. Quarterman*, 551 U.S. 930, 953-54 (2007). Section 2254(d) review must be based on the state court record. *See Pinholster*, 563 U.S. at 181.

### 1.  Review under § 2254(d)(1).

Section 2254(d)(1) allows a habeas remedy for adjudicated claims if a court finds the adjudication "resulted in a decision that was contrary to or involved an unreasonable application" of clearly established Supreme Court law. These two prongs have independent force. *Fratta v. Quarterman*, 536 F.3d 485, 504-05 (5th Cir. 2008).

A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases." *Williams (Terry) v. Taylor*, 529 U.S. 362, 405 (2000); *Lafler v. Cooper*, 566 U.S. 156, 173 (2012) (finding state court applied rule "contrary to" clearly established law).

The "unreasonable application" prong "does not require . . . some nearly identical factual pattern before a legal rule must be applied." *Panetti*, 551 U.S. at 953 (internal quotation marks and citation omitted). "Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts 'different from those of the case in which the principle was announced.'" *Id.* (citation omitted).

### 2.  Review under § 2254(d)(2).

An "unreasonable determination of the facts" may be in a state court's findings of fact and conclusions of law on the merits. *See, e.g., Miller-El v. Dretke (Miller-El II)*, 545 U.S. 231, 236-37 (2005); *Brumfield v. Cain*, 576 U.S. 305, 307 (2015); *Guidry v. Dretke*, 397 F.3d 306, 325–27, 329 (5th Cir. 2005). Section 2254(d)(2) is satisfied where a state court merits determination is "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340. In addition, a factual determination infected by an erroneous legal standard is unreasonable. *McManus v. Neal*, 779 F.3d 634, 660 n.12 (7th Cir. 2015); *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

Finally, § 2254(d)(2) operates independently from § 2254(e)(1). It is wrong "to merge the independent requirements of §§ 2254(d)(2) and (e)(1)." *Miller-El I*, 537 U.S. at 341. "AEDPA does not require petitioner to prove that a decision is objectively unreasonable by clear and convincing evidence." *Miller-El I*, 537 U.S. at 341.

Section 2254(e)(1) should be addressed at the fact-development phase of the litigation. Unlike (d)(2), (e)(1) is not limited to the state court record.

CLAIMS FOR RELIEF

**CLAIM 1.**      **BROWN RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT PHASE OF HIS CAPITAL TRIAL BECAUSE COUNSEL FAILED TO INVESTIGATE, DEVELOP, AND PRESENT CRITICAL EVIDENCE THAT WOULD HAVE UNDERMINED THE CAPITAL MURDER CHARGE, AMONG OTHER SIGNIFICANT ERRORS**

Brown's trial counsel failed to investigate and prepare for the guilt phase of trial and consequently neglected to develop and present *any* viable defense to capital murder for the death of Stella Ray. Counsel's deficient performance in that respect and others, both individually and cumulatively, prejudiced Brown and thereby violated his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution. Brown incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. This claim was partially raised below, but it was not adjudicated on the merits and this court may review it de novo.[1] To the degree this claim was not raised, this Court may review the merits of any procedurally defaulted claim because Brown can demonstrate both cause for any failure to properly exhaust a particular claim and prejudice from the constitutional violation. *See, e.g., Martinez v. Ryan*, 566 U.S. 1, 9 (2012). Alternatively, because the

---

[1] Brown respectfully reserves the right to timely request a limited stay and abeyance pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005), in order to return to state court to present any unexhausted claims, should the need to do so become apparent. *See Nickleson v. Stephens* 803 f3d 748, 754 (5th Cir. 2015).

14

state court failed to meet the standards that would trigger deference under 28 U.S.C. § 2254(d) on the claim that was presented, this Court may still consider it de novo.

## A. INTRODUCTION

In defense counsel Toby Wilkinson's opening statements to the jury at the start of Brown's guilt-phase proceedings, he told jurors that the question at the heart of the trial was not one of guilt, but of the circumstances under which the crime occurred. Wilkinson, Brown's appointed attorney, told the jurors, "This is not a whodunit case. [Brown] did it. I'm not going to lie to you. I'm not going to say he didn't. He did. He shot Stella. He took her life. This is a whydunit case, why did he do it." 40 RR 34.

Because Brown's defense team never conducted an adequate investigation into mitigation, they were unable to present a case to the jury of why Brown committed the crime, and why that crime was not capital murder as charged by the State. Without that investigation, combined with the uninformed and indefensible decision not to have their client evaluated by appropriate experts despite copious red flags for neurodevelopmental disorders, mental illness, childhood sexual abuse, family dysfunction, abuse, and neglect, Brown's defense counsel failed to tell a counter-narrative to the State's version of events or present any evidence to undermine the State's charges. Counsel performed well below the standards of prevailing professional norms and thereby prejudiced Brown; as such, Brown's conviction and sentence are unreliable and in violation of his constitutional right to effective assistance. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).

## B. BACKGROUND ON BROWN'S CAPITAL TRIAL PROCEEDINGS

Brown was indicted for capital murder on October 28, 2011 for intentionally or knowingly killing Stella Ray in the course of committing obstruction, retaliation, or terroristic threat. 1 CR 35, 120. Toby Wilkinson was appointed to represent Brown on December 15, 2011. 1 CR 43. Wilkinson filed a motion to have an investigator, James Smith, appointed on the same day as his

own appointment. 1 CR 41. He filed four boilerplate motions in limine two weeks after appointment which failed to include any specifics regarding the record in Brown's case, were duplicative, and one was unsigned. 1 CR 58-66. Second chair Katherine Ferguson was not appointed until two months later, on February 16, 2012. 1 CR 74. Brown's case was the first capital case she had ever tried, and so she relied upon Wilkinson for direction and decision-making. 12 WRR 76-77.

Wilkinson filed an ex parte request for funding for a psychiatrist to assist if Brown's "sanity will be a significant factor at trial." 1 CR 201. Additionally on November 6, 2012, nearly a year after his appointment, Wilkinson filed a motion to request a hearing to determine whether Brown was intellectually disabled ("ID") and thus ineligible for the death penalty under *Atkins v. Virginia,* 536 U.S. 304 (2002). The motion misstated the name of the defendant, naming "Penry" as Wilkinson's client.[5] Further, because Wilkinson submitted this motion without ever having had Brown evaluated by an expert, there was no factual support for such a motion, which the State pointed out in pretrial hearings. 11 RR 54. Instead of pursuing even an as-yet-unsubstantiated ID claim, Wilkinson failed to remove the death penalty from jury consideration and told the court that he was preserving the *Atkins* defense for the punishment phase, after Brown was found guilty of a capital crime. 11 RR 54.

Significantly, Wilkinson did not request a change of venue, despite extensive news coverage of the murder and the trial. *See* CLAIM 4(B), *infra.* He also failed to file motions in limine to exclude Brown's confession to a police investigator or to exclude Brown's interview with a news channel before counsel had been appointed. *See* CLAIM 6, *infra.*

Crucially, lead counsel Wilkinson fundamentally failed to provide guidance, information, and direction for the duration of Brown's state trial proceedings. He failed to understand the

---

[5] The motions Wilkinson filed were form motions. In one he sought funding for a Dr. Natarajan, who was never utilized. In another he used the wrong client's name. When asked by state habeas counsel if he read motions before filing, Wilkinson said, "Sometimes you do; sometimes you don't, ma'am." 10 WRR 20.

importance of an investigation before settling on a defense. As a result, the defense theory presented at trial for the death of Ray was fundamentally flawed. Counsel conceded that Brown had killed Ray, but argued that he had done so because, as defense counsel stated, "the bitch deserved it." 9 WRR 23; 10 WRR 138 ("And, once again, our strategy was because of her attitude, being a bitch and the drugs, he did this."). However, such a defense supported, rather than undermined, the capital charges against Brown. Counsel's focus should have been on undercutting the evidence that Brown had the requisite mens rea to support the capital murder charge, which rested on the State proving beyond a reasonable doubt that: 1. Brown knowingly or intentionally committed murder; and 2. Brown intentionally committed the murder *in the course of* committing or attempting to commit obstruction, retaliation, or terroristic threat. 44 RR 8; Tex. Penal Code § 19.03(a)(2). As defined, the capital charge required that murder serve as a secondary consequence of the primary pursuit of retaliation, obstruction, or terroristic threat. *Id.* Therefore, it was imperative defense counsel impress upon the jury that Brown killed Ray for reasons other than police presence or police involvement; Brown committed murder, but if it was for purely personal reasons, or out of uncontrolled rage or emotional decompensation due to his history with the victim, then it was not capital murder. Then it was simply, and tragically, murder.

Unfortunately, rather than directly addressing and undermining the capital charge, Brown's trial counsel chose a strategy which could fit neatly within the State's narrative of events without disrupting it (retaliation or obstruction are not incongruent with "the bitch deserved it"). Moreover, rather than undertaking an investigation to inform strategic decisions about a defense, counsel chose a theory of the crime for which they could not offer evidence or testimony. Trial counsel had scant hope of such success with such a legally flawed and factually dubious strategy. But having settled on that strategy early on, counsel tailored their subsequent investigative decisions to bolstering that approach, leaving them—and Brown—ill-equipped for trial when the time came.

17

### 1.   Deficient representation from the beginning

In Wilkinson's opening statement, he informed the jury that Brown's case was not a "whodunit," but a "whydunit." There was no question before the jury whether Brown killed Ray. As such, counsel desperately needed to explain the "whydunit" based on strategic, informed choices after a thorough investigation, and offer the jury evidence of why that "whydunit" undermined the State's capital murder allegations. That effort should have started the day counsel was appointed.

In 2003, the American Bar Association ("ABA") updated its Guidelines for the Appointment and Performance in Death Penalty Cases, which it had drafted and revised over the course of several decades and which reflected a national consensus among capital defense practitioners as to the obligations of counsel for capital cases. *See* ABA Guidelines for the Appointment and Performance in Death Penalty Cases, 31 Hofstra L. Rev. 913 (2003) ("ABA Guideline(s)"). The Supreme Court has consistently relied upon guidelines from the ABA to inform the inquiry into reasonable professional conduct. *See e.g., Padilla v. Kentucky*, 559 U.S. 356, 366–67 (2010) ("We long have recognized that the '[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable. . . .'" (omissions in original) (quoting *Strickland*, 466 U.S. at 688)); *see also, e.g., Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam).

Sixth Amendment precedent and professional guidelines required Wilkinson to expeditiously investigate all guilt/innocence issues, even if the client admits or concedes guilt. *See* ABA Guideline 10.7 A.1; *see e.g., Lockett v. Anderson*, 230 F.3d 695, 713 (5th Cir. 2000) (faulting counsel for failing to investigate a background of mental illness which called into question the reliability a confession). Moreover, that investigation should not be narrowly construed, as counsel "should conduct a prompt investigation of the circumstances of the case and *explore all avenues* leading to facts relevant to the merits of the case and the penalty." ABA Standards for Criminal

Justice, Standard 4-4.1 (emphases added); *see also Ex parte Gonzales*, 204 S.W.3d 391, 400-01 (Tex. Crim. App. 2006) (Cochran, J., concurring) ("It is not sufficient to inquire generally and leave it up to the defendant to raise topics or respond to open-ended questions. Like a doctor, [capital] defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic."). Counsel however failed to provide effective representation from the beginning.

Wilkinson's obligation to conduct a thorough, independent investigation relating to the issues of both guilt and penalty began the day he accepted appointment to Brown's case. *See* ABA Guideline 10.7 A. But to begin that investigation, it was imperative for Wilkinson to meet with Brown as soon as possible. "Barring exceptional circumstances, an interview of the client should be conducted within 24 hours of initial counsel's entry into the case." ABA Guideline 10(B)(1). Contrary to professional norms, Brown rarely ever saw his lead attorney before jury selection for his trial began. 43 RR at 160. Wilkinson admitted that he did not meet with Brown until two months after his appointment. 9 WRR 46. He then waited another eight months after his first jail visit to visit Brown a second time. 9 WRR 50.

Once a case is deemed capital and a second attorney is appointed, lead counsel bears overall responsibility for the performance of the entire defense team. ABA Guideline 10.4(B). As soon as possible after counsel is appointed and/or capital charges are brought, lead counsel should seek to appoint "a. at least one mitigation specialist and one fact investigator; and b. at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments." ABA Guideline 10.4(B)(2) cmt. When Ferguson was appointed to Brown's case, she was aware that the ABA and applicable standards of capital representation required a mitigation specialist be retained as soon as possible to assist in Brown's defense. But despite what was required of Wilkinson as lead counsel, and despite the crucially important role a

19

mitigation specialist fills on capital defense team, Wilkinson failed to understand what professional norms required of him, and he failed to understand what a mitigation specialist was or did. 9 WRR 39-40; 12 WCR 4824-35 (DX 39 Writ Hr'g). He emailed the Texas Defender Service[6] saying:

> I have a death penalty case that will get national attention so I am crossing all myT's etc My 2nd chair and I are at isuue over "our" Mitigation expert.
>
> A Mitigation Expert is usually an investigator.
>
> 1) do you have to have a college degree to be a ME?
> 2) Specialised courses?
> 3) can prior death penalty case experience qualify you as a ME? If so how much?
> 4) who designates someone as a ME?
> 5) can on attorney be his/her own ME?
> 6) What are the minimnum requirements to be a ME?
> & What else should I look for?

12 WCR 4826 (DX 39 Writ Hr'g) [*sic*]. Wilkinson later stated he believed that having hired fact investigator James Smith was sufficient, as Wilkinson had trained him. 9 WRR 77, 95. Despite not knowing what a mitigation specialist did, Wilkinson believed he had sufficiently trained Smith to do the work that Wilkinson did not fundamentally understand.

As Wilkinson resisted conducting a proper mitigation investigation, Ferguson was forced to enlist the assistance of the Texas Defender Service to convince Wilkinson to hire a mitigation specialist. 10 WRR 252. Due to this disagreement and Wilkinson's ignorance, it was 8 months after Wilkinson's appointment that Ferguson finally contacted Maureen Griffin, a mitigation specialist with over sixteen years of experience, in July 2012. 1 WCR 228 (St. Habeas Appl. Ex. 8 [Griffin Aff. ¶ 7]). Griffin was officially appointed to work as Brown's mitigation specialist in October 2012, a

---

[6] Texas Defender Service maintains the Capital Trial Project, which "trains, consults, and provides trial teams with litigation support." http://texasdefender.org/programs/capital-trial-project

mere three months prior to the start of Brown's trial, at the time scheduled for January 2013. *Id.* This was also *ten months* after Wilkinson was first appointed to represent Brown.

Of course, retaining a mitigation specialist is only the start of how a capital mitigation team should function; working as a team by listening and responding to team members is required to meet professional norms of representation. *See* ABA Guideline 10.4. cmt.[7] After her first visit with Brown, Ms. Griffin observed that Brown had a flat affect and memory problems. 1 WCR 231(St. Habeas Appl. Ex. 8 [Griffin Aff. ¶ 18]). Sensing something was "off" about Brown, Griffin recommended to Ferguson that Brown be evaluated by an expert psychologist or neuropsychologist. *Id.* Because of her experience with someone in her family, Griffin suspected that Brown had Asperger's Syndrome, a lifelong neurodevelopmental disorder. *Id.* Moreover, when discussing a plea agreement with Brown, Griffin specifically told Ferguson she suspected Brown had ASD. 12 WRR 186. However, Ferguson admitted she probably didn't take note such information, as she was merely concerned with Brown's "competency" to accept a plea agreement and would not have understood how ASD would have mattered in such a context. 12 WRR 235-36.

Despite the importance of a mitigation investigator to the team, Griffin was systematically excluded from the ongoing fact investigations and team decisions. Griffin did not receive any memos or reports from the defense fact investigator. 12 WRR 138. Wilkinson failed to act as lead counsel; he was unaware of what communication there was between the mitigation specialist and fact investigator, 10 WRR 47-48, and that he didn't even know if Griffin was ever provided with discovery. 10 WRR 50.

---

[7] "[T]he provision of high quality legal representation in capital cases requires a team approach that combines the different skills, experience, and perspectives of several disciplines. The team approach enhances the quality of representation by expanding the knowledge base available to prepare and present the case . . ." ABA Guideline 10.4 cmt.

21

Meanwhile, Smith, the only member of the team that Wilkinson spoke with regularly, failed to do even the bare minimum expected of a fact investigator. By the time Griffin was hired, Smith had spoken to a number of witnesses. Smith never had any formal training (and Wilkinson was unable to give him any, having none himself). Smith's interview notes were never more than a few lines long. They did not delve into Brown's psychosocial background, they did not record sensitive details about his childhood, his abuse, or his family dynamics. Smith's interviews and subsequent memos with witnesses were negligent at best, and harmful at worst. An example of the entirety of one of his memos of his interview with Kenneth Humble: "I've known Brown since he was a child. He and my son are very good friends. Never thought he would do something like this. It tears me apart to think about it. Don't think can help him. I know too many things." 8 WCR 2953 (SX 24 Writ Hr'g). There was no follow up to this interview.

Smith was not only failing to conduct an adequate investigation, he was "burning" witnesses. ("I believe Mr. Smith was detrimental to the mitigation investigation because he spoke very briefly to witnesses, which resulted in many being unwilling to be more thoroughly interviewed by me, a trained mitigation specialist. Mr. Smith seemed to take limited notes and, to my knowledge, produced no reports of his conversations with mitigation witnesses." 1 WCR 230 (St. Habeas Appl. Ex. 8 [Griffin Aff. ¶ 14]). Mitigation specialists are skilled at developing strong bonds with witnesses over time to gather sensitive, embarrassing information and secure assistance with defense counsel. The ABA Guidelines require a mitigation specialist because in probing sensitive, embarrassing information regarding a client or his family's history, "it can be difficult to elicit such information." ABA Guideline 4.1 cmt. For instance, in one email discussing the family's fears about trial and sensitive information being revealed, Griffin said to Ferguson that she was "just trying to keep everyone on board and stable." 2 WCR 385 (St. Habeas Appl. Ex 21 at 3). But unlike what Griffin was trying to do with witnesses, cultivate relationships and discover sensitive information, Smith

would interview a witness once, and then they would refuse to speak further or in more depth with Griffin. 1 WCR 230 (St. Habeas Appl. Ex. 8 [Griffin Aff. ¶ 14]).

As Wilkinson did not understand the role or importance of a mitigation specialist, he failed Brown from the day he was assigned. Not only was the investigation inadequate and cursory, Wilkinson and Smith used distant relations who did not know Brown well as an excuse to take a trip to California rather than undertake investigation into intergenerational trauma, a family history of sexual abuse, mental illness, neurocognitive disorders, or substance abuse. 10 WRR 128-32. They did not communicate with Griffin about their trial strategies or thoughts about possible defenses. 12 WRR 174. An expert retained for future dangerousness received a copy of the case file before the mitigation specialist. 9 WRR 105. Therefore, one of the experts at the trial never even benefitted from the work of a mitigation specialist in order to inform his opinions. 11 WRR 47-48; 13 WCR 5130 (DX 61 Writ Hr'g [Cunningham Decl. ¶ 29]).

Due to the failures in communication and team management and engagement, in November 2012 Griffin wrote a letter to counsel in which she attempted to withdraw from Brown's case, citing counsel's failure to communicate with her. 2 WCR 404-05 (St. Habeas Appl. Ex. 21 at 22-23). The letter laid out the lack of leadership and teamwork plaguing the Brown defense members. After sending her fee schedule in August and requesting discovery, Griffin was not appointed until October 9, 2012. *Id.* She did not receive discovery until nearly a full three months after she requested it. *Id.* Griffin repeatedly requested team meetings to plan an investigation and prepare for trial, but at the time of her letter on November 20, 2012 there had been no team meetings and almost no responses to her requests for greater communication. *Id.*

Griffin's resignation letter prompted Wilkinson to finally reach out to her. He was angry, and gave her excuses as to why he hadn't been working with her; one of them was that his son had

died, which appears to have been either a drastic miscommunication or completely untrue.[8] 12 WRR 176. However, the letter forced defense counsel to schedule its first and *only* team meeting with Griffin. Based on promises by counsel that communication and teamwork would improve, Griffin agreed to continue working on Brown's case. 1 WCR 228-29 (St. Habeas Appl. Ex. 8 [Griffin Aff. ¶ 10]); 2 WCR 399 (St. Habeas Appl. Ex. 21 at 17).

But despite trial counsel's previous promises that communication would improve among the defense team, the team was irrevocably fractured. Griffin thought she was being replaced by one of the experts retained by counsel for the penalty phase. 12 WRR at 187-88. Griffin was not the only team member who struggled to work with Wilkinson. Co-counsel Ferguson stated Wilkinson often didn't make time for her, didn't respond to her emails and phone calls, cut meetings short, and despite this being her first capital case, she sometimes had to make decisions without his input. 12 WRR 31-32, 77. In fact, there was never a single team meeting with the whole team, and even though Ferguson was hoping for more direction on her first capital case, Wilkinson was uninterested in fulfilling his role as the team leader. 12 WRR 76-77, 102. Ferguson was often disappointed that when she and Wilkinson did meet or speak, it was perfunctory and undirected. 12 WRR 76-77.

Ultimately, Ferguson never acted in response to Griffin's suggestion that Brown had ASD, nor was Brown given a psychological or neuropsychological evaluation. *See* 2 WCR 393, 395 (St. Habeas Appl. Ex. 21 at 11, 13). Griffin asked Ferguson, "Do you have a shrink on this case other than Dr. Love? I'm thinking someone who can pitch his childhood and put his reactions toward Doc [Ray] in perspective." 2 WCR 395 (St. Habeas Appl. Ex. 21 at 13). Griffin also raised testing Brown multiple times by a psychologist or a neuropsychologist for various reasons including the inconsistencies in his memory and his atypical relationship with women. *Id.*; 10 WRR 259-60; 11

---

[8] There is no mention of his son dying anywhere in the record. Wilkinson's other excuse, that he had heart surgery, was reflected in the record. *See* 2 CR 349-50.

WRR 42. Yet when Ferguson asked Wilkinson if they should do testing, Wilkinson said no. 10 WRR 256. Wilkinson admitted that unless Griffin had essentially known the outcome of the testing, he "probably wouldn't do it." 10 WRR 27 ("like you don't go looking for things unless you're - - like you don't ask a question if you don't know the answer"). Thus, by the time Brown's trial began, Wilkinson had uncovered none of the information that would have helped him present a supportable defense to capital murder, nor was he prepared for a comprehensive mitigation presentation.

### 2.   Failure to identify clear red flags and obvious leads

Instead of embracing a deficient defense strategy early on, trial counsel could have conducted an adequate investigation—one that involved exploring alternative narratives for the crime, speaking with one or more experts who could have helped explore viable defenses to the charges, and cultivating relationships with witnesses familiar with details regarding Brown's history of trauma, developmental delays, and mental illness. Armed with that information, counsel would then have been able to prepare a legally and factually defensible challenge to the charge of capital murder.

Counsel cannot "abandon[] their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins*, 539 U.S. at 524. Fundamentally, as the Supreme Court has recognized, "[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." *Hinton v. Alabama*, 571 U.S. 263, 273 (2014).

From the outset, Wilkinson had a wealth of information on valuable avenues of investigation for Brown's guilt-phase proceedings. Based on documentation alone, it was clear that Brown was spiraling out of control at the time of the murder. Had counsel merely followed an investigation down the paths that the overwhelming evidence before them laid out, they would have found themselves at a defense that directly addressed the charges.

First, Wilkinson later alleged there was no evidence that Brown had psychological issues. This was a shocking statement. Despite the *Atkins* motion he filed before Brown was ever evaluated, Wilkinson stated he would never just have a client evaluated without a clear need, and claimed that no witnesses identified any psychological issues to him that indicated a need. 10 WRR 14-16. In fact, in defending his decision not have Brown evaluated, Wilkinson stated that Brown's records, "didn't show anything other than suicide," and "you can be depressed and not have a psychological problem." 10 WRR 15.

Brown could not have evidenced a clearer need to be evaluated. While a thorough background for Brown is below, *see* CLAIM 2(B), counsel was aware, at the barest minimum, there were glaring signs of mental illness and psychiatric distress. 10 WRR 15, 23. Brown had been hospitalized for addiction twice, and diagnosed with depression and anxiety. 13 WCR 3181-82 (SX 39 Writ Hr'g). He had attempted suicide only six months before the crime, for which he was hospitalized for several days. *Id.* Moreover, Brown was suicidal *the day of the crime.* He spent the day drinking, trying to get up the courage to hang himself. 43 RR 118. And the signs of mental illness were not new; Brown's sister reported that Brown had such severe social anxiety he would throw up every morning before going to work. 8 WRR 92-93; 9 WCR 3413 (DX 1 Writ Hr'g [Mesibov Aff. ¶ 57]). There was clear evidence that Brown had mental illness and needed to be evaluated by experts to assist counsel in making informed decisions about his case.

Second, counsel was informed that Brown had experienced childhood trauma that causes adverse, lifelong effects. Brown was sexually abused over the course of a summer by his older stepbrother. 47 RR 45-46. He never received counseling or help to deal with the abuse. The ABA Guidelines specifically highlight the need to hire a mental-health expert to examine sexual abuse, as having suffered such trauma is "common among persons convicted of violent offenses on death row." ABA Guideline 4.1 cmt. The Supreme Court has specifically pointed to sexual abuse as the

type of "powerful" evidence that, where counsel fails to present it to the jury, the client is prejudiced. *Wiggins*, 539 U.S. at 534–35. Counsel should have consulted experts who could evaluate Brown to opine not just generally on what child abuse could do (as Dr. Cunningham did in the penalty phase of Brown's trial, *see* CLAIM 2(D)), but specifically what effect that childhood abuse and trauma had on Brown up to, and including the day of the crime.

Third, there were numerous red flags that Brown had neurodevelopmental disorders—indeed, Brown's counsel were on notice after Griffin, the oft-ignored mitigation specialist who worked on the Brown case for a limited time, informed Ferguson she believed Brown had Asperger's Syndrome. 1 WCR 231 (St. Habeas Appl. Ex. 8 [Griffin Aff. ¶ 18]) ("Because the testing of clients is common practice, I recommended to Ms. Ferguson that Brown be examined for mental health and neuropsychological issues. My impression was that Brown had Asperger's Syndrome. My husband's eldest son has Asperger's Syndrome, which was one reason I was attuned to its symptoms."). Despite being on notice their client likely had a neurodevelopmental disorder, counsel never had Brown evaluated. Counsel was also aware that Brown already had one neurodevelopmental disorder, ADHD, from Dr. Cunningham, 47 RR 42-43, therefore, it was more than likely that Brown suffered additional neurodevelopmental disorders that would have only been discovered by expert evaluation. Brown's teachers stated in school records that he struggled with attention and maturity. 9 WCR 3604, 3606 (DX 24 Writ Hr'g at 1, 3). His family reported he was less mature than his peers, was extremely concrete and literal, and used childish humor that was not age appropriate. 53 RR 26-27; 8 WRR 35; 11WRR 88, 93-94; 13 WCR 5443 (DX 85 Writ Hr'g [Thomas Decl. ¶ 22]). He had polysubstance abuse disorder that had started when he was in his teens, most likely an effort to self-medicate. 47 RR 60. If counsel had merely spent the necessary time with Brown required by professional norms to ensure effective representation, they would have recognized that there was something abnormal in his flat affect, his inability to answer compound

27

questions or discuss abstract concepts. 1 WCR 231(St. Habeas Appl. Ex. 8 [Griffin Aff. ¶ 18]); 12 WRR 153, 166-67.

Fourth, there was evidence of clear emotional and psychological dysregulation at the time of the murder. If counsel had taken the time to discuss Brown's testimony with him and prepare for it before deciding whether or not he should take the stand, they would have learned that he had large gaps in his memory from that day, 43 RR 190, he could not explain his actions or his thinking, 43 RR 141, 180, and his intense suicidality and dysregulation, foregoing sleep for days, 43 RR 118, 126, should have alerted counsel that Brown needed to be evaluated by mental health, trauma, and neuropsychological experts to assist in a defense to intentional or knowing capital murder.

Finally, there was evidence that because of a younger brother with a severe developmental disability that required constant care, Brown grew up without the parental support kids need, 11 WRR 88, 128-29, 132, especially a kid who was small and under-developed for his age (and thus was relentlessly bullied, 47 RR 96; 11 WRR 94). Brown's late development—emotionally and physically—like his father and grandfather also suggested a genetic disorder, something counsel was on notice of because of the mitigation specialist but did not investigate. 9 WCR 3566 (DX 21 Writ Hr'g). Finally, counsel knew the work Brown had been doing with neon signs for years, but never investigated his potential exposure to toxins at work and their effect on his brain. 43 RR 92. Without an investigation that would have helped jurors understand the how and why leading up the murder, counsel was never able to give context to Brown's actions, statements, and motivations. They were unable to make informed decision about Brown testifying during the trial. 12 WRR 189.[9] And

---

[9] When Griffin was asked if she would have recommended Brown taking the stand, she said "not without putting Micah's behavior in context." 12 WRR 189. Because of how Brown communicates and presents himself due to ASD, Griffin had concerns the jury would misinterpret his testimony as being "cold and unfeeling," as opposed to his attempt to operate within the limits of a neurodevelopmental disorder. *Id.* Brown's testimony was later used against him by the State in his

counsel hamstrung themselves from making an uninformed, strategic choice about a viable defense, such that the defense offered in opening statements counsel themselves ultimately undermined in their case in chief, and by closing arguments were forced to abandon entirely. They were never able to explain how Ray's murder, while tragic, did not amount to capital murder.

### C. BECAUSE BROWN'S COUNSEL FAILED TO CONDUCT AN ADEQUATE INVESTIGATION BEFORE SETTLING ON A RISKY AND INSUPPORTABLE DEFENSE, COUNSEL'S REPRESENTATION AT TRIAL WAS DEFICIENT

A criminal defendant has the right to effective assistance of counsel during the defense's opening statement. *See, e.g., Wilson v. Mazzuca*, 570 F.3d 490, 502–07 (2d Cir. 2009) (finding counsel ineffective in part due to failures during opening statement). However, Wilkinson's opening statement worked to Brown's detriment, as he undermined the defense's credibility from the outset by making promises he did not keep. *See Strickland*, 466 U.S. at 688; s*ee, e.g., Anderson v. Butler*, 858 F.2d 16, 17 (1st Cir. 1988) ("[L]ittle is more damaging than to fail to produce important evidence that ha[s] been promised in an opening."). Lead counsel assured jurors in his opening that though Brown committed the murder, the defense could establish Brown was pushed to do so by a woman so "mean-spirited" her "playing with fire" constituted a defense to capital murder. 40 RR 34-35. That defense never materialized. Counsel's flawed strategy uninformed by an investigation resulted in a jury never understanding the "whydunit" counsel assured them they would hear.

Defense counsel's errors included not just an opening that made promises of a risky, insupportable defense it could not keep. Counsel failed to remotely meet the prevailing standards required to provide constitutionally-required effective capital representation. At trial, counsel's lack of an investigation-supported strategy led to Brown's unreliable and arbitrary capital conviction.

---

punishment-stage proceedings as evidence, just as Griffin predicted, he was cold and unfeeling. *See* CLAIM 2(D), *infra.*

### 1. Failure to contest the State's case

The State had an airtight case that Brown had indeed murdered Ray on July 20, 2011. Brown confessed to police investigator Felicia White after he was arrested on July 21; the State played the videotape of the confession. 40 RR 198. Brown also gave an incriminating interview to CBS Channel 11; that too was played for the jury. 42 RR 106. Moreover, the shooting was captured on the dashcam video of the police officer responding to Ray's 9-1-1 call. 40 RR 63-64.

But while the State could prove the charge that Brown murdered Ray beyond a reasonable doubt, they had nearly no support for the capital murder charge, let alone to enough evidence convince jurors beyond a reasonable doubt. For a murder to become capital murder, a perpetrator must knowingly or intentionally commit murder in the course of retaliation or obstruction. 40 RR 21-22; Tex. Penal Code § 19.03(a)(2). In other words, the perpetrator must be committing murder *not* merely out of selfish impulse, anger at the victim, or psychiatric distress, but in the course of attempting another crime.

The State's case rested on several theories. One was that Brown was retaliating against Ray for a report she had filed against him the day before the murder. 40 RR 203-04. This was undermined by the evidence. Brown was unaware of the filing of the report, and police admitted they had not yet taken action on it. 41 RR 30. Another was that Brown was retaliating against Ray for calling the police several days before the murder about Brown's threats to commit suicide, resulting in Brown's loss of his sawed-off shotgun. 41 RR 76-79. Yet the State was unable to provide evidence that Brown harbored any resentment over the call, 43 RR 45-46; he told the officer who arrested him that he was responsible for the welfare check, as he had only reported to Ray he was suicidal to make her feel guilty. 43 RR 179.

Second, the State claimed that Brown was obstructing the police by killing Ray for calling the police. The support for this theory was merely the sequence of events – Brown stated that he knew

Ray was on the phone with police, and he shot her after the police car arrived. 40 RR 201. Because Brown's statements reiterated this sequence, the State asserted this established mens rea without any evidence to establish it. (The only evidence, from Brown's statement to the investigator, was actually clearly contrary: "[it] was just spur of the moment . . . I just got so mad that I did it." 41 RR 18).

Finally, the State alleged that Brown's consideration of suicide by cop was a "terroristic threat," but the allegation Brown shot Ray in the course of trying to be killed by police was simply not supported by anything admitted at trial. 40 RR 201-02. The evidence showed that Brown shot Ray and then fled the police, 40 RR 81, 104, doing everything possible to avoid police attention, 40 RR 205-06, before he peaceably surrendered. 41 RR 140-41, 186. Indeed, on cross-examination, the State asked Brown whether he knew the police would kill him after he shot Ray. Brown responded that he did not know that, and that he "wouldn't have took off if [he] wanted the cops to shoot [him]." 43 RR 179-80. Moreover, in an interview by a police investigator only shortly after Brown's arrest, in a series of questions about his actions after the shooting, Brown was asked whether he planned on having the police shoot him. Brown replied that after the crime he did not plan to shoot at police officers, but that he "wasn't going to just give up." 9 WCR 3593 (DX 22 Writ Hr'g at 14). Therefore, there was simply no evidence that Brown shot Ray in the course of intentionally of knowingly attempting to die by police fire; regardless of the veracity of Brown's statements, all his actions supported the contrary.

