UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MICAH CROFFORD BROWN, | § | |
|     *Petitioner*, | § | |
| vs. | § | Cause No. 3:19-cv-2301-L-BN |
| | § | |
| BOBBY LUMPKIN, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Institutions Division, | § | |
|     *Respondent*. | § | |

**MOTION FOR LEAVE TO FILE AND BRIEF OF *AMICUS CURIAE*, NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS, IN SUPPORT OF PETITIONER'S OBJECTIONS TO MAGISTRATE JUDGE'S ORDER**

TO THE HONORABLE SAM A. LINDSAY, UNITED STATES DISTRICT JUDGE:

*Amicus* the National Association of Criminal Defense Lawyers, submits this Motion for Leave to file and Amicus Brief in Support of Petitioner's Objections to the Magistrate Judge's Order, ECF No. 31, denying Petitioner's Motion to Modify or Suspend Scheduling Order Due to Extraordinary Circumstances, ECF No. 30. *Amicus* submits this brief pursuant to Local Rules 7.2(b) requesting leave to file the Amicus brief because of the deep and abiding concern that the National Association of Criminal Defense Lawyers has in the provision of competent counsel in death penalty cases particularly at the post-conviction phase.

1

## Table of Contents

Table of Contents ..................................................................................... 2

Table of Authorities ................................................................................. 3

Introduction ............................................................................................. 4

Argument ................................................................................................. 5

   I.   Investigations by telephone, rather than in-person, deprive Brown of effective assistance of counsel. .......................................................... 5

   II.   The Magistrate's Order asks counsel to ignore ethical obligations under standards governing capital cases. ............................................. 7

Certificate of Service ............................................................................. 13

# Table of Authorities

**Cases**

*Doe v. Ayers*, 782 F.3d 425 (9th Cir. 2015) ............................................. 6, 7

*Eaton v. Wilson*, No. 09-cv-261, 2014 WL 6622512 (D. Wyo. Nov. 20, 2014). ..................................................................................................... 5, 6

*Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011) ......................................... 6

*Harries v. Bell*, 417 F.3d 631 (6th Cir. 2005) ............................................ 6

*Lockett v. Ohio*, 438 U.S. 568 (1978) ......................................................... 5

*Strickland v. Washington*, 466 U.S. 668 (1984). ...................................... 5

**Other Authorities**

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003 revision) ......................... 7, 8, 10

BIANCA CODY MURPHY & CAROLYN DILLON, INTERVIEWING IN ACTION: PROCESS AND PRACTICE (1998) .............................................................. 11

Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U.L. REV. 229 (1983) ................................ 5

NACDL, *Concerning Capital Defense Practice During the Pandemic*, https://www.nacdl.org/Content/Concerning-Capital-Defense-Practice-During-the-Pan (last visited Nov. 4, 2020) .......................................... 12

National Alliance of Sentencing Advocates & Mitigation Specialists, Strategic Considerations When Conducting a Mitigation Investigation During the Evolving Conditions of the COVID-19 Pandemic (July 2020). ................................................................................................ 10, 11

The Guidelines and Standards for Texas Capital Counsel ...................... 8

**Rules**

Local Rules 7.2(b) ........................................................................................ 1

## Introduction

The National Association of Criminal Defense Lawyers ("NACDL") is a nonprofit voluntary professional bar association that works on behalf of criminal defense attorneys to ensure justice and due process for those accused of crime or misconduct, in both state and federal court. NACDL was founded in 1958 and has a nationwide membership of many thousands of direct members, and up to 40,000 members when affiliates are included. NACDL's members include private criminal defense lawyers, public defenders, military defense counsel, law professors, and judges. NACDL is the only nationwide professional bar association for public defenders and criminal defense lawyers. It is dedicated to advancing the proper, efficient, and just administration of justice. NACDL seeks leave to file its brief in this case because in cases where the ultimate penalty is sought it is particularly important to proceed with care and deliberation. The United States Supreme Court has recognized that death is different, and calls for much deeper and specialized investigation than in any other type of case. NACDL has a policy that was approved by the NACDL Board of Directors in light of the current COVID 19 pandemic on October 24, 2020 that is based on long standing principles including Supreme Court cases and the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003). Because NACDL has a strong interest in ensuring that death penalty cases are litigated by competent defense counsel who are armed with adequate resources and abilities, it respectfully seeks leave to file this amicus curie brief.

