IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MICAH BROWN, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 3:19-cv-02301-L-BN |
| | § | *CAPITAL CASE* |
| BOBBY LUMPKIN, | § | |
| Director, Texas Department | § | |
| of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

**RESPONDENT LUMPKIN'S ANSWER
WITH BRIEF IN SUPPORT**

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
For Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

ERICH DRYDEN
Assistant Attorney General
Criminal Appeals Division
*Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1400
*erich.dryden@oag.texas.gov*

*Attorneys for Respondent*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........................................................................ v

**ANSWER** ............................................................................................... 1

**BROWN'S ALLEGATIONS** .................................................................. 1

**STATEMENT OF THE CASE** ............................................................... 2

**STATEMENT OF FACTS** ...................................................................... 3

    **I.**    **Facts of the Crime** ................................................................. 3

    **II.**    **Facts Pertaining to Punishment** ......................................... 11

        **A.**    **State's case** ................................................................ 11

        **B.**    **Defense's case** .......................................................... 12

            **1.**    **Lay witnesses** ................................................... 12

            **2.**    **Experts** .............................................................. 17

                **a.**    **Dr. Paula Lundberg-Love** ...................... 17

                **b.**    **Dr. Mark Cunningham** ........................... 21

                    **i.**    **Transgenerational factors** ............. 22

                    **ii.**    **Neurodevelopmental factors** ......... 23

                    **iii.**    **"The Bridge"** ................................ 24

                    **iv.**    **Violence risk assessment** .............. 25

**ARGUMENT** ....................................................................................... 26

    **I.**    **Brown's Claim That Trial Counsel Were Ineffective at the Guilt-Innocence Phase of His Trial Is Procedurally Defaulted and Meritless.** ......................................................................... 28

        **A.**    **Brown's claim is unexhausted and defaulted.** ............. 30

i

**B.     Trial counsel were not ineffective.** ................................... 33

    **1.     Counsel were not deficient**......................................... 35

        **a.     Counsel were not deficient because expert testimony premised on Brown's new factors to negate the aggravating element likely would not have been admissible under state law.** ............... 35

        **b.     Likewise, federal precedent undermines Brown's IATC claim.** ................................................................ 39

        **c.     Counsel were not deficient because they investigated and presented a valid defense theory.** ........ 43

            **1.     The investigation was sufficient.** .................... 44

            **2.     Counsel's defensive theory at guilt-innocence was informed and reasonable based on the facts and circumstances of the case.** ................................ 54

        **d.     Brown's additional arguments are meritless**.................... 61

    **2.     Brown fails to demonstrate prejudice.** ................................... 72

**C.     Brown's claim of cumulative error is meritless.** ........................... 77

**II.     Trial Counsel Were Not Ineffective at Punishment.** ........................ 79

  **A.     State court findings** ........................................................... 81

  **B.     Trial counsel were not ineffective.** ................................. 86

    **1.     Counsel were not deficient**......................................... 87

        **a.     The mitigation case was extremely thorough.** ................. 87

        **b.     Counsel's failure to present evidence of ASD does not amount to ineffectiveness.**............................... 95

        **c.     Trial counsel's punishment strategy was sound.**.............. 98

        **d.     Brown's additional arguments are meritless**.................. 103

2.      Counsel's performance did not result in any prejudice. .... 111

III.   Brown's Claim That Counsel Labored Under a Conflict of Interest Is Procedurally Defaulted and Meritless. ......................... 114

IV.   Trial Counsel Were Not Ineffective for Not Moving for a Change of Venue, and Brown Was Not Deprived of Due Process by the Trial Court's Failure to Change Venue. ................ 121

A.      State court findings ............................................................. 122

B.      Trial counsel were not ineffective. ..................................... 127

1.      Trial counsel were not deficient. ............................... 128

2.      At any rate, Brown fails to demonstrate prejudice. ........... 130

C.      Brown's claim of trial court error is defaulted and meritless. ....................................................................... 132

V.    Brown's Claims of Prosecutorial Misconduct Are Defaulted and Meritless. ...................................................................... 134

A.      The prosecution did not improperly comment on Brown's failure to testify. .................................................................. 136

B.      Brown's Eighth Amendment arguments are meritless. ........... 141

C.      The prosecution's remarks did not deprive Brown of due process. ............................................................................ 146

1.      Brown's claim of burden shifting lacks merit. ..................... 146

2.      The State's religious references were invited. ..................... 147

3.      The alleged inflammatory remarks were a reasonable deduction from the evidence, plea for law enforcement, and invited by the defense. ............................................ 149

D.      Brown's cumulative error argument is defaulted and meritless. ....................................................................... 151

VI.   Brown's Claims Pertaining to His Confession and Channel 11 Interview Are Defaulted and/or Meritless. ......................................... 152

**A.**   **In addition to being defaulted, Brown's claims of trial court error are meritless.**...................................... 154

    **1.**   **Brown did not unequivocally request counsel.** .................... 154

    **2.**   **If Brown's remark is construed as a request for counsel, he subsequently waived that right and chose to speak with police.**.................................................................. 160

    **3.**   **Brown's claim that he did not knowingly, voluntarily, or intelligently waive his *Miranda* rights is defaulted and meritless.** .................................................................. 162

    **4.**   **Brown fails to demonstrate any harm.** .................................. 163

**B.**   **Brown's claim that the trial court erred in admitting his television interview is defaulted and meritless.**........................ 165

**C.**   **Trial counsel were not ineffective.** ............................................ 168

**VII.**   **Brown's Claim of Juror Misconduct Is Inadequately Briefed, Conclusory, and Meritless.**.................................................................. 170

**VIII.**   **Brown's Claim Challenging the Texas Special Issues Is Partially Defaulted and Meritless.** ...................................................... 173

**IX.**   **Brown's Claim That the Texas Sentencing Scheme Is Unconstitutional Because It Fails to Narrow the Class of Death Eligible Defendants and Is Arbitrarily and Disproportionately Applied Is Defaulted and Meritless.** .............. 176

**X.**   **Brown's Claims That He Was Deprived of Effective Assistance of State Habeas Counsel and That Other Infirmities Occurred In His State Habeas Proceeding Are Not Cognizable.** ................... 179

**XI**.   **Brown's Claim of Cumulative Error Is Procedurally Defaulted and Meritless.** ................................................................ 181

**CONCLUSION** ........................................................................................ 182

**CERTIFICATE OF SERVICE** ............................................................... 183

# TABLE OF AUTHORITIES

## Cases

*Abdul-Kabir v. Quarterman,* 550 U.S. 233 (2007) ............................................ 143, 144

*Adekeye v. Davis*, 938 F.3d 678 (5th Cir. 2019) ......................................... 53

*Alexander v. Johnson*, 211 F.3d 895 (5th Cir. 2000) ............................... 182

*Alexander v. McCotter*, 775 F.2d 595 (5th Cir. 1985) .............................. 119

*Allen v. Vannoy*, 659 F. App'x 792 (5th Cir. 2016) .................................... 79

*Anderson v. Collins*, 18 F.3d 1208 (5th Cir. 1994) ..................................... 70

*Anderson v. Harless*, 459 U.S. 4 (1982) ...................................................... 31

*Andrews v. Collins*, 21 F.3d 612 (5th Cir. 1994) ............................... 126, 131

*Andrus v. Texas,* 140 S. Ct. 1875 (2020) ...................................................... 30

*Barnes v. Johnson*, 160 F.3d 218 (5th Cir. 1998) ...................................... 159

*Basso v. Stephens*, 555 F. App'x 335 (5th Cir. 2014) .................................. 28

*Battaglia v. Stephens*, No. 3-09-CV-1904-B, 2013 WL 5570216
  (N.D. Tex. Oct. 9, 2013) .......................................................................... 38

*Beatty v. Stephens*, 759 F.3d 455 (5th Cir. 2014) ................................. 32, 77

*Beazley v. Johnson*, 242 F.3d 248 (5th Cir. 2001) ................... 170, 175, 180

*Beets v. Scott*, 65 F.3d 1258 (5th Cir. 1995) ............................................ 115

*Blakely v. City of Laurel*, 644 F. App'x 319 (5th Cir. 2016) .................... 170

*Blue v. Thaler*, 665 F.3d 647 (5th Cir. 2011) ..................................... 174, 175

*Bobby v. Van Hook,* 558 U.S. 4 (2009) ........................................................ 34

*Borjan v. State*, 787 S.W.2d 53 (Tex. Crim. App. 1990) .................... 111, 140

*Boyde v. California,* 494 U.S. 370 (1990) .................................................. 145

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ...................................................... 163, 164

*Broadnax v. Lumpkin*, 987 F.3d 400 (5th Cir. 2021) .............................. 166, 167, 168

*Brown v. Thaler*, 684 F.3d 482 (5th Cir. 2012) ....................................................... 43

*Buchanan v. Angelone,* 522 U.S. 269 (1998) ............................................................ 143

*Busby v. Dretke*, 359 F.3d 708 (5th Cir. 2004) ................................................. 132, 133

*Caldwell v. Mississippi*, 472 U.S. 320 (1985) .......................................................... 143

*Carter v. Johnson*, 131 F.3d 452 (5th Cir. 1997) ............................................. 162, 163

*Carter v. Stephens*, 805 F.3d 552 (5th Cir. 2015) .................................................... 175

*Clark v. Arizona*, 548 U.S. 735 (2006) .............................................................. 39, 40

*Cobb v. Thaler*, 682 F.3d 364 (5th Cir. 2012) ........................................................ 178

*Coble v. Quarterman*, 496 F.3d 430 (5th Cir. 2007) ............................... 57, 77, 84, 139

*Colburn v. Cockrell*, 37 F. App'x 90, 2002 WL 1021891
    (5th Cir. 2002)...................................................................................................... 52

*Coleman v. Thompson*, 501 U.S. 722 (1991) ..................................................... Passim

*Colorado v. Connelly*, 479 U.S. 157 (1986) ...................................................... 162, 163

*Coyler v. State*, 428 S.W.3d 117 (Tex. Crim. App. 2014) .................................. 171, 172

*Creel v. Johnson*, 162 F.3d 385 (5th Cir. 1998) ..................................................... 167

*Crutsinger v. Thaler*, No. 4:07-CV-703-Y, 2012 WL 369927
    (N.D. Tex. Feb. 6, 2012)................................................................................. 40, 41

*Cullen v. Pinholster*, 563 U.S. 170 (2011) ........................................................ Passim

*Cuyler v. Sullivan*, 446 U.S. 335 (1980)........................................................... 115, 120

*Darden v. Wainwright*, 477 U.S. 168 (1986)........................................................... 144

*Davila v. Davis*, 137 S. Ct. 2058 (2016) ..................................................... 133, 153, 180

*Davila v. Davis*, 650 F. App'x 860 (5th Cir. 2016) ..................................................... 175

*Davis v. United States,* 512 U.S. 452 (1994) ...................................................... Passim

*De La Rosa v. Texas*, 743 F.2d 299 (5th Cir. 1984).................................................... 172

*Dewberry v. State*, 4 S.W.3d 735 (Tex. Crim. App. 1999)........................................ 123

*Dobbert v. Florida*, 432 U.S. 282 (1977)........................................................... 127, 130

*Dodson v. Stephens*, 611 F. App'x 168 (5th Cir. 2015) ............................................... 78

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) ...................................................... 135

*Dowthitt v. Johnson*, 230 F.3d 733 (5th Cir. 2000) ............................................... 83, 98

*Doyle v. Thaler*, No. 3:08-CV-138-B, 2009 WL 3028574
   (N.D. Tex. Sep. 21, 2009)........................................................................... 41, 45, 46

*Druery v. Thaler*, 647 F.3d 535 (5th Cir. 2011) ..................................... 68, 96, 97, 175

*Duncan v. Henry*, 513 U.S. 364 (1995)..................................................................... 31

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) ............................................................. 112

*Edwards v. Arizona*, 451 U.S. 477 (1981) ......................................................... Passim

*Enoch v. Gramley*, 70 F.3d 1490 (7th Cir. 1995) ..................................................... 161

*Escamilla v. State*, 143 S.W.3d 814 (Tex. Crim. App. 2004)................................... 166

*Evitts v. Lucey*, 469 U.S. 387 (1985)........................................................................ 153

*Ex parte Flores*, 387 S.W.3d 626 (Tex. Crim. App. 2012) .......................................... 84

*Ex parte Martinez*, 195 S.W.3d 713 (Tex. Crim. App. 2006) ...................................... 83

*Ex parte Sheppard*, No. WR-78,132-01, 2013 WL 5568434
   (Tex. Crim. App. Oct. 9, 2013)..................................................................... 83

*Ex parte Soffar*, Nos. WR-29,980-03, WR-29,980-04, 2012 WL 4713562
   (Tex. Crim. App. Oct. 3, 2012).................................................................... 84

*Ex parte Woods*, 176 S.W.3d 224 (Tex. Crim. App. 2005) .......................................... 83

*Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018) ........................................................... 28

*Franklin v. Lynaugh*, 487 U.S. 164 (1988) .............................................................. 176

*Freeman v. State*, 340 S.W.3d 717 (Tex. Crim. App. 2011) ..................................... 111

*Givens v. Cockrell*, 265 F.3d 306 (5th Cir. 2001) ..................................................... 153

*Goodwin v. Johnson*, 132 F.3d 162 (5th Cir. 1997) ................................................. 164

*Gonzales v. State*, 222 S.W.3d 446 (Tex. Crim. App. 2007) .............................. 123, 126

*Gonzales v. Stephens*, 606 F. App'x 767 (5th Cir. 2015) ...................................... 94, 97

*Graham v. Collins*, 506 U.S. 461 (1993) .................................................................. 176

*Green v. Johnson*, 160 F.3d 1029 (5th Cir. 1998) .................................................... 139

*Green v. Thaler*, 699 F.3d 404 (5th Cir. 2012) .......................................................... 28

*Greer v. Miller*, 483 U.S. 756 (1987) ....................................................................... 135

*Gregory v. Thaler*, 601 F.3d 347 (5th Cir. 2010) ..................................................... 119

*Hardy v. Cross*, 565 U.S. 65 (2011) .......................................................................... 26

*Harrington v. Richter*, 562 U.S. 86 (2011) ....................................................... Passim

*Harris v. Cockrell*, 313 F.3d 238 (5th Cir. 2002) .................................................... 152

*Haynes v. Davis*, 733 F. App'x 766 (5th Cir. 2018) ................................................... 58

*Haynes v. Quarterman*, 526 F.3d 189 (5th Cir. 2008) ............................................. 180

*Henderson v. Stephens*, 791 F.3d 567 (5th Cir. 2015) .............................................. 179

*Hendricks v. Calderon*, 70 F.3d 1032 (9th Cir. 1995) ............................................... 52

*Henness v. Bagley*, 644 F.3d 308 (6th Cir. 2011) ..................................................... 158

*Herbst v. State*, 941 S.W.2d 371 (Tex. App.—Beaumont 1997, no pet.) ................. 126

*Hernandez v. Stephens*, 537 F. App'x 531 (5th Cir. 2013) ......................................... 33

*Hernandez v. Johnson*, 108 F.3d 554 (5th Cir. 1997) ................................................ 115

*Hill v. Davis*, 781 F. App'x 277 (5th Cir. 2019) ..................................................... 78, 79

*Hinton v. Alabama*, 571 U.S. 263 (2014) ................................................................. 33

*Hoffman v. Cain*, 752 F.3d 430 (5th Cir. 2014) ..................................................... 84, 98

*Hogue v. State*, No. 11-11-00143-CR, 2013 WL 1748836
    (Tex. App.—Eastland Apr. 18, 2013, no pet.) ...................................................... 159

*Hopkins v. Cockrell*, 325 F.3d 579 (5th Cir. 2003) ..................................................... 43

*Hudson v. Quarterman*, 273 F. App'x 331 (5th Cir. 2008) ......................................... 28

*Hughes v. Dretke*, 412 F.3d 582 (5th Cir. 2005) ......................................................... 170

*Hummel v. Davis*, 908 F.3d 987 (5th Cir. 2018),
    *cert. denied*, 140 S. Ct. 160 (2019) ..................................................................... 174

*In re Gentras*, 666 F.3d 910 (5th Cir. 2012) .................................................... 179, 180

*In re Murchison*, 349 U.S. 133 (1955) ..................................................................... 127

*In re Sepulvado,* 707 F.3d 550 (5th Cir. 2013) ......................................................... 132

*Irvin v. Dowd*, 366 U.S. 717 (1961) ........................................................ 127, 131, 172

*Jackson v. Johnson*, 194 F.3d 641 (5th Cir. 1999) ..................................................... 138

*Jackson v. State*, 160 S.W.3d 568 (Tex. Crim. App. 2005) ................................... 35, 38

*Jackson v. State*, 877 S.W.3d 768 (Tex. Crim. App. 1994) ....................................... 127

*Johnson v. Cockrell*, 306 F.3d 249 (5th Cir. 2002) ..................................................... 39

*Johnson v. Quarterman*, 306 F. App'x 116 (5th Cir. 2009) ......................................... 70

*Johnson v. Texas*, 509 U.S. 350 (1993) ..................................................................... 176

*Jones v. Barnes*, 463 U.S. 745 (1983) ......................................................................... 70

*Jones v. United States*, 527 U.S. 373 (1999) ............................................................. 175

*Jurek v. Texas*, 428 U.S. 262 (1976) ........................................................ 176, 177, 178

*Kansas v. Marsh*, 548 U.S. 163 (2006) ............................................................ 176, 177

*Kernan v. Hinojosa*, 136 S. Ct. 1603 (2016) ................................................................ 26

*Kerr v. Thaler*, 384 F. App'x 400 (5th Cir. 2010) ...................................................... 174

*Kinsel v. Cain*, 647 F.3d 265 (5th Cir. 2011) ............................................................ 180

*Koch v. Puckett*, 907 F.2d 524 (5th Cir. 1990) .................................................... Passim

*Kotteakos v. United States*, 328 U.S. 750 (1946) ...................................................... 164

*Ladd v. Stevens*, 748 F.3d 637 (5th Cir. 2014) .......................................................... 179

*Leal v. Dretke*, 428 F.3d 543 (5th Cir. 2005) ............................................................ 174

*Lewis v. Thaler*, 701 F.3d 783 (5th Cir. 2012) ........................................................... 28

*Lockett v. Ohio*, 438 U.S. 586 (1978) ................................................................ 112, 143

*Lowenfield v. Phelps*, 484 U.S. 231 (1988) ................................................................ 178

*McNeil v. Wisconsin*, 501 U.S. 171 (1991) ................................................................ 157

*Martinez v. Dretke*, 404 F.3d 878 (5th Cir. 2005) ................................................ Passim

*Martinez v. Ryan*, 566 U.S. 1 (2012) ................................................................... Passim

*Mays v. State*, 318 S.W.3d 368 (Tex. Crim. App. 2010) .................................. 35, 37, 38

*Milam v. State*, No. AP-76,379, 2012 WL 1868458
    (Tex. Crim. App. May 23, 2012) ........................................................................... 51

*Miller v. Johnson*, 200 F.3d 274 (5th Cir. 2000) ........................................ 39, 106, 120

*Miranda v. Arizona*, 384 U.S. 436 (1966) ............................................................ Passim

*Munoz v. State*, 803 S.W.2d 755
    (Tex. App.–Houston [14th Dist.] 1991, pet. ref'd) ............................................... 111

*Murphy v. Davis*, 732 F. App'x 249 (5th Cir. 2018) ................................................. 132

*Murphy v. Florida*, 421 U.S. 794 (1975) ........................................................... 127, 131

*Murray v. Carrier*, 477 U.S. 478 (1986) ............................................ 133, 135, 153, 181

*Neal v. Puckett*, 286 F.3d 230 (5th Cir. 2002) ...................................................... 27, 86

*Nethery v. State*, 692 S.W.2d 686 (Tex. Crim. App. 1985)...................................... 126

*Newbury v. Stephens*, 756 F.3d 850 (5th Cir. 2014) .................................................... 94

*Nelson v. Davis*, 4:16-CV-904-A, 2017 WL 1187880
   (N.D. Tex. Mar. 29, 2017)...................................................................................... 134

*Nikmanesh v. State*, No. 05-16-00363-CR, 2017 WL 2774445
   (Tex. App.—Dallas June 27, 2017, no pet.) .......................................................... 37

*Nobles v. Johnson*, 127 F.3d 409 (5th Cir. 1997)............................................ 31, 32, 77

*Norman v. Stephens*, 817 F.3d 226 (5th Cir. 2016) ............................................ 59, 118

*Oregon v. Bradshaw*, 462 U.S. 1039 (1983) ................................................................ 161

*Oregon v. Elstad*, 470 U.S. 298 (1985) ........................................................................ 163

*Oregon v. Mathiason*, 429 U.S. 492 (1977) ................................................................ 166

*Paez v. State*, 681 S.W.2d 34 (Tex. Crim. App. 1984)............................................... 166

*Pape v. Thaler*, 645 F.3d 281 (5th Cir. 2011)............................................. 57, 102, 130

*Paredes v. Quarterman*, 574 F.3d 281 (5th Cir. 2009) ...................................... 146, 174

*Pennsylvania v. Finley*, 481 U.S. at 555 (1987) ........................................................ 180

*Perillo v. Johnson*, 205 F.2d 775 (5th Cir. 2000) .............................................. 115, 120

*Plazinich v. Lynaugh*, 843 F.2d 836 (5th Cir. 1988)........................................ 160, 161

*Pondexter v. Quarterman*, 537 F.3d 511 (5th Cir. 2008) ................................. 61, 62, 79

*Powell v. State*, 898 S.W.2d 821 (Tex. Crim. App. 1994).......................................... 126

*Pulley v. Harris*, 465 U.S. 37 (1984).......................................................................... 178

*Pyles v. Johnson*, 136 F.3d 986 (5th Cir. 1998) ....................................................... 172

*Ramey v. Davis*, 942 F.3d 241 (5th Cir. 2019) ........................................................... 33

*Reed v. Stephens,* 739 F.3d 753 (5th Cir. 2014) ................................... 52, 98, 132, 175

*Richards v. Quarterman*, 566 F.3d 553 (5th Cir.2009) .................................... 102, 113

*Richardson v. Marsh*, 481 U.S. 200 (1987) ............................................................... 144

*Rideau v. Louisiana*, 373 U.S. 723 (1963) ......................................................... 130, 131

*Roach v. Quarterman*, 220 F. App'x 270 (5th Cir. 2007) ......................................... 178

*Robertson v. Cain*, 324 F.3d 297 (5th Cir. 2003) ..................................................... 164

*Robison v. Johnson*, 151 F.3d 256 (5th Cir. 1998) ............................................... 38, 69

*Ross v. Estelle*, 694 F.2d 1008 (5th Cir. 1983) ........................................................... 37

*Ruffin v. State*, 270 S.W.3d 586 (Tex. Crim. App. 2008) ...................................... 35, 38

*Ruiz v. Davis*, No. 3:12-CV-5112-N, 2018 WL 6591687
    (N.D. Tex. Dec. 14, 2018)........................................................................................ 170

*Santellan v. Cockrell*, 271 F.3d 190 (5th Cir. 2001) ................................................. 113

*Sawyer v. Whitley*, 505 U.S. 333 (1992) .................................................................... 181

*Scheanette v. Quarterman*, 482 F.3d 815 (5th Cir. 2007) ...................................... 142

*Schumacher v. State*, 72 S.W.3d 43 (Tex. App.—Texarkana 2001, pet. ref'd) ....... 156

*Sheppard v. Davis*, 967 F.3d 458 (5th Cir. 2020),
    *cert. filed* Jan 5, 2021 (No. 20-6786) ..................................................................... 94

*Skilling v. United States*, 561 U.S. 358 (2010) ................................................. 127, 131

*Skinner v. Quarterman*, 576 F.3d 214 (5th Cir. 2009) ............................................... 83

*Smith v. Cockrell*, 311 F.3d 661 (5th Cir. 2002) ........................................................ 83

*Smith v. Illinois*, 469 U.S. 91 (1984)....................................................... 157, 159, 160

*Smith v. Texas*, 543 U.S. 37 (2004) ........................................................................ 142

*Sonnier v. Quarterman*, 476 F.3d 349 (5th Cir. 2007)............................. 174, 176, 177

*Sprouse v. Stephens*, 748 F.3d 609 (5th Cir. 2014)........................................... 173, 174

*Stevens v. Epps,* 618 F.3d 489 (5th Cir. 2010) .......................................................... 180

*Stout v. Director, TDCJ-CID,* No. 6:07-CV-23, 2007 WL 1005979
    (E.D. Tex. Mar. 30, 2007) ................................................................................ 38

*Strickland v. Washington*, 466 U.S. 668 (1984)................................................Passim

*Styron v. Johnson*, 262 F.3d 438 (5th Cir. 2001) ..................................................... 136

*Swarthout v. Cooke*, 562 U.S. 216 (2011).................................................................. 133

*Tanner v. United States*, 483 U.S. 107 (1987) .......................................................... 172

*Taylor v. Thaler*, 397 F. App'x 104 (5th Cir. 2010)................................................... 174

*Teague v. Lane*, 489 U.S. 288 (1989) ..................................................................Passim

*Tennard v. Dretke*, 542 U.S. 274 (2004) ............................................................ 83, 142

*Tercero v. Stephens*, 738 F.3d 141 (5th Cir. 2013) ................................................... 179

*Teixeira v. State*, 89 S.W.3d 190 (Tex. App.—Texarkana 2002, pet. ref'd)............... 84

*Thompson v. State*, 9 S.W.3d 808 (Tex. Crim. App. 1999) ....................................... 127

*Trevino v. Johnson*, 168 F.3d 173 (5th Cir. 1999) ...................................................... 28

*Trevino v. Thaler*, 569 U.S. 413 (2013) ..............................................................Passim

*Trottie v. Stephens*, 720 F.3d 231 (5th Cir. 2013)........................................ 59, 98, 136

*Tuilaepa v. California*, 512 U.S. 967 (1994) ............................................................. 143

*Turner v. Epps*, 412 F. App'x 696 (5th Cir. 2011)....................................................... 83

*Turner v. Quarterman*, 481 F.3d 292 (5th Cir. 2007)................................... 77, 78, 152

*United States v. Agurs*, 427 U.S. 97 (1976)............................................................... 135

*United States v. Bagley*, 473 U.S. 667 (1985) .......................................................... 135

*United States v. Blocker*, 104 F.3d 720 (5th Cir. 1997) ............................................ 168

*United States v. Bourgeois*, 537 F. App'x 604 (5th Cir. 2013) .................................. 51

*United States v. Cameron*, 907 F.2d 1051 (11th Cir. 1990) ................................. 39, 41

*United States v. Carrillo*, 660 F.3d 914 (5th Cir. 2011) ........................................... 158

*United States v. Davis*, 609 F.3d 663 (5th Cir. 2010) .............................. 138, 139, 141

*United States v. Fleming*, No. H-07-513-1, 2009 WL 10680618
(S.D. Tex. Apr. 13, 2009) .............................................................................. 41

*United States v. Garcia*, 762 F.2d 1222 (5th Cir. 1985) ............................................. 69

*United States v. Garcia-Jasso*, 472 F.3d 239 (5th Cir. 2006) ................................... 121

*United States v. Gibson*, 108 F. App'x 975 (5th Cir. 2004) ....................................... 158

*United States v. Gonzales-Gomez*, 703 F. App'x 335 (5th Cir. 2017) ...................... 163

*United States v. Grosz*, 76 F.3d 1318 (5th Cir. 1996) ............................................... 139

*United States v. Hall*, 152 F.3d 381 (5th Cir. 1998) ................................................. 170

*United States v. Havlik*, 710 F.3d 818 (8th Cir. 2013) .............................................. 158

*United States v. Herbst*, 460 F. App'x 387 (5th Cir. 2012) ......................................... 41

*United States v. Lipscomb*, 299 F.3d 303 (5th Cir. 2002) ......................................... 132

*United States v. Medoc Health Services LLC*, 470 F.Supp.3d 638
(N.D. Tex. 2020) ........................................................................................... 170

*United States v. Mendoza*, 522 F.3d 482 (5th Cir. 2008) ......................................... 109

*United States v. Montes*, 602 F.3d 381 (5th Cir. 2010) ............................................. 158

*United States v. Mullins*, 315 F.3d 449 (5th Cir. 2002) .............................................. 69

*United States v. Newell*, 315 F.3d 510 (5th Cir. 2002) ............................................. 115

xiv

*United States v. Pohlot*, 827 F.2d 889 (3d Cir. 1987) ........................................... 39, 41

*United States v. Thomas*, 724 F.3d 632 (5th Cir. 2013) ............................................. 77

*United States v. Robinson*, 485 U.S. 25 (1988) ....................................................... 140

*United States v. Valas*, 822 F.3d 228 (5th Cir. 2016) ............................................. 146

*United States v. Williams*, 446 F. App'x 587 (4th Cir. 2011) .................................. 158

*Valdez v. Cockrell*, 274 F.3d 941 (5th Cir. 2001) ..................................................... 28

*Ward v. Dretke*, 420 F.3d 479 (5th Cir. 2005) ........................................... 110, 140, 149

*Ward v. State*, No. AP-75750, 2010 WL 454980
 (Tex. Crim. App. Feb. 10, 2010) ................................................................ 35, 37, 38

*Ward v. Stephens*, 777 F.3d 250 (5th Cir. 2015) .................................................. 82, 98

*Warger v. Shauers*, 574 U.S. 40 (2014) ................................................................. 172

*Weeks v. Angelone*, 528 U.S. 225 (2000) ......................................................... 144, 147

*White v. Thaler*, 522 F. App'x 226 (5th Cir. 2013) .......................................... 158, 174

*White v. Thaler,* 610 F.3d 890 (5th Cir. 2010) ............................................ 78, 79, 113

*Wiggins v. Smith,* 539 U.S. 510 (2003) ............................................................ 30, 84, 86

*(Terry) Williams v. Taylor*, 529 U.S. 362 (2000) .................................................. 26, 27

*Wong v. Belmontes*, 558 U.S. 15 (2009) ............................................................... 83, 94

*Woodford v. Visciotti*, 537 U.S. 19 (2002) ................................................................ 27

*Woods v. Donald*, 575 U.S. 312 (2015) ................................................................. 167

*Woods v. Johnson,* 75 F.3d 1017 (5th Cir. 1996) ............................................ 177, 178

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ................................................. 112

*Yohey v. Collins*, 985 F.2d 222 (5th Cir. 1993) .................................................. 78, 102

*Young v. Davis*, 835 F.3d 520 (5th Cir. 2016) ........................................................ 172

*Zimmerman v. Cockrell*, 69 F. App'x 658, 2003 WL 21356018
   (5th Cir. 2003) ............................................................................. 79

**Statutes**

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) .................... Passim

28 U.S.C. § 2254 .................................................................................. Passim

Tex. Code Crim. Proc. art. 31.01 ............................................................ 133

Tex. Code Crim. Proc. art. 37.071 ........................................ 2, 173, 174, 175

Tex. Code Crim. Proc. art. 38.22 ............................................................ 166

Tex. Penal Code § 19.02 ........................................................................ 36

Tex. Penal Code § 19.03 .............................................................. 36, 38, 177

**Rules**

Fed. R. Evid. 606 ................................................................................ 172

Tex. R. Evid. 403 ............................................................................ 35, 38

Tex. R. Evid. 801 .................................................................................. 82

Tex. R. Evid. 802 .................................................................................. 82

**Constitutional Provisions**

U.S. Const. amend. IV ........................................................................ 168

U.S. Const. amend. V ...................................................................... Passim

U.S. Const. amend. VI .................................................................. 127, 166

U.S. Const. amend. VIII .................................................................. Passim

U.S. Const. amend. XIV .......................................................... 112, 127, 163

## ANSWER

Petitioner Micah Brown was convicted and sentenced to death for the brutal murder of his ex-wife Stella Ray.  Brown now challenges his capital murder conviction and death sentence by filing a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Respondent Lumpkin (the Director) denies all of Brown's assertions of fact except those supported by the record or admitted herein.  Further, some of Brown's claims are procedurally barred because they were not properly raised in state court, and he has failed to show that any of his claims have merit or that he is entitled to further factual development.  The Director respectfully requests that Brown's petition be denied with prejudice and that he be denied a certificate of appealability (COA).

## BROWN'S ALLEGATIONS

The Director understands Brown to assert the following claims for relief:

1. He received ineffective assistance of counsel at the guilt phase of his capital trial because counsel failed to investigate, develop, and present critical evidence that would have undermined the capital murder charge.

2. He received ineffective assistance of counsel at the punishment phase of his capital trial because counsel failed to investigate and present powerful mitigating evidence.

3. His counsel were ineffective due to a conflict of interest on the defense team, denying him his constitutional right to competent and unconflicted representation.

4. Due to pervasive and extremely prejudicial pre-trial and trial publicity, his trial was conducted in an atmosphere that rendered it inherently unfair, and trial counsel were ineffective for failing to move for a change of venue.

5. His constitutional rights were violated due to prosecutorial misconduct during the penalty phase of his capital trial.

1

6. His constitutional rights were violated by permitting the State to introduce statements obtained from him in violation of *Miranda*[1] and *Edwards*,[2] and his counsel were ineffective for failing to move to exclude the statements.

7. Juror misconduct at his guilt- and penalty-phase proceedings deprived him of his rights to a fair and impartial jury, the assistance of counsel, confrontation, equal protection, and a fair trial.

8. He was tried and sentenced to death under an unconstitutional statutory scheme, and the trial court erred in denying the defense motion to declare Texas Code of Criminal Procedure article 37.071 unconstitutional.

9. Because his sentence was imposed under a sentencing scheme that does not narrow the class of death-eligible defendants and is arbitrarily and disproportionately applied, his sentence is unconstitutional.

10. He was deprived of due process and effective assistance of counsel in his state habeas proceedings.

11. His conviction and sentence must be vacated because of the cumulative prejudicial effect of all the errors in this case.

## STATEMENT OF THE CASE

Brown was indicted, convicted, and sentenced to death in the 354th Judicial District Court of Hunt County, Texas, for murdering Stella Michelle Ray during the course of committing or attempting to commit obstruction, retaliation, or terroristic threat. 1 CR 35; 3 CR 694–96; 44 RR 72; 48 RR 68; 49 RR 4.[3] The Texas Court of

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] *Edwards v. Arizona*, 451 U.S. 477 (1981).

[3] CR" refers to the clerk's record, preceded by volume number and followed by the page number(s). "RR" refers to the reporter's record of transcribed trial proceedings, preceded by volume number and followed by page number(s). "SX" refers to the State's exhibits, followed by exhibit number and page number(s) where applicable. "SHCR" refers to the state habeas

2

Criminal Appeals (CCA) affirmed Brown's conviction and sentence on direct appeal. *Brown v. State*, No. AP-77,019, 2015 WL 5453765 (Tex. Crim. App. Sept. 16, 2015) (unpublished). Brown filed a state application for writ of habeas corpus. 1 SHCR 22–145. Following an evidentiary hearing, the trial court entered findings-of-fact and conclusions-of-law recommending that relief be denied. 14 SHCR 5706–63. The CCA issued an order adopting the trial court's findings and conclusions, and, based on those findings and its own review, denied Brown habeas relief. *Ex parte Brown,* WR-85,341-01, 2019 WL 4317041 (Tex. Crim. App. Sept. 11, 2019) (unpublished). These proceedings follow.

**STATEMENT OF FACTS**

## I.    Facts of the Crime

The CCA extensively summarized the facts of the crime as follows:

> In July 2011, [Brown's] ex-wife, Stella Ray, was living in her house in Greenville with their two children, two-year-old Willow and three-year-old Colten. She also resided with Wesley Williams, her fourteen-year-old son fathered by her first husband, Tracy Williams. Ray planned to begin new employment in another town, and [Brown] testified that he was concerned about his ability to see Willow and Colten on a regular basis when Ray moved away. However, he testified that, when Ray found her new job, she told [Brown] that he "would be going with her."

> Wesley testified that Ray and his father, Williams, had been divorced for many years, but they remained friends. He also testified that, at some point in July, Ray allowed Williams to stay at their house because Williams "had nowhere else to go." [Brown] testified that, when [Brown] was married to Ray, Williams caused problems in [Brown's] relationship with Ray. He also testified that he and Ray maintained a sexual

---

clerk's record—the transcript of pleadings and documents filed with the court during Brown's state habeas proceeding—preceded by volume number and followed by page number(s). "EHRR" refers to the reporter's record from the state court evidentiary hearing, preceded by volume number and followed by page number(s).

relationship after they divorced in 2010, but that Ray became "cold" and "distant" towards him when Williams moved in. [Brown's] mother, Brenda Crofford, testified that [Brown] became "very upset" when Williams moved in. Wesley testified that about a week before the instant offense, [Brown] started coming to Ray's house in the early morning hours and "banging on windows and doors." When [Brown] did this, they "[i]gnored him until he left."

On July 15, [Brown] came to Ray's house to pick up Willow and Colten. Wesley testified that [Brown] entered the house without knocking and argued with Ray. [Brown] also walked past Williams twice and "hit him with his shoulder real hard." Ray and Williams asked [Brown] to leave, but he refused. Wesley testified that Williams and [Brown] "wound up getting into a fight" when [Brown] walked by Williams, stepped on his foot, and "put his shoulder in him" a third time. [Brown] and Williams were "grabbing each other," and Wesley thought that Williams was choking [Brown] at one point. [Brown] testified that Williams "grabbed [him] in the choke hold and choked [him] out." Eventually, Williams forced [Brown] outside and locked the door. Wesley testified that [Brown] then "acted like he was about to mess with [Williams'] truck," so Williams walked outside and told him to leave. [Brown] got into his car and left. Williams thereafter left Ray's house and went to stay with his brother in Louisiana.

[Brown] testified that he went home after fighting with Williams and called the police. Officer Randy Gray of the Greenville Police Department testified that he spoke with [Brown] at his home, and [Brown] declined to file charges. Gray testified that Ray had also called the police, but at her request no charges were filed.

[Brown] testified that on July 16, he had a phone conversation with Ray in which he told her that he was going to kill himself. Ray called the police, and Officer Gray again went to [Brown's] house. [Brown] testified that he knew that Ray had called the police after their phone conversation. He told Gray he was not really suicidal and he only said that to make Ray feel guilty. While Gray was at [Brown's] residence, he observed a black bag on the floor which contained a loaded sawed-off shotgun and ammunition.[4] Gray arrested [Brown] for possession of a prohibited weapon. In the living room, Gray saw glass pipes commonly used to smoke methamphetamine. [Brown] also had a small amount of marijuana in his pocket at the time of his arrest. Gray, however, did not

---

[4]   [Brown] testified that he sawed off his shotgun because he was angry at Williams and he planned "to go back and get him with it."

charge [Brown] with possession of drugs or drug paraphernalia.

When [Brown] was released from jail on July 17, his neighbor, Loren Homerstead, asked him why the police had been at his house on the previous day.  Homerstead testified that [Brown] told her that Ray called the police and had him arrested because she thought he was suicidal.  Homerstead testified that she tried to calm [Brown] and reassure him that Ray would continue to let him see his children.

[Brown] testified that he returned to Ray's house on July 19 to pick up Willow and Colten.  He admitted that he used methamphetamines the previous night, but he denied drinking alcohol that day.  Wesley, however, testified that [Brown] was "drunk" when he came to their house.  [Brown] testified that after he put Colten in his car, he argued with Ray "about when [Williams] was there in the past and [Ray] not doing anything to ... stop [Williams] from choking [Brown]."  [Brown] testified that Ray said [Brown] was "too mad," and she removed Colten from his car.  [Brown] testified that while Ray was holding Colten, he "flicked her nose" twice, and then he got into his car and left.  [Brown] denied punching Ray in the eye, but Wesley testified that Ray and Colten "both had a black eye" after the incident.

Ray thereafter called the police and made a report of family violence.[5] Wesley testified that the police came to their house that night.  [Brown], however, testified that he spoke to Ray later that night and she did not tell him that she had called the police.  Photographs from Ray's camera which depicted her face after the incident were introduced into evidence at trial.

[Brown] testified that he returned to Ray's house on the morning of July 20, and she let him come inside for about 20 minutes to see his children.  After he left, he climbed a tree in an isolated field, where he drank alcohol most of the day and tried to get the courage to hang himself.  He had been using methamphetamines and drinking alcohol and was agitated and paranoid because he had not slept in three days.  He called and texted Ray throughout the day, but she did not respond.  Ray's mother, Donna Ray, testified that [Brown] called her around 7:00 p.m.

---

[5]     Investigator Felicia White of the Greenville Police Department testified that, at the time of Ray's murder on July 20, there was a pending family-violence case in the system regarding the incident on July 19, with [Brown] listed as the perpetrator.  She testified that part of the allegations involved injury to a child, Colten.  White acknowledged that she did not contact [Brown] on July 20 about the family-violence incident because the case had not yet been assigned to her.

and said that he was looking for Ray and his children.

[Brown] testified that, when he "ran out of alcohol," he returned to Ray's house. The door was unlocked, and no one was home. He went inside and took a basket containing marijuana and Ray's camera. He also took Wesley's shotgun from his room. He left Ray's house, stopped at a gas station to buy more alcohol, and returned home around 8:00 p.m. [Brown] then sawed off Wesley's shotgun "so [Brown] could reach the trigger and still point it at [his own] head." He continued to call and text Ray, asking how their children were and what they were doing. Ray did not respond. [Brown] then decided he would return to the tree and shoot himself. He testified that he saw Ray drive past his house as he was placing the shotgun in his car. He tried to call her again, but she did not answer. He testified, "I thought she was looking for me so I jumped in [my car] to chase her down, flag her down so I could ask her where the kids [were]."

[Brown] testified that he was flashing his lights and driving next to Ray, asking her to roll down her window and tell him where their children were. When they eventually stopped, [Brown] pulled his car next to hers and saw that she was talking on the phone. He testified that he felt "[h]urt and angry" because she had her phone and was not answering his calls. [Brown] had his window down and was yelling at Ray when he saw a police car behind him with its lights on. At that point, he "stuck the shotgun out the window and pulled the trigger," deliberately aiming for Ray's head. He denied that he shot Ray because she called the police. He testified he "lost [his] mind" because he was angry that Ray had not responded to his calls and texts asking about his children. He testified that he did not know that Willow and Colten were in the back seat of Ray's car when he shot her because her car windows were tinted and he did not have a clear view into the vehicle. As he drove away after shooting Ray, [Brown] assumed that she was fatally wounded because he observed in his rearview mirror that her car "started rolling forward." On cross-examination, [Brown] acknowledged that he believed it was Ray's fault that he shot her. He explained that Ray "pushed [him] to a limit to where [he] took her life[.]"

The evidence showed that Ray was making a 9-1-1 call when she was shot. Heather Doty, a dispatcher for the Greenville Police Department, testified that she received Ray's call around 10:20 p.m. A recording of the call was admitted into evidence and played for the jury. During the call, Ray reported that her ex-husband was following her down Sayle Street, flashing his lights at her and trying to get her to pull over, and that she was afraid that he was going to run into her car. She said that

she had been "driving around ... looking for [her] son" when she saw [Brown] "in the neighborhood," and he started following her. She explained that [Brown] had been harassing her and that she had already filed a police report against him when he punched her in the eye the previous night. She stated, "I told him I was calling the police. So he knows I'm talking to ya'll." At one point during the call, Ray said that [Brown] had "cornered [her] in" and was yelling, "Where are the kids." Doty heard children in the car, and she told Ray that a police officer was on the way. When Doty asked Ray if she saw an officer, Ray responded, "Yeah, there's lights."

Officer Gregory Hughes responded to the scene and pulled up behind two vehicles parked parallel to each other in the north lane on Sayle Street. Ray's car was next to the curb, and [Brown's] car was on her driver's side. Hughes heard a gunshot, then [Brown] drove away and Ray's car "began to roll." Ray's car veered to the right and ran into the curb. When Hughes exited his car and approached Ray's vehicle, he "found a bullet hole through the driver's window and the driver was shot." The doors were locked, and two small children were in the back seat. Another officer who arrived at the scene pushed through the broken side window so they could unlock the doors. Hughes testified that Ray was unresponsive and appeared to have "a bullet wound in the head." Howard Roberson, a passerby who had witnessed [Brown] driving away from the scene, obtained [Brown's] license-plate number and gave it to Hughes. Ray died at the scene. The medical examiner testified that Ray's cause of death was "a shotgun wound to the head." The shot entered her left cheek and exited "on the back of the right [side of the] head."

[Brown] testified that after he left the scene, he called Ray's mother, Donna, and said: "I just shot [Ray] in the head, she's dead, you shouldn't have lied to me about my kids." [Brown] also texted Homerstead: "I shot her in head bitch is dead TOLD her not to fuck with my kids."[6] He called Williams and left him a voicemail stating "she's dead" and, "I shot her in the head, which is what I had intended for you." He added, "I'll probably be dead soon. Otherwise, you're a dead man." He also left Williams a second voicemail in which he threatened Williams and his brothers. Donna testified that [Brown] called her again later that night and said, "See, I told you."

---

[6]   Homerstead testified that she called the police after receiving [Brown's] text message. When questioned by the prosecutor, she acknowledged that she also told police that [Brown] said, "It's true I did it, I'm not dead yet, going to go, DPS are all over me."

[Brown] testified that he also called his mother, Crofford, and told her that he had shot Ray. In an interview with Investigator Felicia White of the Greenville Police Department, Crofford recounted what [Brown] told her about what had happened before the shooting. According to Crofford, [Brown] said that Ray told him, "Micah, I'm calling the police." [Brown] said that he told Ray, "I know you are," and "I see the police."

[Brown] testified that he backed his car into a grove of trees, where he hid for a few hours. He then knocked out his headlights and drove on Highway 69 until he ran out of gasoline. He went to a house and asked for gasoline, then he "took off on foot" when that proved unsuccessful. He put on a vest and brought his flashlight, shotgun, ammunition, and pocket knives, which were items he thought he needed to "survive in the wilderness." Officer Perry Sandlin testified that [Brown's] abandoned car was located on County Road 1033 at 3:30 or 4:00 a.m. on July 21, with an empty shotgun-shell box on the ground nearby. Investigator White testified that Ray's camera, which contained the photographs that Ray took on July 19, was recovered from the back seat of [Brown's] car.[7]

[Brown] testified that he walked along some railroad tracks, where he lost his cell phone. When he heard helicopters, he got into a pond to avoid "being located by the infrared." He came upon a vacant house and hid in it for a while. Eventually, he went "next door" to Cactus Saddlery, a business located about five to six miles north of Greenville on Highway 69.

Cactus Saddlery employee Efrain Girardot testified that he encountered [Brown] outside the building at around 6:00 a.m. on July 21. [Brown] walked towards Girardot carrying a shotgun and a knife, and he asked him for water and to use the phone. Girardot told [Brown] to put his weapons down, and [Brown] laid them on the ground in the parking lot. When they went inside the building, Girardot offered [Brown] water and let him use the phone in his office. Girardot testified that [Brown] called his mother and told her that he was tired and he wanted her to pick him up. Another employee, Gary Magennis, called the police when Girardot made him aware that [Brown] had a gun. Girardot went outside with [Brown] and sat with him while [Brown] smoked a cigarette. Meanwhile, Magennis picked up [Brown's] weapons and ran towards the SWAT team that had arrived at the front gate. [Brown] then walked towards the SWAT team with his hands up. He complied when he was told to get on the ground, and he was handcuffed and taken into custody.

---

[7]    In her interview with White, Crofford said that [Brown] told her that "he had [Ray's] camera" in his vehicle and "was looking at the pictures."

Investigators White and Jamie Fuller conducted a videotaped interview of [Brown] at the Greenville Police Department on July 21. [Brown] told them that, before the offense, he had unsuccessfully called Ray to ask about his children. He saw Ray drive by his house, so he "jumped in [his] truck and tried to stop her and chase her down," but "she wouldn't stop." He stated, "And, obviously, I could tell she called-was up with the police on the phone." When he "finally got [Ray] to pull over," he asked her to roll down her window and tell him where the children were. He stated, "[S]he didn't do it. And I saw the police lights pulling up behind me, so I just—I shot her." [Brown] said that he was angry at Ray because she planned to move away with the children, allowed Williams to stay at her house, and failed to stop Williams from fighting with him and choking him. He explained, "There's a number of things like that that added up," and "I lost it." While questioning [Brown] about his actions after the shooting, White asked, "Was there any point in time where you planned on killing yourself or having the cops shoot you or shoot at them?" [Brown] answered that he "was going to fire, like, a warning shot just to, I guess, [commit] suicide by cop."

While in jail on July 22, [Brown] agreed to be interviewed by a reporter from a news station in the Dallas/Fort Worth area. During the televised interview, [Brown] admitted that he murdered Ray because he "wanted her dead." He stated that when he was following Ray and trying to get her to stop, "she was on the phone" and he "figured it was with the police." He added:

> I finally got her to pull over, just trying to convince her, just tell me where are my kids, and she never would say. I saw the police and then the lights in my rearview mirror, so I just pulled the gun—gun out and shot her ... It was kinda—it was just spur of the moment. I always told her, you know, if anybody ever tries to come between me and my kids, that I would kill someone over that. I didn't do anything to deserve her not to tell me where they are or anything, and I meant it when I said it. I just got so mad that I did it.

When the reporter asked [Brown] if he knew his children were in the back seat, he said that he looked but did not see them. He said, "I would have never done that in front of them." The reporter asked, "So you regret that you killed her in front of your kids, but you don't regret that you killed her[?]" [Brown] answered, "No."

[Brown] told the reporter that "a lot of things built up inside of [him]," like the fact that Ray let Williams stay with her, she did nothing to stop

Williams from choking [Brown], and she planned to move away with their children on "August 1st." He stated, "It just drove me crazy, I guess, not being able to see my kids." When [Brown] acknowledged that he had been suicidal, the reporter asked him why he felt that way. [Brown] answered:

> I've been suicidal in the past. And the only two things that, you know, I'm still here is my kids and they're about to be taken away from me.
>
> The other—the other problem, I want to say was I wanted to go hunting and she called the police on me saying I was suicidal. And they came in the house and they found a sawed off shotgun. So that's a felony. So I can't—I wasn't able to go hunting anymore.
>
> Anyways, I can't be around my kids. I can't do—I mean, the two things—the reason I was stripped away from me and—

The reporter later asked [Brown], "Is there anything else you want to say?" [Brown] added:

> And then, like I said, I guess I just—I went crazy. I couldn't stand the fact of, you know, only being able to see my kids four days a month. And [I] just don't know how it went from calling the cops on me and this and that from she was going to take me with her if she found—when she found a job and moved off.

[Brown] also described his involvement in the offense and demonstrated a lack of remorse in a letter he wrote to a fellow jail inmate. [Brown] testified that "Casper" was an inmate in a neighboring cell who asked him what happened. In the letter, [Brown] recited in part that Ray was moving away, that she let Williams move in, that he and Williams fought, that he felt suicidal, and that Ray stopped answering his calls. With regard to the instant offense, he explained:

> I chased her down and made her pull over. She wouldn't look at me and she was on the phone. I knew it was the cops and for some reason when I saw the red and blues behind me I put the shot gun [sic] out the window and blew her head off. Clean off.

He stated in the letter, "I still don't regret it one bit." He added, "To be honest, I would do the same to [Williams] if I had the chance." [Brown] also instructed Casper to "flush" the letter after reading it.

10

*Brown v. State*, 2015 WL 5453765, at *1–*6 (footnotes in original and footnotes omitted).

## II.   Facts Pertaining to Punishment.

### A.   State's case

The State presented three witnesses at punishment.  William Ray, Ray's father, testified that he had another daughter named Cindy and that he is very close to his daughters.  45 RR 20–21.  He stated that he felt an unbelievable loss due to Ray's death.  45 RR 21.

Tamara Burton, a friend of Ray's, testified that she was the maid of honor at Ray's wedding.  45 RR 22.  On July 20th, she received a call from Ray's mother, informing her that Ray had been shot and killed.  A friend named Sandra also told her, "Doc is dead, he shot her."  45 RR 23–34.  Burton was attending a family function for her birthday but left and went to the hospital to be with Ray's family.  45 RR 24. Hospital personnel would not let the family see Ray because of her wounds.  45 RR 25.  Then, Burton and Ray's family went to the crime scene to get the young children, who were still with police.  *Id.*  The family went back to the hospital and then to the police station, where they met up with Tracy Williams.  45 RR 27.  The family was then escorted to a safe house.  *Id.*  At one point, Burton and Tracy went to Donna's house to pick up some medication for Donna.  Burton was frightened because she did not know where Brown was.  45 RR 28–29.  After getting the items, she and Tracy drove back to the safe house.  45 RR 29.

11

Cindy Kemp, Ray's sister, testified that she was very close to Ray and saw her regularly.  45 RR 34–35.  She did not expect that Brown would ever kill Ray.  45 RR 35.  Kemp described Ray as quiet, sensitive, and a dog lover.  She also said Ray was an excellent mother.  *Id.*  However, Ray's life changed after she had kids; she was working full time and taking care of the children, which overwhelmed her.  45 RR 36.  Ray was also working on her doctorate when she got pregnant.  45 RR 36–37.  Ray was very happy when she eventually obtained her doctorate, and the family threw her a party.  45 RR 37.  Ray planned on getting a job at a college teaching English— her doctorate was in British literature.  45 RR 37–38.  Cindy stated that she is seven years older than Ray and often helped take care of her when Ray was a child.  45 RR 38.  Her fondest memory of Ray was that Ray volunteered to be an egg donor when Cindy was having fertility problems.  45 RR 39–40.

## B.  Defense's case

### 1.  Lay witnesses

Amberly Lago, Brown's sister, testified that she was in disbelief when she heard her brother killed Ray.  45 RR 45.  She said that, as a child, Brown made people laugh, was the class clown, and was liked by all.  45 RR 46.  She also said Brown was an incredible father and spent a lot of time with Colten and Willow.  45 RR 47.  She was aware that Brown had started using drugs, but she did not know what he was taking.  *Id.*  According to Lago, Brown changed after he married Ray in that he was not as happy and talkative.  She also did not have as much contact with Brown.  45 RR 49.  On cross-examination, Lago stated that it would surprise her if Brown informed

12

Dr. Mark Cunningham that she drinks alcohol daily and abuses oxycodone. Lago stated that the accusation was not true, that she only takes oxycodone for a medical condition. 45 RR 50.

Edward "Biff" Brown, Brown's father, testified that he and Brown's mother divorced at one point, and he lived in a different town. 45 RR 55–56. Nevertheless, he enjoyed and loved Brown, and he tried to spend as much time with him as possible. 45 RR 56. He was shocked when he found out that Brown killed Ray. *Id.* About ten days prior to the crime, he traveled to Greenville and met with Brown because his other son, Corey, advised him that Brown might be suicidal. 45 RR 57–58. Biff spent about an hour with Brown, but he was unable to "reach" Brown. 45 RR 58. He had heard Brown was using drugs and knew Brown had gone to rehab. 45 RR 59. He also heard Brown was going to the hospital the following day. 45 RR 60. Biff Brown stated that he has no explanation for why his son murdered Ray and that he did not believe Brown would have done this when he was younger. 45 RR 60–61. On cross-examination, Brown stated that he talked to Ray on July 20th and told her Brown would not be coming back to her house. 45 RR 62. He also said that Brown was more withdrawn in the two years before the murder. 45 RR 63.

Brenda Crofford, Brown's mother, testified that Brown was full of joy as a child and was never expelled from school. 45 RR 67. She was shocked that Brown killed Ray. *Id.* She was aware that Brown was using drugs, but she did not know what drugs he was taking. *Id.* She also said that Brown and Ray used drugs together. *Id.* Crofford stated that she helped Brown go to drug rehab at one point, which was

successful for a short time. However, he started abusing drugs again. 45 RR 68. She also saw Brown in the days prior to the shooting and tried to talk to him. 45 RR 68–69. She did not know that he had been up for three days using methamphetamine, but she was aware that his anger was escalating at the time. *Id.*

Morris Beene, a licensed counselor, testified that he had been counseling Brown since October of 2011. 46 RR 6–8. Beene stated:

> [Brown] really began with dealing with the anxiety and the depression that he was dealing with initially when he was first arrested, worked through that. Mostly working from a spiritual perspective. I'm an ordained minister as well as a licensed professional counselor so we talked a lot about his spiritual circumstance, his spiritual state and God's direction in his life at this point in his life.

46 RR 8–9. Brown now considered himself to be a Christian, his conversion occurring several weeks after he was arrested. 46 RR 9. Beene stated that he believed Brown was sincere in his new-found beliefs. 46 RR 10. Brown also volunteered information about the crime that was similar to his trial testimony. 46 RR 10–11, 13. Regarding the counseling, Beene said: "Micah is doing very well. He's worked through the depression. The anxiety issues don't seem to be a problem at this point. If I were to characterize Micah right now, he's a man at peace with where he's at, not with what he's done but with where he's at." 46 RR 12. Beene also stated that Brown did not like jail but felt safe there because he was able to focus on his life and did not have access to drugs. *Id.* He also believed Brown made progress dealing with his drug issues. 46 RR 13–14. Further, Brown expressed regret for his actions, and Beene considered Brown to be sincere. 46 RR 14–15. Brown also completed "homework" assignments on addiction and invested himself in completing these lessons. 46 RR

14

15–17.  Finally, Beene said he did not have any concerns about Brown being a danger to anyone in prison.  46 RR 23.

On cross-examination, Beene said Brown did not tell him about any of the incidents occurring before the murder.  46 RR 18–20.  And although he did not believe Brown exhibits sociopathic tendencies, Beene said that Brown "sure looked like [a sociopath]" in the Channel 11 interview.  46 RR 20–21, 26–27.  On re-direct, Beene stated that Brown was a different person than the person on the Channel 11 video, and he was not surprised that Brown looked bad on the video knowing his drug history.  46 RR 26.  He then reiterated that he does not believe Brown is a sociopath.  46 RR 27.  On re-cross-examination, Beene conceded that he would be surprised to hear that Brown testified that Ray was responsible for her own murder and that Brown attempted to paint Ray in a negative light.  46 RR 28–29.

Randy Meeks, the Sheriff of Hunt County, testified that Brown did not cause any problems in jail, was cooperative and polite, and was a model inmate.  46 RR 33–35.  Sheriff Meeks further said that, based on his interactions with Brown, if he did not know that Brown had committed murder, he would be surprised to find out that Brown actually did murder Ray.  46 RR 37.

Heather Kietrell testified that she grew up with Brown.  46 RR 49.  Brown was "very, very nice," and she never saw him be mean to anyone.  46 RR 50.  When she was nine years old, she had a life-threatening incident where she started choking on some food.  Brown came over, gave her the Heimlich maneuver, and saved her life.

46 RR 50–51.  On cross-examination, she agreed that the person who saved her life is quite different than the man who killed Ray.  46 RR 56.

Tony Mock testified that he met Brown in the Hunt County Jail because they were in adjoining cells.  46 RR 58–59.  They would talk and sometimes read scripture or listen to the radio.  46 RR 59.  Mock described his experience with Brown as "good" because Brown helped him with depression.  46 RR 60–61.  Brown also contacted Mock's wife during times when Mock was unable to do so.  Mock said Brown did this just to be a good guy and a friend.  46 RR 62.  Brown helped Mock get through his time in administrative segregation and got him interested in the Bible.  46 RR 63–64.  Finally, Mock never noticed Brown being rude or obnoxious to anyone.  46 RR 65.

Doris Mock, Tony Mock's wife, testified that Mock had a psychotic "break" and instead of taking him to a mental hospital, the police took him to jail.  46 RR 69.  While in jail, Mock had a confrontation with a guard and was put in administrative segregation.  46 RR 70.  Doris said that Brown helped her husband by keeping him from having another psychotic break.  46 RR 70–71.  She and her husband still keep in contact with Brown, she visits Brown when his family is unable, and she sends Brown materials to read, including Bible scripture.  46 RR 71–72.  Doris also believed that Brown had a positive influence on her husband because her husband started going back to church.  46 RR 73.

Jerry Stevens, an assistant jail administrator for Hunt County, testified that he was responsible for transporting inmates to and from court.  46 RR 75–76.  He was with Brown 99 percent of the time during transport, and Brown never gave him any

16

problems, attempted to escape, or hurt anyone.  46 RR 77–78.  Stevens "could say" that Brown was a model prisoner.  46 RR 78.

John Robinson, employed by the sheriff's department, testified that he was also with Brown every time he was transported to and from court.  46 RR 88, 89.  Brown was always respectful, did not complain, and did not misbehave once.  46 RR 92–94.

Jason Hammock, a school teacher and licensed minister, testified that he visited Brown in jail at Brown's mother's request.  46 RR 97–98.  During their visits, they talked about the Bible and God, and Hammock believed Brown was sincere.  46 RR 98–99.  Brown was very friendly, polite, and remorseful.  46 RR 100–01.  Hammock stated that Brown had "gotten right with God" and appeared sincere.  46 RR 102–04.  On cross-examination, Hammock said it would surprise him to know Brown still blamed Ray for her death.  46 RR at 107.

Marley Brown testified that Brown was her favorite uncle.  46 RR at 111–12.  During family get-togethers, Brown was funny and made everyone smile.  46 RR 112.  They would write each other and discuss school, God, or anything going on in her life.  46 RR 112–13.  Marley also stated that she thought Brown was trying to be a positive influence and that she had learned from him.  46 RR 114–15.

### 2. Experts

#### a. Dr. Paula Lundberg-Love

Dr. Paula Lundberg-Love testified that she was a professor of psychology and licensed professional counselor, with specific training in psychopharmacology.  46 RR 116–17.  After explaining the basics regarding how drugs alter the brain, she

specifically addressed the use of cocaine and methamphetamine.  46 RR 119–47.  In short, chronic methamphetamine and cocaine use induce a paranoid psychotic state with symptoms similar to paranoid schizophrenia.  46 RR 145–46.

Dr. Lundberg-Love stated that she viewed the Channel 11 interview, Brown's interviews with detectives, video of the shooting, and text messages.  She also interviewed Brown on November 10, 2012, for four hours.  46 RR 147–48.  She received family history from Brown and got his substance abuse history from hospital and rehab records.  46 RR 148.  In discussing Brown's behavior before, during, and after the crime, she stated that methamphetamine suppresses the brain's reflective reactive system—the portion of the brain responsible for rational reflection—and overstimulates the reward reactive system.  46 RR 149–52.  The drug makes a person more impulsive and less likely to consider consequences.  46 RR 152.  The resulting behavior is often described as someone "snap[ping]," although she did not believe that drugs made Brown pull the trigger.  46 RR 152–53.  When the drug is stopped, the brain starts healing.  46 RR 154.  A prison environment would probably be free from drugs, and while Brown was in jail, he did not take any drugs.  As a result, he now has some ability to understand what he did and is more reflective.  46 RR 155.

Dr. Lundberg-Love noted that Brown calling Donna after the crime and telling her he killed Ray was an example of him having no filter due to drug use.  46 RR  156.  Also, methamphetamine causes sleep deprivation, which in turn leads to impulsive behavior.  46 RR 156–57.  Alcohol further contributes to impulsivity, aggression, and inappropriate behavior.  46 RR 157–58.  Because of Brown's drug use, he would not

have been amenable to rational discussion.  For example, he would not have believed statements from his mother and Ray that he would still be able to see his children. 46 RR 159.  Further, addiction is a disease of relapse and is influenced by triggers and genetic factors.  46 RR 159–64.

Dr. Lundberg-Love visited with Brown about his family history of stressors. Brown was a victim of sexual abuse at age twelve by his step-brother Nathan.  46 RR 165.  There is also a history of substance abuse on his father's side of the family and a history of anxiety and depression on his mother's side.  46 RR 166.  Nonetheless, science cannot explain why one person can take drugs and not engage in murder while another person will.  46 RR 167.  But when a person is in the thralls of addiction, the brain does not work properly and might cause a person to engage in out-of-character behaviors.   This could explain why Brown's family members expressed shock that he killed Ray.  46 RR 167–68.  If drugs are removed from the picture, the reflective system can repair itself, which decreases the probability of future violent behavior.  46 RR 169–70.  Therefore, if Brown is in a controlled environment without access to the "fuel" of drugs, there is a lower probability he will be violent, particularly if evidence suggests that he was violent only when taking drugs.  46 RR 171.  Dr. Lundberg-Love concluded that if Brown no longer abuses drugs, it is highly unlikely that he is going to commit violent crimes.  46 RR 171–72.

On cross-examination, Dr. Lundberg-Love stated that there are no guarantees Brown will no longer be violent, but he does not have a history of violent behavior; drugs did not cause Brown to murder Ray or threaten Tracy; Brown's behavior was

19

consistent with impulsivity, not sociopathy; it is, however, possible Brown's behavior was consistent with one who has no emotions or feelings; there were times during Brown's life when he had repressed bad behaviors based on his desire to change; and there was no cause and effect between child abuse and murder.  46 RR 174–80.  She further stated that Brown did not tell her he stole Wesley's gun to kill Ray, and she agreed that this information could be emotionally damaging to Wesley.  46 RR 193–94.  Brown also told Dr. Lundberg-Love that he was not paranoid when he killed Ray, but she disagreed.  46 RR 196.  Importantly, Brown did not tell Dr. Lundberg-Love that he blamed Ray for the murder, and she said she would be surprised if Brown made that remark.  46 RR 200.

On re-direct, Dr. Lundberg-Love suggested that drug abuse leads to delusional thinking, such that one would assign blame to another.  46 RR 201–02.  She further reiterated that Brown does not have a history of impulsivity or violence apart from drugs, and that he has never been diagnosed as a sociopath.  46 RR 205, 207–10.  Also, Brown was currently being treated with medications for depression and anxiety, and he would keep receiving the treatment in a controlled environment.  46 RR 206.  On re-cross-examination, Dr. Lundberg-Love said that Brown started using drugs when he was a teenager and had been abusing them most of his life.  46 RR 211–14.  Brown also had no documented history of attention deficit hyperactivity disorder (ADHD), which increases the risk for substance abuse.  46 RR 215.

20

### b.   Dr. Mark Cunningham

The last witness for the defense was Dr. Mark Cunningham, a clinical and forensic psychologist.   47 RR 9, 11.   He was asked to evaluate two issues: the damaging factors in Brown's life that adversely affected the direction of his life or would be associated with his offense, and the likelihood that Brown would commit serious violence in prison.   47 RR 24.   Dr. Cunningham interviewed Brown for six hours and interviewed thirteen others, including family, friends, and co-workers. 47 RR 25–26.   He also reviewed a voluminous amount of records pertaining to all aspects of the case and Brown's history.   47 RR 26–27.   Dr. Cunningham focused on "damaging impairing factors" that affected Brown's choices.   47 RR 34.   Those factors were transgenerational or genetic, neurodevelopmental, family and parenting, community, and disturbed trajectory.   47 RR 35–36.

In Brown's case, "There are three transgenerational [family dysfunction] adverse factors: [h]ereditary predisposition for alcohol and drug abuse or dependence, hereditary predisposition to personality pathology and also to mood disorder."   47 RR 40–41.   Dr. Cunningham found three neurodevelopmental factors present in Brown: symptoms of ADHD, delayed physical growth, and chronic psychosocial immaturity, which is prevalent in other family members.   47 RR 42.   With respect to family and parenting factors, Dr. Cunningham noted eight of significance: the divorce of Brown's parents; the marital dysfunction between his mother and step-father, Chuck; Brown's observation of Chuck's emotional abuse of his mother; Brown's observation of Chuck's physical and emotional abuse of Corey, Brown's older brother; Chuck's sexual abuse

21

of Amberly Lago; the sexual abuse of Brown by his step-brother, Nathan; Chuck's abandonment of the family right before Brown graduated from high school; and the corruptive influence of Corey, who gave Brown alcohol when he was thirteen-years old.  47 RR 44–45.  Dr. Cunningham identified three corruptive community factors relevant to Brown: teen peer harassment, alcohol and drug abusing peers, and the drug epidemic common to many communities.  47 RR 45.

### i.    Transgenerational factors

Dr. Cunningham found evidence of significant hereditary pre-disposition for alcohol and drug abuse.  47 RR 56.  He discussed Brown's family tree in relation to this factor noting, for example, that "of the kids who are actually out in the community, all four of the children, the three community-capable siblings of Micah have also had issues with alcohol and/or drug abuse."  47 RR 64.  Dr. Cunningham further addressed in detail seven family members, including Brown, who supposedly have problems with alcohol or substance abuse.  47 RR 72–74.  He also found that five family members have a predisposition to mood disorders.  47 RR 76–79.  Additionally, Brown's father, Biff, once committed an act of violence toward Chuck that was reminiscent of Brown's murder of Ray, even though no one was hurt.  But Dr. Cunningham found this incident significant because, in his opinion, Biff is generally passive like Brown.  47 RR 79–82.

Next, Dr. Cunningham addressed the tendency of Brown and his family to become involved in dysfunctional relationships.  He found eight relationships in the family beset by infidelity, verbal and physical abuse, drug abuse, antagonism, and

general dysfunction.  47 RR 84–87.  For instance, he noted that Brown's step-father, Chuck, was his primary father figure, and Chuck was abusive toward everyone in the household.  47 RR 86.  He concluded that the high "saturation of very troubled marital relationships in this family system . . . interacts with sequential damage and the passive personality issues and substance dependence" which creates a "volatile" and "dysfunctional" mix.  47 RR 87.

Dr. Cunningham addressed the significance of the sexual abuse Brown sustained from his step-brother Nathan.  To Brown, Nathan was, or should have been, a person of trust, but Brown was forced to endure his abuse.  47 RR 94–95.  And sexual abuse can lead to feelings of betrayal and powerlessness.  Thus, when Brown felt Ray betrayed and manipulated him, those feelings have roots in the abuse and family dysfunction.  47 RR 96.  "So essentially, [when] you take vulnerabilities that were present already and then you are using a drug that undermines your psychological integration, [it] makes you much more suspicious and paranoid and activates you to react in an aggressive fashion."  47 RR 97.

### ii.    Neurodevelopmental factors

Dr. Cunningham believed Brown has ADHD.  According to Dr. Cunningham, Brown's preschool director said that he had an inability to focus and a tendency toward impulsivity.   47 RR 88–93.  Brown's mother Brenda recalled that he did not apply himself in school, which indicates that he was not staying focused on tasks. Further, Brown was a "class clown" and was always more immature than his peers. Social immaturity is an expression of ADHD.  47 RR 88–89.

Dr. Cunningham stated that boys with ADHD are about twice as likely to have been arrested, three times more likely to be convicted, and fifteen times more likely to be incarcerated.  47 RR 92.  A 2010 study showed that forty percent of long-term prison inmates had histories of ADHD.  Of the forty percent, all of them described having a substance use disorder or were identified as abusing amphetamines, just like Brown.  Mood, anxiety, and personality disorders, such as Brown's, were common among the inmates.  47 RR 92–93.

### iii.   "The Bridge"

Next, Dr. Cunningham addressed his concept of "the bridge", which was his way of conceptualizing Brown's life and why the crime occurred.  Essentially, "the bridge" refers to what people can tolerate before they break, and it is a function of its "concrete" or supports.  47 RR 97.  He stated: "Now, as we think about [Brown's] bridge, the span is fundamentally weakened by genetic predispositions to substance abuse and personality disturbance and mood disorder, to ADHD symptoms, delayed growth and development and chronic immaturity.  That's kind of what we start out with."  47 RR 97–98.  Then, factors such as alcoholism, drug abuse, immaturity as a father, marital conflict, and sexual abuse add more weight.  47 RR 98–99.  Brown's support was not substantial because he was harassed by his peers in school, he started becoming dependent on drugs and alcohol, and his marriage fell apart.  47 RR 99.   In the final two months before the murder, Brown started using methamphetamines heavily, which eroded his underlying support, "unhinge[d] emotion," and "promote[d] paranoia and suspiciousness."  47 RR 98.  He then got

24

"mixed signals" about his marital relationship; he was humiliated when Williams choked him in front of his children; he was paranoid and suspicious from drug abuse; "[a]nd then Doc drives by and this system collapses." 47 RR 98–100. According to Dr. Cunningham, this would explain why Brown might have "snapped." 47 RR 100.

### iv.   Violence risk assessment

Last, Dr. Cunningham addressed Brown's risk for committing future acts of violence. He stated: "The bottom line is that there is a very low likelihood that he would exhibit serious violence confined for life in the Texas prison system" based on the following factors: Brown is thirty-four-years old; he had a nonviolent adjustment during the twenty-two months he was in the Hunt County Jail; Brown has a high school diploma; he has a history of community employment; he will have continuing visitation and contact with family; and he will be serving life without parole in prison. 47 RR 101–02, 106–14. Age "is the most powerful descriptive factor in identifying who is going to be violent in prison," and studies show that violence in prison declines with age. 47 RR 106–07. Moreover, research reveals that individuals convicted of capital murder have very low rates of serious violence in prison. 47 RR 114, 116.

Dr. Cunningham stated that Brown is in the lowest 7.8 percent of incoming inmates to engage in potentially violent misconduct. 47 RR 130. Indeed, Dr. Cunningham believed that Brown was at a lower risk of committing an act of violence "than either the general inmates or the other capital offenders that we would compare him with." 47 RR 133–34. Brown would also have access to treatment for ongoing psychological disorders. 47 RR 132.

## ARGUMENT

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). AEDPA "requires a state prisoner seeking federal habeas relief first to 'exhaus[t] the remedies available in the courts of the State.'" *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1604 (2016) (per curiam) (alteration in original). State court adjudication, in turn, requires review under § 2254(d). *Richter*, 562 U.S. at 98–99. This section "imposes a highly deferential standard of review for evaluating state court rulings and demands that state court decisions be given the benefit of the doubt," *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (per curiam) (quotation omitted), and "is limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Under § 2254(d), relief may not be granted unless the state court adjudication (1) "'was contrary to' federal law then clearly established in the holdings of" the Supreme Court, (2) "'involved an unreasonable application of' such law," or (3) "'was based on an unreasonable determination of the facts' in light of the record before the state court." *Richter*, 562 U.S. at 100 (quoting § 2254(d)(1)–(2)) (citing *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A state court decision is contrary to clearly established federal law if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or confronts facts that are "materially indistinguishable" from relevant Supreme Court

26

precedent yet reaches an opposite result. (*Terry*) *Williams*, 529 U.S. at 405–06. A state court unreasonably applies clearly established federal law if it correctly identifies the governing Supreme Court precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407–09. To analyze unreasonable application, a federal court "must determine what arguments or theories supported or . . . could have supported[] the state court's decision[] and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Richter*, 562 U.S. at 102. Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree" on the correctness of the state court's decision. *Id.* at 101 (quotation omitted).

Further, it is the state court's "ultimate decision" that is to be tested for unreasonableness and not every jot of its reasoning. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc). Indeed, state courts are presumed to "know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). And, even if the state court's decision lacks reasoning, § 2254(d) applies and the petitioner must overcome it. *Richter*, 562 U.S. at 98.

AEDPA also provides that state court factual findings "shall be presumed to be correct" unless an inmate carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." § 2254(e)(1). "The presumption of [factual] correctness not only applies to explicit findings of fact, but it also applies to

those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).[8]

## I.   Brown's Claim That Trial Counsel Were Ineffective at the Guilt-Innocence Phase of His Trial Is Procedurally Defaulted and Meritless.

In his first claim, Brown alleges that trial counsel were ineffective at the guilt-innocence stage for failing to investigate and present a cohesive theory to rebut the aggravating element alleged by the State that Brown murdered Ray "during the course of committing or attempting to commit obstruction, retaliation, or terroristic

---

[8]      Brown makes several claims about the standard of review that are erroneous. For instance,  he alleges that he does not have the burden of proof.  ECF 29 at 7–8.  That is incorrect.  *See Pinholster*, 563 U.S. at 181 ("The petitioner carries the burden of proof" with respect to claims under § 2254(d)); *Coleman v. Thompson*, 501 U.S. 722, 748 (1991) ("[A] state procedural default of any federal claim will bar federal habeas unless the petitioner demonstrates cause and actual prejudice.") (emphasis added); *Floyd v. Vannoy*, 894 F.3d 143, 160 (5th Cir. 2018) ("A state prisoner seeking federal habeas relief pursuant to 28 U.S.C. § 2254 carries the heavy burden of demonstrating entitlement to that relief.").  Brown also argues that the Court should look at the merits first and then apply AEDPA. ECF 29 at 8. This was rejected by *Richter*, 562 U.S. at 101–02 (finding the lower court erred in treating "the unreasonableness question as a test of its confidence in the result it would reach under de novo review"); *see also Lewis v. Thaler*, 701 F.3d 783, 787 n.1 (5th Cir. 2012).

Brown also argues that the claims he presented to the state court were not adjudicated on the merits because the state court adopted verbatim the State's proposed findings, and there was no "judge-made decision on the merits."  ECF 29 at 9–10. As Brown concedes, this is a claim the Fifth Circuit has repeatedly rejected.  ECF 29 at 10 n.3; *Green v. Thaler*, 699 F.3d 404, 415–16 (5th Cir. 2012) (holding that the Supreme Court has never held that a state court's verbatim adoption of findings of fact are entitled to less deference under the AEDPA); *Hudson v. Quarterman*, 273 F. App'x 331, 335 (5th Cir. 2008) (rejecting claim that less deference was owed where state court adopted respondent's proposed findings) (unpublished) (citing *Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999)).  Further, Brown makes "no showing that the state habeas court failed independently to consider and evaluate the state's proposed findings before adopting them as its own," *Hudson*, 273 F. App'x at 335, particularly considering that the state court conducted a week-long evidentiary hearing and extensive evidentiary development.  The CCA also stated that it denied relief based on its "own review."  *Ex parte Brown*, 2019 WL 4317041, at *1.  Moreover, deference is afforded a state court decision under § 2254 "where the decision 'is unaccompanied by an explanation.'" *Basso v. Stephens*, 555 F. App'x 335, 342 (5th Cir. 2014) (unpublished) (quoting *Richter*, 562 U.S. at 98).

threat."  Brown complains repeatedly that, to rebut the aggravating element, trial counsel settled on a flawed theory of "the bitch deserved it," ECF 29 at 16–17; in other words, that Ray was a bad person who simply provoked Brown to kill her.

Brown claims that counsel's guilt-innocence theory was untenable.  He argues that counsel should have enlisted the help of a mitigation investigator to develop evidence and then presented one or more experts to testify that Brown committed murder due to a host of mental and emotional impairments that caused him to "spiral downward" and murder Ray.  For instance, Brown states that "counsel had abundant information on valuable avenues of investigation," including severe mental illness, decompensation, and psychiatric distress; sexual abuse that affected Brown throughout his life; a neurodevelopmental disorder; evidence of "clear emotional and psychological dysregulation at the time of the murder"; and a possible familial genetic disorder and toxic exposure that altered his brain functioning.  ECF 29 at 49.  Brown states: "All of these avenues of investigation would have supported a defense that would have directly addressed the charges Brown was facing by undermin[ing] the State's allegation that Brown was acting with the requisite intent for capital murder when he killed Ray."  *Id.*  Thus, Brown claims that counsel should have used these alleged impairments to rebut the mens rea element for the aggravating factor.

There are multiple problems with Brown's claim.  First, it is unexhausted and procedurally defaulted because he never raised this claim in state court.  Second, it is doubtful this type of evidence would have been admissible at the guilt-innocence phase of Brown's trial because Texas law does not permit the admission of evidence

that fails to negate mens rea.  In approximately forty-five pages of briefing, Brown never offers a concrete explanation for how evidence of these alleged impairments would have rebutted the aggravating element, at least in any way that would have convinced to the jury.  In fact, Brown's claim actually pertains to punishment and mitigation because that is how he frames it—as a failure to conduct a proper mitigation investigation that could have been utilized at guilt-innocence in some ambiguous fashion.  This is evidenced by his discussions of *Wiggins v. Smith*[9] and *Andrus v. Texas*,[10] ECF 29 at 48–49, 51–52, which involve claims of counsel's failure to investigate and present mitigating evidence.  In fact, Brown eventually concedes that "[w]hile this [approach] may not have affected the guilt-phase outcome," there is a reasonable probability that the jury having heard this evidence "would have voted differently on the sentence for Ray's death."  *Id.* at 60–61.  Brown, thus, acknowledges that his claim is unconvincing.  Third, contrary to Brown's allegations, counsel did investigate the case and presented the only viable theory for why the aggravating element did not apply—Brown murdered Ray because he feared she was taking away his children and he "snapped," not because he was engaged in act of retaliation. Finally, for the reasons addressed below, Brown cannot demonstrate any prejudice.

### A.     Brown's claim is unexhausted and defaulted.

Habeas relief "shall not be granted" under any circumstances unless it appears that "the applicant has exhausted the remedies available in the courts of the State."

---

[9]     539 U.S. 510 (2003).

[10]    140 S. Ct. 1875 (2020).

28 U.S.C. § 2254(b)(1).  A petitioner must have first provided to the highest court of the state a fair opportunity to apply (1) the controlling federal constitutional principles to (2) the same factual allegations before a federal court will entertain the alleged errors.  *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995).

In order to satisfy exhaustion, all of the grounds raised in a federal habeas application must have been "fairly presented" to the state courts prior to being presented to the federal courts.  *Id.*; *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997).  Moreover, "[t]he exhaustion requirement is not satisfied if the prisoner presents new legal theories or factual claims in his federal habeas petition."  *Nobles*, 127 F.3d at 420 (citing *Anderson v. Harless*, 459 U.S. 4, 6–7 (1982)).

On state habeas review, Brown alleged that trial counsel were ineffective for failing to present all available evidence to negate the aggravating element.  But Brown argued that trial counsel should have presented additional evidence from four of his relatives, including his mother and father, to show his behavior before the murder, that he killed Ray because he feared losing his children, and that he was on a downward spiral from depression and drug use.  1 SHCR 87–90.  The instant claim is different—trial counsel were ineffective for failing to investigate and present mitigation-type evidence from an expert about Brown's alleged mental, emotional, and physiological impairments to rebut or negate evidence of the aggravating element.  ECF 29 at 14–61.  Brown does not claim that counsel failed to present

additional evidence from his relatives. *Id.* Thus, the instant claim is factually distinct and unexhausted.[11]

Further, Brown's unexhausted claim is procedurally defaulted for the purposes of federal habeas review because if he returned to state court in order to exhaust his claim by filing a successive state application, the application would be dismissed for abuse of the writ. *Coleman*, 501 U.S. at 735 n.1; *Beatty v. Stephens*, 759 F.3d 455, 465 (5th Cir. 2014); *Nobles*, 127 F.3d at 422.

Brown argues that to the extent this claim is not exhausted, he can overcome his default via the equitable exception announced in *Martinez v. Ryan*, 566 U.S. 1 (2012). *See also Trevino v. Thaler*, 569 U.S. 413 (2013). In *Martinez*, the Supreme Court found for the first time an equitable exception to the general rule that an error by an attorney in a state postconviction proceeding does not qualify as cause to excuse a procedural default. 566 U.S. at 9. *Trevino* held that this limited equitable exception applies to Texas capital cases. 569 U.S. at 417. To meet the *Martinez/Trevino* exception, Brown must show that (1) his underlying ineffective-assistance-of-trial counsel (IATC) claim is "substantial," meaning he "must demonstrate that the claim has some merit," *Martinez,* 566 U.S. at 14; and (2) his initial state habeas counsel was ineffective in failing to present this claim in his first state habeas application. *See id.*; *Trevino,* 569 U.S. at 429. "To demonstrate that his [IATC] claim 'has some merit,' [the petitioner] must also show that he was 'actual[ly] prejudiced'

---

[11]     Should this Court determine that the instant allegation is substantially similar to the claim Brown raised on state habeas review, AEDPA deference to the state court decision rejecting the claim applies.

by trial counsel's allegedly ineffective assistance." *Ramey v. Davis*, 942 F.3d 241, 255 (5th Cir. 2019). "Proving 'actual prejudice' requires a prisoner to 'establish not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Id.* at 255–56 (citing *Hernandez v. Stephens*, 537 F. App'x 531, 542 (5th Cir. 2013) (unpublished)). Brown cannot satisfy this exception because, for the reasons addressed below, his ineffectiveness claim lacks merit, and state habeas counsel was not ineffective for not raising it. He also cannot demonstrate actual prejudice.

### B.   Trial counsel were not ineffective.

Claims of ineffective assistance of counsel are governed under the familiar standard enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984). A defendant's claim that he was denied constitutionally effective assistance requires him to affirmatively prove both that (1) counsel rendered deficient performance, and (2) his actions resulted in actual prejudice. *Id.* at 687–88, 690. Importantly, failure to prove either deficient performance or resultant prejudice will defeat an ineffectiveness claim, making it unnecessary to examine the other prong. *Id.* at 687.

Regarding deficient performance, Brown must show that in light of the circumstances as they appeared at the time of the conduct, "counsel's representation fell below an objective standard of reasonableness," i.e., "prevailing professional norms." *Id.* at 689–90; *see also Hinton v. Alabama*, 571 U.S. 263, 273 (2014) (per curiam) (emphasizing that the "performance inquiry must be whether counsel's

assistance was reasonable considering all the circumstances") (citation omitted). The Supreme Court has held that judicial scrutiny of counsel's performance "must be highly deferential," with every effort made to avoid "the distorting effect of hindsight." *Strickland*, 466 U.S. 689–90; *Richter*, 562 U.S. at 105 ("It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'"). Thus, there is a "strong presumption" that the alleged deficiency "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even if deficient performance can be established, Brown must still affirmatively prove prejudice that is "so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Id.* at 687. He must show a reasonable probability that but for counsel's deficiencies, "the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is one sufficient to undermine confidence in the outcome. *Id.* And as explained by the Supreme Court, the question in conducting *Strickland*'s prejudice analysis "is *not* whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel [had] acted differently." *Richter*, 562 U.S. at 111 (emphasis added and citations omitted). Rather, "[t]he likelihood of a different result must be substantial, not just conceivable." *Id.* at 112 (citation omitted).

Finally, Brown repeatedly refers to the American Bar Association (ABA) Guidelines for performance of counsel in death penalty cases. *See, e.g.,* ECF 29 at 18–19, 21–22. However, these guidelines are not controlling. *Bobby v. Van Hook,* 558 U.S. 4, 17 (2009) (per curiam).

1. **Counsel were not deficient.**

   a. **Counsel were not deficient because expert testimony premised on Brown's new factors to negate the aggravating element likely would not have been admissible under state law.**

The first problem with Brown's argument is that had counsel gone down the path he now desires—expert testimony focused on mental and emotional impairments to negate mens rea—it is unlikely this evidence would have been admitted. Under Texas law, relevant evidence that negates the mens rea element of an offense, including evidence of a defendant's history of mental illness, may be presented to a jury. *See Ruffin v. State*, 270 S.W.3d 586, 593–97 (Tex. Crim. App. 2008); *see also Jackson v. State*, 160 S.W.3d 568, 574 (Tex. Crim. App. 2005) ("As with the other elements of the offense, relevant evidence may be presented which the jury may consider to negate the mens rea element."). But mental-illness evidence must still meet the general requirements for admission under the Texas Rules of Evidence, and it may be excluded if it does not actually negate the required mens rea of the offense. *Mays v. State*, 318 S.W.3d 368, 381–82 (Tex. Crim. App. 2010) (trial court not required to admit expert testimony concerning defendant's mental illness during guilt stage of trial where "it d[oes] not directly rebut his culpable mens rea"); *Jackson*, 160 S.W.3d at 574–75 (trial court has discretion to exclude mental-illness evidence which does not negate element of mens rea ); *see also Ward v. State*, No. AP-75750, 2010 WL 454980, at *2 (Tex. Crim. App. Feb. 10, 2010) (evidence of mental illness "may be excluded under Rule 403 if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues,

or misleading the jury" and "[s]uch evidence may also be excluded if it does not actually negate the applicable mens rea") (footnotes omitted) (unpublished).

The elements for Brown's offense are whether "[a] person . . . commits murder as defined under Section 19.02(b)(1) and . . . the person intentionally commits the murder in the course of committing or attempting to commit . . . obstruction or retaliation, or terroristic threat . . ." Tex. Penal Code § 19.03(a)(2). Brown concedes that he committed murder. ECF 29 at 18. Thus, Brown must show his alleged impairments prevented him from forming the intent to commit murder in the course of committing or attempting to commit obstruction or retaliation, or terroristic threat. However, Brown only offers tenuous, wholly speculative, and ambiguous theories for how his evidence could have negated intent. *See, e.g.,* ECF 29 at 15, 26, 28–29, 37, 39–40, 44. One example is as follows:

> Within Brown's testimony was evidence of extreme emotional dysregulation in reaction to fraught interpersonal interaction, especially regarding masculinity, control and perceptions of weakness, which should have alerted counsel that Brown may have been experiencing the ongoing effects of the trauma of childhood sexual abuse and a profound sense of powerlessness. Brown's inability to articulate why he did things the day of the murder, or even events that occurred, should have alerted counsel to his severe dissociation and mental distress. His limited emotional range should have been a red flag for [Autism Spectrum Disorder or] ASD. His suicidality evidenced clear mental illness, and indicated his brain was in a state of hyperarousal (otherwise known as fight-or-flight response), resulting in his acting out without understanding why. If counsel had spoken at length with Brown, they would have recognized the necessity of an adequate investigation, full utilization of a mitigation investigator, and psychological and neurological evaluation to be able to effectively explain to the jury the "whydunit" of the crime.

36

ECF 29 at 39.[12] The briefing from the above page citations are of the same tenor.

What is sorely lacking from Brown's arguments is any legitimate explanation for how these unpresented disorders actually negate the aggravating factor. The closest Brown comes to an explanation is that counsel failed to provide the jury "context" for Brown's actions. But under state law, Brown's alleged disorders must do more than provide an excuse or justification for him forming the requisite intent; rather, he must show that he was *prevented* from forming the requisite intent. *See Mays*, 318 S.W.3d at 381 (mental-illness evidence did not rebut culpable mental element of either capital murder or murder; mental-illness evidence only showed why defendant intentionally and knowingly killed law enforcement officer); *see also Ward*, 2010 WL 454980, at *4 (forensic psychologist's testimony "presented only an excuse for the crime: that [defendant] intentionally killed [the complainant] because he was so paranoid that he thought [the complainant] ... was out to get him"); *Nikmanesh v. State*, No. 05-16-00363-CR, 2017 WL 2774445, at *3–4 (Tex. App.—Dallas June 27, 2017, no pet.) (expert testimony concerning defendant's "major depressive disorder or obsessive-compulsive personality disorder could only offer an explanation or motive for [his] actions but could not negate intent" for offense of murder) (mem. op., unpublished). Moreover, given the ambiguity of this evidence to the issue of intent and the possibility of confusion of the issues, it would not have been an abuse of

---

[12]    The Director also notes that many of Brown's assertions of his alleged mental and emotional problems are just that—assertions. Most are made without citations to the record or to a declaration from an expert who has reached these conclusions. Absent that support, the assertions are conclusory and, thus, do not state a claim for habeas relief. *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990); *Ross v. Estelle*, 694 F.2d 1008, 1011–12 (5th Cir. 1983).

discretion if the trial court refused to admit it under Texas Rule of Evidence 403. *Mays*, 318 S.W.3d at 380–82; *Ward*, 2010 WL 454980, at *2; *Jackson*, 160 S.W.3d at 574–75.

Thus, the evidence Brown proffers does not negate the requisite mens rea for the offense of capital murder.  In *Ruffin*, on the other hand, evidence was presented that the defendant suffered from both auditory and visual delusions such that when he shot at police officers, he thought he was shooting at "Muslims."  270 S.W.3d at 594.  The CCA held this evidence was relevant to rebut the element that Ruffin intended to shoot police officers and would, if believed, lessen the crime from a first-degree aggravated assault of a police officer to a second-degree aggravated assault. *Id.* at 596–97.  Brown's evidence, on the other hand, at best amounts to an excuse; it does nothing to actually negate any element of the crime under Article 19.03(a)(2).

In sum, trial counsel is not ineffective for presenting evidence that is inadmissible.  *See Robison v. Johnson*, 151 F.3d 256, 260–61 (5th Cir. 1998); *see also Battaglia v. Stephens*, No. 3-09-CV-1904-B, 2013 WL 5570216, at *25 (N.D. Tex. Oct. 9, 2013) ("Because state law would have rendered this evidence inadmissible, counsel could not be ineffective for failing to offer inadmissible evidence, even if it were not inconsistent with their trial strategy.") (unpublished); *Stout v. Director, TDCJ-CID*, No. 6:07-cv-23, 2007 WL 1005979, at *6 (E.D. Tex. March 30, 2007) ("[T]he dispositive factor is that an affidavit from Williams would have been inadmissible, and counsel was not ineffective for failing to offer an inadmissible affidavit.") (unpublished).  And it is settled that trial counsel is not ineffective for not engaging in futile actions.

*Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002); *Koch*, 907 F.2d at 527.  Finally, because Brown never specifically explains how any of his new evidence negates the aggravating element, his allegation is conclusory.  *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (holding that "conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding").

> **b.**   **Likewise, federal precedent undermines Brown's IATC claim.**

Courts have long recognized the problems inherent in attempting to use psychiatric maladies to negate an element of a specific-intent crime.  Specifically, such evidence "(1) will only rarely negate specific intent, (2) presents an inherent danger that it will distract [juries] from focusing on the actual presence or absence of mens rea, and (3) 'may easily slide into wider usage that opens up the jury to theories of defense more akin to justification.'"  *United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990) (quoting *United States v. Pohlot*, 827 F.2d 889, 904–05 (3d Cir. 1987)).

The Supreme Court has also expressed similar reservations.  In *Clark v. Arizona*, the Court determined that Arizona law prohibiting the admission of mental-health evidence to dispute mens rea did not violate the Due Process Clause.  548 U.S. 735 (2006).  The Court emphasized that such evidence has the potential to mislead jurors because mental-disease classifications "may suggest something very significant about a defendant's capacity, when in fact the classification tells us little or nothing about the ability of the defendant to form mens rea or to exercise the cognitive, moral, or volitional capacities that define legal sanity."  *Id*. at 775.  As a result, it is not unreasonable to confine such evidence solely to the issue of insanity,

on which a defendant usually has the burden of persuasion. *Id.* at 776. The Court

then addressed the reliability of expert opinions regarding capacity to form mens rea:

> Unlike observational evidence bearing on mens rea, capacity evidence
> consists of judgment, and judgment fraught with multiple perils: a
> defendant's state of mind at the crucial moment can be elusive no matter
> how conscientious the enquiry, and the law's categories that set the
> terms of the capacity judgment are not the categories of psychology that
> govern the expert's professional thinking. . . . And even when an expert
> is confident that his understanding of the mind is reliable, judgment
> addressing the basic categories of capacity requires a leap from the
> concepts of psychology, which are devised for thinking about treatment,
> to the concepts of legal sanity, which are devised for thinking about
> criminal responsibility. . . . In sum, these empirical and conceptual
> problems add up to a real risk that an expert's judgment in giving
> capacity evidence will come with an apparent authority that
> psychologists and psychiatrists do not claim to have.

*Id.* at 776–77 (citations omitted).

Federal district courts in Texas, including this Court, have likewise rejected

the argument that trial counsel is necessarily ineffective for failing to present mental-

health evidence to negate mens rea. In *Crutsinger v. Thaler*, this Court assumed that

the petitioner's mental-impairment evidence was admissible under Texas law to

negate intent. No. 4:07-CV-703-Y, 2012 WL 369927, at *10 (N.D. Tex. Feb. 6, 2012)

(unpublished). However, the evidence must truly negate mens rea. *Id.* (citing *Ruffin*,

270 S.W.3d at 594, 596). This Court found that "[e]vidence of general cognitive

impairment, unconnected to Petitioner's intent during the commission of the offense,

does not negate the allegation that he intended to cause the victims' deaths." *Id.*

Indeed, the expert's findings revealed the opposite because they confirmed that

"[p]etitioner intentionally caused the victims' death during an alcoholic rage because

they would not hire him to work." *Id.* Thus, counsel were not ineffective for failing to present this evidence to negate the culpable mental state.

In *Doyle v. Thaler*, this Court rejected the petitioner's request for a hearing on his IATC claim that trial counsel were ineffective for not presenting mental-health evidence to rebut mens rea. No. 3:08-CV-138-B, 2009 WL 3028574, at *6 (N.D. Tex. Sep. 21, 2009) (unpublished). This Court held that the petitioner failed to show that a mens rea defense "would have been available at trial, even with the additional evidence developed after the trial. The state court found that the proffered evidence 'does not negate his intent to kill but merely shows lack of impulse control or motive. Thus, the evidence would not have been admissible'" under Texas law. *Id.*; *see also United States v. Fleming*, No. H-07-513-1, 2009 WL 10680618, at *4 (S.D. Tex. Apr. 13, 2009) (declining to admit expert testimony because "[a]ll of the evidence proposed by Fleming goes not to negate mens rea, but to show she had no 'meaningful understanding of her actions and their consequences.' As in *Pohlot* and *Cameron* her 'lack of self-reflection does not mean a lack of intent and does not negate mens rea.'") (unpublished) (quoting *Cameron*, 907 F.2d at 1067 & *Pohlot*, 827 F.2d at 907). The Fifth Circuit, citing to *Cameron* and *Pohlot*, has also rejected the claim that a trial court erred in refusing to admit testimony from an expert that failed to connect how manipulation of the defendant affected the defendant's knowledge, which would only have served to confuse the jury. *United States v. Herbst*, 460 F. App'x 387, 395 (5th Cir. 2012) (unpublished).

Here, trial counsel were not ineffective because, as discussed above, Brown offers multiple lengthy assertions about what counsel allegedly did not do, but he fails to connect his alleged impairments to intent to commit the aggravating element. Moreover, even if the trial court would have deemed the evidence admissible, had counsel attempted to convince the jury that sexual abuse and terms such as "emotional dysregulation," "neurodevelopmental disorders," and "Asperger's Syndrome" actually factored into the elements of the crime, this would have only confused the jury. Even worse, the jury might have believed the defense was offering an excuse for Brown's actions, which would have harmed him at punishment.

Also, Brown claims that with this proposed evidence, he could have shown "he was acting out on those he knew intimately, *based on perceived threats* stemming from the lifelong effects of negligence and abuse"; the murder was "a deeply personal act that was committed by an individual that had been *spiraling out of control* and whose suicidality had led him to *lashing out at those around him and murder*"; and he "was acting out *personal fears and angers due to his neurological and traumatic state*." ECF 29 at 39–40, 44 (emphases added). The worst case scenario is that a jury would not have merely considered this an excuse but an actual explanation for why he murdered Ray—he retaliated due to perceived threats, personal fears and anger caused by neurological and psychological impairments. The jury could have interpreted it as evidence supporting the State's case, which is surely how the State would have framed it. Indeed, during the state habeas hearing, Brown's counsel asked Toby Wilkinson, Brown's lead trial attorney, if the defense considered Brown's

42

supposed autism in its guilt-innocence theory.  Wilkinson responded: "You have to
understand that with a layperson, if you start talking about psychological problems,
autism, based upon some of the responses from the jury selection, that's psychobabble
and that is not mitigating to many of -- a lot of people.  It's aggravating."  10 EHRR
30.[13]  Regarding punishment, co-counsel Katherine Ferguson considered it in the
same light.  10 EHRR 266–68 (recognizing the double-edged nature of autism and
mental impairments); *Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012); *Hopkins v.
Cockrell*, 325 F.3d 579, 586 (5th Cir. 2003).  Indeed, she stated: "[M]y experience with
Hunt County juries, is you start getting into things like autism and not real well
defined that everybody understands issues, and they kind of look at it like you're
talking about voodoo."  10 EHRR 267.  Clearly, this is not a strategy counsel wanted
to pursue regarding guilt-innocence.  Given the above precedent, this decision was
not unreasonable.

### c. Counsel were not deficient because they investigated and presented a valid defense theory.

Brown repeatedly complains that counsel failed to conduct a sufficient
investigation and did not seek to understand how a "mitigation" investigation into
Brown's various alleged problems would have supported the defense's guilt-innocence

---

[13]     Although the Director believes the instant claim is unexhausted, the state habeas
hearing testimony is relevant to this claim, particularly given the overlap between the
instant claim and Brown's state habeas claim that trial counsel were ineffective for failing to
investigate and present mitigating evidence.  And many of the hearing citations in the instant
answer are contained in the state habeas findings.  *See* 14 SHCR 5707–27.  Thus, even if the
deferential scheme of § 2254(d) does not apply to this claim, § 2254(e)(1) still applies—the
findings of fact are presumed to be correct, and it is Brown's burden to rebut the findings
with clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  As shown, he has failed to do so.

strategy.  *See* ECF 29 at 26–47.  As shown above, Brown fails to adequately explain how any of this evidence negates mens rea.  At any rate, his claims are baseless because counsel clearly investigated and presented a tenable defense theory.

### 1.   The investigation was sufficient.

Brown's claim is undermined by the sheer breadth of witnesses counsel presented at trial.  As shown in the Statement of Facts, *supra*, counsel presented four defense witnesses at guilt-innocence, including Brown himself.  At punishment, counsel presented fourteen witnesses including family, friends, a counselor, a school teacher, law enforcement officials, and two experts.  The first expert, Dr. Lundberg-Love, testified about the effects of Brown's drug and alcohol abuse on his state of mind.  She interviewed Brown for four hours, received Brown's family history, and got his substance abuse history from hospital and rehab records.  46 RR 148.  Her testimony comprises about 100 pages of the reporter's record.  46 RR 116–215.  The defense's second expert, Dr. Mark Cunningham, testified for almost one full day of the trial, and his testimony comprises nearly 200 pages of the reporter's record.  47 RR 9–196.  As shown, Dr. Cunningham's testimony covered a host of topics Brown claims counsel failed to investigate, including ADHD and neurodevelopmental issues, psychosocial immaturity, family dysfunction, sexual abuse, predisposition to substance abuse, dysfunctional relationships, marital conflict, lack of support, and Brown's methamphetamine use that promoted paranoia and suspiciousness.  And Dr. Cunningham's own investigation into the case was as follows:

> I interviewed a Micah Brown, the Defendant, for approximately six hours on February the 12th of this year.  I interviewed Biff Brown, his

father, for approximately two and a half hours on February 10th of this year. I interviewed Richard Sumrow, who is a paternal second cousin, for a half hour on February 10th of this year. I interviewed Audra Nicole Waddle, a friend, for an hour on February 10th of this year. I interviewed Jennifer Smith, another friend, for an hour and 15 minutes on February 10th of this year. I interviewed Roger Gilby who had contracted with Micah Brown to do sign work. I talked to him for 15 minutes on February 11th of this year. I interviewed Lois Crawford, the maternal grandmother, for 65 minutes on February 11th of this year. I interviewed Jim Crawford, a paternal uncle, for 40 minutes on February 11th of this year. I interviewed Ivanna Ott, who is a paternal aunt. I interviewed her for 70 minutes on February 12th of this year. I interviewed Brenda Simms, who is a family friend and had been a preschool director where Micah was in preschool. And her son dated Taylor and so lots of connections with the family. I interviewed her for an hour and 20 minutes on February 13th of this year. I interviewed Taylor Gafford Harmon, who is Micah's younger maternal half sister. I interviewed her for two hours and 20 minutes on February 13th of this year. I interviewed Brenda Crofford, Micah's mother. I interviewed her for three hours and 20 minutes on February 13th of this year. I interviewed Corey Brown, Micah's brother. I interviewed him for 50 minutes on February 15th of this year. I reviewed voluminous records. I reviewed police interview narratives, affidavits, e-mail traffic, crime scene video, videos of Micah Brown being interviewed, audios that had been part of the investigation process or transcripts of those, handwritten letters that Micah Brown had done, mental health records from Green Oaks Hospital where he was hospitalized in January of 2011, Homeward Bound, which is a drug rehab where he had been treated on two occasions in 2010 and also in 2009 for about three weeks and then four days of detox in 2010, June of 2010. I interviewed -- again, the transcripts of the interviews of a number of individuals that had been done as part of the investigation process. I interviewed[sic] the medical examiner's report, crime scene photos. The materials that I brought that are specific to this case were two binders and then two other big binders I thinned and didn't bring with me but instead extracted the records that were most important to me.

47 RR 25–27. These facts alone undermine Brown's allegation. For instance, in

*Doyle*, this Court held:

> While Doyle contends that his attorneys did not investigate mental health evidence for purposes of defending mens rea, the same evidence was the subject of Dr. Kessner's investigation for mitigation purposes

> and was fully available to trial counsel, and made the subject of
> extensive testimony during the punishment phase of his trial.
> Therefore, these matters appear to have been adequately investigated
> and the information that the attorneys had in their possession fully
> sufficient to make an informed judgment about the strategic use of this
> evidence and what, if any, additional investigation was needed.

2009 WL 3028574, at *6.

At the state habeas evidentiary hearing, counsel elaborated on their investigation. Wilkinson testified that "we investigated and talked to everybody we could talk to, every relative, friend, witness, about [Brown]." 9 EHRR 24–25. Wilkinson stated that he was able to spend a lot of time with Brown and his family primarily during jury selection when they were together for the entire day. 9 EHRR 53. Specifically: "[W]hen we did jury selection, that was, for the most part, a full day for weeks at a time with Mr. Brown, myself. We discussed all kinds of things. In jail I talked to him, and in the courtroom I talked to him. So yes, I had a lot of time with him." 10 EHRR 165. Brown "told us all about his childhood, his dad, stepdad, mom. He gave us the names of people to go visit." 9 EHRR 118. Wilkinson stated that he and investigator James Smith "interviewed a lot of witnesses and those names were all made available to Dr. Cunningham, Dr. Love and [mitigation specialist] Ms. Griffin." 9 EHRR 144. Smith "was tasked [ ] to locate all possible witnesses, whether it be guilt/innocence, mitigation and whatever else an investigator does, including getting records and things such as that." 9 EHRR 36. As a result, the defense team spoke to more than eighty-two people. 10 EHRR 162. Wilkinson also met with Brown's mother Brenda on multiple occasions and spoke with her during

jury selection.  10 EHRR 193.  He further noted that there was a lot of "crossover" between guilt-innocence and mitigation witnesses.  10 EHRR 163.

Regarding the defense's experts, "we told everybody, do whatever you need to do to do your job; if that includes testing, then you test him."  9 EHRR 70–71.  Asked specifically about Dr. Cunningham, Wilkinson stated that "we gave him all of the files, access to all of the people[.]"  9 EHRR 70–71.  Wilkinson "hired [Dr. Cunningham] to do whatever a person of his professionalism does, and if that means testing, testing.  If it doesn't mean testing, then no testing."  9 EHRR 72. Wilkinson had several discussions with Dr. Cunningham prior to trial, and he would have had Brown tested had Dr. Cunningham requested that it be done.  To his recollection, Dr. Cunningham did not request it, 10 EHRR 190–91, which is supported by Dr. Cunningham's state habeas declaration that he conducted no testing on Brown.  13 SHCR 5132–33.[14]  Wilkinson said he met with Dr. Cunningham on at least three occasions not including trial.  10 EHRR 201.  Investigator Smith gathered Brown's entire family history, and the defense provided "Dr. Cunningham with a list of all the witnesses or people that we felt he should talk to.  Those names and addresses were also provided to [Ms. Griffin]."  9 EHRR 95–96.  Wilkinson said: "When we took all the records including lists of witnesses, etcetera, to

---

[14]     Dr. Cunningham's state habeas declaration was admitted for record purposes only and was not evidence considered by the state habeas court because Brown had an opportunity to call Dr. Cunningham to testify at the hearing and did not.  The trial court sustained the State's objection to the declaration on the ground that admitting it would deprive the State of any opportunity to cross-examine Dr. Cunningham.  10 EHRR 240–45.

[Dr. Cunningham's] office . . . we sat down and talked to him about the case and what we -- what was going on." 9 EHRR 111.

Co-counsel Ferguson testified that Dr. Cunningham was hired to do mitigation, 10 EHRR 260, including "everything about [Brown's] background, his psychological history and condition, the drug abuse, his relationships with his family and his ex-wife." 11 RR 44. Ferguson explained that Dr. Cunningham was going to "incorporate everything, including the drugs aspects and then the other parts of [Brown], that he was going to kind of tie it all together . . . in a nice package with a bow" to make it understandable for the jury, and "[t]o show them how all the pieces fitted together so that it wasn't just that we were flinging excuses out like Frisbees and hoping that one of them hit." 12 EHRR 23–24. Regarding her contact with Dr. Cunningham, she stated:

> I was actively talking either to him in his office to make sure that he was getting documents that he needed, that he had gotten the discovery in the case. There may even be a reference in some of my e-mails to -- there was a box of materials that I believe [Griffin] had gathered that we FedExed out to his office.

12 EHRR 55.

Regarding hiring Dr. Lundberg-Love, Ferguson stated she wanted her as an expert because it "was apparent" Brown had been on a drug "binge" prior to the murder, and "I wanted someone to be able to explain the effect of drugs on the brain's ability to make decisions, on -- that it would also explain potentially why he looked so awful in that [television] interview." 12 EHRR 36.

48

About her contact with Brown, Ferguson testified that she met with Brown on several occasions or "multiple hours" before trial ever started to keep him informed about what was going on and to ask questions. 12 EHRR 67. She had a good working relationship with Brown, who was friendly and forthcoming. 12 EHRR 68. Ferguson was also responsible for preparing Brown to testify, and she "spent a lot of time" with him in the process. 12 EHRR 29. Ferguson further stated she felt free to discuss anything with Wilkinson, and they discussed all issues regarding jury selection, guilt-innocence, and punishment, and they discussed all of those issues with Brown. 12 EHRR 32–33.

Both attorneys also elaborated on why they did not conduct psychological testing on Brown. Wilkinson stated: "[E]verybody we talked to from the very beginning -- every family member, every friend, Micah himself -- told us he never ever, ever had any psychological problems." 10 EHRR 14, 193. Wilkinson had no reason to question Brown's competence or cognitive skills. 10 EHRR 165–66. Wilkinson met with Brown's family several times, and while they noted that Brown may have been bullied as a child due to his small stature, no one provided evidence that would call his mental competence or cognitive skills into question. 10 EHRR 194. No one, to Wilkinson's knowledge, ever brought up the possibility that Brown had autism. 9 EHRR 139. Wilkinson also believed that testing should be for a specific objective, i.e., not just for the sake of trying to find something. 10 EHRR 27. Further, in addition to stating that autism testimony might amount to "psychobabble" that juries might not understand, he said that even if he had been aware of Brown's

49

purported autism, he would have likely used the same strategy given the news video and Brown's good behavior in pre-trial confinement.  9 EHRR 139.

Ferguson testified that, even had they known Brown suffered from ASD, she did not know if they would have pursued this line of defense at trial.  10 EHRR 266. She explained:

> The problem with if he had an organic brain dysfunction issue, it's a double-edged sword, because it enables the State to argue that you can't fix him, that he is the way he is and can't be fixed.  And I was wanting to present to the jury, look, you have nothing to worry about giving him life without parole because he's not going to be around women pushing his button about his kids and he's not going to be loaded up on cocaine, meth, and alcohol.  And so, you know, take those two extreme factors out of his life and he's not a risk for harming anybody.  Yes, it may have been helpful.  I don't know. . . . But I can see it being used just as easily against [Brown].

*Id*.  She further testified that, because they already had evidence demonstrating that Brown was a model prisoner, she would have had to consult with an expert about using this information because "I don't know if slapping an ASD label on him would do more harm than good from the standpoint of the State saying, 'well, you can't fix him, he's deadly, you've got to execute him.'" 10 EHRR 267.  And, again, she stated that her "experience with Hunt County juries, is you start getting into things like autism and not real well defined that everybody understands issues, and they kind of look at it like you're talking about voodoo."  *Id*.

Ferguson also testified that counsel did not request testing for Brown because the family had not indicated that there were ever any issues and concerns about him; they were able to determine that he had not been in special education at school; and Wilkinson was informed at a seminar that you "don't just go scattershot running a

50

psychological eval on your client unless you have reason to believe there's something there." 10 EHRR 256–57. Ferguson did not come across anything that made her think there was an issue that required psychological testing. 12 SHRR 27. She also testified that she did not recall a conversation with Griffin where Griffin indicated she believed Brown might suffer from Asperger's Syndrome. 12 EHRR 231. Specifically: "No. I would have -- I would have remembered a mental -- a conversation referencing a mental impairment. I would have documented that and had sent an e-mail or sent something to somebody about that. I would have covered that." 12 EHRR 235. She further said that had she been told Brown had a mental disorder that would have impacted his ability to appreciate the situation he was in, "I would have immediately communicated that to Mr. Wilkinson, along with – it would have been kind of an, Oh, holy crap, do we need to get an expert, because I've just been told that they think he's – not competent or not capable of understanding. 12 EHRR 235–36.

Of course, ultimately, Dr. Cunningham could have conducted testing on Brown had he deemed it necessary or referred Brown for additional testing, which he was certainly qualified to do. *See, e.g., United States v. Bourgeois*, 537 F. App'x 604, 633–34 (5th Cir. 2013) (where Dr. Cunningham was told defendant "experienced recurrent 'rage' episodes, accompanied by violent assaults and verbal aggression" from childhood "which worsened in severity following the head injury," he "recommended that trial counsel obtain a comprehensive neurological and neuropsychological evaluation of Bourgeois") (unpublished); *Milam v. State*, No. AP-76,379, 2012 WL 1868458, at *17 (Tex. Crim. App. May 23, 2012) (noting that Dr. Cunningham

testified that defendant met the diagnostic criteria for intellectual disability and that his methamphetamine abuse led to psychotic symptoms that looked similar to schizophrenia, such as delusions and hallucinations) (unpublished).  Wilkinson said he informed the experts to do any testing that they saw fit, and there is no evidence trial counsel advised Dr. Cunningham not to do so.   Further, Dr. Cunningham testified that Brown had ADHD, a predisposition to substance abuse, and a predisposition to personality pathology and mood disorder, 47 RR 40–44, but he did not mention ASD.   Thus, while trial counsel decided not to pursue psychological testing themselves, they hired a qualified expert who could have conducted the testing or informed counsel that, upon assessing Brown, additional testing was necessary.  This was not a neglected avenue.  *See Reed v. Stephens,* 739 F.3d 753, 775 (5th Cir. 2014) (holding trial counsel not ineffective because "[t]his is not a case of counsel failing to retain an expert or retaining an expert who could not address the issues disputed at trial"); *Colburn v. Cockrell*, 37 F. App'x 90, 2002 WL 1021891, at *11 (5th Cir. 2002) ("Where a previous mental health examination appears to be very thorough, where counsel has no reason to suspect that another expert might reach a different conclusion, and where the original expert conclusion comports with counsel's own perceptions and observations of the defendant, counsel is not deficient in not seeking another expert.") (unpublished); *see also Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995) ("To now impose a duty on attorneys to acquire sufficient background material on which an expert can base reliable psychiatric conclusions, independent of any requests for information from an expert, would defeat

the whole aim of having experts participate in the investigation."). Brown's claim that counsel should have "taken the advice of their *mitigation specialist* to have Brown evaluated . . . before they chose a defense strategy," ECF 29 at 51 (emphasis added), is nonsensical in light of the fact that they had an psychological expert for that very purpose. *See also id.* at 26, 28 (claiming counsel ignored "red flags" that "should have alerted counsel that Brown needed to be evaluated by mental health, trauma, and neuropsychological experts to assist in a defense to intentional or knowing capital murder."), 56 (claiming again that counsel failed to consult an expert to evaluate Brown).

In sum, a more than sufficient investigation was conducted in this case. Brown's allegations deriding the investigation are not supported by the record. Finally, "[a] defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *Adekeye v. Davis*, 938 F.3d 678, 683 (5th Cir. 2019) (internal quotations and citation omitted). Brown alleges what an additional investigation would have revealed, although much of it mimics what Dr. Cunningham found. But he wholly fails to show that the jury, or even one juror, would have found such evidence sufficient to negate the mens rea for the aggravating element. Moreover, as shown, it likely would not have been admissible under Texas law had counsel attempted to present this testimony via an expert. And it is evident that counsel would not have pursued this strategy even if it was available given their

53

skepticism that a Hunt County jury would have found it persuasive.  Because Brown does not carry his burden, his claim fails.

>### 2.  Counsel's defensive theory at guilt-innocence was informed and reasonable based on the facts and circumstances of the case.

In the instant claim, Brown boils down the defense's guilt-innocence strategy to the following: "the bitch deserved it."  He uses this phrase approximately eight times in briefing this claim.  ECF 29 at 17, 31–32, 34, 36, 52.  Brown latches on to this phrase because trial counsel used it at the evidentiary hearing, essentially quoting what Brown said to one witness following the crime.  *See* 9 EHRR 23.  However, the remark is divorced from context, as will be discussed below.  Nonetheless, Brown is arguing that counsel's guilt-innocence theory was to "blame the victim," which is incorrect.  Ray's supposed manipulation of Brown, or "pushing his buttons," may have been a minor part of the defense's case, but trial counsel's actual theory was as follows: Brown did not kill out of retaliation, obstruction, or terroristic threat but because he feared Ray was taking away his children.

Through cross-examination of the State's witnesses and presentation of defense witnesses, the defense attempted to show that Brown murdered Ray because he feared losing his children and "snapped."  This was the defense's persistent theme.  *See* 40 RR 42 (cross-examination of 911 dispatcher Heather Doty who said she could hear a man say repeatedly, "Where are the kids?"); 40 RR 178–79 (cross-examination of Donna Ray who stated that Brown called her the night of the murder asking if she knew where his children were); 41 RR 15–16 (cross-examination of Officer White who

stated that Brown expressed a lot of anger because Ray was moving with the kids, she allowed Williams to stay with her, Ray did not break up the fight between them, and he "lost it"; Brown did not say he killed out of retaliation because Ray was going to be a witness against him); 41 RR 17–18 (Officer White reading a portion of the Channel 11 interview where Brown says he killed in "the spur of the moment" because he thought Ray was coming between him and his kids); 41 RR 18–19 (Brown indicating in Channel 11 interview that he killed out of selfishness but essentially for his kids); 41 RR 19–20 (Brown stating in interview he was suicidal because of the situation with his kids); 43 RR 12 (testimony from Taylor Harmon that Brown did not complain about Ray having him arrested but rather that Ray would not let him see his children); 43 RR 26 (Harmon stating she was aware Brown was frequently calling Ray wanting to see his kids); 43 RR 47 (Brenda Crofford testifying that Brown was heartbroken and suicidal over the situation with his children); 43 RR 70–71 (testimony from Loren Homerstead that Brown called her after the murder and said "I shot the bitch, I told her not to fuck with my kids"); 43 RR 73 (Homerstead stating that Brown expressed his concerns about not having access to children); 43 RR 75–76 (Homerstead testifying that Brown's text messages to her after the crime mentioned his kids and not the police).  And Brown testified that he murdered Ray because various factors, including fear of losing his kids and Ray's failure to respond to him, caused him to "snap."  43 RR 91, 119, 125, 129–30, 131, 135–37, 141, 155, 201–02.

During closing argument, trial counsel Wilkinson and Ferguson returned to this theme time and time again.  44 RR 34, 37-52.  For instance:

- "It's not a whodunit, it's a whydunit.  Why did he do it?  Because he was upset with her.  He was mad that she was taking the kids." 44 RR 34.

- "He had those kids every day and in his mind those kids were being ripped from him and he lost it.  He told you, I snapped."  44 RR 37–38.

- "The only evidence is he did it because she messed with his kids." 44 RR 39.

- "Why did he do it?  He didn't have to be right.  He didn't have to be correct that Stella was going to yank those kids from him and take them away forever."  44 RR 39–40.

- "Look at the transcript of his mother from her interview with Detective White.  It's in evidence.  You can read it.  His kids, his kids, his kids.  I tried to talk to him.  He wouldn't listen.  Of course not, you're hopped up on meth, you're not rational, you're not going to listen to reason."  44 RR 42.

- "Rightly or wrongly he blamed Stella for a lot; but calling the cops, being a witness against him, those weren't the reasons.  The reasons were the children."  44 RR 43.

- "He may be a murderer, but he's not lying to you.  He's telling you the truth, I killed her because I thought she was taking my kids from me."  44 RR 45.

- "He told you what he was thinking.  He told you what he was thinking six, seven times to different people consistently.  Donna Ray up here testifying, Micah said he killed her and then he said he called her because she lied to me about my kids or that his message to her was something about, I called Donna Ray, Stella's mother, because she lied to me about my kids.  It's the kids again."  44 RR 47.

- "What's the simplest solution here?  He mistakenly believed Stella was going to take his kids away from him; and in his drug-induced paranoia, anger, panic, he committed a horrible act, which he's owned

up to.  That, ladies and gentlemen, I submit to you, is the simplest solution because it is the solution.  It's the truth."  44 RR 48–49.

● "He knowingly and intentionally shot Stella Ray on July 20th, 2011; but he didn't do it because of some retaliation, terroristic threat, obstruction.  He did it because he thought she was taking his kids. Rightly or wrongly, that's why he did it."  44 RR 51.

Counsel made roughly twenty-five references to Brown's children during final argument.  The defense's theme or theory could not be more obvious—he murdered for a reason that had nothing to do with the aggravating element.  Brown's claims to the contrary are patently meritless.  *See* ECF 29 at 29 ("[Counsel] were never able to explain how Ray's murder, while tragic, did not amount to capital murder."); *id.* at 32 ("[F]rom the start, Wilkinson failed to give an alternate story to undermine the State's charges.").  Given counsel's investigation and the bad facts of the case— particularly Brown's television interview after the murder—counsel's strategy should not be second-guessed.  *Richter*, 562 U.S. at 105 ("It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'"); *Pape v. Thaler*, 645 F.3d 281, 291 (5th Cir. 2011) (in hindsight, counsel's strategy may not be second-guessed "merely because an alternative course of action existed during trial"); *Coble v. Quarterman*, 496 F.3d 430, 437 (5th Cir. 2007) (the "desire to have a specific defense theory presented does not amount to ineffective assistance").

Brown's claim that there is a reasonable probability that adding additional mental or emotional problems to the mix would have altered the verdict fails because, regardless of what was affecting his state of mind—be it drugs, paranoia, sleep deprivation, autism, neurodevelopmental problems, prior sexual abuse, emotional

dysregulation, exposure to toxic substances—that would not have changed the
defense's theme that Brown murdered Ray because he feared she was taking away
his children.  This was a point Wilkinson made at the state habeas hearing when
asked if the defense should have presented more evidence of depression or other
mental-health issues at guilt-innocence:

> [W]hether it was depression, whether it was because she retaliated, the
> fact is he did it and we had to try to save his life. . . . Once again, ma'am,
> you know, our view was whether -- whatever the actual cause was --
> might have been, the fact is he did it.  And we thought that the drug use
> could be explained better necessarily than others to a jury who
> understand drugs.

10 EHRR 179–80.  Ultimately, the defense did not persuade the jury that Brown
murdered Ray only because he feared losing his children, but that in no way means
counsel were ineffective for failing to utilize Brown's suggested strategy.  *See Haynes
v. Davis*, 733 F. App'x 766, 770 (5th Cir. 2018) (where petitioner's argument was that
counsel should have employed a better mitigation strategy, "this amounts to no more
than a claim that a different strategy could have been 'more effective,' which falls far
short of the required showing that 'but for counsel's errors, the result of the
proceeding would have been different.'") (unpublished).  Indeed, because the jury was
unconvinced about Brown's belief regarding his children, the notion that it would
have been persuaded if counsel had presented evidence regarding what neurological,
mental, or emotional disorders *might have affected* Brown's belief has no merit.  And
because counsel tried to present evidence regarding Brown's state of mind, Brown is
now complaining about counsel's failure to present cumulative evidence, which is

inadequate to demonstrate ineffective assistance.  *Norman v. Stephens*, 817 F.3d 226, 233 (5th Cir. 2016); *Trottie v. Stephens*, 720 F.3d 231, 244–47 (5th Cir. 2013).

Further, Brown's claim that trial counsel utilized a "blame the victim" or "the bitch deserved it" strategy is also refuted by counsel's final argument.  Three times during final argument counsel stated specifically that Ray did not deserve what Brown did to her.  44 RR 39 ("We're talking about a bright young woman who was trying to improve her life and she was killed.  No one deserves that.  We're not asking you to say Ray deserved to die.  She didn't deserve to die."); 44 RR 40 ("That's what this is all about, Micah's perception.  It was a wrong perception.  Ray didn't deserve what happened to her."); 44 RR 46 ("Stella didn't deserve to die.  Mr. Brown, in his, as he admitted, warped perceptions, took her life; and he told you, I didn't have the right to do that and I did it because I thought she was taking my kids.").  Even if trial counsel thought initially that blame-shifting might be incorporated into their strategy, they obviously shied away from that tactic as the trial proceeded.

Brown's argument is premised on statements counsel made at the habeas hearing taken out of context.  Wilkinson explained the defense's theory of the crime was that Ray was manipulating Brown by continuing her relationship with her first ex-husband, and Brown, who was also on drugs on the time, snapped and murdered her. 9 EHRR 22–23.  Specifically:

> It was like, 'the bitch deserved it,' and that's not what we said, but that was kind of what it was, that she pushed Micah's buttons; he was on drugs, she got him on drugs -- or at least got him using meth; was having sex with him and the ex-husband, was leading him on, and that he just (indicates motion with fingers). . . . I don't know if he snapped but he chased her and - - and it happened.

59

9 EHRR 23[15]; *see also* 9 EHRR 138; 43 RR 32 (Taylor Harmon's testimony that Ray "pushed Brown's buttons"). Wilkinson said the defense wanted to show that Brown exploded from a combination of factors and the murder was not necessarily done in retaliation, as asserted by the State. 10 EHRR 170–71. In her testimony, Ferguson referred to Ray as "pushing" Brown's "buttons" but in the context of mitigation. In other words, if the person "pushing his buttons" was no longer in the picture, he would not be a future danger. 10 EHRR 262–63, 267. But Ferguson cautioned that presenting evidence of autism might only undermine the strategy of arguing Brown would not be a danger once away from deleterious influences. Specifically:

> Again, if you have a brain disorder, a mental disorder, which autism spectrum disorder is, then that undoes all of the argument about take all the rest of that away, take the drugs and the evil woman pushing his buttons away, and you're left with, well, but he still has that brain dysfunction and that's going to follow him into the jail, so he could still be a risk.

10 EHRR 267.

These are the only instances in the state habeas record where counsel claimed a portion of the strategy was to highlight Ray's negative influence on Brown. But the larger context was that this was part of a combination of factors that led him to "snap" and murder Ray, not that she "deserved it." Regardless, counsel's statements about their recollections of trial strategy are far outweighed by the trial record in terms of what actually transpired. And the strategy employed at trial was clear and

---

[15]     Wilkinson's recollection here may not be entirely accurate because during the argument at punishment, Ferguson specifically told the jury that the defense never stated that Ray got Brown hooked on drugs, including methamphetamine. 48 RR 48.

reasonable under the circumstances.  Brown's description of counsel's trial strategy, apart from being crude and simplistic, is wholly refuted by the record.

### d.    Brown's additional arguments are meritless.

In his petition, Brown levels a host of complaints about trial counsel's performance.  Many of these were addressed above.  But his additional arguments regarding counsel's ineffectiveness are incorrect, based on distortions of the record, or meritless

For instance, Brown claims that "rather than undertaking an investigation to inform strategic decisions about a defense, counsel chose a theory of the crime for which they could not offer evidence or testimony."  ECF 29 at 17.  This is incorrect, as shown above.  Also, during the habeas hearing, Ferguson was asked about how the defense tried to show this was not a case of retaliation;  she said:

> The -- there were some phone messages that Micah had left to Stella's mother.  There were some text messages that he had sent to neighbors.  There was a series of text messages for Micah and phone messages during that day.  We established that Micah had not been aware that Stella had called the police about the -- whether or not he poked her or flicked her or whatever that episode was, that he was totally unaware she had contacted law enforcement, that she wasn't a necessary witness.  It couldn't be retaliation for the -- when the officers found he had the sawed off shotgun when they made the welfare check because she's not a necessary witness against him in that case.  Stella's 911 call to the officers.  I think I even said in closing argument that although she didn't know she was getting ready to die, Stella is telling you why she died, because she said, Micah is yelling, Where are the kids, where are the kids.

12 EHRR 62–63.  Although unsuccessful, the theory was valid, and Brown fails to demonstrate ineffective assistance.  *Pondexter v. Quarterman*, 537 F.3d 511, 521 (5th

Cir. 2008) (counsel's tactical decisions do not fall below *Strickland* standards simply because they do not succeed as planned) (citations omitted).

Brown also claims: "Contrary to professional norms, Brown rarely ever saw his lead attorney before jury selection for his trial began.  Wilkinson admitted that he did not meet with Brown until two months after his appointment.  He then waited another eight months after his first jail visit to visit Brown a second time."  ECF 29 at 19 (citing 9 EHRR 46, 50).  This is incorrect.  At the hearing, Wilkinson said that he did not know if the first time he met with Brown was two months after he was appointed.  9 EHRR 46.  Brown then accused Wilkinson of waiting three more months, *not eight*, before visiting him again.  9 EHRR 48.  Wilkinson responded that, based on jail procedures, it was possible he visited Brown but was not logged in, that Smith or Ferguson met with Brown, or that he met with Brown in open court. 9 EHRR 48–49.  Wilkinson explained that under the jail's visiting procedures, only the first person on the defense team to show up is logged in the record; thus, Wilkinson could have met with Brown but his name would not appear in the register. 9 EHRR 52–53.  Brown's mischaracterizations repeatedly led the trial court to sustain the State's objections to the questioning.  9 EHRR 49–50.  Nevertheless, based on the evidence discussed previously, Wilkinson and Ferguson both met and discussed the case frequently with Brown, particularly during jury selection and in preparation for his testimony.

Brown alleges that Wilkinson did not understand what a mitigation investigator did, citing an e-mail he sent to Texas Defender Services (TDS). ECF 29 at 20. He states:

> Despite not knowing what a mitigation specialist did, Wilkinson believed he had sufficiently trained Smith to do the work that Wilkinson did not fundamentally understand. As Wilkinson resisted conducting a proper mitigation investigation, Ferguson was forced to enlist the assistance of the Texas Defender Service [TDS] to convince Wilkinson to hire a mitigation specialist. Due to this disagreement and Wilkinson's ignorance, it was 8 months after Wilkinson's appointment that Ferguson finally contacted Maureen Griffin, a mitigation specialist with over sixteen years of experience, in July 2012.

*Id.* (citations omitted). This was a topic of some contention at the hearing, but it does not demonstrate ineffectiveness. Wilkinson said Smith "was tasked as an investigator to locate all possible witnesses, whether it be guilt/innocence, mitigation and whatever else an investigator does, including getting records and things such as that." 9 EHRR 36. He trained Smith to investigate criminal cases, not necessarily to do mitigation work. *Id.* Ferguson had a different perspective stating that Wilkinson told her they did not need a mitigation specialist because Smith would do the work and Wilkinson trained Smith. 10 EHRR 251–52; 11 EHRR 12–14. Wilkinson and Ferguson were at odds over whether a mitigation specialist was needed, with Ferguson insisting that it was. 9 EHRR 39; 10 EHRR 251–52; 11 EHRR 12–14. After Ferguson got TDS involved in the conversation, Wilkinson relented and Maureen Griffin was hired as the mitigation specialist. 11 EHRR 15; 12 EHRR 37–38, 46. A few months after her appointment, Griffin sent the defense a resignation e-mail citing problems communicating with Wilkinson and Smith and not getting the

defense team together for a meeting.   11 EHRR 17–18, 24; 12 EHRR 151–52.
Wilkinson believed that Griffin was frustrated because witnesses would not talk to
her, and Ferguson agreed that some witnesses would only talk to Smith and not
Griffin.   9 EHRR 35–36; 12 EHRR 52–54.   Regardless, Wilkinson and Ferguson
convinced Griffin to stay on the case as the mitigation specialist, and Wilkinson met
with Griffin to clear up any misunderstanding.   9 EHRR 119–21; 11 EHRR 26.   And
although Griffin continued to complain about communication problems, 10 EHRR
255; 11 EHRR 39; 12 EHRR 151, 188, Griffin received discovery based on the work
previously done and continued her work on the case, including interviewing Brown
on several occasions, interviewing family members, constructing a lengthy family
history that detailed all aspects of Brown's life, and doing additional work that was
provided to the experts.   11 EHRR 48–49, 12 EHRR 15, 18–20, 55, 152–53, 178, 206–
09; 8 SHCR 3278–311.   Given this resolution and the record as a whole, Brown cannot
demonstrate that this issue within the defense team resulted in ineffectiveness.

Of note, during the hearing, Griffin conceded to having an in-person meeting
with Wilkinson, Smith, and Dr. Cunningham, and during the meeting she did not
take the opportunity to clarify issues regarding her role in the case and
communication problems.   12 EHRR 203–05.   She stated: "I really don't know what
was going through my head at that time. . . . So it was on me.   I wasn't that assertive."
12 EHRR 204–05; *see also* ECF 29 at 21 (claiming "Griffin was systematically
excluded from the ongoing fact investigations and team decisions").   As for the e-mail
Wilkinson sent to TDS, this did not demonstrate any ignorance about mitigation

investigators.  He explained that he knew what a mitigation specialist was and that he sent the e-mail to get a different opinion about questions he presented regarding mitigation specialist qualifications.  9 EHRR 37–39.  He stated: "I ask questions a lot of times when I know the answer, so I was wanting a different opinion as to those questions."  9 EHRR 39–40.  At any rate, none of this demonstrates ineffectiveness because, in the end, a mitigation specialist was actually hired and used.

Next, Brown claims that counsel, specifically Ferguson, ignored Griffin's belief that Brown might have Asperger's Syndrome.  ECF 29 at 21, 24.  The problem is, as shown previously, neither Wilkinson nor Ferguson recalled Griffin ever telling them she suspected Brown had this disorder.  9 EHRR 68; 12 EHRR 231, 235–36; *see also* 10 EHRR 35 (Wilkinson stating: "If [Griffin] had said, I think Mr. Brown has this and we need to test him for this, I would have said, Let's get him tested.  That's just the way I operate.").  Griffin mentioned that she "recalled" relaying her belief to Ferguson only once in a phone call they had about plea negotiations, 12 EHRR 198, 212, and then she downplayed her role in being responsible for alerting the defense about this issue or other mental impairments, stating that she does that "infrequently." 12 EHRR 199.  She then admitted that she sent an e-mail to Ferguson where she noted Brown might have PTSD but mentioned nothing about autism.  12 EHRR 199– 200.  She also did not document the ASD issue anywhere else, for instance, in an e- mail.  12 EHRR 212.  Given that neither attorney recalled this issue, particularly Ferguson's emphatic denial, and Griffin's suspect assertion, a reasonable conclusion

is that Griffin in fact never told counsel. At any rate, for the reasons addressed above, Brown fails to explain how evidence of ASD negates mens rea.

Brown also complains about investigator James Smith's role in the case, stating that Smith "failed to do even the bare minimum expected of a fact investigator," lacked adequate training, produced insufficient notes about Brown's background, and conducted interviews of witnesses and memos that "were negligent at best, and harmful at worst." ECF 29 at 21–22. Wilkinson hired Smith to interview witnesses because he had worked with him on other cases and trusted him. 9 EHRR 27–28, 36; 10 EHRR 153–54. Smith was particularly helpful because some witnesses would only talk to him. 10 EHRR 154–55, 173. Not only did Wilkinson read Smith's reports, sometimes he was with Smith when he read them. 10 EHRR 48. He agreed that most of Smith's reports were short, but Wilkinson said that was because the people Smith interviewed said Brown had no difficulties. 10 EHRR 50, 53. Wilkinson explained that Smith's purpose was to gather information to provide to the experts, particularly Dr. Cunningham. 10 EHRR 159; *see also* 9 EHRR 95–97, 144. Ferguson said Smith created a list of witnesses for Brown's case. 12 EHRR 48. She also worked with Smith in getting documents, school records, and mental health records, 12 EHRR 49–50, and it was never communicated to her that his role in contacting witnesses was detrimental to the case. 12 EHRR 50–51. Griffin did testify that she was never provided any reports of interviews Smith had conducted and that Smith said he never writes reports. 12 EHRR 145. She also stated that she had trouble contacting Smith, which she expressed to Ferguson. 12 EHRR 149–50. However, she

66

eventually did receive the discovery she requested. 12 EHRR 152–53. She also agreed that Smith had work to do in the case she was not hired to do. 12 EHRR 210–22. But ultimately, Brown fails to demonstrate ineffectiveness because the defense interviewed eighty-two people, information was provided to Drs. Lundberg-Love and Cunningham, and Dr. Cunningham testified for nearly a full day about all aspects of Brown's background. In other words, whether or not Smith was qualified, the work was accomplished. Brown's claim that Smith's work was harmful or negligent is baseless. *See also* ECF 29 at 25 ("Thus, by the time Brown's trial began, Wilkinson had uncovered none of the information that would have helped him present a supportable defense to capital murder, nor was he prepared for a comprehensive mitigation presentation.").

Brown also argues that counsel ignored the true "whydunit" in the case. He states:

> Had the jury understood that Brown was acting out personal fears and angers *due to his neurological and traumatic state*, they would have understood that the murder was not committed with any thought about police involvement, or even a knowing or intentional act. *Rather, this was the desperate act of a man who had suffered from lifelong trauma, neurodevelopemental disorders, mental illness, and severe emotional dysregulation at the time of the crime.*

*Id.* at 44 (emphasis added); *see also id.* at 41. But this strategy would have been disastrous because the defense would have been conceding that Brown has disorders that caused him to commit murder. This tactic would have also destroyed the defense's punishment case because it would have proven, as Ferguson feared, that Brown is damaged and cannot be fixed. That is certainly how the State would have

67

portrayed the evidence, which Brown ignores.  Counsel's decision to avoid attaching mental disorders to Brown's reason for killing Ray was reasonable.  *Druery v. Thaler*, 647 F.3d 535, 541–42 (5th Cir. 2011) ("[A]s the State argued, 'expert testimony suggesting that [petitioner's] condition was permanent would have eviscerated counsel's defensive theory.'").

Brown further claims that counsel's decision to call him to testify was essentially a mistake and may have been the defense's "undoing."  Specifically:

> His testimony was that he still blamed Ray for getting killed, he failed to support a "bitch-deserved-it" defense by offering any evidence of why, exactly, Ray deserved it, or even why he perceived she had "pushed [him] to a limit," and failed to effectively undermine the State's charges that he killed Ray in the course of retaliation or obstruction.

ECF 29 at 36.  Then, without any evidence or a record citation, Brown states: "Notably, Brown did not request to testify, and would have chosen not to do so. However, trial counsel told Brown that he needed to testify, as whether he was sentenced to death or not rested on his shoulders."  *Id.* at 37.  Brown also complains that he was "ill-prepared" to testify and had "barely spoken to counsel before jury selection."  *Id.*  But Wilkinson testified that it was Brown's choice whether or not he would testify.  10 EHRR 176–77.  Wilkinson agreed with Brown's decision because he thought that Brown was a nice person who was calm at the time, unlike "the crazed individual on that video.  And what we were trying to show was he was a totally different person."  10 EHRR 177; *see also* 9 EHRR 116 (Wilkinson stating that Brown "looked like a crazy person on that video that he gave to Channel 11.  And we knew the Jury was going to see that.").  Wilkinson also stated that "the decision was to

68

show that jury that [Brown] was not what the State was trying to portray him as. . . . I personally thought he came off great."  10 EHRR 177.  Ferguson said the defense was "concerned about trying to prep [Brown] and counteract the horrible interview that he gave on Channel 11" and that she spent a lot of time helping him phrase his sentiments in a way that would portray him in a better light.  12 EHRR 29; *see also* 11 EHRR 66 (Ferguson stating that the TV interview showed Brown sleep-deprived and on drugs, not the "normal Micah").  She agreed that Brown's testimony was a pivotal part of the defense's trial strategy, asserting: "I thought we had sufficient circumstantial evidence to establish this was not done as a retaliation, that this was done because [Ray] was jacking with his kids.  And we believed that the jury needed to hear that -- out of Micah's mouth."  12 EHRR 29.  She also confirmed that testifying was his decision, and if he wanted to testify and she did not think it was a good decision, she would have got that on record.  12 EHRR 29–30.

The Fifth Circuit has "examined counsel's decision on whether a defendant will testify as part of counsel's trial strategy."  *United States v. Mullins*, 315 F.3d 449, 453 (5th Cir. 2002).  As such, "we keep in mind that 'the decision whether to put a Defendant on the stand is a 'judgment call' which should not easily be condemned with the benefit of hindsight.'"  *Id.* (quoting *Robison*, 151 F.3d at 261 & *United States v. Garcia*, 762 F.2d 1222, 1226 (5th Cir. 1985)).  Because counsel knew the television interview was going to be played for the jury and that it was incredibly damaging, calling Brown to the stand to at least give the jury a different viewpoint of his behavior was reasonable under the circumstances.  Whether Brown helped or hurt

69

his cause is beside the point; at the time, it made sense as a matter of strategy. And because Brown himself chose to testify, contrary to his claim, counsel could not have overridden his decision given his constitutional right to testify. *Id.* at 453–54; *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Brown's claim that the decision was made "without adequate investigation and based on a strategy unsupported by fact," ECF 29 at 37, is refuted by the record. And, again, his attempt to tie his testimony and actions to complex, tenuous mental disorders to negate the aggravating element, *id.* at 39–40, is conclusory at best and ultimately refuted by the record.

Brown also complains that the trial court excluded evidence about Wilkinson's past history at the state habeas hearing that would have "provide[d] a lens through which to view his actual deficient performance in Brown's case." ECF 29 at 46–47. However, infirmities in state habeas proceedings do not present legitimate grounds for relief on federal habeas review. *See* Section X, *infra*. Further, the state habeas court's refusal to consider the opinions from other attorneys regarding whether Wilkinson was ineffective was appropriate. *Johnson v. Quarterman*, 306 F. App'x 116, 128–29 (5th Cir. 2009) (holding that expert testimony advising the court how to address a *Strickland* claim invades the court's province as trier of the law) (unpublished). Likewise, Wilkinson's performance in other cases is irrelevant to the instant claim of ineffectiveness. *Anderson v. Collins*, 18 F.3d 1208, 1215 (5th Cir. 1994) ("Anderson cannot establish that the representation he received was constitutionally inadequate merely from evidence about [counsel's] reputation or conduct in other cases.").

Next, Brown takes certain statements trial counsel made at the hearing out of context.   For example, he states: "Wilkinson claimed he had abdicated all responsibility, and named Brown as solely responsible for the fundamentally flawed legal decisions regarding his case."  ECF 29 at 52.  But in a portion of testimony Brown quotes, *id.*, Wilkinson said he believes the client is ultimately responsible for strategic decisions because he has had clients demand he pursue a course of strategy and "I argued against it but did what they said."  9 EHRR 17.  Then, Brown's habeas counsel asked Wilkinson if he was abdicating his role to the client, and Wilkinson said, "Not abdicated it."  *Id.*  When Wilkinson asked Brown's counsel if she wanted an example, Brown's counsel said, "Not particularly," thus demonstrating that Brown had no interest in clarifying the matter.  *Id.*  Wilkinson then testified that he and Ferguson made the strategic decision regarding which experts to hire.  9 EHRR 17–18.  Brown also asserts:

> [W]hen Wilkinson was asked if he would have wanted to know about traits Brown had that would have made him more susceptible to manipulation, he responded that he didn't know what "traits" were, and then refused to answer the question. His second chair, Katherine Ferguson, when asked if it would have been helpful to know if Brown has a neurodevelopmental disorder that made him susceptible to manipulation, did not hedge in her answer: "Oh, absolutely."

ECF 29 at 53.  Brown's statement about Wilkinson lacks context.  Wilkinson sought to clarify what Brown's habeas counsel meant by "traits," and upon receiving that clarification, he said he did want to know that information.  Then he stated four times that the defense asked witnesses about characteristics pertaining to Brown.  9 EHRR 24–25. Regarding Ferguson, again Brown disregards context.   She said "Oh,

71

absolutely" when asked if it would have been useful to know if Brown had a disorder that made him vulnerable to manipulation.  11 EHRR 64.  What Brown ignores are Ferguson's multiple statements, discussed previously, that she would have been reluctant to present that evidence given its double-edged nature.  10 EHRR 266–68.

Lastly, Brown claims that "Wilkinson failed to incorporate and utilize a mitigation specialist for all aspects of this case.  And as a result, Cunningham never received the assistance of a mitigation specialist."  ECF 29 at 54–55.  This claim disregards the evidence shown above, namely that Griffin was hired; she met with Cunningham and Wilkinson; she did not speak up at the meeting regarding any problems she was having; she nevertheless continued to work on the case, as shown by her own records, even though she claimed otherwise; and Ferguson "Federal Expressed a box of photographs and things that [Griffin] had put together" to Dr. Cunningham.  11 EHRR 48.  Further, Brown fails to show how this amounts to ineffective assistance considering that Dr. Cunningham conducted his own extensive investigation, *see* Section I.B.1.c.1, *supra*, and Ferguson "was actively talking [ ] to [Dr. Cunningham] in his office to make sure that he was getting documents that he needed."  12 EHRR 55.

## 2.    Brown fails to demonstrate prejudice.

Brown has not shown how his new evidence would have negated the mens rea for the aggravating element.  Absent that, he clearly cannot demonstrate prejudice. And in his prejudice section, he merely reiterates the arguments addressed above. *See* ECF 29 at 58–61.  But for additional reasons he cannot establish prejudice.

First, Brown's television interview did not aid his cause, when he stated:

> The other -- the other problem, I want to say was I wanted to go hunting and [Ray] called the police on me saying I was suicidal.  And they came in the house and they found a sawed off shotgun.  So that's a felony.  So I can't -- I wasn't able to go hunting anymore.  Anyways, I can't be around my kids.  I can't do -- I mean, the two things -- the reason I was stripped away from me and –

41 RR 19–20.  From this, the jury could have surmised that Brown was unhappy with Ray about the arrest, which supports the theory that he murdered out of retaliation.

Second, there was evidence presented indicating that Brown did not know of the pending assault charges, 41 RR 30–31, and he testified that neither Ray nor the police notified him of the charges.  43 RR 113.  On the other hand, the State showed that Brown took the camera from Ray's house that contained pictures of injuries to her and Colten.  43 RR 122, 175–78.  Brown claimed that taking the camera was a coincidence because it was in the same basket as the marijuana.  However, on cross-examination, he also admitted that he knew he had done something to Ray on July 19th, that the marks on her face matched up with how Brown claimed he "poked" her, and that he knew Ray was "pretty mad" about the incident.  43 RR 175–78.  He also admitted to Channel 11 that he "poked" Ray.  SX 388H at 23–24.  Because Brown took the evidence documenting his crime and knew he had hurt Ray and Colten, the jury was free to consider the murder an act of retaliation.

Third, the State presented evidence that Brown knew Ray was on the phone with police at the time of the murder.  Brown told Officer White that he jumped in his truck and tried to stop Ray and chase her down.  Ray would not stop, and he could tell she was with the police on the phone.  40 RR 200–01.  Ray also reported that

Brown was trying to run her off the road.  40 RR 205.  Howard Roberson said that he

thought the scene involved a car accident or a hit-and-run because Ray's car appeared

to be rammed off the road.  40 RR 104–05.  The 911 dispatcher testified that Ray said,

"He has me cornered in."  40 RR 41.  And Brown told the police:

> I finally got her to pull over and was like, Doc, just roll your window
> down. I just want to know where the kids are, just roll your window
> down, please.  And she -- she didn't do it.  And I saw the police lights
> pulling up behind me, so I just -- I shot her.

40 RR 205.  He also told Channel 11 that when he was chasing Ray, he saw she was

on the phone and "I figured it was with the police."  40 RR 216.  Further, in his letter

to Casper, Brown wrote:

> She drove past my house.  I chased her down and made her pull over.
> She wouldn't look at me and she was on the phone.  *I knew it was the
> cops* and for some reason when I saw the red and blues behind me I put
> the shotgun out the window and blew her head off.  Clean off.

40 RR 224 (emphasis added).  Moreover, Brown testified that he felt hurt and angry

because Ray had her phone and it was working.  43 RR 133.  A reasonable inference

from this evidence is that not only did Brown know Ray was talking to the police, she

was successful in reporting the crime, and he retaliated as a result.

Fourth, regarding the terroristic threat component, Brown told Officer White

and Officer Fuller that his intention was to commit "suicide by cop."  40 RR 202;

42 RR 41.  He also admitted that he told his family the same.  43 RR 180.  And in a

text message to Homerstead, he said: "It's true I did it, I'm not dead yet, going to go,

DPS all over me."  43 RR 71.  Further, as shown above, the State presented evidence

that Brown was fully armed with a shotgun, knives, ammunition, and a vest to hold those objects when he murdered Ray.

Fifth, there is evidence that Brown retaliated because, after Ray called the police and they took Brown's shotgun, he was unable to get "revenge" on Tracy Williams for the fight that occurred the previous day, which the State highlighted in its final argument.  44 RR 56–57, 64, 67.  There was no question that Brown was angry and humiliated by the fight with Williams and that he was upset Ray did not stop the fight.  Brown testified that he sawed off the confiscated shotgun because he was angry with Williams and intended to kill him.  43 RR 102, 193.  Indeed, he said he had been exchanging threats with Williams since the altercation.  43 RR 142. Given that Ray's intervention precluded Brown from carrying out his plan to kill Williams, the jury also could have considered the murder to be a form of retaliation.

Lastly, Brown highlights what he perceives were weaknesses in the State's case.  Regarding the claim that Brown retaliated against Ray for filing the police report, Brown states: "This was undermined by the evidence. Brown was unaware of the filing of the report, and police admitted they had not yet taken action on it." ECF 29 at 30 (citing 41 RR 30 (cross-examination of Officer White)).   Regarding Brown's retaliation against Ray for calling the police about Brown's threats to commit suicide, resulting in Brown losing his shotgun, Brown asserts: "[T]he State was unable to provide evidence that Brown harbored any resentment over the call; he told the officer who arrested him that he was responsible for the welfare check, as he had only reported to Ray he was suicidal to make her feel guilty."  *Id.* (citing 43 RR 45–

75

46 (direct examination of defense witness Brenda Crofford) & 43 RR 179 (cross-examination of Brown)).  Regarding the issue of "obstruction," Brown states that "the support for this theory was merely the sequence of events" in that "Brown stated that he knew Stella was on the phone with police, and he shot her after the police car arrived."  ECF 29 at 30–31.  He then asserts: "The only evidence, from Brown's statement to the investigator, was actually clearly contrary: '[it] was just spur of the moment . . . I just got so mad that I did it.'"  *Id.* at 30 (quoting 41 RR 18 (cross-examination of Officer White)); *see also* 41 RR 16 (Officer White stating on cross-examination that Brown never told her he retaliated against Ray because she was going to be a witness against him).  Regarding the issue of "terroristic threat" or committing "suicide by cop," Brown claims this was "not supported by anything at trial."  ECF 29 at 31.  He states: "The evidence showed that Brown shot Ray and then fled the police [ ] doing everything possible to avoid police attention [ ] before he peaceably surrendered.  *Id.* (citing 40 RR 81 (cross-examination of Officer Hughes), 104 (direct examination of Howard Roberson); 41 RR 140–41 (direct examination of Efrain Girardot), 186 (direct examination of Officer Sandlin)).  Brown then points to the fact that he testified on cross-examination that he "wouldn't have took off if [he] wanted the cops to shoot [him]."  *Id.* (citing 43 RR 179–80).

Thus, Brown's argument that the evidence regarding the aggravating element was weak is premised heavily on testimony elicited by his counsel on cross-examination, the presentation of his own witnesses, and his testimony.  Implicitly, Brown is acknowledging that his counsel performed effectively.  And as shown in

Section I.B.1.c.2., *supra*, through cross-examination of the State's witnesses and presentation of defense witnesses, the defense attempted to show that Brown murdered Ray because he feared losing his children.

In sum, Brown has offered no evidence showing that he was prejudiced by counsel's failure to attempt to negate mens rea by presenting evidence of mental and emotional impairments.  Because Brown has failed to present a claim with some merit or show that state habeas counsel was ineffective for failing to raise this claim, he cannot meet the *Martinez*/*Trevino* equitable exception to his procedural default. Therefore, this Court should deny the instant claim.

### C.   Brown's claim of cumulative error is meritless.

Brown argues: "While each instance of deficient performance described above is prejudicial on its own, counsel's guilt-phase errors were decidedly prejudicial when considered cumulatively."  ECF 29 at 61.  This claim is defaulted and meritless.  First, Brown never raised a cumulative-error claim on direct appeal or state habeas review. *See* Appellant's Brief on Direct Appeal; 1 SHCR 47–143.  Therefore, the claim is unexhausted and procedurally barred.  *Coleman*, 501 U.S. at 735 n.1; *Beatty*, 759 F.3d at 465; *Nobles*, 127 F.3d at 420, 422.  Second, the Fifth Circuit has repeatedly held that individual errors not of constitutional dimension cannot be cumulated to form an error worthy of relief.  *United States v. Thomas*, 724 F.3d 632, 648 (5th Cir. 2013) ("there is no precedent supporting the idea that a series of 'errors' that fail to meet the standard of objectively unreasonable can somehow cumulate to meet the high burden set forth in *Strickland*"); *Coble*, 496 F.3d at 440; *Turner v. Quarterman*,

481 F.3d 292, 301 (5th Cir. 2007) ("[W]here individual allegations of error are not of constitutional stature or are not errors, there is 'nothing to cumulate.'") (quoting *Yohey v. Collins*, 985 F.2d 222, 229 (5th Cir. 1993)). As shown, none of Brown's claims about trial counsel's performance at guilt-innocence have merit; thus cumulation would afford him no relief. The Fifth Circuit has also recognized that the Supreme Court has never accepted cumulative error as a valid constitutional claim. *Hill v. Davis*, 781 F. App'x 277, 280–81 (5th Cir. 2019) (unpublished). As such, this claim is barred under the non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288, 310 (1989) ("[N]ew constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced.").

Brown claims "this circuit applies a cumulative *Strickland* prejudice analysis when confronted with a case in which there were multiple instances of deficient performance by counsel." ECF 29 at 61. But the primary case he refers to is *White v. Thaler* where the Fifth Circuit held that defense counsel's questioning of petitioner at trial about his post-arrest silence was deficient performance, defense counsel's failure to object with respect to evidence that the murder victim was pregnant at time of her death was also deficient performance, and the combined prejudicial effect of these errors demonstrated that the state court's rejection of White's IATC claims was objectively unreasonable. 610 F.3d 890, 912 (5th Cir. 2010); *see also* ECF 29 at 61 (citing *Dodson v. Stephens*, 611 F. App'x 168, 179 (5th Cir. 2015)). Here, there are not multiple instances of deficient performance by counsel, and the claim that counsel were ineffective for failing to present evidence of mental and emotional impairments

78

to negate mens rea is meritless.  Thus, *White* does not apply.  Moreover, in *Hill*, the

Fifth Circuit addressed *White* and stated:

> Although Hill is correct that we have employed a cumulative framework
> at times to assess ineffective assistance of counsel claims, there is no
> hard and fast rule governing its use, even as a matter of circuit
> precedent.  On multiple occasions, this court has either declined to apply
> a cumulative prejudice analysis or questioned its relevance altogether.
> *See, e.g., Pondexter* [ ], 537 F.3d [at] 525 (holding that "[m]eritless claims
> or claims that are not prejudicial cannot be cumulated, regardless of the
> total number raised") [ ]; *see also Allen v. Vannoy*, 659 F. App'x 792, 818
> (5th Cir. 2016) (per curiam); *Zimmerman v. Cockrell*, 69 F. App'x 658,
> 2003 WL 21356018, at *12 (5th Cir. 2003) (per curiam).

781 F. App'x at 281 n.2.  Given the multiple occasions the Fifth Circuit has rejected

a cumulative error analysis, and that the Supreme Court has never recognized it, this

Court should likewise reject it.

## II.  Trial Counsel Were Not Ineffective at Punishment.

Brown alleges that trial counsel were ineffective for failing to investigate and

present mitigating evidence at punishment, including the evidence discussed in the

claim above.  Brown states his claim as follows:

> Given: 1. Micah's genetic predispositions for mental illness and
> addiction; 2. his congenital neurodevelopment disorders, ASD and
> ADHD, that schools at the time failed to recognize, diagnose, and
> provide support for; and 3. the real chaos and trauma he survived in his
> own home which included neglect, sexual abuse, inappropriate sexual
> and emotional boundaries within his close family, personally witnessing
> consistent physical and emotional abuse, communication difficulties
> because of his ASD, and a lack of parental and structural support,
> Micah's trial counsel could have presented a cohesive, detailed,
> sympathetic narrative of his background and history that could have
> swayed one juror to vote for life in prison.

ECF 29 at 68.  He further states that "[i]t is a testament to the incompetence of trial

counsel that they chose to present a single mitigating symptom to the jury—and the

symptom most seen as a 'choice' by jurors: drug addiction," instead of investigating and presenting "the vast evidence of underlying mitigating factors that Micah was saddled with at birth and in childhood that caused that symptom." *Id.* at 65.

Brown's claim is patently meritless. As stated, counsel presented fourteen punishment phase witnesses, including family, friends, a counselor, law enforcement officers and two experts. And, save for ASD, basically everything he claims was not presented was in fact presented through Dr. Cunningham's testimony, which lasted nearly one full day and covered a full range of issues. Ultimately, Brown concedes this fact after trying to argue at length that counsel had only one punishment theme that was focused on drug use. *Id.* at 89 ("Counsel was on notice of the vast mitigation evidence they could have pursued, *as their own expert listed them for the jury*.") (emphasis added); *id.* at 99 ("Morris Beene stated that Brown was no longer depressed, anxious, or addicted [ ] *whereas Cunningham's testimony was that Brown was struggling with lifelong adverse effects of childhood trauma and abuse*.") (emphasis added) (citation omitted); *id.* at 101–02 (claiming the State mischaracterized Brown's upbringing and stating "*Cunningham identified numerous aspects of family dysfunction in Brown's childhood home*," followed by two passages from Dr. Cunningham's testimony) (emphasis added). At the very least, because Brown raised this claim on state habeas review, 1 SHCR 47–78, and the state court rejected it, 10 SHCR 5727–32, Brown cannot demonstrate that the state court's denial of his claim is objectively unreasonable.[16]

---

[16]   Brown has attached to his petition two reports from psychologists, Matthew Mendel and John Matthew Fabian. ECF 29-2 & 29-3. These psychologists address Brown's

## A.    State court findings

On state habeas review, the trial court entered the following findings of fact regarding this claim:

● In his first claim for relief, [Brown] contends that trial counsel was ineffective for failing to investigate and present mitigating evidence at the punishment phase of trial concerning his background and the fact that he suffers from ASD.  Application at 26–52.

● The trial court finds, based on the record, that despite the alleged difficulties in communication and Griffin's testimony that she felt ineffective, counsel conducted a reasonable investigation into possible mitigation for [Brown's] trial on punishment.  In addition to counsel, the defense team included a fact-investigator, a mitigation specialist, and two forensic psychologists—one of whom testified concerning future dangerousness and the other of whom testified regarding mitigation. The Court finds that there was significant overlap in the guilt-innocence and mitigation investigation; and that the defense team interviewed more than eighty friends and family of [Brown] to ascertain information relevant to both the guilt-innocence and punishment phases of trial. *See* State's Hearing Exhibit 24; 45.  9 EHRR 24–25, 118, 144.

● The Court finds, based on the record, that Griffin's assertion that she told Ferguson she thought [Brown] suffered from Asperger's Syndrome is not credible.

● The Court finds, based on the record, that trial counsel's strategy on punishment—to convince the jury that [Brown], when removed from the threat to take his children and the influence of drugs, would not be violent—was a reasonable, trial strategy.  *See Strickland* [ ], 466 U.S. 668 [ ].

---

purported mental and emotional problems. *Id.*  It does not appear that Brown directly cites to these reports in raising the instant claim, but he likely incorporates them.  To the extent he does, these reports are barred under *Pinholster* because the instant claim was adjudicated on the merits, and Brown did not present them to the state court.  In *Pinholster*, the Supreme Court held that "review under § 2254(d)(1) is *limited to the record that was before the state court* that adjudicated the claim on the merits."  563 U.S. at 181 (emphasis added).  Thus, "evidence introduced in federal court has no bearing on § 2254(d)(1) review.  If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court."  *Id.* at 185. Moreover, neither psychologist indicates that he was willing and available to testify at trial, which precludes a finding of ineffectiveness based on their reports.  *See* Section III, *infra*.

- Several lay witnesses testified that [Brown] has positive character traits, was remorseful and had changed for the better while in jail, was a model prisoner, and had committed no acts of violence while in jail. 45 RR 48–49, 55–61, 66–69; 46 RR 6–17, 33–37, 49–53, 58–65, 69–73, 75–79, 88–94, 97–104, 111–14.

- Dr. Lundberg-Love testified about the effects of drugs on brain chemistry, stating that [Brown] was abusing methamphetamine, which can cause a paranoid-like state and rendered [Brown] more impulsive and less likely to consider the consequences of his actions. She testified that with drugs removed from the picture, [Brown's] brain can "heal" and there will be a low probability that he would commit future acts of violence. 46 RR 119–72.

- The second expert Dr. Cunningham testified regarding mitigation, addressing [Brown's] background, genetic predisposition, neurodevelopmental problems, family dysfunction, sexual abuse, corruptive community factors, and drug abuse. He explained that [Brown's] actions started with a shaky foundation, and when all the other negative elements were thrown into the mix, his life spiraled out of control, culminating in the murder. Dr. Cunningham also explained why he believed [Brown] would pose a very low risk to commit acts of violence in prison; specifically, [Brown's] age, education, lack of violent history, contact with family, structure of the prison environment, lack of access to drugs, and treatment for mental problems would place him at low risk. 47 RR 24–146.

- The Court finds that affidavits submitted by [Brown] in his petition from Cory Brown, Edward Brown, Jim Crofford, Lois Crofford, Taylor Harmon, Brian Humble, Amberly Lago, Brenda Sims, and Audra Waddle are inadmissible hearsay for purposes of these habeas proceedings. Tex. R. Evid. 801(d); 802. Although designated by [Brown] as potential witnesses to testify at the evidentiary hearing, [Brown] did not offer any testimony from these witnesses.

- The Court finds, based on the record, that counsel is not deficient because trial counsel presented a thorough case in mitigation, including the testimony of a competent forensic psychologist and several family members to testify regarding [Brown's] background and the circumstances of the offense, and [Brown] merely complains that counsel ought to have done more. *Ward v. Stephens*, 777 F.3d 250, 265 (5th Cir. 2015) ("[P]erhaps [Applicant's] trial counsel could have investigated more, hired different experts, or presented more mitigating witnesses. But as we have said previously, courts 'must be particularly

82

wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second guessing.'" (quoting *Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009) (quoting *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000)).

● The Court finds, based on the record, that trial counsel was not deficient for, and [Brown] was not harmed by, the failure to present additional mitigation evidence because the alleged unpresented, mitigation evidence concerning [Brown's] family history, family dysfunction, relationships, drug abuse, and other difficulties is largely cumulative of evidence presented during trial. *See Wong v. Belmontes*, 558 U.S. 15, 22 (2009) (defendant not prejudiced by counsel's failure to present mitigating evidence where "[s]ome of the evidence was merely cumulative of the humanizing evidence [counsel] actually presented; adding it to what was already there would have made little difference"); *Ex parte Martinez*, 195 S.W.3d 713, 731 (Tex. Crim. App. 2006) ("since the jury was privy to some of the severe abuse Applicant suffered during his childhood, there is not a reasonable probability that the unadmitted alleged mitigating evidence would have tipped the scale in Applicant's favor"); *Ex parte Woods*, 176 S.W.3d 224, 227 (Tex. Crim. App. 2005) (counsel not ineffective for failing to present mitigating evidence where much of the mitigating evidence Applicant now claims his attorneys should have presented through his friends and family was presented by his expert); *Ex parte Sheppard*, [No. WR-78,132-01], 2013 WL 5568434, *2 (Tex. Crim. App. Oct. 9, 2013) ("[T]he record shows that the testimony the trial court faults counsel for not developing through Robinson, Davenport, and Smith was actually before the jury through the testimony and report of Birdwell, Dr. Ray, and others. A decision not to present cumulative testimony does not constitute ineffective assistance.") (unpublished).

● The Court finds that the fact that Dr. Mesibov reached a different diagnosis than the one reached by trial expert, Dr. Cunningham, does not render trial counsel deficient. *See Turner v. Epps*, 412 [F. App'x] 696, 704 (5th Cir. 2011) ("While counsel cannot completely abdicate a responsibility to conduct a pre-trial investigation simply by hiring an expert, counsel should be able to rely on that expert to alert counsel to additional needed information of other possible routes of investigation."); *see also Smith v. Cockrell*, 311 F.3d 661, 676–77 (5th Cir. 2002), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004) ("Counsel should be permitted to rely upon the objectively reasonable evaluations and opinions of expert witnesses without worrying that a reviewing court will substitute its own judgment, with

83

the inevitable hindsight that a bad outcome creates, and rule that his performance was substandard for doing so.").

●      The Court finds, based on the record, that trial counsel is not deficient for failing to present evidence that [Brown] may suffer from ASD during the punishment phase of trial because they hired [a] qualified and competent forensic psychologist to determine, among other things, whether [Brown] suffered from any neurodevelopmental issues and that expert diagnosed [Brown] with ADHD.  47 RR 43–44, 88–93; *See Ex parte Flores*, 387 S.W.3d 626, 636–38 (Tex. Crim. App. 2012) (refusing to find counsel deficient because "after an investigation into the facts, counsel determined that expert assistance was necessary, so he retained a well-known, highly qualified/local expert with whom he had worked before and who he knew testified well in front of a jury," and because "the proper focus is on counsel's investigation, not counsel's choice of a specific expert"); *see also Ex parte Soffar*, [Nos. WR-29,980-03, WR-29,980-04,] 2012 WL 4713562, *11 (Tex. Crim. App. Oct. 3, 2012) ("At some point, finite time and judicial resources dictate that not every expert on every subject can be consulted or retained, even for a capital-murder case.") (Cochran, J., concurring) (unpublished); *Hoffman v. Cain*, 752 F.3d 430, 443–44 (5th Cir. [2014]) ("As our sister circuit has recognized, there is no 'per se rule that trial counsel is ineffective at mitigation unless a particular type of expert is retained.'").
.

●      The Court finds, based on the record, that trial counsel is not deficient for failing to present evidence that [Brown] may suffer from ASD during the punishment phase of trial because counsel hired a qualified and competent forensic psychologist who addressed mitigation themes similar to those [Brown] claims should have been addressed by an ASD expert, but in the context of a different disorder.  *See Coble* [ ], 496 F.3d [at] 441–42 [ ] ("At most, Coble is challenging the strategy employed by trial counsel, arguing that witnesses should have been better prepared and that more witnesses should have been proffered. Coble's challenge is measurably distinct from the failure to investigate social history in *Wiggins*."); *see also Teixeira v. State*, 89 S.W.3d 190, 193 (Tex. App.—Texarkana 2002[, pet. ref'd]) ("That another attorney, including appellant's counsel on appeal, might have pursued a different course of action does not necessarily indicate ineffective assistance.").

●      The Court finds credible trial counsel's testimony at the evidentiary hearing regarding the fact that they would not likely have highlighted the fact that [Brown] may suffer from ASD during the punishment phase of trial because it was as likely to harm [Brown's] defense as help it.

● The Court finds, based on the record, that trial counsel was not deficient for, and [Brown] was not harmed by, the failure to present evidence that [Brown] may suffer from ASD because highlighting evidence of a brain disorder could have severely undermined counsel's reasonable punishment strategy of attempting to convince the jury that [Brown] was a non-violent person who, removed from drugs and the manipulative influence of his ex-wife, would not constitute a continuing threat to society. *See Martinez v. Dretke*, 404 F.3d 878, 890 (5th Cir. 2005) ("The introduction of evidence that Martinez suffered from organic (i.e., permanent) brain damage, which is associated with poor impulse control and a violent propensity, would have substantiated the [S]tate's evidence and increased the likelihood of a future dangerousness finding.").

● The Court finds, based on the record, that trial counsel is not deficient for, and [Brown] was not harmed by, the alleged failure to investigate, discover, and present evidence that [Brown] suffers from ASD because [Brown] has not established as a matter of fact, that this is the case. The Court finds, based on the review of the records that, while the possibility exists that [Brown] suffers from ASD, [Brown] fails to establish this as a matter of fact because 1) [Autism Diagnostic Observation Schedule (ADOS)] results obtained by Dr. Mesibov barely place [Brown] on the spectrum; 2) Dr. Mesibov destroyed the raw data supporting the test score for the ADOS prior to the hearing and could not produce it for inspection or cross-examination; 3) Dr. Mesibov could not recall the specifics supporting the scores recorded on the ADOS; 4) Dr. Mesibov testified that it was unusual for a person who suffered from ASD to do many of [the] thing[s] that [Brown] clearly did and achieved (e.g.[,] obtaining excellent grades in school, attending college, obtaining employment and owning his own business, being a class clown, being married, and enjoying fiction); 6) Dr. Mesibov disregarded and did not account for factors and evidence inconsistent with his diagnosis; 7) Dr. Mesibov did not engage in differential diagnosis to determine whether his symptoms were attributable to another cause; and 8) post-conviction accounts by friends and family members to Dr. Mesibov differed from those given to the defense team at trial as evidenced by trial counsel's testimony and the social history report of Maureen Griffin, *see* State's Hearing Exhibit 45. [*See also* 14 SHCR 5707–15 (findings of fact pertaining to Dr. Mesibov's full testimony].

14 SHCR 5727–32. The trial court concluded that Brown failed to satisfy his burden under *Strickland* of showing that trial counsel were ineffective. 14 SHCR 5754–55.

The CCA held: "[Brown] has not shown that counsels' representation fell below an objective standard of reasonableness under prevailing professional norms; nor has he shown that there is a reasonable probability that, but for counsels' actions, the result of the trial or appellate proceedings would have been different." *Ex parte Brown*, 2019 WL 4317041, at *1. This decision is not objectively unreasonable.

### B.    Trial counsel were not ineffective.

The standard for assessing ineffective assistance of counsel was addressed in the prior section.  But regarding errors at the sentencing phase of a death-penalty trial, the relevant prejudice inquiry is "whether there is a reasonable probability, that absent the errors, the sentencer [ ] would have concluded the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *Wiggins*, 539 U.S. at 534); *see also Neal*, 286 F.3d at 241 ("Stated to the point: Is this additional mitigating evidence so compelling that there is a reasonable probability at least one juror could reasonably have determined that, because of Neal's reduced moral culpability, death was not an appropriate sentence?") (footnote omitted).

Further, relief is not warranted even if this Court believes Brown has satisfied *Strickland*.  Instead, given the state court's rejection of this claim, Brown is entitled to relief only if this Court concludes that the state court's determination that Brown did not satisfy *Strickland* is objectively unreasonable under § 2254(d).  *Richter*, 562 U.S. at 101.  Thus, under the AEDPA, a federal court's review of a state court's resolution of an IATC claim is "doubly deferential." *Pinholster*, 563 U.S. at 190.

1.     **Counsel were not deficient.**

a.     **The mitigation case was extremely thorough.**

Trial counsel presented a thorough case in mitigation, calling fourteen witnesses, including two experts.  As shown in the Statement of Facts, *supra*, the lay witnesses testified that Brown has positive character traits, was remorseful and had changed for the better while in jail, was a model prisoner, and had committed no acts of violence while in jail.  Brown's family acknowledged that he was, however, abusing drugs, and that became a prominent defense theme.  Dr. Lundberg-Love testified about the effects of drugs on brain chemistry.  Specifically, she stated that Brown was abusing methamphetamine, which can cause a paranoid-like state and rendered Brown more impulsive and less likely to consider the consequences of his actions.  With drugs removed from the picture, Brown's brain can "heal" and there would be a low probability that he would commit future acts of violence.  46 RR 149–55, 171–72.

Dr. Cunningham's testimony delved into a host of topics covering Brown's entire background and included a PowerPoint presentation.  47 RR 28.  He interviewed Brown for six hours, many other persons, and reviewed numerous documents, as addressed above.  *See* 47 RR 25–27.  Dr. Cunningham's lengthy testimony addressed genetic predisposition, neurodevelopmental problems, family dysfunction, sexual abuse, corruptive community factors, and drug abuse.  He explained that Brown's actions started with a shaky family foundation, and he discussed about a dozen family members.  Dr Cunningham stated:

> There are eight factors under family and parenting.  [1.] The divorce of
> his parents.  [2.] The chronic marital dysfunction of the marriage of his

mother and stepfather, Chuck.   [3.] The observation of Chuck's emotional abuse of Brenda, his mother.   [4.] Observation of Chuck's physical and emotional abuse of Corey, the older brother.  [5.] The sexual abuse of Amberly by Chuck.   [6.] The sexual abuse of Micah by his stepbrother, Nathan.   [7.] The abandonment by Chuck and disillusionment of Chuck as his sexual abuse of Amberly is discovered and he precipitously leaves the family as Micah is in the process of graduating from high school, about a week before.  [8.] And then there's the corruptive influence of Corey, the older brother, who is giving alcohol to Micah from about the time Micah is 13 years old.

47 RR 44–45.  He also identified corruptive community factors that contributed to Brown's behavior, including "teen peer harassment [and] alcohol and drug abusing peers."  47 RR 45.  He then went through Brown's family tree via the PowerPoint slides, 47 RR 63–64, and proceeded to address family members individually while referencing the slides.  47 RR 71–88.  He testified about individual family members who had a predisposition to alcohol and drugs, including Brown's paternal grandmother and father, 47 RR 72–74; individual family members and their predisposition to mood disorders, emotional problems, and other negative behaviors, particularly Brown's father Biff, 47 RR 76–82; and hereditary pre-disposition to personality pathology, or forming pathological relationships that are across marriages, including Chuck's poor relationship with Brenda, Chuck's abuse toward others in the family, and Brown being sexually abused by his step-brother Nathan, 47 RR 84–87.  Dr. Cunningham opined: "The saturation of very troubled marital relationships in this family system is high. . . . This is not a family system that you would expect to have functional healthy long term relationships with persons that are sober."  47 RR 87.

88

Dr. Cunningham then addressed neurodevelopmental factors pertaining to Brown. School records and history demonstrated his inability to focus, impulsivity, and social immaturity, which are expressions of ADHD. 47 RR 88–89. Kids with ADHD are more prone to conduct problems and other mental health issues, and Brown's Green Oaks hospital records show a panic disorder apart from substance abuse, anxiety, depression, and a mood disorder, all of which might lead Brown to self-medicate. Moreover, his social competence across his childhood and adulthood was lower. 47 RR 90–91. Dr. Cunningham asserted that as a person like Brown has "symptoms along this continuum, that has significant implications for their involvement in substance abuse. And now that interaction of impulsivity and substance abuse creates a significant risk of carrying them into prison." 47 RR 93. He also said these types of problems are found much more commonly among the criminal population. 47 RR 90–93.

Dr. Cunningham addressed the fact that Brown was dealing with all of the above problems, and then he experienced sexual abuse from his step-brother. "So we've got a kid who ends up developmentally delayed in his growth, he's small, his world is out of control. Now the person that he would otherwise trust significantly, his brother, is sexually abusing him in this household." 47 RR 94–95. Dr. Cunningham said research shows sexual abuse is equally if not more damaging to men than/as women. 47 RR 95. It leads to traumatic sexualization, betrayal, and powerlessness. Thus, when Brown felt betrayed by Ray and powerless because he felt she was manipulating his feelings, this had roots in his sexual abuse, out-of-

control family system, and bullying by peers.  47 RR 96.  Adding drugs to these

existing vulnerabilities "makes you much more suspicious and paranoid and activates

you to react in an aggressive fashion."  47 RR 97.

Dr. Cunningham then addressed the concept of "the bridge," which was his

way of conceptualizing Brown's life.  "Now, as we think about Micah's bridge, the

span is fundamentally weakened by genetic predispositions to substance abuse and

personality disturbance and mood disorder, to ADHD symptoms, delayed growth and

development and chronic immaturity.  That's kind of what we start out with."  47 RR

97–98.  Dr. Cunningham then added the following detailed explanation:

> Alcoholism and immaturity of the father, the chronic marital conflict
> that's experienced between Brenda and Chuck, whereas mom is being
> recurrently and verbally abused, and where his brother is being
> physically and verbally abused as well. . . . [Brown] experiences sexual
> abuse, which is a significant additional weight on this system.  And then
> in early adolescence, you see drug and alcohol abuse that's increasingly
> a coping mechanism.  Now, as we think about his support, it's got dotted
> lines because it's not a very substantial support.  It's not a very
> functional way to cope.  He's harassed by his peers in high school.  You
> know, by then, he is, in fact, displaying indications of being alcohol
> dependent.  That drug addiction is an additional weight on this system
> in terms of increasing the likelihood of it failing.  So he has a marriage
> with Doc and that's an important source of support to this and he has
> children.  And those are things that help hold up this structure.  Now,
> of course, as his drug addiction goes, his marriage understandably
> begins to come apart and has taken off.  And then as we add meth in the
> final two months before this offense, that's a very significant additional
> weight and the meth is also eroding at the structure of the concrete as
> it derails the logical integration of thought as associated with sleep
> deprivation, unhinges emotion so they don't have the same control,
> promotes paranoia and suspiciousness and over-reaction and that kind
> of thing.  And then he's getting mixed signals or what he interprets as
> mixed signals about the marital relationship.  And then he's choked out
> by Tracy, which he takes as being a significant humiliation in front of
> his children.  And remember, his interpretation of that [is] being affected

by the meth abuse that he's on and it's promoting of suspicion and paranoia. And then Doc drives by and this system collapses.

47 RR 98–100. Dr. Cunningham explained why these factors would cause Brown to "snap." 47 RR 100.

Finally, Dr. Cunningham went through an extremely detailed violence risk assessment of Brown premised on research and studies conducted on the issue. 47 RR 100–33. He concluded that there was a very low likelihood that Brown would commit a serious act of violence in prison. 47 RR 133–34. In sum, Dr. Cunningham's analysis and testimony regarding Brown and his family was about as thorough as an expert's could be.

Nonetheless, Brown turns a blind eye to this evidence and renders numerous baseless assertions. For example, Brown discusses his entire history leading up to the murder, DE 29 at 68–77, which basically mirrors Dr. Cunningham's discussion of the same, 47 RR 44–100, and then claims that counsel "told the jury there was only one mitigator in this case – Micah's drug abuse," without laying "the groundwork for why drugs were an attempt to self-medicate." DE 29 at 77. He asserts:

> If Micah's background and character, given the vast amount of mitigating evidence, would have been presented to the jury with expert and lay witness assistance so jurors could have made an informed, individualized sentencing determination, there is a reasonable likelihood at least one juror would have voted for life. *That counsel presented none of this renders Brown's sentence unreliable and merits relief.*

*Id.* (emphasis added); *see also id.* at 78–79 ("Because counsel erred by failing to conduct an adequate investigation, failed to have Brown evaluated by appropriate experts, failed to identify lifelong trauma and neurodevelopmental disorders, failed

91

to spend enough time with Brown to realize he should not testify at trial . . . and failed to adopt an informed, supportable (and morally sound) defense, the State was able to use all of these errors against Brown in seeking a sentence of death."); *id.* at 79 ("The jury heard almost no reason from Brown's counsel why Brown's character and background necessitated a life sentence in this case."); *id.* at 81 ("[Counsel's] failures include the wholesale failure to investigate Brown's social history, lifelong neurodevelopmental disorders, family dynamics, absence of support of parental figures, childhood sexual abuse, self-medication via drug and alcohol abuse, suicidality, and PTSD from the shooting itself."); *id.* at 90 ("Counsel presented no witnesses to speak to Brown's struggles, his family dysfunction and resulting neglect and abandonment, or how he tried to self-medicate and failed because his underlying mental illness, abuse, and trauma, including undiagnosed neurodevelopmental disorders, were never addressed.").

One of the more egregious assertions is the following: "*As the experts never evaluated Brown themselves*, they were left speaking about drugs in the abstract, or reciting a litany of traumas and how they statistically affected a person, without ever being able to explain to the jury how these things affected Brown himself." *Id.* at 80 (emphasis added).[17]  But Drs. Lundberg-Love and Cunningham interviewed Brown for four and six hours, respectively, with Dr. Cunningham concluding that Brown has

---

[17]     Brown also claims that Dr. Cunningham "only briefly touched on" Brown's family history.  ECF 29 at 101.  As shown, Dr. Cunningham's testimony about Brown's family history was done via a PowerPoint presentation and consisted of roughly seventeen pages of the record.  47 RR 71–88.  The trial court recessed for lunch before this presentation because the defense knew it would take some time.  47 RR 64–65.

ADHD and other neurodevelopmental issues.  Apparently, Brown does not consider lengthy interviews where a defendant is clearly being evaluated to be actual "evaluations."

> Nevertheless, Brown then refutes the above allegations with the following:
>
> Cunningham spoke about how survivors of childhood sexual abuse are deeply damaged by that abuse, and the adverse effects are lifelong. . . . Cunningham succinctly explained how the echoes of Brown's trauma, not his intentional or knowing retaliation or obstruction of police officers, was motivating Brown to lash against someone with whom he had an intensely personal relationship.

*Id.* at 94; *see also id.* at 89, 99 (recognizing that "Cunningham testified to the large amount of violence and family dysfunction in Brown's home growing up, Brown's chronic psychosocial immaturity, and the severe effects that childhood sexual abuse continue to have on adult behavior"), 102 ("Cunningham identified numerous aspects of family dysfunction in Brown's childhood home.").  Thus, Brown claims none of this evidence was presented and then ultimately concedes that Dr. Cunningham addressed these matters.  As a result, his claims are groundless and refuted by what in fact transpired at trial.

Brown also claims that his background and family history did not come from lay witnesses, and for that reason counsel were ineffective.  *Id.* at 80, 84, 96–98.  The problem with that claim is obvious: counsel's investigators and Dr. Cunningham interviewed all of these same people, and what they stated came out via Dr. Cunningham's testimony.  There is no precedent mandating that counsel *must* present evidence of family background and dysfunction from those within the family.  Essentially, Brown is complaining about counsel's failure to present evidence that

93

duplicates Dr. Cunningham's testimony.  But, as shown, counsel is not ineffective for failing to present cumulative evidence.  *Wong*, 558 U.S. at 22; *Sheppard v. Davis*, 967 F.3d 458, 468–69 (5th Cir. 2020) (deferring to state court's determination that trial counsel was not ineffective for not presenting additional mitigating evidence that would have been cumulative and stating that had other family members testified about evidence that was contained in records and reports, this "would have added few details to this already woeful story"), *cert. filed* Jan. 5, 2021 (No. 20-6786); *Gonzales v. Stephens*, 606 F. App'x 767, 772 (5th Cir. 2015) (holding counsel not ineffective for failing to present duplicative evidence where counsel "obtained the services of a mitigation specialist, an investigator, a neuropsychologist, and a prison expert" who conducted numerous interviews with petitioner and his family, "performed psychological evaluations, and reviewed substantial records, such as school, probation, police, and jail records," and "[t]he evidence that [petitioner] suffered emotional, physical, and sexual abuse, as well as that his mother drank alcohol and used drugs while pregnant with him, was extensively presented to the jury by both lay and expert witnesses") (unpublished); *Newbury v. Stephens*, 756 F.3d 850, 873 (5th Cir. 2014) (where counsel "presented six witnesses to testify about [petitioner's] family, medical, and educational history" and  because the jury "heard about [petitioner's] traumatic childhood" which included neglect and abuse, counsel were not ineffective for not presenting evidence that may have provided more details but "is of the same genre as that presented to the jury at trial").

### b.   Counsel's failure to present evidence of ASD does not amount to ineffectiveness.

The only true difference between what trial counsel did and what Brown claims counsel should have done is presentation of the alleged ASD.  ECF 29 at 67–68, 82, 88–90, 93, 103–06.  Brown's contention is that this syndrome could have explained his flat affect and lack of emotion on the Channel 11 video and in his trial testimony, and in general explained his troubles communicating and understanding his emotions.  *Id.*  Brown claims this should have been done to show why he appeared to lack remorse on the video and during his testimony, pointing to Dr. Mesibov's hearing testimony.  *Id.* at 81–82, 103–06.  But this argument fails for several reasons.

First, as discussed in the prior section, this is a road counsel were hesitant to go down.  Both Wilkinson and Ferguson testified their reluctance to present this type of evidence for fear that the jury would consider it aggravating.  10 EHRR 29–30, 42–43, 267–68; *id.* at 268 (Ferguson stating: "I don't know if slapping an autism label on him would do more harm than good from the standpoint of the State saying, well, you can't fix him, he's deadly, you've got to execute him.").  Moreover, as will be discussed below, trial counsel's primary strategy at punishment was clear: to demonstrate that Brown was essentially a non-violent person who, in fact, had displayed helpful and positive behaviors when healthy.  However, when Brown started taking drugs, in particular methamphetamine, his life spiraled out of control and in a moment of impulsivity, he "lost it" and killed his ex-wife.  Counsel emphasized this theme during final argument stating that, according to the experts, Brown is calm when he is not on drugs, and that after the crime, as the drugs wore off, he turned himself in to police

without resisting arrest and has not committed an act of violence since.  48 RR 40–41, 43–47.  Therefore, because Brown would not have access to drugs in prison, he would pose a very low risk to commit future acts of violence.  Adding in a brain disorder to try to explain Brown's behavior would have undermined this strategy.  For example, in his state habeas application, Brown stated:

> [E]vidence that Brown has a biological brain disorder *causing significant impairments over which he can exercise little to no conscious control* is mitigating by nature; [ ] *evidence that Brown's deficits impacted his terrible, impulsive decision to shoot Ray* would have buttressed trial counsel's theory that Brown was in a downward spiral culminating in murder by providing the jury with an explanation for how Brown got to a breaking point and why he broke.

1 SHCR 49 (emphases added); *see also id.* at 39 ("[T]hreats by someone with ASD, like Brown, should have been taken very seriously and not roundly dismissed as the State advocated."); *see also* ECF 29 at 44.  If, as counsel feared, Brown has a disorder over which he has no control, then prison would make little difference in terms of his propensity for violence.  At the very least, the prosecution surely would have made this argument to the jury, likely crippling the defense's theory.

In *Druery v. Thaler*, the Fifth Circuit rejected a similar claim, holding:

> As the state court found, "[p]resentation of some type of brain injury could indicate that [petitioner's] violent behavior was of a permanent nature not induced by drug use, suggesting he could be a future threat to those in prison."  *Such evidence, according to the court, would be "double-edged mitigation evidence," since it could undermine [defense counsel's] theory that once separated from drugs, petitioner would no longer be a continuing threat to those in prison.*  Or, as the State argued, "expert testimony suggesting that [petitioner's] condition was permanent would have eviscerated counsel's defensive theory."

647 F.3d at 541–42 (emphasis added); *see also Martinez*, 404 F.3d at 890 ("The introduction of evidence that Martinez suffered from organic (i.e., permanent) brain damage, which is associated with poor impulse control and a violent propensity, would have substantiated the state's evidence and increased the likelihood of a future dangerousness finding.").

Second, counsel had an expert in the field—Dr. Cunningham. Dr. Cunningham may not have conducted psychological testing, but as discussed previously, he could have if he deemed it necessary. At any rate, he assessed Brown for six hours and reviewed all the relevant evidence, including the television interview. 47 RR 26. As shown, he found Brown suffered from a number of psychological problems including ADHD, and according to Dr. Mesibov, ADHD and ASD overlap. 7 EHRR 212–13. As shown by the state court findings, Dr. Mesibov also found that Brown was barely on the autism spectrum. If that is the case, then adding ASD to the mix would be largely cumulative. Regardless, Dr. Cunningham did precisely what Brown claims was not done and did not determine Brown had ASD. That another expert latched on to ASD is of no moment because courts have routinely rejected arguments that come down to a choice between experts. In *Gonzales v. Stephens*, the Fifth Circuit rejected a claim that trial counsel was ineffective for failing to secure an abuse expert because counsel hired an expert who thoroughly addressed the issue and, as Ferguson stated here, 12 EHRR 23–24, tied everything together. 606 F. App'x at 773–74 ("Dr. Milam testified that many, if not all, of these issues were connected with [petitioner's] mother's use of drugs while pregnant, his severely neglected childhood, and the

pervasive emotional, physical, and sexual abuse he suffered throughout his childhood.   Beyond Dr. Milam's extensive testimony, additional testimony by an abuse expert would most likely have been cumulative, and [petitioner] does not show otherwise.").  The Fifth Circuit has also consistently rejected claims premised on trial counsel's alleged failure to call a particular expert.  *Reed*, 739 F.3d at 775; *Hoffman*, 752 F.3d at 443–44; *see also Dowthitt*, 230 F.3d at 748 ("trial counsel was not deficient by not canvassing the field to find a more favorable defense expert").

Third, Brown is arguing not that counsel failed to investigate and present mitigating evidence, but that counsel did not present *enough* evidence to his liking. As the state court found, arguments that come down to a matter of degrees, i.e., whether counsel presented enough mitigating evidence, "are even less susceptible to judicial second-guessing."  14 SHCR 5729 (quoting *Ward*, 777 F.3d at 265); *see also Trottie*, 720 F.3d at 248 ("[A]lthough the jury may not have had all of the facts that Trottie now wishes it had, Trottie's counsel did offer meaningful information regarding Trottie's childhood and how it may have impacted Trottie's decisions on the day of the incident.").  The state court's rejection of this claim is not unreasonable.

### c.   Trial counsel's punishment strategy was sound.

As discussed above, Brown's claim that counsel had a strategy of focusing only on Brown's drug use, *see* ECF 29 at 65, 80, is refuted by the record.  Brown takes a theme counsel addressed at the habeas evidentiary hearing and reduces it to a simplistic phrase.  But the hearing record refutes this argument.

Wilkinson testified that given the damning evidence of the Channel 11 video, the defense tried to focus more on getting a favorable outcome at punishment. 10 EHRR 171.  He explained:

> Micah Brown looked like a crazy person on that video that he gave to Channel 11.  And we knew the Jury was going to see that.  Our whole strategy was, at trial, Micah had put on weight; he had, I think, cut his hair; he was very calm.  We put on testimony, if I remember, from the jailers, that he was a perfect inmate.  And our whole approach was, that was the old Micah, this is the new Micah; you can predict future danger by their activities and their behavior in jail.  And that's what we were trying to impress upon the jury was that, while he was on the drugs, he did these things. Since he was off of them for several years, model prisoner, he was going to do great in prison if they were to give him life.

9 EHRR 116; *see also* 9 EHRR 124; 10 EHRR 76.  Wilkinson believed that the evidence showed Brown was well-behaved in jail, and this was the focus of the defense at punishment.  10 EHRR 181; *see also* 9 EHRR 124 ("Our defense was he was on drugs and whatever caused him to have this problem, he exploded, whether it was because he was suicidal, whether it was because of whatever, that that jury knew that lady pushed his buttons and because of drugs and whatever reason, he exploded and killed her.  And since then, being off the drugs, in the jail, he was a model prisoner and therefore not a future danger."); 10 EHRR 181 ("And the record was Micah was a perfect inmate.  And our whole goal was to show the jury, I don't care what he did before, I don't care whether it was drugs, alcohol, depression, retaliation, he was the perfect poster boy for getting life, not death.").

Ferguson's testimony largely echoed Wilkinson's.  She explained that the defense's theory was to:

show the jury that [Brown] was not a dangerous person, that it was the convergence of an evil (descriptive sound) pushing his buttons and denying him his kids, and then the fact that in the midst of all of that, he was impaired by chronic meth, cocaine, alcohol use, such that, I think as Dr. Love titled it, your reflective versus reactive—the lower level that says do something takes—hijacks the brain, and the upper level that would say, whoa, wait a minute, this is not a good idea, just doesn't—it's like mashing the accelerator with no break.  And ...it was my intent to show the jury, in effect, that if you take [Brown] away from drugs and take him away from a situation where you know he's being deprived of his kids by someone who is basically trying to push his buttons, that there's not a thing in the world dangerous about him, that he is—he's just a nice, normal guy that got screwed up on drugs and then had the grave misfortune to get hooked up with that hellion.

10 EHRR 262–63; *see also* 12 EHRR 21–22 ("We talked about the theory that we had developed that was there was really nothing wrong with Micah once -- in terms of being a killer, if you got him away from the drugs and you got him away from Doc, because he was a model prisoner, he was a good kid, and no significant history of violence.").  Ferguson testified that to counter the State's typical attempts to argue that voluntary drug use was not an excuse, counsel sought to show the jury that regardless of whether Brown made a bad decision to use drugs, by virtue of biochemistry, Brown was limited in his ability to make certain choices regarding drug use, 10 EHRR 263–64; that Brown was at a greater risk of drug use because of his past, 10 EHRR 264; and that there were factors in Brown's past that predisposed him to drug use and mitigated against it, including the sexual abuse, *id*.[18]  As shown,

---

[18]    The Director notes that there is a distinction between arguing that Brown lacked control over his drug use and arguing that Brown has a mental disorder like ASD that leads to lack of impulse control and potentially violence.  First, the defense stated that drug use factored into Brown's behavior but was not the sole cause of it.  Second, and more importantly, drug use can be mitigated because Brown would not have access to drugs in prison.  But if Brown has ASD or a related disorder causing a lack of impulse control, he would carry that with him into prison, such that it is less likely his behavior could be

these were themes Dr. Cunningham addressed in his testimony.   Ferguson also wanted Dr. Lundberg-Love as a witness because she was an expert on the effects of drug use on the brain.   Because their investigation showed Brown had a drug history and was on a drug "binge" prior to the offense, "as a psychopharmacological expert, I wanted someone to be able to explain the effect of drugs on the brain's ability to make decisions, on -- that it would also explain potentially why he looked so awful in that interview."   12 EHRR 36.   Dr. Lundberg-Love testified that drug use, such as methamphetamine, makes one more impulsive, aggressive, more likely to engage in inappropriate behavior, and less likely to perceive the consequences of one's actions. 46 RR 152–54, 157–58.   Once the drug is removed, the brain can begin to heal giving the person more time for reflection.   46 RR 154–55.   Therefore, if Brown is in a controlled environment without access to the "fuel" of drugs, there is a lower probability he will be violent. 46 RR 171–72.

Contrary to Brown's argument, the punishment strategy was not to show Brown committed murder only because he was taking drugs.   Brown's drug use was a part of it because it was something the defense could not avoid.   Even Dr. Cunningham was forced to address at some length how Brown's drug use factored into his behavior.   But the case on punishment was (1) Brown had no previous violent history; (2) his history since the murder was one of non-violence and good behavior in jail; (3) drug use did contribute to his behavior, but his predisposition to use drugs is related to numerous genetic, familial, developmental, mental, and emotional factors;

controlled.   This is one reason why mental-health disorders of this nature are routinely considered double-edged, as Ferguson mentioned.

101

(4) he would not have access to drugs in prison and, thus, would lack the "fuel" that could contribute to violence; and (5) he would perform well in a prison setting. Brown disputes counsel's actions, for instance by arguing that counsel failed to offer "a competing narrative explaining why Brown was self-medicating with drugs" that left "unchallenged" the State's narrative of Brown's drug use as a choice. ECF 29 at 84. But the trial strategy was more than reasonable given counsel's investigation and the circumstances of the case. Indeed, the defense explained at length why all the facts and circumstances of Brown's life and the events leading up to the crime were mitigating. 48 RR 42–47. As the Supreme Court held in *Strickland*:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689. The Fifth Circuit has likewise held that a "'conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.'" *Pape*, 645 F.3d at 291 (quoting *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) (internal quotations and citations omitted)); *see also Yohey*, 985 F.2d at 228 ("Given the almost infinite variety of possible trial techniques and tactics available to counsel, this Circuit is careful not to second guess legitimate

strategic choices."). Based on the totality of the circumstances, trial counsel performed effectively.

### d.   Brown's additional arguments are meritless.

Brown presents additional arguments in his petition that are also unfounded. Brown complains about counselor Morris Beene's testimony that Brown seemed to have recovered well during the time he spent with Brown. *See* 46 RR 6–17. Brown alleges: "Beene's testimony was that Brown had recovered from what had plagued him before the murder, precluding the compelling, humanizing narrative counsel should have told about Brown struggling with mental illness, developmental disorders, and trauma that would have helped to explain his behavior." ECF 29 at 87. He likewise complains that counsel presented testimony from law enforcement personnel that Brown had behaved well in prison, arguing: "These witnesses all painted Brown as a man that was rehabilitated and healed by prison and therefore not a future danger" whereas counsel should have "uncovered ASD, and the long-term effects of childhood sexual abuse, neglect, abandonment, and mental illness, none of which can be 'cured' by prison." *Id.* at 88. But counsel never said prison "cured" Brown; they simply presented evidence of his good behavior in prison, which speaks directly to the future-dangerousness special issue. And if Brown is suggesting counsel should not have presented these witnesses, that tactic would surely have been negligent because evidence of Brown's good behavior was paramount to the defense's case. Discarding that evidence and presenting Brown solely as a man plagued by his past and various mental disorders would have been a recipe for disaster because it

would have shown only the negative side of his character premised in part on fixed conditions, i.e., this would have enhanced the State's case on future dangerousness. Moreover, there is no contradiction between presenting evidence of Brown's good behavior *and* Dr. Cunningham's extensive testimony about how Brown's history and mental condition contributed to his behavior leading up to the crime.   In fact, Dr. Cunningham explained that these factors showed that Brown would perform well in a prison setting, indicating the consistency of both types of testimony.   *See id.* at 99 (Brown suggesting Beene's and Dr. Cunningham's testimony conflicted).

Brown claims counsel failed to prepare the experts by not giving them the materials needed.   For instance, he states: "Dr. Lundberg-Love . . . admitted that she visited Brown without the benefit of having first received the discovery on Brown's chronic drug abuse." *Id.*   Brown provides no record citation to support this.   Moreover, Dr. Lundberg-Love stated she got a family history from Brown and received his substance abuse history from hospital and rehab records.   46 RR 148.   Ferguson testified at the habeas hearing that she gave all the necessary materials to Dr. Lundberg-Love, including a social family history prepared by Griffin.   11 EHRR 49; 12 EHRR 15, 20–21, 24.   Brown makes a similar claim about Dr. Cunningham, arguing that he never received a social history that Griffin prepared.   ECF 29 at 91. Ferguson indicated otherwise, stating that she recalled sending the same social history to Dr. Lundberg-Love and Dr. Cunningham.   12 EHRR 15; *see also* 8 SHCR 3278–311 (Griffin's social history of Brown).   But even if that were not the case,

Brown could not demonstrate any prejudice because Dr. Cunningham conducted his own detailed history and presented that to the jury.

Next, Brown claims that Dr. Lundberg-Love "was never given the opportunity to correspond with" Dr. Cunningham. ECF 29 at 93. Thus, "[b]ecause the two experts never spoke, or counsel did not share their findings, they gave conflicting testimony. Lundberg-Love testified that Brown had no history of ADHD, a neurodevelopmental disorder Dr. Cunningham would later testify that he did have." *Id.* Dr. Lundberg-Love did testify that she did not meet with Dr. Cunningham. 46 RR 215. But she testified that Brown had no *documented history* of ADHD per his records and that Brown did not tell her he had the disorder. 46 RR 205, 215. Dr. Cunningham concluded Brown did have ADHD after evaluating him—an evaluation Brown claims never happened—but that would not have altered Dr. Lundberg-Love's testimony. Nor is there any inconsistency here given that one expert was talking about Brown's documented history and the other about what he believed upon interviewing Brown and assessing his past behavior. At any rate, Brown fails to explain how this amounts to ineffective assistance.

Brown also complains:

> Wilkinson ultimately skipped a significant amount of Cunningham's presentation on the adverse factors that influenced Brown. Jurors never heard about neurodevelopmental factors, or, given the chronic abuse Brown witnessed in his childhood home, "the presentation of research findings demonstrating a nexus between child maltreatment or observed family violence and violent crime. Wilkinson would later claim he skipped the slides because the jury was bored. But the jury was bored because the defense had given them no narrative framework with which to view expert testimony.

ECF 29 at 95.  Brown's claim is premised on Dr. Cunningham's state habeas declaration, which, as stated, the trial court did not consider.[19]  But this claim fails in two respects.  First, the evidence Brown claims the jurors never heard was, as shown above, in fact presented to the jurors, regardless of Dr. Cunningham's declaration.  Second, Wilkinson did testify that he skipped over certain PowerPoint slides because the jury was getting bored and he did not want to lose their attention for important parts of the testimony.  9 EHRR 111–15; 10 EHRR 196 ("Well, if you look over and you've got jurors that are, you know, cleaning their ear or not looking, to me, you lose the importance of testimony because they're just not paying attention. And in my experience, if they stop paying attention, they a lot of times stop paying attention to everything.").  As a matter of trial strategy, this should not be second-guessed because it would have made little sense for counsel to continue questioning that would "lose" the jury.  Moreover, Brown's claim regarding why the jury was bored is sheer speculation unsupported by anything in the record.  As such, it is conclusory. *Miller*, 200 F.3d at 282; *Koch*, 907 F.2d at 530.

---

[19]   On state habeas review, Brown submitted numerous affidavits from family members with his state habeas application.  *See* 1 SHCR 148–262.  But, as shown, the trial court found that these affidavits were inadmissible hearsay because Brown did not call these witnesses to testify at the hearing.  14 SHCR 5729.  This decision is not objectively unreasonable and, in this proceeding, bars consideration of the affidavits under *Pinholster.*  Further, it was not until the end of the habeas hearing that Brown tried to present a declaration from Dr. Cunningham, which the trial court refused to consider.  10 EHRR 240–45.  This declaration is likewise barred under *Pinholster*, and the trial court's decision not to admit this evidence because Dr. Cunningham was not subject to cross-examination is not objectively unreasonable under § 2254(d).

Brown claims the defense did not "heed" Griffin's warning not to use Brown's drug use as a mitigating factor because it could be aggravating. ECF 29 at 100–01; *see also* 12 EHRR 183. He argues: "[B]ecause the defense portrayed Brown as a functioning, unencumbered individual both before and after the crime without the influence of drugs, Brown's counsel made using drug abuse as an aggravator" because the State portrayed it as a choice. ECF 29 at 101. But Griffin was not the expert in this case; Drs. Lundberg-Love and Cunningham were. And, as shown, even Dr. Cunningham was forced to address Brown's drug use. It was a reasonable strategy to argue that removing drugs from the picture, which would occur in prison, would contribute toward Brown being non-violent and also pointing to his pre-trial confinement history as proof. Brown suggests that counsel should have portrayed the drug use as involuntary in that Brown was self-medicating to "help manage his ADHD, social anxiety, depression, trauma, and Autism." *Id.* at 101. However, the State could have used that against Brown—if he is abusing drugs to manage disorders over which he has little to no control, then the disorders would be permanent fixtures in his life. Thus, either strategy allows the State to make a particular counter-argument. If counsel's effectiveness hinged on precluding counter-arguments, then counsel would be deemed ineffective in virtually all cases. At any rate, "[t]here are . . . 'countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'" *Richter*, 562 U.S. at 106 (quoting *Strickland*, 466 U.S. at 689).

107

Next, Brown alleges that counsel were ineffective for not presenting evidence that his alleged lack of remorse and emotion, particularly on the Channel 11 interview, was caused by ASD.  He claims that an expert, like Dr. Mesibov, could have explained that Brown's flat affect, difficulty showing emotions and communicating, and lack of ability to show remorse was due to ASD.  Brown states: "Brown's difficulties in understanding his own emotions, communicating them to others, and then understanding how others would view his answers because of his undiagnosed ASD greatly prejudiced him during sentencing."  ECF 29 at 103–06.  This matter was addressed above.  Again, counsel was entitled to rely on their expert's opinion, and Dr. Cunningham did not diagnose Brown with ASD.  Consequently, counsel had no basis to pursue this strategy.

Moreover, Ferguson brought in Dr. Lundberg-Love to explain how Brown's behavior at the time of the offense and just after was affected by his drug use.  12 EHRR 36 (stating that she wanted Dr. Lundberg-Love to "explain the effect of drugs on the brain's ability to make decisions" and also "why [Brown] looked so awful in that interview.").  She testified that chronic use of methamphetamine and cocaine can lead to symptoms similar to paranoid schizophrenia and psychotic states.  46 RR 145–67.  During final argument, Ferguson stated:

> That Channel 11 interview, yeah, he looks pretty bad.  Does that look like the same man?  No.  Because this is a man that hasn't been on meth and cocaine and had his head screwed up so badly that he commits a capital murder.  Yeah, he looks terrible on that interview.  That interview was right after this event happened. . . . But what has he done since the Channel 11 interview?  Nothing of note.

48 RR 45.   The defense also presented two witnesses, Morris Beene and Jason Hammock, who testified that Brown expressed remorse and regret for his actions and appeared sincere.   46 RR 14–15, 101, 104.   The problem here is that Brown demonstrated a lack of remorse not because he has ASD but because (1) he told Channel 11 and Casper that he regretted killing Ray in front of his kids but did not regret killing her and, more importantly, (2) he testified at trial that he still blamed Ray for the offense.   ASD would not "explain away" those damaging assertions.   And, as Ferguson warned, presenting evidence of a fixed condition does not come without a downside.   In hindsight, Brown may not agree with the way counsel chose to address this matter, but he has not shown counsel's strategy amounted to ineffectiveness, let alone deficient performance.[20]

---

[20]     In a footnote, Brown claims that counsel should have objected to the following argument by the State: "You look at that Channel 11 interview, you look at Felicia's interview and you look at the Defendant's eyes, you look at his face, you look at his responses, you listen to his responses.   His entire countenance suggests nothing more than he is dangerous." ECF 29 at 104 & n.27 (quoting 48 RR 21).   Citing to *United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008), Brown states: "A prosecutor arguing that a defendant should be sentenced to death for their appearance or demeanor when that defendant has ASD is especially offensive to the Eighth Amendment . . ." ECF 29 at 104 n.27.   Brown did not present this claim to the state court; thus, it is unexhausted and procedurally defaulted.   Moreover, it is meritless and, consequently, fails to meet the *Martinez* exception.   In *Mendoza*, the Fifth Circuit held that the courtroom demeanor of a *non-testifying* defendant is an improper subject for comment by the prosecution.   522 F.3d at 491.   Here, in the passage Brown quotes, the State did not appear to allude to Brown's *courtroom* demeanor.   But even if it did, Brown testified; thus, the State was free to comment on his demeanor while testifying.   Moreover, even assuming Brown has ASD, which is questionable, there was no evidence presented at trial of this disorder.   Thus, an objection along these lines would have been futile.   *Koch*, 907 F.2d at 527.   Finally, Brown's claim is nonsensical because he is arguing trial counsel should have lodged an objection to an argument as offending the Eighth Amendment when neither the State nor defense knew about the alleged ASD or its supposed connection to Brown's appearance.

Lastly, Brown argues that trial counsel were ineffective for failing to object to aspects of the State's closing argument. Specifically: "The State improperly appealed to juror's obligations to police officers and community safety to urge jurors to sentence Brown to death. They implied that if jurors failed to impose a capital sentence, it would chill public requests for police assistance and endanger others." ECF 29 at 107. Brown refers to the following argument by the prosecution:

> You know, we talked about this at guilt/innocence. What changed that caused him in that last two weeks to kill Stella. It's these offenses he doesn't want her calling the police, he doesn't want her reporting what's happened. He doesn't want her heard. And, ladies and gentlemen, the fact that someone would take a witness or a victim in a case and hunt them down and shoot them is enough for you to determine that a death sentence is appropriate. Think about that. Do we want people to come forward and ask for help?

48 RR 60. Brown also refers to prosecution statements that the jury should consider the effect of the crime on law enforcement. ECF 29 at 107–08 (citing 48 RR 61–62). Brown argues that the prosecution's remarks undermined confidence "that Brown's death sentence was not imposed based upon a sense of obligation to protect the community as opposed to the individualized sentencing determination that is constitutionally required." *Id.* at 108. Brown did not present this claim to the state court; thus it is unexhausted and procedurally defaulted. Moreover, it fails to meet the *Martinez* exception because it is wholly meritless and state habeas counsel was therefore not ineffective for failing to raise it. An objection was not warranted for two reasons. First, the State's remarks were nothing more than a plea for law enforcement, which is a proper argument under Texas law. *Ward v. Dretke*, 420 F.3d 479, 497–98 (5th Cir. 2005). Second, a prosecutor may ask the jury to consider the

impact its verdict may have on the community as a whole or on a particular segment of the community, and may ask the jury to represent that segment of the community and to send a message to the community with its verdict. *Freeman v. State*, 340 S.W.3d 717, 729–30 (Tex. Crim. App. 2011) (although the State is generally not permitted to argue that the community or any segment of the community demands a certain verdict or punishment, the State is not prohibited from addressing the concerns of the community); *Borjan v. State*, 787 S.W.2d 53, 56–58 (Tex. Crim. App. 1990) (comments directed toward the community in general constitute a proper plea for law enforcement); *Munoz v. State*, 803 S.W.2d 755, 756–57 (Tex. App.–Houston [14th Dist.] 1991, pet. ref'd) (the prosecutor made a legitimate plea for law enforcement in a sexual assault case when he asked the jury to send a message with its verdict to three segments of the community pertaining to women). The State's remarks were proper under Texas law. Therefore, any objection would have been futile. *Koch*, 907 F.2d at 527. Consequently, counsel were not ineffective.

## 2.   Counsel's performance did not result in any prejudice.

Brown fails to demonstrate any prejudice because, in addressing prejudice, he merely reiterates the faulty arguments he made above. For instance, his entire factual argument regarding prejudice is as follows:

> As explained above, the outline of a strong mitigation case can be gleaned from the extremely limited investigation conducted by counsel in acquiring records and from the information recovered in the brief time she was on the case by Maureen Griffin. Griffin put counsel on notice that Brown likely suffered from a neurodevelopmental disorder and mental illness (as well as from copious records including hospitalization for suicide), and was aware of the sexual abuse, neglect, significant family dysfunction, and long-term exposure to familial violence in

111

> Brown's childhood.  *See* CLAIMS 1(B) and 1(D) above.  Yet this
> presentation was never made to the jury.

ECF 29 at 111.  As shown, none of this is accurate.  Griffin was an investigator, not

an expert.  She even conceded at the hearing that she is not qualified to screen people

for mental illness because she does not have a medical background. 12 EHRR 126.

On the other hand, Drs. Lundberg-Love and Cunningham addressed all of these

issues, as Brown ultimately admits in various portions of his petition.  Because the

evidence Brown claims was not presented was in fact presented, he cannot

demonstrate prejudice.[21]

Further, Brown cannot demonstrate prejudice based on the totality of the facts.

In finding the evidence sufficient to support the jury's finding on future

dangerousness, the CCA held:

> The evidence shows that [Brown] had an escalating pattern of violence
> and disrespect for the law prior to killing Ray.  In the days leading up to
> the murder, [Brown] got into physical altercations with both Williams
> and Ray.  He admitted that he sawed off his shotgun because he planned
> "to go back and get [Williams] with it."  When police confiscated that
> gun, [Brown] stole Wesley's shotgun and sawed it off.  He also stole Ray's
> camera, which contained photographic evidence of their physical
> altercation on July 19.  He chased Ray in his car, forced her to pull over,

---

[21]    Brown also makes an unusual argument in his prejudice section claiming counsel's
ineffectiveness violated the Eighth and Fourteenth Amendments.  ECF 29 at 111–12 (citing,
*e.g.*, *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982); *Lockett v. Ohio*, 438 U.S. 586, 605 (1978);
*Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)).  Apart from being unexhausted and
defaulted, the argument is meritless.  *Lockett* and its progeny pertain to the consideration of
mitigating evidence and hold generally that the sentencer "not be precluded from considering,
as a mitigating factor, any aspect of a defendant's character or record and any of the
circumstances of the offense that the defendant proffers as a basis for a sentence less than
death."  438 U.S. at 604.  This precedent does not pertain to trial counsel's effectiveness.
Moreover, Brown cites no authority for the proposition that trial counsel's failure to
investigate and present mitigating evidence violates the Eighth and Fourteenth
Amendments, and the Supreme Court has never issued an opinion to that effect.  Thus,
Brown's argument, apart from being meritless, is barred under the non-retroactivity doctrine
of *Teague v. Lane*.

and "blew her head off" with Wesley's shotgun while their two small children were in the back seat of Ray's car.  He intentionally killed Ray despite knowing that she had called the police and seeing a police car behind him.  After committing this crime, he fled the scene and attempted to evade capture by the police.

[Brown] also demonstrated a lack of remorse for murdering Ray.  Shortly after committing the offense, [Brown] called Williams and Donna to brag and taunt them about killing Ray.  He left Williams voicemails threatening to kill him and his brothers.  He also sent Homerstead a text bragging that he "shot [Ray] in [the] head" and the "bitch is dead."  He later affirmed to both a television news reporter and fellow inmate Casper that he did not regret killing Ray. He expressed a continued desire to kill Williams in his letter to Casper.  He also continued to blame Ray for her own death when he testified at trial.

*Brown v. State*, 2015 WL 5453765, at *8–*9 (citations omitted).  Given this evidence, additional evidence cumulative of that already presented would not have altered the jury's verdict.  *See Santellan v. Cockrell*, 271 F.3d 190, 198 (5th Cir. 2001) ("[c]onsidering [petitioner's] history in light of the horrific nature of this offense, a reasonable court could conclude that there was no substantial likelihood that the outcome of the punishment phase would have been altered by evidence that he suffered organic brain damage.").  Thus, Brown cannot demonstrate prejudice.  At the very least, the state court's denial of this claim is not objectively unreasonable. 28 U.S.C. § 2254(d); *Richter*, 562 U.S. at 101.

Finally, Brown argues that the errors in this case can be cumulated to demonstrate prejudice, citing to *White v. Thaler* and *Richards v. Quarterman*. ECF 29 at 111.  This claim was addressed in Section I.C., *supra.*  To restate, the claim is unexhausted and defaulted, Brown has failed to demonstrate any constitutional errors, individual errors not of constitutional dimension cannot be cumulated to form

113

an error worthy of relief, and the Supreme Court has never recognized a claim of cumulative error. Therefore, this claim must be denied.

### III. Brown's Claim That Counsel Labored Under a Conflict of Interest Is Procedurally Defaulted and Meritless.

Brown alleges that his constitutional rights were violated because counsel was affected by a conflict of interest that required counsel to pick his fact investigator over defense strategy. ECF 29 at 113. He claims the defense intended to portray Ray in a bad light by highlighting her drug use, a defense trial counsel "promised" to the jury but on which it did not deliver. *Id.* at 118. James Smith's wife could have corroborated this defense, but was not called. And other than Brown, "[n]o other witness testified that Ray used drugs." *Id.* at 119. Thus, Brown alleges: "For a defense team to decline to call a witness who could have bolstered their defense merely because the defense investigator did not wish to have himself or his wife embarrassed at trial presented a clear conflict of interest." *Id.* at 116. He further argues that "[t]here is no question that Wilkinson's loyalties to Smith over his client prejudiced Brown. Wilkinson determined that it was more important to preserve the Smith[s'] standing in the community than support the defense's own theory in the guilt phase of Brown's capital trial." *Id.* at 120.

Brown concedes that he did not present this claim to the state court. *Id.* at 113. Consequently, this allegation is unexhausted and procedurally defaulted. Moreover, Brown cannot meet the *Martinez/Trevino* exception because he cannot show that this claim has some merit or that state habeas counsel was ineffective for not raising it.

In this circuit, this type of "conflict of interest" claim is evaluated under *Strickland* and not under the less demanding standard of *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). *Beets v. Scott*, 65 F.3d 1258, 1265–66 (5th Cir. 1995) (en banc). The Fifth Circuit has expressly limited *Cuyler* "to actual conflicts resulting from a lawyer's representation of multiple criminal defendants." *Hernandez v. Johnson*, 108 F.3d 554, 559 (5th Cir. 1997) (citing *Beets*, 65 F.3d at 1266). In limiting *Cuyler*, the Fifth Circuit has reasoned that "*Strickland* more appropriately gauges an attorney's conflict of interest that springs not from multiple client representation but from a conflict between the attorney's personal interest and that of his client. *Beets*, 65 F.3d at 1260; *see also United States v. Newell*, 315 F.3d 510, 516 (5th Cir. 2002) (noting that "*Strickland's* two-pronged analysis, including its requirement of a showing of prejudice, governs all [non-*Cuyler*] attorney-client conflicts, their range being 'virtually limitless'").[22]

As a preliminary matter, the Director notes that several assertions Brown makes in his petition are not supported by the record. First, he states that after discussing the conflict, "Brown's mother (rather than Brown himself) was asked to make [the] choice" between Smith remaining as the investigator and Smith's wife testifying. ECF 29 at 116–17. But in the portion of the hearing record Brown cites,

---

[22]    Brown recognizes that Fifth Circuit precedent controls here, ECF 29 at 111, but he asserts that *Cuyler* should apply without providing any additional explanation. *Id.* Because Brown cites no Supreme Court case for the proposition that *Cuyler* presumed-prejudice applies in this context, his claim is *Teague*-barred. Likewise, he cites no precedent for the claim that an investigator's supposed conflict can be imputed to trial counsel; thus, that argument is also *Teague*-barred. Moreover, even if *Cuyler* applied, Brown cannot show "an actual conflict that adversely affected counsel's performance," for the reasons stated herein. *Perillo v. Johnson*, 205 F.2d 775, 781–82 (5th Cir. 2000).

11 EHRR 104–05, Brown's mother Brenda Crofford never made that statement. She simply said that, in the meeting, Smith stated he would have to withdraw if his wife testified, and he would not allow her to testify. If she did testify, the defense would lose its investigator. 11 EHRR 102–05. At no point here did Crofford state *she* had to make the decision about Smith rather than Brown.

Second, Brown states: "Brown himself was never told about the conflict, let alone given the chance to consent to this decision." ECF 29 at 117. However, in the portion of the hearing record he cites, which refers to discussions Ferguson had with Brown, 10 EHRR 126, Ferguson addressed sealed record sessions she had with Brown. She stated that *during these sessions*, she "personally" did not tell Brown about this potential conflict. 10 EHRR 120–26. Ferguson did not state that Brown was never informed about this issue. Brown cites to no portion of the record supporting this claim. Indeed, that notion is refuted by the record. As discussed previously, Brown and his mother spent extensive periods of time with counsel during voir dire, 9 EHRR 53, 118; 10 EHRR 165, and Ferguson likewise spent a lot of time with Brown. 12 EHRR 67–68. Ferguson stated they discussed all issues regarding jury selection, guilt-innocence, and punishment with Brown. 12 EHRR 32–33. Ferguson also discussed *this* matter with Crofford and Brown's father Biff. 11 EHRR 54; 12 EHRR 27–28. The idea that Brown never knew about this matter—that neither counsel nor his family told him about it— does not withstand scrutiny.

Third, citing to the defense's opening statement, 40 RR 31–35, Brown portrays Ray's drug use as "integral" to the defense's overall theory. ECF 29 at 118. However,

all counsel stated during the defense's opening argument was that the evidence might show Ray had drugs in her system at the time she died.  40 RR 34.  That was trial counsel's only mention of Ray's purported drug use during opening argument.

Fourth, Brown states that, other than his testimony, "[n]o other witness testified that Ray used drugs."  ECF 29 at 119.  This is incorrect.  Brown's sister Taylor Harmon testified that she had seen Ray "smoke weed."  43 RR 32.  Brenda Crofford testified that both Brown and Ray used methamphetamine, 43 RR 45, although she conceded she never saw Ray use drugs.  43 RR 53.  The medical examiner also testified that Ray had metabolites of marijuana in her system, although those metabolites can be found in blood thirty days after use.  41 RR 54. Thus, Brown may have testified more extensively about Ray's drug use, *see* 43 RR 85–86, but he was not the only witness to mention it.

At any rate, Brown cannot demonstrate ineffectiveness under *Strickland*.  He cannot show counsel were deficient because, as shown in the paragraph above, there was additional evidence in the record of Ray's drug use, including from two defense witnesses.   Moreover, when counsel cross-examined the medical examiner, the medical examiner testified that it was possible Ray could have been driving around "high on marijuana" at the time of the offense.  41 RR 63.  Brown has also not shown that counsel's decision not to delve deeper into Ray's purported drug use was not a matter of reasoned trial strategy, particularly given that a strategy of focusing heavily on that topic, i.e., the victim's negative character, may have been counterproductive.  *Strickland*, 466 U.S. at 689 ("the defendant must overcome the

presumption that, under the circumstances, the challenged action might be considered sound trial strategy").

More importantly, Brown cannot demonstrate any prejudice for several reasons.  First, Brown assumes that due to this alleged conflict, trial counsel were absolutely precluded from presenting additional testimony about Ray's alleged drug use to support Brown's testimony.  However, Brown has not shown that Smith's wife was the *only* person who could have testified about this issue, assuming it is true and integral to the defense's strategy.  In other words, Brown's claim cannot succeed without a showing that this strategy depended solely on Smith's wife testifying.  If anyone else was available to testify about this matter—and, as shown, others did testify about Ray's drug use—then the alleged conflict was irrelevant.  Because Brown has not shown that only Smith's wife could have testified about Ray's supposed drug use, he cannot carry his burden.

Second, Brown's claim is speculative.  He states: "[Smith's wife's] testimony would have not only supported the credibility of Brown's testimony, it would have supported the defense theory of the crime, and delivered on defense counsel's promise to the jury that it would hear about the other side of Ray."  ECF 29 at 119.  This is premised an assumption that Brown's testimony combined with that addressed above was insufficient to support the issue of Ray's purported drug use.  Thus, Brown is complaining about counsel's failure to present cumulative evidence, which is inadequate to demonstrate ineffectiveness.  *Norman*, 817 F.3d at 233.  Moreover, "[t]o prevail on an ineffective assistance claim based upon uncalled witnesses, an applicant

118

must name the witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable." *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010).  Brown names the witness, Jennifer Smith, but he merely speculates as to whether she would have testified, the content of her testimony, and its favorability.  The supposition is that Smith would have stated she and Ray used drugs together, but Brown offers no actual proof to confirm this.[23]  Claims of uncalled witnesses are disfavored on habeas review, *id.*, in part because speculation as to what an uncalled witness would have testified is too uncertain.  *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985).

Third, and most importantly, Brown cannot demonstrate any prejudice because Ray's supposed drug use was inconsequential to the outcome.  The issue at guilt-innocence was whether Brown committed the aggravating element.  Ray's drug use did not factor into whether Brown murdered her during the course of retaliation, obstruction, or committing a terroristic threat; the aggravating element depended on distinct facts not dependent on one of Ray's supposed personal flaws.  Moreover, Brown's statement that the defense settled on "the bitch deserved it" defense, to which this matter was integral, is baseless for the reasons addressed in the prior sections.  As shown, trial counsel's defense was that Brown murdered Ray because he feared she was taking away his children, not because she "deserved it."  Her

---

[23]     Likewise, Brown's argument assumes Smith would not have taken the Fifth Amendment had she been called.  That assumption is dubious given that she would have been admitting to illegal drug use.

alleged drug use has no bearing on this issue.[24]   Regarding the punishment phase, Brown complains that because Smith's wife did not testify, Griffin was unable to incorporate her information into Brown's social history.   ECF 29 at 117–18, 21. Disregarding the fact that Brown argues that counsel failed to even utilize Griffin's social history, Brown does not explain how this would have altered the outcome given that Brown's drug use was discussed extensively during punishment by Drs. Lundberg-Love and Cunningham.   He does not address how adding Ray's drug use to the picture would have altered the outcome.   His allegation is, therefore, conclusory.[25]   *Miller*, 200 F.3d at 282.

Lastly, even if the *Cuyler* standard applied here—and it does not—Brown would be unable to demonstrate a meritorious claim.   Regarding an actual conflict of interest that adversely affected counsel's performance, "'adverse effect' may be established with evidence that some plausible alternative defense strategy or tactic could have been pursued, but was not because of the actual conflict impairing counsel's performance."   *Perillo*, 205 F.3d at 781 (internal quotations and citation omitted).   As stated, Brown has not shown that, but for the alleged conflict and Smith's testimony, counsel was precluded from presenting the evidence of Ray's drug

---

[24]     Oddly, in his petition, Brown asserts that counsel's failure to call Smith's wife "hamstr[ung] themselves from effectively arguing their (*strategically unsound*) theory of the case to defend Brown from a capital murder conviction."   ECF 29 at 116 (emphasis added). If the theory was strategically unsound, then there is not a reasonable probability that additional evidence supporting this theory could have altered the outcome of the trial.

[25]     In a footnote, Brown mentions that Wilkinson supposedly briefly represented the inmate whose letter was admitted at trial.   ECF 29 at 115 n.28.   But Brown does not claim that this amounted to conflicted multiple representation under *Cuyler*, and the Director does not construe Brown to make that allegation.

use because (1) that evidence was presented and (2) Brown has not shown this strategy depended solely on Smith testifying. *United States v. Garcia-Jasso*, 472 F.3d 239, 243 (5th Cir. 2006) (a conflict is hypothetical unless attorney made a choice between options). Thus, even under a less demanding standard, Brown cannot prevail.

In sum, because Brown has failed to show that his *Strickland* claim has some merit, let alone that state habeas counsel was ineffective for failing to raise this claim, he fails to meet the *Martinez/Trevino* exception. Therefore, his claim is defaulted and alternatively meritless.

## IV. Trial Counsel Were Not Ineffective for Not Moving for a Change of Venue, and Brown Was Not Deprived of Due Process by the Trial Court's Failure to Change Venue.

Brown alleges that trial counsel were ineffective for not moving for a change of venue and, alternatively, that the trial court erred by not sua sponte changing venue. ECF 29 at 121–28. Brown claims:

> Given the community bias toward Brown, as exhibited in the media, community social media, and the extensive inflammatory pre-trial coverage, it was unreasonable under prevailing professional norms for defense counsel to not file a motion for a change of venue. The extensive publicity in the town of Greenville was mainly generated by local newspaper and television. The victim was well-known in the community and an elementary school teacher. Given the localized nature of the adverse publicity, and the victim's recognition in the close-knit community, there was no reasonable trial strategy for defense counsel not to move to have the trial moved out of Greenville and Hunt County.

*Id.* at 123. He also claims that trial counsel's strategy of wanting jurors who knew both parties was unreasonable because "[t]here could be no guarantee that whoever the people were 'who knew both parties' and 'their actual reputation' would make it

on the jury," and "there was a greater chance that those people who did know the parties well enough to know their 'actual reputation,' [would] be excluded from the jury—either for cause or by peremptory strike." *Id.* at 124. This latter claim is contradictory because Brown subsequently argues that many people in the jury pool knew the prosecutors and Ray, and the prosecution used this familiarity to its advantage. *Id.* at 124–25. Thus, Brown concedes trial counsel's point after claiming it was unfounded.

Brown's IATC claim was adjudicated on the merits by the state court and rejected. Brown concedes his claim of trial court error is unexhausted. *Id.* at 127. The latter claim is defaulted, and both claims are meritless.

### A.     State court findings

On habeas review, the state court issued the following extensive findings rejecting this claim:

The Venire Panel

●     During general voir dire, approximately 140 prospective jurors appeared. 14 RR 12. Of the 140 venire members, thirty-one indicated that they knew about the case. [14 RR] 16. Of those thirty-one, twenty-one indicated that they had formed an opinion about the case. [14 RR] 17. Thirteen venire members revealed that they knew [Brown] or his family. Of those thirteen, seven said they had formed an opinion about the case and could not be fair. *Id.* Fourteen venire members indicated that they knew Stella or her family. [14 RR] 18. Of those fourteen, eight revealed that they could not remain neutral. *Id.*

●     Further, of the 140 venire members, twenty—including four not among the thirty-one noted above—indicated that they had read about the case in the newspaper and had formed an opinion. [14 RR] 20. Of those twenty, fourteen said that the press coverage had affected their ability to perform their duties based solely on the evidence. [14 RR] 20–21.

●    At the conclusion of general voir dire by the trial court, both the State and defense agreed to excuse for cause twenty-six venire members. [14 RR] 23.  After further voir dire by the State and defense, the parties agreed to excuse eight more.  [14 RR] 67.  In total, the State and defense agreed to excuse thirty-four venire members for cause because they indicated that they could not remain impartial based on the publicity or allegiances to the families involved.  Thus, only twenty-five percent of the venire knew about the case from the press coverage and stated that they could not set aside their views.

●    The Court finds that, based on the record and given the small size of the county, this amount does not establish inflammatory and widespread prejudicial coverage.  *See Dewberry v. State*, 4 S.W.3d 735, 745 (Tex. Crim. App. 1999) ("A trial court may use the jury selection process to gauge the tenor of the community as a whole.").

●    The Court finds that the Court of Criminal Appeals and other appellate courts have found trial courts within their discretion in cases when the courts seated panels where 69 venire members out of 109 had seen publicity on the accused's case, where 44 out of 72 had seen publicity on the defendant's case, and where 52 panelists out of 64 had seen something on the defendant's case.  *See Gonzales v. State*, 222 S.W.3d 446, 450 (Tex. Crim. App. 2007).

●    The Court finds that the Court of Criminal Appeals has also found the trial court acted within their discretion when they seated juries where 15 venire members out of 77 stated that they had an opinion that could not be set aside, and where 39 out of 112 held that same view. *Gonzales*, 222 S.W.3d at 450 (footnotes omitted).

<u>Seated Jurors</u>

●    During individual voir dire, jurors who indicated on the juror questionnaire that they were aware of the case were questioned by either the State, the defense or both regarding their knowledge of the case and whether it would affect their ability to remain unbiased. *See* Applicant's Exhibit 27.

●    Of the fourteen jurors selected, six—Robert Hugh Johnston, David Lloyd Yost, Arliri Irwin McCroskie, Jodie Alana Cannon, Matthew D. Bradshaw, and Lisa Gay Danley—were not asked and gave no indication that they knew anything about the case.  *See* 22 RR 56–139; 25 RR 12–70; 30 RR 9–63; 32 RR 16–72; 37 RR 24–77, 82–120.

123

●   With regard to the remaining eight, Juror Paula Pope stated that she heard Stella was a teacher, but that she knew nothing else about Stella, did not know [Brown], and does not read the paper nor watch the news.  15 RR 54–55.

●   Juror John Adel stated that he went to church with Jeff Ott, who is [Brown's] cousin, and that Ott told him about the case.  Adel testified that Ott did not mention anything to affect Adel's impartiality because Ott failed to provide much detail about the crime.  Adel testified that Ott just told him that the crime was tragic.  [15 RR] 180–84.

●   Juror Stacy deClercq stated that she "googled" the crime after the general voir dire and "got, like, two lines."  She said the information she found on the internet would not affect her ability to remain unbiased because the media reports on events before all the evidence has been presented and, thus, she discounted the significance of news reports.  16 RR 36–37.

●   Juror Mark Sweeney stated that he did not know Stella, he knew nothing about the case from television or news, and he had heard nothing at his son's daycare about the case.  18 RR 46–47.

●   Juror Jimmy Don Moore stated that he knew some officers who worked for the Greenville Police Department, including Officer White.  But that would not affect his impartiality.  More importantly, he said that while he had heard about the case via word of mouth—that it involved a shooting into some type of car—he did not know any of the facts, and what he knew would not affect his ability to judge fairly.  29 RR 36–41.

●   Juror Janette Manley said that she knew [Brown's] step father—Charles Gafford—because she worked on her practicum with him.  However, the relationship was strictly professional.  [29 RR] 98–101.  She also indicated that she knew some others in law enforcement, but that this would not affect her impartiality.  [29 RR] 106–10.  Further, she said that she knows [Brown's] mother because his mother works for the dentist who treats Manley's daughters.  [29 RR] 116.  However, she does not know [Brown], and her acquaintance with [Brown's] mother would not affect her impartiality.  [29 RR] 116–17.  Manley testified that her daughter told her about the case, but only that [Brown's] defense attorney's wife is a teacher.  [29 RR] 126 ("I just remember [my daughter] connecting maybe your wife with the case.").  Her daughter did not tell her anything that would cause her to form an opinion about the case.  *Id.*

●   Juror Debbie Jean Dunham testified that she knew about the case because she and her husband lived close to the crime scene.  35 RR 137. [35 RR] 138.  She went in the house, and her husband went down the street to find out what happened.  [35 RR] 139.  He came back and said that he did not find out much, only that it appeared someone had been shot.  [35 RR] 139–40.  He provided vague details, and other than reading an article in the paper about the case in 2011, she did not know any particulars.  [35 RR] 137–40.  She testified that nothing about what she had heard would affect her ability to judge impartially.  [35 RR] 140.

●   Juror Theresa Roseberry Sadler stated that she knew a lot of the Greenville police officers because her father used to be police chief. But she said that this would not affect her ability to judge impartially.  36 RR 90–92.  Further, like John Adel, she had heard about the case from Jeff Ott because they were in a prayer group.  [36 RR] 92.  Ott was grieving, and he shared some of his concerns and emotions.  *Id*.  However, Ott did not give her any specifics about the crime; he was simply emotional and talked about what was going on with his family.  [36 RR] 93.  Sadler stated that her experience with Ott would not sway her one way or another.  [36 RR] 93–94.

●   The Court finds, based on the record, that the jury itself was not tainted by pre-trial publicity.  Six of the jurors knew nothing at all about the case, and the remaining eight had heard about their case, but it is clear from their individual voir dire testimony that they did not have specific details regarding the crime, and there was nothing in the record to indicate that what little they did know about the crime would alter their ability to judge fairly and impartially.

Pretrial Publicity

●   [Brown] attached several news articles to support his claim that the pre-trial publicity in this case was prejudicial.  Applicant'[s] Petition Exhibit 16.

●   [The] Court finds, based on a review of these articles, that they essentially fall into four categories: factual reporting about the crime, articles of remembrance about Stella, articles pertaining to domestic violence awareness in the county, and reports about pre-trial hearings and the start of the trial.  *See* Applicant['s] Exhibit 16.

●   The Court finds that the articles submitted by [Brown] in Exhibit 16 reporting on the instant murder generally end a few months after the offense occurred, more than a year and a half before trial.

125

●     The Court finds that other articles about Stella's death and domestic violence begin to appear in September of 2011 and 2012 and end in October of those same years, and that this timing coincides with an annual Domestic Violence Awareness Month, which occurs in October in Hunt County.

●     The Court finds that the articles written in the months leading up to trial are only factual recitations of the proceedings, and these articles are not about Stella or the domestic violence event.

●     The Court finds that the evidence submitted by [Brown] in support of his claim does not demonstrate inflammatory and prejudicial publicity that may have tainted his trial.  *See Gonzales*, 222 S.W.3d at 451 ("News stories, be it from print, radio, or television, that are accurate and objective in their coverage, are generally considered by this Court not to be prejudicial or inflammatory.").

●     The Court finds that because the trial court would have acted within its discretion in denying a motion to change venue, trial counsel [were] not ineffective for failing to lodge this request.  *See Andrews v. Collins*, 21 F.3d 612, 632 (5th Cir. 1994) (finding no error in the denial of a venue change where publicity concerning the murder was largely factual in nature and defendant failed to uncover deep or widespread prejudice against him during voir dire); *Herbst v. State*, 941 S.W.2d 371, 374 (Tex. App.—Beaumont 1997[, no pet.]) ("[t]he mere fact that a crime was publicized in the news media does not establish prejudice or require a change of venue per se."); *see also Powell v. State*, 898 S.W.2d 821, 826 (Tex. Crim. App. 1994) (holding trial court did not abuse discretion in denying motion to transfer venue where the articles introduced by appellant "indicate that the underlying facts and circumstances of this case were publicized by the Beaumont press during the week after the victim's death, almost four months before the venue hearing and eight months before appellant's trial"); *Nethery v. State*, 692 S.W.2d 686, 694–95 (Tex. Crim. App. 1985) ("The few articles that were introduced appeared in the local newspapers immediately after the murder.  The trial was held about four months later.  Appellant has not shown that outside influences affected the community's climate of opinion.").

●     [Brown] fails to demonstrate deficient performance, much less harm, based on the alleged deficiency of trial counsel in failing to move to change venue.  *Strickland*, *supra*.  Additionally, [Brown] does not overcome the strong presumptions that trial counsel's actions fell within the wide range of reasonable professional behavior and were motivated

by sound trial strategy. *Id*. at 689; *Thompson* [*v. State*], 9 S.W.3d [808,] 813–14 [(Tex. Crim. App. 1999)]; *Jackson* [*v. State*], 877 S.W.2d [768,] 771 [(Tex. Crim. App. 1994)].

14 SHCR 5747–51, 5756.  This decision is not objectively unreasonable.

### B.    Trial counsel were not ineffective.

The Fourteenth Amendment protects a defendant's Sixth Amendment right to have his case decided by an impartial jury, *Irvin v. Dowd*, 366 U.S. 717, 722 (1961), and a defendant may request a "transfer of the proceeding to a different district ... if extraordinary local prejudice will prevent a fair trial—'a basic requirement of due process.'" *Skilling v. United States*, 561 U.S. 358, 378 (2010) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). The Supreme Court has stated that an impartial jury is not one in which the jurors must be totally ignorant of the facts and issues involved in the case.  *Irvin*, 366 U.S. at 722; *see also Dobbert v. Florida*, 432 U.S. 282, 301 (1977).  "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Irvin*, 366 U.S. at 723; *see also Murphy v. Florida*, 421 U.S. 794, 800 (1975).  Even extensive community knowledge about the crime and the accused is insufficient to violate constitutional guarantees.  *Dobbert*, 432 U.S. at 303.  Moreover, relief is not warranted unless Brown can show a "trial atmosphere utterly corrupted by press coverage."  *Id*. Finally, under *Strickland*, it is Brown's burden to "overcome the presumption that,

127

under the circumstances, the challenged action might be considered sound trial strategy."  466 U.S. at 689 (citation and internal quotations omitted).

### 1.    Trial counsel were not deficient.

At the state court hearing, both attorneys explained their rationale for not seeking a change of venue.  Wilkinson discussed the pros and cons of doing a motion to change venue with Brown, but ultimately the decision was made not to make a motion, with Brown's approval, in part because Brown's family was respected in the community, there was sympathy for Brown, and Ray did not have a reputation for being a nice person.  10 EHRR 100–01, 169.  Wilkinson did not want to attack the victim, and remaining in the community where the victim's reputation was known would allow the defense to avoid such attacks.  10 EHRR 168.  He noted that the media coverage was portraying Brown unfavorably and the victim favorably, and in a new venue that media coverage was all people would know, whereas in Hunt County the jurors would have more knowledge of the individuals involved.  10 EHRR 168.

Ferguson testified that there were concerns about the publicity in the case because it was a "notorious case" in a small community; that she and Wilkinson discussed that it could "cut both ways" because there were a lot of people who knew the Brown family and had good opinions of them, and there were also a lot of people who knew that there was a "shoveling-cocaine-up-her-nose Stella"; and that if they moved they would have "12 strangers who have no idea of any of the dynamics" and "don't care about any of the families involved."  12 EHRR 58–59.  Ferguson testified

that it was ultimately Brown's decision as to whether they would move to change venue because the motion requires an affidavit from the defendant.  12 SHRR 60.

Brown fails to demonstrate that trial counsel's decision amounted to an unreasonable strategy.  His argument is premised on his speculative assertion that trial counsel could not guarantee people who knew both Ray and the Brown family would sit on the jury and that it was more likely that such people would be excluded from the jury.  ECF 29 at 124.  As stated, he then contradicts himself when, in the very next section, he presents some evidence regarding how "tight knit" the community was.  For instance, he states: "One of the jurors specifically knew the victim: 'Juror Sadler attended high school with Stella, where Stella was the homecoming queen Sadler's junior year and the two were both involved in the Environmental Awareness Club.'"  *Id.* at 125 (quoting 1 SHCR 113 n.19).  That proves counsel's point about why keeping the trial in Hunt County was a reasonable decision.  Brown then states: "There is no doubt the State used the juror familiarity to their advantage; knowing two of the jurors went to her church, prosecutor Aiken repeatedly invoked Christian concepts of mercy and repentance in her closing argument to argue for the death penalty."  *Id.* at 125.  This is sheer speculation; Brown provides nothing to show the prosecutor made this or any remarks solely because she knew two of the jurors, let alone that he was prejudiced by it.  In short, other than conclusory assertions, Brown offers nothing to show counsel's trial strategy was unreasonable under the circumstances.  He has certainly failed to show that this "conscious and

informed decision . . . permeate[d] the entire trial with obvious unfairness." *Pape*, 645 F.3d at 291.

### 2.   At any rate, Brown fails to demonstrate prejudice.

Brown fails to demonstrate that counsel's decision to keep the trial in Hunt County amounted to prejudice.   Again, his argument on prejudice is that the community was "close knit," some of the jurors knew the prosecutors and the victims, and, in conclusory fashion, that the prosecution tailored arguments to take advantage of the lack of relocation.   This hardly satisfies the above precedent.   Brown does not show "extensive community knowledge about the crime and the accused," let alone a "trial atmosphere utterly corrupted by press coverage."   *Dobbert*, 432 U.S. at 303.   At most, he has only shown that "the community was made well aware of the charges against him," which is insufficient to warrant relief.   *Id.* (noting as well that "[o]ne who is reasonably suspected of murdering his children cannot expect to remain anonymous").

Regarding Brown's reference to the Channel 11 interview, ECF 29 at 122, he has made no showing, and indeed does not claim, that the interview was shown repeatedly up until the time of trial.   By contrast, in *Rideau v. Louisiana*, to which Brown compares his case, *id.*, the Supreme Court held that in a rare case, pre-trial publicity can be pervasive and inflammatory essentially guaranteeing that a defendant cannot receive a fair trial in the county where the crime occurred.   373 U.S. 723 (1963).   In *Rideau*, a film of the defendant's staged interrogation and confession was shown to an estimated 97,000 of the 150,000 residents of Calcasieu Parish,

130

Louisiana, within a three-day period two weeks before arraignment. *Id.* at 724–25. Brown fails to show that this interview or the media exposure here reached that level of saturation.  For instance, he states: "Numerous newspaper articles also reported that Brown had made a videotaped confession to the police." *Id.* at 122.  A complaint about factual reporting does not suffice. *Andrews*, 21 F.3d at 632.  Moreover, the Supreme Court has held that its decisions "'cannot be made to stand for the proposition that juror exposure to ... news accounts of the crime ... alone presumptively deprives the defendant of due process.'" *Skilling*, 561 U.S. at 380 (quoting *Murphy*, 421 U.S. at 798–99).  Indeed, "[p]rominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*." *Id.* at 381 (emphases in original).

Regarding Brown's "Facebook" evidence, he states that "at least one Facebook page dedicated to Ray's memory was created after the shooting with thousands of members, and many members of the community changed their own Facebook profile photograph to a photo of Ray."  ECF 29 at 125 (internal quotations and citation omitted).  This evidence hardly demonstrates "pervasiveness," and Brown does not explain how it was inflammatory or prejudicial.  Considering that Facebook and other social media sites are now commonplace, a change of venue would be warranted in every case if simply commenting on these sites was deemed prejudicial. *Irvin*, 366 U.S. at 722–23.

In sum, Brown fails to show that trial counsel's decision, and Brown's decision, to keep the trial in Hunt County resulted in prejudice.  Importantly, as the state

habeas findings show, neither the jury pool nor the jury itself was tainted by excessive coverage of the case.  Jurors who could not remain impartial were dismissed, and those who ultimately sat on the jury gave no indication that they were influenced by press coverage or even knew much about the case.  A defendant must show "particular jurors selected for service in his case" harbored an "actual, identifiable prejudice attributable to that publicity[.]"  *Busby v. Dretke*, 359 F.3d 708, 725 (5th Cir. 2004).  Brown has failed to do so.  And as the Fifth Circuit has held, a fair trial in the face of even prejudicial pretrial publicity can usually be satisfied "through voir dire that ferrets out such prejudice."  *United States v. Lipscomb*, 299 F.3d 303, 344 (5th Cir. 2002).  That occurred in this case.  At the very least, the state court's rejection of this claim is not unreasonable.

### C.   Brown's claim of trial court error is defaulted and meritless.

Brown also alleges that the trial court should have sua sponte relocated the trial due to the alleged prejudicial coverage and the small size of the community.  ECF 29 at 126–28.  First, Brown concedes this claim is unexhausted.  *Id.* at 127.  Thus, it is procedurally defaulted.  Brown, however, claims he can overcome his default, citing *Martinez* and *Trevino*.  *Id.*  He is incorrect.  The Fifth Circuit has refused to extend the *Martinez* exception beyond the boundaries explicitly set by the Supreme Court in that case.  In other words, the exception applies only to IATC claims.  *See Murphy v. Davis*, 732 F. App'x 249, 257 (5th Cir. 2018); *Reed*, 739 F.3d at 778 n.16; *In re Sepulvado,* 707 F.3d 550, 554 & n.8 (5th Cir. 2013).  More importantly, the Supreme Court limited its holding in *Martinez* by declining to extend

it to claims of ineffective assistance of appellate counsel. *Davila v. Davis*, 137 S. Ct. 2058, 2065–70 (2016). Because the instant claim is one of trial court error, Brown's burden is higher. He must demonstrate "cause and prejudice" to overcome the bar or show a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. "Cause" requires Brown to show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986)*; see also Davila*, 137 S. Ct. at 2065 (a factor is only considered external "if it cannot fairly be attributed to the prisoner"). Brown fails to meet his burden because he does not even address his default, apart from his erroneous citations to *Martinez* and *Trevino*. He certainly has failed to show some external factor impeded state habeas counsel's ability to raise this claim. Nor does he demonstrate prejudice under *Coleman*, let alone that the failure to consider the claim will result in a fundamental miscarriage of justice. As such, it is defaulted. *Busby*, 359 F.3d at 724 (finding similar claim defaulted).

Second, Brown cites no Supreme Court precedent holding that a trial court may sua sponte change venue. In the absence of that precedent, Brown's claim is barred under *Teague v. Lane*. And although state law permits a trial court to sua sponte change venue, *see* Tex. Code Crim. Proc. art. 31.01, "federal habeas corpus relief does not lie for errors of state law." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (internal quotations and citation omitted).

133

Third, for the reasons addressed above, Brown cannot show that the trial court should have sua sponte changed venue, or that the failure to do so resulted in a biased or tainted jury.  Therefore, the claim is alternatively meritless.

## V.   Brown's Claims of Prosecutorial Misconduct Are Defaulted and Meritless.

In his next claim, Brown alleges that various remarks by the prosecution at punishment amounted to prosecutorial misconduct.  ECF 29 at 128–42.  As a preliminary matter, Brown claims these allegations were not presented to the state court and are, consequently, unexhausted.  *Id.* at 128.  He then asserts: "However, there is a clear path to merits review in state court, and should the claim be ultimately defaulted, any default is excused and this Court may review the claim de novo." *Id.*  Brown takes snippets from the prosecution's closing arguments that were in fact presented as grounds for error on direct appeal—some of which the CCA rejected on the merits—or on state habeas review, but he reconstructs the underlying legal allegation and the facts in an apparent attempt to render the claims unexhausted and, thus, avoid any deference to the state court decision under § 2254(d).  He should not be permitted to do so.  *Nelson v. Davis*, 4:16-CV-904-A, 2017 WL 1187880, at *11 (N.D. Tex. Mar. 29, 2017) ("Nor can petitioner obtain de novo review of claim that has been exhausted by piling on extraneous matters and alleging that he is presenting a new claim under *Martinez*.  Allowing such would completely undermine the purpose of habeas review.") (unpublished).  As explained below, because these were grounds for error addressed on appeal, the claims should be reviewed under § 2254(d), except where the claim is clearly unexhausted.

134

Further, should this Court determine the claims are unexhausted and defaulted, Brown cannot overcome the default because he does not provide any additional argument or citations regarding the exhaustion issue.  If he is relying on the *Martinez*/*Trevino* exception, it is inapplicable because Brown is raising claims of prosecutorial misconduct, not IATC.  Thus, he must show some objective, external factor impeded counsel's failure to raise this claim in state court.  *Carrier*, 477 U.S. at 488.  Brown has not done so given his failure to address this matter in his petition.  Nor does he demonstrate prejudice under *Coleman* or that the failure to consider the claim will result in a fundamental miscarriage of justice.  Consequently, if they are unexhausted, these prosecutorial misconduct claims are defaulted.

Brown's claims also lack merit.  The Supreme Court has recognized that prosecutorial misconduct may "so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process."  *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  To constitute a due process violation, the prosecutorial misconduct must be "'of sufficient significance to result in the denial of the defendant's right to a fair trial.'"  *Greer*, 483 U.S. at 765 (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985) (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976)).  Further, the Fifth Circuit has addressed the issue as follows:

> We analyze prosecutorial-misconduct claims in two steps.  First, we evaluate whether the prosecutor made an improper remark.  If so, then we determine whether the defendant suffered prejudice.  The prejudice step of the inquiry sets a high bar: Improper prosecutorial comments constitute reversible error only where the defendant's right to a fair trial is substantially affected.  Thus, a criminal conviction should not be

135

lightly overturned on the basis of a prosecutor's comments standing alone.  Rather, the determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict.

*Trottie*, 720 F.3d at 253 (internal quotations and citations omitted).  Further, "[t]o warrant a new trial, prosecutorial misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the trial*." Id.* (internal quotations and citation omitted); *see also Styron v. Johnson*, 262 F.3d 438, 449 (5th Cir. 2001).

### A.    The prosecution did not improperly comment on Brown's failure to testify.

Brown alleges that the prosecution commented on his failure to testify at the punishment stage of trial, referring to the following remarks:

> "Ladies and gentlemen of the jury, mercy is given by God to those who show true repentance.  Right?  True repentance.  Full unadulterated, unmitigated responsibility.  I did it.  It's my fault.  I'm not blaming my family.  I'm not blaming the victim.  I'm not blaming society.  I'm not blaming drugs.  I did it.  Please forgive me.  Show me mercy, Lord.  That's how mercy is given.  That's how repentance occurs.  *Have you seen that from this Defendant?  Absolutely not.  So give him what he's asking for*."

> "Who do we give life without parole to in a capital murder case?  A defendant who throws himself at the mercy of the jury. . . ."

> "So it's my fault, only me.  Blame me.  Punish me for what I did.  No one else, just me.  That didn't happen and it's not going to happen in this case."

ECF 29 at 130 (emphasis in original) (quoting 48 RR 51–53).  Brown referenced this argument in his first two points of error on direct appeal.  Appellant's Brief at 3, 14.  In Point of Error 1, Brown argued that the prosecution's argument deprived him of vehicle to permit the jury to give a reasoned moral response to his mitigating evidence.  *Id.* at 1–8.  In Point of Error 2, Brown argued in part that the prosecution's

136

comments to the jury "had the likely effect to further emphasize that the instructions required a nexus between [Brown's] mitigating evidence and the criminal acts for which he had been convicted." *Id.* at 12. The CCA held in part:

> [Brown] [ ] complains about the rebuttal portion of the prosecutor's closing argument, which occurred after defense counsel asked the jury to "render the deeds of mercy" to [Brown] when deciding the special issues. The prosecutor responded that "mercy is given by God to those who show true repentance," and that [Brown] had not done so. The prosecutor stated that [Brown's] murder of Ray was "a true reflection of lack of mercy," and then continued:

>> [PROSECUTOR]: Who do we give life without parole to in a capital murder case? A defendant who throws himself at the mercy of the jury.

>> [DEFENSE COUNSEL]: Objection, Your Honor, that is not the standard and she is misstating the law.

>> [PROSECUTOR]: Your Honor, she argued who should and should not get it [and] I think I should be able to argue against it.

>> THE COURT: Overruled.

>> [PROSECUTOR]: A defendant throws himself on his face in front of the jury and said I did it all, forgive me. It's my fault.

>> [DEFENSE COUNSEL]: Objection, Your Honor, that is not the standard. The standard is the two special issues. That is how you decide.

>> THE COURT: Ladies and gentlemen of the jury, you are the ones that decide the issues. And again, whatever the attorneys say is not evidence. It's argument.

> The prosecutor's argument about mercy was a permissible answer to the argument of opposing counsel. Defense counsel pleaded for the jury's mercy in closing argument, and the prosecutor properly argued against it.

*Brown v. State*, 2015 WL 5453765, at \*13–\*14.  On direct appeal, Brown did not raise this claim as a comment on his failure to testify at punishment.  On state habeas review, Brown referenced the same passage but claimed that trial counsel were ineffective for failing to object to the prosecution's remark as a comment on his failure to testify.  1 SHCR 92–97.  The state habeas court rejected this claim.  14 SHCR 5736–39 (FF 141–55).  Thus, the instant claim is a hybrid of the direct appeal and habeas claims.  But regardless of how Brown frames this allegation, the CCA analyzed it correctly on direct appeal, the state court decision should be afforded deference under § 2254(d), and the CCA's resolution is not objectively unreasonable under § 2254(d) to the extent that the claim is exhausted.  Likewise, the claim fails under de novo review if the Court considers the current claim unexhausted.  Moreover, regarding the state habeas IATC claim, the findings of fact are presumed to be correct, and Brown has failed to rebut the presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

Regarding a claim that the prosecution commented on a defendant's failure to testify, the Fifth Circuit has held that while the Fifth Amendment prohibits a prosecutor from making such a comment, the issue is whether "'the prosecutor's manifest intent in making the remark must have been to comment on the defendant's silence, or the character of the remark must have been such that the jury would naturally and necessarily construe it as a comment on the defendant's silence.'" *United States v. Davis*, 609 F.3d 663, 685 (5th Cir. 2010) (quoting *Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir. 1999)).  "'The prosecutor's intent is not manifest if there

is some other, equally plausible explanation for the remark.'" *Id.* (quoting *United States v. Grosz*, 76 F.3d 1318, 1326 (5th Cir. 1996)). The Fifth Circuit has also rejected the argument that a prosecutor's comment about a defendant's lack of remorse was improper "[w]ithout some indication that the prosecutor was referring to [the defendant's] failure to testify." *Coble*, 496 F.3d at 438.

As a preliminary matter, Brown testified at guilt-innocence. As such, the prosecution was clearly permitted to comment on the nature of his testimony. Brown seems to claim that because he did not testify at punishment, the prosecution's punishment arguments were off limits. But Brown has not shown that the prosecutor's punishment arguments were not merely permissible references to his guilt-innocence testimony, when they likely were. *See Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998) (prosecution did not comment on defendant's failure to testify where defendant "testified during the guilt/innocence phase of his trial" and "that testimony was a before the jury in making its determinations regarding punishment"). Brown cites no precedent holding that where a defendant testifies at guilt-innocence but not punishment, the prosecution is precluded at punishment from commenting on the defendant's earlier testimony. Nor has he shown that the prosecution actually commented on his failure to testify at the punishment phase.

At any rate, Brown combines portions of arguments that reveal two points: Brown showed a lack of remorse, and he did not deserve mercy. Regarding the former, the evidence supported the prosecution's comment about a lack of remorse because Brown testified at guilt-innocence that he still blamed Ray for the murder.

139

43 RR 164–65.   And after defense witnesses Morris Beene and Jason Hammock testified that Brown had exhibited remorse, 46 RR 14–15, 99–104, they expressed surprise that he still blamed Ray for the offense.   46 RR 28–29, 107.   Dr. Lundberg-Love expressed the same.   46 RR 200.   Brown also told Channel 11 he regretted killing Ray in front of his kids but did not regret killing her.   46 RR 159; SX 388H at 26.   He further stated that he "wanted [Ray] dead."   SX 388H at 21.   Additionally, Brown's letter to Casper, in which he said that he chased Ray down and "blew her head clean off," indicated a lack of remorse.   40 RR 224.   Brown exhibited a lack of remorse via his phone calls to Donna Ray and Lauren Homerstead.   40 RR 168–69; 43 RR 70–71 ("I shot the bitch, I told her not to fuck with my kids.").   Because the plausible explanation here was that Brown lacked remorse, not that he failed to testify, the prosecution's remarks were not erroneous.

Additionally, "Texas law provides that 'proper jury argument must fall within one of the following categories: (1) summary of the evidence; (2) reasonable deduction from the evidence; (3) in response to argument of opposing counsel; and (4) plea for law enforcement.'"   *Ward*, 420 F.3d at 497 (quoting *Borjan*, 787 S.W.3d at 55). Comments that pertain to a failure to testify are permissible if they are a "fair response" to the defendant's arguments.   *United States v. Robinson*, 485 U.S. 25, 28–32 (1988).   Here, before the State made the above argument, defense counsel asserted:

> Now, they say he's shown no remorse, no evidence of remorse. Really?   Did they forget about Morris Beene, who's a counselor and a pastor?   Did they forget about Pastor Hammock? Morris has been meeting with Micah once a week pretty much continuously since October of 2011.   He's a counselor and a pastor.   He's used to dealing with people who may be trying to snow him.

140

> What did he tell you?  He thought Micah Brown was sincere.  He
> had no doubt that Micah Brown was sincere in his regret for what he'd
> done and that he had changed.  Pastor Hammock said the same thing.

48 RR 38.  The prosecution's argument was a clear response to defense counsel's argument that Brown showed remorse.  Moreover, regarding the latter point about Brown not deserving mercy, this will be addressed in more detail in Section V.C.2., *infra*, but as the CCA held, the prosecution made this argument directly after Brown's counsel pleaded for mercy.   Again, this was a proper response to the defense's argument.  Moreover, Brown has failed to point to any place in the record where the prosecutor specifically remarked on his failure to testify at punishment.  *See Davis*, 609 F.3d at 685 ("As for whether a jury would naturally and necessarily construe a remark as a comment on the defendant's failure to testify, the question is not whether the jury possibly or even probably would view the challenged remark in this manner, but whether the jury necessarily would have done so.") (internal quotations and citations omitted).  Brown has failed to demonstrate prosecutorial misconduct.

### B.   Brown's Eighth Amendment arguments are meritless.

Brown alleges that various remarks by the prosecution violated the Eighth Amendment because "[t]he prosecutor improperly told the jury that Brown's mitigation evidence must be connected to the crime," but the Supreme Court has rejected a "causal nexus requirement."  ECF 29 at 131–32.  He further argues that various other comments by the State addressing his mitigating evidence were made to "unconstitutionally limit the scope of mitigation the jury could consider."  *Id.* at 132; *see also id.* at 134.  As shown in the previous section, Brown raised these claims

on direct appeal.  The CCA found that Brown failed to preserve error regarding one portion of the argument.  *Brown v. State*, 2015 WL 5453765, at \*12–\*13.  The Fifth Circuit has long held that the Texas contemporaneous objection rule is an adequate and independent state ground barring federal habeas relief.  *Scheanette v. Quarterman*, 482 F.3d 815, 823 (5th Cir. 2007).  But the CCA also held:

> When mitigating evidence is presented, all that is constitutionally required is a vehicle by which the jury can consider and give effect to the mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime.  [ ] Neither the trial court's instructions nor the prosecutor's arguments deprived the jury of a vehicle by which to consider and give effect to the mitigating evidence, nor did they require a nexus between the crime and the mitigating evidence.

*Id.* at \*14.  This decision is not objectively unreasonable under § 2254(d).

Brown first complains about the following statement from the prosecution: "'But there's nothing special about [Mr. Brown's family history] insofar as that *it was sufficient to cause the Defendant to commit this offense.*'"  ECF 29 at 132 (emphasis in original) (quoting 48 RR 23).  Brown also complains about the prosecution stating that the "'terrible things'" in Brown's past "'didn't kill Stella.'"  *Id.* (quoting 48 RR 56).  Brown relies on *Tennard v. Dretke* and *Smith v. Texas*[26] for his "causal nexus" argument.  ECF 29 at 131–32.  The Court held in these cases that evidence need not be "connected" to the offense to be given mitigating effect.  But both of these cases pertain to prior flaws in the Texas special issues that did not permit a jury to give effect to mitigating evidence, as well as errors in a "nexus" test employed by the Fifth Circuit.  *Smith*, 543 U.S. at 43–47; *Tennard*, 542 U.S. at 283–89.  Brown also relies

---

[26]   543 U.S. 37 (2004).

on cases such as *Lockett* and *Tuilaepa*,[27] which pertain generally to statutes that either did or did not permit individualized consideration of mitigating factors, as required under the Eighth Amendment.   *Lockett*, 438 U.S. at 606–08; *Tuilaepa*, 512 U.S. 976–80; ECF 29 at 133.   He further cites *Buchanan v. Angelone* for the proposition that a prosecutor's comments may not foreclose the jury's consideration of mitigating evidence, ECF 29 at 133, but the issue in *Buchanan* was whether a jury instruction violated constitutional principles.   522 U.S. 269, 277 (1998).   In other words, none of these cases are directly on point.

It is true that, in very specific instances, the Supreme Court has found a prosecutor's arguments to be sufficiently egregious to run afoul of the Eighth Amendment.   For instance, Brown cites to *Caldwell v. Mississippi*, 472 U.S. 320 (1985).   ECF 29 at 133.   But in *Caldwell*, the prosecution urged the jury not to view itself as the final decision-maker in determining whether the defendant would die because a death sentence would be reviewed for correctness by the state supreme court.   472 U.S. at 323.   The Supreme Court held that this violated the Eighth Amendment since it led jurors to believe that "the responsibility for determining the appropriateness of the defendant's death rest[ed] elsewhere."   *Id.* at 328–29.   In *Abdul-Kabir v. Quarterman*, the prosecution "made jurors 'promise' they would look only at the questions posed by the special issues, which, according to the prosecutor, required a juror to 'put . . . out of [his] mind' [petitioner's] mitigating evidence." 550 U.S. 233, 251 (2007).   The Court held that "[a]rguments like these are at odds

---

[27]     *Tuilaepa v. California*, 512 U.S. 967 (1994).

with the Court's understanding . . . that juries could and would reach mitigating evidence proffered by a defendant." *Id.* In Brown's case, the prosecution did not minimize the jury's role in considering the special issues, nor did it tell the jury what evidence it could and could not consider to be mitigating. Brown cites no Supreme Court case holding that a prosecutor's remarks like those here—a summary of or reasonable deduction from the evidence—violate the Eighth Amendment.

Importantly, regardless of how Brown frames his "nexus" allegation, claims of improper prosecutorial argument are still governed by due process and not the Eighth Amendment, despite the above exceptions. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (standard of review for claims of prosecutorial misconduct on habeas review is "the narrow one of due process, and not the broad exercise of supervisory power") (citation omitted). As explained above, Brown must show that the comments permeated his entire trial with unfairness. Brown has not made this showing, particularly considering that the jury was properly instructed on the mitigation special issue, "mitigating evidence" was defined, and the jury was told it need not agree on which evidence supported an affirmative finding to the special issue. 3 CR 688. Jurors are presumed to follow their instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).

Moreover, Brown disregards the full context of all of these arguments, including the above. These arguments all involve instances where the prosecution stated that the evidence Brown proffered was insufficient to mitigate the murder of Ray. *See* 48 RR 23–24. Specifically, the prosecution summarized the defense's

144

evidence, and stated: "I want you to think about that carefully.  Sufficient is a keyword and the reason its key is because it has to be sufficient.  It can't just be mitigating.  It has to be sufficient mitigating evidence."  48 RR 24.  The reason for this argument is that the second special issue specifically referred to "sufficient mitigating circumstance or circumstances."  *See* 3 CR 687.  The prosecutor, thus, stated that Brown's evidence did not satisfy this special issue, which was a proper summary of the evidence or reasonable deduction from the evidence.  The Supreme Court, moreover, has rejected a very similar claim.  In *Boyde v. California*, the petitioner argued the prosecution gave an argument that reinforced an impermissible interpretation of a statutory mitigating factor.  494 U.S. 370, 384–85 (1990).  The Supreme Court held:

> [W]e agree with the Supreme Court of California, which was without dissent on this point, that "[a]lthough the prosecutor argued that in his view the evidence did not sufficiently mitigate Boyde's conduct, he never suggested that the background and character evidence could not be considered."  [ ]  His principal tack was not to contend that background and character were irrelevant, but to urge the jury that despite petitioner's past difficulties, he must accept responsibility for his actions.

*Id.* at 384 (citation omitted).  Likewise, the prosecution here never stated the jury could not consider mitigating factors or "tried to unconstitutionally limit the scope of mitigation the jury could consider."  ECF 29 at 132.  The prosecution merely summarized what it believed to be inadequate mitigating circumstances.  Brown would have this Court fashion an Eighth Amendment rule that would essentially prohibit a prosecutor from offering the State's perspective of a defendant's evidence.  Brown offers no legal authority for this proposition.  Moreover, argument is not

evidence, *United States v. Valas*, 822 F.3d 228, 247 (5th Cir. 2016), and any error was cured by submission of the special issues, which have been repeatedly upheld. *Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009).

### C.    The prosecution's remarks did not deprive Brown of due process.

Brown argues that he was deprived of due process by various other comments by the prosecution during final argument of the punishment phase.  ECF 29 at 134–40.  These claims lack merit.

### 1.    Brown's claim of burden shifting lacks merit.

Brown contends that the following remark by the prosecution improperly shifted the burden of proof on future dangerousness to him:

> But there's nothing special about [Brown's mitigating evidence] insofar as that it was sufficient to cause the Defendant to commit this offense. *It's not sufficient to prove that he's not a future danger*, and it's not sufficient as a mitigating circumstance to justify life without parole.  It's just not.

48 RR 23 (emphasis added); ECF 29 at 134–35.  This claim is likely unexhausted and defaulted because, although the CCA quoted this remark in a portion of its opinion finding Brown failed to preserve error, *Brown v. State*, 2015 WL 5453765, at *12–*13, Brown did not argue on direct appeal that this comment improperly shifted the burden of proof on future dangerousness to him.  At any rate, the claim lacks merit.

For some context, the prosecution made this remark after arguing the State had proven beyond a reasonable doubt that Brown would "commit continuing acts of violence in whatever society he's in whatsoever."  48 RR 21.  The prosecution then moved on to a lengthy discussion of the second special issue, or the mitigation special

issue.  48 RR 21–26.  While summarizing Brown's proffered mitigating evidence via all the witnesses who testified at punishment on his behalf, the prosecution made the above remark.  It appears the prosecution was simply attempting to argue that Brown's evidence was insufficiently mitigating to warrant a life sentence, particularly given the prosecution's repeated references to "sufficient mitigating evidence," as stated in the second special issue.  48 RR 23–24, 29.

Regardless, even if it was an erroneous comment, Brown has failed to demonstrate any prejudice, i.e., that the comment deprived him of a fair trial.  The prosecution referred to its burden to prove future dangerousness three times during final argument, including after making the remark in question.  48 RR 13, 21, 30.  And the trial court instructed the jurors that the State had the burden of proving the first special issue.  48 RR 6; 3 CR 686.  As stated, jurors are presumed to follow their instructions.  *Weeks*, 528 U.S. at 234.  Brown has presented no evidence to the contrary; he has failed to show the jury did not hold the State to its burden of proof or that the jury was somehow confused by the remark.  And he has clearly not demonstrated that this remark deprived him of a fair trial.

### 2.    The State's religious references were invited.

Brown argues that "[i]n its closing argument, the prosecution repeatedly referenced God and equated the teachings of God to the duty of the jury.  This too was improper."  ECF 29 at 135–38.  The portion of the prosecution's final argument to which Brown complains is as follows:

> Ladies and gentlemen of the jury, mercy is given by God to those who
> show true repentance.  Right?  True repentance.  Full unadulterated,

> unmitigated responsibility. I did it. It's my fault. I'm not blaming my
> family. I'm not blaming the victim. I'm not blaming society. I'm not
> blaming drugs. I did it. Please forgive me. Show me mercy, Lord.
> That's how mercy is given. That's how repentance occurs. Have you
> seen that from this Defendant? Absolutely not. So give him what he's
> asking for. That's what they want you to do when you go back in there
> to make your decision. Think about that. . . . Stella Ray didn't have a
> chance to fight for her life. She didn't get a chance to repent and ask for
> God's forgiveness for whatever she had done in her life.

48 RR 51–52. Brown states: "Invoking religious authority and the will of God to argue

for the death penalty is improper and highly prejudicial." ECF 29 at 137. As shown

in Section V.A., *supra*, the CCA addressed the comments pertaining to "mercy" on

direct appeal and correctly held that the remarks were made in response to defense

counsel's comments about the same. Brown, however, did not argue on direct appeal

that the prosecution improperly invoked religious references. To the extent the claim

is unexhausted, it is procedurally barred from review. If this Court determines it is

exhausted, the state court's adjudication is not objectively unreasonable.

Brown ignores that the prosecution's comments were invited by the defense.

At the conclusion of the defense's argument, Brown's trial counsel stated:

> What did Shakespeare tell us about justice and mercy? Mercy is an
> attribute of God himself. And earthly powers show themselves like God
> when mercy seasons justice. Therefore, though justice be thy plea,
> consider this. In the course of justice, none of us should see salvation.
> We pray for mercy and that prayer teaches us to render the deeds of
> mercy. . . . And if you get to that second question and are answering that
> second question, I'm asking you on Micah's behalf, render the deeds of
> mercy. Thank you.

48 RR 51. The State's remarks about "God" and "repentance" occurred at the very

beginning of its rebuttal argument just following the concluding remarks by the

defense. 48 RR 51–52. This was unquestionably a response to the defense invoking

"God" and "mercy."  As such, it was proper.  *Ward*, 420 F.3d at 497.  Moreover, the prosecution did not invoke "God" as a basis for the jury to impose a death sentence. The prosecution argued that Brown did not deserve mercy due to his lack of remorse, which was also invited.  There was nothing improper about this argument.

### 3.  The alleged inflammatory remarks were a reasonable deduction from the evidence, plea for law enforcement, and invited by the defense.

Brown argues that the prosecution made inflammatory remarks during final argument.  ECF 29 at 139–40.  Specifically, he refers to the following:

> You know, he saws off one shotgun for Tracy Williams.  You can see that. He sawed that off thinking about killing Tracy Williams. That's his own testimony to Dr. Love.  That's a future danger right here.

> And when it didn't work, when Stella turned him in and he got it taken away, heck, he got another -- he got another one.  Went and got Wesley's gun.  Was that an accident that he took Wesley's gun?  You know, there's been all this talk about what a gun enthusiast he was and how he loved to shoot.  Why did he have to go get Wesley's gun?

> But you want proof of future danger?  Here you go.  He sat down and sawed that sucker off himself, himself, because he didn't have that one anymore.  Better yet, you want proof of future danger.  Let's stick some bullets in this sucker, lay it on the table and let the Defendant just walk out of this courtroom.

> [DEFENSE COUNSEL]: Objection, Your Honor.  That is improper argument and she knows it.  She knows better.  She's trying to inflame this jury.  That is not a proper argument.

> [PROSECUTION]: It is absolutely proper, Your Honor.

> THE COURT: Overruled.

> [PROSECUTION]: Stick bullets in it and let him walk out of this courtroom.  Do you think Tracy Williams would make it out of the courthouse alive?

[DEFENSE COUNSEL]: Your Honor, I'm going to object again.  She's mischaracterizing everything.  This jury knows Mr. Brown is never going to walk out of this courtroom out into the public again regardless of which sentence they impose.

THE COURT: Overruled.

[PROSECUTION]: So my question to you, ladies and gentlemen, I load the shotgun.  I lay it on the table.  I let him walk out of the courthouse.  In your mind, think this question, would Tracy Williams make it out of the courthouse doors alive?  What do you think?

48 RR 53–55.  Brown argues: "These inflammatory comments suggested to the jury that if it did not enter a death sentence, it was essentially placing a loaded shotgun in Brown's hands and placing members of the community, specifically Mr. Williams, in danger."  ECF 29 at 139.  Brown states the comment was constitutionally improper because the prosecution implied a non-death sentence for Brown meant a death sentence for Williams.  *Id.* at 140.  Brown raised a similar claim on state habeas review, but he argued that trial counsel were ineffective for failing to object, when in fact counsel did object.  1 SHCR 97–100.  He did not raise the claim as one of prosecutorial misconduct.  Consequently, this claim is unexhausted and defaulted.  Nonetheless, the trial court found that counsel could not have been ineffective because the prosecution's remarks were not improper.  14 SHCR 5741.  These findings are entitled to a presumption of correctness, and Brown has failed to rebut the presumption with clear and convincing evidence.

Here, the prosecution was not attempting to inflame the jury or inject new facts into the proceedings.  The argument was a summation of the evidence followed by a reasonable deduction from the evidence.  In his letter to Casper, Brown said he did

not regret killing Ray and "I would do the same to Tracy if I had the chance."  SX 86.

He left Williams voicemails following the crime in which he threatened to kill

Williams and his brothers.  *Brown v. State*, 2015 WL 5453765, at *4.  And Brown

testified at trial that he intended to use the sawed-off shotgun to kill Williams.  43 RR

193.  The prosecution's point was not that Brown would ever be able to walk out the

court room but that Brown still held a grudge and would harm Williams if he could.

This spoke directly to the future-dangerousness special issue and was also a proper

plea for law enforcement.

Moreover, the prosecution's remarks were not improper because they were a

response to defense counsel's arguments.  Specifically:

> The point Dr. Cunningham made after the fight with Tracy, Micah went
> and took meth, got all hopped up, going to go saw off a shotgun and said
> yeah I'm going to go kill Tracy.  And then what happened.  The drugs
> wore off a bit.  And in the cool morning light, he realized I don't need to
> do that.  Now, he was still messed up because he was thinking suicide.
> But have you heard any evidence that he ever did anything to Tracy
> other than make ugly phone calls after this event?  No.  He didn't go
> back over and blow Tracy's head off.

48 RR 43–44.  Because defense counsel addressed the conflict between Brown and

Williams and implied that Brown had no intention of harming Williams, the

prosecution was permitted to offer a counter argument.  There was nothing improper

about this argument, and Brown's claim is meritless.

### D.   Brown's cumulative error argument is defaulted and meritless.

Brown claims he is entitled to relief because "[c]umulatively, it is clear that

these constitutional errors prejudiced Brown."  ECF 29 at 141.  This claim is

unexhausted and defaulted because Brown did not raise it in state court.  It is also *Teague*-barred for the reasons stated above.  Regardless, it lacks merit.  As shown, the complained-of remarks above were proper given the full context.  There can be no prejudice based on cumulation when there is no error to cumulate.  *Turner*, 481 F.3d at 301.  Brown's argument that "[t]he improper statements by the prosecutor . . . are precisely the types of arguments the Supreme Court has identified as arguments that would deprive a petitioner of a fair trial," ECF 29 at 140, is refuted by the record.  Further, for the reasons addressed above, Brown has failed to demonstrate that the comments amounted to persistent and pronounced misconduct that deprived him of a fundamentally fair trial.  *See Harris v. Cockrell*, 313 F.3d 238, 245 (5th Cir. 2002).  Thus, he is not entitled to relief.

## VI.   Brown's Claims Pertaining to His Confession and Channel 11 Interview Are Defaulted and/or Meritless.

Brown argues that his constitutional rights were violated by the trial court's admission of his custodial confession into evidence and his Channel 11 interview.  He claims his confession should have been suppressed because he invoked his right to counsel, he did not knowingly, intelligently, or voluntarily waive his right to counsel, and he was denied counsel for his television interview.  ECF 29 at 142–48.  He also claims that the admission of these statements "fatally infected" his trial.  *Id.* at 148– 49.  Brown then alleges that trial counsel were ineffective for not moving to suppress these statements.  *Id.* at 149–50.

Brown states that these claims were raised in "similar form" in state court "but because the state courts failed to meet the standards that would trigger deference

under § 2254(d), this Court may consider the claim de novo." *Id.* at 142.  This is only partially correct.  Brown did not challenge the admission of his statements on direct appeal.  On state habeas review, he claimed that counsel were ineffective for failing to move to suppress these two statements, 1 SHCR 103–07, but he did not allege that his constitutional rights were violated by the admission of his statements.  Thus, his IATC claim is exhausted, but his Fifth Amendment claim is not.  The latter, therefore, is procedurally defaulted.

In a footnote, Brown states he "can overcome any default as the ineffective assistance of Brown's direct appeal counsel in failing to raise this claim constitutes cause for the default and resulted in prejudice to Brown."  ECF 29 at 142 n.36 (citing *Evitts v. Lucey*, 469 U.S. 387 (1985)).  However, the defense did not move to suppress the confession and did not object before it was played for the jury.  40 RR 197–98.  Because error was not preserved, appellate counsel could not have been ineffective.  *Davila*, 137 S. Ct. at 2067; *Givens v. Cockrell*, 265 F.3d 306, 310 (5th Cir. 2001) (holding appellate counsel not ineffective for failing to raise claim on appeal where error was not preserved; thus, raising the claim would have been frivolous).  Consequently, appellate counsel's failure to challenge the statements cannot constitute cause.  Brown, moreover, fails to demonstrate cause and prejudice under *Carrier* and *Coleman*.

Regarding the IATC claim, the state court found that when Brown was questioned by the police, he did not make an unequivocal request for counsel and, thus, the trial court would not have erred in denying a motion to suppress; trial

counsel were not deficient for not seeking to suppress the statement for that reason; even if Brown's statement could be construed as a request for counsel, Brown waived his rights when he continued to speak to the questioning officer, whose remarks were informational and not "badgering"; trial counsel made a legitimate strategic decision not to challenge the confession based on their understanding of the law at the time; and Brown was not harmed by the admission of the confession because identity was not an issue and the confession was cumulative of other evidence including Brown's own testimony. 14 SHCR 5743–45. Regarding the television interview, the state court found that the interview was not the product of a custodial interrogation; there was no evidence the television interviewer was acting pursuant to any agreement or agency with law enforcement; because the trial court would not have erred in denying a motion to suppress this statement, trial counsel could not have been deficient for not filing a motion to suppress; and Brown was not harmed by the admission of the statement because identity was not an issue and it was cumulative of other evidence including his testimony. 14 SHCR 5746. The CCA adopted this finding and concluded that trial counsel were not ineffective. *Ex parte Brown*, 2019 WL 4317041, at *1. This decision is not objectively unreasonable.

### A.   In addition to being defaulted, Brown's claims of trial court error are meritless.

#### 1.   Brown did not unequivocally request counsel.

Brown claims that when he was interrogated, he asserted his right to counsel and, thus, the police questioning should have ceased. ECF 29 at 144–45. He is incorrect. The relevant part of the police interview is as follows:

INVESTIGATOR: Have a seat right over there, Micah.  Micah, I'm [ ] Felicia Lineman [White], a detective up here.  This is Jamie Fuller.  She's also an investigator up here.  Okay.

THE DEFENDANT: Okay.

INVESTIGATOR: Before we do anything, let me read you this.  You know you have the right to remain silent.  Anything you say can and will be used against you in court.  You have the right to consult with an attorney and have an attorney present during questioning.  If you cannot afford an attorney, one can be provided to before any questioning at no cost.  Do you understand these rights?

THE DEFENDANT: Yes.

INVESTIGATOR: Okay.  With these rights in mind, do you wish to me speak to me now?

THE DEFENDANT: Well, I don't mind speaking to you, but I -- I feel like I've -- like I need a lawyer.

INVESTIGATOR: Do what?

THE DEFENDANT: I feel like I need a lawyer present to answer any questions.

INVESTIGATOR: I'm just going to ask you about what happened. And you and I know both what happened.

THE DEFENDANT: Yeah.  Yeah, we – I'll go ahead and tell you.

INVESTIGATOR: Okay.  Are you sure?

THE DEFENDANT: Yeah.

INVESTIGATOR: Okay.  And after this we'll go smoke cigarettes, all right?

THE DEFENDANT: All right.

INVESTIGATOR: Deal?  Okay.  First of all, let me start out getting your full name.

155

SX 388A at 2–3.  Brown then confessed to murdering Ray and explained to the police how it transpired.  *Id*. at 3–18.

The procedural safeguards established in *Miranda v. Arizona* protect an accused's Fifth Amendment privilege against self-incrimination during custodial interrogation.  384 U.S. at 478–79.  Prior to custodial interrogation, the subject is to be informed that (1) he has the right to remain silent; (2) anything said can and will be used against him in court; (3) he has the right to consult with counsel prior to questioning; (4) he has a right to have counsel present at the interrogation; and (5) if he cannot afford an attorney, one will be appointed.  *Id*. at 468–70, 479.  Further, "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present."  *Id*. at 474.

As a preliminary matter, Brown's claim of trial court error in admitting his confession fails because he is complaining of an error that did not occur—he did not object or challenge the admission of the confession at trial, thus there was no adverse ruling.  *See Schumacher v. State*, 72 S.W.3d 43, 50 (Tex. App.—Texarkana 2001, pet. ref'd) (trial court was not required to take action sua sponte to determine the voluntariness of defendant's confession where defendant failed to pursue motion to ruling).  Brown cites no Supreme Court precedent mandating that a trial court is required to sua sponte review a confession for the voluntariness of a *Miranda* waiver.  Therefore, his claim is *Teague*-barred.

Regarding the merits of Brown's claim, in *Davis v. United States*, the Supreme Court held that the invocation of the right to counsel "'requires, at a minimum, some

statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" 512 U.S. 452, 459 (1994) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). The Court stated that the police need not cease questioning a suspect if the suspect makes an ambiguous or equivocal reference to an attorney that the officer would have understood "only that the suspect *might* be invoking the right to counsel." *Id.* (emphasis in original). Essentially, a suspect is required to unambiguously request counsel, and "a statement either is such an assertion of the right to counsel or it is not." *Id.* (quoting *Smith v. Illinois*, 469 U.S. 91, 97–98 (1984)). Thus, the Court set out a bright line rule: in order to invoke the right to counsel during questioning, the suspect must invoke his right to have counsel present "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, [*Edwards v. Arizona*] does not require that the officers stop questioning the suspect." *Id.*

The *Davis* Court held that a suspect's statement during interrogation that "maybe I should talk to a lawyer" did not satisfy this standard. *Id.* at 462. Brown's case is similar. He said that he did not mind speaking to Officer White, but that he "felt" like he needed a lawyer. Officer White then stated her intentions and expressed the fact that the crime was no mystery. At that point, Brown agreed to talk. Officer White asked, "Are you sure?" Brown reiterated his decision to speak.

Brown did not unequivocally assert his right to counsel. Instead, he indicated his desire to talk, accompanied by expression of a feeling that talking in the presence

157

of counsel might be better.   The Fifth Circuit has consistently found similar statements to be equivocal under *Davis*.   *White v. Thaler*, 522 F. App'x 226, 231 (5th Cir. 2013) (suspect's statement "I have a right to a, one ... I definitely have the right to have a lawyer present" was merely an acknowledgement of his right to counsel and not an unequivocal assertion of that right) (unpublished); *United States v. Carrillo*, 660 F.3d 914, 923 (5th Cir. 2011) (under the circumstances, suspect's statement "I wish I had a lawyer here" was not an invocation of the right to counsel); *United States v. Montes*, 602 F.3d 381, 385 (5th Cir. 2010) (statements "Maybe I should get an attorney" or "Do I need an attorney?" did not amount to clear invocation of the right to counsel; *United States v. Gibson*, 108 F. App'x 975, 976 (5th Cir. 2004) (statements "Do I need an attorney?" and "Well, this sounds serious.   Maybe I need to talk to an attorney" did not constitute unequivocal requests for counsel) (unpublished).   And other federal appellate courts have held that ambiguous statements such as Brown's do not amount to a clear request for counsel.   *United States v. Havlik*, 710 F.3d 818, 821–22 (8th Cir. 2013) ("In response to an officer's statement that he had the right to counsel, Havlik responded: 'I don't have a lawyer.   I guess I need to get one, don't I?' This question is insufficient to trigger an obligation to cease questioning."); *Henness v. Bagley*, 644 F.3d 308, 319–20 (6th Cir. 2011) ("I think I need a lawyer" not an unambiguous request for counsel); *United States v. Williams*, 446 F. App'x 587, 590 (4th Cir. 2011) (holding that defendant's statement "I don't think I want to say anything more until I talk to a lawyer" was substantially similar to statements found to be equivocal) (unpublished).   Similarly, absent a specific request to have an

158

attorney present for questioning, Brown's assertion that he felt like he needed an attorney was not an unequivocal invocation of that right. *See Hogue v. State*, No. 11-11-00143-CR, 2013 WL 1748836, *3 (Tex. App.—Eastland Apr. 18, 2013, no pet.) ("The statements, 'I feel like I need a lawyer' and 'I think I need a lawyer,' are substantially the same and, under federal and Texas case law, do not unambiguously tell police the defendant is invoking his right to counsel.") (unpublished).

Further, after Brown stated that he would talk to Officer White, Officer White asked Brown if he was sure about agreeing to talk. Brown responded: "Yeah." Thus, Officer White attempted to ascertain whether Brown was invoking his right, and he stated that he was not. Given that Brown waived his rights after Officer White asked a clarifying question, it was proper for her to question Brown. *Davis*, 512 U.S. at 461 (although it is not required, "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney."); *see also Barnes v. Johnson*, 160 F.3d 218, 225 (5th Cir. 1998). In fact, Brown testified at trial that he spoke to the police voluntarily, which forecloses his claim. 43 RR 156.

Brown cites *Smith v. Illinois* in support of his claim, ECF 29 at 144–45, but this case is not on point. In *Smith*, which was decided before *Davis*, the Supreme Court held that it did not need to decide the standard for an ambiguous or equivocal assertion of the right to counsel because the defendant's request was unequivocal. 469 U.S. at 95–97, 99–100. Specifically, after being advised of his right to counsel, the defendant said, "Uh, yeah. I'd like to do that." *Id.* at 93, 97. The Court noted that

with the possible exception of the word "uh," the defendant's statement was neither indecisive nor ambiguous.  *Id.* at 97.  Moreover, the issue in *Smith* was that the lower courts found the assertion equivocal based on arguably ambiguous comments the defendant made *after* he said "I'd like to do that."  *Id.* at 97–98.  Thus, the Court held that "an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself."  *Id.* at 100 (emphasis in original).  *Smith* did not address the issue before the *Davis* Court, and it does not pertain to the issue here.

### 2.  If Brown's remark is construed as a request for counsel, he subsequently waived that right and chose to speak with police.

To the extent that Brown did request counsel, his immediate change of heart also precludes relief.  In *Edwards v. Arizona*, the Supreme Court held that after an accused invokes his right to counsel, he is not subject to further interrogation until counsel has been made available unless the accused initiates further conversation with police.  451 U.S. at 484–85.  But the Fifth Circuit has rejected "an interpretation of *Edwards'* prophylactic rule that is divorced from the context of badgering police conduct from which the rule sprang."  *Plazinich v. Lynaugh*, 843 F.2d 836, 838–39 (5th Cir. 1988).  In *Plazinich*, the accused spoke to an attorney but subsequently changed his mind and agreed to talk to the police.  "Presumably, this change of heart occurred because Officer Rossi informed Plazinich that his co-defendant had attempted suicide because she was afraid she would face responsibility for the whole crime herself.  It is difficult to conceive, however, that one informational comment

made to a defendant can be so 'overreaching' as to violate the spirit of *Edwards*." *Id.* at 839. The court further stated that while Officer Rossi technically spoke first, he made only an informational comment; Plazinich actually initiated further dialogue with Rossi. *Id.* Rossi's informational comment did not violate *Edwards* because "it emphasizes that the police have fatally erred only when they recommence interrogation after an accused has asserted his right to counsel. Officer Rossi's reporting to Plazinich one true fact concerning his co-defendant cannot be interpreted to have reinstituted custodial interrogation." *Id.* (citations and footnote omitted). As the court noted, "The Supreme Court later characterized the [*Edwards*] holding as 'in effect a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers in the manner in which the defendant in *Edwards* was.'" *Id.* at 838 (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983)).

Here, after Brown said he "felt" like he needed a lawyer, Officer White did not commence interrogation, nor did she ask a question. She simply stated the purpose of her questioning, followed by a remark indicating that both she and Brown knew what happened. At most, Officer White's remark was informational and certainly not "badgering" as prohibited by *Edwards*. *See Enoch v. Gramley*, 70 F.3d 1490, 1500 (7th Cir. 1995) ("Briefly reciting to a suspect in custody the basis for holding him, without more, cannot be the functional equivalent of interrogation."). The fact that Brown immediately agreed with the officer and chose to speak indicates that Officer White's comment was not overreaching. Brown's remark reveals that he desired to waive the right to counsel and confess. Thus, to the extent Brown initially invoked

his right to counsel, his confession was admissible because he initiated communication.  Finally, as stated, Brown conceded at trial that he voluntarily spoke to police.  43 RR 156.  Clearly his confession was admissible.

### 3. Brown's claim that he did not knowingly, voluntarily, or intelligently waive his *Miranda* rights is defaulted and meritless.

Brown alleges that he did not knowingly, voluntarily, or intelligently waive his *Miranda* rights due to his alleged mental impairments.   ECF 29 at 145–46. Specifically:

> Because of his neurodevelopmental disorders, Brown likely did not understand his *Miranda rights* when they were read to him before being immediately pressed by the investigator to confess.  Moreover, due to his Autism Spectrum Disorder, Brown covers his communication deficits and the inability to understand spoken language by being agreeable. Though Brown's confession may have been voluntary, he did not have the mental capacity to intelligently and knowingly waive his right to an attorney.

*Id.* at 146 (footnote omitted).  Brown did not raise this claim on direct appeal or state habeas review.  Thus, it is unexhausted and procedurally defaulted.  Moreover, Brown fails to address his default and, consequently, does not demonstrate cause and prejudice under *Coleman* to overcome it.

Further, Brown's claim has no merit.  The sole concern under the Fifth Amendment is government coercion, nothing else.  *Colorado v. Connelly*, 479 U.S. 157, 170 (1986).  "Although mental condition may be a significant factor in the voluntariness calculus, 'this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'"  *Carter v. Johnson*, 131 F.3d

452, 462 (5th Cir. 1997) (quoting *Connelly*, 479 U.S. at 164). The voluntariness of the Fifth Amendment waiver of self-incrimination depends on the absence of police overreaching. *Connelly*, 479 U.S. at 170. "Indeed, the Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Id*. (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)). The requirement of official coercion applies equally in the context of a waiver of a suspect's *Miranda* rights. *Id*. at 169–70 ("There is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context."); *United States v. Gonzales-Gomez*, 703 F. App'x 335, 339 (5th Cir. 2017) (evidence of police coercion is "a key consideration in whether a waiver of *Miranda* rights is involuntary.") (unpublished).

Here, Brown does not refer to any coercion that rendered his waiver involuntary. Instead it is premised only on his alleged mental impairments. Under the above precedent, his assertions are insufficient to state a valid claim for relief. Moreover, Brown's claim is conclusory because he simply claims that these supposed impairments influenced his waiver. He offers nothing in the way of proof or additional argument to support his claim, other than a citation to his prior arguments addressed in Section II. *See* ECF 29 at 146 n.39. Because conclusory allegations do not state a valid claim for relief, *Koch*, 907 F.2d at 531, his claim must be denied.

### 4.    Brown fails to demonstrate any harm.

The Supreme Court has held that trial error is governed by a lower harmless-error test on collateral review. *Brecht v. Abrahamson*, 507 U.S. 619, 623, 637–38

(1993).  Pursuant to *Brecht*, federal habeas relief may not be granted for trial error that, although of constitutional magnitude, did not have a "substantial and injurious effect or influence in determining the jury's verdict."  *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Robertson v. Cain*, 324 F.3d 297, 306–07 (5th Cir. 2003) (holding the *Brecht* standard survived enactment of the AEDPA); *Goodwin v. Johnson*, 132 F.3d 162, 181 (5th Cir. 1997) ("The admission of confessions obtained in violation of *Edwards* and its progeny constitutes trial error, and is therefore amenable to harmless error analysis.").

Regarding his confession, Brown cannot demonstrate any harm under *Brecht* because, as the state court found, identity was never an issue in this case—there is no question that Brown murdered Ray.  Likewise, any claim that the confession was critical to the aggravating factor is undermined by the record.  The State proved the aggravating element by all the facts and circumstances leading up to the crime and occurring just after.  This included statements Brown made such as his letter to Casper, his news interview, calls he made to others, and phone messages he left.  And nearly all the details from Brown's confession came out when he testified at trial. Indeed, the State's case that Brown demonstrated a lack of remorse and was a future danger did not hinge on the confession.  For example, Brown demonstrated a lack of remorse when he testified at trial and said he blamed Ray for pushing him to the limit.  43 RR 164–65.  In fact, he agreed when the prosecution asked him if the "hole in her head" was Ray's fault.  43 RR 165.  In Brown's letter to Casper, where he said he "blew" Ray's head "clean off," Brown also stated: "I still don't regret it one bit.  To

be honest, I would do the same to Tracy [Williams] if I had the chance." SX 86.  Brown called Williams and "left him a voicemail stating 'she's dead' and, 'I shot her in the head, which is what I had intended for you.'  He added, 'I'll probably be dead soon.  Otherwise, you're a dead man.'  He also left Williams a second voicemail in which he threatened Williams and his brothers."  *Brown v. State*, 2015 WL 5453765, at \*4.  Homerstead testified that Brown told her in a call: "I shot the bitch, I told her not to fuck with my kids."  43 RR 70–71.  Given this evidence, the confession was not crucial to the outcome of either phase.  Thus, contrary to Brown's claim, ECF 29 at 148–49, its admission did not have a "substantial or injurious effect" on the jury's verdict.

### B.     Brown's claim that the trial court erred in admitting his television interview is defaulted and meritless.

Brown claims that the admission of his television interview violated his constitutional rights because it occurred without the benefit of counsel.  ECF 29 at 146–48.  First, this claim is unexhausted and procedurally defaulted because Brown did not raise this as a claim of trial court error on habeas review, but rather as an IATC claim.  1 SHCR 104–06.  Brown has failed to allege any cause or prejudice to overcome his default.

Second, Brown's claim is *Teague*-barred because he is claiming the trial court should have sua sponte reviewed this interview for purposes of *Miranda*.  Brown cites no Supreme Court authority holding that a trial court is required to do so.

Third, the claim is patently meritless.  In *Miranda*, the Supreme Court held that the procedural safeguards announced there applied to custodial interrogation.  "By custodial interrogation, we mean *questioning initiated by law enforcement officers*

165

after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.  384 U.S. at 444 (emphasis added); *see also Oregon v. Mathiason*, 429 U.S. 492, 494 (1977).  The CCA has likewise held that Article 38.22 of the Texas Code of Criminal Procedure, which codifies the *Miranda* warnings, does not apply to non-law enforcement personnel who are not state agents.  *Escamilla v. State*, 143 S.W.3d 814, 822 (Tex. Crim. App. 2004) (citing *Paez v. State*, 681 S.W.2d 34, 36–37 (Tex. Crim. App. 1984)); *see also id.* at 822–24 (holding that a television reporter does not qualify as a state agent even where the police asked a reporter to get the suspect to talk because he refused to speak with police).

Further, the Fifth Circuit just recently rejected the claim Brown is raising.  In *Broadnax v. Lumpkin*, the petitioner claimed that he was denied the right to counsel while giving voluntary media interviews that occurred after he had been taken before a magistrate.  987 F.3d 400, 414 (5th Cir. 2021).  Although the petitioner claimed the interviews constituted a "critical stage" of his trial, the Fifth Circuit noted that he "signed the stations' request forms seeking interviews, the reporters were not employed by law enforcement, and no law enforcement officer had requested that they conduct the interviews."  *Id.*  The district court "examined whether the reporters who interviewed Broadnax were acting as agents of the State.  Concluding they were not, the district court held that Broadnax's Sixth Amendment claims lacked merit."  *Id.* at 414–15.  The court noted that the district court considered the Fifth Circuit's test "for determining whether an informant was a government agent: whether the informant '(1) was promised, reasonably led to believe, or actually received a benefit

in exchange for soliciting information from the defendant; and (2) acted pursuant to instructions from the State, or otherwise submitted to the State's control.'" *Id.* at 415 (quoting *Creel v. Johnson*, 162 F.3d 385, 393 (5th Cir. 1998)).  The court held:

> There is no evidence in the record supporting either of these claims.  The mere fact that reporters followed Sheriff's Department procedures to request interviews does not prove that they submitted to the State's control or received some benefit.  The district court correctly observed that "[t]o hold otherwise would transform every media interview conducted with an individual under custodial detention into a custodial interrogation by a de facto state agent."

*Id.*  The Fifth Circuit then held that because the petitioner "cite[d] no legal authority for the proposition that voluntary media interviews, conducted within days of an initial appearance, are a 'critical stage' of a prosecution requiring the presence of defense counsel," his claim was barred under *Teague* as "ensconced in AEDPA."  *Id.* (citing *Woods v. Donald*, 575 U.S. 312, 317 (2015) & *Teague*, 489 U.S. at 299–310).

This authority forecloses Brown's claim.  *Miranda* applies only to law enforcement officers.  But even if it arguably applies to someone else, such as a television reporter, there must still be evidence that an interviewer received some benefit in exchange for the interview or "acted pursuant to instructions from the State, or otherwise submitted to the State's control."  Brown provides no such evidence.  He simply states, in conclusory fashion: "The Hunt County Sheriff's Office knew of and facilitated the news interview, providing Channel 11 access and space to conduct the interview.  The reporter who interviewed Brown *likely* 'intended to assist law enforcement efforts or to further [their] own ends.'"  ECF 29 at 148 (emphasis

added) (quoting *United States v. Blocker*, 104 F.3d 720, 725 (5th Cir. 1997)).[28] Brown's supposition fails to satisfy *Broadnax*. There is nothing to suggest the Channel 11 reporter was acting as an agent for the State. In fact, Brown testified at trial that he gave the interview voluntarily. 43 RR 156. Finally, under *Broadnax*, Brown's claim is *Teague*-barred. For these reasons, his claim must be denied.

### C. Trial counsel were not ineffective.

As stated, Brown presented the instant issue as an IATC claim on state habeas review. The state court's rejection of this claim is not objectively unreasonable. For the reasons addressed above, Brown's statements were admissible. His custodial statement was admissible under *Davis* and its progeny, and the television interview was admissible because Brown was not questioned by a law enforcement official and there is nothing to suggest the interviewer was acting as an agent for the State. Counsel, who would not have succeeded in suppressing these statements, is not required to make futile motions. *Koch*, 907 F.2d at 527.

Further, trial counsel addressed this matter during the state habeas hearing. Wilkinson testified that the defense did not file a motion to suppress Brown's custodial statement because he believed, based on the caselaw, that such a motion would have been frivolous given that Brown continued to speak to law enforcement

---

[28]     Brown cites *Blocker* in support of his claim, arguing that a test employed in that case applies here and that he satisfies the test. ECF 29 at 147–48. But in *Blocker*, the Fifth Circuit addressed a Fourth Amendment issue and articulated a test to determine if a private party was acting as an agent of the government for purposes of conducting a search of another's person or property. 104 F.3d at 725. The issue there did not involve eliciting statements from the accused. Regardless, because Brown offers only supposition to support his claim rather than evidence, he fails to meet any test.

and waived his rights.   10 EHRR 97, 167.   Regarding the television interview, Wilkinson said he did not try to determine if the interviewer was acting as an agent for the State.   10 EHRR 97–98.   But he stated that "the feeling was that [news interview] was coming in no matter what and the police video wasn't going to hurt or help one way or the other."  10 EHRR 167.  Ferguson testified that she and Wilkinson discussed Brown's confession and did not believe they would be able to keep it out based on the caselaw at the time requiring the invocation of *Miranda* rights to be "deliberate" and "very clear."  12 SHRR 57.  Given the existing law, trial counsel were correct, and their decision not to move to suppress these statements amounted to reasonable trial strategy.  *Strickland*, 466 U.S. at 689.

Finally, Brown cannot demonstrate any prejudice regarding the confession. Brown's custodial confession was cumulative because the jury did not learn anything from the confession that it did not acquire from other sources.  The killer's identity was a non-issue since Brown freely admitted to many people, including the jury, that he murdered Ray.  Therefore, suppression of the confession could have only impacted the State's case regarding the aggravating element.  But here it does not because Brown did not mention anything in his confession pertaining to the aggravators that was not elicited elsewhere, as stated above.  Also, as discussed, the confession was not critical to punishment.  There is not a reasonable probability that the outcome of either phase would have been different but for counsel's failure to suppress the confession.  At the very least, the state court's denial of Brown's IATC claim is not objectively unreasonable, and the Court should deny habeas relief.

169

## VII.  Brown's Claim of Juror Misconduct Is Inadequately Briefed, Conclusory, and Meritless.

Brown alleges that juror misconduct at both phases of his trial deprived him of his right to be tried by a fair and impartial jury.  ECF 29 at 151–52.  The problem with this claim is that Brown does not name the juror(s) or the nature of the misconduct.  He only states: "Given the excessive news coverage, the jury was exposed to extrinsic information about the case on which it was empaneled"; "it is likely there was additional juror misconduct such as considering extraneous information in deliberations among other things"; and "instances of misconduct demonstrate that jurors were improperly influenced in multiple ways." *Id.* at 152.  The claim regarding media coverage was addressed above in Brown's venue allegation.  The remainder of the allegation is inadequately briefed and waived.  *Blakely v. City of Laurel*, 644 F. App'x 319, 320 (5th Cir. 2016) (unpublished); *Hughes v. Dretke*, 412 F.3d 582, 597 (5th Cir. 2005); *United States v. Medoc Health Services LLC*, 470 F.Supp.3d 638, 660 n.11 (N.D. Tex. 2020); *Ruiz v. Davis*, No. 3:12-CV-5112-N, 2018 WL 6591687, at *12 (N.D. Tex. Dec. 14, 2018) (unpublished).  And because Brown renders these assertions without any support, they are conclusory.  *Koch*, 907 F.2d at 531.

Brown states that a juror misconduct claim was presented to the state courts.  ECF 29 at 151.  This is correct, 1 SHCR 129–34, but the Fifth Circuit has declined to consider arguments not explicitly made with only a citation to a lower court brief.  *Beazley v. Johnson*, 242 F.3d 248, 266 (5th Cir. 2001); *United States v. Hall*, 152 F.3d 381, 398 n.9 (5th Cir. 1998).  To the extent Brown can incorporate by reference his state habeas claim, that claim is meritless and was properly rejected by the state

court, precluding relief under AEDPA.  14 SCHR 5753; *Ex parte Brown*, 2019 WL 4317041 at *1.  On state habeas review, Brown alleged that Juror Stacy deClercq considered information beyond the scope of the evidence and the trial court's instructions during deliberations.  1 SHCR 129–34.  He presented an affidavit from deClercq, who provided information about her thought processes during deliberations, among them that she believed Brown did not commit capital murder; although she tried to sway others, she was unsuccessful and changed her vote; she voted to convict because she believed Brown's case would get reversed on appeal; and she argued against a death sentence but felt like she was fighting a losing battle and changed her vote on punishment.  1 SHCR 131, 223–25.  Thus, Brown claimed that deClercq searched for a reason to convict despite instructions to the contrary.  *Id.*

However, under Texas law, a juror can only testify whether any outside influence was improperly brought to bear upon any juror or to rebut a claim that a juror was not qualified to serve.  *Coyler v. State*, 428 S.W.3d 117, 122–26 (Tex. Crim. App. 2014).  This is to prevent exactly what Brown is attempting: to obtain relief by attacking his verdict via a disgruntled juror.  *Id.* at 123.  In Texas, a juror "is not permitted to testify about any events or statements occurring during jury deliberations, any of the jurors' mental processes, or how an improper outside influence actually affected the jurors."  *Id.*  Moreover, "external events or information, unrelated to the trial, which happen to cause jurors to feel personal pressure to hasten (or end) deliberations are not 'outside influences' because those

171

pressures are caused by a juror's personal and emotional reaction to information that is irrelevant to the trial issues." *Id.* at 125.

Texas law is also consistent with federal precedent.  The constitutional right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin*, 366 U.S. at 722.  Only jury misconduct that deprives the defendant of a fair and impartial trial warrants granting a new trial.  *De La Rosa v. Texas*, 743 F.2d 299, 304 (5th Cir. 1984).  But federal courts also prohibit the admission of juror testimony to impeach a jury verdict.  *Warger v. Shauers*, 574 U.S. 40, 50–53 (2014) (juror's affidavit regarding foreperson's conduct during deliberations was internal matter, and thus it was not admissible under exception to Federal Rule of Evidence generally barring evidence about any statement made during jury deliberations unless it pertains to evidence of extraneous prejudicial information); *Tanner v. United States*, 483 U.S. 107, 117 (1987) (unless a situation falls into an exception for external influence, "the Court [has] adhered to the common-law rule against admitting juror testimony to impeach a verdict"); *Young v. Davis*, 835 F.3d 520, 529 (5th Cir. 2016) ("[W]e have repeatedly held that [Federal Rule of Evidence] 606(b) forbids consideration of juror affidavits in federal habeas cases."); *Pyles v. Johnson*, 136 F.3d 986, 991 (5th Cir. 1998).

Here, deClercq's affidavit is precisely the type of evidence this precedent was designed to preclude.  Juror deClercq did not refer to any specific outside influence that altered the deliberative process.  Instead her affidavit pertained to how she felt, what she thought, and the circumstances originating in the jury room and between

172

the jurors.  *See* 14 SHCR 5753.  Even if, in hindsight, she believes she was mistaken, that is irrelevant for purposes on this habeas proceedings.  In short, the Court cannot consider the affidavit since it is nothing more than an attack on the deliberations and jury verdict.  And Brown has failed to demonstrate any juror misconduct, let alone misconduct that deprived him of a fair trial.  This claim should be denied.

## VIII. Brown's Claim Challenging the Texas Special Issues Is Partially Defaulted and Meritless.

Brown argues that he was tried under an unconstitutional statutory scheme and that the trial court erred in not declaring Texas Code of Criminal Procedure, Article 37.071 unconstitutional.  ECF 29 at 153–60.  Specifically, Brown argues that the future-dangerousness special issue fails to narrow the class of defendants eligible for the death penalty and fails to define the terms "probability," "criminal acts of violence," or "continuing threat to society"; that the mitigation special issue fails to adequately define "mitigation evidence"; and that Texas's "10-12" rule is unconstitutional.  *Id.*  Brown raised the claim regarding the "10-12" rule on state habeas review, 1 SHCR 119–28, and the state court properly rejected it.  14 SHCR 5752–53; *Ex parte Brown*, 2019 WL 4317041, at *1.  This decision is not objectively unreasonable.  The first two claims, however, are unexhausted and procedurally barred, and Brown fails to allege cause and prejudice to overcome his default.

At any rate, these claims are meritless.  First, Brown's claim about the future-dangerousness special issue lack merit.  The Fifth Circuit has repeatedly rejected the same arguments about the failure to define the terms in this special issue.  *See Sprouse v. Stephens*, 748 F.3d 609, 622–23 (5th Cir. 2014) (denying COA on

173

complaints about the lack of definitions of "probability," "criminal acts of violence," and "continuing threat to society" in a Texas capital sentencing jury charge); *Paredes*, 574 F.3d at 294 (holding the terms "probability," "criminal acts of violence," and "continuing threat to society" "have a plain meaning of sufficient content that the discretion left to the jury is no more than that inherent in the jury system itself"); *Leal v. Dretke*, 428 F.3d 543, 552–53 (5th Cir. 2005) (listing numerous Fifth Circuit opinions rejecting complaints about the failure of Texas courts to define the terms "probability," "criminal acts of violence," and "continuing threat to society"). Likewise, the Fifth Circuit has held that the Texas scheme does not fail to narrow the class of defendants eligible for the death penalty. *White*, 522 F. App'x at 235; *Taylor v. Thaler*, 397 F. App'x 104, 108–10 (5th Cir. 2010) (unpublished); *Sonnier v. Quarterman*, 476 F.3d 349, 366–67 (5th Cir. 2007). Moreover, because the Supreme Court has never held that Texas's capital sentencing statute contains vague terms that require definitions, Brown's claim is barred under non-retroactivity doctrine of *Teague v. Lane*. *See Kerr v. Thaler*, 384 F. App'x 400, 404 (5th Cir. 2010).

Second, regarding Brown's claim that the second special issue fails to define "mitigation evidence" or "mitigating circumstances," the Fifth Circuit has routinely rejected this claim. *Hummel v. Davis*, 908 F.3d 987, 994 (5th Cir. 2018) (holding that Article 37.071 § 2(e)(1) offers a "broad definition of mitigating evidence"), *cert. denied*, 140 S. Ct. 160 (2019); *Sprouse*, 748 F.3d at 622 (denying a COA on this same issue); *Blue v. Thaler*, 665 F.3d 647, 665–66 (5th Cir. 2011) (rejecting argument that the definition of mitigating evidence is unconstitutionally narrow and holding that

174

Article 37.071 does not unconstitutionally preclude the jury from considering as a mitigating factor any aspect of a defendant's character or record and any of the circumstances of the offense the defendant proffers as a basis for a life sentence); *Beazley*, 242 F.3d at 260 (holding that "the definition of mitigating evidence does not limit the evidence considered" under the mitigation special issue).  And because the Supreme Court has never held the second special issue is unconstitutional because it fails to define the term "mitigation evidence," Brown's claim is *Teague*-barred.

Lastly, regarding Brown's challenge to the "10-12" rule, the Supreme Court has rejected the theory that a trial court's failure to instruct the jury as to the consequences of deadlock gives rise to an Eighth Amendment violation.  *Jones v. United States*, 527 U.S. 373, 381–82 (1999).  Brown's various complaints about the "10-12" rule have also been rejected on numerous occasions by the Fifth Circuit. *Davila v. Davis*, 650 F. App'x 860, 871–72 (5th Cir. 2016), *aff'd on other grounds*, 137 S. Ct. 2058 (2017); *Carter v. Stephens*, 805 F.3d 552, 556–57 (5th Cir. 2015); *Reed*, 739 F.3d at 779; *Blue*, 665 F.3d at 669–70; *Druery*, 647 F.3d at 542–44.  And because the Supreme Court has never held that this particular rule is unconstitutional, Brown's claim is *Teague*-barred.  *Blue*, 665 F.3d at 670.  Finally, Brown cites to Juror deClercq's affidavit in support of his argument, ECF 29 at 160, but for the reasons provided in the section above, this Court cannot consider it.

175

IX.   **Brown's Claim That the Texas Sentencing Scheme Is Unconstitutional Because It Fails to Narrow the Class of Death Eligible Defendants and Is Arbitrarily and Disproportionately Applied Is Defaulted and Meritless.**

Brown argues that Texas's capital sentencing scheme is unconstitutional because it fails to narrow the class of death eligible offenders.  He also argues that it is arbitrarily and disproportionately applied and fails to ensure a comparative proportionality review of Brown's death sentence, rendering the sentence unconstitutional.  ECF 29 at 160–64.  Although Brown raised a slightly similar claim in state court, that claim was premised on race and geographical factors.  1 SHCR 134–43.  Brown did not raise this particular claim in state court.  Thus, it is unexhausted and procedurally defaulted, and Brown fails to demonstrate cause and prejudice to overcome his default.

Moreover, Brown's claim has no merit.  His claim that the scheme fails to adequately narrow the class of death eligible offenders was addressed above.  Additionally, the Supreme Court has repeatedly upheld the constitutionality of the Texas death-penalty scheme.  *Johnson v. Texas*, 509 U.S. 350, 362 (1993) (holding its previous opinions upholding the Texas capital sentencing scheme found no constitutional deficiency in the means used to narrow the group of offenders subject to capital punishment because the statute itself adopted different classifications of murder for that purpose); *Graham v. Collins*, 506 U.S. 461 (1993); *Franklin v. Lynaugh*, 487 U.S. 164 (1988); *Jurek v. Texas*, 428 U.S. 262 (1976).  And in *Sonnier*, the Fifth Circuit found that "the Texas capital sentencing scheme bears some striking similarities to the Kansas scheme" which was at issue in *Kansas v. Marsh*, 548 U.S.

176

163 (2006).  476 F.3d at 365.  "[U]nder both Texas law and Kansas law, the death penalty is only an option for those defendants convicted of the crime of capital murder."  *Id.*  Further, under Section 19.03 of the Texas Penal Code, "[t]his distinction between capital murder and other categories of murder is the initial narrowing of the class of persons who may potentially face the death penalty."  *Id.* at 366.  Then, if a defendant is convicted of capital murder, he only becomes eligible if the State seeks a separate hearing on punishment.  *Id.*  Under both the Texas and Kansas schemes, "the government must prove beyond a reasonable doubt the existence of one or more statutorily enumerated aggravating circumstances."  *Id.*  The court held:

> [T]he Texas scheme, like the one in place in Kansas, is constitutionally valid under the rationale provided in *Marsh*, in that it rationally narrows the classes of defendants determined to be eligible and selected for the death penalty.  The Texas capital sentencing scheme, like the Kansas system, limits the death penalty, first, to defendants convicted of capital murder under one or more of the aggravating circumstances inherent in the definition of that crime, and, second, to those capital murderers who are determined to be eligible for the death penalty by virtue of the jury's finding of an additional aggravating circumstance in respect to their character, background, and crime, i.e., the probability that they will commit criminal acts of violence that would constitute a continuing threat to society.

*Id.* at 366–67.

Brown's claim is foreclosed by this precedent.  Moreover, he simply renders general assertions that the scheme is too broad and "encompasses the vast majority of murders actually committed."  ECF 29 at 160–62.  But as the Fifth Circuit explained, Section 19.03 distinguishes between capital and non-capital murder.  Brown offers no evidence to the contrary.  Further, in *Woods v. Johnson*, the Fifth Circuit found that the *Jurek* Court "held that the constitutionally required narrowing

function . . . under the Texas scheme was adequately performed at the guilt/innocence stage by the narrow categories of murder meeting the statutory definition of capital murder." 75 F.3d 1017, 1033 (5th Cir. 1996). The court pointed out that *Jurek* was subsequently confirmed by the Supreme Court in *Lowenfield v. Phelps*, 484 U.S. 231 (1988). *Id.* at 1033–34. Indeed, in *Lowenfield*, the Court held: "We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase. Our opinion in *Jurek* [ ] establishes this point." 484 U.S. at 244–45. In short, there is no merit to Brown's claim.

Brown's claim of a lack of comparative proportionality review is likewise meritless. The Supreme Court has rejected the argument that a state appellate court is required to independently re-weigh aggravating and mitigating evidence. *Pulley v. Harris*, 465 U.S. 37, 50–51 (1984) ("There is [ ] no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death sentence is imposed and the defendant requests it."). The Fifth Circuit has also consistently held no such "proportionality review" of a capital sentence is constitutionally mandated. *Cobb v. Thaler*, 682 F.3d 364, 381 (5th Cir. 2012) (holding that *Pulley* forecloses petitioner's claim that he was entitled to proportionality review); *Roach v. Quarterman*, 220 F. App'x 270, 275–76 (5th Cir. 2007) (holding that "appellate review of the proportionality of a death sentence is not required where a statute properly channels a sentencer's discretion") (unpublished). And because the Supreme Court has never held that the Texas special issues fail to

narrow the class of eligible offenders or that the Texas scheme requires proportionality review, Brown's claim is barred under *Teague*.

Lastly, although Brown's claim about "proportionality review" is mainly a facial challenge to the Texas scheme, he does argue that it worked to his detriment by comparing his case to others he considers more extreme where the defendant received life without parole. ECF 29 at 163. But Brown brutally hunted down and murdered his ex-wife in front of their children, stated he did not regret it, and then continued to blame her for his actions even at trial. He also expressed his intention to kill Tracy Williams. The facts were sufficient to warrant a death sentence. *See also Brown v. State*, 2015 WL 5453765, at *8–*9.

## X.  Brown's Claims That He Was Deprived of Effective Assistance of State Habeas Counsel and That Other Infirmities Occurred In His State Habeas Proceeding Are Not Cognizable.

Brown alleges that he was deprived of a fair state habeas proceeding due to various deficiencies, for instance the trial court making evidentiary rulings that precluding him from presenting certain evidence at the habeas hearing. He also alleges that his state habeas counsel was ineffective for several reasons, including focusing too heavily on ASD and failing to timely submit reports and evidence from experts and other witnesses. ECF 29 at 164–68. These claims are not cognizable.

It is well settled in this circuit that alleged infirmities in state habeas proceedings are not cognizable grounds for federal habeas relief. *Henderson v. Stephens*, 791 F.3d 567, 578 (5th Cir. 2015); *Ladd v. Stevens*, 748 F.3d 637, 644 (5th Cir. 2014); *Tercero v. Stephens*, 738 F.3d 141, 147 (5th Cir. 2013); *In re Gentras*,

179

666 F.3d 910, 911 (5th Cir. 2012); *Kinsel v. Cain*, 647 F.3d 265, 273 & n.32 (5th Cir. 2011); *Beazley*, 242 F.3d at 271.  Likewise, complaints of ineffective assistance of state habeas counsel are not cognizable grounds for federal habeas relief, including post-*Martinez* and *Trevino*.  28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."); *Davila*, 137 S. Ct. at 2068 (recognizing that the Court has never held the Constitution guarantees a postconviction right to counsel); *Martinez*, 566 U.S. at 17 (recognizing that § 2254(i) still precludes a petitioner from relying on ineffective assistance of postconviction counsel as a ground for relief);  *Stevens v. Epps,* 618 F.3d 489, 502 (5th Cir. 2010); *Haynes v. Quarterman*, 526 F.3d 189, 195 (5th Cir. 2008); *Beazley*, 242 F.3d at 271.

The Director also notes that Brown's complaints are unfounded.  He received an five-day evidentiary hearing in state court.  7 EHRR–12 EHRR.  The hearing record contains numerous volumes of exhibits from the State and Brown.  13 EHRR–22 EHRR.  And the state habeas clerk's record consists of fourteen volumes.  1 SHCR–14 SHCR.  Brown was well represented on sate habeas review and received multiple opportunities to present evidence to the trial court and make his case.  Thus, even if this Court could review the instant claim, it would lack merit.  Finally, contrary to Brown's claim, ECF 29 at 166, he is not entitled to bypass the state rules of evidence simply because this is a capital proceeding.  *Pennsylvania v. Finley*, 481 U.S. at 555, 557, 559 (1987) (where a State allows for post-conviction proceedings, "the Federal Constitution [does not] dictate[] the exact form such assistance must assume.").

## XI.  Brown's Claim of Cumulative Error Is Procedurally Defaulted and Meritless.

In his final claim, Brown argues that the cumulative effect of all of the alleged errors raised in his petition substantially prejudiced him and undermined the reliability of his trial.  Thus, he argues he is entitled to relief based on cumulative error.  ECF 29 at 168–70.  Brown concedes he never raised this claim in state court and that it is unexhausted, but he claims he can "overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of appellate and state post-conviction counsel."  *Id.* at 168.  Brown is incorrect because this is not an IATC claim.  As such, the *Coleman* and *Carrier* standard apply, and he must demonstrate cause and prejudice to overcome his default, where cause is an objective external factor that impeded counsel's ability to raise this claim in state court.  *Carrier*, 477 U.S. at 488.  Or he must show a fundamental miscarriage of justice, i.e., that he is actually innocent of capital murder or his death sentence.  *Sawyer v. Whitley*, 505 U.S. 333, 339–40, 349 (1992).  Brown offers no evidence or argument to meet this standard; thus, the instant claim is defaulted.

Further, as explained in Section I.C. *supra*, when none of the alleged errors are of constitutional dimension, there is nothing to cumulate.  Because Brown has failed to show he is entitled to relief on any claim, his claim of cumulative error necessarily fails, even under de novo review.

## CONCLUSION

For the foregoing reasons, the Director respectfully requests that this Court deny Brown's petition for federal habeas relief, deny his requests for an evidentiary hearing and discovery, deny his additional requests, ECF 29 at 170, and deny a COA. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (explaining that the district court has the power to sua sponte deny a certificate of appealability without prior briefing and argument by counsel).

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
For Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division


/s/ Erich Dryden
*ERICH DRYDEN
Assistant Attorney General
State Bar No. 24008786
Erich.Dryden@oag.texas.gov

*Attorney-in-Charge

P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548
(512) 936-1400
(512) 320-8132 (Fax)

ATTORNEYS FOR RESPONDENT

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Answer has been

served electronically to Timothy Gumkowski and Maureen Franco on May 7, 2021.


/s/ Erich Dryden
ERICH DRYDEN
Assistant Attorney General