Counsel in capital cases "should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client." ABA Guideline 10.11(L). But having conducted not even a minimally adequate investigation, Wilkinson was in no position to make reasonable, sound, deference-worthy strategic decisions at that time to undermine the State's case for death. And instead of addressing the actual capital charges at issue in Brown's trial, Brown's defense counsel chose a risky and insupportable defense: "the bitch deserved it." 9 WRR 23. In

Wilkinson's opening, he warned the jury that "this lady is dead. We can't change that, and I might have to talk bad about her." 40 RR 33. As an example, Wilkinson invoked Thomas Jefferson owning slaves, and told the jury if you asked Saddam Hussein's family members, "[H]e was a wonderful person." 40 RR 33.

Wilkinson told the jury in his opening that, despite his client pleading not guilty, Brown was guilty of shooting Ray. However, Wilkinson assured the jury that "when the evidence is all out, you'll understand that this lady was a mean-spirited, coldhearted lady." 40 RR 34. Wilkinson claimed that the evidence would show that at the time of her murder there were drugs in Ray's system. *Id.* And because Ray "pushed [Brown's] buttons . . . unfortunately, it turned out bad for her." *Id.* Wilkinson hammered in that the murder was because of Ray's instigation, as "this lady played with fire and this man's heart regarding his kids until she got burned." 40 RR 35. In fact, Ray could have prevented her own murder, according to Wilkinson: "all she had to do was one thing, one thing, tell that young man where their children were" and Ray would still be alive. *Id.*

Therefore, from the start, Wilkinson failed to give an alternate story to undermine the State's charges. In fact, Wilkinson bolstered them: both parties stated that Brown was acting out in retaliation against his wife. After admitting guilt, Brown's counsel told the jury it could meet the significant burden of placing the responsibility for murder on the murder victim. It did not, however, present an alternate narrative to the State's charges; Brown could have been both obstructing police abilities to help Ray and retaliating against Ray for contacting the police *because* "the bitch deserved it."

The State called the police officers who responded to Ray's 911 calls, those who appeared at the scene, the police officer who responded to a welfare check on Brown the day before, and the investigator who questioned Brown and took Brown's statement. In questioning these witnesses, defense counsels' attempts to even tell a coherent narrative that Ray instigated her own murder was

muddled and confused. Wilkinson asked the 911-responding officer and a police investigator whether Ray's car was cheap or expensive. 40 RR 81; 42 RR 80. Wilkinson also asked the officer to speculate whether people "sometimes flat-out lie" during 911 calls, which did not detract from the charges or add to the defense, as Brown didn't hear the call. 40 RR 93. In the absence of concrete facts or even support that Ray specifically was "mean-spirited" or "playing with fire," Wilkinson also asked a police officer if he had "ever encountered situations where one spouse is lying about a domestic violence" to gain the upper hand in a custody dispute, but was never able to establish that Ray was lying or that occurred in Brown's case. 41 RR 11.

Defense counsel also fixated on a number of issues that did not even support the defense's theory of the crime. One seemed to be discrediting Ray's teenage son, who took the stand during the guilt phase. 40 RR 136. This was unlikely to garner sympathy for the defense from jurors. Wilkinson accused Wesley of "trying to be evasive" and "not telling the truth." 40 RR 138-39. Wilkinson asked the teenage boy if he knew what his mother had told Brown, asking him to speculate, 40 RR 145 ("Q: But she could have? A: She could have, but I don't know if she did"), and then scolded him after a later question, "Well, if you don't know, then don't speculate, please." 40 RR 145. Wilkinson asked Wesley if his mother should have been driving the two young children, Willow and Colten, around while on drugs, and tried to question him about where his mother obtained drugs and which ones. 40 RR 144, 151-56. All questions Wesley could not answer. The cross-examination therefore became more an opportunity for defense counsel to inform the victim's son that his mother was a bad person than eliciting any facts about the victim's actual behavior.

Inexplicably, a large percentage of defense counsel questions of State witnesses focused on whether or not Ray was out driving because she looking for Wesley the night he was murdered. 40 RR 141, 175-76, 180; 41 RR 24-25, 38-39. It is unclear what this pervasive line of questioning during guilt phase was designed to do, as it neither addressed the charges nor bolstered the defense. Defense

counsel also persisted asking Ray's family about her supposed driving around high with the children in the car, 40 RR 143, 183, when the only evidence provided by the medical examiner was that while marijuana was in Ray's system it could have gotten there any time within the last 30 days before the murder. 41 RR 54. Wilkinson also mistook the medical examiner for someone else while she was on the stand. 41 RR 59-61.

Ultimately, without a comprehensive investigation, or even a seemingly cursory review of the facts in the case, Brown's defense settled on a strategy which was not only insupportable, but also most likely offensive to jurors in light of the evidence submitted by the State during trial. A "bitch-deserved-it" defense is a questionable strategy, but it was particularly problematic here, where defense counsel's complete failure to investigate meant that Brown's trial counsel was unable to craft an alternative narrative to the State's presentation of the crime. Simply, an ill-informed decision to forego a thorough investigation of Brown's mental health history, 10 WRR 27, the neurodevelopmental disorder flagged by the mitigation specialist, childhood sexual abuse, 43 RR 157, and emotional decompensation, 8 WCR 3180-83 (SX 39 Writ Hr'g), led to an equally ill-informed defense. Thus, defense counsel effectively ensured the jury would hear the evidence at trial from only the State's perspective, with no competing narrative from the defense. Without an investigation to support the "whydunit" of the crime, defense counsel never presented the jury the context of Brown's psychological and neurological decompensation in the days leading up to the crime. Counsel simply failed to provide jurors with a frame through which to view facts the State presented.

For instance, defense counsel were unable to explain to the jury the neurodevelopmental and mental health issues which drove Brown's drug abuse. 41 RR 82. Defense counsel were unable to explain the echoes of Brown's own abuse that resulted in his altercation with the victim's ex-husband, 40 RR 126-27, the custodial dispute that led to Ray filing a police report, 40 RR 126-31,

and his constant phone calls and home visits to the victim. 40 RR 124, 126, 214. Defense counsel were also unable to explain for the jury why Brown's suicidality and dysregulated fight-or-flight responses resulted in the calls to the victim's mother the night of Ray's death, 40 RR 168-69, or why Brown wrote a letter to another prisoner in jail about the murder that was likely a result his deep-seated insecurities about weakness and emasculation due to the unaddressed and untreated trauma of childhood sexual abuse. 43 RR 157. Without a defense strategy conceived after an investigation and based on what that investigation found, Brown's counsel could offer no facts or testimony to support any defense, leaving the State's narrative as the only one the jury heard.

### 2. Failure to mount a coherent defense

The ABA Guidelines obligate counsel to "consider witnesses familiar with and evidence . . . that . . . would rebut or explain evidence presented by the prosecutor" and "expert and lay witnesses along with supporting documentation . . . to rebut or explain evidence presented by the prosecutor." ABA Guideline 10.11(F)(1),(2). There is no evidence that it was a strategic decision to conduct at most a perfunctory investigation of the State's experts and their reports. Counsel's failure was deficient.

The defense case lasted only a single day. Brown's trial counsel called four lay witnesses: Brown's sister, Brown's mother, Brown's neighbor Loren Homerstead, and Brown himself. Brown's mother and sister elicited considerably more evidence that Ray was a good mother and kind person under defense questioning than the State had presented in its case-in-chief. Counsel's strategy was unclear; they may have been called to the stand merely to testify Brown was a devoted father. However, as a result of their testimony, the jury learned that both Brenda Crofford, Brown's mother, and Taylor Harmon, Brown's sister, had an ongoing relationship with Ray after the divorce. 43 RR 9, 49, 54. Harmon told the jury that the day before she was murdered Ray was driving around town looking for Brown because she was concerned about him being suicidal. 43 RR 13. Harmon also

testified that after the divorce Ray was very accommodating of custody of the children with Brown and his family, 43 RR 17; additionally Ray would bring food and groceries over to Brown's house and give Brown rides because he did not have car. 43 RR 28-29. Harmon admitted that the night of Ray's murder she requested police protection for herself and her mother because "I never knew what would – I mean, if he did that, what would happen." 43 RR 22-23.

Brenda Crofford testified that the week of the murder, she had called Ray for assistance locating Brown because she was concerned for Brown's safety. 43 RR 54. She also did not portray Ray as "mean-spirited" or "cold-hearted," as promised by counsel. 40 RR 34. She admitted that she had asked Ray the day of the murder not to answer Brown's phone calls anymore because Crofford was concerned that Brown needed to "get over" Ray before Ray moved. 43 RR 54-55. When the State asked, "Why didn't you just tell the Defendant that you told [Ray] not to answer his phone calls?" Crofford answered simply, "I don't know. I don't – I don't know." 43 RR 56.

It's unclear what evidence the defense hoped to elicit by questioning Loren Homerstead. However, calling her as a witness allowed the State to enter into evidence the phone calls and text messages that Brown sent Homerstead after the murder. 43 RR 70-71, 75. Those calls and text messages, while unsympathetic, were sent while Brown was experiencing the shock and trauma of the murder itself, but were presented for the jury without any context for Brown's actions.

Defense counsel intended Brown's testimony to be the centerpiece of their case. Instead, it may have been their defense strategy's undoing. His testimony was that he still blamed Ray for getting killed, he failed to support a "bitch-deserved-it" defense by offering any evidence of why, exactly, Ray deserved it, or even why he perceived she had "pushed [him] to a limit," and failed to effectively undermine the State's charges that he killed Ray in the course of retaliation or obstruction. 43 RR 164-65.

Notably, Brown did not request to testify, and would have chosen not to do so. However, trial counsel told Brown that he needed to testify, as whether he was sentenced to death or not rested on his shoulders. The problem was that, in order for the jurors to determine that the crime was not capital, counsel needed two things to happen. The jury not only needed to accept as true Brown's testimony, but also needed to conclude that his testimony was sufficient to establish that he had "snapped," and that the sequence of events over the previous days and the evening of the murder did not support the retaliation or obstruction charges beyond a reasonable doubt. That counsel failed to corroborate Brown's testimony was one major hurdle to success. Anything, especially expert testimony, that corroborated Brown's testimony buttressed the defense as a whole.[10] That counsel also did little to challenge the State's theory or give context to Brown's behaviors practically ensured that his testimony would fall flat.

Yet with so much at stake, Ferguson only spent at most two hours preparing Brown the night before he took the stand. At Ferguson's prompting, Brown testified that they had only first discussed his testimony at 7:30 the night before he took the stand. 43 RR 203-04. Indeed, Brown admitted he had barely spoken with counsel before jury selection the previous month, so counsel wouldn't have had the familiarity with Brown to make an informed decision about the wisdom of putting him on the stand. 43 RR 160. As with every other decision made by counsel, Brown's testimony was a choice without adequate investigation and based on a strategy unsupported by fact.

Brown's testimony under defense questioning undermined counsel's attempts to establish that Ray instigated her own murder, as it never made clear what Ray did to "deserve it." The questioning was scattered and unfocused. For instance, it wasn't clear why counsel asked Brown to

---

[10] *See, e.g., Cunningham v. Wong*, 704 F.3d 1143, 1168 (9th Cir. 2013) (Pregerson, J., concurring in part and dissenting in part) (recognizing that "[a]n expert opinion is one from an objective third party that carries an aura of special reliability and trustworthiness," while a defendant's testimony "may be viewed by the jury as a desperate attempt to save himself" (internal quotation marks omitted)).

clarify that his note to a fellow inmate about the crime was true but wasn't meant for other people to read. 43 RR 157-59.

The State's questioning painted an incredibly unsympathetic portrait of Brown for the jurors. Because counsel made a grave error in putting Brown on the stand—as well as failing to prepare him for the stand, during the course of which they would have discovered he should not testify—the State was able to use his testimony against him in both the guilt *and* punishment phase. *See* CLAIMS 5 and 6 below. Brown told the prosecutor that because "[s]ome things [Ray] had done pushed me to a limit to where I took her life," he believed it was Ray's fault he shot her. 43 RR 164-65.

However, if counsel had spoken with Brown at length about the crime and followed the red flags that were evident in his statements, counsel would have realized those flags pointed to a dire need to have Brown evaluated by neuropsychologists or psychologists about his decompensation at the time of the murder. Under defense questioning, Brown admitted he had been doing meth and not sleeping for two nights before the altercation with Ray which resulted in her filing a police report, three nights before the murder. 43 RR 107-12. Brown was extremely suicidal immediately prior to the murder – he spent that day drinking trying to get up enough courage to hang himself. 43 RR 118. He spoke most emotionally about the physical incident he had with the victim's ex-husband. While Brown admitted he started the altercation with Tracy that his kids witnessed, he testified that being choked out by Tracy "ruined any pride that I had. It was very humiliating, and it hurt." 43 RR 98-99. His reaction to seeing Ray on the phone just before he short her was the only other emotion he was able to articulate on the stand; once he saw Ray drive past, and then saw her on the phone, he said that he was "hurt and angry" when he "found out that she wasn't – wasn't answering the phone [that day] because she didn't want to talk to me." 43 RR 135. He admitted he was "agitated and paranoid" that day. 43 RR 126. Brown clarified to the State that he "didn't *decide* to go shoot" Ray, 43 RR 187 (emphasis added), and when asked why he called Ray's mother, Brown said, "I don't

know why I did any of this stuff." 43 RR 141. He later reiterated under questioning about his actions, "I don't know why I did a lot of things." 43 RR 180. He stated that the day of the murder he was later told he was visited by and spoke with his father, but he couldn't recall anything about the conversation. 43 RR 190.

Within Brown's testimony was evidence of extreme emotional dysregulation in reaction to fraught interpersonal interaction, especially regarding masculinity, control and perceptions of weakness, which should have alerted counsel that Brown may have been experiencing the ongoing effects of the trauma of childhood sexual abuse and a profound sense of powerlessness. Brown's inability to articulate why he did things the day of the murder, or even events that occurred, should have alerted counsel to his severe dissociation and mental distress. His limited emotional range should have been a red flag for ASD. His suicidality evidenced clear mental illness, and indicated his brain was in a state of hyperarousal (otherwise known as fight-or-flight response), resulting in his acting out without understanding why. If counsel had spoken at length with Brown, they would have recognized the necessity of an adequate investigation, full utilization of a mitigation investigator, and psychological and neurological evaluation to be able to effectively explain to the jury the "whydunit" of the crime.

Defense counsel rested after Brown's testimony. Trial counsel were thus asking the jury to believe Brown and to find that there was no intentional or knowing obstruction or retaliation despite having presented no evidence explaining *why* Brown's crime was an intensely personal, trauma-fueled act that had nothing to do with the involvement of state actors in their official duties. The defense also completely ignored evidence that Brown had been decompensating for months and especially the days prior to the murder, but critically was never anything but polite and amenable to the police that he encountered during that time. Rather, he was acting out on those he knew intimately, based on perceived threats stemming from the lifelong effects of negligence and abuse.

By failing to investigate, have Brown evaluated by a psychologist or neuropsychologist, or consulting an expert about Brown's chaotic and traumatic history, defense counsel relied on the only evidence they introduced to undermine the capital charges: their own speculative questions posed to State witnesses and Brown's testimony that Ray instigated her own murder.

Finally, without having presented anything to support it, even counsel abandoned its defense in closing argument. In response to the State pointing out that there had been no "bad Stella" presented to the jury, 43 RR 29-30, Wilkinson told the jury:

> [D]on't get confused or distracted on, well, was Stella really a good person or was Stella really a bad person. We're not saying. We don't know; but it doesn't matter because the reality is if Stella was Mother Teresa, it still wouldn't matter because what you have to look at in this charge is what was Brown's thought process, what he was thinking. He told you what he was thinking. He told you what he was thinking six, seven times to different people consistently.

43 RR 46-47.

Had counsel investigated Brown's life, discovered he was on the autism spectrum, explained the lifelong effects of childhood sexual abuse and trauma to the jury, as well as the effects of Brown's suicidality on his actions, they could have countered the State's charge that Brown was acting out of perceived actions by police officers. Rather, they would have understood the murder as a deeply personal act that was committed by an individual that had been spiraling out of control and whose suicidality had led him to lashing out at those around him and murder. This was not strategy, as there had been no investigation to inform these decisions. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins*, 539 U.S. at 521–22.

### 3. The "whydunnit" the jury never heard

In Wilkinson's opening statement, he told the jury this murder was not a whodunit, as Brown murdered Ray, but a whydunit. Defense counsel then failed to provide that why to the jury, allowing the State to prove their case without contention. Had counsel investigated as required under prevailing professional norms, they would have found substantial evidence that Ray's murder was not committed in the course of obstructing or retaliating for police involvement, but rather as an extremely personal act that was driven by abuse, psychological decompensation, and brain dysregulation.

First, Brown suffered from lifelong neurodevelopmental disorders, Autism Spectrum Disorder (ASD) and Attention Deficit Hyperactivity Disorder (ADHD). ASD fundamentally affected every aspect of Brown's life – how he understood and tried to navigate the world around him. *See* 14 WCR 5464 (DX 87 Writ Hr'g at 15). Unfortunately, those who have ASD have difficulty with managing social interactions, reading and portraying "appropriate" emotional reactions as easily (and as expected by) neurotypical people, and with verbal and non-verbal communication. They often exhibit repetitive behaviors and have trouble managing change. Brown's symptoms are typical of those with ASD: delayed social development throughout his life, difficulty understand other people's perspectives and expectations, a lack of social insight, and "mind blindness," and inability to understand that other people have different thoughts, perspectives, and experiences. Brown also needed structure and routine to manage his anxiety. Moreover, being on the spectrum meant that Brown was more likely to suffer, as he did, from ADHD, anxiety, depression, and suicidal ideation.

Because counsel never had Brown evaluated, or simply met with him long enough to have recognized there was something atypical or "off" about him, they were unable to explain to the jury the impacts that ASD had on Brown's interrogation, news interview, and testimony. Brown struggles to understand compound questions or processes language quickly or reliably. He also cannot intuit

41

what a person wants to hear as opposed to what is being asked of him; he answers questions literally and directly, without giving context himself. Crucially, Brown's difficulty with receiving and responding to verbal prompts is masked by being agreeable in order to cover a lack of understanding. 14 WCR 5464 (DX 87 Writ Hr'g at 15). Therefore, the jury never understood that Brown often simply agreed with interrogators because he did not have the skills or ability to process the question or intuit what was actually being asked of him.

When the State asked Brown a series of questions about whether he thought the crime was Ray's fault, Brown's inability to describe nuance or understand and describe the larger-picture context meant that he was backed into a verbal corner and thus eventually assented. His first answer to the question about blaming Ray was, "It's not really a yes or no question," followed by "It's hard for me to say yes or no," and then eventually he just agreed with the prosecutor, "I guess so, yes, ma'am." 43 RR 165. Brown was also unable to show the emotion a neurotypical person would expect, and tended to give concrete answers to questions, which made him appear cold and calculated. For instance, the jury was unaware why ASD would have led Brown to respond to a reporter's inquiry as to why he killed with Ray with a flat-affected "I wanted her dead." 44 RR 27-28, 9 WCR 3466 (DX 15 at 21 Writ Hr'g). Without an ASD framework with which to view Brown's responses, the jury was left with only the State's narrative that Brown was an unrepentant, vindictive murderer, rather than a neurodivergent person who so failed to have a grasp on or understanding of language, social situations, and other people's perceptions of him that he made no attempt to shield himself from blame or opprobrium.

Counsels' lack of investigation meant they were unable to present and explain an ASD diagnosis to assist the jury in understanding the crime. The jury did not have the benefit of any context for Brown, who had never previously been violent, suddenly and dramatically acting out:

> An all-consuming preoccupation with circumscribed interests and the denial of access to those interests may serve as a reliable trigger for violence (Barry-Walsh & Mullen, 2004). Haskins and Silva (2006) posit that circumscribed interests combined with deficits in Theory of Mind (ToM) and Weak Central Coherence may result in the development of intense and fixated interests uninhibited by future consequences and social norms that result in criminal behavior. For example, in Brown's case, he perceived his children moving away with his ex-wife as losing his children, who had served as an anchor in his daily routine. That development, coupled with his inability to see the larger picture of legal custody and the agreement outlined in his divorce decree, resulted in him over-reacting to the upcoming change in visitation that would result from the move.

14 WCR 5454-55 (DX 87 Writ Hr'g at 5-6). With an understanding of Brown's mental state, there is a reasonable probability one juror would have found that Ray's murder was not in the course of obstruction, retaliation, or terroristic threat. Counsel's ineffectiveness resulted in a guilty verdict that is unreliable and arbitrary.

Second, because counsel failed to investigate and explain Brown's history of trauma, they were unable to explain Brown's acts as within the scope of the adverse effects many boys suffer from childhood sexual assault at the hands of another male.[11] Generally, boys who experience sexual assault at the hands of other boys experience lifelong insecurity over their masculinity and strength. Brown never received counseling or assistance to deal with the sexual assault, retaining those insecurities into adulthood. Notably, Brown repeatedly mentions the incident of Tracy choking him out in front of his children as precipitating the chain of events that resulted in Ray's murder. Effective counsel could have explained to the jury that such an incident would have directly targeted Brown's insecurities, leading to a downward emotional spiral and resulting in his perceived need to act out in hypermasculine ways to reassert his strength and masculinity. Therefore, Brown's threats to Tracy, Ray, and their families, and Ray's ultimate murder, were about addressing a deep-seated trauma and

---

[11] *See* Dr. Matthew Mendel's Preliminary Report, Pet. Ex. 2.

fear of weakness and emasculation that another man was taking Brown's place and taking his children.

Third, had counsel retained a neuropsychologist,[12] they could have explained to the jury that Brown's suicidality in the night of the murder meant that he was in a heightened fight-or-flight mode before Ray's car ever drove past his house. Because suicidality and homicidality trigger the same parts of the brain, Brown was acting out due to being in a heightened fight-or-flight mode, with the dysregulated hyper-vigilant and hyper-aggressive behavior that can accompany such a state. Had the jury understood that Brown was acting out personal fears and angers due to his neurological and traumatic state, they would have understood that the murder was not committed with any thought about police involvement, or even a knowing or intentional act. Rather, this was the desperate act of a man who had suffered from lifelong trauma, neurodevelopemental disorders, mental illness, and severe emotional dysregulation at the time of the crime. Ray's murder was case not of capital murder but of interpersonal violence, where a person losing control is takes out personal and intimate insecurities and fears on those closest to them, the only people who could have stoked those feelings in the first place.

Fourth, Griffin alerted counsel to evidence of possible genetic disorders, 2 WCR 392 (St. Habeas Appl. Ex. 21 at 10 ("Matured later than most boys physically and emotionally (as did father and grandfather")), and counsel failed to investigate, given Brown's employment history, whether he had exposure to toxic gasses from time spent working on neon signs.

In a case where counsel concedes guilt in opening statements, it is incumbent on effective counsel to undermine the capital charge in the guilt phase. Defense counsel needed to thoroughly investigate any and all leads, including those that may typically only be used in the penalty phase, in

---

[12] *See* Dr. John Matthew Fabian's Preliminary Report, Pet. Ex. 3.

order to mount a defense. Instead, Brown's trial counsel failed to do the basic investigation required by professional standards, and then presented a defense without a charge, one that was not only insupportable but was likely to alienate jurors against their client. Once the adversarial process between appropriate parties breaks down "and loses its character as a confrontation between adversaries, the constitutional guarantee [of counsel] is violated." *United States. v. Cronic*, 466 U.S. 648, 656–57 (1984). As such, Brown did not receive representation congruent with his constitutional rights and his verdict must be overturned.

### D. BECAUSE OF THEIR INDIVIDUAL AND CUMULATIVE FAILURES TO INVESTIGATE, CONSULT APPROPRIATE EXPERTS, AND PRESENT A COHERENT DEFENSE TO THE CAPITAL CHARGES, BROWN'S ATTORNEYS' ACTIONS CONSTITUTED DEFICIENT PERFORMANCE

"As a bedrock principle in our justice system," Brown has a Sixth Amendment right to effective assistance of counsel. *Martinez*, 132 S.Ct. at 1317. Brown's Sixth Amendment rights were violated because of his trial counsel's deficient performance and the resulting prejudice.

Trial counsel failed to adequately investigate the law and facts related to Brown's guilt-phase proceedings, especially as they related to the capital charge, which required intentional or knowing murder committed *in the course* of retaliation, obstruction, or terroristic threat. 44 RR 8. Instead of conducting a reasonable investigation and then developing a strategy for the defense, counsel conducted an extremely limited investigation with a conflicted investigator, settled on a strategy that failed to even address, let alone undermine, the charges the State brought against Brown, and then tailored subsequent investigative and other decisions to fit within that predetermined, unsupportable, and extremely risky strategy. As described below, had counsel conducted a reasonable investigation and *then* determined trial strategy, taking into account expert consultations, witness interviews, and the like, counsel would have been able to present a reasonable defense and undercut the State's case,

such that there is a reasonable probability that at least one juror would have concluded that Brown was not guilty of capital murder.

Moreover, counsel's deficient performance began from the date of appointment, continued through the cursory investigation period and pretrial motions stage, and then resulted in innumerable errors during trial. This Court must consider those errors cumulatively.

Finally, whether an attorney performed reasonably takes into account the attorney's professional history: the "character of a particular lawyer's experience may shed light in an evaluation of his actual performance." *Cronic*, 466 U.S. at 665. State habeas counsel provided abundant materials related to Wilkerson's history of ineffective assistance of counsel. The state habeas court excluded the proffered impeachment and misconduct evidence, deeming it inadmissible. 10 WRR 208-31, 234. The evidence included:

1. Evidence related to lead trial attorney Wilkinson's forced judicial resignation due to allegations of misconduct (DX 56);

2. Numerous writs for habeas corpus filed by Wilkinson in which he copied and pasted letters from his clients and filed them as legal briefs and otherwise provided deficient post-conviction representation (DX 59);

3. Wilkinson's bar disciplinary file (DX60);

4. Wilkinson's capital list application (DX86C);

5. Multiple news articles detailing Wilkinson's incompetence (titles of which include "10 Ways to Blow a Death Penalty Case" (DX59), "Lawyer Accused of Bilking Texas;" "Attorney Cuts Pastes Convicted Client's Letter," and "Paid By the Word, Apparently") (DX86E-86I);

6. Affidavits from Attorneys Richard Ellis (DX86A) and Don Bailey (DX86B), both of whom represented clients of Wilkinson's with ineffective assistance of counsel

46

claims against him. The affidavits of Bailey and Ellis detail Wilkinson's egregious conduct in other cases, and provide evidence of Wilkinson's poor reputation in the capital defense community. Attorney Bailey averred that that "Wilkinson should never touch another death penalty case." DX86B at 2.

The abundant history of Wilkerson's ineffective assistance provides a lens through which to view his actual deficient performance in Brown's case, a case which may have been a difference of kind (i.e. a habeas petition rather than direct trial representation in the present case) but not degree.

### 1. Trial counsel performed deficiently by failing to conduct a reasonable investigation that resulted in them settling on a legally unsound and ill-considered guilt-phase strategy

One of the primary duties of trial counsel is to conduct a reasonable investigation. *See Kimmelman*, 477 U.S. at 384 (concluding that the adversarial process "will not function properly unless defense counsel has done some investigation into the prosecution's case and in to various defense strategies"); *see also*, e.g., *Profitt v. Waldron*, 831 F.2d 1245, 1249 (5th Cir. 1987) (refusing to indulge presumption of reasonableness as to "tactical" decision that afforded no advantage to the defense). Counsel must "conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case." *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (internal citations omitted). Then, once counsel has conducted a reasonable investigation, counsel may make strategic decisions based upon the information gathered—including the decision to curtail further investigation. Simply put, investigation must precede and inform strategy. *See Wiggins*, 539 U.S. at 521–22. Counsel's decisions warrant deference only when those decisions follow a "thorough investigation of law and facts relevant to plausible options[.]" *Strickland*, 466 at 689–90. Such is not the case when counsel (1) adopts a strategy after an inadequate investigation, and then (2) limits further investigation based on that ill-conceived strategy. *See Wiggins*, 539 U.S. at 521–22; *see e.g. Weeden v. Johnson*, 854 F.3d 1063, 1070 (9th Cir. 2017)

("[C]ounsel could not have reasonably concluded that obtaining a psychological examination would conflict with his trial strategy without first knowing what such an examination would reveal."). With regard to the *Strickland* test for the guilt/innocence phase specifically, the Fifth Circuit has long "recognized that, at a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case. This duty is reflected in the ABA Standards for Criminal Justice, a proper guide for determining what is reasonable under the circumstances." *Nealy v. Cabana*, 764 F.2d 1173, 1177–78 (5th Cir. 1985) (footnotes omitted).

The ABA Guidelines state that counsel should conduct a prompt investigation. Guideline 4-4.1. Critical to that investigation was the expeditious appointment of a mitigation specialist to the case.

> Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence . . . that the defendant may have never disclosed.
>
> They have the clinical skills to recognize such things as congenital, mental or neurological conditions [and] to understand how these conditions may have affected the defendant's development and behavior.

ABA Guideline 4.1 cmt. A key role of the mitigation specialist is to compile "a comprehensive and well-documented psycho-social history of the client," which "analyzes the significance of the information in terms of impact on development, including effect on personality and behavior . . ." *Id.*

In addition to the guidance provided by a mitigation specialist, counsel themselves had a duty to, at a minimum, identify avenues which required further investigation. The Supreme Court has determined that "[i]n assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. Failing

48

to do so cannot be described as a reasonable exercise of professional judgment or as "part of a calculated trial strategy, but is likely the result of either indolence or incompetence." *Anderson v. Johnson*, 338 F.3d 382, 393 (5th Cir. 2003) (internal quotation marks and citation omitted).

In determining whether counsel's performance is deficient, a court must consider not only the evidence already known to counsel, but also whether the known evidence would have lead a reasonable attorney to investigate further. *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005); *Wiggins*, 539 U.S. at 521. As discussed above, *see* CLAIMS 1(B), 2(B), counsel had abundant information on valuable avenues of investigation for Brown's guilt-phase proceedings. First, there were clear signs of severe mental illness, decompensation, and psychiatric distress. Second, counsel was informed that Brown was sexually abused as a child, which would have adversely affected him throughout life. Third, there was considerable evidence that Brown had neurodevelopmental disorder. Fourth, there was evidence of clear emotional and psychological dysregulation at the time of the murder that should have alerted counsel of the need for evaluation of their client by mental health, trauma, and neuropsychological experts to understand his state of mind at the time of the murder. Fifth, Brown's family history should have alerted counsel to possible genetic disorder, while Brown's work with neon signs could have caused toxic exposure that altered his brain functioning.

All of these avenues of investigation would have supported a defense that would have directly addressed the charges Brown was facing by undermined the State's allegation that Brown was acting with the requisite intent for capital murder when he killed Ray.

### 2. Trial counsel's performance fell well below the standards required under prevailing professional norms governing capital representation and their decisions should not be afforded deference

Brown's "counsel's representation fell below an objective standard of reasonableness" as measured "under prevailing professional norms." *Strickland*, 466 U.S. at 688. Generally, the reasonableness of counsels' conduct and choices are afforded the presumption of reasonableness by

reviewing courts, and "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690. There is a presumption that Brown's counsel's conduct "fell within the wide range of reasonable professional assistance." *Id.* at 689. However, Brown's counsel failed to fall within even that wide range of deference; his counsels' decisions resulting from a complete lack of diligence in preparation and investigation are not protected by the presumption in favor of counsel. *See Wiggins,* 539 U.S. at 521-22 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations necessary.") (citing *Strickland,* 466 U.S. at 690-91)); *see also Escamilla v. Stephens,* 749 F.3d 380, 388 (5th Cir. 2014) ("However, the deference afforded counsel's informed, strategic choices, does not eliminate counsel's duty to 'make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'") (internal citations omitted). Very simply, the strength of the presumption that Brown's counsel engaged in sound trial strategy turns directly upon the adequacy of counsel's investigations. Trial counsel in this case failed to conduct almost any, let alone an adequate, investigation.

When representing capital clients, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691; *see also id.* ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."). The Supreme Court later reaffirmed this mandate, holding that trial counsel has an "obligation to conduct a thorough investigation of the defendant's background." *Williams (Terry),* 529 U.S. at 396. Subsequent decisions of the Supreme Court and the Fifth Circuit all affirm the previous holding that counsel is required to conduct a reasonable and adequate

investigation of the defendant's history. *See, e.g., Wiggins,* 539 U.S. at 521 (holding that the "deference owed such strategic judgments" of trial counsel is "defined . . . in terms of the adequacy of the investigations supporting those judgments"); *Walbey v. Quarterman,* 309 F. App'x 795 (5th Cir. 2009) (citing case law "that firmly establishes a duty to investigate the background and character of a capital defendant, along with his family and social circumstances and mental health history"); *see also Adams v. Quarterman,* 324 F. App'x 340 (5th Cir. 2009); *Williams v. Allen,* 542 F.3d 1326, 1329–30 (11th Cir. 2008); *Gray v. Branker,* 529 F.3d 220, 225–26 (4th Cir. 2008).

### 3. Testimony from Brown's trial attorneys at the state evidentiary hearing clearly illustrated the prevailing professional norms for representation were not met

Brown's attorneys themselves testified as to their own deficient performance at an evidentiary hearing during state habeas proceedings. Counsel believed that they were owed deference for their decisions because when faced with evidence discovered only after an investigation undertaken by post-conviction counsel, they may not have used such evidence at trial. This reverses the standard that governs adequate representation for capital counsel. *See Wiggins,* 539 U.S. at 521-22; *see also United States v. Drones,* 218 F.3d 496, 500 (5th Cir. 2000) ("*Strickland* does not require us to defer to decisions that are uninformed by an adequate investigation into the controlling facts and law."). Rather, counsel must first have fully investigated Brown's social history, taken the advice of their mitigation specialist to have Brown evaluated, and followed the leads that innumerable red flags in Brown's background should have alerted them to before they chose a defense strategy.

The Supreme Court has recently reaffirmed counsel's obligation to investigate. In *Andrus v. Texas,* 140 S. Ct. 1875 (U.S. 2020) (per curiam), the Court held that counsel rendered constitutionally deficient performance because counsel "performed almost no mitigation investigation, overlooking vast tranches of mitigating evidence"; "failed adequately to investigate the State's aggravating evidence"; and presented evidence that "backfired by bolstering the State's

51

aggravation case." *Id.* at 1881-82. The similarities to the present case are striking. Because Brown's counsel made an uninformed decision to blame the victim after a cursory fact investigation (and without the benefit of an adequate mitigation investigation), jurors could have seen Brown counsels' defense as fitting neatly within the State's narrative of events, especially as defense counsel had no evidence or testimony to present an alternative, non-capital theory of the crime. Even if Wilkinson's minimal efforts to investigate before trial could be construed as investigation, that does not render the strategy decision reasonable. *See, e.g., Wiggins*, 539 U.S. at 526 (stating that "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision").