## Argument

**I.  Investigations by telephone, rather than in-person, deprive Brown of effective assistance of counsel.**

Defense counsel's ability in a death penalty case to effectively represent the client is derived from "the overarching duty to advocate the defendant's cause." *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  This duty is even more critical in capital cases, since "'the penalty of death is qualitatively different' from any other sentence." *Lockett v. Ohio*, 438 U.S. 568, 604 (1978).  As such, capital cases require a "greater degree of reliability when the death sentence is imposed." *Id*.  However, reliability is only attainable when defense counsel is able to adequately investigate and prepare, which is fundamental to attorney competence.  *See* Gary Goodpaster*, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U.L. REV. 229, 344 (1983).  Inhibiting defense counsel's ability to investigate renders counsel ineffective and harms the client.  In fact, several courts have found defense counsel constitutionally ineffective for failing to conduct an in-person investigation.

In *Eaton v. Wilson*, the Wyoming district court stressed defense counsel's obligation to conduct proper investigations. *Eaton v. Wilson*, No. 09-cv-261, 2014 WL 6622512, at *19 (D. Wyo. Nov. 20, 2014).  Relying on ABA guidelines, the court opined that counsel's ability to investigate includes seeking assistance from investigators and mitigation specialists who receive specialized training. *Id*.  Such training is "indispensable to discovering and developing the facts that must be unearthed at trial or in post-conviction proceedings." *Id*.  Moreover, mitigation specialists are also indispensable throughout capital proceedings based on their "ability to elicit sensitive,

5

embarrassing and often humiliating evidence that the defendant may have never disclosed." *Id*. Such information cannot be obtained through an impersonal telephone call, but must be elicited after establishing a relationship with the witnesses and garnering their trust. Such interviews involve emotional situations and require empathy on the part of the field interviewer. The Death Penalty Standards also counsel that when the in-person interview is conducted by counsel, the lawyer should be accompanied by a third person.

The Sixth Circuit has also found defense counsel's performance constitutionally deficient for failing to conduct an in-person investigation. *Harries v. Bell*, 417 F.3d 631, 638 (6th Cir. 2005). In *Harries*, defense counsel limited his investigation to contacting the defendant's mother and brother by telephone. *Id*. According to the court, defense counsel's failure to properly investigate and develop mitigation evidence "hampered [their] ability to make strategic choices[.]" *Id*. The Sixth Circuit ultimately held the defendant was prejudiced by counsel's deficient performance. *Id*. at 641.

These courts are not alone. Other circuits have also concluded that conducting mitigation investigations by phone amounts to ineffective representation. *See Doe v. Ayers*, 782 F.3d 425, 438 (9th Cir. 2015); *Ferrell v. Hall*, 640 F.3d 1199, 1219 n.14 (11th Cir. 2011) (noting that counsel's mitigation investigation consisted of telephone, rather than in-person, character witness interviews). In *Doe v. Ayers*, defense counsel conducted a few phone interviews with the defendant's mother, but failed to conduct any in-person interviews. 782 F.3d 425, 438 (9th Cir. 2015). Importantly, the Ninth

6

Circuit acknowledged that capital defendants—and most people—do "not volunteer deeply painful, shameful information when not pressed for details." *Id.* at 437.

The Magistrate's Order directly fails to take into account the need for counsel to meet the above minimum standards to adequately represent Brown by conducting an in-person investigation. Specifically, the Order finds that contrary to the minimum standards for competent death penalty counsel, it would be sufficient for counsel to conduct an investigation via telephone. As the above cases highlight, capital cases are unlike other cases and such a telephone conducted investigation is ineffective.

## II. The Magistrate's Order asks counsel to ignore ethical obligations under standards governing capital cases.

A mitigation investigation in a capital case must not deviate from the American Bar Association Guidelines for the Appointment and Performance of Council in Death Penalty Cases and the Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases. Capital life sentence investigations must be conducted according to well-established best practices. The ABA Guidelines, the Supplementary Guidelines, and Texas Guidelines articulate the national and state standards regarding the investigation obligations of defense teams in such cases.

The ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003 revision) assign to lead counsel (at Guideline 10.4(B)) the responsibility for conducting a thorough investigation relating to both guilt and penalty, regardless of any statement by the client opposing such investigation.