Lead counsel was unable to answer affirmatively under repeated questioning whether his representation was governed by any professional principles or standards of representation or not. 9 WRR 9-17. Wilkinson did not believe he was obligated to follow the ABA Guidelines because "I'm not a member of the American Bar Association." 9 WRR 13.

Although lead counsel bears overall responsibility for the performance of the defense team, *see* ABA Guideline 10.4(B) cmt., Wilkinson claimed he had abdicated all responsibility, and named Brown as solely responsible for the fundamentally flawed legal decisions regarding his case:

> Q. [] Involving a client with -- in decision-making is not the same, wouldn't you agree, as being responsible for the ultimate decisions being made in a case?
> A. Okay.
> Q. Wouldn't you agree that strategic decisions are the role of defense counsel and not the defendant?
> A. Ma'am, the defendant -- it's his or her case and I have at times felt strategically like I did not want to do X and the client demanded it. And because it's his or her case, I went with what they said. I argued against it but I did what they said.

9 WRR 17; *accord* 9 WRR 56.

Wilkinson ultimately described the defense theory as "the bitch deserved it." 9 WRR 23. He agreed that "one of the avenues of defense [he] explored was painting Doc as a drug addict who manipulated Brown." 9 WRR 29. Therefore, there were two aspects to such a defense: Ray's drug

use, and Brown's susceptibility to manipulation. As to the first, Wilkinson was aware that investigator James Smith's wife could have testified to Ray's drug use, but he did not call her to the stand. 9 WRR 29. *See* CLAIM 1(B). In fact, he didn't call anyone to testify to this fact. Despite the defense's theory of the case, Wilkinson admitted the defense did not put a single witness on the stand who could have supported their allegations that Ray abused drugs except for Brown. 9 WRR 29. As to the second, when Wilkinson was asked if he would have wanted to know about traits Brown had that would have made him more susceptible to manipulation, he responded that he didn't know what "traits" were, and then refused to answer the question. 9 WRR 24-25. His second chair, Katherine Ferguson, when asked if it would have been helpful to know if Brown has a neurodevelopmental disorder that made him susceptible to manipulation, did not hedge in her answer: "Oh, absolutely." 11 WRR 64.

Counsel have a duty to investigate and present any "medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense." ABA Guidelines 10.11(F)(2). The person most likely to have discovered why Brown was susceptible to manipulation would have been a mitigation specialist. But Wilkinson at the time of the evidentiary hearing still did not understand what a mitigation specialist did:

> A: Ma'am, I don't like the term "mitigation specialist" attached to an investigator. To me an investigator is an investigator. And someone that's going to testify about mitigation would be the expert.
> . . .
> Q. Now you trained James Smith yourself to do what you considered to be mitigation investigation, didn't you?
> A. I trained James to investigate criminal cases. We did not sit down and say, okay, this is what mitigation needs to be done, to the best of my recollection. We did that. We investigated.
> Q. Do you deny telling your second chair, Attorney Katherine Ferguson, that you had trained James Smith yourself to do mitigation investigation?
> A. I can't deny that I said that to her, no[.]

9 WRR 35-36. Wilkinson then immediately confirmed he had no training to be a mitigation specialist in order to have trained Smith. 9 WRR 36-37. Further, he resisted allowing his second chair, Ferguson, to hire a mitigation specialist. 9 WRR 39 ("My second chair and I are at issue over our mitigation expert."). In fact, Wilkinson asked the Texas Defender Service if an attorney could be his own mitigation specialist (regardless of his lack of training or knowledge of what a mitigation specialist was). 9 WRR 39-40; 12 WCR 4826 (DX 39 Writ Hr'g).

Once Maureen Griffin was hired as a mitigation specialist over Wilkinson's objection, Wilkinson also failed to direct, work with, or coordinate with Griffin, both as to trial strategy and preparing expert witnesses. Griffin stated:

> From the beginning, I was disappointed and uncomfortable with the lack of communication between myself and the other members of Brown's defense team. In October, I sent them several emails requesting documents and asking to set up an in-person meeting. Each time, I had to make repeated requests just to get a response, and even then, my requests usually were not answered. This lack of communication made it difficult to collaborate on potential mitigation themes that were emerging during the course of my investigation and I determined that I could not work effectively under those conditions.

1 WCR 228 (St. Habeas Appl. Ex.8 [Griffin Aff. ¶ 9). This was undoubtedly because Wilkinson believed that a mitigation specialist like Griffin was unnecessary: "Well, a fact investigator can get an entire history from a family and a defendant." 9 WRR 77, 95. This behavior prompt Griffin to attempt to withdraw from the case. *See* 2 WCR 404-05 (St. Habeas Appl. Ex. 21). Dr. Cunningham, hired as a testifying expert about future dangerousness, corrected Wilkinson after he referred to Cunningham as a "mitigation specialist," and informed Wilkinson that as a testifying expert he would rely heavily on a mitigation specialist. 9 WRR 86-87, 94; 12 WCR 4841 (DX 42 Writ Hr'g). Though Cunningham as a testifying expert would have normally relied heavily on the information gathered by a mitigation specialist, Cunningham received the discovery in the case *before the mitigation specialist*. 9 WRR 105. As lead counsel, Wilkinson failed to incorporate and utilize a mitigation

specialist for all aspects of this case. And as a result, Cunningham never received the assistance of a mitigation specialist. 11 WRR 47-48; 13 WCR 5130 (DX 61 Writ Hr'g [Cunningham Decl. ¶ 29]).

In addition, it is incumbent upon counsel to undertake a thorough investigation in order to make strategic decisions about a case. *See Wiggins*, 539 U.S. at 521–22. Counsel's decisions warrant deference only when those decisions follow a "thorough investigation of law and facts relevant to plausible options[.]" *Strickland*, 466 U.S. at 689–90. Here, Wilkinson failed to undertake that investigation, and then made uninformed, insupportable decisions for which he should not be afforded deference. In an exchange with state habeas counsel:

> Q: Don't you think knowing that autism -- that Brown had autism would have helped your defense?
> A. Not necessarily, ma'am, no.
> Q. Well, you would agree it's not inconsistent with your defense, right?
> A. Nothing at this point would have been incons- -- well, there are certain things that might have been inconsistent, but no.
> Q. So autism would not have been inconsistent with your theory, right?
> A. It might or might not have, ma'am.

10 WRR 29-30. Wilkinson, having never discovered Brown had ASD, and then never having consulted with experts about how ASD would have affected every aspect of the crime, including his client's subsequent actions and statements, could not determine whether or not ASD was inconsistent with the defense's untenable theory at trial. Because lead counsel failed to undertake an adequate investigation,[13] his defense was ultimately inadequate as well, and counsel fell well below the Sixth Amendment guarantees of effective representation.

On appointment, Brown's second-chair Ferguson, was immediately thrust into the position of trying to rectify Wilkinson's deficient performance. Aware of the requirements of capital counsel—

---

[13] Wilkinson may have done so because he fundamentally believed, regardless of any red flags in Brown's background, the State's version of the crime. In questioning whether suicidality played into the murder, Wilkinson stated it did not. State habeas counsel followed up, asking "Q. It was part of the reason that he killed her, wasn't it?
A. No, ma'am. The reason he killed her was she had him arrested." 10 WRR 39-40.

despite Brown being her fist capital client—Ferguson reached out to the Texas Defender Service for assistance, as she was "receiving some resistance from Mr. Wilkinson about having a mitigation expert." 10 WRR 252. As a result of that disagreement, Griffin was not finally appointed until ten months after Wilkinson was appointed, and eight months after Ferguson joined the case. 11 WRR 12.

Ferguson was well aware that Wilkinson, despite being lead counsel, refused to communicate with Griffin, so while Ferguson was working with Griffin, "trying to get her and Mr. Wilkinson together or her, me, and Mr. Wilkinson together was not going well." 10 WRR 253. The breakdown of the team dynamic was so bad that Griffin tried to resign. 12 WRR 176. When Griffin emailed the team asking whether testifying expert Cunningham could address Brown's psychological issues or suggest someone who could, Ferguson never followed up; rather, she stated that Wilkinson was handling Cunningham as an expert. 10 WRR 259-60. Brown's defense team simply never communicated, let alone communicated effectively to provide adequate representation. Because of the stark divide of labor and Wilkinson's failure to hold team meetings, have strategy discussions, or engage in meaningful teamwork at all,[14] there was no one to take the mitigation specialist's recommendation to have Brown evaluated seriously. Without an evaluation, an ASD diagnosis was never made, a diagnosis which, if known, could have assisted the defense in making strategic decisions before and during trial. 10 WRR 266, 268 (Ferguson—"Yes, it may have been helpful. I don't know. [. . .] This would all be speculatory on my part.").

Regardless of Wilkinson's membership status with the ABA, the Supreme Court has repeatedly assessed the reasonableness of counsel's performance by looking to "[p]revailing norms

---

[14] Ferguson was surprised that Wilkinson had admitted that he didn't read many of her emails or open her attachments, though he often would not respond to her emails. 10 WRR 83 138; 11 WRR 27-28.

of practice as reflected in [the] American Bar Association standards." *Strickland*, 466 U.S. at 688; *see also Padilla v. Kentucky*, 559 U.S. 356, 367 (2010) (noting that the *ABA Standards* "may be valuable measures of the prevailing professional norms of effective representation"); *Rompilla*, 545 U.S. at 387 ("'[W]e long have referred [to the ABA *Standards for Criminal Justice*] as guides to determining what is reasonable.'" (quoting *Wiggins*, 539 U.S. at 524) (additional quotations omitted). At the time of Brown's trial, his attorneys' obligations were governed by the "prevailing professional norms," even if those norms did not align with a less rigorous defense based on "most common customs." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

Wilkinson failed to meet these standards. Counsel failed to conduct an adequate investigation before making strategy decisions for Brown's guilt-phase proceedings. Wilkinson chose a defense strategy for which he had no witnesses to testify to and no evidence with which to support, largely because he failed to utilize a mitigation specialist and did not understand the requirements of a counsel's duty to investigate all avenues and red flags in a defendant's background (*see* CLAIMS 1(D), 2(D)). Counsel was on notice that their client required psychological and neuropsychological testing from their mitigation specialist. 2 WCR 395 (St. Habeas Appl. Ex. 21 at 13); 10 WRR 259-60; 11 WRR 42. That most obvious of red flags, raised by member of the defense team, was never pursued.[15] Accordingly, counsel's decisions were uninformed, unreasonable especially in light of the capital charges, and unworthy of any sort of deference. *See Wiggins*, 539 U.S. at 521; *see also Lewis v. Dretke*, 355 F.3d 364, 367–68 (5th Cir. 2003) (per curiam) (finding counsel ineffective in capital sentencing for failing to investigate and present evidence of petitioner's abusive childhood); *Moore v. Johnson*, 194 F.3d 586, 616–17 (5th Cir. 1999) (per curiam) (finding counsel deficient because,

---

[15] Ferguson testified that when she asked Wilkinson about getting psychological testing for Brown, he said no because there was no evidence from talking to the family or anything that they had developed that would lead them to believe that it was required or that Brown had any issues. 10 WRR 256.

although counsel knew some of petitioner's background, he did not investigate or present mitigating evidence that would have shown abuse and abandonment by family). That counsel's strategy—to try to blame the victim—was legally and factually not viable only emphasizes the unreasonableness of counsel's actions.

### E.   Trial counsels' deficient performance prejudiced Brown

Whether an attorney's deficient performance caused prejudice depends on whether there is a "reasonable probability" that the jury would have reached a different result absent counsel's errors. *Cronic*, 466 U.S. at 694. A "reasonable probability" is just one "sufficient to undermine confidence in the outcome," a "defendant need not show that counsel's deficient conduct more likely than not altered the outcome." *Id.* at 693. Further, because of the requirement of unanimity, prejudice turns on whether there is a reasonable probability that even one juror would have made a different decision. *Wiggins*, 539 U.S. at 537.

When evaluating prejudice, a court must consider "the totality of the evidence—both that adduced at trial, *and the evidence adduced in the habeas proceeding*[s]." *Id.* at 536 (alteration in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000)). And, critically, the question is not only whether each instance of deficient performance was on its own prejudicial, but also whether the combined effect of all of those instances was to undermine confidence in the outcome. *See Strickland*, 466 U.S. at 694.

Counsel's deficient performance so riddled the trial with repeated errors, misstatements, and uninformed strategic choices it ultimately rendered Brown's death sentence unreliable and capricious. And like the Supreme Court, the Fifth Circuit has previously applied a cumulative *Strickland* prejudice analysis when confronted with a case in which there were multiple instances of deficient performance by counsel. *See, e.g., White v. Thaler*, 610 F.3d 890, 912 (5th Cir. 2010) (holding, in the alternative, that "[t]he combined prejudicial effect of the post-arrest silence and the

death of the unborn child inexorably leads us to conclude that White has shown that the state court's conclusion that there was no reasonable probability of a different outcome is objectively unreasonable."); *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) ("We will address each aspect of Davis's performance the district court found deficient before considering whether Richards was cumulatively prejudiced thereby."). Accordingly, this Court should consider the resulting prejudice from the numerous examples of trial counsel's deficient performance in a cumulative manner and grant Brown relief.

Because counsel failed to adequately investigate, they lost the opportunity to present a legally sound, reasonable defense to capital murder that was compelling because it both undermined the State's charges and explained Ray's murder in the context of Brown's mental illness, a dysregulated fight-or-flight response, and troubled background, which included abuse, negligence, and neurodevelopmental disorders. And, because counsel had instead opted for a legally and factually problematic defense to the capital charge for Ray's death, counsel had no narrative to challenge the State's case against Brown. The result was a breakdown in the adversarial system, sufficient to undermine confidence in the conviction. *See Strickland*, 466 U.S. at 687. In this case, all that is needed to undermine confidence is a reasonable probability that at least one juror would have rejected capital murder. *See Strickland*, 466 U.S. at 694 (declaring that a showing of "a reasonable probability" is a lesser standard than "a preponderance of the evidence").

Here, the jurors could have heard an entirely different story than the one presented. They could have heard that key aspects of the State's allegations of retaliation or "terroristic threat" that wholly unsupportable. They could have heard that the little evidence offered regarding Brown's motivations did not suggest, let alone prove, that the crime was committed in the course of interfering with police duties or in retaliation for police involvement. They could have learned how the events leading up to the crime echoed the trauma and abuse in Brown's background. If the jury had been

offered this evidence, then there is a reasonable probability that one jury would not have found Brown guilty of capital murder.

Lastly, without a proper mitigation investigation, counsel conceded guilt without the ability to lay the groundwork for why Brown did not deserve a death sentence. As the primary goal of a capital-defense attorney is to avoid a death sentence, counsel must take every reasonable opportunity to ensure that outcome. *See* ABA Guideline 10.11 ("[c]ounsel at every stage of the case should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client"). One critical way of doing so is to ensure that the jury is introduced to the defense's mitigation story as early as possible during proceedings. In other words, counsel must "frontload" the mitigation. *See Eaton v. Wilson*, No. 09-CV-261-J, 2014 WL 6622512, at *149 (D. Wyo. Nov. 20, 2014) (citing expert testimony on frontloading and calling the frontloading of mitigation "so crucial in a death penalty case"). This is especially important as there is "reason to believe that a number of jurors make up their minds about the defendant's punishment even before they hear any evidence in the penalty phase." Stephen Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 Colum. L. Rev. 1538, 1543 (Oct. 1998).

Brown was prejudiced by counsel's failure. Counsel could have framed the jury's understanding of Brown's crime from the outset in terms of his history of trauma, neglect, and abuse, giving the jury and integrated understanding of both the crime and why it occurred. As the jurors learned about the crime, they would also have learned about Brown's mental illness, suicidality, neurodevelopmental disorder, and deep emotional distress. *See Eaton*, 2014 WL 6622512 at *149 (quoting expert testimony on how frontloading "help[s] the jury to understand [the defendant] as fully human as early as possible"). This approach would have helped the jurors absorb Brown's ensuing mitigation presentation and use it to give context to the crime. While this may not have affected the guilt-phase outcome, there is a reasonable probability that at least one juror, having

heard the mitigation at the outset and throughout the penalty-phase proceedings, would have voted differently on the sentence for Ray's death.

### F. Trial counsel's numerous error, individually and cumulatively, undermined the reliability of Brown's guilt-phase proceedings

While each instance of deficient performance described above is prejudicial on its own, counsel's guilt-phase errors were decidedly prejudicial when considered cumulatively. When evaluating an ineffective-assistance claim, this Court must consider the cumulative impact of counsel's various errors. As the Supreme Court has stated, "In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695; *see Williams (Terry)*, 529 U.S. at 397–98.

As stated above, this circuit applies a cumulative *Strickland* prejudice analysis when confronted with a case in which there were multiple instances of deficient performance by counsel. *See Dodson v. Stephens*, 611 F. App'x 168, 178–79 (5th Cir. 2015) (footnote omitted) (assuming that cumulative prejudice analysis is required) (citing *White v. Thaler*, 610 F.3d 890, 912 (5th Cir. 2010); *Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999) (stating in a pre–AEDPA case that "we are unable to state that ... the cumulative effect of all deficiencies at the guilt phase[ ] is sufficient to render the guilty verdict ... unreliable.)).

Trial counsel's deficient performance resulted in cumulative prejudice that warrants relief. Here, had counsel not performed deficiently, the jury would have heard a legally cognizable and factually supported defense to Brown's capital charges. Had counsel performed competently, there is at least a reasonable probability that one juror would have decided differently on the first-degree murder count for Ray's death. *See Strickland*, 466 U.S. at 694.

### G. Conclusion

For the reasons stated above, Brown's counsel provided ineffective assistance at Brown's guilt-phase proceedings, thereby prejudicing Brown. The state-court decision is no bar to this Court's de novo review of this claim, and Brown is entitled to relief from his unconstitutional convictions.

**CLAIM 2.     BROWN RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PUNISHMENT PHASE OF HIS CAPITAL TRIAL BECAUSE COUNSEL FAILED TO INVESTIGATE AND PRESENT POWERFUL MITIGATING EVIDENCE, AMONG OTHER SIGNIFICANT ERRORS**

Counsel's failure to investigate and present powerful mitigating evidence, and counsel's other significant errors, violated Brown's constitutional rights. Without that crucial, compelling, and persuasive information, the jury sentenced Brown to death. Counsel's deficient performance in that respect and others, both individually and cumulatively, prejudiced Brown and thereby violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Brown incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. He presented this claim below in similar form. 1 WCR 47-77. Because of the failure of state court to meet the standards triggering deference under 28 U.S.C. § 2254(d), including adjudicating this claim on the merits, this Court may consider it de novo.

### A. A CAPITAL DEFENDANT MUST RECEIVE AN INDIVIDUALIZED SENTENCING AFTER A FULL AND FAIR CONSIDERATION BY THE JURY

The Eighth and Fourteenth Amendments enshrine the guarantee of individualized sentencing and due process in the capital context. *See, e.g., Lockett v. Ohio*, 438 U.S. 586, 602–05 (1978) (plurality opinion); *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989). Accordingly, a capital sentencer must be afforded the opportunity to assess "'the character and record of the individual offender.'" *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)). As the Supreme Court has explained:

> If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."

*Penry*, 492 U.S. at 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)). The assistance of competent and qualified counsel is necessary to safeguard these fundamental principles. *E.g.*, *Strickland*, 466 U.S. at 685 ("[C]ounsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution to which they are entitled.'") (quoting *Adams v. United States ex rel. McCann*, 317 U.S. at 275, 276 (1942)).

In *Strickland*, the Supreme Court outlined the standard for determining when counsel has provided ineffective assistance. *See, e.g.*, CLAIMS 1(D) and 1(E), *supra*. Under *Strickland*, counsel is constitutionally ineffective if (1) "representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 687–88, 694. When evaluating prejudice, a court must consider "the totality of the evidence—'both that adduced at trial, and the evidence adduced in the habeas proceeding[s].'" *Wiggins v. Smith*, 539 U.S. 510, 536 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 397–398 (2000)) (emphasis and alteration in original).

The Supreme Court has since repeatedly applied the requirements of *Strickland* and the Sixth Amendment to the capital-sentencing context. And applying that *Strickland* requirement for effective assistance in penalty-phase procedures, it is clearly established federal law that counsel must "investigate and to present substantial mitigating evidence to the sentencing jury." *Williams*, 529 U.S. at 390.

Absent an objectively reasonable basis for doing otherwise, counsel are bound by "a duty to investigate the background and character of a capital defendant, along with his family and social circumstances and mental health history." *Walbey*, 309 F. App'x at 801; *Wiggins*, 539 U.S. at 521

(the "deference owed such strategic judgments" of trial counsel is "defined . . . in terms of the adequacy of the investigations supporting those judgments"); *see also, e.g.*, *Sears v. Upton*, 561 U.S. 945, 953 (2010) (holding that trial counsel's inadequate investigation, which led to a misleading portrayal of petitioner's upbringing, was deficient and prejudicial); *Williams*, 529 U.S. at 396 (concluding that counsel's failure to uncover and present extensive mitigation was not a tactical decision when counsel had not thoroughly investigated defendant's background); *Adams v. Quarterman*, 324 F. App'x 340 (5th Cir. 2009). Of course, individualized sentencing demands the sentencer have an opportunity to consider mitigating evidence, and so counsel's duties do not end with unearthing that evidence. The Court has thus also made clear that, absent an informed, strategic determination, defense counsel has a constitutional duty to present to the jury the mitigation. *See Williams*, 529 U.S. at 396 (faulting counsel's failure to introduce mitigating evidence as an abrogation of duty); *Moore v. Johnson*, 194 F.3d 586, 616–17 (5th Cir. 1999) (per curiam) (finding counsel deficient in penalty phase because, although counsel knew some of petitioner's background, he did not investigate or present mitigating evidence that would have shown abuse and abandonment by family).

Further, as noted earlier, the Supreme Court has consistently relied upon guidelines from the ABA and other professional groups to inform the inquiry into reasonable professional conduct. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 387 & n.7 (2005). The 2003 ABA Guidelines outlined the key aspects of competent capital representation applicable to Brown's mitigation proceeding, which commenced in in 2013. By the time Brown's sentencing commenced, there was absolutely no question as to the duty of capital counsel to thoroughly investigate, present, and explain the significance of all relevant mitigation.

### B. BROWN'S LIFE HISTORY CONTAINED HIGHLY COMPELLING MITIGATION THAT COUNSEL NEVER PRESENTED

It is a testament to the incompetence of trial counsel that they chose to present a single mitigating symptom to the jury—and the symptom most seen as a "choice" by jurors: drug addiction, rather than investigate and present the vast evidence of underlying mitigating factors that Micah was saddled with at birth and in childhood that caused that symptom. Micah's life was defined by chaos and trauma. Surmounting constant turmoil for any child requires the help of stable, loving adults who can provide support and model healthy boundaries and emotionally appropriate relationships. But this is especially true for vulnerable children like Micah, who was born with developmental disorders which made it exponentially harder to understand and navigate the world around him.

But from birth through adolescence and even in into early adulthood, Micah was unable to form the types of healthy relationships he needed for support, especially because those closest to him in his immediate family could not provide them. Some of the most toxic and damaging relationships throughout Micah's life, the relationships that most repeatedly traumatized, harmed, and betrayed him, were at the hands of the people he needed for comfort and support. The people that were supposed to nurture, care, and support Micah ended up inflicting the most trauma.

Micah was born into a broken home, the identity of his father in question. Both of his parents were having extramarital affairs, and Micah's biological father, upon discovering his wife's affair, followed in his car, confronted and threatened with a gun the man who would become Micah's stepfather. Micah's new stepfather, Chuck, was sexually abusing his own son, Nathan; once he married Micah's mother, started sexually abusing Micah's sister and Micah's half-sister, Chuck's daughter. Chuck's son would also continue this cycle of abuse; Micah's stepbrother Nathan did not live in the home, but he sexually abused Micah during a summer visit when Micah was elementary-aged.

Chuck also turned out to be mentally ill, and was physically and emotionally abusive of Brenda, Micah's mother, and consistently verbally abusive to Micah's older brother Corey, often when Brenda was not there to see. Micah witnessed his stepfather's reign of terror against other members of his family. When Micah's youngest brother Jordan was born, he was extremely developmentally disabled, and required round-the-clock care. While home healthcare aides helped care for Jordan during the day, Brenda took on the bulk of his care in the evenings. Because Chuck struggled to hold down a job, Brenda held two, holding a day job keeping the family afloat and caring for Jordan in the evening. Micah was, in essence, abandoned in his own home.

Micah appeared much younger than his age, both physically and mentally, and he struggled to make connections with peers as he grew older. Because of his immaturity in high school he ended up being bullied by the same people he once considered friends. Micah's conception of his own emasculation and weakness, exacerbated by sexual abuse at the hands of an older boy when he was a child, contributed to his negative self-image, depression, and social anxiety. Micah's own siblings were trying hard to survive themselves in their abusive and chaotic home environment, avoiding it altogether, which in effect, left Micah feeling alone and abandoned.

Given the chaos of his home and the time period in which he grew up, Micah was never diagnosed with Autism Spectrum Disorder (ASD) and Attention Deficit Hyperactive Disorder (ADHD), two neurodevelopmental disorders which profoundly and adversely affected how Micah tried to navigate in the world. ASD made communicating with, understanding, and being understood by other people very difficult for Micah. He struggled to understand his own emotions, let alone recognize them in others, which made it difficult for him to truly identify the emotional distress he was in as a child and convey it to someone who could help. Unfortunately, because his house was so chaotic, and because many of Micah's male relatives also struggled with ASD, the adults in his life were unstable or unavailable. Micah was left to struggle alone.

66

Aside from a dysfunctional home filled with abusive relationships, Micah was not neurologically, developmentally, or genetically equipped to withstand the traumatic events he experienced throughout childhood. Micah exhibited a significant delay in physical and emotional development, a genetic inheritance from his father and grandfather. He was also born into a family with extensive history of substance abuse and mental health issues, predisposing him to both. Micah was repeatedly described by family [and friends?]as exhibiting social anxiety, passivity, and immaturity throughout his life. He was quiet, shy and extremely anxious in social settings, to the point of avoiding them completely.

In an attempt to self-medicate, Micah turned to alcohol and drugs. Abusing substances was a path adults paved for him; Micah remembers his stepfather would give him wine during their fishing trips when he was 12 years old. Authority figures establishing substance abuse as a form of bonding in Micah's childhood would repeat itself in adulthood, and ultimately established a substantial part of the relationship Micah would have with his future wife, Stella.

Stella was Micah's first and only real girlfriend; when they married, Micah was her third husband, and Stella already had a son from a previous relationship. While his marriage with Stella may have been tumultuous, Micah finally found the stability and love he had craved throughout his life in his relationships with his children. Colton was born just under a year after the couple married; their daughter, Willow, was born a year after that. Even after Micah and Stella divorced after three years of marriage, Micah continued to see his children every day. When Micah was told that Stella was moving to take another job, he was utterly devastated, and began a downward spiral of depression, drug abuse, and suicidality. During Micah's decompensation, an altercation with Stella's ex-husband, Tracy Williams, left him feeling emasculated and humiliated in front of his children, an echo of the sexual trauma he suffered as a child. Micah's mother reported that Micah became fixated on how his own father Biff abandoned him, telling Micah he would come see him after he and

Brenda divorced but then never did. Micah's past trauma was repeating itself in the present. After a lifetime of failed attempts at making connections with others, his children were the only uncomplicated, unconditional loving relationships Micah had experienced.

Given: 1. Micah's genetic predispositions for mental illness and addiction; 2. his congenital neurodevelopment disorders, ASD and ADHD, that schools at the time failed to recognize, diagnose, and provide support for; and 3. the real chaos and trauma he survived in his own home which included neglect, sexual abuse, inappropriate sexual and emotional boundaries within his close family, personally witnessing consistent physical and emotional abuse, communication difficulties because of his ASD, and a lack of parental and structural support, Micah's trial counsel could have presented a cohesive, detailed, sympathetic narrative of his background and history that could have swayed one juror to vote for life in prison.

### 1.   The Brown home

Micah Crofford Brown was born on June 7, 1979. By the time he was born, his parents, Edward "Biff" Armondale Brown and Brenda Crofford Brown, already had been married for a little over a decade (September 6, 1968), most of which was extremely tumultuous. He was an unplanned addition to a family that was quickly falling apart around the time he was born.

Biff and Brenda met while still in high school and married following graduation. Biff worked a short stint at a job where he was exposed to chemicals that made him sick; after being laid off he joined his father in a family-owned sign business.

Not long after they married, Biff realized he was not ready to be a husband and a father and started having numerous affairs. Despite his constant cheating, Biff would sometimes fly into unprovoked jealous rages, accusing Brenda of wanting to be with other men, escalating from yelling to hitting her on several occasions throughout their marriage.

Before Micah was born, Biff and Brenda had two children: Cory Edward Brown (1970) and Amberly Kaye (1972). Cory exhibited compulsive behavior and later formed alcohol dependency and abuse issues. Amberly also had problems with alcohol since she began drinking in her late 20s.

### 2.   The broken home into which Micah was born

When Micah was born, it was an especially difficult time for the family. Biff's parents' marriage fell apart. Biff and Brenda were failing to make their marriage work. And then Brenda met Charles "Chuck" Gafford while she worked at a law firm. He was also married and had two kids, Nathan and Trina Gafford. Brenda and Chuck began having an affair. Micah was conceived during the time of this affair, and Micah's paternity is in question. Chuck once told Biff that Micah was his child, but Biff believes Micah to be his son.

When Chuck and Brenda's affair was exposed, Biff was furious, despite his own history of repeated infidelities. After a few counseling sessions, Biff and Brenda divorced on March 2, 1981. After Chuck's wife found out about the affair, she divorced Chuck and left for Tennessee with Nathan and Trina. Micah was only about 1 ½ years old when Brenda and Biff divorced.

### 3.   The Gafford home

Chuck and Brenda married on December 13, 1981, when Micah was two-years old. Chuck doted on Micah, and the family was well aware that Micah was clearly Chuck's favorite. He would say he wanted Micah to be his son. Chuck initially worked hard to make Brenda happy and he purchased gifts for the kids to win them over. Brenda and Chuck had two children together, Taylor Gafford (1983) and Jordan Gafford (1984), bringing the total number of children in the household to five (Cory, Amberly, Micah, Taylor, and Jordan). The gifts did not continue for all of Brenda's children with Biff, however; Chuck would later become verbally and sexually abusive to Amberly and especially verbally abusive to Cory, who became his frequent target.

Though Chuck treated Micah as his own, this did not entirely spare Micah from his rages. For instance, once when Micah was 3 or 4 years old, he forgot his jacket in a restaurant. Chuck picked Micah up by the arm and shook him violently in the air for a couple of minutes while screaming at him.

Brenda came to believe that Chuck was mentally ill, as his personality could turn on a dime. Chuck was physically and emotionally abusive toward Brenda. Once, he physically pushed Brenda to the ground while she was pregnant. He told her he wished she would die on the delivery table while giving birth. After these types of outbursts, Chuck would apologize soon after and Brenda found herself trapped in a cycle of abuse. Chuck struggled to hold down steady employment and was frequently terminated from jobs due to his temper, so the family relied upon Brenda's income almost entirely.

As chaotic as the home environment was, things only became more unstable in 1984 when Brenda gave birth to her son Jordan. Jordan required around-the-clock care due to his profound developmental disabilities. Although the State provided an aide during the day, the family was left to care for Jordan in the evenings. Micah and Taylor used to babysit Jordan on the weekends, making sure Jordan was comfortable and did not injure himself. Micah and Jordan adored each other's' company; Brenda believed that because Micah struggled so much with language and communication, and Jordan was nonverbal, they found special ways to connect with each other that others couldn't understand. But Brenda working during the day, tending to Jordan at night, and withstanding relentless abuse from Chuck left her little time or emotional ability to support her other children, who so desperately needed it.

### 4.   A home filled with secrets and sexual abuse

Shortly after Brenda and Chuck married, Chuck "began sneaking into Amberly's room at night where he would expose himself and touch her vagina." 8 WCR 3286 (SX 45 Writ Hr'g at 9).

Chuck told her not to tell her mother; Amberly felt threatened by him and did as he said. Chuck would say sexual things to Amberly and tell her he wanted to shower with her. Amberly was so troubled by what Chuck was doing, she altered her behavior around the house, including refusing to wear a swimsuit when he was around. The abuse continued from when Amberly was 8 years old until Amberly fought back two years later. 1 WCR 246 (St. Habeas Appl. Ex. 11 [Amberly Lago Aff. ¶ 8]). Chuck shifted towards attacking Amberly with emotional abuse. Years later Chuck would turn to sexually abusing his own daughter, Taylor.

Cory also desperately tried to avoid Chuck's verbal abuse, staying away from the home, and retuning only to sleep. Cory later told his father, "You don't know how much Chuck has screwed me up." 8 WCR 3287 (SX 45 Writ Hr'g at 10).

During the summers, Chuck's children from his prior marriage, Nathan and Trina, would come to Greenville to visit. Amberly recalls more troubling memories from these visits. Trina was bulimic and had a problem with shoplifting. Chuck would ask Trina to shower with him, and Nathan once chased Trina around the house with a knife, threatening to harm her.[16]

Nathan, who had been sexually abused by Chuck, also sexually abused Micah during at least one of these summer visits. On several occasions when Micah was elementary age, Nathan would go into the bathroom and expose himself to Micah, forcing Micah to masturbate him and then masturbating Micah. Micah felt powerless to stop Nathan, and when Nathan told Micah not to tell anyone, Micah obeyed. His struggles with emotion, language, and communication due to his ASD made him ideal prey for Nathan, and he was unable to reveal the abuse to anyone until nearly a decade later.

---

[16] Nathan is suspected to be schizophrenic.

### 5. Support systems breaking down

Biff tried to maintain a relationship with his children, seeing them every other weekend, giving Cory, Amberly and Micah a reprieve from Chuck (though Amberly was often put in the role of primary caretaker, something Biff was unable to do). Micah and his sibling's safe environment at their father's house soon ended when Biff married Patricia "Pat" Leonard in 1986. Pat managed to drive a wedge between Biff and his children, and eventually the visits ended. In 1989, when Micah was ten, Amberly disclosed to Biff that Chuck had sexually abused her. She asked Biff if she could move in with him and Pat, but Biff refused. Amberly, who had been a surrogate mother figure for Micah, refused to stay at home with Chuck, and eventually moved to California. Micah did not know why Amberly left, and felt abandoned by someone he had come to rely upon as a second mother. A few years later in 1992, Micah lost his older brother when Cory got married and moved to Arkansas.