7

(Guideline 10.7). To meet this responsibility, lead counsel must assemble a capital defense team consisting of no fewer than two qualified attorneys, an investigator, and a mitigation specialist – with at least one member of that team qualified by training and experience to screen for the presence of mental or psychological disorders or impairments. (Guidelines 4.1 and 10.4 C). Guideline 5.1 C states:

> Mitigation specialists must be able to identify, locate and interview relevant persons in a culturally competent manner that produces confidential, relevant and reliable information. They must be skilled interviewers who can recognize and elicit information about mental health signs and symptoms, both prodromal and acute, that may manifest over the client's lifetime. They must be able to establish rapport with witnesses, the client, the client's family and significant others that will be sufficient to overcome barriers those individuals may have against the disclosure of sensitive information and to assist the client with the emotional impact of such disclosures. They must have the ability to advise counsel on appropriate mental health and other expert assistance.

*See* ABA Guidelines 5.1 C.

The Guidelines and Standards for Texas Capital Counsel also clearly state the duties of habeas corpus counsel. Guideline 12.2B. Specifically, "Habeas corpus counsel cannot rely on the previously compiled record, but must conduct a thorough and independent investigation." Tex. Guideline 12.2B1(b). Further, the Texas Guidelines state:

> Habeas counsel cannot rely on the work of, or representations made by, prior counsel to limit the scope of the post-conviction investigation. Therefore, counsel has a duty to conduct a searching inquiry to assess whether any constitutional violations may have taken place, including— but not limited to—claims involving police and prosecutorial misconduct, faulty eyewitness evidence, unreliable jailhouse informant testimony, coerced confessions, dubious or flawed forensic scientific methods, ineffective assistance of trial and appellate counsel, and juror misconduct.

Tex. Guideline 12.2B1(c).

The effect of the pandemic on mitigation specialists, mitigation investigations, and field investigations is unique. These investigations are typically exhaustive and delve into every aspect of a defendant's life. The topics addressed are particularly emotional and rely on the ability of a mitigation specialist or habeas corpus counsel to establish rapport and foster relationships of trust with both defendants and witnesses. Despite this, the Magistrate Judge's Order found that "Petitioner's legal and investigative staff have not been prevented since March 2020 from investigating his claims via the telephone or other means of communication still operative at this juncture, including first class postage transmitted via the United States Postal Service." *See* Magistrate Judge's Order, ECF No. 31 at 2. One cannot elicit admissions of guilt by others, admissions of mistakes, oversights and failings by prior counsel, or sensitive, embarrassing, devastating, or inculpatory information from witnesses or prosecutors over the telephone or by mail.  One cannot adequately refresh counsel or a witness with the file, a transcript, or a report, over the telephone or by letter.  One cannot even gain access to witnesses who are currently incarcerated in places where visitation is not permitted because of the dangers of the pandemic. And the current pandemic is a remarkable, once in 100 year, circumstance.

The National Alliance of Sentencing Advocates and Mitigation Specialists (NLADA) highlight many of the unique problems associated with conducting these investigations by telephone or video conference. These problems include:

9

> Calls and video conferences are unreliable, and access varies by facility. Legal teams must ask staff to arrange the calls, which places new stresses on the already sensitive relationship defense teams have with correctional staff. This power dynamic makes it difficult to push for better arrangements. Uncooperative correctional officers can retaliate, refusing to assist the team or targeting the client in abusive ways.
>
> Calls and videos with defense teams are shortened in some cases and may take place within the earshot of correctional staff compromising the client's privacy and what the team can accomplish. Companies that provide telephonic and video communications have recorded privileged communication in the past, creating further doubts about whether confidential communication with clients is currently possible.
>
> Phone calls and video conferences fail utterly to provide the safe, confidential, and intimate setting that is necessary to discuss sensitive issues related to the client's history or difficult legal decisions such as whether to accept a plea offer.
>
> Mitigation specialists bring hard copies of releases for the client to sign. Without face-to-face contact, defense teams have to further rely on correctional staff to assist in obtaining the client's signature. This practice compromises the client's privacy, and the team is unable to assess whether the client understood the documents they were asked to sign.

National Alliance of Sentencing Advocates & Mitigation Specialists, Strategic Considerations When Conducting a Mitigation Investigation During the Evolving Conditions of the COVID-19 Pandemic, at 16 (July 2020).

In capital cases, the defense team must abide by the ABA Guidelines and Supplementary Guidelines regardless of whether the pandemic makes compliance more difficult. *See* ABA Guideline 10.5. Regarding habeas corpus counsel's communication with their client, the Texas Guidelines unequivocally state:

> Without exception, habeas corpus counsel has a duty to meet the capital client face-to-face as soon as possible after appointment. Counsel, or some member of the defense team, should make every effort to establish a relationship of trust with the client. It is also essential for counsel or some member of the defense team to develop a relationship of trust with

>the client's family or others on whom the client relies for support and advice.