In 1996, Brenda found out that Chuck had been sexually abusing Amberly. Brenda ordered Chuck out of the house. Chuck packed up and left for good, leaving notes for Cory, Micah and Taylor saying he was on surveillance related work as a private investigator. This was soon before Micah's high school graduation, and Micah was devastated Chuck was not there to celebrate his eighteenth birthday and then see him graduate from high school. Micah never saw him again.

As traumatic as Chuck's presence was in Micah's family, Micah looked to Chuck as a father figure. Chuck raised Micah, taught Micah to fish and hunt, and treated him as his own son. After Chuck's departure, Micah began to experience depression. For Micah, this was the dismantling of the family unit as he knew it, even if he hadn't known how harmful Chuck's presence was for some.

Moreover, when Chuck was forced to leave the home, Brenda was left the sole provider for the family. She started working 7 days a week to keep the family afloat. Unfortunately, spending so much time away from the home working, Brenda was unable to care for Jordan, who was 13 at the

time but could still do little more than an infant. Brenda had no choice but to place Jordan in a care facility where he remains today. Micah's tenuous support system broke down just as he was trying to navigate the increasing complexities and demands of adulthood.

### 6.   Micah's difficult inheritance

From the moment he entered educational settings, Micah exhibited different behaviors that caught the attention of his teachers. When he was attending St. Paul's Parish at the age of 4, his teachers noted his immaturity and lagging social development in comparison to other children. His eye contact and fine motor skills were poor, and he had trouble playing well with other children.

When Micah was in Kindergarten, his teacher documented a period marked by a lack of progress in his social maturity, language and vocabulary development and his ability to provide a narrative of experiences or events. As Micah got older and the social demands of school became greater and more nuanced, he began missing a great deal of school from middle school through high school. Micah's lagging development and social ostracization only became more apparent as he aged but never matured. There were also signs that Micah had inherited a genetic disorder due to his late puberty, late maturity, and other physical and emotional symptoms. But with a family in chaos at home, there was no one to get Micah diagnosed and finally provided the support he needs.

### 7.   Early drug exposure

Micah began to drink alcohol when he was 12 years old. Chuck would take him fishing and give Micah wine to drink with him.

Having ADHD and ASD, and undiagnosed and having never received therapy or support services, Micah turned to harder drugs as he got older to manage the social anxiety and hyperactivity. Around age 18 Micah began using cocaine and smoking marijuana more regularly, both of which eased the symptoms of his neurodevelopmental disorders. This was also around the time that Micah was struggling depression, which is comorbid with ASD and was exacerbated by his crumbling family

unit. Without anyone intervening in childhood to get him the support the needed, Micah increasingly turned to alcohol and harder drugs in attempt to manage adulthood.

After high school in 1997, Micah got a job at L3 Communications for a year. His employment was short as he quit before he failed a company drug test. Micah followed his father and started working at sign businesses, where drug use was rampant among employees. In his early 20s Micah started using methamphetamine. And when Micah met Stella, she introduced him to benzodiazepines because they helped Micah prolong their sexual activities. She also introduced Micah to opioids.

### 8.  Micah's relationship with Stella Ray

Micah met Stella Ray at a bar in 2005. She was his first and only serious relationship. He noticed her because she was pretty and vivacious but he was too intimidated to talk to her. The following week, Stella noticed Micah had been watching her and she approached him. They talked for a bit, and Micah suggested they go outside and smoke a joint together in a van. After that, they started dating.

While they were dating, Stella herself struggled with severe depression and attempted suicide. While Stella was in the hospital, Micah looked after her son from a previous marriage with Tracy Williams, Wesley Williams. A year after they met, Micah asked Stella to marry him. They married on July 4, 2007 and within the year, his son Colten was born on April 8, 2008. His daughter Willow followed soon after, born on June 17, 2009. During their relationship, Micah constantly felt like he was failing her, while at the same trying hard to be a good father, as best as he understood. He wanted to be the father for his kids that he never had, and a source of stability and love that he had always needed.

Micah and Stella had a tenuous marriage. Micah's friend, Brian Humble, stopped spending time with Micah and Stella because of the toxic nature of their relationship. Humble also saw Micah

and Stella do drugs together, including marijuana and cocaine. Micah's depression seemed to deepen after his marriage to Stella, and he often appeared unhappy. Stella was aware of Micah's childhood sexual abuse, and Micah believed that Stella tried to use his insecurities about masculinity that stemmed from that abuse against him.

Though drugs had brought them together, after three years Stella decided to quit using drugs except marijuana. Micah wasn't able to quit as easily. Micah entered drug rehabilitation for an addiction to prescription pain medication. When Micah got out of treatment, Stella moved out, and they divorced in 2010. The divorce exacerbated Micah's depression.

Even after their divorce, Micah remained a constant and reliable parent in his children's lives. He would visit often and Stella routinely dropped off the kids with him after he arrived home from work.

### 9.   Spiraling down – addiction, mental health, and suicidality

Micah went to rehab for drug addiction from April 10, 2009 through May 8, 2009. He was diagnosed with polysubstance dependency, anxiety and depression. Then Micah returned to rehab from June 15, 2010 through June 19, 2010. He was diagnosed with opioid dependence, major depression (recurring/severe without psychotic), problems with primary support group, problems related to social environment, occupational problems and economic problems.

In January 2011, several months before the instant offense, Micah attempted to commit suicide by overdosing on pills. Brenda found Micah in his house, along with a suicide note and piles of Micah's possessions that he had set out for family members to collect. Micah went to the hospital as a result, where due to his deep depression and continued suicidal ideation he remained for several days.

Micah was diagnosed with major depressive disorder (recurring), panic disorder, opiate dependence, and alcohol dependence. Micah was depressed in the months following his suicide

attempt. He was using drugs and staying up all night. Prior to the instant offense, Micah learned that Stella was leaving Greenville and would be taking Colten and Willow with her. Micah had continued to see Stella and his children on a daily basis following their divorce, so this news deeply disrupted his sense of order and security.

Two weeks before the shooting, Wesley's father, Tracy Williams, moved back in with Stella because he was going through another divorce. With Tracy at the house, Micah felt threatened, both as a father and a man. He wasn't allowed to be around his kids as much once Tracy moved in. Micah's depression and emotional decompensation only worsened. On July 15, 2011, Micah went over to Stella's house to see the kids and ended up getting into a fight with Tracy. Micah bumped into Tracy a couple of times after which they both began wrestling on the floor. Tracy eventually placed Micah into a chokehold and threw him out of the house. Micah was devastated; he felt his pride as a man and a father had been irreparably damaged. He felt humiliated and hurt, especially because Stella did not try to stop it from happening.

The fight with Tracy precipitated a rapid decline in Micah's mental wellness and stability. Micah became intensely suicidal, altering his brain chemistry and existing only in a dysregulated fight-or-flight state for days, exacerbated by continued drug use. Micah's fears about his masculinity and not being enough of a man, which had plagued him since he was sexually abused by an older boy, came back with a vengeance. His ASD, which required structure and set schedules, was utterly disrupted by Stella's impending move. Most importantly, he was desperately afraid to lose his children, like he lost his own father once his parents were divorced. The relationships Micah had with his children were the only easy and uncomplicated relationships Micah had, especially given his immaturity, difficulty with language, and inability to handle the nuance and complexity of adult communication. Moreover, his children didn't trigger any of Micah's unresolved trauma, neglect, and abuse.

At Micah's trial, counsel told the jury there was only one mitigator in this case – Micah's drug abuse. The State incorrectly painted drug abuse as a choice. The defense, by failing to lay the groundwork for why drugs were an attempt to self-medicate, failed to give the jury the information they required to make an individualized determination about Micah's sentence. Even if attempting to mediate the effects of his depression, anxiety, and lifelong neurodevelopmental disorders were a simple, immoral choice, Micah did not choose the broken, abusive homes he was raised in, the neglect and abandonment he experienced when he lost not one but two father figures, the sexual abuse he experienced as a child and the unaddressed trauma and insecurities it rooted in him, his Autism Spectrum Disorder which made it exponentially harder for him to understand and navigate the world and his relationships with other people, and the mental illness that was both inherited and is comorbid with ASD and ADHD.

If Micah's background and character, given the vast amount of mitigating evidence, would have been presented to the jury with expert and lay witness assistance so jurors could have made an informed, individualized sentencing determination, there is a reasonable likelihood at least one juror would have voted for life. That counsel presented none of this renders Brown's sentence unreliable and merits relief. *See Herrera v. Collins*, 506 U.S. 390, 405 (1993) ("the Eighth Amendment requires increased reliability of the process by which capital punishment may be imposed").

### C. A DEFENDANT'S RIGHT TO A CONSTITUTIONALLY VALID CAPITAL SENTENCE REQUIRES A FULL MITIGATION INVESTIGATION AND PRESENTATION, AND NECESSITATES EFFECTIVE COUNSEL AT THE SENTENCING PHASE OF TRIAL

As discussed above, a defendant's right to place before the sentencer all relevant evidence during the mitigation phase of sentencing hinges on the right to effective counsel. *E.g.*, *Strickland*, 466 U.S. at 685 ("[C]ounsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution to which they are entitled.'") (quoting *Adams v.*

*United States ex rel. McCann*, 317 U.S. at 275, 276 (1942)). Brown's counsel had a duty to ensure that the jury heard the full scope of mitigating evidence, including Brown's full psychosocial history. The consideration of the defendant's life history is a "constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson*, 428 U.S. at 304.

Because of the lack of investigation, Brown's counsel was unable to make reasonable decisions about what information to put before the jury and how to present it, denying the jury the ability to make an individualized sentencing determination. *Wiggins*, 539 U.S. at 523. "Although counsel nominally put on a case in mitigation in that counsel in fact called witnesses to the stand after the prosecution rested, the record leaves no doubt that counsel's investigation to support that case was an empty exercise." *Andrus*, 140 S. Ct. at 1882.[17]

Counsel was ineffective for a number of reasons. First, the grave errors counsel made before trial and at the guilt-phase then plagued Brown's penalty-phase proceedings. Because counsel erred by failing to conduct an adequate investigation, failed to have Brown evaluated by appropriate experts, failed to identify lifelong trauma and neurodevelopmental disorders, failed to spend enough time with Brown to realize he should not testify at trial (let alone prepare him adequately for taking the stand), and failed to adopt an informed, supportable (and morally sound) defense, the State was

---

[17] As noted in the previous section, counsel's deficient performance here bears striking similarity to that in *Andrus*:

> Here, the habeas record reveals that Andrus' counsel fell short of his obligation in multiple ways: First, counsel performed almost no mitigation investigation, overlooking vast tranches of mitigating evidence. Second, due to counsel's failure to investigate compelling mitigating evidence, what little evidence counsel did present backfired by bolstering the State's aggravation case. Third, counsel failed adequately to investigate the State's aggravating evidence, thereby forgoing critical opportunities to rebut the case in aggravation. Taken together, those deficiencies effected an unconstitutional abnegation of prevailing professional norms.

*Andrus*, 140 S. Ct. at 1881–82.

able to use all of these errors against Brown in seeking a sentence of death. Brown's seeming lack of remorse, never contextualized for the jury by explaining that Brown had ASD, and the defense's strategy of blaming Ray for her own murder from the guilt phase, became centerpieces of the State's argument that Brown did not deserve mercy.

Second, counsel focused so heavily on the first special question the jury had to answer, whether Brown was a future danger, that Wilkinson and Ferguson wholly neglected to humanize their client. The jury heard almost no reason from Brown's counsel why Brown's character and background necessitated a life sentence in this case. While expert testimony mentioned some of the struggles Brown had faced, the lay witnesses counsel called all painted Brown as without mitigating issues before and after the murder. This framing allowing the State to paint Brown as a remorseless killer with a vendetta against Ray[18] rather than a man desperately struggling with lifelong trauma, abuse, developmental disorders, and mental illness.[19]

Third, the strategy to combat future dangerousness, was doomed to fail. Counsel's argument amounted to claiming that drugs were entirely at fault for the death of Ray, and now that Brown was in prison he was essentially "fixed." Brown was fine now, "at peace." 46 RR 12. This is a wildly inaccurate portrayal of how childhood sexual abuse, a chronically violent home, and neurodevelopmental disorders affect those who experience them, but it also left the defense open to easy attack from the State. As Maureen Griffin would have alerted counsel, if Wilkinson had not excluded her from defense team decisions, jurors often find drug use and abuse as aggravating information rather than mitigation, and the State certainly played to that belief. 12 WRR 183. In addition, if Brown was doing so well in prison, if he was content and at peace there, then that simply

---

[18] *See, e.g.,* 46 RR 10 ("He didn't hesitate when he said he'd do it again and he didn't feel bad about killing her. In fact, I think the testimony you're going to hear during the course of punishment will show that he felt better after he did kill her.).

[19] *See* Drs. Mendel and Fabian Preliminary Reports, Pet. Exs. 2, 3.

couldn't be punishment enough. And if there was one thing both the State and defense agreed upon, it was that Brown should be punished. 46 RR 21, 23, 102, 112-13.

Fourth, in that effort to argue that Brown would not be a future danger, counsel failed to adequately prepare their experts, and then failed to prepare lay witness testimony to support expert testimony. As the experts never evaluated Brown themselves, they were left speaking about drugs in the abstract, or reciting a litany of traumas and how they statistically affected a person, without ever being able to explain to the jury how these things affected Brown himself. And without lay witnesses to support the expert's testimony to, for instance, explain the deeply personal, concrete impact of a laundry list of horribles—listed briefly on a powerpoint slide—that Brown experienced, the jury never heard the mitigation presentation it required in order to deliver a constitutionally-mandated capital sentence. Because of counsel's grossly deficient performance, Brown was prejudiced, rendering his capital sentence unreliable and arbitrary.

### 1. Lead counsel's derogation of his duties and the resulting team dysfunction led to a deficient mitigation investigation and inadequate presentation

"Lead counsel bears overall responsibility" for a capital case. ABA Guideline 10.4(B). Moreover, "the provision of high quality legal representation in capital cases requires a team approach that combines the different skills, experience, and perspectives of several disciplines." ABA Guideline 10.4(B) cmt. Brown's capital representation met neither of these standards. Lead counsel's failure to assemble and manage a defense team to conduct an investigation fell below prevailing professional norms and resulted in an unreasonable mitigation investigation. *See, e.g.,* *Williams,* 529 U.S. at 399; *Sears,* 561 U.S. at 953.

A jury's consideration of an offender's life history is a "constitutionally indispensable part of the process of inflicting the penalty of death." *Eddings,* 455 U.S. at 112 (internal quotation marks and citation omitted). But lead counsel at best did not assist in the mitigation-phase investigation,

and at worst undermined the investigation, leaving Brown without representation in conformity with prevailing professional norms. Prior to Brown's punishment-phase proceedings, Brown's counsel was required to have undertaken a thorough investigation into Brown's background and history in order to uncover any available evidence that would have mitigated the imposition of the death penalty. This did not happen, as discussed in CLAIMS 1(B) and 1(C), *supra*.

Under prevailing professional norms, "Investigation and planning for both phases must begin immediately upon counsel's entry into the case." *ABA Guidelines*, 31 Hofstra L. Rev. 913, 925 (2003). As stated above, lead counsel Wilkinson did not appoint a mitigation specialist until ten months after his own appointment to Brown's case. After losing the argument with his second chair about whether to have a mitigation specialist join the team, Wilkinson then systematically excluded Maureen Griffin from participating in trial preparation and hampered her ability to effectively investigate the copious red flags signaling mitigation both in Brown's troubled history and his present demeanor. Given prevailing professional norms, and that a mitigation investigation into Brown's life would have revealed the vast complexity of potential mitigation evidence, it was unreasonable for counsel to wait so long to hire a mitigation specialist only to then frustrate her abilities to assist Brown's defense at trial. *See* ABA Guideline 10.4(C).

As a result, Brown's defense team failed to investigate, develop, and present readily available and compelling mitigation evidence that could have made a difference to at least one juror. These failures include the wholesale failure to investigate Brown's social history, lifelong neurodevelopmental disorders, family dynamics, absence of support of parental figures, childhood sexual abuse, self-medication via drug and alcohol abuse, suicidality, and PTSD from the shooting itself. *See* CLAIMS 1(B), 1(C). They also failed to present evidence from expert and lay witnesses regarding Brown's inability to conform to neurotypical standards of what "remorse" looks and sounds like, as well as specifically why he found the structure and routine of prison a relief after the

81

difficulty of navigating the world with ASD. They did not conduct a reasonable investigation into Brown's mental illness, failed to investigate and present evidence they did have to the jury about his emotional distress and decompensation, and failed to adequately prepare the experts they called at the penalty phase.[20]

Because Brown's defense team failed to undertake a reasonable investigation, they also failed to retain and prepare appropriate experts and thus failed to provide the jury with a complete, accurate mitigation presentation. Counsel's ineffective performance prejudiced Brown and resulted in his arbitrary and unreliable death sentence. *Wiggins*, 539 U.S. at 521; *Walbey*, 309 F. App'x at 801.

> ### 2. Brown's counsel had no strategy for responding to the State's penalty-phase presentation, as the bulk of the State's aggravating evidence had been introduced by the defense during the guilt phase

The Texas capital sentencing scheme asks the jury to answer two questions after finding a defendant guilty of capital murder: 1. "Whether there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?" 48 RR 6. If the jury finds "yes" beyond a reasonable doubt[21] the jurors move to answering 2. "Whether, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?" 48 RR 7. Therefore, the first objective of the prosecution was simple: to prove beyond a reasonable doubt that there was a probability that Brown would commit future acts of violence and that he would be a continuing threat to society. The heart of the prosecution's

---

[20] *See also* Drs. Mendel and Fabian Preliminary Reports, Pet. Exs. 2, 3.

[21] Jurors are also told for both questions, in violation of Brown's constitutional rights: "You may not answer Special Issue No. 1 'Yes' unless you agree unanimously. You may not answer Special Issue No. 1 'No' *unless ten or more jurors agree.*" 48 RR 7, 8 (emphasis added). *See* CLAIM 8(C).

future dangerousness strategy was to simply reiterate the facts that had been before the jury in the guilt phase, facts that Brown's counsel had failed to give any context for with an adequate mitigation investigation and expert testimony.

Because defense counsel had already made the State's case for them due to their deficient performance in the guilt phase, the State's penalty-phase presentation was minimal. The State told jurors, "I think you're going to realize during the course of testimony from the punishment phase that a lot of the evidence regarding future danger you've already heard. You've already heard a lot of it." 45 RR 7. The State listed, as evidence of future dangerousness, Brown's short-lived desire to kill Tracy for choking him in front of his kids, 45 RR 7-8, his arrest for having a sawed-off shotgun, 45 RR 8, the family violence charge filed by Ray the night before the shooting, 45 RR at 8, and that Brown initially ran from the scene of the crime and hid from police, 45 RR 9.

But the State focused specifically on one thing: Brown's ostensible lack of remorse.

One of the most important ways that you know that the Defendant is still dangerous is that he doesn't have any remorse. He would do it again. He was very clear about that in his interviews with police and with CBS 11 . . . You can watch those interviews again, if you need to, to remind yourself. He didn't hesitate when he said he'd do it again and he didn't feel bad about killing her. In fact, I think the testimony you're going to hear during the course of punishment will show that he felt better after he did kill her. No remorse.

45 RR 9-10.

There were threads of mitigation evidence running through the prosecution's evidence at sentencing that defense counsel was never able to weave together. The State told the jurors in her opening statement, "[Y]ou'll remember during the first part of the trial all of the implications that Stella Ray somehow got the Defendant hooked on drugs . . . the Defendant was using drugs long before he met Stella. And I'm not talking pot, I'm talking meth, coke, crack, pills, and marijuana and alcohol from the time he was 18." 45 RR 12.

If defense counsel had conducted an investigation and had Brown evaluated, they could have changed the narrative about Brown's drug use. Without lay witness or expert testimony on mental illness, abuse, and neurodevelopmental disorders to counter the State's allegations, the State was unencumbered from presenting Micah's long history of attempts to self-medicate with drugs as an aggravating factor. "In fact, you'll hear that this Defendant went to rehab a couple times and actually got off of drugs on his own a couple times. So his desire to stay high when he committed this crime . . . you can consider that as an aggravating factor." 45 RR 12. Without a competing narrative explaining why Brown was self-medicating with drugs, the State's narrative about drug use as "choice" went unchallenged.

Because jurors already heard substantial aggravation presented by the defense itself in the guilt phase, the State only called three lay witnesses for the penalty phase: William Ray, the victim's father, Tamara Burton, the victim's best friend; and Cindy Ray Kemp, the victim's sister. Mr. Ray only spoke briefly about his daughter. 45 RR 18-21. Burton spoke about her night with Ray's family the night of the shooting. 45 RR 22-30. She told Wilkinson she have never seen Ray been mean to Brown, and she said she had no way of knowing whether Wilkinson's assertion Ray had gotten Brown hooked on pain pills was true. 45 RR 31-32 Wilkinson tried, without giving any specifics, to get Burton to admit that Ray could have lied to her, that she didn't always tell the truth. 45 RR 32. Burton responded that Ray never lied to her in the 20 years they were friends. 45 RR 33.

Kemp testified to how she and Ray both got their doctorates, and how close they were. 45 RR 34-40. Wilkinson asked her the same question he had asked Burton, 45 RR 31, if Kemp knew what it was like to be awake for three nights on methamphetamines. 45 RR 42. Of course neither woman knew. It's unclear what the defense strategy was; none of the state's witnesses mentioned, let alone speculated about, Brown's state of mind at the time of the crime. Though Wilkinson asked Kemp to confirm she was not, in fact, inside Brown's head. 45 RR 43.

84

The State then rested, allowing Brown's counsel make the rest of their case for them.

### D. BECAUSE OF THEIR FAILURE TO INVESTIGATE, BROWN'S COUNSEL FAILED TO PRESENT SUBSTANTIAL MITIGATION EVIDENCE TO THE JURY, DENYING BROWN OF AN INDIVIDUALIZED SENTENCING DETERMINATION

Jurors are required to make in an individualized sentencing determination for each defendant in a capital case. *Penry*, 492 U.S. at 319. But in order for a juror to be able to do so, "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Id.* (internal quotation marks and citation omitted); *Eddings*, 455 U.S. at 112 (explaining that consideration of an offender's life history is a "constitutionally indispensable part of the process of inflicting the penalty of death" (internal quotation marks and citation omitted)).

An investigation into a defendant's background is critical to show that a defendant warrants leniency. *Boyde v. California*, 494 U.S. 370, 382 (1990). This is particularly true where defense counsel has possession of files and background information that contain leads to mitigating evidence. "[W]hen 'tantalizing indications in the record' suggest that certain mitigating evidence may be available, those leads must be pursued." *Lambright v. Schriro*, 490 F.3d 1103, 1117 (9th Cir 2007) (internal citations omitted); *Wiggins*, 539 U.S. at 522–23. Given the Texas sentencing scheme, it was imperative upon counsel to investigate and present to the jury evidence which would negate future dangerous and illustrate that Brown's background, character, or the circumstances of the crime compelled a sentence less than death. Because counsel failed to undertake a mitigation investigation as detailed in the section above, they were unable to effectively argue that their client was not dangerous and deserving of mercy. Moreover, their grave failures to understand Brown's background, including ASD, trauma, and abuse, may have condemned him to a death sentence.

Just as in Brown's guilt-phase proceedings, counsel's failures throughout this phase of trial were startling and began during opening statements. Wilkinson's opening statement was three short paragraphs. He failed to directly address either of the special questions the jury would be required to answer. As to future dangerousness, he told the jury, "The other thing you need to know is future danger, how do you predict future danger? I don't know," and then suggested jail behavior could be an indication. 45 RR 17. As to mitigation, Wilkinson said only: "But this is a situation where you have a young man that had been up for three days doing methamphetamine. I submit to you it caused severe problems with him and that is where the problem stems from is his drug usage." 45 RR 17.

Counsel then failed to provide the jury any theory of how Brown would not be a future danger, a summary of the mitigation case, or a framework through which to view the penalty phase proceedings. Wilkinson only said, "Ladies and gentlemen, we're asking for you to listen to everything like you promised you would in answering those special issues." 14 RR 17.

### 1. Counsel failed to investigate the numerous avenues of mitigation and yet again adopted an insupportable strategy

Counsel's complete failure to investigate as required by prevailing professional norms doomed not just Brown's guilt-phase proceedings, but his penalty-phase proceedings as well. Rather than undertake a comprehensive mitigation investigation that would have explored the numerous red flags in Micah's history and background, as discussed above, counsel chose yet another unjustifiable defense: Ray's murder was driven entirely by drugs, and now that Brown had no access to drugs in prison, he was fine and would no longer be a danger while incarcerated.

The defense called two spiritual advisors who worked with Brown after he had been arrested. The first witness that the defense called harmed Brown's case more than helped. 46 RR 5. First, Morris Beene, a counselor and spiritual advisor who visited Brown regularly in prison, portrayed

86

Brown as essentially fixed, now that he was in prison. Beene's testimony was that Brown had recovered from what had plagued him before the murder, precluding the compelling, humanizing narrative counsel should have told about Brown struggling with mental illness, developmental disorders, and trauma that would have helped to explain his behavior. 46 RR 8-14.

Beene told the defense that under his guidance Brown had "worked through the depression. The anxiety issues don't seem to be a problem at this point." 46 RR 12. Brown was now a man "at peace." 46 RR 12. Though Brown had no access to drugs while in jail, Beene testified that, based on a workbook he did with Brown, Brown had made progress on his additions "so that he's really not prone to the drug use at this point." 46 RR 13-14. When Ferguson specifically asked if Micah seemed to have interpersonal or communication problems, Beene said no, he had no flat affect, he was "very open, very personable." 46 RR 24. Inexplicably, when Ferguson asked Beene if lying could have explained Brown's appearance during the news interview (likely anticipating Beene to explain Brown's appearance was the result of chronic drug abuse), Beene said yes, and testified that lying could "make you gaunt." 46 RR 30.

Cross-examining Beene was the first instance of the State bringing up whether Brown was sociopathic.[22] 46 RR 20. When the State asked Beene if he would be surprised that Brown admitted previously on the stand that he blamed Ray for her death and "the Defendant has attempted throughout the trial to consistently paint Stella in a negative light for this jury," Beene admitted he was surprised to both. 46 RR 28-29.

---

[22] The DSMR-IV and V do not recognize "sociopathy" as a clinical condition; it is a social construct. *See e.g.* https://www.psychologytoday.com/us/blog/insight-is-2020/201812/difference-between-the-psychopath-and-so-called-sociopath. That a licensed counselor was unaware of this, and proceeded to answer questions about an unrecognized personality disorder for which there are no diagnostic criteria is troubling. Thus there was all the more reason for counsel to have Brown evaluated by a qualified expert.

Jason Hammock, another minister who visited Brown in prison and was called by the defense, expressed the same surprise as to Brown's testimony that he continues to blame Ray for her death. 46 RR 107. After both men expressed their sincere belief that Brown had repented before the lord, counsel's fatal decision to put Brown on the stand during the guilt phase undermined both men's credibility.

The defense then called three men who had observed Brown's behavior since being arrested—Randy Meeks, 46 RR 33-38, Jerry Stevens, 46 RR 77-83, and John Robinson, 46 RR 88-94. All three men stated that Brown had been well-behaved in jail and caused no problems, as if jail had entirely cured what ailed Brown before the murder. Tony Mock, a former jailhouse inmate who had known Brown for 38 days, and Doris Mock, his wife, testified that Brown was a good influence on Tony and had helped him through depression while they were both in jail together. 46 RR 58-74. Brown's niece, Marley Brown, said that even from prison Brown was attempting to be a positive influence in her life. 46 RR 111-15. These witnesses all painted Brown as a man that was rehabilitated and healed by prison and therefore not a future danger. Such a strategy could only have been informed by an insufficient investigation, as an adequate investigation would have uncovered ASD, and the long-term effects of childhood sexual abuse, neglect, abandonment, and mental illness, none of which can be "cured" by prison.

This defense not only precluded a comprehensive mitigation presentation for the jury, it opened up two avenues of attack by the State. First, the standard for future dangerousness which the jury would be asked to apply was not whether Brown would be peaceable in prison, but was no longer a danger generally. 48 RR 6. As stated in the State's opening argument that even if the defense's experts testify that Brown does not present a future danger while in prison, "[t]he law asks you whether or not there's a probability that the Defendant would be a future danger to society. It

doesn't say prison society." 45 RR 11. Moreover, defense witnesses admitted on cross-examination that if Brown was not in prison and had access to drugs, he may very well become violent again.

> Q: Mr. Beene, you can't tell this jury that, if the Defendant were released today, he wouldn't go straight out and go find access to drugs?
>
> A: I couldn't say that, no.
>
> Q: And you also can't tell this jury that he wouldn't kill again if given the opportunity?
>
> A: I couldn't say that either.

46 RR 23; *see also* 46 RR 174 ("State: Okay. You can't guarantee this jury that the Defendant is no longer violent, can you? Dr. Lundberg-Love: I don't know that anyone can guarantee that.").

Secondly, the State sought to establish that if prison was a place that Brown enjoyed being, then life imprisonment was not sufficient punishment for an individual who had never repented for the murder he committed. Defense witnesses stated that Brown liked prison because it allowed him to "to focus on his life" and "he feels safe there," and "at peace." 46 RR 12. The State introduced evidence that Brown likened prison to a Starbucks. 47 RR 200-01. To bolster their argument that prison was too light a punishment for Brown, the State asked one of the defense experts if she knew that Brown was planning on marrying another inmate when he got to prison. 46 RR 183. The State emphasized that if Brown regarded prison as pleasant, it wasn't punishment, and defense witnesses agreed with the State that Brown should be punished for what he had done. 46 RR 21, 23, 102, 112-13.

As discussed in the previous section, counsel failed to investigate a multitude of red flags in Brown's background, flags that, unlike drug use, jurors would not have held Brown personally responsible for planting. Counsel was on notice of the vast mitigation evidence they could have pursued, as their own expert listed them for the jury. These red flags included (among many others undiscovered by counsel, like ADHD and ASD): childhood sexual abuse, witnessing chronic

physical and emotional abuse among family members, neglect, abandonment by caretakers, and being plied by his stepfather and brother with alcohol starting in middle school. 47 RR 44-45. Because counsel never had any experts evaluate Brown, the jury never heard how these events, for which there will be lifelong, adverse effects, psychologically damaged Brown. Counsel presented no witnesses to speak to Brown's struggles, his family dysfunction and resulting neglect and abandonment, or how he tried to self-medicate and failed because his underlying mental illness, abuse, and trauma, including undiagnosed neurodevelopmental disorders, were never addressed. Counsel were deficient for failing to humanize their client and give a full presentation of the extensive mitigating evidence in his background for the jury, who were then unable to make an individualized sentencing determination as required under the Constitution. *See Penry*, 492 U.S. at 319.

> **2.   Counsel's unreasonable investigation led to a failure to provide experts with critical information and a lack of lay witness testimony to support those expert opinions, and resulted in the jury hearing a constitutionally inadequate mitigation presentation**

Closely related to the duty to thoroughly investigate and present mitigation is the duty to provide complete and accurate information about the defendant's background to evaluating mental-health professionals. *See e.g.*, *Lambright*, 490 F.3d at 1117 (counsel has an affirmative duty to provide mental-health experts with social-history information needed to develop an accurate mental-health profile of the defendant). Only once counsel has assembled an adequate social history and provided that information to experts will they be able to conduct and complete a reliable mental-health evaluation and to recommend additional experts as needed. *See* Russell Stetler, *Mental Health Evidence and the Capital Defense Function: Prevailing Norms*, 82 UMKC L. Rev. 407 (2014); George W. Woods et al., *Neurobehavioral Assessment in Forensic Practice*, 35 Int'l J. of L. & Psychiatry 432 (2012).

### a.   Failure to adequately prepare experts

Counsel then hired experts who failed to evaluate Brown himself, and thus were unable to elaborate on the ways that sexual abuse, trauma, and a lifelong neurodevelopmental disorder specifically influenced Brown's actions over the days around and after the shooting.

But counsel failed to give their experts the necessary material they needed to give an informed opinion. Dr. Lundberg-Love, a psychopharmacologist, admitted that she visited Brown without the benefit of having first received the discovery on Brown's chronic drug abuse. And Dr. Cunningham, who was hired to testify regarding future dangerousness, never had the benefit of receiving the social history prepared by the mitigation specialist, 11 WRR 47-48, even though he stated he had relied heavily on the work of mitigation specialists before. 13 WCR 5126 (DX 61 Writ Hr'g [Cunnnigham Decl. ¶20]).

Dr. Paula Lundberg-Love testified first. The defense asked her to assess how methamphetamine and cocaine use would have affected how Brown's brain was working in the days leading up to and the night of the murder.[23] Dr. Lundberg-Love explained generally how addiction works, rewiring the pathways in the brain to become not a choice, but a disease. 46 RR 130. All of her testimony was general—she testified that a person who is chronically using meth or cocaine will experience similar symptoms to paranoid schizophrenia, and once an individual on these stimulants has those delusions, they are more likely to impulsively act them out, as the drugs have removed any filters to behavior, and the brain doesn't "have those brakes not to do it." 46 RR 146, 155-56. Thus

---

[23]   Dr. Lundberg-Love began her testimony with a short history of amphetamine and methamphetamine use, and made the unfortunate—and ahistorical—statement that, "[a]llegedly Adolf Hitler used amphetamine and we think that's why he -- you know, that was underlying the basis for his paranoid, somewhat psychotic behavior." 46 RR 149-50. Defense counsel, if they had adequately prepared Dr. Lundberg-Love, would have advised her not to make such a comparison to their client, nor jeopardize her own credibility with the jury.

Brown's statement regarding the murder that he just "snapped" was consistent with his drug abuse, as were his phone calls to Ray's mother and to Tracy the night of the murder. 46 RR 153-56.

When the State questioned Dr. Lundberg-Love regarding sociopathy, Lundberg-Love accurately pointed out that "sociopathy" was not a clinical diagnosis, the State was referring to antisocial personality disorder ("ASPD"). 46 RR 207-08. However, because Dr. Lundberg-Love was not asked to evaluate Brown—she was asked merely to do a pharmacological assessment—she could not say Brown definitely did not have antisocial personality disorder. 46 RR 207. In fact, before trial Dr. Lundberg-Love had been under the impression that another expert would be conducting psychological evaluation in order to combat the accusation of ASPD. 13 WCR 5329 (DX 62 Writ H'rg [Lundberg-Love Decl. ¶ 15]). Because of counsel's failures, Brown was never evaluated, and there was no one to definitely refute the State's allegations that Brown had ASPD.