Guideline 12.2B2(a) (emphasis added)

While telephonic and video communication may be appropriate for casual check-ins to maintain existing relationships, they do not allow for substantive interviews that require a safe, confidential, and an intimate environment necessary to discuss the sensitive issues regarding the client's case and history. Therefore, these types of telephonic or video conferences are in violation of both the ABA and Texas standards and are impermissible in capital cases.

Regarding the contact of witnesses, NLADA found that "long-prevailing professional norms stress the importance of in-person, face-to-face interviews." *See* NLADA at 16. Further, NLADA found that that phone calls are more likely to jeopardize future contact with the individual because of the inability to confirm who the caller is and the uncomfortable nature of sharing information over the phone due to the privacy concerns. *Id.* Conducting investigations by telephone not only hinders the ability to build strong rapport, but also reduces the accuracy of the investigation because "as much as 65% of what is communicated is communicated nonverbally." BIANCA CODY MURPHY & CAROLYN DILLON, INTERVIEWING IN ACTION: PROCESS AND PRACTICE 28 (1998). Not being able to observe body language, general appearance, and critical nonverbal cues greatly diminishes the accuracy of the investigation. Further, a telephone interview disallows the investigator to "meet the client's friends and family; see family pictures; note relationships with cherished pets and neighbors that the client may not think to mention…." MURPHY & DILLON at 60. By having these

conversations on the telephone, investigators are not allowed a deeper perspective of the individual that is desperately needed when discussing traumatic and sensitive topics. The impersonal nature of a phone call greatly impedes the ability to conduct an accurate investigation and build any kind of meaningful rapport, both of which are crucial in conducting a thorough mitigation investigation in a capital case. Moreover, many psychological and neuropsychological examinations cannot be conducted over the telephone. Such exams must be conducted in person to be valid exams.

Because of these important standards for the proper conduct of investigations and the existence of the pandemic NACDL recently expressed concerns about providing effective advocacy for capital clients during the pandemic. NACDL, *Concerning Capital Defense Practice During the Pandemic*, https://www.nacdl.org/Content/Concerning-Capital-Defense-Practice-During-the-Pan (last visited Nov. 4, 2020) (also attached as Exhibit A).

> Because developing positive rapport and working relationships with witnesses in capital cases is fundamental and witness engagement can be difficult, taking shortcuts such as conducting interviews by phone or video, or showing up on a witness's doorstep wearing a mask, will increase the chances of a witness declining an interview and disengaging from the process. An effective mitigation investigation requires the defense to ask witnesses about traumatic and humiliating experiences, including sexual and physical violence, mental illness, extreme poverty and the like. Witness disengagement is often unresolvable, and potentially deadly for a client.

*Id*.

This guidance ensures that capital defendants continue to receive adequate representation consistent with preserving their constitutional rights.

For the above reasons Amicus Curiae, the National Association of Criminal Defense Lawyers respectfully asks leave to file this amicus brief supporting the objections of Brown's counsel to the United States Magistrate Judge's Report and Recommendation to this Court, which asks for modification of the scheduling order until such time as a competent, in-person, investigation can be accomplished by counsel for the defense.

Respectfully submitted.

/s/ Cynthia E. Orr
**CYNTHIA E. ORR**
Bar No. 15313350
**Goldstein & Orr**
310 S. St. Mary's St., Ste. 2900
San Antonio, Texas 78205
Telephone: (210) 226-1463
Facsimile: (210) 226-8367
Email: whitecollarlaw@gmail.com
Attorney for *Amicus Curie*
The National Association
of Criminal Defense Lawyers

### Certificate of Service

I certify that a copy of this Motion for Leave to file and Brief was delivered via electronic delivery to all known filing users through the Court's CM/ECF system in accordance with the Federal Rules of Civil Procedure on November 4, 2020.

/s/ Cynthia E. Orr
**CYNTHIA E. ORR**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MICAH CROFFORD BROWN, | § | |
| *Petitioner*, | § | |
| vs. | § | Cause No. 3:19-cv-2301-L-BN |
| | § | |
| BOBBY LUMPKIN, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Institutions Division, | § | |
| *Respondent*. | § | |

### ORDER

On this the ____ day of _____, 20____, this Court considered *Amicus Curiae*, National Association of Criminal Defense Lawyers, Motion for Leave to File Brief in Support of Petitioner's Objections to Magistrate Judge's Order. Having considered the merits, this Court hereby orders this motion:


(Granted)                    (Denied)



_____
HONORABLE SAM A. LINDSAY,
UNITED STATES DISTRICT JUDGE

14