In addition, because counsel never had Brown adequately evaluated, the experts called at trial were unable to use Brown's diagnosis of ASD to bolster their mitigation testimony. As Dr. Lundberg-Love later explained:

> An ASD diagnosis adds another mitigating factor to Mr. Brown's case. It would have been particularly relevant to my understanding of his behavior and his propensity for substance abuse. For example, I would have altered my approach to questioning Mr. Brown regarding his childhood sexual abuse had I known of this diagnosis. As a person with ASD, Mr. Brown would be less likely to disclose sexual abuse, and when he did disclose it, his affect might have been different from that of an individual without ASD. Likewise, knowing about Mr. Brown's ASD diagnosis would have been relevant to my discussion of Mr. Brown's self-medication with drugs and alcohol.

13 WCR 5330 (DX 62 Writ Hr'g [Lundberg-Love Decl. ¶ 18]).

Moreover, Lundberg-Love stated, in response to the State's query, that childhood trauma was part of her counseling practice. 46 RR 193-94. Yet Brown's counsel *never asked Lundberg-Love to discuss Brown's childhood trauma*. There can be no strategic reason for counsel to have hired an expert to opine only about how drug abuse effects in the brain generally—especially when juries rarely

find drug use mitigating—but then neglect to have that same expert explain Brown's sexual victimization as a child and the lifelong effects of that sexual abuse for the jury. Thus, the only childhood trauma that Lundberg-Love testified about was Wesley Williams' possible trauma for having his gun used to shoot his mother. 46 RR 194. Counsel utterly failed to explain and humanize Brown given the opportunity, a failure by counsel for which no deference should be given.

Finally, Lundberg-Love was never given the opportunity to correspond with the other expert testifying in Brown's case, Dr. Cunningham. Because the two experts never spoke, or counsel did not share their findings, they gave conflicting testimony. Lundberg-Love testified that Brown had no history of ADHD, a neurodevelopmental disorder Dr. Cunningham would later testify that he did have. 46, RR 205, 215-16.

Next, Dr. Mark Cunningham was called to testify regarding his opinion on two issues (neither of which required him to evaluate Brown himself): first, what, if any, damaging or impairing factors were present in Brown's background that would have adversely influenced the trajectory of his life leading up to the offense, and second, whether there was a likelihood that Brown would commit serious violence while in prison. 47 RR 24. As to the first, Cunningham listed numerous factors which negatively altered Brown's ability to navigate relationships, adulthood, or high stress situations. 47 RR 35-36. But as Cunningham was not asked to evaluate Brown, he was unable to speak to the additional factor of how fundamentally ASD frustrates a person's ability to navigate the world. These factors include familial dysfunction, a chaotic childhood home, ADHD, a genetic history of delayed growth (Brown did not hit puberty until 18), chronic psychosocial immaturity (also seen in Brown's brother, father, and grandfather), and Brown's observation throughout his childhood of emotional and physical abuse of his mother by his stepfather. 47 RR 41, 42, 44, 85-86.

A significant degree of Cunningham's testimony could have, in the hands of effective counsel, supported a defense to the capital charges at the guilt phase in order to explain and support Brown's

testimony that he "just lost it" rather than committed capital murder. 43 RR 135. For instance, Cunningham spoke about how survivors of childhood sexual abuse are deeply damaged by that abuse, and the adverse effects are lifelong. One of those adverse effects is:

> powerlessness, that the child's will ends up being overwhelmed. Now, later as an adult when Micah feels betrayed by Stella, whether he should or not, when he feels betrayed by her and when he feels powerless that she is manipulating him or gaming him in some way, those feelings in that relationship with her have roots back here in these experiences of sexual abuse and in the experiences of being out of control in his family system, as well as being this little guy who ends up being harassed and bullied and made sport of by his peers in high school. So feelings of powerlessness and experiences of betrayal are ones that are recurrent themes in his life and in his relationships and now out here in the present end up being reactivated.

47 RR 96. Cunningham succinctly explained how the echoes of Brown's trauma, not his intentional or knowing retaliation or obstruction of police officers, was motivating Brown to lash against someone with whom he had an intensely personal relationship. Notably, Brown never acted out against any police officers; indeed, testimony at the guilt phase was that Brown was nothing but polite and acquiescent with the police. 41 RR 97, 129; 42 RR 28-30. That was because police officers had not personally betrayed Brown; in Brown's mind, Ray did. But Cunningham gave this presentation during the penalty phase, not the guilt phase, and the chance for Brown to receive effective representation before his guilt of capital murder had been pronounced had already passed.[24]

Though Cunningham was in the best position to explain mitigating factors to the jury, he was denied the full ability to prepare for trial because Wilkinson had excluded Maureen Griffin from trial preparation. Cunningham told state habeas counsel, "I find that, as an expert who testifies about mitigating circumstances, I am more effective in those cases where I am able to consult with a skilled

---

[24] Notably, both Cunningham and Lundberg-Love testified that it was extremely likely that when Brown committed the crime, he "just snapped." 46 RR 153; 47 RR 100. Why this was presented in the penalty phase as opposed to countering the capital charges during the guilt phase was not strategic; it was inexcusable.

mitigation specialist who has already conducted a thorough mitigation investigation." 13 WCR 5126 (DX 61 Writ Hr'g [Cunningham Decl. ¶ 20]).

Moreover, Wilkinson, despite the special issue the jury was tasked to answer about mitigation during the penalty phase, *still* did not understand what mitigation was, or why it was important. So Wilkinson ultimately skipped a significant amount of Cunningham's presentation on the adverse factors that influenced Brown. Jurors never heard about neurodevelopmental factors, or, given the chronic abuse Brown witnessed in his childhood home, "the presentation of research findings demonstrating a nexus between child maltreatment or observed family violence and violent crime: 13 WCR 5139 (DX 61 Writ Hr'g [Cunningham Decl. ¶ 46]). Wilkinson would later claim he skipped the slides because the jury was bored. 9 WRR 112. But the jury was bored because the defense had given them no narrative framework with which to view expert testimony. If the defense had adequately prepared lay witnesses to provide the groundwork for the experts, those witness would have already humanized Brown, described some of his extreme personal struggles, and explained his actions as the result of human frailty and brain dysfunction. Then, Cunningham would have been merely bolstering that testimony with expert analysis and explanations for the jury, rather than trying to convey the bulk of the mitigation presentation using dry research and statistics.

Cunningham's violence-risk assessment was focused not on Brown himself, but was based upon research and statistics generally. 47 RR 100-143. Therefore, the State's attack was all the more effective because it grounded those statistics by asking about the toll the murder took on the actual people involved. The State repeatedly asked Cunningham to discuss how the murder would alter the trajectory of Willow's and Colten's lives. 47 RR 161-63, 167-70. Without proper preparation, actual expert evaluation of Brown, or lay witness preparation to appropriately explain the vast mitigation evidence and how it affected Brown over the course of his life, defense expert testimony

fell flat, and counsels' deficient performance denied Brown an adequate mitigation presentation and individualized sentencing determination by the jury.

### b.   Failure to adequately prepare lay witnesses

To put on a competent mitigation presentation, counsel must "use lay witnesses as much as possible to provide the factual foundation for the expert's conclusions," as "[f]amily members and friends can provide vivid first-hand accounts of the poverty and abuse that characterize the lives of many capital defendants. These witnesses can also humanize the client. . . ." ABA Guideline 10.11 cmt. Social science research indicates that defense experts are viewed with great skepticism and often regarded as "hired guns" unless their conclusions are supported by abundant, credible evidence from lay witnesses. *See, e.g.*, Scott E. Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony,* 83 Va. L. Rev. 1109 (1997) (finding that two-thirds of the witnesses jurors thought "backfired" were defense experts).[25] Here, counsel were deficient because, despite the availability of numerous lay witnesses who could have provided compelling testimony, counsel presented next to no first-hand lay-witness testimony.

Given their shoddy preparation of experts, it was unsurprising defense counsel did not seem to have a clear strategy behind the lay witnesses they called and the testimony they sought to present. They also failed to use lay witness testimony to support their expert's findings, leaving the jury without a relatable, humanized narrative of Brown's life.

Defense counsel first called Amberly Lago, who lived in California and had moved away when Micah was still young. 45 RR 45. Lago stated that as a child, Brown "was the class clown. He was always making people laugh. Very soft-spoken. Just a sweet, fun person to be around who always just wanted to make everybody laugh." 45 RR 46. Lago testified that Brown's personality changed

---

[25] It most certainly did not help this perception that Wilkinson prompted Cunningham to talk about how much money he made from the work he did. 47 RR 143-44.

after he married Ray; he was not as happy, and "seemed like he was going through a hard time." 45 RR 49. This painted a picture of Brown as a happy, social child unencumbered by abuse, neglect, neurodevelopmental disorders, and trauma. This picture was grossly misleading, but Brown's counsel failed to provide another one for the jurors, one that would help explain how Brown ended up sitting at the defense table.

The State asked Lago if it would surprise her that Brown had told Cunningham that Lago drank every day and abused oxycodone. 45 RR 50. Lago said, yes. *Id.* With those questions, the State undermined the closeness with Brown that Lago had asserted. 45 RR 45. Wilkinson on re-direct had Lago explain that because of an accident that resulted in chronic pain she took doctor-prescribed oxycodone. 45 RR 51-53. It likely did not escape the jury that Lago had just testified she had no experience with drugs. 45 RR 47. If counsel had adequately prepared Lago, the jury would have been left with less questions about her credibility.

Biff Brown, Micah Brown's father, testified about being with Micah a few hours before the murder. 45 RR 55, 57. He went to see Micah because Micah's brother Cory had told him Micah was suicidal. 45 RR 58. Biff testified, "When I went to the door and went in, [Micah] was asleep on the couch; and the house was a mess." 45 RR 58. Biff tried to talk to Micah about religion but said he could tell he wasn't reaching him. *Id.* He believed Micah was going to the hospital the next day, and "thought that was it." 45 RR 60. He testified Micah had never been mean-spirited and he had no idea why Micah would have shot Ray. 45 RR 60-61.

The State asked Biff if he remembered Micah telling him from jail that he did not feel bad about killing Ray. 45 RR 61. When Biff denied Micah saying it, the State reminded him that phone calls at the jail are recorded. 45 RR 61-62. The State also elicited that Biff had called Ray prior to the murder to tell her that Micah would not be coming back to her house to bother her, though Biff admitted, "I had no idea things were as bad as they were." 45 RR 62. Through Biff's testimony, the

State also introduced the jury to information that Micah started taking drugs at 18, and lost a job because of a drug test at 18 or 19. 45 RR 63.

Counsel had Brenda Crofford, Brown's mother, take the stand again. 45 RR 66. Crofford testified that Micah never got in trouble at school. 45 RR 67. She also raised one of the red flags that counsel had failed to investigate. When Wilkinson asked, "Did you have any clue that -- that his temperament was escalating during those few days before this happened?" Crofford answered yes. 45 RR 69. There was no further follow up from counsel. The State, however, was able to elicit significantly helpful testimony for their allegation that Brown made a choice to continue taking drugs. Crofford stated that she had helped Brown in the past with his addictions, and would have done so again had Brown only asked. 45 RR 70-71.

Had defense counsel adequately prepared lay witnesses, they could have supported Lundberg-Love's and Cunningham's testimony and humanized Brown for the jury. For instance, Lundberg-Love testified that people who chronically abuse cocaine or methamphetamine experience "what is a paranoid, psychotic state" that is similar to paranoid schizophrenia. 46 RR 145, 146. This paranoid psychosis led to Brown overreacting to the perception his children being taken away from him. 46 RR 158-59. But Brown's mother could have explained to the jury that this fear wasn't merely a paranoid state induced by drugs; it was in fact Brown's lived experience. As Crofford told a police investigator, Brown kept repeating to her in the days before the shooting how Crofford's divorce from Biff Brown left Brown feeling abandoned by his father. Crofford said Brown "kept talking about his dad, how we got a divorce and [] how he never got to see his dad, even though his dad said he would see him." 53 RR (SX 388C at 13 [Transcript of Brenda Crofford]). Therefore, Brown's drug-fueled paranoia was not the only thing driving his behavior, as defense counsel tried to suggest; echoes of Brown's feelings of abandonment and trauma as a child were also driving his

decompensation in the days before the crime. But because of counsel's deficient performance, the jury was left without key evidence that could have supported a vote for a life sentence over death.

Moreover, when Cunningham testified to the large amount of violence and family dysfunction in Brown's home growing up, Brown's chronic psychosocial immaturity, and the severe effects that childhood sexual abuse continue to have on adult behavior, there were no lay witnesses to testify to any of this evidence, leaving the jury without a full, relatable picture of the mitigation evidence that would be reasonably likely to convince a juror to vote against death. Lay witness testimony seemed to be at odds with expert testimony; Morris Beene stated that Brown was no longer depressed, anxious, or addicted, 46 RR 8, 13-14, whereas Cunningham's testimony was that Brown was struggling with lifelong adverse effects of childhood trauma and abuse. 47 RR 35-36. Brown's niece testified that Brown would "crack jokes and make everybody smile," 46 RR 112, and Brown's sister testified that, "Everybody loved Micah. He was the class clown. He was always making people laugh. Very soft-spoken. Just a sweet, fun person to be around who always just wanted to make everybody laugh." 45 RR 46. Their testimony made Brown sound adept at reading a room and responding not just appropriately but successfully. Yet Cunningham found that Brown had social and psychosocial immaturity as a result of ADHD and genetic factors. 47 RR 78, 89. The lay testimony entirely omitted that Brown was chronically harassed and bullied growing up because of his immaturity and late development, 7 WRR 19, 150-152, 160, leaving the jury with a disjointed, unrealistic picture of Brown's life up to the murder. 47 RR 89, 96. The jury was thus unable to "confront and examine the individuality of the defendant" for "consideration of what this Court has termed '[those] compassionate or mitigating factors stemming from the diverse frailties of humankind.'" *Caldwell v. Mississippi*, 472 U.S. 320, 330–31 (1985) (quoting *Woodson*, 428 U.S. at 304).

Counsel's deficient performance in failing to adequately prepare lay and expert testimony left the jury with conflicting information and an inaccurate portrait of Brown, rendering Brown's sentence unreliable and arbitrary.

### 3. Counsel provided ineffective assistance for failing to adequately investigate, prepare for, and address the State's evidence regarding aggravating evidence

Counsel fundamentally failed, as the ABA Guidelines require, to formulate a defense theory "that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." ABA Guideline 10.10.1. In the guilt-phase proceedings, counsel's defense theory was "the bitch deserved it." 9 WRR 23. Brown as much echoed the same theory when he took the stand. 43 RR 164-65. But that theory allowed the State to mercilessly attack Brown as a cold-hearted, remorseless killer who had not asked forgiveness for the crime and deserved no mercy. In fact, the State told the jury they could consider Brown's counsels' guilt-phase defense against him: "You can consider his desire to drag Stella's name through the mud and make her look as bad as possible during this trial an aggravating factor." 45 RR 14. Counsel's ill-informed and fundamentally flawed defense in the guilt phase only helped to condemn Brown in the penalty phase.

Moreover, counsels' strategy at the penalty phase also supported the State's theory of aggravation. Had counsel worked as team with their mitigation specialist instead of against her, they would have taken her advice about the overemphasis on drugs to the exclusion of other mitigation issues. Maureen Griffin expressed her concerns about focusing solely on drugs in the punishment phase because, "Unless there was some extenuating circumstances to why or how Micah became involved with drugs, that my experience was that many juries find that an aggravator, not a mitigator." 12 WRR 183. Griffin told the team that juries tend not to have sympathy for a drug use defense because they think drug use is "voluntary." *Id.* When Griffin expressed this concern to the defense

team, "They understood what I was saying, but they disagreed. [ . . . ] I said my piece and that was it." 12 WRR 183.

Had Griffin's warnings been heeded and a better, more complete strategy which included the context around Brown's drug use been presented by counsel during punishment, the State would have been deprived one of their strongest aggravating factors. In opening, the State told the jury, "[Y]ou'll hear that this Defendant went to rehab a couple times and actually got off of drugs on his own a couple times. So his desire to stay high when he committed this crime . . . you can consider that as an aggravating factor." 45 RR 12. And because the defense portrayed Brown as a functioning, unencumbered individual both before and after the crime without the influence of drugs, Brown's counsel made using drug abuse as an aggravator simple. In closing, the State again reiterated that "drug use is an aggravating factor. It's just one of another. You know why? Because drug use, it's a choice. It is a decision. At some point, the decision was made to take the drugs." 48 RR 27.

That Brown was using drugs to self-medicate, to help manage his ADHD, social anxiety, depression, trauma, and Autism Spectrum Disorder would have helped explain why drugs were not a simple "choice" that the State could portray as aggravating. Due to counsels' deficient performance, the jury was once again only left with the State's narrative of the crime.

The State also used Brown's family as an aggravator. Counsel assisted this argument by failing to prepare Brown's family for testimony that would have shed light on the deeply dysfunctional, secretive, and abusive home in which Brown was raised (and which Dr. Cunningham only briefly touched on). The State portrayed Brown as coming from "a pretty decent home from a middle class family of good, honest, hard-working people who were willing to do pretty much anything for him; and he blew it off. He had help, he didn't want it . . . instead he chose to kill. That can be an aggravating factor." 45 RR 13.

This was a far cry from what was actually going on in Brown's home. Cunningham identified numerous aspects of family dysfunction in Brown's childhood home:

> The divorce of his parents. The chronic marital dysfunction of the marriage of his mother and stepfather, Chuck. The observation of Chuck's emotional abuse of Brenda, his mother. Observation of chuck's physical and emotional abuse of Corey, the older brother. The sexual abuse of Amberly by Chuck. The sexual abuse of Micah by his stepbrother, Nathan. This is Chuck's son by a prior marriage who is about five years older than Micah. The abandonment by

> Chuck and disillusionment of Chuck as his sexual abuse of Amberly is discovered and he precipitously leaves the family as Micah is in the process of graduating from high school, about a week before. And then there's the corruptive influence of Corey, the older brother, who is giving alcohol to Micah from about the time Micah is 13 years old.

47 RR 44-45. Moreover, counsel presented no lay witnesses to make the connection for the jury about the statistics that Cunningham spoke about—Brown's witnessing of his stepfather's chronic abuse of his mother and brother in childhood would significantly impair his ability to regulate his own behavior as an adult. 47 RR 85-86, 166. But for counsel's failures to present a full picture of Brown's presentation, the State would not have been able to so easily make its case for death, lending that sentence unreliable and arbitrary.

Finally, the State, in rebuttal after the defense rested, played a jailhouse call between Brown and his sister in which he tried to assuage his sister it wasn't that bad, jail was like Starbucks. The State used that to argue that life in prison would not be punishment enough. "You're also going to hear testimony that this Defendant likes jail, that it's like Starbucks. He can drink coffee and read books all day long, doesn't have to work, three meals a day, cot provided, makes friends, even a girlfriend. You can consider that an aggravating factor." 45 RR 15-16.

But because counsel had failed to investigate or have Brown evaluated, they could not have explained how ASD influenced that statement. "Without the context of an ASD diagnosis, the jury may have interpreted this as flip, remorseless and as if Micah was enjoying himself in prison." 14

WCR 5500 (DX 87 Writ Hr'g [Sperry Rep. at 51]). One of the characteristics of ASD is Weak Central Coherence, where the individual understands the individual threads of a situation but cannot see the larger tapestry. So Brown could understand that you drink coffee and read in Starbucks, and he was drinking coffee and reading in prison, but he failed to recognize that he was utterly without any personal freedom or agency while incarcerated in the latter. He could *only* drink coffee and read now. "The larger tapestry that is lost on Micah is that you get to leave Starbucks. In prison, he has lost his liberty, his ability to see his children ever again or have meaningful contact with the outside world." 14 WCR 5500 (DX 87 Writ Hr'g [Sperry Rep. at 51]).

> **4. Counsel's failure to investigate, discover, and explain ASD for the jury allowed the State to argue Brown showed no remorse and no mercy and thus deserved a death sentence; as such, counsel's deficient performance that prejudiced Brown**

Despite all the red flags in Brown's file, the mitigation specialist's repeated suggestion that Brown be evaluated, and her explicitly informing counsel that Brown likely has ASD,[26] counsel failed to investigate Brown's background or evaluate him to have discovered he had suffered from a lifelong neurodevelopmental disorder. 7 WRR 105. Due to counsel's deficient performance, the jury was unable to make an individualized sentencing determination for Brown as person with Autism Spectrum Disorder, and the State used Brown's disability to their advantage in arguing for the death penalty.

The State asked the very first defense witness, counselor Beene, his impressions of the Channel 11 interview: "In watching the Channel 11 interview, did you not believe that Micah Brown exhibited sociopathic qualities?" Beene responded, "In that interview he sure looked like one, yes." 46 RR 21. In closing, the State tried to make Brown's demeanor evidence of that sociopathy and

---

[26] 1 WCR (St. Habeas Appl. Ex. 8 [Griffin Aff. ¶ 18]), 2 WCR 395 (St. Habeas Appl. Ex. 21 at 13); 10 WRR 259-60; 11 WRR 42; 12 WRR 186.

dangerousness. "You look at that Channel 11 interview, you look at Felicia's interview and you look at the Defendant's eyes, you look at his face, you look at his responses, you listen to his responses. His entire countenance suggests nothing more than he is dangerous.[27] 48 RR 21.

The State repeatedly brought up Brown's lack of show of remorse, which, if counsel had performed reasonably, they could have explained as a lack of *ability to show* remorse. "Ladies and gentlemen of the jury, mercy is given by God to those who show true repentance. Right? True repentance . . . Have you seen that from this Defendant? Absolutely not. So give him what he's asking for." 48 RR 51-52. Because counsel fundamentally failed to conduct an adequate investigation that would have revealed information crucial to explaining to the jury Brown's difficulty showing emotion, then the State could have less successfully used Brown's demeanor as evidence of sociopathy, future dangerousness, and compelling the jury to sentence Brown to death.

What the jury needed to understand to render a reliable death sentence was that Brown's Autism Spectrum Disorder fundamentally affects the way he communicates and expresses himself.

---

[27] Defense counsel should have objected to this argument as improper.

> The precedents that we have discovered from other circuits agree that courtroom demeanor of a non-testifying criminal defendant is an improper subject for comment by a prosecuting attorney. Of course, it is inevitable that jurors will observe a defendant at counsel table during the course of a trial. Some jurors may form opinions from these observations regardless of instructions given them by the court. This is a natural consequence of a defendant's decision to exercise his right to be present at trial. *See Faretta v. California*, 422 U.S. 806, 819 n. 15 (1975). But the prosecutor may not elevate these opinions that may arise with "no help from the court" to the status of evidence which jurors should consider during their deliberations. *United States v. Wright*, 489 F.2d 1181, 1186 (D.C.Cir. 1973). [The defendant] did not testify. His courtroom demeanor was not "in any sense legally relevant to the question of his guilt or innocence of the crime charged." *Id.* The prosecutor's comments were error.

*United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008). A prosecutor arguing that a defendant should be sentenced to death for their appearance or demeanor when that defendant has ASD is especially offensive to the Eighth Amendment, as it is tantamount to arguing that a person should be executed not because of the severity of their crime but because of the nature of their disability.

Dr. Gary Mesibov, an expert in autism diagnosis in adults, testified during state habeas proceedings that all people on the Autism Spectrum struggle with "communication difficulties. Some of the ones that are most profound would be maybe their voice -- the tone of their voice sounds very – very stiff and sometimes very rigid and not a lot of inflection." 7 WRR 41. People with ASD not only have trouble communicating emotions, they struggle with understanding them in other people and themselves. People with ASD are "good with things that are concrete. Emotions aren't . . . So it's hard for them to deal with them. It's hard for them to understand their own emotions." 7 WRR 49. Brown maintains a "flat affect, not much emotional expression." 7 WRR 114. When Dr. Mesibov interviewed Brown, he noticed, "His face was pretty rigid and stern, I guess. It's a strong word for it, but -- but didn't show a lot of emotion." 7 WRR 108. Mesibov saw the same flat affect in Brown's news interview. 7 WRR 115. Mesibov highlighted that for those who do not have ASD, observing that demeanor would negatively affect their view of Brown:

> The other thing is, in terms of a criminal, you know, people – we're suspicious of people who look like that. . . . And so I look at that and I say to myself, boy, people are going to think he's cold and unfeeling. But again, from my background, if he has an autism spectrum disorder, that's what they do. For some reason their brain does not connect to smiling and looking and responding and reacting.

7 WRR 115.

Dr. Mesibov stated that although Brown's interview was full of red flags indicating ASD, one of Brown's answers stood out to him. When asked why Brown killed Ray, he answered he wanted her dead. That statement stood out to Mesibov as indicative of ASD for two reasons. One, because "the direct, factual, unemotional statement, 'I wanted her dead'" is "very indicative of autism." 7 WRR 119. And two, because of the concreteness of the answer. People on the autism spectrum struggle with nuance in communication, and so are "not giving any thought to how that [answer is] going to come across to other people." 7 WRR 119. *See also* 14 WCR  5500 (DX 87 Writ Hr'g

[Sperry Rep. at 44]) (explaining the answer as "an example of excessive candor and concrete/literal thinking" and typical for ASD).

Ultimately, counsel's deficiencies in diagnosing Brown's ASD allowed the State to portray Brown as "sociopathic" and dangerous. 46 RR 20 (prosecutor describing sociopaths as having "a distinct lack in fear and emotion towards others"). Brown's difficulties in understanding his own emotions, communicating them to others, and then understanding how others would view his answers because of his undiagnosed ASD greatly prejudiced him during sentencing. "It has been repeatedly documented that Micah has either a flat affect (neutral facial expression) or a smile, regardless of his internal mental state. A neutral, negative or ambiguous display of affect could put the person with ASD at a disadvantage during the penalty phase." 14 WCR 5489-90 (DX 87 Writ Hr'g [Sperry Rep. at 40-41]). Without the benefit of knowing Brown had ASD and understanding how this affected him, "the jury would have interpreted Micah's bizarre or absent displays of remorse during his police interrogation, television interview and his behaviour in court" as aggravating, which "would have impacted their sentencing decision." 14 WCR 5490 (DX 87 Writ Hr'g [Sperry Rep. at 41]).

Because the jury did not have information on Brown's lifelong neurodevelopmental disorder, the jurors may very well at the State's urging have sentenced Brown to death based on prejudice or mistake. *See Eddings*, 455 U.S. at 118 (O'Connor, J., concurring) ("[T]his Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake"). Counsel's deficient performance rendered Brown's sentence unreliable, and he must be granted relief. *See Caldwell*, 472 U.S. at 328–29; *see also Barefoot v. Estelle*, 463 U.S. 880, 924 (1983) (Blackmun, J., dissenting) (*Woodson*'s concern for

106

assuring heightened reliability in the capital sentencing determination "is as firmly established as any in our Eighth Amendment jurisprudence").

### 5. Counsel provided ineffective assistance when they failed to object to aspects of the State's closing argument

State prosecutors made a number of inappropriate comments during closing arguments. *See* CLAIM 5. Some counsel objected to. However most went unchallenged by Brown's counsel, and Brown was prejudiced by counsel's deficient performance.

A sentencer must make an "*individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 879 (1983) (emphasis in the original). The State improperly appealed to juror's obligations to police officers and community safety to urge jurors to sentence Brown to death. They implied that if jurors failed to impose a capital sentence, it would chill public requests for police assistance and endanger others. The State told the jury:

> You know, we talked about this at guilt/innocence. What changed that caused him in that last two weeks to kill Stella. It's these offenses he doesn't want her calling the police, he doesn't want her reporting what's happened. He doesn't want her heard.
>
> And, ladies and gentlemen, the fact that someone would take a witness or a victim in a case and hunt them down and shoot them is enough for you to determine that a death sentence is appropriate. Think about that. Do we want people to come forward and ask for help?

48 RR 60.

The State then told jurors that they should consider not just an individualized sentence for Brown but appealed to jurors' sense of law and order, insisting that jurors needed to consider the effect of crime on law enforcement. Essentially, to vote for life would be to disrespect local law enforcement:

> And what about all the police officers in this case who did a great job and worked so hard to bring you every bit of evidence they could . . .   What about Perry Sandlin

and all those TAC officers who were out there all night long who were afraid at any
moment he might kill them or shoot them?

What about them? When the cops do their job, when they bring you a case, when
they solidify every piece of evidence and show it to you and hand it to you, you've got
to consider them, too.

48 RR 61-62.

These statements were improper. *See* ABA Standards for Criminal Justice § 3-6.7(c) (4th
ed. 2015) ("prosecutor should not make arguments calculated to appeal to improper prejudices");
*see also United States v. Darden*, 688 F.3d 382 (8th Cir. 2012), cert. denied, 133 S. Ct. 2817
(2013) (prosecutor invites jury sympathy by questioning why police officers would "risk their careers,
families, lives" to put an innocent man in prison, and insinuating that an acquittal would tell police
that "helping honest residents" and "people who are hearing gunfire every night and who are worried
about sitting out on their porch in safety" is "meaningless").

To put the responsibility of law and order and the safety of the community on the shoulders
of jurors undermines confidence that Brown's death sentence was not imposed based upon a sense
of obligation to protect the community as opposed to the individualized sentencing determination
that is constitutionally required. *See Eddings*, 455 U.S. at 110–112; *Lockett*, 438 U.S. at 601–605
(plurality opinion). The State repeated this theme multiple times, urging jurors to vote for death to
protect those in a town where almost everyone knew each other. "One way to guarantee that this guy
won't hurt anyone else one hundred percent is a death sentence. One way to guarantee that no other
family goes through any suffering at the hands of this Defendant is a death sentence. Isn't one
enough? Do we need more? Really, do we need more?" 48 RR 60-61.

Just in case the jury was not sufficiently swayed by concerns for community safety, the State
implied that a capital sentence was required to protect *all* women in the community from domestic
violence. "The loss of [Ray's] life is part of your consideration. Did she have value? Did she deserve

to have the opportunity to call the police and ask for help and not be killed for it? Do we want other women in her position to do the same thing?" 48 RR 63. *See e.g. United States v. Barragan*, 871 F.3d 689 (9th Cir. 2017), cert. denied, 138 S. Ct. 1572 (2018) (improper for prosecutor to urge jurors to convict defendant in order to protect community values, preserve civil order, or deter future lawbreaking); *Bates v. Bell*, 402 F.3d 635 (6th Cir. 2005) (prosecutor improperly argues at penalty phase of capital trial that voting for life sentence would be tantamount to voting for death sentence for some future victim).

These arguments are especially improper where, as state habeas counsel pointed out, the town of Greenville, and "the character of Hunt County—namely, the close-knit community it fosters" made this crime personal for many of the seated jurors. 1 WCR 113. "Indeed, the news reports of Ray's murder noted that this was a 'community where everyone seems to know each other.' (Ex. 15 at 12 [CBS 11 News].)" 1 WCR 113. A considerable number of jurors knew the prosecutors, law enforcement officers, the families involved, and each other. 1 WCR 113-14. Community pressure on those jurors would have been considerable. Counsel was deficient for not objecting when the prosecutor's arguments were directly targeted at increasing that community pressure and denying Brown an individualized sentencing and full consideration of his mitigation. *See Penry*, 492 U.S. at 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)).

The prosecutor's misleading and prejudicial remarks prejudiced Brown by creating the risk that he was sentenced to death in an arbitrary and capricious manner. *See Furman v. Georgia*, 408 U.S. 238, 274 (1972) (Brennan, J., concurring). Had trial counsel objected and the trial court appropriately restrained the State, there is a reasonable probability that the outcome of the sentencing proceeding would have been different.

### E. Brown was prejudiced by his counsel's individual and cumulative failures, and the mitigation evidence that was not presented is sufficiently substantial to undermine the reliability of the death sentence in this case

A defendant is prejudiced where there is a reasonable probability that at least one juror would have been persuaded to vote for life by what could have been presented in mitigation had counsel not performed deficiently. *See, e.g. Sears*, 561 U.S. at 954–55. The question is not whether the jury would have credited the evidence developed in the post-conviction proceedings, but whether the nature and quality of that evidence would have created a reasonable probability of a different result at the guilt-innocence or penalty phase. As the Fifth Circuit has explained:

> In conducting the *Strickland* prejudice analysis in this context, the Court has explained that we must consider both the "newly uncovered evidence" presented to the state habeas court, "along with mitigating evidence introduced during [the petitioner's] penalty phase trial, to assess whether there is a reasonable probability that [the petitioner] would have received a different sentence after a constitutionally sufficient mitigation investigation." *Sears v. Upton*, 561 U.S. 945, 956 (2010). After "compar[ing] the evidence actually presented at sentencing with any additional mitigating evidence presented in the habeas proceeding[,]" we inquire as to "whether under the applicable state capital sentencing statute, the additional mitigating evidence [is] so compelling that there [is] a reasonable probability that at least one juror could have determined that because of the defendant's reduced culpability, death [is] not an appropriate sentence." *Ruiz v. Stephens*, 728 F.3d 416, 424 (5th Cir. 2013) (internal quotation marks and footnote omitted). In so doing, we consider all evidence presented to the state habeas court, without limiting our analysis to evidence that would have been admitted under Texas evidentiary rules. *Id.* at 424–25.

*Escamilla v. Stephens*, 602 F. App'x 939, 941–42 (5th Cir. 2015) (per curiam).

In assessing prejudice, a reviewing court considers the effects of more than one deficiency cumulatively. In *Strickland*, the Supreme Court explained that a showing that counsel's deficient performance prejudiced the defendant requires that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687; *see also id.* at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

As stated in the previous section, like the Supreme Court, the Fifth Circuit has previously applied a cumulative *Strickland* prejudice analysis when confronted with a case in which there were multiple instances of deficient performance by counsel. *See, e.g., White v. Thaler*, 610 F.3d 890, 912 (5th Cir. 2010) (holding, in the alternative, that "[t]he combined prejudicial effect of the post-arrest silence and the death of the unborn child inexorably leads us to conclude that White has shown that the state court's conclusion that there was no reasonable probability of a different outcome is objectively unreasonable."); *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) ("We will address each aspect of Davis's performance the district court found deficient before considering whether Richards was cumulatively prejudiced thereby."). Accordingly, this Court should consider the resulting prejudice from the numerous examples of trial counsel's deficient performance in a cumulative manner and grant Brown relief.

As explained above, the outline of a strong mitigation case can be gleaned from the extremely limited investigation conducted by counsel in acquiring records and from the information recovered in the brief time she was on the case by Maureen Griffin. Griffin put counsel on notice that Brown likely suffered from a neurodevelopmental disorder and mental illness (as well as from copious records including hospitalization for suicide), and was aware of the sexual abuse, neglect, significant family dysfunction, and long-term exposure to familial violence in Brown's childhood. *See* CLAIMS 1(B) and 1(D) above. Yet this presentation was never made to the jury.

This abundant evidence starkly illustrates the difference between what counsel could have presented and what actually was presented. Trial counsel's failures cannot be reconciled with the Eighth and Fourteenth Amendment requirements that sentencing procedures "focus the jury's attention on the particularized nature of the crime," *Gregg v. Georgia*, 428 U.S. 153, 206 (1976), while also allowing "the particularized consideration of relevant aspects of the character and record" of the individual defendant, *Woodson*, 428 U.S. at 303 (1976). Because "an individualized decision

111

is essential," *Lockett*, 438 U.S. at 605, the Eighth Amendment mandates that the sentencer "not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death," *Id.* at 604. Likewise, the sentencer may not "refuse to consider, as a matter of law, any relevant mitigating evidence." *Eddings*, 455 U.S. at 114 . Relevant mitigating evidence is not limited only to evidence that would "relate specifically to petitioner's culpability for the crime he committed." *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986). Likewise, there is no requirement that mitigating evidence even have a "nexus" to the offenses or that the defendant make any showing that "the criminal act was attributable" in any way to the mitigating factors. *Tennard v. Dretke*, 542 U.S. 274, 286 (2004).

In essence, the Eighth Amendment provides this fundamental premise: If the sentence fails to consider "those compassionate or mitigating factors stemming from the diverse frailties of humankind," an unacceptable risk exists that the death penalty will be imposed in spite of factors that warrant a less severe penalty. *Woodson*, 428 U.S. at 304.

A jury can only consider evidence in mitigation, however, if trial defense counsel reasonably and diligently investigates and then presents the available evidence. Because the scope of the evidence that may be considered by the jury in sentencing is extraordinarily broad, trial counsel is under a greater obligation to discover, investigate, evaluate, and digest evidence in mitigation. "The responsibility of the lawyer is to walk a mile in the shoes of the client, to see who he is, to get to know his family and the people who care about him, and then to present that information to the jury in a way that can be taken into account in deciding whether the client is so beyond redemption that he should be eliminated from the human community." *Battenfield v. Gibson*, 236 F.3d 1215, 1229 (10th Cir. 2001) (quoting Stephen B. Bright, *Advocate in Residence: The Death Penalty As the*

*Answer to Crime: Costly, Counterproductive and Corrupting*, 36 Santa Clara L. Rev. 1069, 1085-86 (1996)). Brown's defense counsel utterly failed to meet this burden, and Brown was prejudiced.

### F. CONCLUSION

The prevailing professional norms in 2013 required, at minimum, that defense counsel attempt through mitigation investigation and evidence to provide the jury with the complete picture of Brown's life and circumstances to allow the individualized consideration required by the U.S. Constitution. Trial counsel's performance here did not meet this burden, and the cumulative consideration of trial counsel's deficiencies resulted in an unconstitutionally rendered capital sentence. Counsels' deficient performance and resulting prejudice undermines confidence in Brown's death sentences and requires relief.

### CLAIM 3. BROWN'S COUNSEL WERE INEFFECTIVE DUE TO A CONFLICT OF INTEREST ON THE DEFENSE TEAM, DENYING BROWN HIS CONSTITUTIONAL RIGHT TO COMPETENT AND UN-CONFLICTED REPRESENTATION

Brown's constitutional rights were violated when his trial counsel proceeded to trial plagued by a significant conflict of interest, failed to disclose the conflict, and failed to obtain informed consent from Brown. The conflict resulted in deficient performance by counsel, had a devastating effect on the strategy counsel adopted at the guilt phase, and thereby prejudiced Brown. Brown failed to receive effective representation as guaranteed under the Sixth and Fourteenth Amendments. Brown incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. This claim was not presented to the state courts. However, there is a clear path to merits review in state court, and should the claim ultimately be defaulted, any default is excused and this Court may review the claim de novo.

### A.  LEAD COUNSEL RESOLVED A CONFLICT BETWEEN BROWN AND THE FACT INVESTIGATOR ON BROWN'S CASE AGAINST BROWN

The Supreme Court has stated that, "perhaps the most basic of counsel's duties" is "the duty of loyalty." *Strickland,* 466 U.S. at 692. "The [S]ixth [A]mendment right to effective assistance of counsel derives from the defendant's fundamental right to a fair trial, a goal best achieved by ensuring that the process involves vigorous partisan advocacy by both sides." *United States v. Newell*, 315 F.3d 510, 515 (5th Cir. 2002) (quoting *Haynes v. Cain,* 272 F.3d 757, 761 (5th Cir.2001)). Therefore, counsel are obligated to avoid conflicts of interest with their clients to ensure the fairness of an adversarial proceeding. *Strickland,* 466 U.S. at 692. The obligations to avoid such includes not just those that arise between clients but also conflicts "between the attorney's personal interest and that of his client." *Beets v. Scott*, 65 F.3d 1258, 1260 (5th Cir. 1995). This Circuit applies a *Strickland* test to a conflict between a client and a member of the defense team. Brown can show that his counsels' performance was deficient, as it fell well below a professional standard of reasonableness, and that deficient performance prejudiced Brown. *See Strickland,* 466 U.S. at 686–97; *Perillo v. Johnson*, 205 F.3d 775, 781–82 (5th Cir. 2000); *Beets,* 65 F.3d at 1265.

While recognizing this Circuit's precedent, Brown contends that a different standard, that set out in *Cuyler v. Sullivan*, 446 U.S. 335 (1980), should apply to this conflict. And under the less-demanding *Cuyler* test, Brown also prevails.

### 1.  Introduction

An individual known to have information that would support Brown's otherwise insupportable defense was identified early on in the case by both counsel and Brown's investigator. Jennifer Smith, a friend of Stella Ray's who Ray had done drugs with, could have testified about the victim's drug use, and could have corroborated the ill-conceived defense theory that the victim was

a drug addict who had gotten Brown hooked on opioids and precipitated his decline that resulted in murder.

However, Jennifer Smith was the wife of Brown's investigator, James Smith. If Jennifer Smith were to testify about her knowledge of Ray's drug use, she would have to disclose her own. Prior to trial, James Smith made it clear that he would not permit his wife to be called as a witness to support the defense theory. As a result, trial counsel never called Ms. Smith at trial and the failure to do so left Brown's defense without support and open to attack by the prosecution. This conflict violated Brown's constitutional rights.

### 2. Trial counsel protected the interests of his investigator over those of his client

Brown was denied his Sixth Amendment right to effective assistance of conflict-free counsel at trial because his trial attorney, Toby Wilkinson, was acting under a "duty of loyalty" not to Brown, his client, but to James Smith, his friend and long-time collaborator. *Strickland,* 466 U.S. at 692.

Brown's lead trial counsel, Toby Wilkinson, successfully sought to have James Smith appointed as the investigator on Brown's case, at the same time he was appointed to represent Brown. 1 CR 40, 41, 43; 9 WRR 27.[28] Wilkinson and Smith had worked on several cases together prior to Brown's, and Wilkinson "trusted" and "relied on" Smith.[29] 9 WRR 27-28. They were so close that they took a court-funded vacation together, using distant relations who did not know Brown well as an excuse to take a trip to California to go horseback riding on the beach rather than

---

[28] Wilkinson also, for a brief period of time which overlapped his representation of Brown, represented the jailhouse inmate who months before that representation allegedly received a letter written by Brown while the two men were incarcerated together. The letter made its way to the police investigators and eventually to the prosecutors. The letter was then admitted into evidence against Brown. 40 RR 223 (SX 86). Though counsel objected to its admittance, 40 RR 218-23, the extent of Wilkinson's relationship with the jailhouse informant or knowledge about the letter is not currently known.

[29] Wilkinson testified that he would have had Smith appointed on the case even if it "had been a burglary," because it was a criminal case. 9 WRR 135-36.

undertake substantive investigative work. 10 WRR 128-32; 11 WRR 101. Therefore, while Smith's wife, Jennifer, would have been an important witness for the defense, Smith determined his wife would not testify and the defense team acquiesced to that wish, hamstringing themselves from effectively arguing their (strategically unsound) theory of the case to defend Brown from a capital murder conviction.

The defense that counsel settled on, "the bitch deserved it," required "painting [Ray] as a drug addict who manipulated Micah." 9 WRR 28. Therefore counsel wanted to present the victim in a way that they believed many in the community did not see, the "shoveling-cocaine-up-her-nose Stella." 12 WRR 59. To do so, counsel had to investigate Ray's background, her drug use, and her reputation in the community. 9 WRR 28-29. The defense team was well aware that Jennifer Smith and Ray had used drugs together in the past and that Jennifer Smith could have testified to that fact. 9 WRR 29. Yet Jennifer Smith was never called as a witness at trial.

For a defense team to decline to call a witness who could have bolstered their defense merely because the defense investigator did not wish to have himself or his wife embarrassed at trial presented a clear conflict of interest. Brown's mitigation specialist, Ms. Griffin, raised the concerns to Brown's defense team and requested a team meeting to discuss the issue. 11 WRR 54. No team meeting was held. Rather, second-chair, Ferguson and Investigator Smith met with Brown's family. 11 WRR 54. Smith took the position that if his wife testified, he would have to withdraw from the case, and a new investigator would have to be appointed. 11 WRR 54-55, 103. Smith informed Brown's mother, Brenda, that he did not want his wife to testify, and if she did testify, he would have to withdraw "because he was not going to allow his wife to testify." 11 WRR 104-05. If this were to happen, Brown would "lose the investigator." 11 WRR 105. Because of the conflict, Brown's mother (rather than Brown himself) was asked to make a choice: either call a witness (who could have been significantly meaningful in establishing the defense theory of the crime), or lose an investigator as

116

trial was looming. Brown's mother deferred to the defense team, as she was concerned about Brown's chances at trial without the benefit of an investigator. 11 WRR 104-05.

For a client to waive a conflict of interest regarding a Sixth Amendment right to effective counsel, such waivers must "not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *United States v. Newell*, 315 F.3d 510, 519 (5th Cir. 2002) (quoting *Brady v. United States,* 397 U.S. 742, 748 (1970)). But Brown himself was never told about the conflict, let alone given the chance to consent to this decision. 10 WRR 126. Thus, Wilkinson's loyalty remained to his investigator, and Jennifer Smith did not testify. 11 WRR 55.

Jennifer Smith's testimony, in the small close-knit community of Greenville, would have been detrimental to the Smiths' reputation. News coverage of Ray's murder described Greenville as a "community where everyone seems to know each other." 1 WCR 275 (Ex. 15 [transcript of CBS 11 News Report at 12]). Defense counsel was aware of the conflict, and would have understood why James Smith would not want his wife to testify to using drugs with the victim. The concern was so great that no one else on the defense team could proceed in any way in which the Smith's interests could be compromised. James Smith made it clear to Maureen Griffin, the mitigation specialist, that he wanted her to "stay away from anything involving drug activity." 12 WRR 182. Specifically, Smith told Griffin to "stay away from any witnesses pertaining to the drug issue," because "it wouldn't be safe for [her]." 12 WRR 187. This was pretext; Jennifer Smith was not a physical danger to anyone. The information she had merely presented a danger to both her and her husband's reputation in the community. So while Griffin "was also interested in speaking to witnesses regarding Micah's drug use," as part of her mitigation investigation and creation of a complete social history for Brown, she was unable to, as she was informed she was "to avoid those issues and witnesses, as Mr. Smith was to handle them." 1 WCR 230 (St. Habeas Appl. Ex. 8 [Griffin Aff. ¶ 16]). Of course Smith never

117

handled them, and that information was excluded from the comprehensive mitigation portrait that Griffin was trying to paint. This benefited nobody but the Smiths' and their reputation.

Ultimately, counsels' choice to protect their investigator's personal interests over that of their client presented an unconstitutional conflict which prejudiced Brown at trial.

### B.   COUNSEL'S CONFLICT PREJUDICED BROWN

In his opening statement to the jury, Wilkinson told the jury that the evidence was going to show that Ray was "a mean-spirited, cold-hearted lady," who "pushed [Brown's] buttons." 40 RR 34. This portrayal was to include the fact that Ray used drugs. *Id.* This depiction was integral to the defense theory: that Ray got Brown hooked on drugs, manipulated him, and, "unfortunately, it turned out bad for her." *Id.* Ray was dead, according to Wilkinson, because "this lady played with fire and this man's heart regarding his kids until she got burned." 40 RR 35. Trial counsel admitted that part of the defense theory was that Ray "got him on drugs - - or at least got him using meth." 9 WRR 23.[30]

Trial counsel promised the jury that it would hear evidence of a "bad-Stella," evidence that could have been presented through Jennifer Smith. Counsel never delivered on this promise. "Promising a particular type of testimony creates an expectation in the minds of jurors, and when defense counsel without explanation fails to keep that promise, the jury may well infer that the testimony would have been adverse to his client and may also question the attorney's credibility." *United States ex. rel. Hampton v. Leibach,* 347 F.3d 219, 259 (7th Cir. 2003)

Although defense counsel's broken promise to present certain evidence to the jury may be justified when unexpected developments warrant such a change in trial strategy, if the failure to

---

[30] This assertion was factually incorrect, and handily debunked by the State at penalty-phase proceedings. *See* 46 RR 213-14. Had counsel actually done an adequate investigation into Brown and Ray's drug use instead of taking steps to protect Smith, Wilkinson would perhaps not have mislead the jury with insupportable claims.

present the promised testimony is not caused by unforeseeable events, the attorney's broken promise may be reasonable. *Id.* at 257. However, when the failure to present the promised testimony cannot be chalked up to unforeseeable events, the attorney's broken promise may be unreasonable, for "little is more damaging than to fail to produce important evidence that had been promised in an opening." *Anderson v. Butler*, 858 F.2d 16, 17 (1st Cir. 1988); *see also Washington v. Smith*, 219 F.3d 620, 634 (7th Cr. 2000) (failure to produce witness identified in notice of alibi and mentioned during voir dire gave rise to "negative inference" against the defendant). Here, it was known and decided before counsel's opening statement that Jennifer Smith would not be testifying, and no other testimony was offered to back up counsel's promise. There were no unforeseeable events that caused counsel to break his promise to the jury.

After taking the stand, Brown testified that he and Ray used all kinds of drugs together, including "hydrocodone, Xanax, Valium, marijuana, cocaine, crack cocaine, methamphetamine, alcohol." 43 RR 85-86. No other witness testified that Ray used drugs. On cross-examination, when Brown was asked about allegations of Ray's drug use, he replied, "There's no way to prove it." 43 RR 192. Of course there was, but Wilkinson's loyalty to his friend and colleague precluded Jennifer Smith from testifying. Her testimony would have not only supported the credibility of Brown's testimony, it would have supported the defense theory of the crime, and delivered on defense counsel's promise to the jury that it would hear about the other side of Ray. Calling Ms. Smith as a witness was a "plausible defense strategy or tactic [that] might have been pursued but was not, because of the conflict of interest." *Perillo v. Johnson*, 79 F.3d 441, 449 (5th Cir. 1996). But rather than allow the Smiths' reputation to be harmed, the defense counsel offered the jury promises and a defense that they never intended to support, all to Brown's detriment.

In his closing argument to the jury in the liability phase, the prosecutor immediately attacked Brown's testimony regarding Ray, calling it "not credible in many aspects." 44 RR 18. The prosecutor

pointed out to the jury that there had been "no evidence that there were two Stellas. There's been no evidence that there was a good Stella or a bad Stella. In fact, the testimony that's before you is we had a good Stella." 44 RR 29. The prosecutor repeated his attack on the defense theory:

> There is no bad Stella in this case. . . . Listen to the credible evidence. Time and time again, the issues that -- perhaps that she mistreated the Defendant, that's not true. The drugs, there was some marijuana that was found in her system. There is not a shred of evidence before you to suggest that drugs or any marijuana in Stella's system had anything whatsoever to do with this case, none.

44 RR 30.[31]

In his closing argument at sentencing, the prosecutor returned to defense counsel's broken promise to the jury:

> If you remember the opening, that there was going to be these bad things about Stella, that never materialized, that never happened. You didn't get that evidence. There was an attempt but the evidence there, it did not accomplish that. Stella didn't get him on dope, if he even used.

48 RR 28.

There is no question that Wilkinson's loyalties to Smith over his client prejudiced Brown. Wilkinson determined that it was more important to preserve the Smith's standing in the community than support the defense's own theory in the guilt phase of Brown's capital trial. Moreover, this decision had grave consequences in the penalty-phase proceedings, where the State emphasized to the jury, "You can consider his desire to drag Stella's name through the mud and make her look as bad as possible during this trial an aggravating factor" to support a death sentence. 45 RR 14.

In sum, counsel failed to inform Brown of the conflict of interest between the investigator on his case and his defense, let alone gave Brown the chance to waive the conflict. *See Newell*, 315 at

---

[31] The prosecutor further attacked Brown's credibility by doubting the testimony that Brown, himself, was using drugs. 42 RR 24 ("And again, I don't think the evidence supports that. I don't think the evidence supports that Stella would stay with him if it was horrible. There was a hydrocodone issue, the Defendant admitted that himself.").

519. Counsel precluded the mitigation specialist from effectively investigating the mitigation in Brown's case by preventing her from including Brown and Ray's drug use into Brown's social history. 12 WRR 187; 1 WCR 230. Counsel's assertion that Ray instigated and thus deserved her murder was so unsupported by the guilt-phase proceedings that Wilkinson dropped the claim in closing argument, telling the jury, "[D]on't get confused or distracted on, well, was Stella really a good person or was Stella really a bad person. We're not saying. We don't know." 43 RR at 46-47. There is no question that the conflict resulted in deficient performance, fatally undermined the defense theory of the case, and Brown was thus prejudiced.

The trial errors made by conflicted counsel were so numerous, and so substantial, that trial counsel simply was not functioning as the counsel guaranteed by the Sixth Amendment. *See Strickland*, 466 U.S. at 694; *White v. Thaler*, 610 F.3d 890, 912 (5th Cir. 2010). Counsel resolving a conflict in favor of the defense team investigator over the interests of Brown individually and cumulatively contributed to Brown's denial of constitutionally guaranteed representation.

**CLAIM 4.**      DUE TO PERVASIVE AND EXTREMELY PREJUDICIAL PRE-TRIAL AND TRIAL PUBLICITY, BROWN'S TRIAL WAS CONDUCTED IN AN ATMOSPHERE THAT RENDERED IT INHERENTLY UNFAIR, AND TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO MOVE FOR A CHANGE OF VENUE

Brown was accused of murder and brought to trial in a small, close-knit community that had been barraged by publicity against him, including repeated airings of an edited, taped confession with a news reporter. Despite the overwhelming indication that a fair trial before an impartial jury would not be possible in Hunt County, counsel failed to move for a change of venue, and the trial court did not act to preserve Brown's due process rights to a fair trial. Brown incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. This claim was partially presented to the state courts, but because the state courts failed to meet the standards that

would trigger deference under § 2254(d), including adjudicating the claim on this claim on the merits, this Court may consider the claim de novo.

## A.  INTRODUCTION

The Sixth Amendment guarantees the accused in all criminal prosecutions the right to a trial by an impartial jury. *Duncan v. Louisiana*, 391 U.S. 145, 148-54 (1968). Included with this fundamental right is the right to a trial by a jury free from outside influences, such as prejudicial pre-trial publicity. *Sheppard v. Maxwell*, 384 U.S. 333, 362-63 (1966). Here, a change of venue was imperative in order for Brown to receive a fair trial. The case received extensive inflammatory, prejudicial publicity which impacted Brown's right to receive a fair trial in the small, tight-knit community of Hunt County. *See* 1 WCR 113 (St. Habeas Appl. at 92). The prejudicial impact of the media coverage was highlighted and compounded by Brown's uncounseled interview with Channel 11. *See* CLAIM 6. The interview was aired in an edited and sensationalized format, which highlighted prejudicial, out-of-context statements by Brown. Channel 11 continued to use the inflammatory excerpts of the interview in subsequent newscasts regarding the shooting.[32] *See* 1 WCR 264-305 (Ex. 15 Transcripts of CBS 11 News Reports). Numerous newspaper articles also reported that Brown had made a videotaped confession to the police. 1 WCR 307-53 (St. Habeas Appl. Ex. 16 [Greenville Herald-Banner Newspaper Articles]).

The potential jury pool in Hunt County was "repeatedly exposed" to the "spectacle" of Brown "personally confessing" to killing Stella. *See Rideau v. Louisiana*, 373 U.S. 723, 726 (1963). Such coverage impacted the "current community pattern of thought" regarding Brown's guilt. *See,*

---

[32] The assertion that Brown may have agreed to give the recorded interview is not a fact that should be considered by a court in determining whether prejudicial pre-trial publicity has potentially compromised the jury pool in a motion to change venue. Such a fact is an "irrelevant detail" for purposes of that analysis. *See Rideau v. Louisiana*, 373 U.S. 723, 726 (1963) (reversing where change of venue denied despite televised news broadcasts of the defendant's confession).

*e.g., Irvin*, 366 U.S. 717, 725 (1961). The pre-trial publicity in this case was inflammatory and highly prejudicial.

Despite the danger that the prejudicial media coverage had tainted the jury pool, trial counsel made no effort to seek a change of venue. Given that the court itself had a duty to protect Brown's right to a fair trial, had trial counsel requested a change of venue, there is a reasonable likelihood the request would have been granted in light of the widespread and inflammatory media coverage of the shooting and Brown's arrest. Instead, Brown was tried before an irredeemably partial tribunal and was effectively denied his rights under the Constitution.

### B.   COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO MOVE FOR A CHANGE OF VENUE

Given the community bias toward Brown, as exhibited in the media, community social media, and the extensive inflammatory pre-trial coverage, it was unreasonable under prevailing professional norms for defense counsel to not file a motion for a change of venue. The extensive publicity in the town of Greenville was mainly generated by local newspaper and television. The victim was well-known in the community and an elementary school teacher. Given the localized nature of the adverse publicity, and the victim's recognition in the close-knit community, there was no reasonable trial strategy for defense counsel not to move to have the trial moved out of Greenville and Hunt County. Trial counsel acknowledged that the pre-trial media coverage "painted Ms. Ray as a wonderful—an angel that everybody loved, and it painted Brown as a coldblooded crazed killer." 10 WRR 168. Like in *Irvin*, Brown was accused of murder "in a small rural community" and "[i]n the months before [the] trial, 'a barrage of publicity was 'unleashed against him,' including reports of his confessions." *Skilling v. United States*, 561 U.S. 358, 392 (2010) (quoting *Irvin*, 366 U.S., at 727–728) (internal citations omitted).

The only premise that would support a finding that defense counsel's failure to move for a change of venue was not deficient performance is trial counsel's self-serving testimony that there were people in Hunt County "who knew both parties, both families, and their actual reputation was a little more well known." 10 WRR 168. First, trial counsel's credibility is called into question by the record, and the state court failed to conduct a proper assessment of counsel's credibility. Second, counsel's purported reason for deciding to keep the trial in Hunt County is unreasonable. There could be no guarantee that whoever the people were "who knew both parties" and "their actual reputation" would make it on the jury. In fact, there was a greater chance that those people who did know the parties well enough to know their "actual reputation," who be excluded from the jury—either for cause or by peremptory strike.

## C.  COUNSEL'S DEFICIENT PERFORMANCE PREJUDICED BROWN

The extensive inflammatory pre-trial publicity, knowledge of the crime and individuals involved by members of the close-knit community, and the recognition of the victim within the community negatively impacted Brown's defense and his right to an impartial and indifferent jury in Hunt County. The media—both news and social—demonstrate that a fair and unbiased jury in Greenville and Hunt County would have been impossible.

Indeed, state habeas counsel detailed just how close-knot the community was, and how the jury pool and resulting panel would have been irreparably biased not just by the news coverage but their extensive ties to each other, the law enforcement community, the prosecutors, and each other:

> For example, Jurors Sadler and Adel attend church with Assistant District Attorney Keli Aiken; with Brown's cousin, Jeff Ott; and with defense punishment phase witness, Morris Beene. (36 RR at 63, 91; 15 RR at 182, 184.) Juror Sadler also is neighbors with defense counsel Katherine Ferguson. (36 RR at 95.) Several jurors knew law enforcement officials involved in the case. Juror Sadler, whose father was a former chief of police in Greenville, acknowledged knowing many of the law enforcement officers listed on the juror questionnaire, and has known the key law enforcement witness against Brown at trial, Investigator Felicia White, since she was "quite young." (36 RR at 90-91.) Juror Adel knew many of the law enforcement

officers listed in the questionnaire because of his past job working for the city of Greenville. (15 RR at 201.) Jurors Moore, Manley, and Sweeney also knew law enforcement officers listed on the questionnaire. (29 RR at 39-40, 106; 18 RR at 46.) Juror Manley also had worked with Brown's stepfather, Chuck Gafford, who played a prominent role in Brown's punishment phase presentation. (29 RR at 98-101.)

1 WCR 113-14 (St. Habeas Appl. at 92-93 n.19). One of the jurors specifically knew the victim: "Juror Sadler attended high school with Ray, where Ray was the homecoming queen Sadler's junior year and the two were both involved in the Environmental Awareness Club." 1 WCR 114 (St. Habeas Appl. at 93) (citations omitted). Moreover, at least one Facebook page dedicated to Ray's memory was created after the shooting with thousands of members, and "many members of the community changed their own Facebook profile photograph to a photo of Ray." *Id.*; *see also* 2 WCR 367-75 (St. Habeas Appl. Ex. 17 [Stella Ray Memorial Facebook Page]); 2 WCR 262 (St. Habeas Appl. Ex. 14 [Waddle Aff. ¶13]).

There is no doubt the State used the juror familiarity to their advantage; knowing two of the jurors went to her church, prosecutor Aiken repeatedly invoked Christian concepts of mercy and repentance in her closing argument to argue for the death penalty. *See e.g.* 48 RR 51-52: "Ladies and gentlemen of the jury, mercy is given by God to those who show true repentance." The State also improperly appealed to jurors' concepts of community justice, protecting law enforcement, and protecting women from violence in the community. In just one example, Aiken told the jury, "The loss of [Ray's] life is part of your consideration. Did she have value? Did she deserve to have the opportunity to call the police and ask for help and not be killed for it? Do we want other women in her position to do the same thing?" 48 RR 63. *See e.g. United States v. Barragan*, 871 F.3d 689 (9th Cir. 2017), cert. denied, 138 S. Ct. 1572 (2018) (improper for prosecutor to urge jurors to convict defendant in order to protect community values, preserve civil order, or deter future lawbreaking). These improper comments were made specifically because community pressure on the jurors would have been so great.

A sentencer must make an "*individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant*, 462 U.S. at 879 (emphasis in the original). But due to counsel's ineffective assistance, Brown's death sentence may have been imposed due to passion, pressure, or a sense of duty, of law and order in the community, instead of the individualized sentencing determination guaranteed under the Constitution. *See Eddings,* 455 U.S., at 118 (O'Connor, J., concurring) ("[T]his Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake"). Brown's counsel was deficient for failing to request a change of venue, and as he was prejudiced by this failure Brown deserves relief.

### D.  IN THE INTEREST OF FAIRNESS, IT WAS INCUMBENT FOR THE TRIAL COURT TO RELOCATE THE TRIAL TO PROTECT BROWN'S CONSTITUTIONAL RIGHT TO DUE PROCESS

Brown's conviction and sentence are invalid because he was deprived of his constitutional right to due process of law due to the fact that his trial was conducted in an inherently unfair venue. As the Supreme Court has stated, because of the due process guarantee under the Constitution: "a person accused of committing a crime is vouchsafed basic minimal rights. Among these are the right to counsel, the right to plead not guilty, and the right to be tried in a courtroom presided over by a judge. Yet in this case the people of [the venue] saw and heard, not once" but multiple times because of a television interview played over the news in the small community in which the trial was held. *Rideau v. Louisiana,* 373 U.S. 723, 726–27 (1963). Indeed, though written before the current technologic age, where smartphones allow anyone to watch news clips of televised confessions or view memorial Facebook pages at anytime, anywhere, it is even more true that "[f]or anyone who has ever watched television the conclusion cannot be avoided that this spectacle, to the tens of

thousands of people who saw and heard it, in a very real sense was [the defendant's] trial—at which he pleaded guilty to murder." *Id.* at 726.

The Sixth Amendment guarantees a criminal defendant the right to a fair trial by an impartial jury. *See Skilling v. United States,* 561 U.S. 358, 377 (2010). The failure to provide such a trial violates due process. *Id.* at 378.

As discussed above, due to extensive media coverage of the events surrounding the murder, Brown's trial was conducted in an atmosphere calculated to deprive him of any chance of fairness, due to the extensive exposure of the jurors to that publicity. *See* 1 WCR 264-353, 2 WCR 356-75 (St. Habeas Appl. Exs. 15-17). The pre-trial and trial coverage of the murder was both inflammatory and prejudicial, and could only have had the effect of depriving Brown of due process of law. Moreover, due to the publicity and personal relationships, jurors carried bias against Brown that prejudiced him.[33] *See* 2 WCR 377-81 (St. Habeas Appl. Exs. 18-20); 1 WCR 223-25 (St. Habeas Appl. Ex. 7 [deClercq Aff.]). And, because the trial was conducted in an inherently prejudicial atmosphere, prejudice to Brown can be presumed. *See Dobbert v. Florida,* 432 U.S. 282, 303 (1977).

This due process claim was not raised in state court. However, there is a clear path to merits review in state court. *See* Tex. Code Crim. Proc. art. 11.071, § 5. And, should the claim ultimately be defaulted, any default is excused and this Court may review the claim de novo due to state counsel's ineffectiveness.[34] *See Martinez,* 566 U.S. at 9; *Trevino,* 569 U.S. at 429.

---

[33] Many of the seated jurors were connected to attorneys, law enforcement, witnesses and other jurors involved in Brown's trial. *See* 15 RR 182, 184, 201; 18 RR 46; 29 RR 39-40, 98, 101, 106; 36 RR 63, 90-91, 95.

[34] Because this specific claim was not raised in state court, the claim was not adjudicated on the merits and thus, § 2254(d) does not apply. *See* 28 U.S.C. § 2254(d) (speaking to about a "claim").

The errors of the trial court and Brown's counsels deprived Brown of his Fifth, Sixth and Fourteenth Amendment right to due process, leading to a "substantial and injurious effect" on his conviction. *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). As such, Brown's habeas relief must be granted.

**CLAIM 5.    BROWN'S CONSTITUTIONAL RIGHTS WERE VIOLATED DUE TO PROSECUTORIAL MISCONDUCT DURING THE PENALTY PHASE OF HIS CAPITAL TRIAL**

Throughout its closing argument at sentencing, the prosecution repeatedly made improper comments that violated Mr. Brown's constitutional rights. Taken individually and cumulatively, these errors demonstrate that Brown's convictions and sentence are unlawful under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Brown incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. This claim was not raised in Brown's state-court proceedings. However, there is a clear path to merits review in state court, and should the claim be ultimately defaulted, any default is excused and this Court may review the claim de novo.

A prosecutor in a criminal case is not simply a party to a controversy; he represents "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all[.]" *Berger v. United States*, 295 U.S. 78, 88 (1935). His interest should not be to win a case or obtain the maximum penalty. It should be "that justice shall be done." *See id.* While it is his duty to prosecute a case with earnestness, it is "as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id.* at 88. As the United States Supreme Court has explained, "the average jury, in a greater or less degree, has confidence that these obligations . . . will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Id.* The State further

oversteps these bounds when is arguments are "undignified and intemperate" or contain "improper insinuations and assertions calculated to mislead the jury." *Id.* at 85.

To prevail on a prosecutorial misconduct claim, a petitioner must demonstrate that the prosecutor's conduct either (1) prejudiced a substantive right, *see Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) (citing *Griffin v. California*, 380 U.S. 609 (1965)), or (2) rendered the trial fundamentally unfair, *see Berger*, 295 U.S. at 78. When evaluating instances of prosecutorial misconduct, the reviewing court must consider the cumulative effect of the harm. *See Berger*, 295 U.S. at 89 (awarding a new trial because of "probable cumulative effect" of instances of prosecutorial misconduct). Here, Brown can show that the prosecutor's conduct both prejudiced his substantive rights and rendered the trial fundamentally unfair. Thus, the prosecutorial misconduct had a "substantial and injurious effect" on Brown's convictions and sentences. *See Brecht*, 507 U.S. at 623; *see also Foy v. Donnelly*, 959 F.2d 1307, 1316 (5th Cir. 1992) (holding prosecutors "may abridge a specific right conferred by the Bill of Rights, or may constitute a denial of due process generally").

### A. THE PROSECUTOR'S COMMENTS INFRINGED UPON BROWN'S CONSTITUTIONAL RIGHTS

#### 1. The prosecution committed misconduct in urging the jury to sentence Brown to death because he failed to testify in his punishment stage proceedings in violation of the Fifth Amendment

The Supreme Court has held that a prosecutor's statements on a defendant's failure to testify violate the Fifth Amendment. *Griffin v. California*, 380 U.S. 609 (1965). There has been a long-standing prohibition against prosecutorial comment that a defendant's silence is evidence a jury should consider. *See Wilson v. U.S.*, 149 U.S. 60 (1893); *see also Anderson v. Nelson*, 390 U.S. 523 (1968) (conviction reversed when prosecutor commented extensively on defendant's failure to testify); *United States v. Robinson*, 485 U.S. 25 (1988) (comment invited by defense counsel's

argument); *Lesko v. Lehman*, 925 F.2d 1527 (3d Cir. 1991) (improper comment on defendant's silence applicable at penalty phase of capital trial).

Whether a prosecutor's language constitutes an improper comment on the defendant's failure to testify depends on whether the statements "manifestly intended" or were of such character that the jury would "naturally and necessarily" take it as a comment on the failure to testify. *United States v. Hasting*, 461 U.S. 499, 515 n.6 (1983) (Stevens, J., concurring). "A statement violates the Fifth Amendment if 'the prosecutor intended to comment on [the defendant's] failure to testify or [if] a jury would naturally and necessarily interpret the prosecutor's remarks in that light.'" *Montoya v. Collins*, 955 F.2d 279, 286 (5th Cir. 1992) (quoting *Brock v. McCotter,* 781 F.2d 1152, 1159 (5th Cir.), *cert. denied,* 476 U.S. 1153 (1986)).

Here, the State repeatedly argued to the jury that Brown should be sentenced to death because he did take the stand during his sentencing proceeding to express remorse. There is no other way to interpret the State's argument to the jury; short of testifying and begging for mercy, Brown did not deserve to be given any, precluding any mitigation presentation that had been presented. The prosecutor told the jury:

> Ladies and gentlemen of the jury, mercy is given by God to those who show true repentance. Right? True repentance. Full unadulterated, unmitigated responsibility. I did it. It's my fault. I'm not blaming my family. I'm not blaming the victim. I'm not blaming society. I'm not blaming drugs. I did it. Please forgive me. Show me mercy, Lord. That's how mercy is given. That's how repentance occurs. *Have you seen that from this Defendant? Absolutely not. So give him what he's asking for.*

> Who do we give life without parole to in a capital murder case? A defendant who throws himself at the mercy of the jury. . . .

> So it's my fault, only me. Blame me. Punish me for what I did. No one else, just me. That didn't happen and it's not going to happen in this case.

48 RR 51-53 (emphasis added). In concluding, the prosecutor again argued that the jury should penalize Brown because he did not "ask for redemption." 48 RR 65.

130

> Ladies and gentlemen, you don't give mercy to someone who hasn't asked for it, who hasn't asked for redemption, who hasn't admitted everything they've done. But you know what you give them? . . . Justice, ladies and gentlemen, is a death sentence in this case.

48 RR 65.

This was prosecutorial misconduct and a violation of Brown's Fifth Amendment rights. *Griffin*, 380 U.S. at 615; *United States v. Wharton*, 320 F.3d 526, 538 (5th Cir. 2003) ("A prosecutor is prohibited from commenting directly or indirectly on a defendant's failure to testify or produce evidence."). This prohibition applies to both phases of a capital trial. *See Estelle v. Smith*, 451 U.S. 454, 462-63 (1981).

Unlike in *Montoya v. Collins*, 955 F.2d 279, 287 (5th Cir. 1992), the State's comments were not on the failure of the defense or defense counsel, but specifically on the failure of the defendant. Reasonable jurors could not have concluded otherwise; by necessity, no one else could have begged for mercy and forgiveness but the defendant. *Id.* Moreover, such an argument precludes any mitigation the defense could have submitted to the jury, denying Brown the individualized sentencing that is required. *See, e.g., Penry*, 492 U.S. at 319.

By arguing to the jury that it should sentence Brown to death due to his unwillingness to "throw himself on his face in front of the jury and [say] I did it all . . . it's my fault, only me, punish me for what I did," the prosecution violated Brown's Fifth Amendment rights, rendering his sentence unreliable and unconstitutional.

### 2. The prosecution committed misconduct by making improper comments attempting to limit the scope of mitigation the jury could consider in violation of Brown's Eighth Amendment rights

The Eighth Amendment is violated when courts impose a requirement that evidence must satisfy a "causal nexus" test before it is considered and given effect as mitigating. *Tennard*, 542 U.S. at 285-86; *see also id.* at 285. Courts and the State must not apply a screening mechanism such as a

heightened relevance standard to take mitigating evidence out of the jury's effective reach. *Id.* In *Smith v. Texas*, the Supreme Court again condemned a state appellate court's application of a causal nexus barrier to finding and giving effect to mitigation. 543 U.S. 37, 45 (2004) (per curiam). The Court characterized the causal nexus requirement as "a test we never countenanced and now have unequivocally rejected." *Id.*

The prosecutor improperly told the jury that Brown's mitigation evidence must be connected to the crime. Specifically, the prosecutor told the jury, "But there's nothing special about [Mr. Brown's family history] insofar as that *it was sufficient to cause the Defendant to commit this offense.*" 48 RR 23 (emphasis added). Later, the prosecutor reaffirmed, "Those are terrible things [discussing mitigation evidence]. But they didn't kill Stella." 48 RR 56. This "nexus-requirement" violated the Eighth Amendment, was a complete misstatement of the law, and misled the jury.

Not only was the State requiring a causal nexus between mitigation and the crime is a violation of the Eighth Amendment, the State continually tried to unconstitutionally limit the scope of mitigation the jury could consider. When addressing Brown's mitigation evidence offered at his sentencing phase, the prosecutor told the jury that what the defense had presented to them was, "a red herring. It is not mitigation as far as the family tree goes." 48 RR 24. Indeed, the State argued that Brown's unchosen, inherited traits that contributed to his dysregulation and decompensation before and at the time of the murder, were a smokescreen, a bag of tricks the jury should not fall for. The State stressed the jurors should not consider it, as, after all, "I'm sorry, you decide this but you take that family tree and you just take a dry eraser and you erase every name from that family tree and then plug in whoever you want. Plug in anybody's family. You plug in your own family perhaps. There is not one among us who within our family don't have" similar problems with alcoholics or family dysfunction. 48 RR 23. The State then doubled down, saying, "I mean, you have to ask yourself, too, how much of this did he even know about prior to this happening. You have to

know for it to affect you somehow." *Id.* The State asked the jury to discount the (albeit limited) evidence of inherited mental illness, addiction, and neurodevelopmental disorders the defense had managed to introduce through its experts. Thus the State unconstitutionally limited the mitigation the jury could consider.

The Supreme Court has clearly established that "in capital cases the fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Lockett,* 438 U.S. at 604 (quoting *Woodson,* 428 U.S. at 304). As such, "the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.*

This consideration of mitigating factors—required by the Eighth Amendment—is necessary to allow the required individualized determination of whether a defendant should receive a death sentence. *Tuilaepa v. California,* 512 U.S. 967, 971-73 (1994); *Zant,* 462 U.S. at 878-79. The Eighth Amendment mitigation requirement also applies to the actions and comments of prosecutors. *See Caldwell,* 472 U.S. at 341 (a prosecutor's comments that led the jury to believe that an appellate court could later mitigate the death sentence violates the Eighth Amendment because it misleads the jury as to its responsibility). Thus, when a prosecutor's actions or comments effectively "foreclose the jury's consideration of . . . mitigation evidence," the jury is prevented from making a fair, individualized determination as required by the Eighth Amendment. *Buchanan v. Angelone,* 522 U.S. 269, 277 (1988).

The prosecutor's comments regarding mitigation violated the Eighth Amendment, as they were so prejudicial as to "constrain the manner in which the jury was able to give effect" to mitigating

evidence. *Id.*; *see also DePew v. Anderson*, 311 F.3d 742, 748 (6th Cir. 2002). The prosecutor's improper comments were designed to mislead the jury as to what they could appropriately consider as mitigating evidence and effectively undermined Brown's Eighth Amendment right to receive the "constitutionally indispensable" consideration of his proffered mitigation evidence. *Lockett*, 438 U.S. at 604. Because of State's closing argument contained an improper causal-nexus test and unconstitutionally limited the scope of mitigation it told the jury was proper to consider, the misconduct had a "substantial and injurious effect or influence" on the jury's imposition of the death sentence, and Brown is entitled to relief. *See Brecht*, 507 U.S. at 638; *see, e.g., McKinney v. Ryan*, 813 F.3d 798, 823-24 (9th Cir. 2015) (applying *Brecht* to the Arizona Supreme Court's improper application of its causal-nexus test).

## B.  THE PROSECUTION'S COMMENTS VIOLATED DUE PROCESS

In addition to the improper comments that infringed upon Brown's specific constitutional rights, the prosecution made numerous comments that misstated and manipulated the law and evidence, and inflamed the jury. Together, these comments "so infected the [penalty phase of the] trial with unfairness as to make the resulting [sentence] a denial of due process." *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000) (alterations in original).

### 1.  Burden shifting to prove *not* a future danger

Texas law places the burden on the State to affirmatively prove beyond a reasonable doubt that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Crim. Proc. Art. 37.071 §§ 2(b)(1), (c). However, in its closing argument, the prosecution misstated the law and misled the jury by shifting the burden to Mr. Brown to prove he was not a future danger. When discussing Mr. Brown's mitigation evidence, the prosecutor placed the burden on Mr. Brown by telling the jury that the evidence was "*not*

134

*sufficient to prove* that he's not a future danger and it's not sufficient as a mitigating circumstance to justify life without parole. It's just not." 48 RR 23 (emphasis added).

The Supreme Court has been clear that, "Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt *of every fact* necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). It is a violation of the Constitution to shift to the defendant the burden of disproving an element of the crime charged. *Sandstrom v. Montana*, 442 U.S. 510, 513 (1979), *holding modified by Boyde v. California*, 494 U.S. 370 (1990).

While this violation often arises in jury instructions, it is similarly improper for the State to make comments that prejudicially shift the burden of proof to the defendant. "In this case, by contrast, the State has affirmatively shifted the burden of proof to the defendant. The result, in a case such as this one where the defendant is required to prove the critical fact in dispute, is to increase further the likelihood of an erroneous murder conviction." *Mullaney v. Wilbur*, 421 U.S. 684, 701 (1975) (quoting *Speiser v. Randall*, 357 U.S. 513, 525—526 (1958): "(W)here one party has at stake an interest of transcending value—as a criminal defendant his liberty—th(e) margin of error is reduced as to him by the process of placing on the (prosecution) the burden . . . of persuading the factfinder at the conclusion of the trial . . ."). And unlike in *United States v. Salcido*, 342 F. App'x 976, 978 (5th Cir. 2009), the State's comments here were not "a response to defense counsel's statements" and therefore constituted misconduct. Moreover, given the cumulative effect of misconduct in the State's summation, Brown was prejudiced.

### 2.   Improper references to religiously motivated punishment

In its closing argument, the prosecution repeatedly referenced God and equated the teachings of God to the duty of the jury. This too was improper. The rule against inquiring into

religious beliefs is grounded in constitutional bars against religious persecution contained in the First Amendment; by invoking god's justice upon a defendant, the State equates state executions with god's will. *See, e.g., United States v. Cartagena-Carrasquillo*, 70 F.3d 706 (1st Cir. 1995) (prosecutor insinuates alliance between government and the church).

The prosecutor's penalty phase summation by its heavy reliance on religious authority in arguing to the jury that the death penalty was sanctioned by God due to the defendant's lack of repentance by Christian standards was improper. During the sentencing phase, the State asked a Christian minister:

> Q: According to *our religion*, you understand that when someone has to ask forgiveness from God or redemption from God, they have to admit all their sins and ask for true forgiveness from him; is that correct?
> A: That's correct.
> Q: And in doing so, they're just allowing themselves the opportunity, when they die, to have a closer relationship with God and to be in heaven with him and also to have a relationship with him while they're here on earth?
> A: Yes.
> Q: But they're not avoiding the responsibility for the physical actions they committed here on earth as a human being?
> A: That's correct. There are consequences to our sins.
> Q: And this may seem like a silly question, but certainly capital murder would be one of the chief sins?
> A: Yes.

46 RR 21-22 (emphasis added).

The prosecutor asked the jury, "[M]ercy is given by God to those who show true repentance. Right?" 48 RR 51. To generate further antipathy—and again emphasize Brown did not take the stand during his sentencing proceedings—the prosecutor told the jury that Ray "didn't get a chance to repent and ask for God's forgiveness for whatever she had done in her life." 48 RR 52. The jury was left with the inference that Brown should pay not just for his own sins but also for robbing Ray of her chance to "be in heaven with [God]." 46 RR 22.

"In some instances, invoking God's name may constitute improper jury argument, such as when a prosecutor makes gratuitous references to God, or otherwise urges the jury to base its decision on matters involving "divine retribution." *See, e.g., Turner v. Quarterman*, A–08–CA–811–SS, 2009 WL 2406203, at *10 (W.D.Tex. Aug. 3, 2009) (prosecutor made improper, albeit curable, "references to God and urged the jury during closing argument to base their guilt-innocence determination on divine retribution," which did not fit within any of the four categories of proper jury argument under Texas law). A defendant is "denied a fair penalty phase trial by the prosecutor's closing argument that invoked divine authority" and the error is not harmless when the State uses religious and Biblical support for the imposition of the death penalty. *Sandoval v. Calderon*, 241 F.3d 765, 769 (9th Cir. 2000).

"Similarly, any suggestion that the jury may base its decision on a "higher law" than that of the court in which it sits is forbidden." *Sandoval v. Calderon*, 241 F.3d 765, 776 (9th Cir. 2000) (citing *Jones v. Kemp,* 706 F.Supp. 1534, 1558–59 (N.D.Ga. 1989); *Commonwealth v. Chambers,* 528 Pa. 558, 599 A.2d 630, 644 (1991)). Here, the prosecutor urged the jury that for someone who had not followed God's law, they must then impose "man's law":

> Ladies and gentlemen of the jury, mercy is given by God to those who show true repentance . . . you don't give mercy to someone who hasn't asked for it, who hasn't asked for redemption, who hasn't admitted everything they've done. But you know what you give them? You give them justice under this law, man's law, your law.

48 RR 51, 65.

Invoking religious authority and the will of God to argue for the death penalty is improper and highly prejudicial. *See Cobb v. Wainwright*, 609 F.2d 754, 755 n. 2 (5th Cir.1980) ("In his zeal to obtain a death sentence, the prosecutor made several clearly objectionable, and objected to, remarks. For example, at one point in his argument, the prosecutor resorted to the Bible. He told the jury that under its teachings there was no reason to show the defendants mercy.") *See also*

137

*Romine v. Head*, 253 F.3d 1349, 1367 (11th Cir. 2001) (citing *Wilson v. Kemp,* 777 F.2d 621, 626 (1985) ("[W]hen the prosecutor argues that it is mercy itself that is inappropriate, the jury is told that the concept of mercy—the most significant factor which might point toward a choice of life imprisonment—is illegitimate."); *Brooks v. Kemp,* 762 F.2d 1383, 1410 (1985) ("Because the jury is empowered to exercise its discretion in determining punishment, it is wrong for the prosecutor to undermine that discretion by implying that he, or another high authority, has already made the careful decision required.")).

The purpose of closing argument is to explain to the jury what questions it must answer and what evidence is relevant to deciding its answers. *See United States v. Iglesias*, 915 F.2d 1524, 1529 (11th Cir. 1990). Capital punishment is constitutionally imposed only when the jury makes findings under a sentencing scheme that focuses the jury on the specific factors it is to consider, and is restricted to considering only the evidence put before it, in reaching a verdict. *See Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (holding that capital sentencing statutes must "channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death") (internal citations and quotation marks omitted).

The State's comments were highly improper, prejudicial, inflammatory, and denied Brown a constitutionally sound capital sentence.

### 3.   Inflammatory comments and conduct

It is improper for the State to use arguments calculated to inflame the fears, passions, and prejudices of the jury. *See* ABA Standards for Criminal Justice § 3-6.7(c) (4th ed. 2015) ("prosecutor should not make arguments calculated to appeal to improper prejudices"). Prosecutors informing jurors that a vote for life is in essence condoning another victim being killed are in error, and have unfairly prejudiced defendants. *See e.g. Bates v. Bell*, 402 F.3d 635, 648 (6th Cir. 2005) (prosecutor

improperly argues at penalty phase of capital trial that voting for life sentence would be tantamount to voting for death sentence for some future victim). Such appeals to jurors are and should be condemned because they introduce fear and irrationality into the decision-making process, ask the jury to protect the safety of the community at large rather than consider the individual defendant in front of them, and ultimately ask jurors to consider the evidence that was not put before them in the course of the proceedings. *See* ABA Standards for Criminal Justice §§ 3-6.8(a), 3-6.9 (4th ed. 2015) (prosecutor may argue all reasonable inferences from evidence in record); *see e.g. United States v. Mooney*, 315 F.3d 54, 59 (1st Cir. 2002) (improper for prosecutor to contrast jurors' sense of community safety with defendant's crime); *United States v. Weatherspoon*, 410 F.3d 1142, 1149 (9th Cir. 2005) (misconduct to argue that convicting defendant "is gonna make you comfortable" that there are no dangerous individuals outside the courtroom with guns and that "finding this man guilty is gonna protect other individuals in this community").

When arguing that Brown was a "future danger," the prosecutor commented to the jury, "[Y]ou want proof of future danger. Let's stick some bullets in this sucker, lay it on the table and let the Defendant just walk out of this courtroom." 48 RR 54. Defense counsel objected, arguing that the prosecutor was "trying to inflame the jury." 48 RR 54. The objection was overruled, and the prosecutor repeated, "Stick bullets in it and let him walk out of this courtroom. Do you think Tracy Williams would make it out of the courthouse alive?" 48 RR 55. A second objection was also overruled. *Id.*

These inflammatory comments suggested to the jury that if it did not enter a death sentence, it was essentially placing a loaded shotgun in Brown's hands and placing members of the community, specifically Mr. Williams, in danger. In effect, the State ended the trial by telling the jurors that it was their job, as citizens who cared about their community and their society, to sentence Brown to death. *See United States v. Sanchez*, 176 F.3d 1214, 1224–25 (9th Cir. 1999) (finding prosecutorial

misconduct because it is "improper for the prosecutor to state that the duty of the jury is to find the defendant guilty"). In suggesting that Williams, the victim's ex-husband, would not "make it out of this courtroom alive" if the jury were to decide Brown was not a "future danger," the prosecutor implied that a non-death sentence for Brown would mean a death sentence for Williams. This was constitutionally improper. *See Bedford v. Collins*, 567 F.3d 225, 234 (6th Cir. 2009) (comments improper if they "fan the flames of the jurors' fears by predicting that if they do not convict, a crime wave or some other calamity will consume their community").

## C. BROWN IS ENTITLED TO RELIEF

Because the prosecutor's remarks infringed upon specific constitutional rights, Brown may establish his entitlement to habeas relief without showing that the comments rendered his sentencing fundamentally unfair. *See Cobb v. Wainwright,* 609 F.2d 754, 755-56 (5th Cir. 1980); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Here, many of the comments infringed on Brown's rights under the Fifth and Eighth Amendments.

While the improper comments that infringed upon specific constitutional rights are sufficient to warrant relief, the sum of all the prosecutor's improper comments "so infected the trial with unfairness" as to make the resulting sentence a denial of due process. *See Darden,* 477 U.S. at 181. The improper statements by the prosecutor in Brown's case are precisely the types of arguments the Supreme Court has identified as arguments that would deprive a petitioner of a fair trial, and thus violate due process. *See id.* at 181-82 (arguments that "manipulate or misstate the evidence," implicate specific rights of the accused "such as the right to counsel or the right to remain silent").

The prosecution's misleading and inflammatory remarks, including those related to burden shifting, the "special issues," God, and what would happen if the jury gave a non-death sentence, inflamed the passions of the jury and infected the sentencing proceedings. Both individually and cumulatively, these instances of misconduct violated due process.

It has been acknowledged that:

In the context of a death penalty sentencing hearing, however, the question of error or effect is more complex than in traditional trials. Rather than determining whether a constitutional error would have pushed a jury from a 'not guilty' verdict to a 'guilty' verdict, we must attempt to discover whether the constitutional error influenced the jury's decision between life and death.

*Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005).

Cumulatively, it is clear that these constitutional errors prejudiced Brown. As the Supreme Court has acknowledged, "the average jury, in a greater or less degree, has confidence that [the State's] obligations . . . will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Berger*, 295 U.S. at 88. The prosecution put on minimal evidence during the penalty phase that addressed either of the two special issues. None of its witnesses offered testimony that spoke to the possibility that Brown would commit criminal acts of violence that would constitute a continuing threat to society. Brown did not have a lengthy criminal history or record of extraneous offenses and although he had been in a downward emotional spiral in the weeks prior to the offense, the State offered little reliable evidence that Brown had acted violently prior to Ray's death. The State had relatively little evidence with which to convince the jury that it should answer the first special issue affirmatively.

Given the scant evidence the State had regarding Brown's sentence, the likelihood that the inflammatory and improper remarks prejudiced the jury and influenced their decision was exponentially more impactful. Had the State not so inflamed, mislead and improperly limited the mitigation the jury could consider, there is a reasonable probability that the jury would have been unwilling to return a death sentence.

The State's misconduct during the penalty-phase proceeding prejudiced Brown's substantive rights and rendered the trial fundamentally unfair. *See Donnelly*, 416 U.S. at 643; *Berger*, 295 U.S. at 78. Accordingly, Brown is entitled to a new sentencing proceeding.

**CLAIM 6.   Brown's Constitutional rights were violated by permitting the State to introduce statements obtained from him in violation of *Miranda* and *Edwards*, and Brown's counsel were ineffective for failing to move to exclude the statements**

The State relied heavily on Brown's custodial statements to convince the jury that Brown committed capital murder and should receive a death sentence. However, those statements were obtained in violation of Brown's constitutional rights; they should not have been admitted at trial, and counsel should have moved to exclude them. The admission of these statements violated Brown's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.[35] Brown incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. These claims were raised in similar form in state court, but because the state courts failed to meet the standards that would trigger deference under § 2254(d), this Court may consider the claim de novo.[36]

**A.   The state court permitted the prosecution to admit statements obtained in violation of *Miranda v. Arizona* and *Edwards v. Arizona* at Brown's capital trial**

The Fifth Amendment to the United States Constitution, as applied to the states through the Fourteenth, guarantees that "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The United States Supreme Court has clearly established rules police must follow when interrogating a person in custody to ensure that the State does not

---

[35] Direct consideration of this claim is not barred by *Stone v. Powell*, 428 U.S. 465 (1976). *See Withrow v. Williams*, 507 U.S. 680, 682 (1993) ("*Stone*'s restriction on the exercise of federal habeas jurisdiction does not extend to a state prisoner's claim that his conviction rests on statements obtained in violation of the safeguards mandated by *Miranda v. Arizona*, 384 U.S. 436 (1966).").

[36] Brown can overcome any default as the ineffective assistance of Brown's direct appeal counsel in failing to raise this claim constitutes cause for the default and resulted in prejudice to Brown. *See Evitts v. Lucey*, 469 U.S. 387 (1985).

violate the "basic" and "precious" rights of the Fifth Amendment. *Miranda v. Arizona*, 384 U.S. 436, 442 (1966). Among these clearly-established rules of constitutional and federal law is that the "assertion of the right to counsel [is] a significant event and that once exercised by the accused, 'the interrogation must cease until an attorney is present.'" *Edwards v. Arizona*, 451 U.S. 477, 485 (1981) (quoting *Miranda*, 384 U.S. at 474). A person, "having expressed his desire to deal with the police only through counsel," must not be "subject to further interrogation by the authorities until counsel has been made available to him." *Id.* at 484–85. The rule is bright-line: once a person has asserted his right to counsel, "law enforcement officers must *immediately cease* questioning." *Davis v. United States*, 512 U.S. 452, 454 (1994) (emphasis added) (citing *Edwards*, 451 U.S. 477). These principles protect a person's Fifth Amendment rights and "prevent police from badgering a [person] into waiving his previously asserted *Miranda* rights," *Michigan v. Harvey*, 494 U.S. 344, 350 (1990). The Texas Courts violated these clearly-established principles.

Following his arrest, Brown was subjected to custodial interrogation by investigators with the Greenville Police Department. In the videotaped interrogation, Brown was read his *Miranda* rights, and Brown indicated that he understood the rights. *53 RR SX 388A* (Transcript of Micah Brown) at 2. Mr. Brown was then asked, "With these rights in mind, do you wish to speak with me now?" *Id.* He responded, "Well, I don't mind speaking to you, but I – I feel like I've – like *I need a lawyer.*" *Id.* (emphasis added).[37] The investigator pressed Brown, asking, "Do what?" *Id.* Brown again repeated his request, "I feel like I need a lawyer present to answer any questions." *Id.*

Rather than acknowledging, let alone honor, his two requests, the investigator coaxed Brown, "I'm just going to ask you about what happened. And you and I know both what happened." *Id.* at

---

[37] The state habeas court's finding misquotes Brown's statement and the transcript of the interrogation. The court's finding quotes Brown as *asking* whether he needs a lawyer by replacing the [.] with a [?] at the end of the sentence. 14 WCR 5743-44 (Finding 176). This was also the exact proposed finding submitted by the State. 14 WCR 5684 (Finding 176).

2-3. Brown then acceded, "Yeah. Yeah, we – I'll go ahead and tell you." *Id.* at 3. Brown discussed the crime —providing prejudicial and incriminating evidence for the State to use against him. *Id.* at 6.

### 1.   Brown invoked his right to counsel

The Supreme Court stated in *Davis v. United States*, that an "[i]nvocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" 512 U.S. at 459 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). Brown's first statement, "like—I need a lawyer," met this minimum requirement. Brown's willingness to speak to the investigators was conditioned on having a lawyer present. It is no stretch to conclude this statement could "reasonably be construed" as an expression of Brown's "desire for the assistance of an attorney." *Id.* Brown's first statement was *not* that he *felt* like he needed a lawyer. He said, "I feel like I've--" something. He stopped, and then said, ". . . like, I need a lawyer." Even if the detective did not hear Brown's first statement he wished to call his lawyer, he reiterated the request. The *Edwards* "bright-line rule that *all* questioning must cease after an accused requests counsel," *Smith v. Illinois*, 469 U.S. 91, 98 (1984) (emphasis in original), required an immediate cessation of the questioning at that point.

In *Smith*, the petitioner told detectives he would like to talk to a lawyer, and the detectives responded, "Okay," but continued reading him the remainder of his rights. 469 U.S. 91, 93 (1984). The detectives then asked, "Do you wish to talk to me at this time without a lawyer being present?" Smith responded, "Yeah and no, uh, I don't know what's what, really." The detectives persisted, "Well. You either have [to agree] to talk to me this time without a lawyer being present and if you do agree to talk with me without a lawyer being present you can stop at any time you want to." Smith then gave in and agreed, "All right. I'll talk to you then." *Id.* at 92-93. The Court clarified, "[a] statement either is . . . an assertion [of the right to counsel] or it is not." *Id.* at 97-98 (internal citation

144

and quotations marks omitted). It explained, "In the absence of such a bright-line prohibition, the authorities through 'badger[ing]' or 'overreaching'—explicit or subtle, deliberate or unintentional—might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." *Id.* at 98-99 (internal citations omitted). Because Brown invoked his constitutional right to counsel, and the police failed to "scrupulously honor" his exercise of that right, the statement subsequently elicited from Brown should have been excluded.[38]

### 2. Brown did not knowingly, intelligently, or voluntarily waive his right to counsel

*Miranda* established a two-prong test to determine the validity of a waiver of the rights it delineated; a valid waiver must not only be (1) voluntary, but also (2) knowing and intelligent. *Edwards*, 451 U.S. at 482. In *Moran v. Burbine,* the United States Supreme Court explained, "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." 475 U.S. 412, 421 (1986) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). When "considering the voluntariness of a confession, this court must take into account a defendant's *mental limitations*, to determine whether through susceptibility to surrounding pressures or inability to comprehend the circumstances, the confession was not a product of his own free will." *Jurek v. Estelle*, 623 F.2d 929, 937 (5th Cir. 1980) (emphasis added).

Brown "could not understand the quick recitation of his *Miranda* rights, or that he was relinquishing those rights." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (explaining due process requires considering all interrogation circumstances in determining voluntariness). Brown

---

[38] Should the State argue that Brown's subsequent responses cast doubt on his request for a lawyer, this argument is wrong. *See Smith*, 469 U.S. at 99 ("No authority, and no logic, permits the interrogator to proceed ... on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all.").

has significant deficits in short-term verbal memory and understanding. Because of his neurodevelopmental disorders, Brown likely did not understand his *Miranda* rights when they were read to him before being immediately pressed by the investigator to confess. Moreover, due to his Autism Spectrum Disorder, Brown covers his communication deficits and the inability to understand spoken language by being agreeable.[39] Though Brown's confession may have been voluntary, he did not have the mental capacity to intelligently and knowingly waive his right to an attorney.

As the United States Supreme Court has explained, "the American system of criminal prosecution is accusatorial, not inquisitorial, and . . . the Fifth Amendment privilege is its essential mainstay." *Malloy v. Hogan*, 378 U.S. 1, 7 (1964) (citing *Rogers v. Richmond*, 365 U.S. 534, 541 (1961)). Brown's confession was not made after a knowing and intelligent waiver of his *Miranda* rights, and thus his interrogation introduced at trial violated due process.

### 3. Brown's news interview was obtained and then used as evidence against him in violation of his constitutional rights

After Brown had sought counsel's assistance, his requests were ignored, and he could not give a knowing and intelligent waiver of his *Miranda* rights, the Grenville Police Department compounded the violation of Brown's constitutional rights. The following day, Brown was further interrogated by a news reporter from KTVT-CBS, Channel 11 News in Dallas ("Channel 11"). While Brown was in state custody, he was subjected to unconstitutional interrogations by the GPD and then by a news reporter in coordination with the Hunt County Sheriff's Office. Mr. Brown was denied access to counsel for both interrogations during these custodial interrogations, as provided in *Miranda* amounted to a Fifth Amendment violation.

---

[39] *See, e.g.,* CLAIM 2(D)

A criminal defendant's *Miranda* rights attach during all custodial interrogations. *See Dickerson v. United States*, 530 U.S. 428, 435 (2000) ("[T]he coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be 'accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself.'" (quoting *Miranda*, 384 U.S. at 439)). And the Supreme Court has defined "interrogation" broadly for the *Miranda* doctrine. Thus, "interrogation" refers "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Such "actions on the part of the police" include agency relationships with non-state intermediaries who elicit testimony that would be inadmissible if obtained directly by law enforcement. *See, e.g., Estelle v. Smith*, 451 U.S. 454, 466-67 (1981) (un-*Mirandized* statements to a court-appointed, "neutral" psychiatrist who interviewed the defendant in jail inadmissible to prove future dangerousness in the penalty phase of a capital murder trial.

Brown was subject to uncounseled interrogation by a news outlet that acted as an instrumentality of the State. In *United States v. Blocker*, 104 F.3d 720 (5th Cir. 1997), the Fifth Circuit prescribed a two-pronged test to ascertain whether a private party functioned as an "instrument or agent" of the State, under which a court must ask "(1) whether the Government knew or acquiesced in the intrusive conduct; and (2) whether the private party intended to assist law enforcement efforts or to further his own ends." *Id.* at 725. In Brown's case, both prongs of the *Blocker* test have been met.

The Hunt County Sheriff's Office knew of and facilitated the news interview, providing Channel 11 access and space to conduct the interview.[40] The reporter who interviewed Brown likely "intended to assist law enforcement efforts or to further [their] own ends." *See Blocker*, 104 F.3d. at 725. Brown's media-affiliated interviewer focused almost exclusively on three areas—Brown's guilt, remorse, and appropriate punishment—each of which assisted the State in ultimately securing a conviction and sentence of death. When the subject of questioning "transform[s] from routine questioning . . . to questions calculated and intended to elicit a criminally incriminating response," that transformation marks the onset of interrogation for the *Miranda* doctrine. *See United States v. Chavira*, 614 F.3d 127, 133 n.8 (5th Cir. 2010).

### 4.   The admission of these statements fatally infected Brown's trial

Brown's statements to the police and the news doubtless had a tremendous impact on the jury. The police investigator and news interview's videotaped interrogations were played in open court for the jury without objections from Brown's counsel. A transcript of the interview was also admitted and published. 40 RR 198-99; 42 RR 106-07. Jurors rely heavily on confessions in their determinations, and "a full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991). Therefore, a court must "exercise extreme caution before determining that the admission of the confession was harmless." *Id.*

The prosecution highlighted Brown's statements to the police and Channel 11 repeatedly when arguing it had proven the elements of capital murder. *See e.g.*, 44 RR 23. As to the necessary elements of the capital charge—murder while committing obstruction, retaliation, or terroristic

---

[40] The speed with which the Sheriff's Office processed the news channel's request for an interview but not Brown's appointment of an attorney belies any explanation other than an effort to deprive Brown of counsel, whose appointment would likely have prevented the interview.

threat—the State argued that it had proven such "[b]ecause the Defendant said that's why he shot her." 44 RR 24. The prosecutor repeated this theme of relying on Brown's confession to demonstrate that the State had met its burden. *See* 44 RR 24-31; *55*; 59-60; 64. The prosecutor concluded by saying, "So we don't know exactly how some of these things did happen, *but what we do know is that the Defendant admitted that he shot her because she had called the police. That is undisputable.*" 44 RR 31 (emphasis added).

The State then used Brown's inadmissible statements to the police and Channel 11 to argue he had no remorse and should be sentenced to death; his appearance during these impermissible interrogations was evidence enough of future dangerousness: "[Y]ou look at the Defendant's eyes, you look at his face, you look at his responses, you listen to his responses. His entire countenance suggests nothing more than he is dangerous." 48 RR 21.

Brown's confession undoubtedly had a powerful impact on the jury, and the prosecution capitalized on this by using it repeatedly to argue that it had proven the elements of capital murder. Where the erroneous admission of a confession has a substantial and injurious effect or influence on the jury's verdict, the error is not harmless. *See Brecht*, 507 U.S. at 637. Brown must be granted habeas relief.

### B. BROWN'S COUNSEL WERE INEFFECTIVE FOR FAILING TO FILE MERITORIOUS MOTIONS TO SUPPRESS BROWN'S POLICE INTERROGATION AND STATEMENT TO THE NEWS ; HE WAS THEREBY PREJUDICED

The Sixth Amendment guarantees a defendant the right to effective assistance of counsel, which protects the due-process right to a fair trial. *Strickland*, 466 U.S. at 684. A petitioner is denied effective assistance when (1) the "representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687–88, 694. The Supreme Court has clearly

established that a "single, serious error" by counsel—including failing to move to suppress—is enough to establish a claim of ineffective assistance. *Kimmelman v. Morrison*, 477 U.S. 365, 383-85 (1986).

Here, trial counsel's performance was deficient because suppression motions for Brown's custodial interrogations—both with the police and Channel 11—based on violating *Edwards* and *Miranda* were meritorious, and there was no actual trial strategy behind failing to move to suppress the custodial statements. Instead, counsel merely misapprehended the law.[41] Because a timely motion to suppress would have been "meritorious and without repercussions to other defense strategies," failure to file that motion "confutes any argument that counsel's failure to file such a motion was professionally reasonable." *United States v. Mercedes-De La Cruz*, 787 F.3d 61, 69 (1st Cir. 2015). Counsel thus performed deficiently.

Brown was prejudiced by his counsel's failure to suppress the confession. The prejudice analysis must be conducted with an awareness that "a confession is like no other evidence," and that "a full confession may have a 'profound impact' on the jury." *Fulminante*, 499 U.S. at 296; *see also United States v. Ince*, 21 F.3d 576, 583 (4th Cir. 1994) ("a confession can have . . . a devastating and pervasive effect" on the outcome of a trial). The question is whether there is a "reasonable probability" of a different outcome at trial had Brown's confession been excluded. *See Strickland*, 466 U.S. at 694.

Given the centrality of the statements to this case, counsel's deficient performance for failing to suppress Brown's custodial confessions had an adverse effect on the jurors' determinations. As such, Brown's conviction and sentence are constitutionally infirm. He is therefore entitled to habeas relief.

---

[41] 10 WRR 97 ("We thought it would have been frivolous, because the case law at the time said if they continue to talk and they waive their right to an attorney, it's coming in."). This conclusion was erroneous for the reasons discussed immediately above.

CLAIM 7.      JUROR MISCONDUCT AT BROWN'S GUILT- AND PENALTY-PHASE
              PROCEEDINGS DEPRIVED BROWN OF HIS RIGHTS TO A FAIR AND
              IMPARTIAL JURY, THE ASSISTANCE OF COUNSEL, CONFRONTATION,
              EQUAL PROTECTION, AND A FAIR TRIAL

Because of juror misconduct, Brown was denied the right to be tried by a fair and impartial jury, and to a fair trial, among other rights, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Brown incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. A juror misconduct claim was presented in state court. However, because the state courts failed to meet the standards that would trigger deference under § 2254(d), this Court may consider the claim de novo.

The Supreme Court has long held that "[t]he requirement that a jury's verdict must be based upon the evidence developed at the trial goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Turner v. Louisiana*, 379 U.S. 466, 472 (1965) (internal quotation marks omitted). The integrity of the jury is paramount, and "any ground of suspicion that the administration of justice has been interfered with" cannot be tolerated. *Mattox v. United States*, 146 U.S. 140, 149 (1892), *superseded by rule as stated in Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017). Additionally, "[i]t is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment." *Id.* Brown's right to a fair and impartial jury was violated for the reasons explained below.

First, a defendant's right to a fair trial and impartial jury is violated when jurors feel pressured or intimidated. "A juror must feel free to exercise his functions without . . . anyone else looking over his shoulder. The integrity of jury proceedings must not be jeopardized by unauthorized invasions." *Remmer v. United States*, 347 U.S. 227, 229 (1954). Due process requires a defendant be tried by a jury capable of deciding a case solely on the evidence before it, unimpeded by biases, personal relationships between and among jurors and parties, or intimidation. *Irvin v. Dowd*, 366 U.S. 717,

151

722 (1961). Given the personal relationships and community pressure in small-town Greenville, Brown was tried before a compromised jury. *See* 1 WCR 113-14 (St. Habeas Appl. at 92-93).

Second, Brown's rights to due process, confrontation, and a fair and impartial jury were violated by the introduction of extraneous information into a juror's deliberations. *See generally Turner*, 379 U.S. at 472. Media coverage about Brown's case was pervasive before and prevalent throughout the trial. *See* CLAIM 4. Given the excessive news coverage, the jury was exposed to extrinsic information about the case on which it was empaneled.

In addition, it is likely there was additional juror misconduct such as considering extraneous information in deliberations among other things. The jury's knowledge of and reliance upon extrinsic evidence violated Brown's constitutional rights to confrontation, due process, a fair trial, assistance of counsel, and a fair and impartial jury. A jury's verdict "must be based upon the evidence developed at the trial" to ensure the integrity of the constitutional right to trial by jury. *Irvin*, 366 U.S. at 722. Such constitutional violations are not harmless errors; extrinsic information would have had a "substantial and injurious effect or influence" in determining at least one juror's verdict. *Brecht*, 507 U.S. at 623.

In a capital trial, it is critical that the jurors charged with determining the appropriate punishment consider only and all the evidence presented to them without being influenced by information outside the proceedings. *See Lockett v. Ohio*, 438 U.S. 586, 605 (1978) ("Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases."). In Brown's case, instances of misconduct demonstrate that jurors were improperly influenced in multiple ways, individually and cumulatively causing a substantial and injurious effect on the juries' verdicts and rendering Brown's convictions and death sentence unreliable. *See Brecht*, 507 U.S. at 623. Brown is therefore entitled to relief.

CLAIM 8.    BROWN WAS TRIED AND SENTENCED TO DEATH UNDER AN UNCONSTITUTIONAL STATUTORY SCHEME; THE TRIAL COURT ERRED IN DENYING THE DEFENSE MOTION TO DECLARE TEXAS CODE OF CRIMINAL PROCEDURE ARTICLE 37.071 UNCONSTITUTIONAL

The capital sentencing scheme, on its face and as applied to Brown, violates the Fifth, Sixth, Eighth and Fourteenth Amendments in multiple ways. Brown incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

In pretrial motions, defense counsel challenged the constitutionality of Texas Code Crim. Proc. Art. 37.071, the capital sentencing statute, on several grounds. *See* 2 CR 284-91. The trial court erred in denying the motion. This claim was also raised in similar form in Brown's state post-conviction habeas application. *See* 1 WCR 119-28 (St. Habeas Appl. at 98-107). However, because the state courts failed to meet the standards that would trigger deference under § 2254(d), this Court may consider the claim de novo.

### A. TEXAS'S SPECIAL ISSUE AS TO "FUTURE DANGEROUSNESS" IS UNCONSTITUTIONALLY VAGUE UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS

Texas's capital sentencing statute required Brown's jury to decide "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society[.]" Tex. Code Crim. Proc. art. 37.071 § 2(b)(1).

Capital sentencing schemes must be tailored to minimize the arbitrary and capricious imposition of the death sentence. Texas courts have held that the circumstances of the crime itself can be sufficient to meet the State's burden under the first special issue. *See, e.g.*, *Fuller v. State*, 253 S.W.3d 220, 231–32 (Tex. Crim. App. 2008). Thus, since any defendant who reaches the penalty phase of trial has necessarily been convicted of capital murder, the special issue performs absolutely no narrowing function. Therefore the special issue, as interpreted by the state courts, fails to

genuinely narrow the class of defendants eligible for the death penalty, and thus violates the Eighth Amendment.

Additionally, the instruction submitted to the jury is unconstitutionally vague on its face and as applied to Brown, as it fails to constitutionally guide the jury's discretion. Neither the statute nor the required jury charge define the terms "probability," "criminal acts of violence," or "continuing threat to society." The use of the term "probability" is unconstitutionally vague. As many judges and commentators have noted, "a probability is simply a chance—however large or small—as measured and defined in mathematical or statistical terms." *See Jurek v. State*, 522 S.W.2d 934, 948 (Tex. Crim. App. 1975) (Roberts, J., dissenting). Notwithstanding the obviously plain meaning of "probability," the Texas courts have for decades held that "probability" in special issue number one means "[l]ikelihood," or "true, real, or likely to occur." *See, e.g., Granviel v. State*, 552 S.W.2d 107, 117 n.6 (Tex. Crim. App. 1976); *Renteria v. State*, 206 S.W.3d 689, 706 (Tex. Crim. App. 2006) ("This Court has repeatedly held that the trial court need not define this term because the jury is presumed to understand it without further instruction."). Yet juries in general are not—and Brown's jury in particular was not—instructed of that definition. Therefore, the jury in Brown's case could have answered the special issue with a "yes" based on their belief that there was a probability anywhere from 1% to 99% that Brown would be dangerous in the future. Thus a failure to define "probability" in the jury instruction is patently unconstitutionally vague. Moreover, the use of "probability" without defining precisely what degree of probability is required undermines the State's burden of proof of a special issue that is ostensibly to be proven beyond a reasonable doubt. *See* Tex. Code Crim. Proc. art. 37.071 § 2(c).

The "continuing threat to society" is similarly vague and constitutionally infirm. The vagueness of this term turns on the term "society:" the CCA has held that "society" means both the prison society to which any life- or death-sentenced prisoner would be confined, and society at large.

*See, e.g., Berry v. State*, 233 S.W.3d 847 (Tex. Crim. App. 2007) (vacating death sentence for lack of sufficient evidence of future dangerousness where defendant is dangerous only toward her own children, and it is very unlikely she will have more children while sentenced to life imprisonment); *cf. Martinez v. State*, 327 S.W.3d 727, 735 (Tex. Crim. App. 2010) (future dangerousness special issue is construed as whether a defendant would be a threat "whether in or out of prison"). That approach alone injects unconstitutional arbitrariness into capital sentencing, because whether a defendant is sentenced to death or a term of 40 years, the defendant will not be soon released back into society and cannot therefore be a continuing threat to it. In conclusion, the mitigation special issue on future dangerousness is unconstitutionally vague and Brown's rights under the Eighth and Fourteenth Amendment have been violated.

As Brown's sentence is constitutionally infirm, it must be vacated.

### B. THE TEXAS MITIGATION SPECIAL ISSUE FAILS TO ADEQUATELY DEFINE "MITIGATION EVIDENCE," CREATING A REASONABLE PROBABILITY THAT THE JURY WOULD CONSTRUE MITIGATING EVIDENCE NARROWLY, REQUIRING A NEXUS TO THE CRIME

In capital cases, the Eighth Amendment requires heightened reliability because death is a qualitatively different punishment. *Lockett*, 438 U.S. at 605. Resultantly, the capital sentencer must undertake an individualized assessment of a defendant's culpability when assessing punishment. *See id.*; *Woodson*, 428 U.S. at 304 (opinion of Stewart, Powell, and Stevens, JJ.) ("[T]he fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.").

Individualized sentencing requires that the sentencer must "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."

*Lockett*, 438 U.S. at 604–05 (footnote omitted) ("[A] statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.").

Texas's statute requires the trial court to instruct the jury that it "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." Tex. Code Crim. Proc. art. 37.071 § 2(f)(4). The charge given to the jury was:

> [w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

48 RR 21.

As neither "mitigating evidence" nor "mitigating circumstance(s)" were defined for the jury, the instructions effectively instructed the jury to disregard important classes of mitigating evidence if they were not linked to "blameworthiness" or "culpability" for the crime. *See also* CLAIM 9.

By requiring a casual nexus between mitigation and the crime at issue, the jury instructions were unconstitutional.[42] In *Tennard*, the Supreme Court held that the Eighth Amendment is violated when courts impose a requirement that evidence must satisfy a "causal nexus" test before it is considered mitigating. 542 U.S. at 287. While mitigating evidence must be relevant to be admitted, the Court held that courts cannot apply a screening mechanism such as a heightened relevance standard to take mitigating evidence out of the sentencer's effective reach. *Id.* at 285 (quoting *McKoy v. North Carolina*, 494 U.S. 433, 441 (1990) ("[A] State cannot bar 'the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death.'")). "Once this low

---

[42] The State in summation also required an unconstitutional nexus. *See* Claim 5.

threshold for relevance is met, the Eighth Amendment requires that the [sentencer] be able to consider and give effect to a capital defendant's mitigating evidence." *Id.* at 285 (quoting *Boyde v. California*, 494 U.S. 370, 377–78 (1990)).

The *Tennard* Court expressly disapproved of the causal nexus portion of the test utilized by the Fifth Circuit, finding that the test would screen out much traditionally mitigating evidence. 542 U.S. at 285–86. In *Smith v. Texas*, 543 U.S. 37 (2004), the Supreme Court again condemned a state appellate court's application of a causal nexus to find mitigating evidence irrelevant. *Id.* at 45. The Court characterized the causal nexus test as "a test we never countenanced and now have unequivocally rejected." *Id.* Because the jury could not give full effect to Brown's mitigation as required by the Eighth and Fourteenth Amendments, Brown's sentence is unreliable and unconstitutional.

### C. Brown's Constitutional Rights Were Violated Because The Trial Court Was Prohibited From Instructing The Jury That A Vote By One Juror Would Result In A Life Sentence

The "10–12" jury instruction in the Texas capital sentencing scheme violates Brown's rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution, as it unconstitutionally encourages arbitrary and capricious death sentences.

When the U.S. Supreme Court reinstated the death penalty in *Gregg v. Georgia*, 428 U.S. 153, 188 (1976), it did so only after it was satisfied that Georgia's death penalty statute would "not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." To do so, the sentencing jury must be "apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information." *Id.* at 195.

157

Under Texas law, the court shall sentence a defendant to death if the jury answers "yes" to the first two special issues and "no" to the third special issue.[43] Tex. Code Crim. Proc. art. 37.071 § 2(g). If the jury returns a "no" answer to either of the first two special issues, a "yes" to the third special issue, or if the jury is unable to answer all of the questions submitted to under these guidelines, the court shall sentence the defendant to life without parole. *Id.*

However, Brown's jury was statutorily misinformed about the full impact of the way it answers these special issues. The jury was instructed that it could not answer "Yes" to the first special issue without unanimous agreement, and it could not answer "No" to the question unless at least ten jurors agree. 48 RR 7; Tex. Code Crim. Proc. art. 37.071 § 2(d)(2). Similarly, the jury was instructed that it could not answer "No" to the second special issue without unanimous agreement, and it could only answer "Yes" if at least ten or more jurors agree. 48 RR 8; Tex. Code Crim. Proc. art. 37.071 § 2(f)(2). The jury was informed by the judge that if the jury unanimously found a mitigating circumstance under the second special issue, Brown would be sentenced to life without parole. *See* 48 RR 8-9; Tex. Code Crim. Proc. art. 37.071 § 2(e)(2).

Critically, the statute expressly bars the jury from being instructed that if the jury is unable to reach a unanimous or at-least-ten verdict on either of the special issues, the trial court is required to sentence the defendant to life in prison. Tex. Code Crim. Proc. art. 37.071 § 2(a) (barring instruction on the effect of a failure to agree); *Id.* at § 2(g) (life sentence required if jury is unable to agree).

The statute and the confusing instructions create a scenario in which the opposite of "unanimous" is "ten people agree." Clearly, deliberations in a jury room on a death sentence could reach multiple outcomes that fall into neither category: a vote of 9–3, 8–4, 7–5, and so on. However, juries are given no instruction on how to proceed if that likely scenario plays out. Instead, jurors are

---

[43] The second special issue in the statute involves the application of the Texas "law of parties," which was not applicable to Brown's case. *See* Tex. Code Crim. Proc. art. 37.071 § 2(b)(2).

instructed that, in order to make the predicate findings that would result in a sentence of life imprisonment, "10 or more jurors [must] agree." Tex. Code Crim. Proc. art. 37.071 § 2.

The instruction thus violates *Mills v. Maryland*, 486 U.S. 367 (1988). As in *Mills*, a reasonable juror could understand the jury charge to mean that her single vote for life imprisonment would have no effect. *Mills*, 486 U.S. at 375–76; *Francis v. Franklin*, 471 U.S. 307, 315–16 (1985). Indeed, Brown's jury was instructed that it "may not answer" special issue number two "Yes" (mitigation warrants a life sentence) "unless ten or more of you agree." 48 RR 8. On its face, this is precisely the kind of ambiguity that the Constitution does not tolerate in a capital sentencing scheme. *Lockett*, 438 U.S. at 605 ("[T]he risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. . . . is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments."); *Andres v. United States*, 333 U.S. 740, 752 (1948) ("That reasonable men might derive a meaning from the instructions given other than the proper meaning . . . is probable. In death cases doubts such as those presented here should be resolved in favor of the accused.").

The plain language of the statute creates the impression that one juror's dissent from the remaining members of the jury, without the agreement of at least one other juror, would be insufficient to make a difference in the determination of either of these special issues or the ultimate sentence the jury imposes. For this reason, this instruction is also a violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985). Moreover, by actively misleading potential holdout jurors to believe their individual votes will not change the outcome, the instruction injects arbitrariness and unfairness into the penalty phase, in violation of Brown's due process rights.

The statute and instructions also create an unconstitutional risk of jury coercion, wherein the jurors perceive that they must reach a certain result. *See Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam). Just such confusion occurred in this case, where one juror acceded to a death

159

sentence under the assumption she could not get 9 other people to agree to a sentence of life. *See* 1 WCR 223-25 (St. Habeas Appl. Ex. 7 [deClercq Aff. ¶ 7]). For this reason, this instruction is also a violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985).

As Brown's death sentence is unreliable and constitutionally infirm, it must be reversed.

**CLAIM 9.**     **BECAUSE BROWN'S SENTENCE WAS IMPOSED UNDER A SENTENCING SCHEME THAT THAT DOES NOT NARROW THE CLASS OF DEATH-ELIGIBLE DEFENDANTS AND IS ARBITRARILY AND DISPROPORTIONATELY APPLIED, HIS SENTENCE IS UNCONSTITUTIONAL**

Texas's capital-sentencing scheme violates the Eighth and Fourteenth Amendments of the U.S. Constitution because it does not sufficiently channel the sentencer's discretion or sufficiently narrow the class of death-eligible defendants. In addition, the capital-sentencing scheme fails to ensure a proportionality review in violation of the Fifth, Eighth, and Fourteenth Amendments of the U.S. Constitution. As such, Brown's sentence is unconstitutional. Brown incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. Because this claim was previously unavailable, this Court may consider the claim de novo.

In *Furman v. Georgia*, the U.S. Supreme Court declared that a death-sentencing procedure is unconstitutional when it provides "no meaningful basis for distinguishing the few cases in which [death] is imposed from the many cases in which it is not." 408 U.S. at 313 (White, J., concurring) (per curiam); *see also, e.g., Maynard v. Cartwright*, 486 U.S. 356, 362 (1988); *Godfrey v. Georgia*, 446 U.S. 420, 427–28 (1980) (plurality opinion). "*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189 (joint opinion of Stewart, Powell, and Stevens, JJ.).

160

The narrowing process must be established by statute. *See id.* at 207 (stating that the selection of the persons eligible to be prosecuted and ultimately sentenced to death "[must] always [be] circumscribed by . . . legislative guidelines"). "Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates 'standardless [sentencing] discretion.'" *Godfrey,* 446 U.S. at 428 (alteration in original) (quoting *Gregg,* 428 U.S. at 196). Ultimately, "[t]o pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (quoting *Zant v. Stephens*, 462 U.S. at 877).

Texas's death penalty statute violates these mandates of the Supreme Court. Per Texas Penal Code § 19.02, the mens rea required for murder is either intentionally or knowingly causing the death of an individual. Capital murder is murder committed pursuant to one of the enumerated offenses under statute. *See* Tex. Penal Code § 19.03. Under the capital murder statute, a broad range of conduct constitutes first-degree murder, including intentional killings, premeditated killings, killings committed in the course of a myriad of other crimes, and the killings of law enforcement officers in the line of duty. See id. Thus the initial "pool" of individuals eligible for the death penalty is so broadly defined that it encompasses the vast majority of murders actually committed. This is seen by a reading of the statute, which only distinguishes between murder and manslaughter; there is no statutory recognition of non-capital murder (e.g. second-degree murder). Tex. Penal Code § 19.01. A thorough review of the actual cases could demonstrate that almost all murders in Texas could in fact be categorized as first-degree murder. That there is no further statutory narrowing renders the Texas death-penalty scheme unconstitutional.

Given the failure of the Texas statute to narrow the class of death-eligible defendants, the function, then, is ostensibly performed by the jury. However, there is no statute to channel the

sentencer's discretion in determining whether a crime deserves capital punishment. Once the State has proven capital murder, the jury may then only consider mitigation that has in fact been limited by statute to spare a defendant a capital sentence. Tex. Code Crim. Proc. art. 37.071 §2(f)(4). Nothing in Texas's capital sentencing scheme "genuinely narrow[s] the class of persons eligible for the death penalty" or assists the jury in making a reasonable determination to "justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Stephens*, 462 U.S. at 877.

Moreover, the Texas capital-sentencing scheme fails to ensure a comparative proportionality review of Brown's death sentence, rendering the sentence unconstitutional. When the U.S. Supreme Court sanctioned the modern death-penalty scheme, it did so based on the belief that state supreme courts would conduct careful and effective proportionality reviews in individual cases to guard against the arbitrary and capricious infliction of the death penalty. *See Gregg*, 428 U.S. at 203–06 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (highlighting proportionality review on appeal as an important protection against caprice in sentencing); *Proffitt v. Florida*, 428 U.S. 242, 258 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (same); *see also Glossip v. Gross*, 135 S. Ct. 2726, 2763 (2015) (Breyer, J., dissenting) (recognizing the importance of comparative proportionality review to avoid arbitrary imposition of the death penalty); *but see Pulley v. Harris*, 465 U.S. 37, 50–51 (1984). The Texas appellate courts, however, do not ensure this procedural safeguard. *See id.* at 44. The denial of proportionality review allows for the death penalty to be applied arbitrarily in Texas and violates the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

Recent scholarship has collected life verdicts in highly aggravated capital cases that shows just how wildly disproportionate the imposition of a capital sentence in Brown's case was, and just how little the statute narrows to prevent disproportionate sentencing. Rather, the death sentence in Texas is arbitrarily applied. *See* Russell Stetler, *The Past, Present, and Future of the Mitigation Profession,*

46 Hofstra L. Rev. 1161 (2018). Juries—including Texas juries—have imposed life sentences for defendants convicted of murdering children, law enforcement officers, and multiple victims. *Id.* apps. 2-4.

Though all murders are tragedies, the facts in Brown's case pale in comparison to those in other cases in which defendants were granted life without parole. Just a few examples:

- Roberto Rojas Aguirre was sentenced to life without parole by a Texas jury in 2011 for the murder of his eight and six year old stepsons, his three year old son, and his mother-in-law;

- Gabriel Armandariz was sentenced to life without parole by a Texas jury in 2015 for murder by strangulation of his two infant sons; he sent the photo of youngest son's hanged body to estranged wife;

- Brendon Gayton was sentenced to life without parole by a Texas jury in 2015 for the murder of six-year-old and two-year-old girls in drive-by shooting;

- Cornelius Harper was sentenced to life without parole by a Texas jury in 2014 for murdering his cousin and his cousin's pregnant girlfriend, who was repeatedly stabbed, killing her 8.5 month-old unborn child; and

- Maron Thomas was sentenced to life without parole by a Texas jury in 2013 for the murder of his mother, stepfather, brother, and sister who were shot to death, and the murder of his niece who was decapitated.

*Id.* apps. 2, 4. There is no moral, legal, or ethical reason for Brown to be sentenced to death while those whose crimes were far more egregious were given a life sentence without parole by a jury. Such an outcome is simply unconstitutional. *Lowenfield*, 484 U.S. at 244.

Under the Eighth Amendment, "Texas must do more than baldly point out the obvious," that a murder is brutal, to show that no juror could have sentenced Brown to life. *Walbey*, 309 F.

App'x at 804, cited in Stetler, *supra*, at 1211. Because the sentencing scheme under which Brown was sentenced was constitutionally unsound, Brown's capital sentence is constitutionally unsound, and Brown is entitled to relief.

**CLAIM 10.      BROWN WAS DEPRIVED DUE PROCESS AND EFFECTIVE ASSISTANCE IN HIS STATE HABEAS PROCEEDINGS**

Because Brown's state post-conviction proceedings were procedurally unsound and his state habeas counsel were ineffective, Brown was deprived of his constitutional rights to due process and effective assistance of counsel in violation of the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution. Brown incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

By the nature of this claim, these proceedings are the first in which Brown can raise these issues.[44] Because no state court has decided the merits of this claim, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply, and this Court's review of this claim should be de novo. *See Trevino v. Thaler*, 569 U.S. 413, 428-29 (2013).

Especially in a capital case, the defendant "has a substantial and legitimate expectation that he will be deprived of his liberty" only after the state has followed its own statutory guidelines setting forth the mandatory protections guaranteed to preserve a defendant's right to a fair trial and adequate representation. *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). The expectation of adequate counsel and a fair hearing, and the expectation that the state will adhere to its own rules ensuring that right, is a fundamental liberty interest "that the Fourteenth Amendment preserves against arbitrary deprivation by the State." *Id.* Brown's state habeas proceedings fell below constitutional

---

[44] Brown's state post-conviction counsel raised this argument in a Motion to Remand filed with the CCA after the state habeas court made its findings and before the CCA adopted them. *See* Pet. Ex. 1. The CCA summarily denied the motion.

requirements for due process and effective representation and as such his conviction and sentence are constitutionally infirm.

First, Brown was denied the ability to adequately develop material facts in state court, and he did not receive a full, fair, and adequate hearing of his claims in the state court proceedings. The Due Process Clause does not cease to apply once "[a] criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man." *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68 (2009). While a "state ... has more flexibility in deciding what procedures are needed in the context of postconviction relief," *id.* at 69, due process nonetheless requires that a habeas applicant be afforded certain procedural rights, including notice and the opportunity to be heard. *See Townsend v. Sain*, 372 U.S. 293, 312(1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5 (1992) (The availability of habeas corpus relief "pre-supposes the opportunity to be heard, to argue and present evidence."); *see also Ford v. Wainwright*, 477 U.S. 399, 413 (1986) (noting that the "fundamental requisite of due process of law is the opportunity to be heard"). Simply put, when a state provides a mechanism for a habeas applicant to collaterally attack a criminal conviction, the procedures employed must comport with due process. *See Evitts v. Lucey*, 469 U.S. 387, 401 (1985) ("[W]hen a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution-and, in particular, in accord with the Due Process Clause.").

The State of Texas failed to ensure Brown received adequate post-conviction process in compliance with its own law, in violation of Brown's Fifth and Fourteenth Amendment rights. Under Texas law, the trial court was required to admit evidence that would resolve the disputed factual issues, whether in the form of an evidentiary hearing, affidavit, deposition, interrogatory, live testimony, or the court's personal recollection. Tex. Code Crim. Proc. art. 11.071 § 9(a), (b); *see*

*also Goldberg*, 397 U.S. at 268 ("The fundamental requisite of due process of law is the opportunity to be heard.") (internal citations omitted).

The trial court deprived Brown of the ability to substantiate his claims for relief at the evidentiary hearing by excluding necessary testimony and evidence and denying Brown the time necessary to secure in-person testimony. He was unable to present testimony about the juror misconduct that occurred at his trial, expert and lay testimony about his Autism Spectrum Disorder and its impact on his life and the crime, expert testimony about the standard of care in death penalty trial representation, or the substantial prior misconduct of lead trial counsel. To support these claims, Brown asked to be permitted to present the testimony of: Michael Wiseman, Dr. Laurie Sperry, Shelly Thomas, David Gish, Don Bailey, Richard Ellis, Amanda Bailey, Dr. Paula Lundberg-Love, and Dr. Mark Cunningham. The court denied Brown's requests and excluded their testimony.

The State of Texas failed to give effect or due process in procedures it established to ensure that capital defendants did not receive death sentences in violation of their constitutional rights. "Such an arbitrary disregard of the petitioner's right to liberty is a denial of due process of law." *Hicks*, 447 U.S. at 346. Because Brown was denied the right to effective process at the fact-finding level, the CCA had an incomplete and misleading record before it in affirming the trial court's holding.

Second, "[w]ithout the help of an adequate attorney, a prisoner will have . . . difficulties vindicating a substantial ineffective-assistance-of-trial-counsel claim." *Martinez*, 566 U.S. at 11. Ineffective-assistance claims "often require investigative work and an understanding of trial strategy. When the issue cannot be effectually raised on direct review, a prisoner asserting an ineffective-assistance-of-trial counsel claim" during post-conviction proceedings cannot "rely on a court opinion or the prior work of an attorney addressing that claim." *Id.* at 11-12. Thus, "[t]o present a claim of

ineffective assistance at trial in accordance with the State's procedures . . . a prisoner likely needs an effective attorney." *Id.*

The ABA Guidelines state that post-conviction counsel have a duty to "seek to litigate all issues, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality capital defense representation, including challenges to any overly restrictive procedural rules." ABA Guideline 10.15.1(C). This, Brown's post-conviction attorneys did not do. Their representation fell below the standards required for constitutionally effective post-conviction counsel. *See Martinez*, 566 U.S. at 11-12.

Brown's state post-conviction attorneys unreasonably focused their investigation and briefing on a single diagnosis: ASD. A diagnosis does not a claim make. This singular focus on the ineffective-assistance claim for failing to diagnose ASD was not "reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. ASD alone is not an answer, excuse, justification, indication of "morality," or defense to capital murder. Because post-conviction counsel were so singularly focused on the diagnosis itself, they failed to adequately explain the import of such a diagnosis in the context of the charges, trial, and sentencing, and they failed to identify and brief other meritorious, cognizable claims to Brown's detriment.

Post-conviction counsel also failed to timely include reports and supporting evidence from experts and other witnesses, resulting in the exclusion of key testimony and supporting documentation in the evidentiary hearing.

"[T]he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed." *Furman*, 408 U.S. at 309-10 (Stewart, J., concurring); *see also id.* at 313 (White, J., concurring) ("[T]he death penalty is exacted with great infrequency even for the most atrocious crimes and . . . there is no meaningful basis for distinguishing the few cases in which it is imposed

from the many cases in which it is not"). In Brown's case, the state habeas legal system that was designed to ensure due process and constitutional rights failed to do so.

Individually and cumulatively, these mistakes prevented Brown from having an effective post-conviction review of his prior state proceedings. Brown was thus prejudiced. *See Martinez*, 566 U.S. at 9; *Strickland*, 466 U.S. at 694.

### CLAIM 11.        BROWN'S CONVICTION AND SENTENCE MUST BE VACATED BECAUSE OF THE CUMULATIVE PREJUDICIAL EFFECT OF ALL THE ERRORS IN THIS CASE

The cumulative prejudice of the constitutional errors in Brown's case demands that his convictions and sentences be vacated under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Brown incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. He also re-urges and incorporates by specific reference all objections, arguments, and claims of error made at trial, on appeal, and during post-conviction proceedings.

A cumulative error claim was not raised in state court. As this claim was not adjudicated on the merits below, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider this claim de novo. In the alternative, Brown respectfully reserves the right to timely request a limited stay and abeyance pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005), in order to return to state court to present any unexhausted claims, should the need to do so become apparent. *See also Nickleson v. Stephens*, 803 F.3d 748, 754 (5th Cir. 2015).

Should this Court consider this claim defaulted, Brown alleges he can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of appellate and state post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Carpenter*, 529 U.S. at 453; *Strickland*, 466 U.S. at 687–88; *but see Davila v. Davis*, 137 S. Ct. 2058 (2017). As set out above, each of these violations was of such magnitude as to undermine the reliability of the verdicts and

require relief. But it is well-established that this Court must also examine whether the cumulative effect of these errors violated Brown's right to due process of law, and to impose default would be a miscarriage of justice. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Spence v. Johnson*, 80 F.3d 989, 1000-01 (5th Cir. 2004) (relief is warranted for cumulative error when "the constitutional errors committed in the state trial court so 'fatally infected the trial' that they violated the trial's 'fundamental fairness.'") (quoting *Derden v. McNeel,* 978 F.2d 1453, 1457 (5th Cir. 1992)); *Taylor v. Kentucky*, 436 U.S. 478, 487-88 & n.15 (1978); *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3 (1973).

The combination of errors in this case, discussed in the preceding claims, deprived Brown of such rights as his rights to a fair trial, trial by impartial jury, equal protection, due process, effective assistance of counsel, freedom from cruel and unusual punishment, presentation of a complete defense, confrontation, a reliable determination at both the guilt and penalty phases, and fundamental fairness. Even if the errors are deemed harmless when viewed individually, their cumulative effect substantially prejudiced Brown and undermined the fairness and reliability of his proceedings. When evaluating cumulative error, while only guilt-phase errors are relevant to Brown's conviction, "all errors are relevant to the sentence." *Darks v. Mullin*, 327 F.3d 1001, 1018 (10th Cir. 2003); *see also Satterwhite v. Texas*, 486 U.S. 249, 261 (1988) (Marshall, J., concurring).

As a result of the cumulative effect of the errors in the guilt and penalty phases, Brown's convictions and sentences were unlawfully and unconstitutionally imposed. The aggregate harm of these constitutional violations warrants granting this petition without any determination of whether these violations substantially affected or influenced the jury's verdict. *See Brecht,* 507 U.S. at 638 n.9.

Further, these constitutional violations so infected the integrity the proceedings that the errors cannot be deemed harmless, and they did in fact have of a substantial and injurious effect on the

guilt and penalty judgments. Considering all the errors above, this Court should conclude that Brown was denied fair and reliable proceedings and grant him habeas relief.

## PRAYER FOR RELIEF

WHEREFORE, based upon the foregoing, Petitioner respectfully requests that the Court grant him the following relief:

(1)    Under 28 U.S.C. § 2243, ¶ 5, issue an order to have him brought before it, to the end that he may be discharged from the unconstitutional confinement and restraint on the bases set forth in this Petition;

(2)    Under § 2243, ¶ 1, or Habeas Rule 4, direct the State to answer or show cause why relief should not be granted;

(3)    Under § 2243, ¶ 6, and Habeas Rule 5(e), allow Petitioner to deny or allege additional facts, and respond to any procedural defenses, by way of traverse or reply;

(4)    Under Habeas Rule 6, allow Petitioner an opportunity to file a motion for discovery, and, under § 2243, ¶ 7, and Fed. R. Civ. P. 15(a)(2), permit Petitioner an opportunity to seek leave to amend with any newly discovered evidence;

(5)    Under Habeas Rule 7, allow Petitioner an opportunity to suggest that the record be expanded;

(6)    Under Habeas Rule 8, conduct an evidentiary hearing at an appropriately scheduled time where proof may be offered and argument advanced concerning the allegations set forth in his Petition;

(7)    Allow Petitioner to brief the precedential and statutory law relevant to his case in light of the record and the allegations raised by his Petition;

(8)    Direct the parties to brief and argue any issues that may arise in the course of the litigation;

(9)    Grant such other relief as may be necessary and appropriate.

DATED:  September 11, 2020                    Respectfully submitted,

                                             Maureen Scott Franco
                                             Federal Public Defender

                                             Tivon Schardl
                                             Capital Habeas Unit Chief


                                             */s/ Timothy P. Gumkowski*
                                             Timothy P. Gumkowski
                                             TX Bar No. 24104788
                                             Office of the Federal Public Defender
                                             Western District of Texas
                                             Capital Habeas Unit
                                             919 Congress Ave., Suite 950
                                             Austin, TX 78701
                                             (737) 207-3007 (phone)
                                             (512) 499-1584 (fax)
                                             tim_gumkowski@fd.org


                                             Attorneys for Petitioner Micah Brown




## VERIFICATION

I, undersigned counsel for Petitioner in the above-entitled action, state that to the best my

knowledge and belief, the facts set forth in this Petition are true.

I declare, under penalty of perjury, that the foregoing is true and correct.

Subscribed to by me this 11th day of September 2020 in Austin, Texas.



                                             */s/ Timothy P. Gumkowski*
                                             Timothy P. Gumkowski

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of September, 2020, I electronically filed the foregoing

Petition for Writ of Habeas Corpus with the Clerk of Court using the CM/ECF system which will

send notification of such filing to the following:

Erich Dryden
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711

*/s/ Timothy P. Gumkowski*
Timothy P. Gumkowski