IN THE UNITED STATES DISTRICT COURT
NOTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MICAH CROFFORD BROWN, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 3:19-cv-2301-L-BN |
| | § | |
| DIRECTOR, TDCJ-CID, | § | |
| | § | |
| Respondent. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Petitioner Micah Brown filed this federal habeas corpus action under 28 U.S.C.
§ 2254 challenging his May 2013 Hunt County conviction for capital murder and
sentence of death. *See* ECF no. 29. The Respondent has filed an answer, *see* ECF no.
40, and Brown has filed a reply in support, *see* ECF no. 48. For the reasons explained
below, the Court should deny all relief requested in Brown's federal habeas corpus
petition, deny Brown's motion for leave to amend, and deny Brown a Certificate of
Appealability as to all his claims.

## I. BACKGROUND

### A. The Offense

The lengthy factual scenario leading up to Brown's capital offense is set forth
in detail in the Texas Court of Criminal Appeals opinion affirming Brown's conviction
and sentence on direct appeal. *See Brown v. State*, AP-77,019, 2015 WL 5453765, *1-
*6 (Tex. Crim. App. Sept. 16, 2015).

Multiple witnesses, including Brown, testified about a number of instances of violence involving Brown, his ex-wife Stella Ray ("Ray"), and another of Ray's ex-husbands (Tracy Williams) in the days preceding Ray's murder. Those include instances in which Brown allegedly gave Ray and one of their young children each a black eye and another in which Williams allegedly choked Brown in front of Brown's and Ray's children. It was undisputed that, shortly after those events, Brown informed Ray that he was suicidal. Ray contacted police. When police did a welfare check at Brown's residence, they found Brown in possession of an illegal weapon – a sawed-off shotgun – which resulted in the police confiscating the shotgun and arresting Brown.

On the evening of July 20, 2011, Brown went to Ray's residence but found no one at home. Brown searched the house and took a shotgun that belonged to Ray's son Wesley as well as marijuana belonging to Ray and a camera containing photographs of Ray's face taken after an altercation with Brown days before. Brown returned to his own home, sawed off the shotgun, and loaded it with twenty-gauge slugs suitable for hunting hogs. Later that same evening, Brown saw Ray driving her vehicle past his residence. Brown got into his own vehicle, pursued Ray, and attempted to flag her down. Brown admitted that, when Ray stopped her vehicle, Brown pulled his vehicle up beside Ray's vehicle, pointed his shotgun at her head, and pulled the trigger.

It is undisputed that Brown intentionally murdered his ex-wife by fatally shooting her with a sawed-off shotgun as she sat in her vehicle talking to a 911

dispatcher on her telephone. Ray reported to the dispatcher that Brown was pursuing her, that she had previously filed a complaint against Brown, that she feared he might ram his vehicle into hers, and that she had informed Brown that she was then speaking with the police.

A police officer responded to Ray's 911 call. As he approached Ray's and Brown's vehicles from behind with his lights flashing (the two vehicles were stopped side by side), his dash camera recorded the fatal shooting. Immediately after firing the fatal shot, Brown drove away from the scene while law enforcement officers attempted to render assistance to the unresponsive Ray.

The state trial court admitted into evidence as State Exhibit No. 44 the video recording from the dash camera of the Greenville, Texas police officer who responded to Ray's 911 call. The audio recording of Ray's 911 call was also played for the jury. *See* Statement of Facts from Brown's Trial ("S.F. Trial"), Volume 40/53 [ECF no. 53-31], at 65.

## B. Indictment

On October 28, 2011, a Hunt County grand jury indicted Brown on a charge of capital murder – specifically, intentionally or knowingly causing the death of Stella Ray by shooting Ray with a firearm while then and there in the course of committing or attempting to commit the offense of obstruction or retaliation against Ray, and intentionally or knowingly causing the death or Ray by shooting Ray with a firearm while in the course of committing or attempting to commit the offense of terroristic threat against Ray with intent to cause a reaction of any type to his threat by an

official or volunteer agency organized to deal with emergencies. *See* ECF no. 58-3, p. 12 of 355.

### C. Guilt-Innocence Phase of Trial

The guilt-innocence phase of Brown's capital murder trial commenced on May 20, 2013.

### 1. The Prosecution's Evidence

The prosecution presented testimony from Heather Doty, the dispatcher who received Stella Ray's 911 call around 10:20 p.m. on July 20, 2011. Doty testified that she could hear the children in Ray's vehicle and heard the fatal shot fired. *See* S.F. Trial, Vol, 40/53 [ECF no. 53-31], at 36-43.

The audio recording of Ray's 911 conversation with Doty was admitted into evidence as State Exhibit No. 39 and played for the jury. *See id.* at 38. The state trial court also admitted into evidence State Exhibit No. 388L, a written transcription of Ray's 911 call, which appears at ECF no. 53-47, pp. 371-77 of 464, and at ECF no. 53-49, pp. 224-30 of 317. Ray reported to the dispatcher that Brown had struck her the night before (which Ray stated that she had reported to police) and that he was following her in his own vehicle, hollering at her, and trying to get her to pull over. Ray stated that she feared that he would ram his vehicle into hers. She also reported that she had informed Brown that she was calling the police and that he knew she was talking with police at that moment.

Greenville police officer Gregory Hughes, the law enforcement officer who responded to Ray's 911 call and arrived at the scene as Brown fired the fatal shot,

testified that he heard but did not see the shotgun blast; that, after the shot was fired, Brown's vehicle jerked to the left and took off while Ray's vehicle rolled forward but quickly halted when it struck a curb; that officers had to break into Ray's vehicle through the shattered driver's side window because the windows were up and the doors locked; and that he activated his flashing lights just prior to the fatal shot being fired. *See* S.F. Trial, Vol. 40/53 [ECF no. 53-31], at 45-93.

A witness to the shooting testified that he pursued Brown's vehicle after it fled the crime scene, managed to get the license plate of Brown's vehicle, and then returned to the crime scene and gave police the license plate number. *See* S.F. Trial, Vol. 40/53 [ECF no. 53-31], at 102-20.

Ray's teenage son from a prior marriage testified that his biological father (Tracy Williams) came to live with Ray, himself, and Ray's two youngest children a couple weeks before the fatal shooting. He described an incident a few days before the shooting in which Tracy Williams and Brown engaged in a physical confrontation that included Williams choking Brown after Brown arrived at the home and entered without knocking. He testified that Tracy Williams left for Louisiana after that incident to avoid being a source of trouble between Ray and Brown. He also described an incident on July 19, 2011, in which an apparently intoxicated Brown struck Ray and their young son Colten in the face after Ray refused to allow Brown to leave with Colten. Brown sped off after the assaults. Ray's teenage son testified that he took photographs of Ray's and Colten's injured faces on his cell phone. He described Ray as shocked that Brown had struck her. He testified further that he was visiting

-5-

friends the evening the murder and that he had refused to answer Brown's telephone calls to him that evening because Ray told him that Brown was acting crazy. He also testified that, about a week before Ray's murder, Brown began coming to Ray's home early in the morning banging on windows and doors. Finally, he testified that Ray had recently earned her doctorate, had accepted a job with a college in East Texas, and planned to move with him and her two young children starting on July 20. *See* S.F. Trial, Vol. 40/53 [ECF no. 53-31], at 121-60.

Ray's mother testified that Ray and Brown divorced about a year before the fatal shooting. Brown is the biological father of Ray's two youngest children, Colten and Willow. Brown called Ray's mother around 7:00 p.m. on July 20, 2011 to ask about Ray and their children. Ray's mother informed Brown the children were not at her home. Brown called back later to inform Ray's mother that he had shot Ray in the head and that Ray was dead. *See* S.F. Trial, Vol. 40/53 [ECF no. 53-31], at 161-85.

Shortly after his arrest on July 21, 2011, Brown gave a videotaped statement to law enforcement personnel, which was admitted into evidence as State Exhibit No. 46. The recording was played for the jury. *See* S.F. Trial, Vol. 40/53 [ECF no. 53-31], at 198. The state trial court also admitted into evidence State Exhibit No. 388A, a transcript of the same interview, which appears at ECF no. 53-47, pp. 191-208 of 464, and at ECF no. 53-49, pp. 44-61 of 317.

During his police interview, Brown admitted that he pursued Ray in his vehicle; that he sought to get her to pull over; that he fatally shot her when she

refused his demands that she answer his questions about their children; that, just before he fired the fatal shot, he saw a police vehicle approaching them from behind; and that he had no regrets over having shot Ray.

The Greenville police investigators who interviewed Brown following his arrest testified that Brown never asked about Ray or inquired about his children during his post-arrest interview and that Brown never expressed remorse for killing Ray. Brown admitted that he knew Ray was on the phone with police at the time that he shot Ray. Brown stated that he knew the police were directly behind him when he fired the fatal shot. Brown stated that he was using crack, alcohol, and marijuana on the day of the fatal shooting. Brown also admitted that he chased down Ray's vehicle to get her to stop. Brown admitted that he hid his truck, knocked out its headlights, and dove into a lake in an effort to avoid apprehension after the shooting. Brown stated that he was angry with Ray because she was taking his children from him and that, because of Ray's phone call to police, his sawed-off shotgun was confiscated and he was unable to go hunting. Brown admitted that he had "poked" Ray in the face in the days before the shooting. *See* S.F. Trial, Vol. 40/53 [ECF no. 53-31], at 186-233; S.F. Trial, Vol. 42/53 [ECF no. 53-33], at 34-83.

The state trial court also admitted into evidence both State Exhibit No. 49A, a video recording of an interview that Brown gave to a television reporter from Dallas CBS Channel 11 shortly after his arrest, and State Exhibit No. 388H, a written transcription of the same interview. *See id*. at 42. The transcription of Brown's televised interview appears at ECF no. 53-47, pp. 328-68 of 464, and at ECF no. 53-

49, pp. 181-217 of 317. During Brown's televised interview, he admitted that he murdered Ray because he wanted her dead; that he had no regrets about killing Ray but rather only that he had done so in front of their two young children; and that he believed that Ray was talking to the police on her phone as he pursued and shot her.

The medical examiner who performed Ray's autopsy testified that Ray died as a result of a single shotgun blast that was fired several feet away and that the slug entered and shattered her left cheek and exited the right side of her head, moving front to back and slightly upward in trajectory. Ray's toxicology report showed Citalopram, an antidepressant, and metabolites of marijuana. The medical examiner was unable to determine how long before her death Ray had ingested marijuana, because its metabolites can remain in the body for up to thirty days. *See* S.F. Trial, Vol. 41/53 [ECF no. 53-32], at 442-66.

A law enforcement officer who had been involved in Brown's arrest for possession of an illegal weapon on July 16 testified that Brown stated that he had told Ray that he was suicidal even though he was not; that Brown was found in possession of a meth pipe in addition to the illegal weapon; and that, after his arrest, Brown passed a mental health examination and was allowed to bond out. *See* S.F. Trial, Vol. 41/53 [ECF no. 63-32], at 67-129. The same officer also testified that there were deer mounts all over the walls of Brown's home. *See id.* at 123.

Multiple witnesses testified regarding the circumstances under which Brown surrendered to police at the Cactus Saddlery a day after Ray's fatal shooting and Ray's statements regarding the steps that he had taken in the hours after Ray's

-8-

murder to avoid apprehension, including breaking out the headlights of his SUV and diving beneath the surface of a lake to avoid location by a law enforcement helicopter. *See* S.F. Trial, Vol. 41/53 [ECF no. 53-32], at 130-35; S.F. Trial, Vol. 41/53 [ECF no. 53-32], at 137-52; S.F. Trial, Vol. 41/53 [ECF no. 53-32], at 154-69; S.F. Trial, Vol. 41/53 [ECF no. 53-32], at 170-87; S.F. Trial, Vol. 42/53 [ECF no. 53-33], at 17-33.

### 2. The Defense's Evidence

Brown's sister Taylor Harmon testified that she believed that Brown and Ray got along following their divorce; that Brown saw Colten almost every day; that Brown viewed the presence of Tracy Williams at Ray's home as a threat because Brown was not able to be around his children as often as he liked; and that Brown's only complaint with Ray was that he was unable to see his children as often as he had. *See* S.F. Trial, Vol. 43/53 [ECF no. 53-34], at 6-38.

Brown's mother Brenda Crofford testified that Brown and Ray's relationship following their divorce was cordial; that Brown became upset after Tracy Williams moved in with Ray about two weeks before the fatal shooting; that Brown did not blame Ray for his arrest for possession of an illegal weapon; that she spoke daily with Brown, who was suicidal over his children's situation; and that, on July 20, she asked Ray not to answer Brown's telephone calls because she felt that it was better if Brown and Ray distanced themselves. *See* S.F. Trial, Vol. 43/53 [ECF no. 53-34], at 40-63.

One of Brown's neighbors testified that Brown texted her the night of the murder and informed her that "I shot the bitch" and "I told her not to f**k with my kids"; that, the day after Brown was arrested for possession of an illegal weapon,

Brown informed her that Ray had telephoned police and that that was why Brown had been arrested; and that she often saw Ray bring milk to Brown's home. *See* S.F. Trial, Vol. 43/53 [ECF no. 53-34], at 64-76.

Brown testified extensively. He stated that he and Ray were married in 2007 and used marijuana, pain pills, hydrocodone, Xanax, Valium, cocaine, methamphetamine, and alcohol throughout their marriage; that Ray stopped using other drugs but continued using marijuana, which led to their divorce in 2010; that Ray chose to divorce Brown because she knew Brown was continuing to abuse pain pills and she did not want to be linked financially to him; that, after their divorce, they continued to have sexual relations regularly and that he thought they would get back together; that, when Ray got her doctorate, she got a job out of town and planned to move away, taking their children with her; that Tracy Williams assaulted Brown on July 15, an event witnessed by their children; that Brown did not press charges but his pride was wounded; that Ray became less friendly toward Brown after Williams moved in with Ray; that, on July 16, Brown told Ray that he was suicidal and the police showed up at Brown's residence; that Brown let the police in and that they found Brown's sawed-off shotgun, which led to Brown's arrest; that he did not blame Ray for his arrest; that he bonded out of jail and continued to see his children every morning; that Brown was using meth but still going to work throughout this time frame; that, on July 19, Brown went to Ray's residence and took Colten but, when he loaded him into his vehicle, Ray tried to stop him from leaving with Colten; that Brown "flicked" Ray on the nose but did not punch her; that, on the morning of

July 20, Brown again saw his children; that Ray did not tell him that she had called law enforcement authorities after Brown assaulted her the night before; that Brown was unaware Ray had filed charges arising from the events of July 19; that, throughout July 20, Brown drank to get up the courage to commit suicide; that, on the evening of July 20, Brown went to Ray's home but no one was home; that Brown stayed about twenty minutes, searched the home, and took Wesley's shotgun, a camera, and an amount of marijuana; that Brown sawed off Wesley's shotgun; that Ray did not answer his many telephone calls that day; that Brown had been using methamphetamine and had gone without sleep for three days and nights; that, when he saw Ray drive past his home, he got into his vehicle and pursued her, attempting to flag her down; that, when Ray stopped her vehicle, he pulled up next to her; that she was talking on the phone and that he was hurt and angry; that, when the police pulled up behind them, "I stuck the shotgun out the window and pulled the trigger"" while deliberately aiming at Ray; that he denied that he killed Ray because she had called the police or because she would be a witness against him; and that, instead, he insisted "I just lost my mind" and would not have pulled the trigger if he had known their children were in the car with Ray. *See* S.F. Trial, Vol. 43/53 [ECF no. 53-34], at 78-139, 158.

Brown testified that, immediately after the fatal shooting, he drove away from the scene and telephoned or texted multiple people, including his mother, Ray's mother, and Tracy Williams to tell them that he had shot Ray and to threaten Williams. *Id.* at 140-43. Brown testified that he hid his pickup truck in a grove of

trees and smashed his headlights to avoid detection. *Id.* at 144. When his vehicle ran out of gas, he approached a house, unsuccessfully attempted to get gas, and later hid under water and in a vacant building before he turned himself in at the Cactus Saddlery. *Id.* at 144-54. Brown denied that he shot Ray because she was on the phone with police. *Id.* at 198-204.

On cross-examination, Brown admitted that he believed Ray's death was her fault; that he loaded the sawed-off shotgun that he used to shoot Ray with rounds for hunting large animals; that he followed Ray's vehicle a long way before she stopped; that, while in jail, he wrote a letter stating that he would shoot Tracy Williams if he had the chance; that he "poked" Ray in the face days before the fatal shooting and that pictures inside the camera that he took from Ray's home showed marks on her face; that he called Ray's mother twice after he shot Ray; that he left a voice mail message on Tracy Williams' phone after he shot Ray; that Ray told him that he would continue to see their children after she moved to east Texas; that he denied having suicidal ideation after his arrest on July 16; and that he shot Ray while she was on the phone to police. *See id.* at 160-98.

### 3. The Verdict

On May 24, 2013, the jury returned its verdict, finding Brown guilty of capital murder as charged in the indictment. *See* S.F. Trial, Vol. 44/53 [ECF no. 53-35], at 72-73. The verdict form from the guilt-innocence phase of Brown's trial appears at ECF no. 52-16, p. 113 of 161, and at ECF no. 52-19, p. 410 of 458.

### D. Punishment Phase of Trial

The punishment phase of Brown's capital murder trial commenced on May 28, 2013.

### 1. Prosecution's Evidence

The prosecution called Ray's father, who described her death as an unbelievable loss for their family. *See* S.F. Trial, Vol. 45/53 [ECF no. 53-36], at 18-21. A friend of Ray testified that Tracy Williams and Ray's children spent the night of the murder in a shelter waiting for word that Brown had been arrested. *See* S.F. Trial, Vol. 45/53 [ECF no. 53-36], at 22-34. Ray's sister testified that Ray was a quiet and sensitive person and a good mother whose efforts to obtain her doctorate in English literature were delayed by her pregnancies with her children with Brown but who earned her doctorate in December 2010. *See* S.F. Trial, Vol. 45/53 [ECF no. 53-36], at 34-43.

### 2. Defense's Evidence

Brown's sister testified that Brown was loved by everyone when he was a child because he made everyone laugh and later grew into an incredible father. *See* S.F. Trial, Vol. 45/53 [ECF no. 53-36], at 45-54. Brown's biological father testified that he was afraid Brown was suicidal, so he visited Brown's residence the day of the murder and found Brown asleep; that Brown was unsuccessful in drug rehab; and that Brown was not a mean-spirited teenager. *See* S.F. Trial, Vol. 45/53 [ECF no. 53-36], at 55-66. Brown's mother testified that Brown was full of joy as a child, that Brown never got into trouble at school, and that, while she never saw Brown use drugs, she was aware he had gone into rehab for alcohol abuse. *See* S.F. Trial, Vol. 45/53 [ECF no.

53-36], at 66-73. All three expressed shock on learning that Brown had shot Ray. Brown's uncle described Brown as a funny teenager who cracked jokes and counseled him that drugs were bad. *See* S.F. Trial, Vol. 46/53 [ECF no. 53-37], at 111-15.

A licensed professional counselor who had counseled Brown in jail testified that Brown suffered from anxiety and depression and experienced a sincere religious conversion; that Brown had been using methamphetamine for three to four days and was suicidal before Ray's murder; that Brown had worked through his depression and anxiety while in jail; that Brown had made substantial progress in dealing with his substance abuse while in jail; that he believed that Brown was sincerely remorseful for his offense; and that he had not seen any sociopathic qualities in Brown. *See* S.F. Trial, Vol. 46/53 [ECF no. 53-37], at 5-32. A minister who had visited Brown in jail testified that Brown was polite, friendly, respectful and remorseful. *See* S.F. Trial, Vol. 46/53 [ECF no. 53-37], at 96-110. Both admitted during cross-examination that Brown's aggressive demeanor during his televised post-arrest interview was very different from his demeanor when they counseled him.

The Hunt County Sheriff, the assistant jail administrator, and a Sheriff's Department Lieutenant all testified that Brown had not caused any problems during his pretrial detention and had displayed a calm, polite, cooperative demeanor. *See* S.F. Trial, Vol. 46/53 [ECF no. 53-37], at 33-47, 74-96. A childhood friend and neighbor of Brown testified that Brown saved her from choking by using the Heimlich maneuver when she was nine years old. *See* S.F. Trial, Vol. 46/53 [ECF no. 53-37], at 49-57. A former Hunt County Jail inmate and his wife each testified that Brown

helped him deal with depression during his stay at that facility and that both of them thereafter maintained contact with Brown. *See* S.F. Trial, Vol. 46/53 [ECF no. 53-37], at 58-74.

Dr. Paula Lundberg-Love, an expert in psychology and pharmacology, testified about the effects of addiction on the brain and behavior, including how addiction lowers the impulse control of an addict and causes irritability and delusional thinking; that methamphetamine reduces reflective thinking, leads to irritability, and tends toward impulsivity; that addiction is a disease of relapse that is never fully cured; that, while there are genetic factors at play in addiction, childhood stressors play a prominent role by impairing brain circuitry; that Brown had a history of multiple childhood stressors, including post-traumatic stress disorder, depression, anxiety, divorce, substance abuse beginning at age twelve, and sexual abuse at age twelve; that cocaine and methamphetamine abuse tend to lead toward violence and criminal behavior; that Brown had no history of violence except when taking methamphetamine; and that Brown was not impulsive except when on drugs. *See* S.F. Trial, Vol. 46/53 [ECF no. 53-37], at 115-220.

Clinical and forensic psychologist Dr. Mark Cunningham testified that Brown suffered from multiple adverse transgenerational developmental factors, including a lack of parental nurturing, mood disorder, family dysfunction, delayed growth, chronic psychosocial immaturity, Attention Deficit Hyperactivity Disorder ("ADHD"), childhood physical, verbal, and emotional abuse, childhood sexual abuse (of both Brown and other family members), teenage alcohol abuse, teen peer harassment, and

significant hereditary predisposition for substance abuse and mood disorder; that these adverse factors led to Brown's substance abuse, addiction, depression, anxiety, and feelings of powerlessness; that Brown's drug addiction caused his marriage to come apart; and that, despite all of this, there was very little likelihood that Brown would exhibit serious violence if incarcerated. *See* S.F. Trial, Vol. 47/53 [ECF no. 53-38], at 5-197.

### 3. The Verdict

On May 31, 2013, the jury returned its punishment-phase verdict, finding (1) beyond a reasonable doubt that there was a probability Brown would commit criminal acts of violence that would constitute a continuing threat to society and (2) that, taking into consideration all of the evidence, including the circumstances of the offense and the defendant's character, background, and personal moral culpability, there were insufficient mitigating circumstances to warrant that a sentence of life imprisonment be imposed in lieu of a sentence of death. *See* S.F. Trial, Vol. 48/53 [ECF no. 53-39], at 66-69. Brown's punishment-phase verdict form appears at ECF no. 52-16, pp. 141-42 of 161, and at ECF no. 52-19, pp. 438-39 of 458.

### E. Direct Appeal

On May 29, 2014, attorney Craig L. Henry filed Brown's brief on direct appeal, urging six points of error − specifically, arguments that (1) the prosecution's punishment phase jury argument improperly urged the jury to disregard mitigating evidence unless there was a nexus to Brown's capital offense; (2) the punishment phase jury charge and prosecutorial argument combined to deprive Brown of a vehicle

for the jury to give a meaningful reasoned moral response to his mitigating evidence; (3) there was insufficient evidence of Brown's future dangerousness; (4) the trial court erred in admitting a letter that Brown purportedly had written; (5) the trial court erred in admitting graphic autopsy photographs; and (6) there was insufficient evidence of capital murder. Brown's appellate brief appears at ECF nos. 52-31, 52-32, and 52-34.

In an unpublished opinion issued September 16, 2015, the Texas Court of Criminal Appeals affirmed Brown's conviction and sentence. *See Brown v. State*, AP-77,019, 2015 WL 5453765 (Tex. Crim. App. Sept. 16, 2015). Brown did not seek certiorari review from the United States Supreme Court.

### F. State Habeas Corpus Proceeding

On January 15, 2015, the Texas Office of Capital Writs filed Brown's state habeas corpus application, presenting multiple claims for relief, including arguments that (1) his due process rights were violated by the trial court's failure to instruct the jury on the effect of a single holdout juror on the punishment phase special issues; (2) the jury improperly considered extrinsic information; (3) the Texas capital sentencing statute results in the arbitrary imposition of the death penalty because of racial and geographic disparities in the imposition of death sentences throughout the state; (4) Brown's trial counsel rendered ineffective assistance by failing to (a) present available mitigating evidence; (b) present available evidence and argument suggesting Brown was not guilty; (c) object to improper prosecutorial jury argument and an erroneous jury charge at the punishment phase of trial; (d) move to suppress

Brown's statements to police and a television reporter; and (e) request a change of venue; and (5) Brown's state appellate counsel rendered ineffective assistance by failing to raise points of error on direct appeal arguing (a) Brown was not guilty of capital murder and (b) the punishment phase jury charge and prosecutorial argument were erroneous and improper. Brown's state habeas application appears at ECF no. 58-3, pp. 23-146 of 355.

The state trial court held an evidentiary hearing in Brown's state habeas proceeding on July 23-27, 2018. The witnesses who testified during Brown's state habeas hearing included Dr. Gary Mesibov, a clinical psychologist who specializes in developmental disorders and opined that Brown suffers from Autism Spectrum Disorder ("ASD") (formerly known as Asperger's syndrome), which limits Brown's ability to engage in communication and social interaction. *See* Statement of Facts from Brown's state habeas corpus hearing ("S.F. State Habeas Hearing"), Volume 7/23 [ECF no. 54-7], at 26-260; S.F. State Habeas Hearing, Vol. 8/23 [ECF no. 54-8], at 8-116. On cross-examination, Dr. Mesibov admitted that persons with ASD generally do not engage in attention-seeking behavior or enjoy playing pretend games but that Brown's family members described him as someone who enjoyed playing pretend games and behaving as a class clown as a child. Dr. Mesibov also admitted that persons with ASD do not generally engage in social activities but that Brown's childhood was characterized by his active involvement in baseball throughout his developmental and teen years, as well as his involvement in scouting and a team academic competition. Dr. Mesibov also admitted that Brown had never been referred

by any school personnel for evaluation for possible autism-related issues, had never required the type of "support" typically required by autistic individuals to maintain employment, and had been married for several years to a woman who earned a doctorate. Dr. Mesibov also admitted that it was unusual for individuals with ASD to be able to perform the Heimlich maneuver on their own or to be able to engage in romantic relationships. He admitted that these and many other characteristics displayed by Brown were atypical of individuals with ASD.

Brown's mother Brenda Crofford Kluttz testified at Brown's state habeas hearing that, as a child, Brown was slow to develop and showed a lack of social maturity; that, despite this, she trusted Brown to care for his invalid younger brother Jordan who was incapable of walking of talking and who used a feeding tube; that Brown communicated with Jordan through facial expressions; that she divorced Brown's father wen Brown was one year old and married Charles Gafford when Brown was two-and-a-half years old; that Gafford's son Nathan sexually abused Brown when Brown was a child; that Brown's depression grew worse after his divorce from Ray; that Brown was convinced that Ray planned to take their children to east Texas and live with her former husband Tracy Williams, which left Brown distraught; that Brown's biological father struggled with alcoholism; that Brown once quit a job working for an aircraft manufacturer because he did not want to take a drug test; that Brown opened his own sign shop in McKinney but that the business did not flourish and that Brown went back to work for her brother; that Brown's drug problems grew worse after he met Ray; that Brown attempted suicide in January

2011; and that Brown is a loving father and brother, played youth baseball, is creative, and has a talent for making neon signs. *See* S.F. State Habeas Hearing, Vol. 11/23 [ECF no. 54-11], at 85-135.

The state habeas trial court also heard testimony from Brown's state trial counsel, attorneys Toby Wilkinson and Katherine Ferguson. Attorney Wilkinson's testimony appears at S.F. State Habeas Hearing, Vol. 9/23 [ECF no. 54-9], at 6-147, and at S.F. State Habeas Hearing, Vol. 10/23 [ECF no. 54-10], at 6-235. Attorney Ferguson's testimony appears at S.F. State Hebeas Hearing, Vol. 10/23 [ECF no. 54-10], at 246-70; at S.F. State Habeas Hearing, Vol. 11/23 {ECF no. 54-11], at 7-70; and at S.F. State Habeas Hearing, Vol. 12/23 {ECF no. 54-12], at 9-74 & 231-235.

Finally, the state habeas court heard testimony from Brown's mitigation specialist Maureen Griffin concerning the defense team's investigation into Brown's background, including the defense team's findings that Brown demonstrated a lack of maturity, inability to follow directions, and impulsivity during childhood; that Brown was conceived while his mother was having an affair with George Gafford, who had a son with schizophrenia; that Brown was bullied at school and as a result became an entertainer; and that Griffin was concerned that Brown would make a poor witness at trial because his demeanor was cold and unfeeling. *See* S.F. State Habeas Hearing, Vol. 12/23 [ECF no. 54-12], at 124-221.

On November 5, 2018, the state trial court issued its findings of fact, conclusions of law, and recommendation that Brown's state habeas corpus application be denied. The state trial court's findings, conclusions, and recommendation ("FCR")

appear at ECF no. 59-7, pp. 260-315 of 409. On September 11, 2019, the Texas Court of Criminal Appeals adopted the trial court's findings and conclusions and denied state habeas relief. *See Ex parte Brown*, WR-85,341-01, 2019 WL 4317041 (Tex. Crim. App. Sept. 11, 2019).

## G. Proceedings in this Court

Brown filed his federal habeas corpus petition in this court on September 11, 2020 (ECF no. 29), asserting four complaints of ineffective assistance by his trial counsel, six substantive claims, and one cumulative error claim. Respondent filed an answer. *See* ECF no. 40. Brown filed his reply brief. *See* ECF no. 48.

On August 20, 2021, Brown filed a motion for stay and abeyance. *See* ECF no. 63. Respondent filed a brief in opposition on October 1, 2021. *See* ECF no. 67. Brown filed a reply brief on October 15, 2021. *See* ECF no. 68.

In findings, conclusions, and a recommendation issued on January 28, 2022, the undersigned recommended denial of Brown's motion for stay. *See* ECF no. 69. Brown filed Objections thereto on February 14, 2022. *See* ECF no. 70. In an Order issued February 18, 2022, Judge Lindsay overruled Brown's objections and denied Brown's motion for stay. *See* ECF no. 71.

## II. AEDPA STANDARD OF REVIEW

Because Brown filed this federal habeas corpus action after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), this Court's review of his claims for federal habeas corpus relief is governed by AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792 (2001). Under the AEDPA standard of review, this Court cannot

grant Brown federal habeas corpus relief in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded that the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. § 2254(d)(1) have independent meanings. *See Bell v. Cone*, 535 U.S. 685, 694 (2002).

Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Brown*, 544 U.S. at 141; *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite Supreme Court authority does not, per se, establish that the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our

precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell*, 540 U.S. at 16.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *See Brown*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) ("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of ... clearly established Federal law,' § 2254(d)(1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins*, 539 U.S. at 520-21. This inquiry focuses on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins*, 539 U.S. at 520; *Price v. Vincent*, 538 U.S. 634, 641 (2003) ("[I]t is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner"). "Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling

on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (quoting *Harrington v. Richter,* 562 U.S. 86, 101 (2011)).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. 28 U.S.C. § 2254(d)(2) provides that federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See Wood v. Allen*, 558 U.S. 290, 301(2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice

to supersede the trial court's factual determination. *See Wood*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341-42 (2006).

And 28 U.S.C. § 2254(e)(1) provides that a federal habeas petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *See* 28 U.S.C. §2254(e)(1); *Schriro*, 550 U.S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice*, 546 U.S. at 338-39 ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) ("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'").

It remains unclear at this juncture whether Section 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under Section 2254(d)(2). *See Wood*, 558 U.S. at 300-01 (choosing not to resolve the issue of § 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice*, 546 U.S. at 339 (likewise refusing to resolve the Circuit split regarding the application of § 2254(e)(1)).

The deference to which state-court factual findings are entitled under AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El*, 545 U.S. at 240 (the standard is "demanding but not insatiable"); *Miller-El v.*

*Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

Absent a showing that there is an absence of available state corrective process or that circumstances exist that render such process ineffective to protect the rights of a petitioner, this Court is statutorily precluded from granting federal habeas corpus relief on any claim that has not been fairly presented to the state courts. *See* 28 U.S.C. § 2254(b)(1); *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017) (the exhaustion requirement is designed to avoid the unseemly result of a federal court upsetting a state court conviction without first affording the state courts an opportunity to correct a constitutional violation). But this Court is authorized to deny federal habeas relief on the merits notwithstanding a petitioner's failure to exhaust available state court remedies. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *Rhines v. Weber*, 544 U.S. 269, 277 (2005) (a federal habeas court abuses its discretion if it grants a petitioner a stay when his unexhausted claims are plainly meritless).

In those instances in which the state courts failed to adjudicate a claim on the merits that Brown presents to this Court – such as claims (1) the state courts summarily dismissed under the Texas writ-abuse statute or other Texas rules of procedural default or (2) that Brown failed to fairly present to the state courts – this Court's review of the un-adjudicated claim is de novo. *See Porter v. McCollum*, 558

U.S. 30, 39 (2009) (de novo review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U. S. 374, 390 (2005) (de novo review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins*, 539 U.S. at 534 (same).

## III. CONSTITUTIONAL CHALLENGES TO THE TEXAS CAPITAL SENTENCING SCHEME

### A. Overview of the Claims

In his eighth claim for federal habeas relief, Brown argues (1) the Texas future dangerousness special issue is unconstitutionally vague because it fails to identify key terms such as "probability," "criminal acts of violence," and "continuing threat to society"; (2) the term "mitigating evidence" is inadequately – that is, too narrowly – defined in the mitigation special issue; and (3) Brown's state trial court was unconstitutionally forbidden from informing the jury of the effect of a single holdout juror on any of the Texas capital sentencing special issues. *See* ECF no. 29, at 153-60.

In his ninth claim for federal habeas corpus relief, Brown argues that the Texas capital sentencing scheme is unconstitutional because it (1) fails to sufficiently narrow the class of criminal defendants eligible to receive the death penalty and (2) fails to ensure adequate proportionality review of a capital sentence. *See* ECF no. 29, at 160-64.

### B. State Court Disposition

Brown did not present any of his constitutional challenges to the Texas capital sentencing statute or its special issues as points of error in his direct appeal. In his sixth ground for state habeas relief, Brown argued that his due process rights were violated when the state trial court failed to instruct his capital sentencing jury on the effect of a single holdout juror on any of the Texas capital sentencing special issues and that the Texas twelve/ten rule is unconstitutional under the Supreme Court's holding in *Caldwell v. Mississippi*, 472 U.S. 320 (1985). The Texas Court of Criminal Appeals rejected these arguments on the merits when it denied Brown's state habeas corpus application. Brown failed to fairly present the state appellate court with any of his other constitutional challenges to the Texas capital sentencing statute or its special issues.

### C. Clearly Established Federal Law

Brown's constitutional challenges to the validity of the Texas capital sentencing statute and its special issues ignore clearly established Supreme Court precedent. For example, in *Tuilaepa v. California*, 512 U.S. 967 (1994), the United States Supreme Court explained that the Eighth Amendment addresses two different, but related, aspects of capital sentencing: the eligibility decision and the selection decision. *See Tuilaepa*, 512 U.S. at 971. The Supreme Court's analysis of those two aspects of capital sentencing provided the first comprehensive system for analyzing Eighth Amendment claims that a clear majority of the Supreme Court had ever offered:

> To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate

-28-

punishment. To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase. The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or both). As we have explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague. ....

We have imposed a separate requirement for the selection decision, where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence. "What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime." That requirement is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime.

*Tuilaepa*, 512 U.S. at 971-73 (citations omitted).

The Supreme Court clearly declared its view that states may adopt capital sentencing procedures that rely on the jury, in its sound judgment, to exercise wide discretion. *See id.* at 974. The Supreme Court also concluded, at the selection stage, that states are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record," and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." *Id.* at 978.

In *Loving v. United States*, 517 U.S. 748, 755 (1996), the Supreme Court described the first part of the *Tuilaepa* analysis – the eligibility decision – as follows:

The Eighth Amendment requires, among other things, that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" Some schemes accomplish that narrowing by requiring that the sentencer find at least one aggravating circumstance. The narrowing may also be achieved, however, in the definition of the capital offense, in which circumstance the requirement that the sentencer "find the existence of the aggravating circumstance in addition is no part of the constitutionally required narrowing process." (citations omitted).

The Supreme Court later elaborated on the distinction between the narrowing function or "eligibility decision" and the "selection phase" of a capital sentencing proceeding in *Buchanan v. Angelone*, 522 U.S. 269, 275-277 (1998) (citations omitted):

Petitioner initially recognizes, as he must, that our cases have distinguished between two different aspects of the capital sentencing process, the eligibility phase and the selection phase. In the eligibility phase, the jury narrows the class of defendants eligible for the death penalty, often through consideration of aggravating circumstances. In the selection phase, the jury determines whether to impose a death sentence on an eligible defendant. Petitioner concedes that it is only the selection phase that is at stake in his case. He argues, however, that our decisions indicate that the jury at the selection phase must both have discretion to make an individualized determination and have that discretion limited and channeled. He further argues that the Eighth Amendment therefore requires the court to instruct the jury on its obligation and authority to consider mitigating evidence, and on particular mitigating factors deemed relevant by the State.

No such rule has ever been adopted by this Court. While petitioner appropriately recognizes the distinction between the eligibility and selection phases, he fails to distinguish the differing constitutional treatment we have accorded those two aspects of capital sentencing. It is in regard to the eligibility phase that we have stressed the need for channeling and limiting the jury's discretion to ensure that the death penalty is a proportionate punishment and therefore not arbitrary or capricious in its imposition. In contrast, in the selection phase, we have emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination.

In the selection phase, our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence. However, the state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence. Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence. Thus, in *Boyde v. California,* we held that the standard for determining whether jury instructions satisfy these principles was "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."

But we have never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence. And indeed, our decisions suggest that complete jury discretion is constitutionally permissible.

## D. *De Novo* Review of Allegedly Vague Terms in Future Dangerousness Special Issue

For the first time in his eighth claim for federal habeas relief, Brown alleges that a variety of terms included in the Texas capital sentencing scheme's future dangerousness special issue are unconstitutionally vague. *See* ECF no. 29, at 153-55. Because Brown failed to fairly present this argument to the state courts on direct appeal or in his state habeas corpus proceeding, this Court's review of same is necessarily de novo. In those instances in which the state courts failed to adjudicate a claim on the merits that Brown presents to this Court (such as claims (1) the state courts summarily dismissed under the Texas writ-abuse statute or other Texas rules of procedural default or (2) which Brown failed to fairly present to the state courts), this Court's review of the un-adjudicated claim is de novo. *See Porter*, 558 U.S. at 39 (de novo review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland*

analysis); *Rompilla*, 545 U. S. at 390 (de novo review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins*, 539 U.S. at 534 (same).

28 U.S.C. § 2254(b)(1) prohibits a federal district court from granting habeas corpus relief based on an unexhausted claim except in circumstances inapplicable to Brown's unexhausted challenge to the future dangerousness special issue. But 28 U.S.C. § 2254(b)(2) permits a federal district court to deny relief on the merits notwithstanding a petitioner's failure to exhaust available state remedies.

The allegedly vague terms in the Texas capital sentencing statute's future dangerousness special issues that Brown identifies in his eighth claim for federal habeas relief all contain a commonsense core of meaning that do not require further definition. *See James v. Collins*, 987 F.2d 1116, 1120 (5th Cir. 1993) ("To the extent that the words strike distinct chords in individual jurors, or play to differing philosophies and attitudes, nothing more is at work than the jury system…. The answer is that such words, often of great consequence, do have a common understanding in the sense that they ultimately mean what the jury says by their verdict they mean." (quoting *Milton v. Procunier*, 744 F.2d 1091, 1096 (5th Cir. 1984)).

For more than a quarter century, the Fifth Circuit has consistently rejected the same void-for-vagueness challenge to the key terms within the Texas capital sentencing statute's future dangerousness special issue that Brown now raises. *See e.g.*, *Sprouse v. Stephens*, 748 F.3d 609, 622-23 (5th Cir. 2014) (denying Certificate of

Appealability ("CoA") on complaints about the lack of definitions of "probability," "criminal acts of violence," and "continuing threat to society" in a Texas capital sentencing jury charge); *Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009) (holding the terms "probability," "criminal acts of violence," and "continuing threat to society" "have a plain meaning of sufficient content that the discretion left to the jury is no more than that inherent in the jury system itself"); *Turner v. Quarterman*, 481 F.3d 292, 299-300 (5th Cir. 2007) (rejecting claims that the terms "probability," "criminal acts of violence," and "continuing threat to society" were so vague as to preclude a capital sentencing jury's consideration of mitigating evidence); *Leal v. Dretke*, 428 F.3d 543, 552-53 (5th Cir. 2005) (listing numerous Fifth Circuit opinions rejecting complaints about the failure of Texas courts to define the terms "probability," "criminal acts of violence," and "continuing threat to society").

Brown's argument that the Texas capital sentencing statute's future dangerousness special issue is unconstitutionally vague lacks any arguable merit. And, as other judges in this district have recently warned, these or very similar challenges to the validity of the Texas capital sentencing statute that have routinely been rejected on the merits by federal district courts and consistently held to be unworthy of a Certificate of Appealability by the Fifth Circuit could give rise to the imposition of sanctions under Federal Rule of Civil Procedure 11. *See Johnson v. Lumpkin*, ___ F.Supp.3d ___, ___, 2022 WL 877565, * 2 (N.D. Tex. 2022) (explaining that, to comply with Rule 11, a party asserting a claim that has repeatedly been rejected by governing Circuit authority must acknowledge the existence of contrary

governing Circuit legal authority and offer a rational explanation for either distinguishing his case or for adopting a new legal principle); *Williams v. Lumpkin*, 339 F.R.D. 383, 386-89 (N.D. Tex. 2021) (explaining the Fifth Circuit has repeatedly rejected the same challenge to the lack of definitions in the Texas capital sentencing special issues raised here by Brown herein and declaring those arguments to be both legally frivolous as well as violative of Rule 11); *accord Cobb v. Thaler*, 682 F.3d 364, 381 (5th Cir. 2012) (explaining that a federal habeas petitioner who sought CoA on three challenges to the constitutionality of the Texas capital sentencing statute that had consistently been rejected by the Fifth Circuit (including a request for proportionality review) expressly acknowledged that those claims were foreclosed by Circuit authority).

**E. De Novo Review of Allegedly Narrow Definition of Mitigating Evidence**

At the punishment phase, Brown's state trial court instructed his capital sentencing jury as follows: "In deliberating on Special Issue Number 2 you shall consider mitigating evidence that a juror might regard as reducing the defendant's moral blameworthiness." (ECF no. 52-16, p. 138 of 161). The standard for evaluating the constitutionality of a capital sentencing jury charge is whether "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990); *Sprouse*, 748 F.3d at 618. Brown does not identify with any reasonable degree of specificity any evidence actually before his capital sentencing jury that his capital sentencing jury was unable to consider

adequately or unable to give mitigating effect based upon the foregoing "allegedly narrow" definition of mitigating evidence contained in his punishment phase jury charge. On the contrary, the state trial court expressly instructed Brown's jury, in answering the mitigation special issue, to consider "all of the evidence," including evidence of Brown's character, background, and personal moral culpability. *See* ECF no. 52-16, p. 137 of 161. There is no reasonable likelihood Brown's capital sentencing jury considered itself unable to consider or give mitigating effect to any of the evidence properly before it at the punishment phase of Brown's capital murder trial.

Brown argues for the first time in his eighth claim for federal habeas relief that the term "mitigating evidence" employed in the Texas capital sentencing scheme's mitigation special issue is unconstitutionally narrow in that it requires a nexus to the capital offense. *See* ECF no. 29, at 155-57. Brown relies primarily on the Supreme Court's holding in *Tennard v. Dretke*, 542 U.S. 274 (2004), a decision which applied the Supreme Court's holding in *Penry v. Johnson (Penry II)*, 532 U.S. 782 (2001), to a capital murder defendant with a low IQ. Tennard was tried before the Texas Legislature enacted amendments to the capital sentencing statute mandating submission of the current mitigation special issue at the punishment phase of capital murder trials. And so the Supreme Court's opinion in *Tennard* was a straight-forward application of its prior holding in *Penry II*, and *Tennard* does not purport to address the definition of "mitigating evidence" or "mitigating circumstance" as those terms are employed in the Texas capital sentencing statute's mitigation special issue.

-35-

In the years after the Supreme Court decided *Tennard*, the Fifth Circuit has expressly and repeatedly rejected the same argument raised by Brown in this portion of his eighth claim for federal habeas relief – that the definition of "mitigating evidence" or "mitigating circumstance" under Texas law is unconstitutionally narrow because it focuses the jury's attention on evidence reducing the defendant's moral blameworthiness. *See, e.g.*, *Rhoades v. Davis*, 914 F.3d 357, 366-67 (5th Cir. 2019) ("This court has never accepted that it is unconstitutional to define mitigating evidence as evidence that reduces moral blameworthiness."); *Hummel v. Davis*, 908 F.3d 987, 994 (5th Cir. 2018) (rejecting the argument that the Texas capital sentencing special issue unconstitutionally limits a jury's ability to consider mitigating evidence that goes beyond the defendant's moral blameworthiness); *Rockwell v. Davis*, 853 F.3d 758, 763 (5th Cir. 2017) (holding the same); *Sprouse*, 748 F.3d at 622 (noting the Fifth Circuit has repeatedly rejected this same constitutional challenge to the allegedly narrow construction of the mitigation special issue presented by Brown when viewed in conjunction with the future dangerousness special issue); *Blue v. Thaler* 665 F.3d 647, 667 (5th Cir. 2011) (rejecting the argument that Supreme Court precedent requires a definition of mitigating evidence that includes something more than evidence which reduces a defendant's moral blameworthiness).

As was true for Brown's attack on the allegedly vague terms in the future dangerousness special issue, Brown's briefing does not recognize the existence of, much less distinguish, this line of Fifth Circuit authority rejecting his argument that

the Texas definition of "mitigating evidence" is unconstitutionally narrow. Again, this has led other judges recently to warn petitioners of possible Rule 11 violations. *See Williams*, 339 F.R.D. at 389-90.

And the Supreme Court has consistently used the term "relevant mitigating evidence" to describe evidence that, by its very nature, tends to diminish a convicted capital murder defendant's moral blameworthiness or lessen the reprehensible nature of the offense – that is, evidence that relates to the defendant's character or background or to the circumstances of the offense. *See, e.g.*, *Brewer v. Quarterman*, 550 U.S. 286, 293-96 (2007) (depression, troubled childhood, substance abuse); *Abdul-Kabir v. Quarterman* , 550 U.S. 233, 259 (2007) (childhood deprivation and lack of self-control); *Tennard v. Dretke*, 542 U.S. 274, 283-88 (2004) (low intellectual functioning); *Penry v. Johnson*, 532 U.S. 782, 796-804 (2001) (mental retardation and history of childhood abuse); *Lockett v. Ohio*, 438 U.S. 586, 604-05, 608 (1978) (lack of intent to kill, relatively minor role in the offense, and age). Brown does not identify any Supreme Court opinion to date that purports to require that a capital sentencing jury give "mitigating" consideration to any evidence or circumstance wholly unrelated to a defendant's moral blameworthiness or personal moral culpability. In fact, such a rule would be not only counterintuitive but would inject into the capital sentencing process the consideration of matters that could make that process erratic and arbitrary, precisely the concerns that Brown argues should be avoided.

Finally, Respondent correctly points out that, insofar as Brown argues in favor of a definition of "mitigating evidence" or "mitigating circumstances" that goes beyond

evidence that reduces a defendant's moral blameworthiness, Brown's claim runs afoul of the nonretroactivity doctrine set forth in the Supreme Court's holding in *Teague v. Lane*, 489 U.S. 288 (1989), which forecloses adoption of the new principles of federal constitutional criminal procedure in federal habeas corpus proceedings.

Under the holding in *Teague*, federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review. *See Caspari v. Bohlen*, 510 U.S. 383, 389-90 (1994). A "new rule" for *Teague* purposes is one which was not dictated by precedent existing at the time the defendant's conviction became final. *See O'Dell v. Netherland*, 521 U.S. 151, 156 (1997) (holding a "new rule" either "breaks new ground," "imposes a new obligation on the States or the Federal Government," or was not "dictated by precedent existing at the time the defendant's conviction became final"). Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time that his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *See id.*

A conviction becomes final for *Teague* purposes when either the United States Supreme Court denies a certiorari petition on the defendant's direct appeal or the time period for filing a certiorari petition expires. *See Caspari*, 510 U.S. at 390. Brown's conviction became final for *Teague* purposes no later than December 16, 2015 – the ninety-first day after the Texas Court of Criminal Appeals affirmed his conviction and sentence on direct appeal (September 16, 2015) and the expiration of the time period within which Brown had to file his petition for writ of certiorari with

the United States Supreme Court. *See Beard v. Banks*, 542 U.S. 406, 411-12 (2004) (recognizing a state criminal conviction ordinarily becomes final for *Teague* purposes when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for writ of certiorari has elapsed or a timely filed petition for certiorari has been denied); *Caspari*, 510 U.S. at 390 ("A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied."); Rule 13.1, Rules of the Supreme Court of the United States (providing the deadline for filing a certiorari petition is ordinarily ninety days from the date of the judgment for which certiorari review is sought).

*Teague* still applies after the passage of AEDPA. *See Horn v. Banks*, 536 U.S. 266, 268-72 (2002) (applying *Teague* in an AEDPA context); *Robertson v. Cockrell*, 325 F.3d 243, 255 (5th Cir. 2003) (recognizing the continued vitality of the *Teague* nonretroactivity doctrine under AEDPA). As of the date that Brown's conviction and sentence became final for *Teague* purposes, no federal court had ever held a Texas capital sentencing jury was constitutionally required to consider as "mitigating" any evidence or circumstance that did not bear on the defendant's personal moral culpability or moral blameworthiness. Likewise, as of the same date, no federal court had ever held that a Texas trial court was required to instruct a capital sentencing jury to consider as "mitigating" any evidence or circumstances that was unrelated to

the defendant's character, background, or personal moral culpability – that is, the defendant's personal moral blameworthiness.

And so, in addition to being without arguable merit, the new rule that Brown advocates in this portion of his eighth claim for federal habeas relief is also foreclosed by the holding in *Teague*.

The Court should deny relief on this claim.

### F. AEDPA Review of No Hung Jury Instruction/Challenge to Twelve/Ten Rule

As explained above, in his sixth ground for state habeas relief, Brown argued that his due process rights were violated when the state trial court failed to instruct his capital sentencing jury on the effect of a single holdout juror on any of the Texas capital sentencing special issues and that the Texas twelve/ten rule is unconstitutional under the Supreme Court's holding in *Caldwell v. Mississippi*. *See* State Habeas Application, 98-107 [ECF no. 58-3, pp. 120-29 of 355]. The state habeas trial court recommended denial of this claim on the merits. *See* FCR, 47-48, 52 [ECF no, 59-7, pp. 306-07 & 311 of 409]. The Texas Court of Criminal Appeals rejected these grounds on the merits. Brown re-urges these arguments in the final portion of his eighth claim for federal habeas relief, relying this time on both *Caldwell* and *Mills v. Maryland*, 486 U.S. 367 (1988). *See* ECF no. 29, at 157-60.

The Supreme Court implicitly rejected Brown's legal arguments on the first of these two claims in *Jones v. United States*, 527 U.S. 373, 382 (1999), holding that the Eighth Amendment does not require a capital sentencing jury be instructed as to the effect of a "breakdown in the deliberative process," because (1) the refusal to give such

an instruction does not affirmatively mislead the jury regarding the effect of its verdict and (2) such an instruction might well undermine the strong governmental interest in having the jury express the conscience of the community on the ultimate question of life or death.

Likewise, the Fifth Circuit has repeatedly rejected the legal premise underlying this same claim – the argument that a Texas capital murder defendant is constitutionally entitled to have the punishment-phase jury instructed regarding the consequences of a hung jury or a single holdout juror. *See, e.g.*, *Young v. Davis*, 835 F.3d 520, 528 (5th Cir. 2016) (the Eighth Amendment does not "require the jury be instructed as to the consequences of a breakdown in the deliberative process" (quoting *Jones*, 527 U.S. at 382)); *Hughes v. Dretke*, 412 F.3d 582, 593-94 (5th Cir. 2005) (holding the same arguments underlying this portion of Brown's eighth claim for federal habeas relief were so legally insubstantial as to be unworthy of a certificate of appealability); *Alexander v. Johnson*, 211 F.3d 895, 897-98 (5th Cir. 2000) (holding the *Teague v. Lane* non-retroactivity doctrine precluded applying such a rule in a federal habeas context); *Davis v. Scott*, 51 F.3d 457, 466-67 (5th Cir. 1995) (same).

Brown's reliance on the Supreme Court's holding in *Caldwell* is also misplaced. In *Caldwell*, the Supreme Court addressed an instance in which a capital murder prosecutor's jury argument suggested, in an erroneous and misleading manner, that the jury was not the final arbiter of the defendant's fate. More specifically, in *Caldwell*, the Supreme Court held that the following statement by the prosecution during its closing argument undermined reliable exercise of jury discretion: "Now,

-41-

[the defense] would have you believe that you're going to kill this man and they know-
-they know that your decision is not the final decision. My God, how unfair can they
be? Your job is reviewable. They know it." *Caldwell*, 472 U.S. at 325 & 329. To
establish a *Caldwell* violation, "a defendant necessarily must show that the remarks
to the jury improperly described the role assigned to the jury by local law." *Dugger v.
Adams*, 489 U.S. 401, 407 (1989).

No such error occurred during Brown's trial. And the Fifth Circuit has
repeatedly rejected efforts identical to Brown's to shoehorn the Supreme Court's
holding in *Caldwell* into the context of a Texas capital trial. *See, e.g.*, *Turner*, 481
F.3d at 300 (recognizing Fifth Circuit precedent foreclosed arguments the Eighth
Amendment and Due Process Clause of the Fourteenth Amendment mandated jury
instructions regarding the effect of a capital sentencing jury's failure to reach a
unanimous verdict); *Alexander*, 211 F.3d at 897 n.5 (holding the same).

Brown's reliance on *Mills* is also misplaced. The Fifth Circuit has repeatedly
rejected the same arguments underlying Brown's challenge to the Texas capital
sentencing scheme's requirement of jury unanimity for a verdict favorable to the
prosecution but only ten votes for a verdict favorable to the defense on the capital
sentencing special issues (the so-called twelve/ten rule). *See, e.g.*, *Blue*, 665 F.3d at
669-70 (rejecting an Eighth Amendment challenge to the Texas twelve/ten rule);
*Alexander*, 211 F.3d at 897 (specifically rejecting both Fourteenth and Eighth
Amendment challenges to the Texas twelve/ten rule in the course of affirming
rejection of claims virtually identical to those raised by Brown); *Miller v. Johnson*,

200 F.3d 274, 288-89 (5th Cir. 2000) (holding *Mills* inapplicable to a Texas capital sentencing proceeding); *Woods v. Johnson*, 75 F.3d 1017, 1036 (5th Cir. 1996) (holding the same); *Hughes v. Johnson*, 191 F.3d 607, 628-29 (5th Cir. 1999) (holding both *Mills* and *McKoy v. North Carolina* inapplicable to the Texas capital sentencing scheme); *Jacobs v. Scott*, 31 F.3d 1319, 1328-29 (5th Cir. 1994) ("Under the Texas system, all jurors can take into account any mitigating circumstance. One juror cannot preclude the entire jury from considering a mitigating circumstance. Thus, *Mills* is inapplicable."). Because the Texas capital sentencing scheme is different from those employed in Maryland and North Carolina, Brown's reliance on the Supreme Court's opinions in *McKoy* and *Mills* is misplaced. *See Alexander v. Johnson*, 211 F.3d at 897; *Miller v. Johnson*, 200 F.3d at 288-89; *Woods v. Johnson*, 75 F.3d at 1036; *Jacobs v. Scott*, 31 F.3d at 1328-29. Brown's challenge to the Texas twelve/ten rule is meritless.

The Texas Court of Criminal Appeals's rejections on the merits during Brown's state habeas corpus proceeding of his complaints about the absence of a hung jury instruction and the Texas twelve/ten rule were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor did they result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Brown's trial and state habeas corpus proceedings. The Court should deny relief on these claims.

### G. De Novo Review of "Inadequate" Narrowing of Class of Death-Eligible Offenders

For the first time in his ninth claim for federal habeas corpus relief, Brown argues that the Texas capital sentencing scheme is unconstitutional because it fails to sufficiently narrow the class of criminal defendants eligible to receive the death penalty. *See* ECF no. 29, at 160-64.

The Supreme Court has repeatedly rejected, both implicitly and explicitly, this same argument. *See Kansas v. Marsh*, 548 U.S. 163, 175-76 (2006) (upholding the Kansas capital sentencing scheme as constitutional in part because it properly narrowed the category of offenders eligible for the death penalty by requiring in the definition of capital murder that the state prove beyond a reasonable doubt one or more specific elements beyond a premeditated intentional murder); *Loving*, 517 U.S. at 755 (holding the constitutionally required narrowing function may be performed either through adoption of a narrow statutory definition of capital murder or by requiring the jury to find the existence of an aggravating factor); *Tuilaepa*, 512 U.S. at 971-72 (recognizing the finder of fact may make findings regarding the existence of aggravating factors which satisfy the narrowing function at either phase of a capital murder trial); *Johnson v. Texas*, 509 U.S. 350, 362 (1993) (holding its previous opinions upholding the Texas capital sentencing scheme recognized as constitutional the narrowing function performed by the Texas Penal Code's definition of capital murder); *Stringer v. Black*, 503 U.S. 222, 233 (1992) (recognizing that the constitutionally required narrowing function may be accomplished by jury findings at either phase of a capital murder trial); *Lowenfield v. Phelps*, 484 U.S. 231, 243-47 (1988) (comparing the Louisiana and Texas capital murder schemes and holding both

constitutionally narrowed the categories of offenders eligible for the death penalty by narrowly defining the statutory offense of capital murder); *Jurek v. Texas*, 428 U.S. 262, 268-70 (1976) (plurality opinion holding Texas capital murder statute constitutionally narrowed category of offenders eligible for the death penalty by narrowly defining the offense of capital murder).

The Fifth Circuit has likewise upheld the Texas capital murder statute against multiple claims that it fails to constitutionally narrow the class of offenders eligible for capital sentencing. *See, e.g.*, *Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009) (denying CoA on a claim attacking the definitions of terms included in the Texas capital sentencing special issues because the special issues played no role in performing the constitutionally required narrowing function); *Beets v. Johnson*, 180 F.3d 190, 195 (5th Cir. 1999) (holding capital murder statute's murder for hire provision (Texas Penal Code Section 19.03(a)(3)) constitutionally narrowed the class of offenders eligible for the death penalty); *Green v. Johnson*, 160 F.3d 1029, 1043 (5th Cir. 1998) (recognizing the Texas capital sentencing scheme accomplishes the constitutionally required narrowing function at the guilt-innocence phase of trial, thus negating the need for explicit definitions of key terms in the capital sentencing special issues); *West v. Johnson*, 92 F.3d 1385, 1406 (5th Cir. 1996) (holding the Supreme Court's decision in *Jurek* held Texas capital sentencing statute performed constitutionally required narrowing function at the guilt-innocence phase of trial); *Woods*, 75 F.3d at 1033-34 (holding Texas capital sentencing scheme performs the

constitutionally required narrowing function at the guilt-innocence phase of trial through the Texas Penal Code's narrow statutory definition of capital murder).

Brown was charged with capital murder, specifically, intentional murder committed during the commission of, or attempt to commit, the predicate offenses of terroristic threat, retaliation, and obstruction. As the Texas Court of Criminal Appeals explained in its opinion affirming Brown's conviction and sentence on direct appeal, there was overwhelming evidence from which a rational jury could have concluded that Brown intentionally murdered Ray while committing or attempting to commit the offenses of retaliation and obstruction – that is, with knowledge that Ray was in contact with the police and reporting Brown's behavior at the time that Brown shot her and that Ray had previously reported Brown to the police, that Brown had been arrested and lost his own shotgun as a result, and that Brown was aware that Ray could be a potential witness against him in his subsequent criminal proceeding, since she was the person who requested a welfare check be made at Brown's residence. Ray's 9-11 call was played for the jury. Brown admitted that, the night before the murder, he had "flicked" Ray in the face and that Ray then refused to permit him to take their son with him when he left Ray's residence. Brown admitted that, on the night of the murder, he pursued Ray for a considerable distance in an effort to force her to pull her vehicle over. Brown admitted that he was aware that Ray was talking on the telephone and that he believed that she was in communication with the police. Brown confessed that he fired the fatal shot when he saw a police vehicle approach his own vehicle from behind and that that vehicle's

flashing lights were turned on. Following his arrest, Brown told law enforcement officers and a television reporter that he shot Ray because he was angry with her and wanted her dead.

As explained in the undersigned's FCR recommending denial of Brown's motion for stay, *see* ECF no. 69 at 16-21, there was ample evidence before the jury at the guilt-innocence phase of trial to support the jury's guilty verdict on all three theories of capital murder charged in the indictment against Brown. All three capital murder theories submitted to Brown's jury required the prosecution to prove beyond a reasonable doubt an essential element above and beyond Brown's commission of an intentional premeditated murder. This is all the Eighth Amendment required, and so Brown's constitutional right to be tried under a capital sentencing scheme that performed the constitutionally required narrowing function was not violated. *See Loving*, 517 U.S. at 755; *Jurek*, 428 U.S. at 268-75; *Woods*, 75 F.3d at 1033-34.

Brown argues that "almost all murders in Texas could be categorized as first-degree murder." *See* ECF no. 29, at 161. But Brown was not charged merely with "first-degree murder." Brown was charged with capital murder, as defined by Texas Penal Code § 19.03(a). The evidence supported the jury's guilty verdict as to all three theories of capital murder charged in the indictment against Brown. Ray was terrorized the night that she called law enforcement just moments before Brown hunted her down and fatally shot her. The jury heard the audio recording of Ray's call to the 9-11 operator. And the jury could rationally have concluded that Brown's admitted anger with Ray over her call to police a few nights before which led to

Brown's arrest (retaliation) and Ray's refusal to halt her call to police to report Brown's threatening behavior on the evening of the murder while Brown chased her vehicle down in his own vehicle (obstruction) constituted at least some of Brown's motivation for fatally shooting Ray. The prosecution was required to prove, and did prove, beyond a reasonable doubt that Brown was guilty of more than just premeditated intentional murder under each of the three theories of capital murder charged in Brown's indictment.

Brown's Eighth Amendment and Fourteenth Amendment rights were not violated by the manner in which he was charged, tried, and convicted of capital murder as defined by Texas Penal Code Penal Code § 19.03(a). That statute adequately narrowed the category of offenders eligible for the death penalty.

The Court should deny relief on this portion of Brown's ninth claim for federal habeas relief.

## H. De Novo Review of Arbitrary/Disproportionate Application of the Death Penalty

For the first time in his ninth claim for federal habeas corpus relief, Brown argues that the Texas capital sentencing scheme allows the arbitrary and disproportionate application of the death penalty because it fails to distinguish those capital murders for which a sentence of death is appropriate and those for which a life sentence is appropriate. *See* ECF no. 29, at 160-64. Brown cites to examples of Texas defendants who were convicted of capital murders allegedly as heinous as Brown's and who received life sentences from their juries. *See id.* at 163.

But the Supreme Court has expressly rejected the contention that the Constitution requires proportionality review for capital sentences. *See Pulley v. Harris,* 465 U.S. 37, 50-51 (1984) ("There is thus no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death sentence is imposed and the defendant requests it."). The Fifth Circuit has also consistently held no such "proportionality review" of a capital sentence is constitutionally mandated. *See Sprouse*, 748 F.3d at 621 (there is no constitutional requirement for proportionality review of a Texas capital sentence); *Cobb v. Thaler*, 682 F.3d 264, 381 (5th Cir. 2012) (denying CoA on a claim premised upon the lack of proportionality review of a Texas capital sentence and holding the claim foreclosed by *Pulley*); *Martinez v. Johnson,* 255 F.3d 229, 241 n. 17 (5th Cir.2001) (there is no constitutional right to proportionality review); *Hughes v. Johnson,* 191 F.3d 607, 622 (5th Cir.1999) (holding a state appellate court was not required to conduct proportionality review of a capital sentence); *United States v. Webster,* 162 F.3d 308, 354 (5th Cir.1998) (holding the Constitution does not require a comparison of the penalties imposed in similar criminal cases); *Evans v. McCotter,* 790 F.2d 1232, 1243 (5th Cir. 1986) (holding there is no federal constitutional right to any type of proportionality review, so long as the state's capital punishment scheme protects against arbitrary and capricious imposition of the death penalty).

And Brown's ninth claim for federal habeas relief ignores the Eighth Amendment's requirement of an individualized sentencing determination – that is, the selection decision identified in *Tuilaepa*. As the Supreme Court explained in

*Tuilaepa* and *Buchanan*, the selection determination turns primarily on factors relevant to the defendant's unique character, background, and personal moral culpability or blameworthiness. The Texas capital sentencing scheme directs a capital sentencing jury's open-ended focus on defendant-centric factors in rendering its punishment phase verdict, and the Texas capital sentencing scheme's special issues, both the future dangerousness and mitigation special issues, focus the jury's attention on factors relevant to the defendant and do not mandate a direct "weighing" or "balancing" of those factors against the circumstances of the capital offense. *Hughes*, 191 F.3d at 622-23 (Texas is not a weighing jurisdiction which requires an appellate court or jury to "weigh" aggravating factors against mitigating ones).

Brown's demand for a type of proportionality review could be impossible to achieve from a practical standpoint. *See Buchanan*, 522 U.S. at 276 (in the selection phase of capital sentencing proceedings, there is the need for a broad inquiry into all relevant mitigating evidence to permit an individualized determination; proportionality, in contrast, is a proper consideration at the eligibility phase). Even when the circumstances of two capital offenses might appear similar, or even identical, the Eighth Amendment demands consideration during the selection phase of a capital sentencing proceeding of factors relevant to each defendant's unique character, background, and personal moral blameworthiness. Differences in those defendant-centric factors may mandate imposition of different types of capital sentences, even when the capital offenses committed mirrored one another. The arguments underlying Brown's ninth claim would override the long-standing

-50-

principle of individualized sentencing that supports the Supreme Court's Fifth Amendment and Eighth Amendment jurisprudence. *See Cordova v. Johnson,* 993 F.Supp. 473, 508 (W.D. Tex. 1998) ("Petitioner's proposed rule would stand the principle of individualized sentencing on its head.").

And Brown's proposed new rule mandating proportionality review of a state capital sentence runs afoul of the non-retroactivity doctrine announced in *Teague.*

The Court should reject this aspect of Brown's ninth claim for federal habeas relief.

## IV. ALLEGED DEFECTS IN STATE HABEAS CORPUS PROCEEDING

### A. The Claim

In his tenth claim for federal habeas relief, Brown argues for the first time that he was denied effective assistance of counsel during his state habeas corpus proceeding and that the state habeas trial court erroneously excluded certain testimony and evidence that he proffered during the same proceeding. *See* ECF no. 29, at 164-68.

### B. De Novo Review

Infirmities in a state post-conviction proceeding, including allegations of procedural irregularities (such as erroneous evidentiary rulings) and complaints of ineffective assistance by state habeas counsel, do not furnish an independent basis for federal habeas corpus relief. *See Gilkers v. Vannoy*, 904 F.3d 336, 346 n.60 (5th Cir. 2018). The Fifth Circuit has consistently applied this rule in various contexts. *See Rockwell v. Davis*, 853 F.3d 758, 761 n.5 (5th Cir. 2017) (state habeas court

allegedly failed to adhere to Texas criminal procedural laws), *cert. denied*, 138 S. Ct. 215 (2017); *Tercero v. Stephens*, 738 F.3d 141, 147 (5th Cir. 2013) (state habeas court failed to hold an evidentiary hearing on petitioner's *Roper* claim); *In re Gentras*, 666 F.3d 910, 911 (5th Cir. 2012) (state appellate court allegedly used flawed procedures to review state petitions for post-conviction review); *Stevens v. Epps*, 618 F.3d 489, 502 (5th Cir. 2010) (allegedly inadequate funding and staffing of the Mississippi Office of Capital Post-Conviction Counsel); *Haynes v. Quarterman*, 526 F.3d 189, 195 (5th Cir. 2008) (alleged ineffective assistance by initial state habeas counsel); *Brown v. Dretke*, 419 F.3d 365, 378 (5th Cir. 2005) (state habeas judge who issued findings of fact was not the same judge who presided over the petitioner's state habeas hearing); *Moore v. Dretke*, 369 F.3d 844, 846 (5th Cir. 2004) (alleged misapplication by state habeas court of state procedural rules did not furnish a basis for federal habeas relief because "an attack on the state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself" (quoting *Rudd v. Johnson*, 256 F.3d 317, 320 (5th Cir. 2001)); *Elizalde v. Dretke*, 362 F.3d 323, 331 (5th Cir. 2004) (Supreme Court precedent does not recognize a general right to effective assistance in a state post-conviction proceeding); *Henderson v. Cockrell*, 333 F.3d 592, 606 (5th Cir. 2003) (state habeas court held that an alleged violation of a petitioner's state statutory right to effective representation in an initial state habeas proceeding did not furnish a basis for relief in a subsequent state habeas proceeding); *Rudd v. Johnson*, 256 F.3d 317, 319 (5th Cir. 2001) (petitioner denied access to the prosecution's file during state habeas corpus proceeding); *Beazley v. Johnson*, 242

F.3d 248, 271 (5th Cir. 2001) (state habeas court allegedly overburdened petitioner's state habeas counsel by assigning multiple state habeas cases to the same counsel at the same time); *Wheat v. Johnson*, 238 F.3d 357, 361 (5th Cir. 2001) (state habeas court's refusal to consider a supplemental state writ application); *Morris v. Cain*, 186 F.3d 581, 585 n.6 (5th Cir. 1999) (an attack on a state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself and, therefore, will not furnish a basis for federal habeas relief (quoting *Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995)); *Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999) (state habeas court adopted the prosecution's proposed findings of fact and conclusions of law only three hours after they were filed with the state court); *Hallmark v. Johnson*, 118 F.3d 1073, 1080 (5th Cir. 1997) (state court policy against considering challenges to prison disciplinary proceedings in state habeas corpus proceedings); *Nichols v. Scott*, 69 F.3d at 1275 n.36 (state habeas judge had been the prosecutor in one of the petitioner's prior convictions that was introduced into evidence at the punishment phase of petitioner's capital murder trial, state habeas judge failed to recuse himself *sua sponte*, and state habeas judge signed prosecution's proposed findings and conclusions without change); *McCowin v. Scott*, 67 F.3d 100, 102 (5th Cir. 1995) (petitioner proceeded *pro se* and without a copy of the transcript in his state habeas proceeding and state habeas court failed to hold an evidentiary hearing); *Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir. 1992) (state habeas court quashed subpoenas *duces tecum* served on County District Attorney, State Attorney General, and U.S. Marshal).

The rationale behind this rule is that attacks on the propriety of a state post-conviction proceeding are collateral to, and do not directly undermine the validity of, the underlying state criminal proceeding that resulted in the federal habeas petitioner's conviction or the affirmation of same on direct appeal. *Morris*, 186 F.3d at 585 n.6; *Nichols*, 69 F.3d at 1275. Brown's briefing again does not recognize the existence of, much less distinguish, this line of Fifth Circuit authority, and this kind of failure has led other judges recently to warn petitioners of possible Rule 11 violations. *See Williams*, 339 F.R.D. at 389-90. And this Court is statutorily precluded from granting federal habeas relief on the ineffective assistance claims contained in Brown's tenth claim for relief. *See* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

Brown's tenth claim is legally frivolous, and the Court should deny relief on Brown's tenth claim.

## V. ALLEGED JURY MISCONDUCT

### A. The Claim

In his seventh claim for federal habeas relief, Brown argues that an unidentified juror engaged in unspecified misconduct warranting a new trial. *See* ECF no. 29, at 151-52. Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts provides that a petitioner must "specify all the grounds for relief available to the petitioner" and "state the facts supporting each ground." *Harper v. Lumpkin*, 19 F.4th 771, 778 (5th Cir. 2021) (quoting *Mayle v. Felix*, 545

U.S. 644, 655 (2005)). The rule of liberal construction which applies to pro se pleadings, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), does not apply to Brown's pleadings in this case.

## B. State Court Disposition

In his seventh ground for state habeas corpus relief, Brown argued that a juror considered information outside the record in rendering her verdict at Brown's capital murder trial. *See* State Habeas Application, 108-13 [ECF no. 58-3, pp. 130-35 of 355]. In support of this and several of his other state habeas claims, Brown presented his state habeas court with an affidavit from juror S_ D_ in which that juror stated, in part, that she attempted to convince other members of Brown's petit jury to vote in favor of a negative answer to the future dangerousness special issue but was unable to convince any of her fellow jurors to do so. *See* ECF no. 58-3, pp. 224-26 of 355. Brown argued that juror S_ D_ voted in favor of the prosecution on the capital sentencing special issues only because she believed Brown would face a better chance of getting a life sentence on appeal than if she persisted in voting in favor of the defense. Brown argued that juror S_ D_ was misled by the trial court's punishment phase jury charge into believing that her single vote in favor of the defense on the special issues would have no impact on the outcome of Brown's case. The state habeas trial court ruled that juror S_ D_'s testimony and affidavit did not address any external influences on the jury's deliberations and were not admissible under applicable Texas law. *See* FCR, 48, 52-53 [ECF no. 59-7, pp. 307, 311-12 of 409]. The Texas Court of Criminal Appeals denied this claim on the merits.

### C. AEDPA Review

As Respondent correctly argues, Federal Rule of Evidence 606(b) precludes this court from considering juror S_ D_'s post-trial affidavit. *See Young v. Davis*, 835 F.3d 520, 528-29 (5th Cir. 2016) (Rule 606(b) forbids consideration of juror affidavits in federal habeas corpus proceedings). More specifically, Rule 606(b)(1) provides that during an inquiry into the validity of a verdict or indictment (including a collateral attack upon a judgment), a juror may not testify about (1) any statement made or incident that occurred during the jury's deliberations, (2) the effect of anything on that juror's or another juror's vote; or (3) any juror's mental processes concerning the verdict or indictment. *See Austin v. Davis*, 876 F.3d 757, 789 (5th Cir. 2017) (quoting Rule 606(b)(1)); *Young*, 835 F.3d at 529. "The court may not receive a juror's affidavit or evidence of a juror's statement on these matters." *Austin*, 876 F.3d at 789. The only exceptions noted in the Rule itself are for testimony regarding (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) an outside influence was improperly brought to bear on any juror, or (3) a mistake was made in entering the verdict on the verdict form. *See* FED. R. EVID. 606(b)(2). Brown has not alleged any facts showing that any of these exceptions applies to juror S_ D_'s affidavit or his jury's deliberations.

In *Warger v. Shauers*, 574 U.S. 40, 43-48 (2014), the Supreme Court held that Rule 606(b) applies to forbid the admission of juror testimony about the content or jury deliberations or the subjective thought processes of individual jurors during a proceeding in which a party seeks to secure a new trial on the ground that a juror lied

during voir dire. *See Austin*, 876 F.3d at 789 (citing *Warger*). The only exception that the Supreme Court has recognized is "when, after the jury is discharged, a juror comes forward with compelling evidence that another juror made clear and explicit statements indicating that racial animus was a significant motivating factor in his or her vote to convict." *Austin*, 876 F.3d at 790 (citing *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 869 (2017)). Brown has not made any fact-specific allegation of a clear statement of race-based animus by any juror sufficient to invoke the exception recognized in *Pena-Rodriguez*. S_ D's post-trial affidavit is not properly before this Court.

Brown neither alleged any specific facts nor fairly presented the state habeas court with any evidence showing that any member of his jury engaged in misconduct during Brown's trial. Brown neither alleged any specific facts nor presented any evidence showing that any external influence affected the outcome of Brown's jury's deliberations at either phase of trial. Subjective confusion or frustration within the mind of a single juror does not constitute misconduct sufficient to warrant a new trial in a criminal case. Rule 606(b) forecloses this Court and other federal courts from delving into the subjective thought processes of an individual juror after the fact.

Under these circumstances, the Texas Court of Criminal Appeals's rejection on the merits during Brown's state habeas corpus proceeding of his conclusory jury misconduct claim was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination

of the facts in light of the evidence presented in Brown's trial and state habeas corpus proceedings.

The Court should deny Brown's seventh claim for federal habeas corpus relief.

## VI. ALLEGED *MIRANDA* VIOLATIONS

### A. The Claims

In his sixth claim for federal habeas relief, Brown argues for the first time as a stand-alone constitutional claim that his federal constitutional rights were violated by the admission at his trial of his videotaped post-arrest statements to law enforcement officers and a television reporter. *See* ECF no. 29, at 142-50.

### B. State Court Disposition

As explained above, the prosecution offered two videotaped statements during Brown's trial: one that Brown gave to law enforcement officers shortly after his arrest and a second videotaped statement that Brown gave to a television reporter. Brown did not object to the admission of either of his two videotaped statements when the prosecution offered them during trial. A transcript of Brown's interview by law enforcement personnel was also admitted into evidence as State Exhibit No. 388A and appears at S.F. Trial, Vol. 53/53, ECF no. 53-47, pp. 191-208 of 464. A transcript of Brown's interview by a television reporter was admitted into evidence as State Exhibit No. 388H and appears at S.F. Trial, Vol. 53/53, ECF no. 53-47, pp. 328-68 of 464. Brown did not complain about the admission of either video recorded statement or either transcript on direct appeal.

Brown's statement to law enforcement officers began with the following exchanges:

> INVESTIGATOR: Have a seat right there, Micah. Micah, I'm Felicia Lineman, a detective up here. This is Jamie Fuller. She's also an investigator up here. Okay.
> THE DEFENDANT: Okay.
> INVESTIGATOR: Before we do anything, let me read you this. You know you have the right to remain silent. Anything you say can and will be used against you in court. You have the right to consult with an attorney and have an attorney present during questioning. If you cannot afford an attorney, one can be provided to [sic] before any questioning at no cost. Do you understand these rights?
> THE DEFENDANT: Yes.
> INVESTIGATOR: Okay. With these rights in mind, do you wish to speak to me now?
> THE DEFENDANT: Well, I don't mind speaking to you, but I – I feel like I've – like I need a lawyer.
> INVESTIGATIR: Do what?
> THE DEFENDANT: I feel like I need a lawyer present to answer any questions.
> INVESTIGATOR: I'm just going to ask you about what happened. And you and I know both [sic] what happened.
> THE DEFENDANT: Yeah. Yeah, we – I'll go ahead and tell you.
> INVESTIGATOR: Okay. Are you sure?
> THE DEFENDANT: Yeah.
> INVESTIGATOR: Okay. After this we'll go smoke cigarettes, all right?
> THE DEFENDANT: All right.
> INVESTIGATOR: Deal? Okay. First of all, let me start out getting your full name. How do you spell your name?

Brown then proceeded to give a statement in which he candidly admitted that he intentionally shot Ray in the head with a sawed-off shotgun while she sat in her vehicle talking with police on her phone and that he did so after he had pursued her for a considerable distance in his own vehicle while actively attempting to get her to pull her vehicle over.

Brown did not challenge the admission of either statement in question as an independent ground for relief in his state habeas corpus application. But, in his fourth claim for state habeas relief, Brown argued that his trial counsel rendered ineffective assistance by failing to move to suppress his statement to the police. *See* State Habeas Application, 82-86 [ECF no. 58-3, pp. 104-08 of 355]. The state habeas trial court found that Brown did not make an unequivocal request or assertion of his right to counsel during his interview by law enforcement officers and that, therefore, Brown's trial counsel were not ineffective in failing to move to suppress Brown's statement to police. *See* FCR, 38-40 [ECF no. 59-7, pp. 297-99 of 409]. The state habeas trial court also found that Brown's statement to the television reporter was not the product of a custodial interrogation, thus rendering any objection to the admission of that statement likewise without merit. *See* FCR, 41 [ECF no. 59-7, p. 300 of 409]. The state habeas trial court concluded that the failure of Brown's trial counsel to move to suppress the statements was neither deficient performance nor prejudicial within the meaning of *Strickland*. *See* FCR, 51 [ECF no. 59-7, p. 310 of 409]. The Texas Court of Criminal Appeals rejected Brown's fourth claim for state habeas relief on the merits.

## C. De Novo Review

Because Brown chose not to present his straight-forward *Miranda* claims to the state courts as stand-alone or independent claims for relief but rather only in the context of his ineffective assistance claims, they are subject to de novo review by this Court. The Supreme Court has made clear that federal habeas courts may deny writs of habeas corpus by engaging in de novo review when it is unclear whether AEDPA

deference applies because a federal habeas petitioner will not be entitled to a writ of habeas corpus if his claim is rejected on de novo review. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010). The Supreme Court has declined to address an issue of procedural default and chosen, instead, to resolve a claim on the merits, holding that an application for habeas corpus may be denied on the merits notwithstanding a petitioner's failure to exhaust in state court. *See Bell v. Cone*, 543 U. S. 447, 451 n.3 (2005) (citing section 2254(b)(2)). "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *Rhines v. Weber*, 544 U. S. 269, 277 (2005) (quoting 28 U.S.C. § 2254(b)(2)).

### 1. Brown's Statement to Police

In *Miranda v. Arizona*, 384 U. S. 436 (1966), the Supreme Court formulated a warning that must be given to suspects before they can be subjected to custodial interrogation. *See Berghuis v. Thompkins*, 560 U. S. 370, 380 (2010). The substance of that warning still must be given to suspects today:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Berghuis*, 560 U. S. at 380 (quoting *Miranda*, 384 U. S. at 479).

Police are not required to obtain a formal waiver of *Miranda* rights before questioning a custodial suspect; the *Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an

opportunity to invoke his rights before giving any answers or admissions. *See Berghuis*, 560 U. S. at 384-87. Any waiver, express or implied, may be contradicted by an invocation at any time; if the right to counsel or the right to remain silent is invoked at any point during questioning, further interrogation must cease. *See id.* at 387-88.

The Supreme Court has held that a suspect's invocation of his Sixth Amendment's right to counsel following administration of *Miranda* warnings must be unambiguous – that is, it "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Davis v. United States*, 512 U. S. 452, 459 (1994) (quoting *McNeil v. Wisconsin*, 501 U. S. 171, 178 (1991)). "If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Berghuis*, 560 U. S. at 381 (quoting *Davis*, 512 U. S. at 461-62). The Supreme Court has applied the same standard to assertions of the Fifth Amendment right to remain silent following administration of *Miranda* warnings. *See id.* ("There is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously."). "If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.'" *Id.* at 382.

Respondent correctly argues that Brown's comments to his interviewing law enforcement officers quoted above – "Well, I don't mind speaking to you, but I – I feel like I've – like I need a lawyer. …. I feel like I need a lawyer present to answer any questions." – do not constitute an unequivocal assertion of his right to counsel. Brown's purported invocation of his right to counsel was just as ambiguous and equivocal as those that the Fifth Circuit has held did not mandate termination of a custodial interrogation. *See, e.g.*, *United States v. Carrillo*, 660 F.3d 914, 923 (5th Cir. 2011) (considering the entire context in which defendant made comments, "I just man, I'm not gonna lie to you I wish I had a lawyer right here knowing that you know it's gonna I mean I'm gonna work with y'all I'm telling you I'm gonna tell you everything" insufficient to invoke right to counsel); *United States v. Montes*, 602 F.3d 381, 385 (5th Cir. 2010) ("Maybe I should get an attorney" or "Do I need an attorney" insufficiently unambiguous to invoke right to counsel); *United States v. Posada-Rios*, 158 F.3d 832, 867 (5th Cir. 1998) (subject's statement that she "might have to get a lawyer then, huh?" insufficiently unambiguous to invoke right to counsel).

Under these circumstances, Brown's interrogating law enforcement officers were not required to terminate Brown's post-arrest interview when Brown mentioned that he felt like he needed a lawyer. There was nothing inherently coercive in his interrogator's follow-up questions, after the first of which Brown stated "I'll go ahead and tell you."

Brown has failed to allege any facts showing that his Fifth or Sixth Amendment rights were violated by law enforcement officers during Brown's post-*Miranda*-warnings interrogation.

The Court should deny Brown's claim attacking the admission of his videotaped post-arrest statement to law enforcement officers.

### 2. Brown's Statement to Television Reporter

Brown's complaint about the admission at trial of his video-taped statement to a television reporter lacks any arguable merit. Brown alleges no specific facts and presents no evidence suggesting that the television reporter to whom Brown gave his statement was acting as a state actor at the time of Brown's post-arrest interview.

A criminal defendant's post-arrest statements to a private individual who is not acting as an agent of the State are not rendered inadmissible because the individual in question failed to properly give the defendant *Miranda* warnings. *See Powell v. Quarterman*, 536 F.3d 325, 343-44 (5th Cir. 2008) (holding criminal defendant's Fifth Amendment rights were not violated where emergency room physician who treated defendant following arrest testified regarding statements the defendant made to him when police brought the defendant in for treatment).

In *Massiah v. United States*, 377 U.S. 201 (1964), the Supreme Court held that when the Sixth Amendment's right to counsel has attached, a government agent may not seek information from a criminal defendant outside the presence of the defendant's counsel. *See Thompson v. Davis*, 916 F.3d 444, 454 (5th Cir. 2019) ("To bring a *Massiah* claim, the claimant must establish that his Sixth Amendment right

to counsel had attached when a government agent sought information from the defendant without his counsel's presence, and deliberately elicited incriminating statements from the defendants."); *United States v. Bates*, 850 F.3d 807, 810 (5th Cir. 2017) (holding that a defendant asserting a *Massiah* claim must establish, in part, that an individual seeking incriminating statements from the defendant was a government agent acting without the defendant's counsel being present).

In the Fifth Circuit, the test for determining if an informant was a government agent has two prongs: whether the informant (1) was promised, reasonably led to believe, or actually received a benefit in exchange for soliciting information from the defendant and (2) acted pursuant to instructions from the state or otherwise submitted to the State's control. *See Broadnax v. Lumpkin*, 987 F.3d 400, 415 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 859 (2022); *United States v. Bates*, 850 F.3d at 810; *Creel v. Johnson*, 162 F.3d 385, 393 (5th Cir. 1998). Brown has identified no evidence in the record from his trial, his direct appeal, or his state habeas corpus proceeding satisfying either of these requirements. This Court's independent review of the entirety of Brown's pleadings in this case reveals no specific factual allegations establishing that the television reporter who interviewed Brown following Brown's arrest acted as a government agent.

The fact that the reporter who interviewed Brown had to follow procedures established by the Hunt County Sheriff's Department to request and obtain the interview with Brown does not establish that the reporter "submitted to the State's control" in connection with that interview or that the reporter "received a benefit" in

exchange for soliciting information from Brown, as those terms have been utilized in the context of *Massiah* jurisprudence. To hold otherwise would transform every media interview conducted with an individual under custodial detention into a custodial interrogation by a *de facto* state agent. This Court is precluded from adopting such a new rule in the context of this federal habeas corpus proceeding by the principle announced in *Teague*.

The Court should deny the portion of Brown's sixth claim challenging the admission of his statement to the television reporter as a violation of his Fifth and Sixth Amendment rights.

### 3. Voluntariness of Confessions

Brown's suggestion that his consent to give his interview (and confess) to the television reporter was involuntary because Brown was in custody and suffering from the effects of drug intoxication and fatigue is also without arguable merit. Due process precludes admission of a confession where a defendant's will is overborne by the circumstances of the interrogation. *See Schneckloth v. Bustamante*, 412 U.S. 218, 226 (1973). Custodial police interrogation entails inherently compelling pressures and coercive aspects. *See J.D.B. v. North Carolina*, 564 U.S. 261, 268-70 (2011); *Dickerson v. United States*, 530 U.S. 428, 435 (2000) ("police interrogation, by its very nature, isolates and pressures the individual"); *Miranda*, 384 U.S. at 439 (holding the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements and heightens the risk that an individual will not be accorded his privilege against self-incrimination). But, absent coercive police conduct causally

related to a defendant's confession, there is no basis for concluding that any state actor has deprived a criminal defendant of due process of law. *See Colorado v. Connelly*, 479 U.S. 157, 164 (1986). A defendant's mental condition, by itself and apart from its relation to official coercion, does not dispose of the inquiry into constitutional voluntariness. *See id.* And the record here contains no fact-specific allegation, much less any evidence, establishing that any state agent applied any coercive device, tactic, or maneuver to compel Brown to consent against his will to be interviewed by the television reporter who recorded Brown's post-arrest videotaped interview which was later played for his jury. The Court should deny Brown's claim attacking as involuntary the admission of his videotaped interview by a television reporter.

### 4. Harmless Error Analysis

And, because Brown's videotaped statement to the television reporter went into far more detail than did his recorded statement to law enforcement officers, and included the same if not more inculpatory admissions, any error in the state trial court's admission of Brown's statement to law enforcement officers was rendered harmless by virtue of the unobjectionable admission of Brown's far more inculpatory and remorseless statement to the television reporter. *See Brecht v. Abrahamson*, 507 U.S. 619, 623-24 (1993) (the test for harmless error in federal court is "whether the error had a substantial and injurious effect or influence in determining the jury's verdict"). Any error committed by the state trial court in admitting Brown's statement to law enforcement officers was rendered harmless by virtue of the fact there was no legal basis for excluding Brown's equally damaging statement to the

television reporter. In both statements, Brown admitted that he felt no remorse for his offense and that he fatally shot Ray while she was talking on the phone with law enforcement officers after he had pursued her a considerable distance in an effort to get her to pull her vehicle over. Because Brown's statement to the television reporter was admissible, Brown's complaint about the admission of his statement to law enforcement officers does not rise above the level of harmless error.

The Court should deny Brown's sixth claim for federal habeas corpus relief in its entirety.

## VII. ALLEGEDLY IMPROPER PROSECUTORIAL JURY ARGUMENT

### A. The Claim

In his fifth claim for federal habeas corpus relief, Brown argues that the prosecution engaged in improper jury argument at the conclusion of the punishment phase of his capital murder trial. *See* ECF no. 29, at 128-42.

### B. State Court Disposition

Brown presented complaints about allegedly improper prosecutorial jury argument in his first two points of error on direct appeal – specifically, arguments that the prosecution's jury arguments urged the need for the existence of a nexus between Brown's mitigating evidence and Brown's capital offense and that the arguments in question were inflammatory. *See* State Appellate Brief, 1-15 [ECF no. 52-31, at pp. 16-30 of 66]. The Texas Court of Criminal Appeals rejected both points of error on the merits after (1) concluding Brown's punishment phase jury charge did not include any nexus requirement between the capital offense and the mitigating

evidence; (2) concluding there was no reasonable likelihood a jury would have construed Brown's jury charge to include such a nexus requirement; (3) finding that the state trial court had properly sustained Brown's objection to the prosecution's argument that Brown's drug use was not mitigating and that the state trial court instructed the jury that it and it alone was the determiner of what constituted mitigating evidence; (4) concluded the trial court's instruction was sufficient to cure any error in the prosecution's jury argument; (5) concluded that the prosecution's rebuttal argument suggesting Brown did not deserve mercy was a proper response to defense counsel's closing argument urging the jury to grant Brown mercy; (6) found that Brown failed to object to the prosecution's argument that the jury should not feel sympathy for Brown; and (7) concluded that the jury was not deprived of an opportunity to give mitigating effect to any of Brown's mitigating evidence by the jury charge or the prosecution's punishment phase jury argument. *See Brown v. State*, AP-77,019, 2015 WL 5453765, \*12-\*14.

   In his third ground for state habeas corpus relief, Brown argued that his state trial counsel rendered ineffective assistance by failing to raise timely objections to allegedly improper prosecutorial jury arguments that commented on Brown's failure to testify at the punishment phase of trial or included inflammatory remarks. *See* State Habeas Application, 69-82 [ECF no. 58-2, pp. 91-104 of 355]. On direct appeal, Brown did not complain that the prosecution had improperly commented on Brown's failure to testify at the punishment phase of trial. Instead, Brown presented that

argument for the first time in his state habeas corpus application in a claim asserting ineffective assistance by his trial counsel.

The state habeas trial court (1) found that the prosecution argued at the punishment phase of trial that Brown was unworthy of the jury's mercy; (2) found that Brown's defense counsel objected to that argument on the ground the prosecution had misstated the applicable legal standard under the special issues and the state trial court overruled the objection but instructed the jury that it was to decide the special issues; (3) found that Brown's defense counsel argued that Brown had expressed remorse for his capital offense; (4) found that Brown blamed Ray for her death during his guilt-innocence phase testimony; (5) found that Brown stated during his interview by a channel 11 reporter that he regretted killing Ray in front of their children but that he did not regret killing her; (6) found that Brown wrote a letter to another jail inmate while awaiting trial in which he stated that he chased Ray down and "blew her head clean off"; (7) found that Ray's mother testified that Brown telephoned her shortly after the murder and told her that he had shot Ray in the head; (8) found that Brown later called Ray's mother at the hospital and told her "See, I told you"; (9) found that Brown's friend testified that Brown telephoned her shortly after the murder and said "I shot the bitch. I told her not to f__k with my kids"; (10) found that defense witnesses Morris Beene, Jason Hammock, and Dr. Lundberg-Love all expressed surprise at Brown's guilt-innocence trial testimony that he blamed Ray for the offense; (11) found that the record supported the prosecution's comments arguing that Brown had failed to demonstrate remorse for his offense; (12) found that

the prosecution's comments concerning Brown's lack of remorse were a fair response to the arguments of defense counsel; (13) found that Brown's trial counsel were not deficient in failing to object to the prosecution's comments in question because any such objection would have been futile; (14) found that Brown's trial counsel were not deficient for failing to object to allegedly inflammatory prosecutorial arguments because Brown's defense counsel twice objected to similar arguments by the prosecution as improper and inflammatory and the state trial court promptly overruled those earlier objections; (15) found that Brown's defense counsel addressed the prosecution's allegedly inflammatory jury argument concerning Tracy Williams through counter-arguments rather than an objection; (16) found that Brown admitted during his trial testimony that he planned at one time to murder Tracy Williams; (17) found that the prosecution's comment about Brown's plan to kill Tracy Williams was a proper summation of the evidence; (18) found that Brown failed to prove that the prosecution had waved the murder weapon at the jury during closing jury argument; and (19) concluded that Brown's ineffective assistance complaints about his trial counsels' failure to object to prosecutorial jury argument did not satisfy the deficient performance prong of *Strickland*. *See* FCR, 30-38, 50-51, ¶¶ 140-72, 4-5 [ECF no. 59-7, pp. 289-97, 309-10 of 409]. The Texas Court of Criminal Appeals rejected Brown's third claim for state habeas relief on the merits when it adopted the state trial court's findings and conclusions and denied Brown state habeas relief.

## C. De Novo Review of Complaint About Alleged Comment on Failure to Testify

Brown argues in his federal habeas petition that the prosecution improperly commented on his failure to testify at the punishment phase of trial. *See* ECF no. 28, at 129-31. Because Brown did not present this aspect of his fifth claim for federal habeas relief to the state courts as an independent point of error on direct appeal or ground for state habeas relief, it is unexhausted, and this Court's review of this claim will be de novo.

During the punishment phase of Brown's trial, near the conclusion of Brown's counsels' closing argument, the following exchanges took place:

> MS. FERGUSON: Now, again, Ms. Aiken indicated in the guilt/innocence phase about how Micah showed no mercy. I'd like to close with a thought. Number one, mercy isn't one of the special issues. But the State beings it up so I'd like to talk to you about mercy.
>
> Ms. Aiken has been saying in her questioning of Morris Beene, well, he doesn't deserve mercy. Well, I don't know what faith tradition she subscribes to.
>
> MS. AIKEN: Your Honor, objection. That's a direct attack on me and it's completely inappropriate at this point
>
> THE COURT: Sustained.
>
> MS. FERGUSON: We all know mercy isn't earned, mercy isn't deserved. That's why it's mercy. It wouldn't be mercy if you learned [sic] it or deserved it.
>
> I'm going to leave you with a quote. Stella was an English major. I was an English major. The greatest writer of the English language, William Shakespeare. He's had a lot to say about a lot of different subjects and we still read him because it's still relevant because his words ring true. He wrote a play about justice and mercy called the Merchant of Venice. If you'll recall, a gentleman signed a contract with another man that if he violated the contract, the aggrieved party got his pound of flesh from that individual. What did Shakespeare tell us about justice and mercy? Mercy is an attribute of God himself. And earthly powers show themselves like God when mercy seasons justice. Therefore, though justice be thy plea, consider this. In the course of justice, none of us should see salvation.
>
> We pray for mercy and that prayer teaches us to render the deeds of mercy.

When you go back in that jury room, you look at those special issues and you weigh the evidence. I believe you're going to find Special Issue No. 1, the State has not proven it beyond a reasonable doubt. Secondly, but if you find it and you get to the second question, the mitigating circumstances, I think they are there. And if you get to that second question and are answering that second question, I'm asking you on Micah's behalf, render the deeds of mercy. Thank you.

THE COURT: Thank you, Ms. Ferguson. Ms. Aiken.

MS. AIKEN: Thank you, Your Honor. May it please the Court.

Ladies and gentlemen of the jury, mercy is given by God to those who show true repentance. Right? True repentance. Full unadulterated, unmitigated responsibility. I did it. It's my fault. I'm not blaming my family. I'm not blaming the victim. I'm not blaming society. I'm not blaming drugs. I did it. Please forgive me. Show me mercy, Lord. That's how mercy is given. That's how repentance occurs.

Have you seen that from this Defendant? Absolutely not. So give him what he's asking for. That's what they want you to do when you go back in there to make your decision. Think about that.

Think about this: He didn't kill somebody. You know, they want to talk about somebody. He killed somebody. He killed Stella Ray. Stella Ray didn't have a chance to fight for her life. She didn't get a chance to repent and ask for God's forgiveness for whatever she had done in her life. She didn't get that chance, all because of a shotgun and a bullet that he had and he pulled. That's a true reflection of lack of mercy.

Who do we give life without parole to in a capital murder case? A defendant who throws himself at the mercy of the jury.

MS. FERGUSON: Objection, Your Honor, that is not the standard and she is misstating the law.

MS. AIKEN: Your Honor, she argued who should and should not get it I think I should be able to argue against it.

THE COURT: Overruled.

MS. AIKEN: A defendant throws himself on his face in front of the jury and said I did it all, forgive me. It's my fault.

MS. FERGUSON: Objection, Your Honor, that is not the standard. The standard is the two special issues. That is how you decide.

THE COURT: Ladies and gentlemen of the jury, you are the ones that decide the issues. And again, whatever the attorneys say is not evidence. It's argument.

MS. AIKEN: May I continue, Your Honor?

THE COURT: You may.

MS. AIKEN: So it's my fault, only me. Blame me. Punish me for what I did. No one else, just me.

That didn't happen and it's not going to happen in this case. It's not going to happen. Who do you give life without parole to? Someone

who's not a future danger. Well, how do we know that this guy is a future danger? You know, I'm not asking you to guess. I'm not asking you to make it up. Heck, I'm showing you physical proof in my hands of how we know that this guy is a future danger.

You know, he saws off one shotgun for Tracy Williams. You can see that. He sawed that off thinking about killing Tracy Williams. That's his own testimony to Dr. Love. That's a future danger right here.

And when it didn't work, when Stella turned him in and he got it taken away, heck, he got another.- - he got another one. Went and got Wesley's gun. Was that an accident that he took Wesley's gun? You know, there's been all this talk about what a gun enthusiast he was and how he loved to shoot. Why did he have to go get Wesley's gun.

But you want proof of future danger? Here you go. He sat down and sawed that sucker off himself, himself, because he didn't have that one anymore.

Better yet, you want proof of future danger. Let's stick some bullets in this sucker, lay it on the table and let the Defendant just walk out of this courtroom.

MS. FERGUSON: Objection, Your Honor. That is improper argument and she knows it. She knows better. She's trying to inflame the jury. That is not a proper argument.

MS. AIKEN: It is absolutely proper, Your Honor.

THE COURT: Overruled.

MS. AIKEN: Stick bullets in it and let him walk out of this courtroom. Do you think Tracy Williams would make it out of this courthouse alive?

MS. FERGUSON: Your Honor, I'm going to object again. She's mischaracterizing everything. This jury knows Mr. Brown is never going to walk out of this courtroom out into the public again regardless of which sentence they impose.

THE COURT: Overruled.

MS. AIKEN: So my question to you, ladies and gentlemen, I load the shotgun. I lay it on the table. I let him walk out of the courthouse. In your mind, think this question, would Tracy Williams make it out of the courthouse doors alive? What do you think?

Did you think about it or did you know based on what the Defendant told you, did you know based on his letter to Casper that he still wants to kill him? It's a future danger right there.

S.F. Trial, Vol. 48/53, 50-55 [ECF no. 53-39, pp. 50-55 of 70]

MS. AIKEN: The facts and circumstances of the offense are part of your consideration. The loss of life is part of your consideration. Did she have value? Did she deserve to have the opportunity to call the police

and ask for help and not be killed for it? Do we want other women in her position to do the same thing?

I understand that asking for a death sentence is a very heavy burden, a hundred percent. We appreciate that, absolutely appreciate it. Knowing what this Defendant is capable of and what he's done and seeing it up close and dealing with it for all this time is a heavy burden. Very personally aware of that. Seeing the effect that this Defendant's actions have had on these families is a heavy burden. Looking them in the face and doing your best to protect then and their families and doing your best to get justice is a heavy burden. It's heavy. It's a lot of responsibility. And I realize we're passing that on to you one hundred percent. I do.

I'm not asking you to take it lightly. I'm asking you to think about every single thing you've seen and heard. Everything you've heard in this trial, every witness, every bit of testimony. And realize that this is a serious decision. And if somebody goes out and takes extreme actions and kills another person to prevent them from being involved in the criminal justice system, that's an extreme action and it calls for an extreme and serious result.

It calls for it. It's justified. It's justice.

So as you go back in the jury room and you deliberate, ask yourselves a couple of questions. One of them, anywhere in this jury charge does it say do I feel sorry for the Defendant. Is that one of the questions we're asking you? Does it say anywhere in there that sympathy for the Defendant is part of your deliberations? I mean, I'm asking you. It doesn't say that in the charge. It says holding him responsible or it says considering his actions is important, considering what he did, considering the circumstances of the offense, considering the effects of what he's done, those are all in that charge. And that's what we're asking you to do.

If you guys follow the law, this answer will not be easy because it's not an easy question. It will not be easy.

THE COURT: You have one minute.

MS. AIKEN: But it will be right and it will be what's called for by what you've heard and seen.

Ladies and gentlemen, you don't give mercy to someone who hasn't asked for it, who hasn't asked for redemption. Who hasn't admitted everything they've done. But you know what you give them? You give them justice under this law, man's law, your law.

You guys follow that law, you hold him accountable and give him justice. Justice, ladies and gentlemen, is a death sentence in this case. That's justice. Anything less is not. And when you decide what justice is, don't forget Stella or her family or her children. Do not forget them because they're part of this equation. As much as he wants them not to

be, as much as he wanted to silence her, she is part of this equation. You have to consider that when you're deciding what's justice, giving death. You know it's the right decision. You know it's not easy. We're passing it off to you.

Follow the law and give him the death sentence. Thank you.

S.F. Trial, Vol. 48/53, 63-65 [ECF no. 53-39, pp. 63-65 of 70].

Improper jury argument by a prosecutor furnishes a sufficient basis for federal habeas relief only if the prosecutor's improper comments are so prejudicial that they render the trial fundamentally unfair. *See Romano v. Oklahoma*, 512 U.S. 1, 13 (1994) (citing *Darden v. Wainwright*, 377 U.S. 148, 178-81 (1986)); *Hughes v. Quarterman*, 530 F.3d 336, 347 (5th Cir. 2008); *Harris v. Cockrell*, 313 F.3d 238, 245 (5th Cir. 2002). Under Texas law, proper prosecutorial jury argument takes four forms: (1) summation of the evidence; (2) reasonable inference or deduction from the evidence; (3) response or rebuttal to the arguments of the defense; and (4) pleas for law enforcement. *See Hughes*, 530 F.3d at 347; *Ward v. Dretke*, 420 F.3d 479, 497 (5th Cir. 2005); *Milton v. State*, 572 S.W.3d 234, 239 (Tex. Crim. App. 2019).

A prosecutor is prohibited from commenting directly or indirectly on a defendant's failure to testify. *See United States v. Romero-Medrano*, 899 F.3d 356, 362 (5th Cir. 2018); *United States v. Velasquez*, 881 F.3d 314, 344 (5th Cir. 2018). Prosecutorial comments allegedly addressing a defendant's failure to testify must be viewed in the context of the trial in which they are made. *See United States v. Waguespack*, 935 F.3d 322, 334 (5th Cir. 2019); *Romero-Medrano*. 899 F.3d at 362.

As explained above, during the guilt-innocence phase of trial, Brown testified extensively concerning the circumstances of his fatal shooting of Ray and his

motivation for doing so. *See* S.F. Trial, Vol. 43/53, 78-204 [ECF no. 53-34, pp. 78-204 of 209]. At the conclusion of its case-in-chief at the punishment phase of Brown's capital murder trial, the prosecution re-offered all of the evidence that had been presented during the guilt-innocence phase of trial, and the state trial court admitted it. *See* S.F. Trial, Vol. 45/63, at 43-44 [ECF no. 53-36, pp. 43-44 of 74]. This necessarily included Brown's own extensive guilt-innocence phase trial testimony.

For the first time in his fifth claim for federal habeas relief, Brown complains that the prosecution's punishment phase jury arguments included improper prosecutorial comments on Brown's failure to testify at the punishment phase of his capital murder trial. This argument fails for multiple reasons.

First, the prosecution's comments do not expressly address Brown's failure to testify at the punishment phase of trial. *See Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998). Second, viewed in proper context, including the facts that Brown did testify extensively during the guilt-innocence phase of trial and that the prosecution made sure that that testimony was properly before the jury at the punishment phase of trial, none of the prosecution's punishment phase jury arguments can rationally be construed or interpreted as either (1) manifesting an intent to comment on Brown's failure to testify at the punishment phase of trial or (2) naturally and necessarily a comment on Brown's failure to testify. *See United States v. Lara*, 23 F.4th 459, 479 (5th Cir. 2022) (prosecutorial comments regarding a defendant's failure to testify are impermissible under the Fifth Amendment if either the prosecution's manifest intent was to comment on the defendant's silence at trial or the character of the remark was

such that the jury would naturally and necessarily construe it as a comment on the defendant's silence); *Waguespack*, 935 F.3d at 334 (holding the same); *Rhoades v. Davis*, 852 F.3d 422, 432-33 (5th Cir. 2017) (holding the same); *Green*, 160 F.3d at 1042 (holding the same).

On the contrary, no rational jury could have construed any of the prosecution's punishment phase closing jury arguments as a comment on Brown's failure to testify at the punishment phase of trial. It was the prosecution, through its on-the-record request made in the jury's presence, that placed before the jury at the punishment phase of Brown's trial all of the evidence from the guilt-innocence phase of trial, including Brown's extensive guilt-innocence phase testimony. Furthermore, during the punishment phase of trial, the prosecution repeatedly directed the jury's attention (during both its cross-examination of defense witnesses as well as its own closing jury argument) to the contents of Brown's guilt-innocence phase trial testimony. Brown's jury could not rationally have construed the prosecution's closing jury argument as commenting on the absence of the very thing the prosecution argued justified the imposition of a death sentence in Brown's case – that is, Brown's demonstrated lack of remorse and unwillingness to accept responsibility for his capital offense shown during Brown's trial testimony.

Finally, commenting on the absence of specific evidence in the record – such as Brown's refusal to express remorse for his capital offense during his guilt-innocence phase trial testimony (during which Brown repeated his contention that Ray was to blame for her own death), in his post-shooting telephone calls to Ray's family and his

own friends, in his letter to Casper, and during his televised interview – does not constitute a comment on the defendant's failure to testify when witnesses other than the defendant could have testified to such information. *See United States v. Jefferson*, 258 F.3d 405, 313 (5th Cir. 2001) (commenting on the absence of evidence in the record on a particular subject does not constitute a comment on the defendant's failure to testify when witnesses other than the defendant could have testified to such information); *United States v. Morrow*, 177 F.3d 272, 300 (5th Cir. 1999) (holding the same); *Green*, 160 F.3d at 1042 (holding the same). The Fifth Circuit has rejected the notion that a prosecutor's comment that the defendant was "remorseless" was a comment on the defendant's failure to testify. *See Coble v. Quarterman*, 496 F.3d 430, 438 (5th Cir. 2007) (holding state court reasonably rejected an argument that the prosecutor's comment that the defendant's post-offense statements reflected a lack of remorse was an improper comment on the defendant's failure to testify at trial).

Here, Brown had multiple opportunities following his fatal shooting of Ray to express some genuine contrition or sincere remorse for his offense. As the prosecutor argued, Brown made multiple post-offense statements (to Ray's mother, his friend and neighbor, a fellow jail inmate, and a television reporter) all reflecting a lack of sincere contrition or remorse for his offense. While Brown apparently attempted to express remorse in his conversations with his spiritual counselors Morris Beene and Jason Hammock, and during his conversations with defense expert Dr. Lundberg-Love, the state habeas trial court accurately found that all three of those defense witnesses expressed surprise when confronted on cross-examination with Brown's

testimony from the guilt-innocence phase of trial and with Brown's incendiary note to his fellow jail inmate Casper. The prosecution's punishment phase closing jury arguments can rationally be construed as comments on the evidence in the record (including Brown's own trial testimony and Brown's many post-offense statements) showing a lack of sincere contrition and remorse for his capital offense. *See Coble*, 496 F.3d 438.

Nor were Brown's Fifth Amendment rights violated by the prosecution's argument that Brown's lack of remorse and contrition precluded the jury from granting Brown mercy. That argument was an appropriate response to Brown's defense counsel's express plea for mercy.

The Court should deny relief on Brown's claim that the prosecution improperly commented on Brown's failure to testify at the punishment phase of trial.

### D. AEDPA Review of Complaint About Limiting Application of Mitigating Evidence

Brown argues that the prosecution improperly argued during the closing jury argument at the punishment phase in a manner that attempted to limit the jury's consideration of mitigating evidence. *See* ECF no.29, at 131-34. Brown included similar arguments as his first and second points of error on direct appeal. *See* Appellant's Brief, 1-15 [ECF no. 52-31, pp. 16-30 of 66]. More specifically, Brown argued in his first point of error that the prosecution's punishment phase jury argument deprived Brown of a vehicle to permit the jury to give a reasoned moral response to his mitigating evidence. In his second point of error, Brown argued that the trial court's punishment phase jury charge combined with the prosecution's jury

argument to improperly require a nexus between Brown's mitigating evidence and his capital offense. The Texas Court of Criminal Appeals rejected both arguments on the merits during Brown's direct appeal, holding that neither the trial court's instructions nor the prosecution's arguments (1) deprived the jury of a vehicle by which to consider and give effect to the mitigating evidence or (2) required a nexus between the crime and the mitigating evidence. *See Brown*, AP-77,019, 2015 WL 5453765, *12-*14.

In his federal habeas petition, Brown argues that the prosecution improperly argued in a manner that required the jury to find a causal nexus between Brown's mitigating evidence and the capital offense in violation of the Supreme Court's holding in *Tennard v. Dretke*. Specifically, Brown complains about the following prosecutorial jury argument:

> MR. FRANKLIN: I submit to you the State has proven beyond a reasonable doubt that the Defendant would commit continuing acts of violence in whatever society he's in whatsoever.
>
> Now, move to Special Issue No. 2. I wany you to look at this as well. Special Issue No. 2, whether taking into consideration all of the evidence as we mentioned before, including the circumstances of the offense, the Defendant's character and background and the personal moral culpability of the Defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.
>
> Okay. You're going to look at all the evidence, everything you heard just as we discussed from beginning to end, all of the evidence. If you look at the second part of that, including the circumstances of the offense, what are the circumstances of this offense, of the offense? That he chased her down Sayle Street, forced her to pull over and shot her in the face with a shotgun in front of her kids and then drove away. And you heard a lot of talk about suicide by cop or wanting to do this or wanting to do that. The fact of the matter is he ran and he intended to hide. Those are the circumstances of this offense. And the phone calls that were made to Donna, particularly Donna. Who calls the mother of

anyone and says "I did it. I killed her." And calls back, I mean, seriously think about the mindset after that call. Calls back and says "I told you so." It's unbelievable, absolutely unbelievable. But those are the circumstances of this offense.

You look at the Defendant's character and background, you take that into consideration as well. And I submit to you that the evidence that you heard from this witness stand from the Defendant's family and I think it was heartfelt and I think it was genuine, that's my opinion you will decide. But it didn't show any absence of love or it didn't show any absence of caring. As a matter of fact, they were very concerned, very interested in his wellbeing, were taking steps to try to help him, try to protect him, try to get the help that he needed or that they thought he needed. That's what the testimony is before you.

The business about the family tree, I'm sorry, you decide this but you take that family tree and you just take a dry eraser and you erase every name from that family tree and then plug in whoever you want. Plug in anybody's family. You plug in your own family perhaps. There is not one among us who within our family don't have the alcoholics, don't have the individuals who have bad marriages, possibly have been married several times, possibly abuse within the family, possibly sexual abuse within the family. There is nothing - - it's sad, don't get me wrong, it is a sad affair that occurs to any family. But there's nothing special about it insofar as that it was sufficient to cause the Defendant to commit this offense. It's not sufficient to prove that he's not a future danger and it's not sufficient as a mitigating circumstance to justify life without parole. It's just not.

I mean, you have to ask yourself, too, how much of this did he even know about prior to this happening. You have to know for it to affect you somehow. I mean, you can take at this point, it's very crucial, it's very important to start getting into these types of things.

If you think about the interview with Felicia, the Defendant told her he did not have a drug problem but when - - because that seemed important at the time, I would suggest to you, based on the evidence to him that he did not. But then when it matters in terms of there being a prosecution, in terms of there being a crime, in terms of those things mattering, then it was addressed with both the doctors that there was this horrific drug problem.

And again, I don't think the evidence supports that. I don't think the evidence supports that Stella would stay with him if it was horrific. There was a hydrocodone issue, the Defendant admitted that himself. There's been testimony to that with the Defendant why she left him, that that was one of the reasons. But everything else, it's a red herring. It is not mitigating as far as the family tree does.

-82-

I want you to think about that carefully. Sufficient is a keyword and the reason it's key is because it has to be sufficient. It can't just be mitigating. It has to be sufficient mitigating evidence.

There's – if you go through the last one on Special Issue No. 2, the personal, moral culpability of the Defendant. And that is huge. The personal, moral culpability of the Defendant. The personal, the personal, not all the family tree, not everything else, the personal moral culpability or blameworthiness of the Defendant. And can you think of an offense that is any more blameworthy on this Defendant than this offense. He intended to kill Stella. He wanted her dead. He wanted to kill Tracy. Read the letter to Casper, that second page, you can take that back with you and you can read it again. Read that letter. It shows absolute moral blameworthiness of this offense.

And there was some – I don't know how this ultimately panned out, I don't recall, the 12 of you will, but I remember during the course of this trial when Ms. Aiken asked the Defendant whether he aimed that shotgun at Stella. He said yes. He sat there and said yes, that he aimed it. Now, in cross-examination, I don't remember. It seems like it came back and there might have been some further discussion on that and the 12 of you will remember it better.

But what I recall the evidence being is that he said yes, he actually aimed it. Now, regardless, as good of a shot as he is, at that short of a distance, with the same slug that he uses to kill boar hogs. I mean, seriously, the moral culpability is through the roof on this case.

And so when you consider all of those things, as well as other factors, those aren't mitigating. They're aggravating. I've got a laundry list. The letter from [sic] Casper, the extra ammo, why would he have the extra ammo when he went out in the field when he was running from the police? All this suicide by cop, you don't have that - - it takes one. We know that from Stella. It's aggravating. It's not mitigating. The suicide by cop, Wesley's gun is another aggravating factor whether - - even if you buy into the suicide, whether it's suicide or to kill Stella, to use Wesley's gun is a cruel twist to this. To use that boy's gun to shoot his own momma or to use that gun to commit suicide, it that had been the intent, that's aggravating, aggravating factors.

The drug use – and I want to mention the drug use. Drug use is not mitigating. You heard a ton of evidence about testimony that it was tied into a mitigating factor – .

MS. FERGUSON: Your Honor, I'm going to object. He is saying drug use is not mitigation. He cannot tell this jury what is or is not mitigation. This is an error. It is for the jury to decide in their mind what is or is not mitigation and he cannot tell them what it is.

THE COURT: Sustained.

-83-

MS. FERGUSON: I'd ask for an instruction to the jury, Your Honor.

THE COURT: All right. The jury will be instructed that you and you alone decide what is mitigating or aggravating in this case.

MS. FERGUSON: And, Your Honor, also, I move for a mistrial at this time in this case. This is an experienced district attorney. This is a man who has been a prosecutor for I don't know how many years. He knows better and he deliberately and clearly argued a misstatement of the law and tried to tell this jury something that this charge cannot tell, something that this Court cannot tell. I move for a mistrial at this time.

THE COURT: Mistrial is denied.

MR. WALKER: In terms of drug use, I want you to think about the drug use, how that ties in. And I will submit to you and you decide that the drug use is an aggravating factor. It's just one of another. You know why? Because drug use, it's a choice. It is a decision. At some point, the decision was made to take the drugs. It's an aggravating factor that the Defendant didn't get help.

Think about that as well that when before the murder occurred when the Defendant's mother and the Defendant's sister and his father and Stella, everyone thought something may be going on. But what the Defendant did is he eased their conscience. He actually lowered the sense of urgency or the immediacy; and when they offered to get him help, he didn't accept it. They were going to do it tomorrow is what the testimony was. That's an aggravating factor.

S.F. Trial, Vol. 48/53, 21-28 [ECF no. 53-39, pp. 21-28 of 70].

MS. AIKEN: Now, let's talk about the Defendant not leaving jail until he is in a casket. Well, I can tell you one thing. I know somebody who's in a casket. She's in a casket and she's been in a casket for over two years, for two solid years her room has been a pine box in the ground. She's gone. Her family doesn't get to visit her. Her children don't get to hear her voice. Her momma can't hold her hand. Their visits to Stella consist of showing up at a graveyard with a grave and Stella's not even there. It's just her body. That's their visits.

When Colten and Willow grow up and hopefully remember their momma, even though they're only two and three now, they may not. They may never remember her voice. They may never remember her touch. They may never know what it's like for her to hold them. And who's responsible for that, ladies and gentlemen? It's not me. It's not the Defendant's family. It's not the Defendant's drugs. It's not his bad childhood that he wants to tell you about. It's not Chuck Gafford or Nathan Gafford or whoever it is that he says assaulted him all these years ago. Those are terrible things. But they didn't kill Stella.

-84-

> Who's responsible for those babies for the rest of their lives being traumatized by his actions? The Defendant is. And you one hundred percent can consider that when you're answering the special issues.

S.F. Trial, Vol. 48/53, 55-56 [ECF no. 53-39, pp. 55-56 of 70].

Brown argues that these jury arguments effectively prevented the jury from giving mitigating consideration to his evidence of his character and background, including his drug abuse history and difficult childhood. But, viewed in proper context, the prosecution's arguments in question emphasized the jury's duty to consider all of the evidence before it, including the evidence of Brown's character and background, and the prosecution did not instruct the jury to disregard any mitigating evidence. Instead, the prosecution argued that, in light of Brown's personal moral culpability for his capital offense, Brown's evidence of his character, background, and family history did not support an affirmative answer to the mitigation special issue. The prosecution also argued that some of the evidence presented by Brown should be viewed as aggravating rather than mitigating in nature, a choice which the state trial court correctly instructed the jury was available to it.

Many forms of evidence are double-edged in nature in that they contain both aspects that reduce a defendant's moral blameworthiness as well as aspects that render it more likely the defendant will be violent in the future. *See Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012) (explaining that mitigating evidence is "double-edged" when it might permit an inference that the defendant is not as morally culpable for his behavior but also might suggest that, as the product of his environment, the defendant is likely to continue to be dangerous in the future); *Ladd*

*v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002) ("Although the evidence of Ladd's inadequate supervision as a child might permit an inference that he is not as morally culpable for his behavior, it also might suggest Ladd, as a product of his environment, is likely to continue to be dangerous in the future."). The Fifth Circuit has identified several forms of double-edged evidence. *See, e.g.*, *United States v. Fields*, 761 F.3d 443, 459 (5th Cir. 2014) (evidence of mental illness can be double-edged); *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999) (evidence of substance abuse was double-edged in nature). The prosecution's jury argument at the punishment phase of Brown's trial did not preclude his jury from considering the mitigating aspects of Brown's history of drug abuse, but it did correctly alert the jury to those aspects of Brown's drug abuse that were aggravating rather than mitigating in nature.

Brown's reliance on the Supreme Court's holdings in *Caldwell v. Mississippi*, 472 U.S. 320 (1985), and *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007), is misplaced. As explained in Section III.E. above, in *Caldwell*, the prosecution erroneously and misleadingly argued that the jury was not ultimately responsible for deciding Caldwell's fate. Brown's prosecution did not attempt to convince the jury that it was not responsible for ultimately deciding Brown's fate. In *Abdul-Kabir*, a defendant tried prior to the advent of the Texas capital sentencing statute's mitigation special issue confronted a prosecutor who obtained commitments from jurors during voir dire that they would vote in favor of the prosecution on the capital sentencing special issues without regard to the defendant's mitigating evidence. During closing jury argument at the punishment phase of trial, the same prosecutor

reminded Abdul-Kabir's jurors of their earlier commitment. Unlike the capital sentencing jurors in *Abdul-Kabir*, Brown's jurors were confronted with the current Texas mitigation special issue and no request or argument from the prosecution suggesting that they could not give mitigating effect to Brown's evidence regarding his background, character, or personal moral blameworthiness. Instead, viewed in proper context, Brown's prosecution argued that much of Brown's mitigating evidence was double-edged in nature and that, collectively, Brown's evidence did not warrant an affirmative answer to the mitigation special issue.

As explained above, on the lone occasion when Brown's prosecutor attempted to argue that Brown's history of drug abuse was not mitigating in nature, Brown's trial counsel made a timely objection. and the trial court properly instructed the jury that it and it alone was to determine what constituted mitigating evidence. Juries are presumed to follow their instructions. *See Zafiro v. United States*, 506 U.S. 534, 540 (1993).

And complaints of improper prosecutorial jury argument are subject to harmless error analysis. *See Rose v. Clark*, 478 U.S. 570, 576 (1986); *United States v. Hasting*, 461 U.S. 499, 508-09 (1983). The jury heard evidence of Brown's propensity for future violence. He admitted that he chased down and intentionally shot Ray at point blank range with the type of slug that he used to hunt wild boars. He then fled the scene. After doing so, he telephoned Ray's mother multiple times and left taunting messages. He called a friend and admitted that he had shot Ray because he was angry with her for taking away their children. He also called and left threatening messages

for Tracy Williams. After his arrest, Brown gave multiple interviews in which he declared that he was not remorseful for having killed Ray, only for having done so with their children in the car with her when he shot her. After his arrest, Brown wrote a letter to a fellow inmate in which he not only stated he was not remorseful for his crime but that, given the chance, he would also kill Tracy Williams. He took extreme measures to avoid apprehension, including smashing the headlights of his own vehicle and diving into a lake to avoid detection by a helicopter. Brown admitted during his trial testimony that he wrote the Casper note and that, after his vehicle ran out of gas, he approached a home with a plan to rob the owner of gasoline. Given that evidence, any error in the prosecution's punishment phase jury charge does not rise above the level of harmless error. *See Brecht v. Abrahamson*, 507 U.S. 619, 623-24 (1993) (the test for harmless error in federal court is "whether the error had a substantial and injurious effect or influence in determining the jury's verdict").

The prosecution's arguments concerning Brown's drug abuse and Brown's other evidence regarding the circumstances of Brown's offense, and his character, background, and personal moral blameworthiness did not render Brown's trial fundamentally unfair. The Texas Court of Criminal Appeals's rejection on the merits during Brown's direct appeal of this aspect of Brown's fifth claim for federal habeas relief was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in Brown's trial and direct appeal proceedings. The Court should deny relief on these claims.

### E. De Novo Review of Unexhausted Complaints of Allegedly Improper Jury Argument

Brown also includes in his fifth claim for federal habeas relief three other complaints of allegedly improper prosecutorial jury argument, which he either failed to present at all during his direct appeal and state habeas corpus proceeding or which he presented to the state courts in such an oblique and ineffectual manner as to render them effectively unexhausted.

Claims for federal habeas relief premised on allegedly improper prosecutorial jury argument that do not implicate a specific provision of the Bill of Rights made applicable to the States through the Fourteenth Amendment must show that the erroneous prosecutorial argument was so prejudicial that the state court trial was rendered fundamentally unfair within the meaning of the Due Process Clause of the Fourteenth Amendment. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 642-43 (1974)); *Hughes v. Quarterman*, 530 F.3d 336, 347 (5th Cir. 2008); *Harris v. Cockrell*, 313 F.3d 238, 245 (5th Cir. 2002); *Jones v. Butler*, 864 F.2d 348, 356 (5th Cir. 1988); *Guidroz v. Lynaugh*, 852 F.2d 832, 834-35 (5th Cir. 1988). To establish that a prosecutor's remarks were so inflammatory, the petitioner must demonstrate that the misconduct was persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not have occurred but for the improper remarks. *See Hughes*, 530 F.3d at 347; *Harris*, 313 F.3d at 245 (proper question is whether the improper remarks were a

crucial, critical, highly significant factor upon which the jury based its verdict) *Jones*, 864 F.2d at 356. It is not enough that the remarks were undesirable or even universally condemned; a defendant may obtain relief only if the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. *See Darden*, 477 U.S. at 181; *United States v. Beaulieu*, 973 F.3d 354, 361 (5th Cir. 2020). The determining question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict, and, in answering that question, the court may consider the magnitude of the prejudicial effect of the statements; the efficacy of any cautionary instructions; and the strength of the evidence of the defendant's guilt. *See Beaulieu*, 973 F.3d at 361; *United States v. Churchwell*, 807 F.3d 107, 120 (5th Cir. 2015).

## 1. Alleged Burden of Proof Shift on Future Dangerousness

First, Brown complains for the first time in his fifth claim for federal habeas relief that, during closing argument at the punishment phase of trial, the prosecution made the following argument after discussing Brown's evidence of his background and family history: "But there's nothing special about it insofar as that it was sufficient to cause the Defendant to commit this offense. It's not sufficient to prove that he's not a future danger and it's not sufficient as a mitigating circumstance to justify life without parole. It's just not." S.F. Trial, Vol. 48/53, 23 [ECF no. 53-39, p. 23 of 70]. ECF no. 29, at 134-35. Brown's trial counsel did not object to the allegedly improper argument.

As is evident from the passage quoted at length in Section VII.D. above, the comment in question was an isolated misstatement of the law about future dangerousness made during a lengthy discussion by the prosecution concerning Brown's evidence of family dysfunction and other problems that Brown experienced in childhood. It was part of the prosecution's lengthy argument regarding Special Issue No. 2, i.e., the mitigation special issue. As explained in Section VII.D. above, the jury heard evidence of Brown's future dangerousness. The trial court properly charged and instructed Brown's jury in accordance with Texas law that the prosecution bore the burden of proving an affirmative answer to the future dangerousness special issue beyond a reasonable doubt. And juries are presumed to follow their instructions. *See Zafiro*, 506 U.S. at 540.

After concluding de novo review of the entire record from Brown's capital murder trial, the undersigned concludes that the prosecutor's remark in question, which Brown argues attempted to shift the burden of proof on future dangerousness to the defense, did not render Brown's punishment phase fundamentally unfair. The remark was isolated, not persistent or pronounced. It did not attempt to controvert the state trial court's clear and unambiguous jury instructions placing the burden on the prosecution to prove future dangerousness beyond a reasonable doubt. Any error by the prosecution in making the comment in question was harmless.

Under the circumstances, the Court should deny this aspect of Brown's fifth claim for federal habeas corpus relief.

### 2. Religious References to "God" and "Mercy"

Brown next complains, again for the first time in his federal habeas corpus petition, that the prosecution included references to "God" and "mercy" in its punishment phase jury argument. *See* ECF no. 29, at 135-38. As explained in Section VII.C. above, those arguments by the prosecution were invited by Brown's defense counsel's punishment closing argument in which attorney Ferguson expressly and with almost religious fervor invited the jury to grant Brown mercy. Response or rebuttal to opposing counsel's arguments is an appropriate form of prosecutorial jury argument. *See Hughes*, 530 F.3d at 347 (recognizing the four proper areas for prosecutorial jury argument are summation of the evidence; reasonable inferences or deductions drawn from the evidence; response or rebuttal to opposing counsel's arguments; and pleas for law enforcement); *Ward*, 420 F.3d at 497 (the same); *Buxton v. Collins*, 925 F.2d 816, 825 (5th Cir. 1991) (the same). There was nothing improper about the prosecution's comments explaining why the prosecution believed, based on the evidence before the jury, that Brown should not be granted mercy. The undersigned concludes after de novo review that the prosecutor's response to Brown's defense counsel's Shakespearean plea for mercy did not render the punishment phase of Brown's capital murder trial fundamentally unfair. The Court should deny relief on this portion of Brown's fifth claim for federal habeas relief.

### 3. Allegedly Inflammatory Argument About Tracy Williams & a Loaded Shotgun

Brown complains that, during closing argument, the prosecution repeatedly urged the jury to, in considering the future dangerousness special issue, consider a hypothetical in which the sawed-off shotgun that Brown used to kill Ray were loaded

and that Brown were then given access to the shotgun and permitted to walk out of the courtroom. *See* ECF no. 29, at 138-42. As a review of the passage quoted at length in Section VII.C. above shows, Brown's defense counsel twice objected to the prosecution's hypothetical and twice the state trial court overruled Brown's objections.

After fatally shooting Ray, Brown sent messages to Williams threatening him. After his arrest, Brown gave an interview in which he candidly admitted at one point that he planned to shoot Williams. While awaiting trial, Brown wrote a note to his fellow jail inmate Casper in which Brown stated that he was not remorseful for having killed Ray and that, if he were given the opportunity, he would also kill Williams. Under these facts, the prosecution could reasonably infer or deduce that, given the opportunity, Brown would attempt to kill Williams, whom Brown admitted during his trial testimony he blamed for his problems with Ray.

Respondent also correctly argues that the prosecution's comments about Brown posing a continuing threat to Tracy Williams were, in part, a response to Brown's defense counsel's argument. Brown's trial counsel argued that Dr. Cunningham's testimony established that Brown would not pose a future danger if taken off drugs, in part because Brown had chosen not to go after Williams after murdering Ray. The evidence at trial established that Tracy Williams was not in the State of Texas on the date that Brown shot Ray. Wesley Williams testified without contradiction that his biological father had gone to Louisiana before Ray was killed. There was no evidence showing that Brown knew Tracy Williams' location at the time

of, or immediately after, Ray's murder. Brown's threatening messages to Williams were sent after Ray's murder. Brown wrote his note to Casper, in which he again threatened to kill Williams, after his arrest and presumably after Brown had stopped taking the methamphetamine and cocaine that Dr. Cunningham insisted were the sources of Brown's aggressiveness and violence. Under these circumstances, the prosecution could properly respond to defense counsel's argument by inviting the jury to consider whether Tracy Williams would be safe if Brown had access to a loaded weapon and the opportunity to leave the courtroom.

Brown points to the prosecution's argument that, if the murder weapon were loaded and placed on the table and Brown was allowed to walk free, Tracy Williams life would be in danger. As explained above, the prosecution's comments about the loaded shotgun were the subject of multiple objections by Brown's defense counsel, all of which the state trial court overruled. The record by that point in Brown's capital murder trial showed that (1) Brown had intentionally murdered Ray; (2) Brown sent Williams messages after Ray's murder in which Brown threatened to harm Williams; and (3) while in jail awaiting trial for Ray's murder, Brown wrote his fellow inmate "Casper" a note in which Brown explicitly threatened to kill Williams if he ever had the chance to do so. Under these circumstances, the state trial court could reasonably have concluded that the prosecution's comments about loading the shotgun and allowing Brown access to it – melodramatic though they may have been – were either a summation of the evidence or a reasonable inference drawn from the evidence.

The state trial court twice ruled this aspect of the prosecution's closing argument was not subject to objection under state law. In Brown's state habeas corpus proceeding, in the course of rejecting Brown's ineffective assistance claims on the merits, the Texas Court of Criminal Appeals adopted findings and conclusions establishing this aspect of the prosecution's closing argument was not properly subject to objection under state law. State court findings of fact bind a federal habeas court. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Garza v. Stephens*, 738 F.3d 669, 677 (5th Cir. 2013) (holding a Texas habeas court's interpretation of evidentiary rules was binding in a federal habeas case); *Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir. 2009) (a state court's interpretation of state law binds a federal court sitting in habeas corpus).

The undersigned concludes after de novo review that the prosecution's comments about a loaded shotgun and Tracy Williams' safety did not render the punishment phase of Brown's capital murder trial fundamentally unfair. The Court should deny this aspect of Brown's fifth claim for federal habeas corpus relief.

## VIII. INEFFECTIVE ASSISTANCE CLAIMS

### A. Overview of the Claims

In his first four grounds for federal habeas corpus relief, Brown argues that his trial counsel rendered ineffective assistance in violation of the Sixth Amendment (1) by failing to adequately present a defense at the guilt-innocence phase of trial; (2) by

failing to adequately investigate Brown's background and present all available mitigating evidence during the punishment phase of trial; (3) by virtue of a conflict of interest between Brown's trial counsel and his court-appointed fact investigator; and (4) by failing to move for a change of venue. *See* ECF no. 29, 14-128.

## B. Overview of State Court Disposition

In his first five grounds for relief in his state habeas application, Brown argued that his trial counsel rendered ineffective assistance by failing to (1) present all available mitigating evidence, including evidence showing that Brown suffers from Autism Spectrum Disorder ("ASD"); (2) present additional evidence and argument showing that Brown was not guilty of capital murder; (3) object to allegedly improper prosecutorial jury argument at the punishment phase of trial; (4) move to suppress Brown's statements to law enforcement officers and a television reporter; and (5) request a change of venue. *See* State Habeas Application, 26-98 [ECF no. 58-3, pp. 48-120 of 355].

The state habeas trial court held an extensive evidentiary hearing on Brown's ineffective assistance claims and heard testimony from Brown's trial counsel, a clinical psychologist who diagnosed Brown with ASD, Brown's mother, and Brown's court-appointed mitigation specialist. The state habeas trial court then (1) found that Brown's trial counsel conducted a reasonable investigation into Brown's background, including retaining the services of two mental health professionals who testified at trial regarding Brown's lengthy history of drug abuse and future dangerousness; (2) found that Brown's trial counsel were not deficient in presenting available mitigating

evidence; (3) found that Brown was not prejudiced by his trial counsels' alleged failure to present additional mitigating evidence, in part because Brown's testifying experts presented an extensive case in mitigation regarding Brown's background; (4) found that Brown's testifying expert Dr. Mark Cunningham diagnosed Brown with Attention Deficit Hyperactivity Disorder ("ADHD") and not ASD; (5) found that Brown's trial counsel were not deficient for failing to present evidence of ASD, in part because Brown failed to establish as a matter of fact that Brown actually suffers from ASD; (6) found that Brown testified extensively at the guilt-innocence phase of trial regarding his background and state of mind at the time of his capital offense; (7) found that Brown's trial counsel were not deficient for failing to present even more evidence at the guilt-innocence phase of trial; (8) found that the record supported the prosecution's punishment phase jury argument that Brown had failed to demonstrate remorse for his capital offense; (9) found that the prosecutor's remarks at the punishment phase of trial were in large part a proper response to jury arguments by Brown's trial counsel or a proper summation of the evidence; (10) found that Brown's trial counsel were not deficient for failing to object to prosecutorial argument at the punishment phase of trial beyond the objections that counsel did make to allegedly inflammatory jury argument; (11) found that Brown did not make an unequivocal or unambiguous assertion of his right to counsel during his interview by law enforcement officers; (12) found that Brown thereafter waived his right to counsel by responding to law enforcement officers' non-badgering questions; (13) found that Brown was not prejudiced by the admission of his statement to law enforcement

officers because that statement was cumulative of the statement that Brown gave to a television reporter which was properly admitted into evidence; (14) found that Brown's statement to a television reporter was not the product of a custodial interrogation by a state agent; (15) found that Brown had failed to demonstrate prejudicial or inflammatory pretrial publicity permeated Hunt County prior to Brown's trial; (16) found that Brown's trial counsel were not ineffective for failing to move for a change of venue; and (17) concluded that all of Brown's assertions of ineffective assistance failed to satisfy the deficient performance prong of *Strickland*. *See* FCR, 22-46, 49-51, ¶¶ 107-215, 1-7 [ECF no. 59-7, pp. 281-305 of 409, 308-10 of 409]. The Texas Court of Criminal Appeals adopted the foregoing findings and conclusions when it denied state habeas corpus relief and denied all of Brown's ineffective assistance claims on the merits.

## C. Clearly Established Federal Law

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of trial counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

-98-

To satisfy the first prong of *Strickland*, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000). In so doing, a convicted defendant has the burden of proof and must overcome a strong presumption that the conduct of his trial counsel "falls within [a] wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (quoting *Strickland*, 466 U.S. at 688-89). Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *See Wiggins*, 539 U.S. at 523; *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Strickland*, 466 U.S. at 690.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins*, 539 U.S. at 534; *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Strickland*, 466 U.S. at 694.

In instances in which the state courts failed to adjudicate either prong of the *Strickland* test (such as those complaints the state courts summarily dismissed under

the Texas writ-abuse statute or which the petitioner failed to fairly present to the state courts), this Court's review of the un-adjudicated prong is de novo. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009); *Rompilla v. Beard*, 545 U. S. 374, 390 (2005).

Under the AEDPA's deferential standard of review, claims of ineffective assistance adjudicated on the merits by a state court are entitled to a doubly deferential form of federal habeas review. The AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow,* 571 U.S. 12, 19 (2013). Under 28 U.S.C. § 2254(d)(1), "'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *White v. Wheeler,* 136 S. Ct. 456, 460 (2015) (quoting *White v. Woodall,* 572 U.S. 415, 419-20 (2014)); *Harrington v. Richter,* 562 U. S. 86, 103 (2011).

The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. And as this Court has

> explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."

*Harrington*, 562 U. S. at 101 (citations omitted).

The Supreme Court has held that it is unreasonable not to investigate further when counsel has information available to him that suggests additional mitigating evidence – such as mental illness or a history of childhood abuse – may be available. *See, e.g., Porter v. McCollum*, 558 U.S. 30, 39-40 (2009) (trial counsel failed to interview any witnesses or to request any of the defendant's school, medical, or military records and ignored information in a report on the defendant's competency evaluation suggesting possible mitigating evidence – including evidence of mental illness – could be gleaned from investigation into the defendant's family background and military service); *Wiggins v. Smith*, 539, U.S. 510, 524-26 (2003) (counsel failed to investigate the defendant's background beyond review of summary records from competency evaluation, presentence report, and records from the state foster care system, failed to compile a social history of the defendant, and presented no mitigating evidence concerning the defendant's background); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (counsel failed to conduct even a cursory investigation into the defendant's background which would have shown the defendant's parents had been imprisoned for the criminal neglect of the defendant and his siblings, the defendant had been severely beaten by his father, and had been returned to his

parents' custody after they were released from prison). Such claims are commonly referred to as *Wiggins* claims.

The Supreme Court held the petitioners in *Wiggins*, *Porter*, and *Williams* were prejudiced by the failure of their trial counsel to fully investigate, develop and present available mitigating evidence. More specifically, the Supreme Court found in *Wiggins* that his trial counsel failed to discover, develop, and present available mitigating evidence showing that

> Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care. The time Wiggins spent homeless, along with his diminished mental capacities, further augment his mitigation case. Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability.

*Wiggins,* 539 U.S. at 253.

In *Porter*, the new mitigating evidence undiscovered and undeveloped by trial counsel included lay and expert testimony showing that (1) Porter routinely witnessed his father beat his mother, one time so severely that she had to go to the hospital and lost a child; (2) Porter's father was violent every weekend and Porter was his father's favorite target, particularly when Porter tried to protect his mother; (3) on one occasion, Porter's father shot at him for coming home late but missed and beat Porter instead; (4) Porter attended classes for slow learners until he left school at age 12 or 13; (5) to escape his horrible family life, Porter enlisted in the Army at age 17 and fought in the Korean War; (6) Porter suffered a gunshot wound to the leg yet fought heroically through two battles; (7) after the war, Porter suffered dreadful

nightmares and would attempt to climb his bedroom walls at night with knives; (8) Porter developed a serious drinking problem and began drinking so heavily that he would get into fights and not remember them at all; (9) Porter suffered from brain damage that could manifest in impulsive, violent behavior; (10) at the time of the capital offense, Porter was substantially impaired in his ability to conform his conduct to the law and suffered from an extreme mental or emotional disturbance; and (11) Porter had substantial difficulties with reading, writing, and memory. *See Porter*, 558 U.S. at 449-51.

Prejudice was established in *Williams* through testimony showing that trial counsel failed to discover and develop available mitigating evidence showing that (1) Williams experienced a nightmarish childhood; (2) Williams' parents had been imprisoned for criminal neglect of Williams and his siblings; (3) Williams had been severely beaten by his father, committed to the custody of the social services bureau for two years during his parents' incarceration, and then returned to his parents after they were released from prison; (4) Williams was borderline mentally retarded and did not advance beyond the sixth grade in school; (5) Williams received commendations for helping to crack a prison drug ring and for returning a guard's missing wallet; (6) Williams was among the inmates least likely to act in a violent, dangerous or provocative way; (7) Williams seemed to thrive in a more regimented and structured environment; and (8) Williams earned a carpentry degree while in prison. *See Williams,* 529 U.S. at 395-96.

### D. Ineffective Assistance at Guilt-Innocence Phase of Trial

## 1. The Claim Restated

In his first claim for federal habeas relief, Brown argues that his trial counsel rendered ineffective assistance by failing to present an adequate defense at the guilt-innocence phase of trial. *See* ECF no. 29, 14-62. Among the alleged deficiencies in his trial counsels' guilt-innocence phase performance about which Brown complains are allegations that his trial counsel failed to (1) have Brown evaluated for intellectual disability and ASD; (2) prove that Brown killed Ray for a reason other than retaliation or obstruction; (3) present evidence showing that Brown was depressed, addicted, and had been diagnosed and treated for depression and suicidal ideation; (4) investigate whether Brown had been exposed to toxins while working on neon signs; (5) present evidence showing what drove Brown's drug abuse; (6) present evidence showing that Brown had been using methamphetamine, cocaine, and alcohol prior to the fatal shooting; (7) show that Brown was in a state of hyperarousal and severe disassociation and mental distress, displaying a limited range of emotion at the time of the fatal shooting; (8) show that Brown suffered from a lifelong mental developmental disability (ASD) as well ADHD, anxiety, depression, and suicidal ideation at the time of the fatal shooting; (9) show that Brown's ASD effectively prevented him from showing emotion during his trial testimony; and (10) frame Brown's offense in terms of Brown's history of childhood trauma, neglect, and abuse. *See id.*

## 2. State Court Disposition Revisited

Brown presented a less expansive series of complaints about his state trial counsels' guilt-innocence phase performance as his second ground for state habeas relief. *See* State Habeas Application, 57-69 [ECF no. 58-3, pp. 79-91 of 355]. In his second ground for state habeas relief, Brown argued his state trial and appellate counsel should have (1) done a better job arguing Brown was guilty only of murder and not capital murder; (2) argued that the evidence was insufficient to establish capital murder; (3) argued and proved that Brown's murder of Ray was not motivated by Brown's arrest on July 16 for possession of an illegal weapon (following Ray's call to police requesting a welfare check on the allegedly suicidal Brown) or by Ray's report to police of her violent encounter with Brown on July 19 or by the fact that Ray called police on July 20 while Brown was pursuing Ray in his vehicle or that Brown murdered Ray while committing a terroristic threat; and (4) presented evidence showing that (a) Brown struggled to stay sober following his divorce from Ray; (b) Tracy Williams choked Brown in front of Brown's children and Brown was thereafter depressed, withdrawn, and stopped going to work; (c) after Brown's divorce from Ray, Brown remained an attentive father; (d) Brown's struggled with alcohol and drug abuse and depression; and (e) Brown shot Ray because she was leaving the area with their children. *See id.*

The state habeas trial court (1) found that Brown's sister Taylor Harmon testified extensively at the guilt-innocence phase of trial regarding the relationship between Brown and Ray following their divorce; (2) found that Brown's mother Brenda Crofford also testified at the guilt-innocence phase of trial regarding Brown's

relationship with Ray, including Brown's suicidal ideation after he learned that Ray planned to move away and take their children with her; (3) found that Brown's neighbor Loren Homerstead also testified at the guilt-innocence phase of trial regarding Brown's state of mind after he learned that Ray planned to move away with their children; (4) found that Brown himself testified extensively during the guilt-innocence phase of trial regarding his mental state at the time of the murder as well as his relationship with Ray; (5) found that Wesley Williams also testified during the guilt-innocence phase of trial regarding Brown and Ray's relationship; (6) found that Ray's mother also testified during the guilt-innocence phase of trial regarding Brown and Ray's relationship; (7) found that the jury had before it at the guilt-innocence phase of trial extensive testimony showing that Brown suffered from depression and was suicidal and was taking medication for depression at the time of the murder; (8) found that Brown's trial counsel were not deficient in failing to present additional evidence showing Brown's depression, suicidal ideation, and anxiety at the time of the murder because such evidence would not have significantly advanced any defense available to Brown at trial; and (9) found that Brown's trial counsel were not deficient for failing to present additional evidence of Brown's violent confrontation with Tracy Williams, Brown's history of substance abuse, or Brown's relationship with his children because all the new or additional evidence presented by Brown was merely cumulative of evidence actually presented during the guilt-innocence phase of trial. *See* FCR, 27-30, ¶¶ 123-38 [ECF no. 59-7. pp. 286-89 of 409]. The state habeas trial

court concluded that Brown's second claim for state habeas relief failed to satisfy either prong of *Strickland*. *See* FCR, 50, ¶¶ 2-3 [ECF no. 59-7. p. 309 of 409].

### 3. Ineffective Assistance at Guilt-Innocence Phase of Trial

Because Brown has chosen in his first claim for federal habeas relief to expand his list of complaints about the performance of his trial counsel during the guilt-innocence phase of trial beyond the specific complaints that he fairly presented in his second claim for state habeas relief, out of an abundance of caution, this Court should undertake de novo review of all of Brown's ineffective assistance complaints in his first ground for federal habeas relief.

### a. No Deficient Performance

After undertaking an exhaustive and independent review of the entire record from Brown's trial, direct appeal, state habeas corpus proceeding, and pleadings in this federal habeas proceeding, the undersigned concludes that Brown has failed to allege or present any evidence showing that the performance of his trial counsel during the guilt-innocence phase of trial fell below an objective level of reasonableness.

Brown's trial counsel presented extensive evidence during the guilt-innocence phase of trial, through the testimony of Brown's friends, family, and Brown himself, showing that (1) Brown's extensive history of drug abuse (which, contrary to the assertions of Brown's state trial counsel, began long before Brown ever met Ray); and (2) Brown's erratic mental and emotional state (that is, depression, anxiety, insomnia, and suicidal ideation) at the time of the murder, including the details of

Brown's violent encounters with both Tracy Williams and Ray in separate incidents just days before the murder. Insofar as Brown complains that his state trial counsel failed to present additional evidence addressing those subjects, Brown's complaint does not satisfy the deficient performance prong of *Strickland*. Brown's trial counsel cannot reasonably be faulted for failing to present cumulative or redundant evidence. A failure to present cumulative testimony cannot be the basis of a claim of ineffective assistance. *See Howard v. Davis*, 959 F.3d 168, 173 (5th Cir. 2020) (citing *Richards v. Quarterman*, 566 F.3d 553, 568 (5th Cir. 2009)); *Norman v. Stephens*, 817 F.3d 226, 233 (5th Cir. 2016) (defendant was not prejudiced by failure of counsel to present cumulative evidence).

Insofar as Brown complains that his state trial counsel failed to present additional evidence addressing Brown's long history of drug and alcohol abuse, the additional details of Brown's long-term drug and alcohol abuse furnished during Brown's state habeas proceeding were, at best, double-edged in nature. *See Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012) (mitigating evidence is "double-edged" when it might permit an inference that the defendant is not as morally culpable for his behavior but also might suggest that, as the product of his environment, the defendant is likely to continue to be dangerous in the future); *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002) ("Although the evidence of Ladd's inadequate supervision as a child might permit an inference that he is not as morally culpable for his behavior, it also might suggest Ladd, as a product of his environment, is likely to continue to be dangerous in the future."). Failure to present evidence that is double-

edged in nature generally lies within the discretion of trial counsel. *See Ayestes v. Davis*, 933 F.3d 384, 392 (5th Cir. 2019) ("this Court has repeatedly denied claims of ineffective assistance of counsel for failure to present 'double edged' evidence where counsel has made an informed decision not to present it." (quoting *Hopkins v. Cockrell* 325 F.3d 579, 586 (5th Cir. 2003)).

And, as explained in the undersigned's FCR addressing Brown's motion for stay, Brown's focus on his alleged voluntary intoxication at the time of Ray's murder is irrelevant to any issue properly before the jury during the guilt-innocence phase of Brown's capital murder trial. *See* ECF no. 69, at 16-21. It is an affirmative defense under Texas law that, at the time of an alleged offense, the defendant, as a result of a severe defect caused by involuntary intoxication, did not know that his conduct was illegal. *See Engle v. Lumpkin*, ___ F.4th ___, ___, 2022 WL 1498877, *9 (5th Cir. May 12, 2022) (citing Section 8.01 of the Texas Penal Code and *Mendenhall v. State*, 77 S.W.3d 815, 818 (Tex. Crim. App. 2002)). But Brown does not allege any facts and has presented no evidence showing that his alleged intoxication at the time of Ray's murder was the result of involuntary intoxication.

This ineffective assistance claim conflates the concept of mitigating evidence with the type of evidence necessary under Texas law to establish a lack of sufficient *mens rea* to commit a capital offense. Texas law recognizes no "diminished capacity" defense except when evidence shows a defendant suffered from a mental disease or defect so severe as to rebut or disprove the culpable mental state for the offense. *See Ruffin v. State*, 270 S.W.3d 586, 593 (Tex. Crim. App. 2008) ("Insanity is the only

'diminished responsibility' or 'diminished capacity' defense to criminal responsibility in Texas."). Section 8.01(a) of the Texas Penal Code provides: "It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." *Battaglia v. State*, 537 S.W.3d 57, 61 n.3 (Tex. Crim. App. 2017). Brown alleges no facts showing that, at the time of his capital offense, he met the Texas statutory definition of insanity.

At the punishment phase of Brown's capital murder trial, Dr. Lundberg-Love testified extensively regarding Brown's lengthy history of drug and alcohol abuse but did not opine that Brown was legally insane at the time of Ray's murder. Likewise, Dr. Cunningham testified extensively at the punishment phase of trial regarding Brown's developmental history and mental state, including giving a diagnosis of ADHD, but did not opine that Brown was legally insane at the time of Ray's murder. Finally, Dr. Mesibov testified extensively during Brown's state habeas corpus hearing regarding his diagnosis of ASD but did not opine that Brown was legally insane at the time of Ray's murder.

And Brown does not argue that he was unaware of the wrongfulness – that is, the illegality – of his fatally shooting Ray. His flight from police immediately thereafter and his admissions that he considered suicide shortly thereafter belie any rational conclusion to the contrary. Under Texas law, evidence of flight evinces a consciousness of guilt. *See Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007); *Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994).

Texas law does not recognize a defense in a criminal prosecution consisting of evidence the defendant was voluntarily intoxicated at the time of an alleged offense. In Texas, voluntary intoxication does not constitute a defense to the commission of crime. *See Thomas v. Lumpkin*, 995 F.3d 432, 452 (5th Cir. 2021) (citing § 8.04(a), TEX. PEN. CODE); *In re Davilla*, 888 F.3d 179, 187 (5th Cir. 2018) (citing § 8.04(a), TEX. PEN. CODE). Likewise, under Texas law, evidence of voluntary intoxication does not negate the element of specific intent required for capital murder. *See Hernandez v. Johnson*, 213 F.3d 243, 250 (5th Cir. 2000). Under Texas law, alcoholism may not be the basis for an involuntary intoxication defense. *See id.*

Insofar as Brown complains that his trial counsel failed to present evidence during the guilt-innocence phase of Brown's capital murder trial showing that Brown suffered from ADHD and ASD at the time of the murder, Brown misconstrues the requirements of Texas law. Insofar as Brown argues in his federal habeas corpus petition that his trial counsel should have presented evidence of his ADHD diagnosis (presumably from Dr. Cunningham) or ASD diagnosis (presumably from Dr. Mesibov) during the guilt-innocence phase of trial because they were relevant somehow to Brown's *mens rea* to commit his capital offense, Brown once again misconstrues Texas law. The Texas Court of Criminal Appeals has explained the type of evidence necessary to establish that an otherwise sane criminal defendant lacked the necessary *mens rea* to commit an offense under Texas law as follows:

> The Texas Legislature has not enacted any affirmative defenses, other than insanity, based on mental disease, defect, or abnormality. Thus, they do not exist in Texas.

But both physical and mental diseases or defects may affect a person's perception of the world just as much as they may affect his rational understanding of his conduct or his capacity to make moral judgments. For example, suppose that a blind person is sitting on his front porch and hears what he thinks is a trespasser coming up his walk. He shoots at the person to scare him away, knowing that it is illegal to shoot at people, even trespassers. The "trespasser" turns out to be a uniformed police officer who is coming to serve a subpoena. The blind man may be prosecuted for aggravated assault with a deadly weapon, but he cannot be convicted of aggravated assault of a police officer if, because of his blindness, he did not see the uniform and did not know the person was a police officer. Evidence of the defendant's blindness would, of course, be relevant and admissible to rebut the State's assertion that the defendant intended to shoot at a police officer. Such evidence might be elicited from the defendant, a lay witness – mother, brother, friend, or neighbor – or from an expert, an optometrist, physician, etc. Courts routinely admit evidence of a physical abnormality offered to prove a lack of *mens rea*.

In Texas, the same rule applies to evidence of a mental disease or defect offered to rebut or disprove the defendant's culpable *mens rea*. If, instead of blindness, the defendant suffers from mental delusions such that he sees a "trespasser" or a "Muslim" when everyone else around him sees a police officer, he cannot be convicted of intentionally shooting at a police officer, although he may be convicted of intentionally shooting at a trespasser or Muslim. Guilt of the greater offense requires that the State prove, beyond a reasonable doubt, that the defendant intended to shoot a police officer, not a trespasser or Muslim. That is the required *mens rea* and that is the State's constitutional burden of proof.

*Ruffin*, 270 S.W.3d at 593-94 (footnotes omitted).

Brown alleges no facts showing that, at the time that he fatally shot Ray, he suffered from any mental disease or defect, such as a delusion, psychosis, or hallucination, that interfered with his ability to accurately perceive reality. Brown does not argue that, at the time that he fired the fatal shotgun blast, he confused Ray for anyone or anything else. Nor does he allege that he was then suffering from any mental disease or defect that prevented him from appreciating the fact that Ray had previously reported him to police (for being suicidal) and that that report directly led

to Brown's arrest and accompanying loss of his sawed-off shotgun. Brown also does not allege that he suffered from any mental disease or defect that prevented him from perceiving that Ray was communicating with police on her phone at the same time that Brown was pursuing her, forcing her off the road, and then fatally shooting her.

To the contrary, Brown admitted during his trial testimony, and in several other post-arrest statements that were admitted into evidence at trial, that he knew or assumed that Ray was communicating with police while he was pursuing Ray in his vehicle and that he was aware of the arrival of a police officer on the scene at the time that he fired the fatal shot. Nothing in the proposed evidence of Brown's alleged ASD, ADHD, or difficult, abused, neglected childhood that Brown now argues should have been presented at the guilt-innocence phase of his capital murder trial would have been sufficient under applicable Texas law to negate the *mens rea* necessary to show Brown committed Ray's murder in the course of committing or attempting to commit the offense of retaliation or obstruction. Brown identifies no expert opinion or other new evidence sufficient to establish that Brown was mentally incapable of perceiving or comprehending that (1) Ray's murder was wrongful or (2) Ray had made reports to law enforcement about Brown and was in contact with law enforcement at the time Brown fired the fatal shot.

In its opinion affirming Brown's conviction on direct appeal, the Texas Court of Criminal Appeals held that the evidence supporting Brown's conviction for capital murder under the theories that Brown fatally shot Ray while in the course of committing or attempting to commit the predicate offenses of retaliation and

obstruction was not merely legally sufficient; it was overwhelming. *See Brown*, AP-77,019, 2015 WL 5453765, *6-*9. In the undersigned's FCR addressing Brown's motion for stay, the undersigned explained that the evidence supporting the remaining theory of capital murder in Brown's case – that is, intentional murder in the course of committing or attempting to commit the predicate offense of terroristic threat – was even more overwhelming than evidence of capital murder under the other two theories. *See* ECF no. 69, 20-21.

### b. No Prejudice

For the reasons discussed above, the undersigned concludes after de novo review that there is no reasonable probability that, but for the failure of Brown's trial counsel to undertake any of the conduct identified in Brown's first claim for federal habeas relief, the outcome of the guilt-innocence phase of Brown's capital murder trial would have been any different. Brown testified at great length regarding his motivations for killing Ray. His jury had the opportunity to view Brown's demeanor firsthand. It chose not to believe Brown's protestations that the only reason that he shot Ray was because he was upset with her for taking their children to her new home. There may have been multiple reasons why Brown chose to intentionally murder Ray. A rational jury could easily have found that at least part of Brown's motivation for killing Ray was a desire to retaliate against her for her prior report to police about Brown's suspected suicidal ideation (which resulted in Brown's arrest and the confiscation of his sawed-off shotgun). Brown admitted to the television

reporter who interviewed him just days after his arrest that he was upset about that incident.

A rational jury could also have concluded that at least part of Brown's anger toward Ray on July 20 arose from the fact that Ray was on the phone to law enforcement officers (and not responding to Brown's calls) while Brown was attempting to force Ray off the road. Brown admitted to the same television reporter that he believed Ray was on the phone with police while he was pursuing her vehicle.

A rational jury could have concluded that Brown's fatal shooting of Ray took place while Brown was committing or attempting to commit the offense of terroristic threat. The jury could have, in listening to the audio recording of Ray's 9-11 call, observed the panic in Ray's voice as she informed the dispatcher that Brown had forced her off the road: "He's cornered me in now" she shouted. Shortly before her death, Ray reported to the dispatcher that she had informed Brown that she was on the phone to police and that he was aware of that fact.

Given the evidence discussed above, no rational jury could have concluded that Brown's fatal shooting of Ray was completely unrelated to Brown's and Ray's contact with police in the days leading up to the fatal shooting or completely unrelated to the fact that Ray was on the phone reporting to police at the instant that Brown chose to take her life. Brown admitted during his trial testimony that he assumed that was the case. None of the mental health experts who testified at trial or during Brown's state habeas corpus proceeding offered any opinions that would have amounted to a

legally recognizable defense during the guilt-innocence phase of Brown's capital murder trial.

Presenting further evidence at the guilt-innocence phaser of trial of Brown's history of childhood neglect, family dysfunction, childhood sexual abuse, and long history of drug and alcohol abuse would not have negated the mens rea required for capital murder. More testimony from Dr. Lundberg-Love or others concerning Brown's alleged intoxication at the time of his offense would not have furnished Brown with a legally recognized defense under applicable Texas law. Presenting evidence of Brown's ADHD or ASD, bereft of any accompanying expert mental health opinion establishing that Brown was rendered legally insane by those conditions, likewise would not have furnished Brown with a legally recognized defense under applicable Texas law. In sum, there is no reasonable probability that, but for the failure of Brown's trial counsel to undertake any of the tasks that Brown identifies in his first claim for federal habeas relief, the outcome of the guilt-innocence phase of Brown's capital murder trial would have been any different.

Brown's trial counsel each candidly admitted during their testimony in Brown's state habeas corpus proceeding that, given Brown's demeanor during his videorecorded post-arrest interviews, the outcome of the guilt-innocence phase of Brown's trial was almost a foregone conclusion and so their focus was on attempting to save Brown's life at the punishment phase of trial. *See* Testimony of Toby Wilkerson, S.F. State Habeas Hearing, Vol. 9/23 [ECF no. 54-9], at 69, 116, 138; Vol. 10/23 [ECF no. 54-10], at 56, 63, 94, 169-71 (explaining the videos of Brown's

interviews were "powerful," Brown appeared to be a remorseless killer during both interviews, and Brown appeared to be a "crazy person" or a "crazed animal" during his interview by the television reporter); Testimony of Katherine Ferguson, S.F. State Habeas Hearing, Vol. 10/23 [ECF no. 54-10], at 65-67; Vol. 12/23 [ECF no. 54-12], at 28 (Brown looked like a remorseless killer and appeared "crazy-eyed" during his interviews and Brown's interviews appeared "horrible"). Still, Brown's trial counsel did present an extensive amount of evidence at both phases of Brown's trial, including testimony at the guilt-innocence phase of trial documenting Brown's extensive history of drug and alcohol abuse and his use of drugs and alcohol in the days leading up to the murder and testimony at the punishment phase of trial from Dr. Lundberg-Love and others suggesting Brown was unusually susceptible to emotional manipulation by Ray.

### c. Conclusions

The undersigned concludes after de novo review that Brown's first claim for federal habeas corpus relief fails to satisfy either prong of *Strickland*. The Court should deny Brown's initial claim for federal habeas relief.

## E. Ineffective Assistance at Punishment Phase of Trial

### 1. The Claim Restated

In his second claim for federal habeas relief, Brown argues that his trial counsel rendered ineffective assistance during the punishment phase of trial by failing to (1) have Brown evaluated by a qualified mental health expert prior to trial; (2) adequately investigate Brown's background; (3) present all available mitigating

evidence showing that Brown suffers from ASD, ADHD, the effects of a dysfunctional and broken home, delayed childhood development (both physical and emotional), a history of rampant family sexual abuse, personal physical, mental, and sexual abuse during childhood, a pattern of familial and parental infidelity, a history of family mental illness, a history of family substance abuse, a long personal history of substance abuse, and a resulting inability to form lasting relationships; and (4) object to improper prosecutorial closing jury argument. *See* ECF no. 29, at 62-113.

## 2. State Court Disposition Revisited

In his first ground for relief in his state habeas application, Brown argued that his trial counsel rendered ineffective assistance by failing to adequately investigate Brown's background and present additional available mitigating evidence, including evidence showing that Brown suffers from ASD. *See* State Habeas Application, 26-57 [ECF no. 58-3, pp. 48-79 of 355]. More specifically, Brown argued that his trial counsel should have presented evidence showing that Brown suffered from ASD (and accompanying deficits in communication and social skills), depression, anxiety, suicidal ideation, a long history of substance abuse, and an inability to adapt to rapidly changing circumstances. Brown also argued that his trial counsel failed to present evidence showing Brown's dysfunctional family history, depression, drug use, and good character. Brown cited to infighting and a lack of communication within his trial defense team as producing an allegedly inadequate investigation into Brown's background.

The state habeas trial court found that (1) Brown's trial counsel conducted a reasonable investigation into possible mitigation; (2) there was significant overlap in the guilt-innocence and mitigation investigations; (3) the defense team interviewed more than 80 of Brown's family and friends searching for mitigating evidence; (4) the testimony of mitigation specialist Griffin that she informed attorney Ferguson that she believed Brown suffered from Asperger's Syndrome was not credible; (5) Brown's defense team adopted an objectively reasonable punishment phase trial strategy -- specifically, to attempt to prove to the jury that, removed from the pernicious influence of drugs, Brown would not pose a risk of future dangerousness; (6) several witnesses testified to Brown's positive character traits; (7) Dr. Lundberg-Love testified at trial that Brown's abuse of methamphetamine caused him to suffer a paranoid state and rendered Brown more impulsive and that, removed from drugs, Brown's brain would be able to heal; (8) Dr. Cunningham testified regarding Brown's background, detailed Brown's dysfunctional family, genetic predisposition, neurodevelopmental problems, childhood sexual abuse, corruptive community factors, and drug abuse, and explained how Brown's life spiraled out of control; (9) multiple affidavits submitted by Brown during his state habeas corpus proceeding constituted inadmissible hearsay; (10) Brown's trial counsel presented a thorough case in mitigation and were not deficient in failing to present additional mitigating evidence addressing the factors in Brown's background listed above; (11) Brown's trial counsel were not deficient and Brown was not prejudiced by his trial counsels' failure to present evidence of ASD offered through Dr. Mesibov because (a) Dr.

Mesibov and Dr. Cunningham differed in their diagnoses of Brown (Dr. Cunningham diagnosed Brown with ADHD instead of ASD), (b) it was reasonable for Brown's trial counsel to rely on Dr. Cunningham's and Dr. Lundberg-Love's conclusions regarding Brown's mental health, and (c) Dr. Mesibov's diagnosis of ASD was not credible given the discrepancies between Dr. Mesibov's descriptions of ASD and Brown's life history of independent living, successful participation in many social endeavors, owning his own business, sustained employment, marriage and fathering multiple children, and being a class clown and caring parent; and (12) it was reasonable for Brown's trial counsel to choose not to present mitigating evidence showing Brown suffered from a permanent brain impairment (ASD) that rendered him impulsive and prone to violence. *See* FCR, 22-27, ¶¶ 107-22 [ECF no. 59-7, pp. 281-86 of 409].

In his third ground for state habeas relief, Brown argued that his trial counsel rendered ineffective assistance by failing to timely object to all improper prosecutorial jury argument at the punishment phase of trial. *See* State Habeas Application, 69-82 [ECF no. 58-3, pp. 91-104 of 355].

The state habeas trial court found that (1) the record from trial fully supported the prosecutor's punishment phase jury argument suggesting that Brown had failed to demonstrate or express remorse for killing Ray; (2) the prosecutor's comments about Brown failing to show remorse were also a fair response to defense counsels' jury arguments suggesting Brown had, in fact, expressed remorse to his spiritual advisers and Dr. Lundberg-Love; and (3) Brown's trial counsels' failure to object to the prosecution's comments about Brown's lack of remorse was neither deficient nor

prejudicial under *Strickland* because (a) the prosecution's comments in question, construed in proper context, did not comment on Brown's failure to testify and (b) any such objections would have been futile; (4) Brown's trial counsel twice objected as inflammatory to the prosecution's hypothetical arguments regarding Tracy Williams and a loaded shotgun and the trial court twice properly overruled those objections; (5) Brown's trial counsel were not deficient in failing to make additional objections to the same argument; (6) the prosecution's additional comments during closing jury argument about Brown's threats against Tracy Williams were proper summations of the evidence as well as proper responses to defense counsels' arguments regarding Dr. Cunningham's testimony that Brown would not be a threat of future violence if removed from drug abuse; (7) the prosecution did not wave the murder weapon during closing jury argument; (8) the affidavits submitted by Brown in support of his arguments about the prosecution waving the murder weapon were inadmissible hearsay; and (9) even if the prosecution had waved the murder weapon during closing argument, that would not have been a proper basis for reversal because the prosecution's argument was a proper response to defense counsels' jury arguments and the murder weapon played a prominent role in Brown's offense. *See* FCR, 30-38, ¶¶ 140-72 [ECF no. 59-7, pp. 289-97 of 409].

### 3. Failure to Investigate & Present Available Mitigating Evidence

Insofar as Brown argues that his trial counsel failed to adequately investigate Brown's background and present available mitigating evidence during the punishment phase of his capital murder trial, Brown's second ground for federal

habeas corpus relief is not significantly different from his claim raised in his state habeas corpus application. Nonetheless, out of an abundance of caution, the undersigned will undertake review of this claim under both the AEDPA standard and a de novo standard.

### a. AEDPA Review

### (1) No Deficient Performance

The state habeas trial court concluded that Brown's complaints about his trial counsels' failure to present evidence of ASD and additional testimony corroborating Brown's trial testimony, the testimony of his family and friends, and the trial testimony of his mental health experts concerning Brown's background failed to satisfy the deficient performance prong of *Strickland*. *See* FCR, 49-50 [ECF no. 59-7, pp. 308-09 of 409].

The state habeas court reasonably concluded that there was nothing about the scope of Brown's defense team's investigation into Brown's background that fell below an objective level of reasonableness. While Brown presented affidavits from numerous individuals in support of his state habeas application purporting to show additional mitigating evidence that could have discovered by a more thorough investigation of Brown's background, those affidavits were not admitted into evidence during Brown's state habeas corpus proceeding and contained, by and large, nothing new or significantly different from the extensive case in mitigation that Brown's defense team presented at trial. Brown's complaints about the manner in which his defense communicated internally or went about investigating Brown's background

for mitigating evidence miss the point. The state habeas court found that Brown's defense team interviewed 80 friends and family of Brown, as well as Brown himself, in their search for mitigating evidence. Brown did not allege or present any evidence to the state habeas court showing that additional investigation would have produced any new or additional mitigating evidence.

And the broad scope of that investigation is established beyond any doubt by the extensive case in mitigation that Brown's defense team presented at trial. Brown's biological father, mother, and sister, as well as Brown himself, and both his mental health experts, testified at length about Brown's history of a dysfunctional family life, long history of substance abuse, history of childhood sexual abuse at the hands of his stepbrother, and resulting history of depression, anxiety, and substance abuse. But that testimony was tempered by other testimony that the defense offered at trial from Brown's friends and family intended to humanize Brown by showing him to be a caring father who had played youth baseball all the way through high school, been considered a class clown growing up, and had worked at an aircraft company and for a sign manufacturer.

Brown's attorneys had Brown evaluated by two mental health professionals, Dr. Lundberg-Love and Dr. Cunningham. It is undisputed that neither of those two experts suggested that further testing of Brown (for ASD or any other mental health issue) was reasonably necessary. Both experts testified that they conducted in-person interviews of Brown. Dr. Lundberg-Love presented extensive expert testimony concerning Brown's methamphetamine and cocaine addictions and how his

addictions impacted Brown's paranoia at the time of Ray's murder. Dr. Cunningham described in graphic detail Brown's long history of abuse as a child, including sexual abuse by his stepbrother as well as physical and emotional abuse at the hands of his stepfather. But both experts opined that, if placed in a secure environment detached from the pernicious effects of drugs, Brown would pose a very low risk of future violence.

The state habeas court reasonably concluded that there was nothing objectively unreasonable in the failure to investigate Brown's mental health history further and discover that Brown suffers from ASD. Brown presented the state habeas court with no evidence showing that either mental health expert who evaluated Brown suggested that further testing for ASD or any other condition was advisable. Brown's trial counsel testified that (1) they instructed their mental health experts to test Brown as necessary; (2) neither of the two mental health experts that the defense team retained to evaluate Brown and testify at trial recommended or suggested the need for any additional testing for ASD or any other mental health issue; (3) they did not believe that it was prudent to conduct a free-ranging exploration for mental illness because they observed nothing uncommunicative, unintelligent, or "off" with Brown and none of the friends and family of Brown with whom they spoke suggested that Brown had a history of mental illness beyond depression and suicidal ideation; (4) their mitigation specialist did not suggest that Brown had Asperger's Syndrome; (5) evidence of organic brain damage or brain dysfunction could be double-edged; and (6) they believed that evidence of autism and other psychological problems could be

viewed by a Hunt County jury as "psychobabble." *See* S.F. State Habeas Hearing, Vol. 9/23 [ECF no. 54-9], at 70-73, 117, 123, Vol. 10/23 [ECF no. 54-10], at 14-15, 22-23, 27, 30, 39, 85, 166, 178-79, 191, 193-95, 257, 266-67; Vol. 12/23 [ECF no. 54-12], at 27, 68, 93-94. While Brown's mitigation specialist Maureen Griffin testified during the state habeas hearing that she informed Brown's trial counsel that she suspected Brown might have Asperger's Syndrome, both of Brown's trial counsel denied that assertion. The state habeas court found the testimony of attorneys Wilkerson and Ferguson on this point was more credible than that of Griffin. *See* FCR, 23, ¶ 109 [ECF no. 59-7, p. 282 of 409].

Factual findings made by a state habeas court are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1) unless rebutted by clear and convincing evidence. *See Lucio v. Lumpkin*, 987 F.3d 451, 476 (5th Cir. 2021); *Ford v. Davis*, 910 F.3d 232, 234 (5th Cir. 2018); *Murphy v. Davis*, 901 F.3d 578, 585 (5th Cir. 2018). Credibility determinations are entitled to this same statutory presumption of correctness. *See Miller v. Thaler*, 714 F.3d 897, 903 (5th Cir. 2013); *Richards v. Quarterman*, 566 F.3d 553, 563 (5th Cir. 2009); *Blanton v. Quarterman*, 543 F.3d 230, 247 (5th Cir. 2008). The presumption applies regardless of whether the state court held a full and fair hearing on a particular claim. *See Valdez v. Cockrell*, 274 F.3d 941, 951-54 (5th Cir. 2001). Brown has not presented this Court with clear and convincing evidence establishing any error in the state habeas court's credibility determination on this subject.

If nothing else, the state habeas testimony of Brown's new mental health expert Dr. Mesibov established the highly problematic nature of an ASD diagnosis and suggested that, outside of a few specialized clinics in North Carolina, there were few experts qualified in this nation to make such a diagnosis. *See* Testimony of Dr. Gary Mesibov, S.F. State Habeas Hearing, Vol. 7/23 [ECF no. 54-7], at 34-96, 136-40, 170-203; Vol. 8/23 [ECF no. 54-8], at 124-40. Dr. Mesibov testified further that ASD is often misdiagnosed as ADHD (Dr. Cunningham's diagnosis for Brown), cannot be diagnosed through brain scans or any other objective clinical instruments, turns on the evaluation of such traits as eye contact and facial expression, and is best diagnosed through an elaborate and highly subjective interview process which must be conducted by a clinician with highly specialized training. *See id.*, Vol. 7/23 [ECF no. 54-7], at 37-91, 102-14, 212-30; Vol. 8/23 [ECF no. 54-8], at 17-45, 95, 125-30, 139-40, 153. Dr. Mesibov also admitted there is no cure for those suffering from ASD. *See id.*, Vol. 7/23 [ECF no. 54-7], at 197,

The practical problem with Brown's complaint that his trial counsel failed to pursue a diagnosis of ASD is that both of Brown's trial counsel testified that, if they had obtained such a diagnosis, they did not believe they could have successfully presented that evidence at the punishment phase of Brown's capital murder trial. Both attorneys Wilkerson and Ferguson testified during Brown's state habeas corpus proceeding that they wanted to present evidence and argue to the jury that Brown had been depressed and suicidal at the time of the offense due to his drug use and that, removed from drugs, Brown would pose a very low risk of future violence. *See*

Testimony of Toby Wilkerson, S.F. State Habeas Hearing, Vol. 9/23 [ECF no. 54-9], at 24-26, 116, 118, 124, 138, 141; Vol. 10/23 [ECF no. 54-10], at 14-15, 22-23, 40-41, 169-70, 177-82, 195, 198; Testimony of Katherine Ferguson, S.F. State Habeas Hearing, Vol. 10/23 [ECF no. 54-10], at 262-64, 266-68; Vol. 12/23 [ECF no. 54-12], at 21-22, 29, 94. They reasonably pointed to Brown's excellent disciplinary record while awaiting trial for Ray's murder (which the defense established at trial through the testimony of Hunt County Sheriff's Department personnel) as evidence that they believed could help them gain a negative answer to the future dangerousness special issue. And they reasonably believed that presenting evidence of a neurodevelopmental disorder such as ASD would have undermined that strategy. *See* Testimony of Toby Wilkerson, S.F. State Habeas Hearing, Vol. 10/23 [ECF no. 54-10], at 30 (explaining that some jurors were likely to view evidence of mental health problems as "psychobabble" and view same as aggravating rather than mitigating); Testimony of Katherine Ferguson, S.F. State Habeas Hearing, Vol. 10/23 [ECF no. 54-10], at 266-68.

The state habeas court reasonably concluded that Brown's trial counsel pursued an objectively reasonable trial strategy intended to gain a negative answer to the future dangerousness special issue. Brown's trial counsel cannot reasonably be faulted for failing to investigate evidence that would have undermined their objectively reasonable punishment phase trial strategy.

And evidence showing that Brown suffers from ASD would have been of limited mitigating value during the punishment phase of his trial. The state habeas trial

court found that Dr. Mesibov's diagnosis was not credible. *See* FCR, 27, ¶ 122 [ECF no. 59-7, p. 286 of 409] ("The Court finds, based on the record, that trial counsel is not deficient for, and Applicant was not harmed by, the alleged failure to investigate, discover, and present evidence that Applicant suffers from ASD because Applicant has not established as a matter of fact, that this is the case."). This factual finding was supported by the record before the state habeas court.

Dr. Mesibov testified that Brown was at the very low end of the ASD spectrum, meaning that his symptoms were mild in comparison to others on the spectrum. Dr. Mesibov testified that individuals with ASD are unlikely to participate in social activities. Yet the testimony from Brown's trial and state habeas hearing showed that he had participated in youth baseball all the way through high school, he participated in scouting as a youth, and he was once a part of an award-winning team that engaged in competitions involving academic problem-solving. *See* S.F. State Habeas Hearing, Vol. 11/23 [ECF no. 54-11], at 125, 130-31. Dr. Mesibov testified that individuals with ASD rarely do very well academically. Yet Brown's school records showed him earning above-average grades for the most part and graduating from high school. Dr. Mesibov testified that individuals with ASD generally do not engage in attention-seeking behaviors. Yet Brown was described by his family and friends as having been a "class clown" during his childhood. *See* S.F. Trial, Vol. 45/53 [ECF no. 53-36], at 46-47; S.F. State Habeas Hearing, Vol. 7/23 [ECF no. 54-8], at 49, 52, 54-55. Dr. Mesibov testified that individuals with ASD rarely learn to live independently as adults. Yet it was undisputed that Brown had managed to do so well into his thirties. Dr. Mesibov

testified that individuals on the ASD spectrum rarely manage to obtain or maintain employment without substantial assistance. Yet Brown's mother testified that Brown had been employed by an aircraft company and left that position, not because he was unable to perform his duties, but because he chose not to be subjected to random drug testing. *See* S.F. State Habeas Hearing, Vol. 11/23 [ECF no. 54-11], at 118. It was also established at trial that Brown had worked for many years as a sign maker and had even briefly operated his own sign company. *See id.* at 119. There was no evidence suggesting that Brown ever required assistance to perform his job duties. Dr. Mesibov testified that individuals with ASD rarely ever enter into romantic relationships or marry. Yet the evidence at Brown's trial showed that he had managed to date, marry, and remain married long enough to father two children with a young woman who had a career as a high school teacher and earned a doctorate in literature. Finally, Dr. Mesibov testified that one of the key indicators of ASD is an inability to communicate, particularly through facial expressions. Yet Brown's mother testified that she felt comfortable leaving Brown to care for his severely physically and intellectually challenged younger brother in part because Brown had learned how to communicate with his brother through facial expressions. *See* S.F. State Habeas Hearing, Vol. 11/23 [ECF no. 54-11], at 88, 97, 132.

Other than his complaints about a failure to investigate ASD, Brown's *Wiggins* claim amounts to little more than complaints that his trial counsel should have supplemented his testimony as well as that of his two mental health experts with more lay testimony from individuals who could have corroborated specific details of

Brown's lengthy history of childhood family dysfunction, aberrational behavior by his parents, and Brown's own sexual abuse. But, at the punishment phase of trial, the prosecution never sought to disprove any of the mitigating evidence furnished at trial by Brown or his experts concerning Brown's background. Instead, the prosecution merely argued that that evidence presented by Brown did not support an affirmative finding to the mitigation special issue or a negative finding to the future dangerousness special issue. And, so, corroborating the testimony of Brown and his family, as well as that of Brown's mental health experts, on the details of Brown's background would have accomplished little to furnish additional mitigating evidence. The prosecution did not attack the credibility of Brown's witnesses concerning the details of his background. Instead, the prosecution argued that it was insufficient to warrant a sentence of life without parole. Brown's trial counsel cannot reasonably be faulted for failing to present more of the same type of evidence concerning Brown's background. A failure to present cumulative testimony cannot be the basis of a claim of ineffective assistance. *See Howard*, 959 F.3d at 173; *Norman*, 817 F.3d at 233; *Richards*, 566 F.3d at 568.

The state habeas court's conclusion that the performance of Brown's trial counsel during the punishment phase of trial did not fall below an objective level of reasonableness was itself objectively reasonable. For the reasons discussed above, under the doubly deferential standard for reviewing ineffective assistance claims under the AEDPA, the state habeas court's conclusion on this point is unassailable.

## (2) No Prejudice

The state habeas trial court also concluded Brown's complaints about the failure of his trial counsel to investigate and present evidence of ASD, as well as supplement his mitigating evidence with eyewitness testimony of incidents corroborating Brown's trial testimony and that of his family, friends, and mental health experts, did not satisfy the prejudice prong of *Strickland*. *See* FCR, 49-50 [ECF no. 59-7, pp. 308-09 of 409]. The state habeas court reasonably concluded there was no reasonable probability that, but for the failure of Brown's state trial counsel to present evidence that Brown suffers from ASD and to present additional evidence supplementing the extensive trial testimony of Brown himself, his family and friends, and his mental health experts regarding Brown's background, the outcome of the punishment phase of Brown's capital murder trial would have been any different.

Dr. Mesibov's testimony regarding ASD during Brown's state habeas proceeding raised a number of potentially problematic concerns for Brown's trial counsel. As explained above, both attorneys Wilkerson and Ferguson expressed concern over presenting evidence showing that Brown suffered from a permanent developmental disorder. They preferred to portray Brown's capital offense as the result of substance abuse and rising emotional conflict between Brown and Ray, as opposed to mental health issues. Dr. Mesibov testified that ASD is typified by difficulties in cognitive functioning, difficulties in executive functioning, difficulty in expressing one's own emotions and understanding those of others, social isolation, poor organizational ability, difficulty in working memory, concrete thinking, intense sensory perception, difficulties processing language, a propensity toward anxiety and

depression, impulsivity, attention disorders, and difficulty coping with trauma. *See* Testimony of Dr. Gary Mesibov, S.F. State Habeas Hearing, Vol. 7/23 [ECF no. 54-7], at 27-176, 212-14. Dr. Mesibov was confident that Brown displayed most of these characteristics. But he was unable to identify any objective tests for the condition or a recognized cause for the condition beyond noting some studies suggesting a possible genetic link and some possible environmental factors such as exposure to plastics and insecticides. *See id*. at 215-28.

Dr. Mesibov also testified that individuals with ASD (1) tend to become overwhelmed when put under stress and that the results are sometimes dangerous for themselves and others; (2) have difficulty dealing with conflict and social interactions; and (3) lack insight into their own behavior. *See* Testimony of Dr. Gary Mesibov, S.F. State Habeas Hearing, Vol. 8/23 [ECF no. 54-8], at 117-18, 121-22, 140. A rational jury could construe such testimony as indicating that a diagnosis of ASD would render an individual potentially dangerous in the future. As attorney Ferguson observed during her testimony at Brown's state habeas corpus evidentiary hearing, evidence of ASD or a similar neurodevelopment defect could have proven double-edged in nature.

And a failure to investigate, develop, and present double-edged evidence does not prejudice a criminal defendant within the meaning of *Strickland* at sentencing. *See Gray v. Epps*, 616 F.3d 436, 449 (5th Cir. 2010) (no prejudice resulted from failure to present evidence showing the defendant's difficult childhood resulted in a diagnosis of conduct disorder and finding the defendant was antisocial, aggressive, and

"disturbed"); *Martinez v. Quarterman*, 481 F.3d 249, 258-59 (5th Cir. 2007) (no prejudice resulted from failure to investigate temporal lobe epilepsy because evidence was double-edged in nature and experts disagreed over the efficacy of the evidence supporting the diagnosis); *Johnson v. Cockrell*, 306 F.3d 249, 251 (5th Cir. 2002) (no prejudice resulted from failure to present evidence of defendant's history of head injuries, physical and sexual abuse, behavioral instability, substance abuse, and organic brain impairment which rendered the defendant unable to conform his behavior to the requirements of the law); *Dowthitt v. Johnson*, 230 F.3d 733, 744-45 (5th Cir. 2000) (no prejudice resulted from failure to discover and present medical records showing the defendant had brain damage because such evidence was double-edged in nature).

## (3) Conclusions

The Texas Court of Criminal Appeals's rejection on the merits during Brown's state habeas corpus proceeding of Brown's complaints about his trial counsel's failure to investigate his background and present evidence at the punishment phase of trial regarding Brown's alleged ASD and additional evidence of Brown's abusive and problematic background was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Brown's trial and state habeas corpus proceedings. The state habeas court reasonably concluded that the performance of Brown's state trial counsel did not fall below an objective level of

reasonableness and did not prejudice Brown within the meaning of *Strickland*. The Court should deny relief on Brown's second claim for federal habeas corpus relief.

## b. De Novo Review

The undersigned has also undertaken a careful and thorough review of all of the evidence presented at Brown's trial, direct appeal, and state habeas corpus proceedings, including all of the affidavits and other documents that the state habeas court refused to consider under applicable state evidentiary rules (such as the report of Dr. Laurie Sperry found at ECF no. 59-7, pp. 2-57 of 409) but which were attached to Brown's state habeas corpus application or otherwise made a part of the record during Brown's state habeas corpus proceeding. Those documents appear at S.F. State Habeas Hearing, Vols. 13/23 through 23/23 [ECF nos. 54-13 to 57-6 and 58-3 to 59-7]. The undersigned has also undertaken thorough review of the exhibits attached to Brown's petition for federal habeas relief, including the report of Dr. Mendel attached as ECF no. 29-2.

## (1) No Deficient Performance

After de novo review of the entire record now before this Court, the undersigned concludes that. with regard to the investigation of Brown's background and presentation of available mitigating evidence, the performance of Brown's trial counsel at the punishment phase of trial did not fall below an objective level of reasonableness.

The case in mitigation actually presented by Brown's trial counsel was extensive. Brown himself testified in detail about his upbringing, including his

dysfunctional family, his history of childhood sexual abuse, and his long history of substance abuse and addiction, as well as the emotional problems that he experienced leading up to Ray's murder. Brown's older sister testified at trial about the sexual abuse she suffered at the hands of Brown's stepfather. Brown's biological parents both testified at trial regarding their divorce and the difficulties that Brown faced as a child. Brown's older sister, parents, friends, and spiritual advisers testified to Brown's redeeming character traits. Brown's childhood neighbor testified that Brown had saved her life by using the Heimlich maneuver on an occasion when she was choking. Hunt County jail staff testified regarding Brown's exemplary behavior in jail while awaiting trial for more than two-and-a-half years. Dr. Lundberg-Love attempted to detail Brown's history of substance abuse and furnished insight into the mechanisms of addiction that she opined had taken control of Brown's thought processes and behavior at the time of his capital offense. Dr. Cunningham testified at great length about the many difficulties that Brown had faced growing up and explained how those factors had impacted Brown's development. Both Dr. Lundberg-Love and Dr. Cunningham opined that, if kept in a secure environment free of drugs, Brown would nonetheless pose a very low risk of future violence.

The undersigned finds that the new or additional potentially mitigating evidence that Brown offered the state habeas court, and which he offers this Court, did not add anything significant to the expansive case in mitigation that his trial counsel actually presented at Brown's trial. Dr. Lundberg-Love and Dr. Cunningham presented lengthy and exhaustive testimony describing the many challenges that

Brown faced growing up and during his early adult years. Brown's trial counsel cannot reasonably be faulted for failing to present testimony corroborating specific details of Brown's dysfunctional childhood, history of sexual abuse, and lengthy history of substance abuse. As explained above, the prosecution made no effort to challenge the factual accuracy of Brown's mitigation witnesses' testimony about Brown's background. Nor did the prosecution offer any expert testimony challenging the opinions offered by Dr. Lundberg-Love or Dr. Cunningham.

Instead, the prosecution argued essentially that, even if all of Brown's witnesses were believed, their testimony did not, in light of the circumstances of Brown's capital offense and his demonstrated demeanor and behavior during his post-arrest interviews, warrant an affirmative answer to the mitigation special issue. The prosecution also argued that Brown's propensity for future violence was established by virtue of the circumstances of his offense, his demonstrated lack of remorse for same, and his letter to Casper in which he not only denied feeling any remorse for killing Ray but indicated a desire to kill Tracy Williams if given the opportunity. Brown's trial counsel could reasonably have believed that presenting additional witnesses to testify about the details of, or to offer anecdotes about, Brown's background or good character would do little to counter the thrust of the prosecution's aggravating evidence.

And, for the same reasons noted by the state habeas trial court in its findings addressing Brown's first claim for state habeas relief, there was nothing objectively unreasonable about the decision by his trial counsel not to investigate the possibility

that Brown suffered from ASD or any other neurodevelopmental disorder not identified by the defense's two mental health experts. It was undisputed that neither Dr. Lundberg-Love nor Dr. Cunningham recommended to Brown's trial counsel that additional testing be performed on Brown. Brown's lead trial counsel, attorney Wilkerson, testified without contradiction that he advised the defense's mental health experts to conduct any testing that they deemed advisable and that he was never informed by either expert that any additional testing of Brown was required. Dr. Mesibov testified at great length about the difficulty in properly making a diagnosis of ASD. Brown's trial counsel cannot reasonably be faulted for failing to pursue an area of investigation that was (1) not recommended to them by either of their qualified mental health experts; (2) far from obvious to even a skilled mental health practitioner; and (3) at best likely to provide evidence that was double-edged.

Both of Brown's trial counsel testified during his state habeas hearing that they did not believe it prudent to explore each and every aspect of Brown's mental health unless they had some valid reason to believe that such an exploration might prove fruitful. The Supreme Court has explained that it is not incumbent on defense counsel to scour the globe for mitigating evidence. *See Rompilla v. Beard*, 545 U.S. 374, 383 (2005) (the duty to investigate does not require defense counsel to scour the globe on the off chance that something will turn up); *Thomas v. Lumpkin*, 995 F.3d 432, 456 (5th Cir. 2021) (the same). Nothing in any of the new or additional evidence presented by Brown establishes that it was objectively unreasonable for attorneys Wilkerson and Ferguson to rely on Dr. Cunningham's diagnosis of Brown's ADHD,

depression, and anxiety disorder, especially when that diagnosis dovetailed with the views expressed by Dr. Lundberg-Love regarding the etiology and trajectory of Brown's history of substance abuse and addiction.

Attorneys Wilkerson and Ferguson testified without contradiction during Brown's state habeas corpus proceeding that (1) they observed nothing about Brown's demeanor that led them to believe he was intellectually disabled or mentally ill; (2) everyone with whom the defense spoke described Brown as a "good kid" who had no history of psychological problems beyond being depressed to the point of exhibiting suicidal ideation at the time of Ray's murder; (3) they and their mental health experts attributed Brown's flat affect in his post-arrest interviews to Brown's substance abuse, addiction, depression, and anxiety disorder; and (4) they would have been hesitant to present evidence showing that Brown suffered from a permanent mental illness or an organic brain disorder because such evidence would have undermined the defense's punishment phase strategy of presenting evidence arguing that Brown's substance abuse was the primary source of Brown's emotional volatility at the time of Ray's murder and would not be a factor if Brown were sentenced to a term of life imprisonment.

Even when viewed in the context of Dr. Sperry's report, as well as the new affidavits furnished by Brown during his state habeas proceeding, the strategy employed by Brown's trial counsel was reasonable under the circumstances. The circumstances of Brown's capital offense were brutal. He fatally shot his former spouse in front of their two very young children after pursuing her some distance and

forcing her vehicle over while she was on the phone asking police for assistance. The evidence of Brown's guilt was overwhelming. Brown admitted that he intentionally shot Ray at point blank range. Brown's trial counsel knew this only too well. Brown had made a very poor impression in his videotaped post-arrest interviews. Brown's trial counsel reasonably expected that those videos would be admitted into evidence at trial. Under these circumstances, it was objectively reasonable for Brown's trial counsel to choose to present a defense at the punishment phase of trial based on the argument that, at the time of his brutal offense, Brown suffered from the deleterious influences of substance abuse, depression, and anxiety disorder – that is, transitory conditions that could be ameliorated in an institutional setting like a prison through medication and a structured environment.

As described by Dr. Mesibov, a diagnosis of ASD is double-edged in nature. Choosing the tactic now urged by Brown's federal habeas counsel – that is, arguing that Brown suffered from a neurodevelopmental disorder that rendered him prone to poor decision-making, albeit perhaps less morally blameworthy than other murderers – would have amounted to conceding the future dangerousness special issue and throwing a Hail Mary on the remaining mitigation special issue. It would also have done little to mitigate the overwhelming evidence showing that Brown felt little remorse immediately after his capital offense and was still intent on killing Tracy Williams if given the opportunity.

### (2) No Prejudice

For the same reasons discussed at length in Section VIII.E.3.a.(2) above, Brown was not prejudiced within the meaning of *Strickland* by his trial counsel's decision not to present additional anecdotal mitigating evidence detailing Brown's background. That testimony would have been cumulative of the extensive case in mitigation actually presented by Brown's trial counsel, which included Brown's own testimony during the guilt-innocence phase of trial and the lengthy testimony of both Dr. Lundberg-Love and Dr. Cunningham at the punishment phase of trial. *See Howard*, 959 F.3d at 173; *Norman*, 817 F.3d at 233; *Richards*, 566 F.3d at 568.

And Brown was not prejudiced by his trial counsels' failure to investigate, develop, and present double-edged evidence of ASD. *See Gray*, 616 F.3d at 449; *Martinez*, 481 F.3d at 258-59; *Johnson*, 306 F.3d at 251; *Dowthitt*, 230 F.3d at 744-45. The new affidavit furnished by Dr. Mesibov, the report of Dr. Sperry, and the report of Dr. Mendel all seek to furnish additional expert opinions supporting Dr. Mesibov's state habeas testimony establishing that Brown suffers from ASD. They also furnish little in the way of substantial evidence to mitigate the prosecution's aggravating evidence at the punishment phase of trial. On the contrary, Dr. Mendel's report acknowledges that Brown's statement during his televised post-arrest interview that he shot Ray because he wanted her dead was "the factual truth." Mendel Report at 8. Likewise, Dr. Mendel's and Dr. Sperry's reports also acknowledge that Autism and Antisocial Personality Disorder share a common thread in that they both involve a lack of empathy. *See id.* at 8-9. Expert opinion testimony suggesting

that Brown's ability to express empathy was diminished could have been construed by a rational jury as also establishing Brown had a diminished ability to feel empathy.

And, when a criminal defendant seeks to introduce mental health evidence through a psychological expert who has evaluated the defendant, the prosecution is entitled to have its own expert examine and evaluate the defendant. *See Kansas v. Cheever*, 571 U.S. 87, 94 (2013). Had Brown's trial counsel chosen to present opinion evidence of the type furnished by Dr. Mesibov in his new affidavit or state habeas testimony or by Dr. Sperry or Dr. Mendel in their respective reports, the prosecution could have insisted on its right under *Cheever* to have Brown evaluated by its own qualified mental health professional.

Given the rejection of Dr. Mesibov's diagnosis of ASD by the state habeas trial court, the resulting confrontation of conflicting mental health experts could have turned into an instance of dueling diagnosticians debating the proper diagnosis for Brown. And this could have detracted from the central arguments of the defense's case at punishment – that Brown's homicidal conduct was the product primarily of transitory factors such as depression, anxiety, and substance abuse, as opposed to a permanent condition such as mental illness or organic brain disfunction, and that Brown's exemplary behavior in jail while awaiting trial showed his demonstrated propensity to be non-violent once removed from the sources of his addiction. And the prosecution's mental health evaluation of Brown could have resulted in a diagnosis of a personality disorder detrimental to Brown's chances of obtaining a life sentence.

In sum, there were significant risks involved in Brown's trial counsel turning the punishment phase of trial into a battle of the experts.

In evaluating prejudice under *Strickland* in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *See Wong*, 558 U.S. at 20; *Wiggins*, 539 U.S. at 534. *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a trial would have been different. *Wong*, 558 U.S. at 27. Within the context of *Strickland* analysis, "prejudice" means a reasonable probability the result of the proceeding would have been different. *See Hinton v. Alabama,* 571 U.S. 263, 275 (2014). To satisfy the prejudice prong, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112 (quoting *Strickland*, 466 U.S. at 693).

The undersigned independently concludes after de novo review of the entire record from Brown's trial, direct appeal, and state habeas corpus proceedings, as well as all the new documents presented to this Court by Brown's federal habeas counsel, that there is no reasonable probability that, but for the failure of Brown's trial counsel to present expert mental health opinion testimony in accord with the state habeas testimony and affidavit of Dr. Mesibov, the report of Dr. Sperry, and the report of Dr. Mendel, the outcome of the punishment phase of Brown's capital murder trial would have been any different. That is primarily because the new evidence offered by Brown

concerning his ASD condition did nothing to ameliorate or mitigate most of the prosecution's overwhelming aggravating evidence. And there is a real possibility, perhaps even a probability, that Brown's jury would have found testimony from Drs. Mesibov, Sperry, and Mendel that Brown suffered from ASD to be no more credible than the state habeas court found Dr. Mesibov's state habeas testimony. Nothing in the new affidavit from Dr. Mesibov or the reports of Dr. Sperry and Dr. Mendel adequately addresses the apparent holes in Dr. Mesibov's diagnosis pointed out during his lengthy cross-examination at Brown's state habeas hearing.

Brown committed a brutal and violent offense. He murdered his ex-wife in front of their young children by shooting her in the face at point blank range with a shotgun he had just stolen, taken to his home, sawed off, and loaded with slugs he used for hunting wild hogs. While Brown has consistently argued that he was not aware that his children were in the back seat of Ray's vehicle when he fired the fatal shot, there was ample evidence in the record from which a rational jury could have concluded that Brown could or should have known otherwise.

Brown testified that he went to Ray's residence the day of the murder and found no one home but the house unlocked. He admitted that he used the opportunity to enter the home and steal Wesley Williams' shotgun as well as some marijuana and a basket containing a camera with photographs of Ray's injured face taken after their violent encounter the day before. Thus, Brown was aware that there was no one else at Ray's home who could have watched the children. Brown also telephoned Ray's mother the same day in a purported attempt to locate Ray and their children. He did

not thereafter go to the home of Ray's mother. Instead, Brown testified that, when he saw Ray's vehicle drive past his own home later that evening, he got into his vehicle and pursued Ray, shouting at her and demanding that she tell him where their children were. From this evidence, a rational jury could infer that Brown did not believe that the children were with Ray's mother. Given the facts that Ray was driving at a late hour, there was no one else at Ray's home to watch the children, and that the children were apparently not with Ray's mother, a rational jury could have inferred that Brown should have known or at least suspected that his children were with their mother.

Brown's conduct immediately after his offense demonstrated conscious awareness of his own guilt. Immediately after Ray's murder, Brown admitted that he sped off in his vehicle and took extreme steps to conceal himself from law enforcement officers, including breaking out the head lights on his vehicle and diving into a lake to avoid detection by a helicopter overhead. Under Texas law, evidence of flight evinces a consciousness of guilt. *See Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007); *Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994).

Following his arrest, Brown gave videotaped interviews with law enforcement officers and a television reporter in which he demonstrated in his tone of voice and facial expression a lack of remorse for his offense. In their testimony during Brown's state habeas evidentiary hearing, his trial counsel described Brown's demeanor during his post-arrest interviews in stark terms, including "horrific" and "crazy." Brown now argues that expert testimony from Dr. Mesibov, Dr. Sperry, and Dr.

Mendel diagnosing Brown with ASD would have contextualized Brown's flat affect and explained to the jury that Brown was incapable of expressing genuine emotion through his tone of voice or facial expression. As pointed out by Dr. Mendel in his report, a rational jury could have construed such testimony as indicating that Brown was constitutionally incapable of experiencing or expressing empathy.

Simply put, testimony such as Dr. Mesibov's during Brown's state habeas hearing showing that Brown had genuine problems expressing his own emotions and in perceiving the emotions of others could have been used by the prosecution to argue that Brown would pose a risk of future violence. That is especially so given Dr. Mesibov's other testimony described above suggesting that individuals with ASD are prone to impulsivity, irritability, frustration, and feelings of being overwhelmed (because of their poor communication skills), which can result in negative consequences to them and others. A diagnosis of ASD as described by Dr. Mesibov, Dr. Sperry, and Dr. Mendel, would have been double-edged evidence.

And nothing in any of the new expert opinion evidence concerning ASD presented during Brown's state habeas corpus proceeding or offered by Brown's federal habeas counsel to this Court would have done anything to confront the fact that Brown admitted during his trial testimony that he wrote the note to Casper in which he not only vehemently denied any remorse over Ray's death but he also stated he would kill Tracy Williams if he ever got the opportunity to do so. The chilling impact of that note on the jury's punishment phase deliberations is not mitigated, diminished, or offset by the new expert opinion testimony suggesting that Brown

suffers deficits in his ability to express or recognize emotions through his vocal intonation or facial expressions. Brown's written words demonstrated a lack of remorse for his capital offense and a willingness to kill again if given the opportunity. It was not Brown's facial expressions or tone of voice during his post-arrest interviews alone but his words that proved most harmful to the efforts of his trial counsel to convince his jury to give Brown a life sentence.

The undersigned concludes after de novo review of all of Brown's new evidence that there is no reasonable probability that, but for the failure of Brown's trial counsel to present additional evidence regarding Brown's background or expert opinions like those of Dr. Mesibov, Dr. Sperry, and Dr. Mendel diagnosing Brown with ASD, the outcome of the punishment phase of Brown's capital murder trial would have been any different.

### (3) Conclusions

After de novo review, the undersigned concludes that Brown's complaints in his second claim for federal habeas relief about his trial counsels' failures to present evidence of ASD and additional evidence detailing Brown's difficult, abusive, and problematic childhood, history of substance abuse and addiction, history of childhood sexual abuse, depression, suicidal ideation, and other aspects of Brown's background fail to satisfy either prong of *Strickland*.

The Court should deny this portion of Brown's second claim for federal habeas relief.

### 4. Failure to Object to Prosecutorial Punishment Phase Jury Argument

### a. The Claim

Brown argues near the end of his second claim for federal habeas corpus relief that his trial counsel rendered ineffective assistance by failing to object to allegedly improper prosecutorial jury argument at the punishment phase of trial. *See* ECF no. 29, 107-09.

### b. State Court Disposition

In his third ground for state habeas corpus relief, Brown argued that his trial counsel rendered ineffective assistance by failing to object to allegedly improper prosecutorial jury argument at the punishment phase of trial, citing the same alleged defects identified and discussed at length in Section VII above. *See* State Habeas Application, 69-80 [ECF no. 58-3, pp. 91-104 of 355]. Brown's third ground for state habeas relief is broader and more detailed than his corresponding ineffective assistance complaint at the end of his second ground for federal habeas relief.

The state habeas trial court found that (1) the prosecutor's punishment phase jury argument suggesting Brown felt no remorse for killing Ray was a proper summation of the evidence or reasonable inference drawn from Brown's guilt-innocence phase trial testimony as well as Brown's telephone call to Loren Homerstead and Brown's post-arrest letter to Casper; (2) the prosecutor's comments about Brown's lack of remorse were also a proper response to defense counsel's closing jury argument; (3) any objection by Brown's trial counsel to the prosecutor's comments about Brown's lack of remorse on the ground that those comments were a comment on Brown's failure to testify would have been futile; (4) Brown's trial counsel

did in fact object to the prosecutorial arguments suggesting Tracy Williams was not safe from Brown; (5) Brown's trial counsel, having twice been overruled after objection to the prosecutor's arguments regarding a loaded shotgun and Tracy Williams, was not deficient in failing to object further to similar arguments; (6) the prosecutor's argument concerning Brown and Tracy Williams was a proper response to defense counsel's argument paraphrasing Dr. Cunningham's testimony and a proper summation of the evidence; (7) Brown failed to prove that the prosecutor waved the murder weapon at the jury during closing jury argument; and (8) the prosecution's handling of the murder weapon was not improper. *See* FCR, 30-38, ¶¶140-72 [ECF no. 59-7, pp. 289-297 of 409].

### c. AEDPA Review

For the same reasons discussed at length in Section VIII above, the state habeas court reasonably concluded that Brown's complaints about his trial counsel's failure to object to allegedly improper prosecutorial punishment phase jury argument all fail to satisfy both prongs of *Strickland*. All of the objections Brown now argues that his trial counsel should have made were reasonably concluded by the state habeas court to be either futile, meritless, or frivolous.

### (1) No Deficient Performance

There was nothing objectively unreasonable with the failure of Brown's trial counsel to make such meritless or futile objections. A failure to make a futile or meritless objection or motion or the failure to raise a meritless claim cannot form the basis for a finding of deficient performance under *Strickland*. *See Guidry v. Lumpkin*,

2 F.4th 472, 491 (5th Cir. 2021) (defense counsel cannot be ineffective for failure to raise a meritless claim), *cert. denied*, 143 S. Ct. 1212 (2022); *Evans v. Davis*, 875 F.3d 210, 219 (5th Cir. 2017) ("Obviously, counsel is not deficient for failing to make meritless suppression motions."); *Segundo v. Davis*, 831 F.3d 345, 350-51 (5th Cir. 2016) (counsel not ineffective for filing to raise a meritless claim); *Reed v. Stephens*, 739 F.3d 753, 778 (5th Cir. 2014) (failure to assert a meritless objection is not grounds for deficient performance (citing *Clerk v. Thaler*, 673 F.3d 410, 427 (5th Cir. 2012)); *Roberts v. Thaler*, 681 F.3d 597, 612 (5th Cir. 2012) (failure to lodge futile objections does not qualify as ineffective assistance).

Because, as explained in Section VII above, all of the objections that Brown now argues that his trial counsel should have made to various aspects of the prosecution's punishment phase jury argument would have been futile, if not frivolous, there was nothing objectively unreasonable with the failure of his trial counsel to raise such futile or meritless objections.

### (2) No Prejudice

And the failure of Brown's trial counsel to raise such futile or meritless objections did not prejudice Brown within the meaning of *Strickland. See Young v. Davis*, 835 F.3d 520, 528 n.36 (5th Cir. 2016) (failure to raise a meritless claim did not prejudice defendant within the meaning of *Strickland*); *Garza v. Stephens*, 738 F.3d 559, 677 (5th Cir. 2013) (failure to attempt to introduce inadmissible evidence did not prejudice the defendant); *Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir. 2009) (failure to make a meritless objection did not prejudice defendant); *United*

*States v. Kimler*, 167 F.3d 889, 873 (5th Cir. 1999) (failure to raise a meritless argument was not prejudicial because the outcome of the proceeding would not have been different had the attorney raised the issue); *Teague v. Scott*, 60 F.3d 1167, 1174 (5th Cir. 1995) (state appellate counsel's failure to raise a claim on direct appeal that lacked merit did not prejudice the defendant under *Strickland*); *Smith v. Puckett*, 907 F.2d 581, 585 (5th Cir. 1990) (failure to challenge identification procedure did not prejudice defendant where there was no evidence the identification procedure was suggestive). The failure of Brown's trial counsel to raise meritless objections to the identified prosecutorial jury argument did not prejudice Brown within the meaning of *Strickland*.

### (3) Conclusions

Because Brown's complaints about the failure of his trial counsel to object to prosecutorial jury argument at the punishment phase of trial satisfy neither prong of *Strickland*, the Texas Court of Criminal Appeals's rejection on the merits of Brown's third ground for state habeas relief was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Brown's trial and state habeas corpus proceedings. The Court should deny relief on this aspect of Brown's second federal habeas corpus claim.

### d. De Novo Review

Out of an abundance of caution, the undersigned has also undertaken de novo review of this aspect of Brown's second claim for federal habeas relief. For the reasons discussed at length in Section VII above, Brown's complaints about his trial counsel's failures to object to identified aspects of the prosecution's punishment phase jury argument do not satisfy either prong of *Strickland*. There was nothing objectively unreasonable with the failure of Brown's trial counsel to make any of the futile, meritless, or frivolous objections now urged by Brown's federal habeas counsel. Nor was Brown prejudiced within the meaning of *Strickland* by his trial counsels' failure to make any of those same objections. *See Kimler*, 167 F.3d at 893 (failure to raise an argument lacking in merit cannot prejudice a defendant because there is no possibility of a different outcome had counsel raised the argument). Even if reviewed under a de novo standard, the Court should deny relief on this aspect of Brown's second federal habeas claim.

### 5. Conflict of Interest

#### a. The Claim

In his third claim for federal habeas relief, Brown argues for the first time that his trial counsel operated under a conflict of interest arising from the fact that the defense team's fact investigator's wife was a potential witness to drug use by Ray. *See* ECF no. 29, at 113-21. More specifically, Brown alleges that his trial counsel chose loyalty to their fact investigator James Smith over loyalty to Brown by failing to call Smith's wife to testify at trial regarding Ray's drug use. Brown argues that he is

entitled to a presumption of prejudice under the Supreme Court's holding in *Cuyler v. Sullivan*, 446 U.S. 335 (1980).

Because Brown chose not to fairly present this claim to the state courts on direct appeal or in his state habeas corpus proceeding, this Court's review will be de novo.

### b. De Novo Review

As explained above, to satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *See Wiggins*, 539 U.S. at 534; *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *See id.*

In *United States v. Cronic*, 466 U.S. 648 (1984), decided the same day as *Strickland*, the Supreme Court held that a presumption of prejudice similar to that recognized in *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980), arises in three narrow circumstances: first, when a criminal defendant is completely denied the assistance of counsel; second, when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and third, where the circumstances are such that even competent counsel very likely could not render effective assistance. *See Cronic*, 466 U.S. at 659. As examples of the latter two situations, respectively, the Supreme Court cited the denial of effective cross-examination in *Davis v. Alaska*, 415 U.S. 308, 318 (1974) (defendant was denied the opportunity to cross-examine the prosecution's

key witness for bias), and the incendiary circumstances surrounding the trial of the so-called "Scottsboro Boys" addressed in *Powell v. Alabama*, 287 U.S. 45 (1932) (no individual attorney was appointed to represent the defendants and trial proceeded after a volunteer attorney from another state appeared on the first day of trial but confessed he had not had an opportunity to prepare for trial). *Cronic*, 466 U.S. at 659-61. In a footnote, the Supreme Court recognized the continuing efficacy of its earlier holding in *Cuyler*, presuming prejudice where a defendant establishes an actual conflict of interest adversely affected his counsel's performance. *See Cronic*, 466 U.S. at 661 n.31.

In *Bell v. Cone*, 535 U.S. 685, 695-96 (2002), the Supreme Court reiterated that the second exception to the requirement of *Strickland* "prejudice" that it had envisioned in *Cronic* was limited to situations in which defense counsel completely failed to subject the prosecution's case to meaningful adversarial testing. *See Bell*, 535 U.S. at 697-98 (holding complaints about trial counsel's waiver of closing argument at the punishment phase of trial and failure to adduce mitigating evidence insufficient to create a presumption of prejudice absent a showing trial counsel completely failed to challenge the prosecution's case throughout the sentencing proceeding). Simply put, garden-variety ineffective assistance claims of the nature asserted by Brown do not warrant application of the presumption of prejudice recognized in *Cronic*.

The presumption of prejudice recognized in *Cronic* does not apply where the petitioner complains of merely shoddy or poor performance by his trial counsel; for a

defendant to be entitled to such a presumption, his attorney's failure must be complete. *See Bell*, 535 U.S. at 697 (holding the presumption applicable only when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing); *United States v. Griffin*, 324 F.3d 330, 364, 364 (5th Cir. 2003) ("When the defendant complains of errors, omissions, or strategic blunders, prejudice is not presumed; bad lawyering, regardless of how bad, does not support the *per se* presumption of prejudice."); *Riddle v. Cockrell*, 288 F.3d 713, 718 (5th Cir. 2002) (holding "constructive denial of counsel" sufficient to support a presumption of prejudice arises only when counsel was absent from the courtroom, there was an actual conflict of interest, or there was official interference with the defense); *Mayo v. Cockrell*, 287 F.3d 336, 340 n.3 (5th Cir. 2002) (holding the same); *Burdine v. Johnson*, 262 F.3d 336, 344 n.4 (5th Cir. 2001) (holding the same); *Gochicoa v. Johnson*, 238 F.3d 278, 284 (5th Cir. 2000) ("'A constructive denial of counsel occurs in only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all.' We have found constructive denial in cases involving the absence of counsel from the courtroom, conflicts of interest between defense counsel and the defendant, and official interference with the defense; and have stated that constructive denial will be found when counsel fails to subject the prosecution's case to any meaningful adversarial testing." (citations and footnote omitted)).

A lawyer's conflict of interest may be so flagrant as to constitute a violation of the Sixth Amendment. *See Holloway v. Arkansas*, 435 U.S. 475, 484 (1978), *United*

*States v. Gentry*, 941 F.3d 767, 776 (5th Cir. 2019); *United States v. Simpson*, 645 F.3d 300, 310 (5th Cir. 2011). When a conflict of interest springs from multiple representation, a presumption of prejudice under *Cuyler* governs. *See United States v. Palacios*, 928 F.3d 450, 455 (5th Cir. 2019); *Black v. Davis*, 902 F.3d 541, 547 n.2 (5th Cir. 2018); *Beets v. Scott*, 65 F.3d 1258, 1265-66 (5th Cir. 1995). Under this standard, a defendant must show that his counsel labored under an actual conflict of interest that adversely affected his performance at trial. *See Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002); *Palacios*, 928 F.3d at 455. An actual conflict of interest exists when defense counsel is compelled to compromise his duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client. *See Palacios*, 928 F.3d at 455; *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000). An adverse effect may be established with evidence that some plausible alternate defensive strategy or tactic could have been pursued but was not because of the actual conflict impairing counsel's performance. *See Palacios*, 928 F.3d at 455; *Perillo*, 205 F.3d at 781.

Where an attorney's alleged conflict of interest springs not from multiple client representation, but from a conflict between the attorney's personal interest and that of his client, the standard of *Strickland* applies, and the presumption of prejudice under *Cuyler* does not. *See Gentry*, 941 F.3d at 776-77; *Black*, 902 F.3d at 547 n.2; *United States v. Bernard*, 762 F.3d 467, 476 (5th Cir. 2014); *United States v. Newell*, 315 F.3d 510, 516 (5th Cir. 2002); *Beets*, 65 F.3d at 1260.

Brown alleges that his trial counsel was forced to choose between divergent loyalties to Brown and counsel's working relationship with their fact investigator James Smith – who allegedly did not wish for his wife to be called as a witness at trial. Brown does not allege that his trial counsel ever represented Smith or Smith's wife. Thus, the conflict of interest alleged by Brown does not involve a multiple representation situation and, therefore, is not of the variety governed by *Cuyler*'s presumption of prejudice. Brown must, therefore, satisfy the dual prongs of *Strickland*. *See Bernard*, 762 F.3d at 476; *Newell*, 315 F.3d at 516.

But, at trial, Brown, his sister Taylor Harmon, and Brown's mother all testified that Ray had used drugs at one time or another. The medical examiner testified without contradiction that Ray's post-mortem toxicology screen had tested positive for metabolites of marijuana. At best then, Brown alleges that Smith's wife could have offered cumulative testimony at trial -- testimony showing that she had witnessed Ray using drugs on some unspecified occasion or occasions.

The failure of Brown's trial counsel to present cumulative testimony showing that Ray had used narcotics at some point in the past did not prejudice Brown within the meaning of *Strickland*. *See Howard*, 959 F.3d at 173; *Norman*, 817 F.3d at 233; *Richards*, 566 F.3d at 568. There is no reasonable probability that, but for the failure of Brown's trial counsel to present more evidence of Ray's alleged drug abuse in the past, the outcome of either phase of Brown's capital murder trial would have been any different. Ray's possible use of drugs at some unspecified point in the past was irrelevant and immaterial to any issue properly before the jury at the guilt innocence

phase of trial. And additional evidence of Ray's possible past drug use was not reasonably likely to have had any impact on the jury's answers to either of the Texas capital sentencing special issues. Ray's drug use was unrelated to the issues of Brown's future dangerousness or moral culpability, and Brown did not offer any evidence suggesting that he was aware at the time he murdered Ray that she was then using drugs or that her past drug use played any role in his decision to kill her.

The decision by Brown's trial counsel not to attack Ray's reputation further was objectively reasonable. If Brown's trial counsel had attempted to smear Ray's reputation by further emphasizing her alleged drug use, that effort might have proven counter-productive. Brown himself admitted during his trial testimony that he began abusing alcohol in his early teens and began using cocaine and methamphetamine in his late teens, all long before he began dating Ray. Brown admitted during his post-arrest televised interview that his marriage to Ray broke up because of his continued use of pain medication, not because of any substance abuse by Ray. Brown admitted that, at the time of his altercation with Ray the night before her murder, Brown had been using methamphetamine for multiple days, had not slept, and was also abusing cocaine and alcohol.

An aggressive prosecutor could have used Brown's insistence on calling the wife of James Smith as a witness as a springboard to attack Brown's polysubstance abuse in the days leading up to the murder and to remind the jury that Brown had admitted that he poked Ray in the face after she refused to allow him to drive off with their children – possibly because she recognized that Brown was intoxicated or under

the influence at the time. "He murdered her for having the wherewithal to not allow her children to drive off with her obviously impaired ex-husband," the prosecution could have justifiably argued in a proper summation of, or reasonable inference from, the evidence. The prosecution could then have asked the jury the rhetorical question as to whom they believed it was safer for the two young children to be driving with – their intoxicated biological father or their mother, who was preparing to move out of town and begin a new career teaching at a community college after earning her doctorate.

Further emphasizing Ray's alleged drug abuse in the past could have opened the door to prosecutorial argument rhetorically inviting the jury to weigh the relative characters of the victim against that of her remorseless perpetrator. Brown's trial counsel introduced ample evidence showing that Ray had used drugs in the past. Further emphasizing that point could have backfired and proven harmful to their efforts to obtain a life sentence for Brown. It could have opened the door to argument from the prosecution that Brown was attempting to smear the reputation of someone he had brutally murdered while himself high on drugs. Brown's trial counsel cannot reasonably be faulted for failing to pursue a course of conduct at trial that would likely have produced only cumulative evidence and opened the door to potentially damaging rebuttal arguments by the prosecution.

And Respondent correctly points out that Brown has failed to allege any facts or furnish this Court with any evidence showing that the wife of James Smith was available at the time of Brown's capital murder trial to furnish any testimony

favorable to the defense. Ordinarily, to prove prejudice under *Strickland* in connection with an ineffective assistance claim premised upon an uncalled witness, a criminal defendant must do more than make naked assertions – the petitioner must (1) name the witness, (2) demonstrate that the witness was available to testify and would have testified, (3) set out the content of the witness's proposed testimony, and (4) show the testimony would have been favorable to a particular defense. *See., e.g.*, *Nelson v. Davis*, 952 F.3d 651, 669 (5th Cir. 2020); *King v. Davis*, 883 F.3d 577, 590 (5th Cir. 2018); *Trevino v. Davis*, 829 F.3d 328, 338 (5th Cir. 2016); *United States v. Fields*, 761 F.3d 443, 461 (5th Cir. 2014); *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010); *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010); *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)). Brown has not furnished this Court with an affidavit from the wife of James Smith or any other evidence establishing that she was available at the time of Brown's capital murder trial and willing to furnish any testimony favorable to the defense.

### (c) Conclusions

Brown's conflict-of-interest-based ineffective assistance claim does not satisfy either prong of *Strickland*. The Court should deny Brown's third claim for federal habeas corpus relief.

### 6. Failure to Move for Change of Venue

### a. The Claim

In his fourth claim for federal habeas corpus relief Brown argues that his trial counsel rendered ineffective assistance by failing to move for a change of venue based upon intense pretrial publicity in Hunt County. *See* ECF no. 29, 121-28.

### b. State Court Disposition

In his fifth claim for state habeas relief, Brown argued that his trial counsel rendered ineffective assistance by failing to move for a change of venue. *See* State Habeas Application, 87-98 [ECF no. 58-3, pp. 109-20 of 355].

During the evidentiary hearing in Brown's state habeas corpus proceeding, his trial counsel both testified that they consulted with Brown and Brown's family and that their client decided against moving for a change of venue because (1) they believed they could get a favorable jury pool in Hunt County, where Brown's family was well known and Ray had a reputation for drug use; (2) moving to another county would likely result in a jury pool that would be unfamiliar with Brown's family and more likely to focus on the horrific facts of the offense; and (3) moving venue would likely necessitate the defense attacking the reputation of the victim, which is not a good strategy. *See* Testimony of Toby Wilkerson, S.F. State Habeas Hearing, Vol. 10/23 [ECF no. 54-10], at 100-01, 168-69; Testimony of Katherine Ferguson, S.F. State Habeas Hearing, Vol. 12/23 [ECF no. 54-12], at 58-60.

The state habeas trial court found that, (1) based upon the small percentage of the jury venire who were excused for cause because of their exposure to pretrial publicity, Brown failed to establish that pretrial publicity was widespread throughout Hunt County; (2) of the jury selected, six members did not indicate they knew

anything about the case, while eight indicated that they knew Ray had been a teacher but knew nothing else about Ray, did not know Brown, and had not read the paper or watched the news; (3) the eight jurors who had heard something about the case all testified during individual voir dire that they could set aside what they had heard and decide the case on the evidence presented at trial; (4) the jury was not tainted by pretrial publicity; (5) most of the news articles about the crime circulated about a year-and-a-half prior to trial; (6) other articles circulated in the Fall of 2011 in connection with Domestic Violence Awareness month in Hunt County; (7) the articles written in the months leading up to Brown's trial were factual reporting on the trial proceedings and did not address Ray's murder or domestic violence awareness month; (8) Brown's evidence failed to establish that inflammatory or prejudicial pretrial publicity took place prior to Brown's trial; and (9) Brown's trial counsel were not ineffective in failing to move for a change of venue because the trial court would have been fully justified in denying such a motion. *See* FCR, at 42-46, ¶¶ 180-215 [ECF no. 59-7, pp. 301-05 of 409]. The Texas Court of Criminal Appeals adopted these factual findings when it rejected Brown's state habeas application on the merits.

### c. AEDPA Analysis

Both of Brown's trial counsel testified they consulted with Brown and that Brown made the decision not to move for a change of venue in part because the defense wanted a Hunt County jury that was familiar with Brown's family's reputation in the community and aware of Ray's reputation in the community rather than having the case tried by twelve strangers. The state habeas trial court concluded

after careful review of the extent of pretrial publicity and the actual voir dire process that there had not been inflammatory or prejudicial pretrial publicity throughout Hunt County. Brown has failed to present this Court with any clear and convincing evidence showing that any of the state habeas court's factual findings addressing this ineffective assistance claim summarized above were erroneous.

Brown has failed to allege any facts showing that it was objectively unreasonable for his trial counsel to defer to Brown's own decision not to move for a change of venue. Nor does Brown present this Court with any clear and convincing evidence showing that he was prejudiced by his trial counsel's failure to disregard Brown's directive and move for a change of venue. Given the state habeas court's factual findings regarding the actual scope of pretrial publicity concerning the case in Hunt County, the lengthy passage of time between the broadcasting of Brown's confession and the start of jury selection, and the small portion of the entire jury venire dismissed for cause based on their knowledge of the case and inability to set same aside, the state habeas trial court reasonably concluded that there was no reasonable probability that a motion for change of venue would have been granted in Brown's case.

Insofar as Brown contends that he was entitled to a jury venire or jury that was totally ignorant of the facts of his case prior to trial, he is mistaken. Pretrial ignorance of the facts of a case by jurors is not the standard for determining whether a defendant has been afforded his constitutional right to an impartial jury. *See Tsarnaev v. United States*, 142 S. Ct. 1024, 1034 (2022) ("The right to an 'impartial'

jury 'does not require *ignorance.*'" (citing *Skilling v. United States*, 561 U.S. 358, 381 (2010)). Notorious crimes are, almost as a matter of necessity, brought to the attention of those informed citizens who are best fitted for jury duty. *See Tsarnaev*, 142 S. Ct. at 1034 (citing *Reynolds v. United States*, 98 U.S. 145, 155-56 (1879)). A trial court protects the defendant's Sixth Amendment right to an impartial jury by ensuring that jurors have no bias or prejudice that would prevent them from returning a verdict according to the law and evidence. *See Tsarnaev*, 142 S. Ct. at 1034 (citing *Connors v. United States*, 158 U.S. 408, 413 (1895)). The Supreme Court has held that a potential juror's personal viewpoints on a wide variety of subjects do not justify exclusion of that potential juror as biased unless he or she is unable to set aside their viewpoint and render a verdict based on the law and evidence: "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

During their testimony at Brown's state habeas corpus proceeding, his state trial counsel explained the objectively reasonable reasons that they chose not to move for a change of venue: first, Brown made the ultimate decision not to make such a motion; second, they believed that moving the trial to a new county would necessitate the defense attacking the character of the victim (a problematic strategy); and third, Brown's family had a good reputation within Hunt County while they believed Ray did not.

And the state habeas trial court reasonably found that all the members of the jury selected to hear Brown's case who had heard about the offense testified during

individual voir dire that they could set aside what they had heard and decide the case based on the evidence presented at trial. Brown identifies no evidence in the record to the contrary. A trial judge's appraisal of potential bias among prospective jurors is entitled to considerable deference because it is influenced by a host of factors impossible to capture fully in the record, such as the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty. *See Tsarnaev*, 142 S. Ct. at 1034 (citing *Skilling*, 561 U.S. at 386).

Under these circumstances, the state habeas court reasonably concluded this ineffective assistance claim failed to satisfy both prongs of *Strickland*.

The Texas Court of Criminal Appeals's rejection on the merits of Brown's fifth claim for state habeas corpus relief was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Brown's trial, direct appeal, and state habeas corpus proceedings.

The Court should, therefore, deny Brown's fourth claim for federal habeas corpus relief.

### d. De Novo Review

Brown demands de novo review of his claim that his trial counsel rendered ineffective assistance by failing to move for a change of venue. *See* ECF no. 29, at 122. Out of an abundance of caution, the undersigned will also conduct de novo review.

As explained above, Brown possessed a constitutional right to an impartial jury. *See Tsarnaev*, 142 S. Ct. at 1034 ("The Sixth Amendment guarantees 'the accused' the right to a trial 'by an impartial jury.'"). That right does not include the right to a jury venire or jury utterly bereft of any knowledge of Brown's offense. *See id.*; *Skilling*, 561 U.S. at 381; *Dobbert v. Florida*, 432 U.S. 282, 302 (1977) (quoting *Murphy v. Florida*, 421 U.S. 794, 799-800 (1974)). Also as explained above, the fact that Brown's offense was well-publicized at the time it took place (July 2011) is not conclusive on the issue of whether an impartial jury could be found in Hunt County almost two years later when Brown's case came to trial (in May 2013). *See Dobbert*, 432 U.S. at 303 (extensive knowledge of the crime or the putative criminal not sufficient by itself to establish a denial of a fair trial). The state habeas trial court found that six of Brown's jurors made no statements during voir dire indicating that they had heard or read anything about the offense. Eight of Brown's jurors admitted that they had heard various things about the case from a wide variety of sources, but all insisted that they could decide Brown's case based on the law and the evidence introduced at trial. Brown does not identify any evidence contradicting those factual findings.

The fact that Brown fatally shot Ray has never contested – before, during, or after Brown's trial. The type of extensive hostile pretrial publicity that pervaded the run-up to the trials in *Rideau v. Louisiana*, 373 U.S. 723, 725-27 (1963) (film of defendant's confession broadcast on local television three times prior to trial), and *Sheppard v. Maxwell*, 384 U.S. 333, 362-63 (1966) (sensational newspaper headlines

and articles demanded indictment of the defendant and accused the defense of all manner of malfeasance prior to and during trial, which resulted in the case being tried in a carnival-like atmosphere), was not present before or during Brown's May 2013 capital murder trial. The state habeas trial court reasonably found that the scope of pretrial publicity leading up to Brown's Hunt County trial was neither inflammatory nor prejudicial.

Having reviewed the evidence before the state habeas court, the undersigned finds that those factual findings (particularly those addressing the number of venire members excused for cause based on their exposure to pretrial publicity) are supported by the record from Brown's trial, direct appeal, and state habeas corpus proceeding.

In particular, Brown's reliance on *Rideau* is unpersuasive. In *Rideau*, which it decided three years before *Miranda v. Arizona*, the Supreme Court confronted a situation in which law enforcement officers arranged to have what was essentially a pre-*Miranda*, uncounseled custodial interrogation filmed and then released to the media. In sharp contrast, Brown received his full *Miranda* warnings following his arrest. More significantly, after being advised of his *Miranda* rights, Brown agreed with a member of the public media to do an interview in which Brown, albeit perhaps unwisely, attempted to create sympathy for himself and to cast aspersions on the character of his victim. There is no fact-specific allegation, much less any evidence, before this Court establishing that the television reporter who interviewed Brown on

camera was acting as a state agent during Brown's interview. Brown himself bears considerable responsibility for the pretrial publicity about which he now complains.

It appears undisputed that Brown made the final decision not to move for a change of venue after consulting with his trial counsel. The defense team's decision was based in part on their belief that Brown's family enjoyed a good reputation in Hunt County while Ray did not. Brown's trial counsel testified without contradiction during Brown's state habeas corpus proceeding that moving Brown's trial away from Hunt County would likely have required them to attempt to attack the reputation of the victim, a prospect that they considered problematic from a strategic standpoint. There were objectively reasonable reasons for choosing not to move for a change of venue.

The state habeas court reasonably found that, based on the jury's answers during voir dire and the relatively small percentage of the jury venire dismissed for cause based on their knowledge of the case and their inability to set same aside, there was no probability a motion for change of venue would have proven efficacious. The state habeas trial court accurately described the pretrial publicity leading up to Brown's trial as neither prejudicial nor inflammatory. Brown's trial counsel cannot reasonably be faulted for failing to make what in all reasonable likelihood would have been a futile motion. *See Guidry*, 2 F.4th at 491 (defense counsel cannot be ineffective for failure to raise a meritless claim). Likewise, the failure of Brown's trial counsel to make a futile motion did not prejudice Brown within the meaning of *Strickland*. *See Kimler*, 167 F.3d at 893 (failure to raise an argument lacking in merit cannot

-167-

prejudice a defendant because there is no possibility of a different outcome had counsel raised the argument).

As explained above, the evidence establishing Brown's guilt under all three theories of capital murder alleged in the indictment against Brown was overwhelming. Brown's post-arrest statements and his post-arrest letter to his fellow jail inmate Casper provided evidence from which a jury could conclude beyond a reasonable doubt that Brown felt no remorse for his capital offense and would kill again if given the opportunity. Under these circumstances, despite the trial testimony of Dr. Lundberg-Love and Dr. Cunningham, the evidence of Brown's future dangerousness was overwhelming. That fact would not have changed even if Drs. Mesibov, Sperry, and Mendel had also testified regarding ASD. Nothing in the opinion testimony of Brown's mental health experts rebuts or diminishes the dramatic impact of Brown's note to Casper threatening to kill Tracy Williams if he ever got the chance and denying that he felt any remorse over Ray's murder.

The undersigned court concludes after conducting a de novo review of the entire record before the Court in this federal habeas corpus proceeding that Brown's ineffective assistance complaint about his trial counsels' failure to move for a change of venue fails to satisfy either prong of *Strickland*.

The Court should deny Brown's fifth claim for federal habeas relief.

## IX. TRIAL COURT'S FAILURE TO SUA SPONTE CHANGE VENUE

### A. The Claim

In a comment near the end of his fifth claim for federal habeas corpus relief, Brown argues for the first time that his state trial court should have *sua sponte* ordered a change of venue in Brown's case based upon the pretrial publicity the case received in local media. *See* ECF no. 29, 126-28.

## B. Lack of State Court Disposition

Brown did not present this claim to the state court either on direct appeal or in his state habeas corpus application.

## C. De Novo Review

As explained above, extensive knowledge in the community of either the crime or the putative criminal is not sufficient by itself to render a trial constitutionally unfair. *See Dobbert*, 432 U.S. at 303. Brown identifies no alleged error committed by the state trial court during the conduct of voir dire or jury selection, either in ruling on a challenge for cause or addressing the use of peremptory challenges. Brown identifies no members of his jury whose voir dire testimony revealed that they possessed any disqualifying bias. Mere familiarity with the facts of a case, the defendant, the victim, or others involved in a criminal trial may furnish a legitimate basis for further voir dire questioning of a prospective juror, but it does not, standing alone, establish disqualifying bias. *See Irvin*, 366 U.S. at 722 ("It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."). Brown's complaints about pretrial publicity in his case do not support a finding of a due process violation. *See Dobbert*, 432 U.S. at 303 (absent a trial atmosphere utterly corrupted by press coverage, the fact the

community is well aware of the charge against a defendant will not support a presumption of unfairness of constitutional magnitude (citing *Murphy*, 421 U.S. at 798)).

Likewise, as explained above, unlike the situation in *Rideau*, Brown himself was primarily responsible for the creation of the interview by non-state-actors which played on local media following his arrest. Brown used that interview in an overt attempt to curry public favor and to cast aspersions on his victim's character by, among other things, blaming Ray for her own murder because she was preparing to take Brown's children away from their methamphetamine and cocaine abusing biological father. Brown's threatening post-shooting voice mail messages to Tracy Williams, his taunting post-shooting calls to Ray's mother, and his vitriolic post-shooting telephone call to his friend Loren Homerstead all furnished additional inculpatory and aggravating evidence. Like Brown's interview by a channel 11 reporter, Brown's own conduct, not that of law enforcement officers, was responsible for the creation of that evidence. Brown's case is distinguishable from the uncounseled, pre-*Miranda* custodial interrogation filmed by law enforcement officers that the Supreme Court addressed in *Rideau*.

Brown is not entitled to a presumption that the publicity that he largely created himself rendered his trial fundamentally unfair or warranted a *sua sponte* transfer of venue. *See Dobbert*, 432 U.S. at 303; *Murphy*, 421 U.S. at 798.

Insofar as he seeks to establish a new rule mandating that state trial courts transfer venue *sua sponte* based solely upon a finding of large-scale pretrial publicity,

Brown's claim is foreclosed by the nonretroactivity principle of *Teague*. None of the cases cited by Brown in support of his new rule recognized a duty imposed on trial courts to order a change of venue *sua sponte* premised only on pretrial publicity, particularly where that publicity was generated primarily by the defendant's own actions. Nor has this court's independent research located any existing legal authority for the proposition urged by Brown's federal habeas counsel – that is, the existence of a duty imposed on trial courts to transfer venue based on pretrial publicity absent a request from a party. As Respondent correctly points out, Texas trial courts are authorized by state rules to transfer venue *sua sponte*. *See* Art. 31.01, TEX. CODE CRIM. PROC. Nothing in the United States Constitution mandates exercise of that authority based solely upon a showing of pretrial publicity. For that reason, Brown's unexhausted claim is foreclosed by *Teague*.

The Court should deny relief on this unexhausted claim for relief.

## X. CUMULATIVE ERROR

### A. The Claim

In his eleventh and final claim for federal habeas relief, Brown argues for the first time that the cumulative effect of the constitutional errors that he has identified in his federal habeas petition warrants federal habeas relief. *See* ECF no. 29, at 168-70.

### B. Lack of Exhaustion

Brown did not fairly present his cumulative error claim to the state courts, either on direct appeal or in his state habeas corpus application.

### C. De Novo Review

The cumulative error doctrine requires a showing that constitutional error occurred during the defendant's state court trial. *See Young v. Stephens*, 795 F.3d 484, 494 (5th Cir. 2015) (noting petitioner's failure to demonstrate any constitutional error committed during his trial, as required to satisfy the cumulative error doctrine (citing *Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007))); *Coble v. Quarterman*, 496 F.3d 430, 440 (5th Cir. 2007) (federal habeas relief is only available for cumulative errors that are of a constitutional dimension); *Miller v. Johnson*, 200 F.3d 274, 286 n.6 (5th Cir. 2000) (absent constitutional error, there is nothing to cumulate); *Jackson v. Johnson*, 194 F.3d 641, 659 n.59 (5th Cir. 1999) (cumulative error doctrine provides relief only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness (citing *Spence v. Johnson*, 80 F.3d 989, 1000 (5th Cir. 1996)); *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) (federal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension other than violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors "so infected the entire trial that the resulting conviction violates due process" (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

For the reasons discussed in Section VIII above, all of Brown's complaints about the performance of his trial counsel fail to satisfy either prong of *Strickland*. For the reasons discussed in Section III above, all of Brown challenges to the

constitutionality of the Texas capital sentencing scheme are foreclosed by well-settled Fifth Circuit or Supreme Court authority and legally meritless. For the reasons discussed in Sections IV through VII and IX, all of Brown's complaints regarding alleged defects in his state habeas corpus proceeding, alleged jury misconduct, alleged *Miranda* violations, allegedly improper prosecutorial jury arguments, and the state trial court's failure to *sua sponte* change venue are without arguable merit. Thus, under the cumulative error doctrine recognized in the Fifth Circuit, there is nothing for this Court to cumulate. "Twenty times zero equals zero." *Derden*, 978 F.2d at 1458 (quoting *Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987)).

### D. Conclusions

Brown's conclusory cumulative error claim is without arguable merit. The Court should deny Brown's eleventh claim for federal habeas relief.

### XI. REQUEST FOR EVIDENTIARY HEARING

Brown requests an evidentiary hearing. *See* ECF no. 29, at 170. Insofar as Brown's claims in this federal habeas corpus proceeding were disposed of on the merits during the course of his direct appeal or state habeas corpus proceedings, he is not entitled to a federal evidentiary hearing to develop new evidence attacking the state appellate or state habeas court's resolution of his claims unless he can satisfy 28 U.S.C. § 2254(e)(2). *See Shinn v. Ramirez*, 142 S. Ct. 1718, 1728 (2022) (in all but the extraordinary situations listed in § 2254(e)(2), a federal habeas petitioner who failed to develop facts in state court supporting his claim is not entitled to an evidentiary hearing in federal court). Likewise, a federal habeas petitioner is not

entitled to an evidentiary hearing for the purpose of showing that his failure to develop facts in the state court was the result of the ineffective assistance of his state habeas counsel. *See id*. at 142 S. Ct. at ____, *10-*13.

Under AEDPA, the proper place for development of the facts supporting a federal habeas claim is the state court. *See Harrington*, 562 U. S. at 103 ("Section 2254(d) thus complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding."); *Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir. 1997) (holding AEDPA clearly places the burden on a federal habeas petitioner to raise and litigate as fully as possible his federal claims in state court). Where a petitioner's claims have been rejected on the merits, further factual development in federal court is effectively precluded by virtue of the Supreme Court's holding in *Cullen v. Pinholster*, 563 U. S. 170, 181-82 (2011):

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.,* the record before the state court.

Brown is not entitled to a federal evidentiary hearing on any of his claims that were rejected on the merits by the state courts, either on direct appeal or during his state habeas corpus proceedings. *See Shinn*, 142 S. Ct. at 1728; *Halprin v. Davis*, 911 F.3d 247, 255 (5th Cir. 2018) ("If a claim has been adjudicated on the merits by a

state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." (quoting *Cullen*, 563 U.S. at 185)), *cert. denied*, 140 S. Ct. 167 (2019).

As to any new factual allegations, new evidence, or new legal arguments that Brown presents in support of any of the claims for which this Court has undertaken de novo review, he is likewise not entitled to an evidentiary hearing. In the course of conducting de novo review of Brown's claims, except for those assertions that are refuted by the state courts records now before this Court, this Court has assumed the factual accuracy of (1) all the specific facts alleged by Brown in support of his claims for relief and (2) any documents that he has presented in support of those claims. Even when the truth of all of Brown's new factual allegations supporting those claims is assumed, his claims do not warrant federal habeas relief. *See Schriro v. Landrigan*, 550 U. S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."). Brown is not entitled to an evidentiary hearing in this Court with regard to any of his claims for which this Court has undertaken de novo review.

## XII. MOTION FOR LEAVE TO AMEND

In his 185-page proposed amended petition (ECF no. 76-2) attached to his motion for leave to file same, Brown presents twelve numbered claims for relief (not counting subparts) as well as a pair of new ineffective of counsel spins on old substantive claims. Pages 20 through 121 set forth factual recitations and legal

theories in support of Brown's claims that his trial counsel rendered ineffective assistance by (1) failing to adequately present a defense at the guilt-innocence phase of trial premised on Brown's lacking the necessary mens rea to commit capital murder, as opposed to intentional murder; (2) failing to adequately investigate Brown's background and present all available mitigating evidence, particularly evidence Brown suffers from Autism Spectrum Disorder ("ASD"); (3) virtue of a conflict of interest involving the wife of Brown's fact investigator, who was allegedly a friend of Stella Ray – although Brown does not present any affidavit from the former Jennifer Smith, establishing that she was available at the time of Brown's trial and willing to offer any testimony helpful to Brown; and (4) failing to move for a change of venue.

As explained above, these claims are all without arguable merit because they fail to satisfy either prong of *Strickland* under either the AEDPA's standard of review or under de novo review. Allowing amendment of Brown's first four claims for federal habeas relief in his original petition by allowing the substitution of the same basic claims as re-imagined in pages 20 through 121 of Brown's proposed amended petition would accomplish nothing other than delay.

In his fifth claim in his proposed amended petition, Brown re-offers the same complaints of alleged *Miranda* violations that the undersigned recommends the Court reject on the merits but also frames this claim as a new ineffective assistance of counsel claim.

But, as explained by this undersigned in connection with Brown's sixth claim for relief in his original petition, any state trial court error in connection with the admission of Brown's videotaped custodial interrogation was rendered harmless beyond a reasonable doubt by the admission of Brown's videotaped interview by a television reporter. Brown offers no factual allegations, much less any evidence, showing the television reporter was acting as an agent of the state when she interviewed Brown. There was no legal basis for excluding the television reporter's videotaped interview. *See Broadnax v. Lumpkin*, 987 F.3d 400, 415 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 859 (2022).

And, because there was no legal basis available to exclude the television reporter's videotaped interview with Brown, any failure on the part of Brown's trial counsel to seek to exclude the videotape of Brown's custodial interrogation did not prejudice Brown within the meaning of *Strickland*. *See Young v. Davis*, 835 F.3d 520, 528 n.36 (5th Cir. 2016) (failure to raise a meritless claim did not prejudice defendant within the meaning of *Strickland*); *Garza v. Stephens*, 738 F.3d 559, 677 (5th Cir. 2013) (failure to attempt to introduce inadmissible evidence did not prejudice the defendant); *Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir. 2009) (failure to make a meritless objection did not prejudice defendant); *United States v. Kimler*, 167 F.3d 889, 873 (5th Cir. 1999) (failure to raise a meritless argument was not prejudicial because the outcome of the proceeding would not have been different had the attorney raised the issue); *Teague v. Scott*, 60 F.3d 1167, 1174 (5th Cir. 1995) (state appellate counsel's failure to raise a claim on direct appeal that lacked merit did not prejudice

the defendant under *Strickland*); *Smith v. Puckett*, 907 F.2d 581, 585 (5th Cir. 1990) (failure to challenge identification procedure did not prejudice defendant where there was no evidence the identification procedure was suggestive).

Allowing Brown to add a new ineffective assistance claim asserting complaints about his trial counsel's failure to move to exclude the videotaped statements that Brown gave following his arrest would serve no legitimate purpose and accomplish only further delay in the final disposition of this case.

In his sixth claim for relief in his proposed amended petition, Brown re-asserts the same challenges to the constitutionality of the Texas capital sentencing statute and its special issues that the undersigned recommends that the Court reject on the merits in connection with Brown's eighth and ninth claims for relief in his original petition.

In his seventh claim in his proposed amended petition, Brown argues for the first time that Texas law insufficiently narrows the category of criminal defendants charged with capital murder arising from a murder committed in the course of committing or attempting to commit the offenses of obstruction or retaliation. While Brown did include some allusions to such an argument in the five pages of his ninth claim in his original petition (which complained primarily about a lack of proportionality review of Texas capital sentences), the 21-page discussion contained in Brown's seventh claim for relief in his proposed amended petition is sufficiently different legally and factually from anything in Brown's original petition that Brown's proposed new seventh claim does not relate back to any claim found in Brown's

original petition. It would thus be barred by the AEDPA's one-year statute of limitations if this Court were to permit Brown to amend at this late juncture to present this new claim for relief. *See Mayle v. Felix*, 545 U.S. 644, 657 (2005) (claims relate back only when they arise from the same core facts as the timely filed claims and not when they depend on events separate in both time and type from the originally raised episodes); *Ramey v. Davis*, 942 F.3d 241, 249 (5th Cir. 2019) (a claim relates back for limitations purposes when it asserts the same claim set forth or attempted to be set forth in the original pleading). Nothing in Brown's original petition (including his 5-page ninth claim in his original petition) set forth or attempted to set forth the lengthy, new claim asserted in Brown's proposed amended petition as his seventh ground for relief.

Brown's eighth claim in his proposed amended petition – a *Giglio/Napue* claim addressing allegedly misleading testimony by a law enforcement officer about Brown's desire to commit "suicide by cop" – was likewise not included in any way in his original petition. It would be barred by the AEDPA's one-year statute of limitations if this Court permitted amendment at this late juncture in this case. And it fails to satisfy the materiality prong of *Giglio/Napue* analysis. Neither Brown's conviction nor his sentence was impacted in any prejudicial manner by the allegedly false testimony of one of the enforcement officers who conducted Brown's post-arrest custodial interrogation that she believed Brown wanted to commit suicide by cop. The jury saw the entire videotape of Brown's custodial interrogation and was able to make its own inferences as to Brown's state of mind.

Brown's ninth claim in his proposed amended petition – an ineffective assistance claim based upon his trial counsels' failure to attack the lack of a jury instruction mandating jury unanimity on a particular theory of capital murder – also does not relate back to any claim set forth or attempted to be set forth in Brown's original petition. It would be barred by the applicable statute of limitations if this Court permitted Brown's proposed amendment.

And this proposed new claim lacks any arguable merit. When a defendant has been charged with capital murder committed under multiple theories of capital murder, there is no constitutional requirement of jury unanimity on a particular theory of capital murder. On the contrary, under well-settled Texas law, when a capital murder defendant is charged under alternate theories and the jury returns a general verdict of guilty, the verdict will be upheld if the evidence is sufficient to support a guilty finding under any of the allegations submitted. *See Sorto v. State*, 173 S.W.3d 469, 472 (Tex. Crim. App. 2005); *Rabbani v. State*, 847 S.W.2d 555, 558 (Tex. Crim. App, 1992).

This is consistent with clearly established federal law as set forth in United States Supreme Court's opinion in *Schad v. Arizona*, 501 U. S. 624, 631 (1991). In *Schad*, the Supreme Court recognized that "[o]ur cases reflect a long-established rule of the criminal law that an indictment need not specify which overt act, among several named, was the means by which a crime was committed." The four-Justice plurality in *Schad* cited several of that Court's prior opinions, as well as Federal Rule of

Criminal Procedure 7(c)(1), for the rule that, in cases of murder, it is "immaterial whether death was caused by one means or the other." *Id.*

The Supreme Court plurality in *Schad* explained that the principle in question applied to both the manner in which an offense was charged in an indictment and the manner in which the jury was charged at the guilt-innocence phase of trial: "We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone." *Schad*, 501 U. S. at 631. "We see no reason, however, why the rule that the jury need not agree as to mere means of satisfying the *actus reus* element of an offense should not apply equally to alternative means of satisfying the element of *mens rea*." *Id.*, 501 U. S. at 632 (emphasis in original).

Concurring separately, Justice Scalia explained the rationale for this long-established rule: "As the plurality observes, it has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission. That rule is not only constitutional, it is probably indispensable in a system that requires a unanimous jury verdict to convict." *Schad*, 501 U. S. 649-50 (Scalia, J., concurring) (citations omitted). Justice Scalia explained the practical application of the rule as follows: "When a woman's charred body has been found in a burned house, and there is ample evidence that the defendant set out to kill her, it would be absurd to set him free because six jurors believe he strangled her to death (and caused the fire accidentally in his hasty escape), while six others believe he left her unconscious and set the fire to kill her." *Id.*, 501 U. S. at 650.

Likewise, in Brown's trial there was no constitutional mandate that the jury unanimously agree on a particular theory of capital murder. Where a defendant is charged with multiple factual theories underlying the same capital offense, there is no constitutional requirement of jury unanimity with regard to a particular theory of capital murder.

Correspondingly, there is no constitutional requirement that there be legally sufficient evidence to support a finding of guilt as to every alternate theory of capital murder submitted to the jury. *See Griffin v. United States*, 502 U.S. 46, 49 (1991) ("It was settled law in England before the Declaration of Independence, and in this country long afterwards, that a general jury verdict was valid so long as it was legally supportable on one of the submitted grounds – even though that gave no assurance that a valid ground, rather than an invalid one, was actually the basis for the jury's action."); *Turner v. United States*, 396 U.S. 398, 420 (1970) (when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, the verdict will stand if the evidence is sufficient with respect to any of the acts charged). Brown's indictment charged him with committing murder in the course of committing or attempting to commit three separate predicate felonies – specifically, obstruction, retaliation, and terroristic threat.

His conviction stands if the evidence supports the jury's verdict as to any of those three theories. *See United States v. Garza-Robles*, 627 F.3d 161, 166 (5th Cir. 2010) ("If the evidence was sufficient to support one theory, the fact that the evidence was insufficient to support another of the theories does not negate the verdict." (citing

*Griffin*, 502 U.S. at 59-60)); *Santellan v. Cockrell*, 271 F.3d 190, 196 (5th Cir. 2001) (where a jury is given the option of choosing factually adequate and factually inadequate theories of guilt, jurors can be counted on to base their verdict upon the factually adequate theory (citing *Griffin*, 502 U.S. at 59)); *United States v. Powers*, 168 F.3d 741, 754 (5th Cir. 1999) ("the case was submitted to the jury on two alternative, legally valid theories. If either theory was supported by sufficient evidence, we are bound to affirm.").

Furthermore, for the reasons explained above, Brown's attack on the alleged inconsistencies between the sentencing outcomes of multiple Texas capital murder trials in which capital murder was alleged under a theory involving retaliation or obstruction as the predicate felony was rejected decades ago by the both the District Court and the Fifth Circuit in *Cordova v. Johnson,* 993 F. Supp. 473, 508 (W.D. Tex. 1998) ("Petitioner's proposed rule would stand the principle of individualized sentencing on its head."), *CPC denied*, 157 F.3d 380 (5th Cir. 1998), *cert. denied*, 525 U.S. 1131 (1999).

And Brown again ignores that he was also charged under a capital theory premised on his commission or attempt to commit the predicate offense of terroristic threat, as to which the evidence that Brown terrorized Ray in the minutes leading up to Brown's fatal shooting of Ray was overwhelming. The jury could hear terror in Ray's voice on the audio recording of her 9-11 call minutes before her murder, especially when she screamed that Brown had managed to "corner" her. Brown admitted during his guilt-innocence testimony that he pursued Ray in his vehicle,

flashed his lights, and did whatever he could to attempt to get her to pull over. When she did, he pointed his gun at her head and intentionally pulled the trigger.

As explained above, contrary to Brown's first claim in his original and proposed amended petitions, the fact Brown was enraged at Ray for planning to move to another city with their children is not a mental disease or defect under Texas law that rendered Brown legally insane or which otherwise rendered Brown incapable of forming the necessary mens rea to commit capital murder.

Also, as explained above, a rational jury could have believed that, contrary to Brown's assertions, Brown had to know his and Ray's two very young children were in the car with Ray at the time he fired the fatal shot. Brown had been to Ray's residence and knew the children were not there. Brown searched Ray's home and therefore knew there was no one at Ray's residence to watch the children. It was undisputed that, prior to the murder, Brown had already called Ray's mother and, presumably, learned the children were not there. Brown made no effort to go to the home of Ray's mother to see his children after he spoke with his former mother-in-law. A rational jury could have reasonably inferred from this evidence that Brown should have known his children were with Ray at the time Brown forced Ray's car to the shoulder of the road and shot her.

Brown's tenth and twelfth claims in his proposed amended petition echo the same legally frivolous claims asserted as his claims ten and eleven in his original petition. Both claims remain legally frivolous as set forth in his proposed amended petition.

-184-

Brown's eleventh claim in his proposed amended petition contains a conclusory assertion of jury misconduct so vague and lacking in factual specificity as to be subject to summary dismissal under Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts. *See Proposed Amended Petition*, at pp. 178-80 [ECF no. 76-2, pp. 204-06 of 493]). Brown's new eleventh claim in his proposed amended petition is so non-fact-specific that it fails to relate back to Brown's jury misconduct claim contained in his seventh claim in his original petition. *See Mayle*, 545 U.S. at 655 (recognizing that Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts requires a federal habeas petitioner to specify all grounds for relief and state the facts supporting each ground). Brown's eleventh claim in his proposed amended petition does not identify with discernible clarity exactly what it is that he alleges his jury did that constituted "jury misconduct." Even when viewed in light of the declarations accompanying Brown's proposed amended petition, his vague references to unspecified "media coverage," "personal relationships," "extrinsic evidence," and "community pressure" are insufficient to support a pro se claim for federal habeas relief, much less one presented by counsel, where the rule of liberal construction of pro se pleadings is inapplicable. Rule 2(c) requires Brown to allege some specific act of misconduct on the part of his jurors. *See id.* His eleventh claim in his proposed amended petition fails to satisfy this standard.

Brown attaches to his proposed amended petition an additional collection of new documents –experts' reports, witness declarations, and state court records from Jennifer Smith's divorce proceeding totaling more than 270 pages (*see* ECF no. 76-2,

at pp, 212-493 of 493). The state court records in question date from 2013. Brown offers no rational explanation for his failure to submit these materials at the time that he filed his original federal habeas corpus petition in September 2020. And Brown offers no rational explanation for his failure to attach the 2018 declaration of Brad Levenson and the declarations of his other two state habeas counsel (attorneys Ashley Steele and Erin Eckhoff) to his original federal habeas corpus petition. Brown does not allege any facts showing those three attorneys were unavailable to furnish their declarations prior to his filing of his original petition. The only exhibits attached to Brown's original petition were a copy of Brown's motion for remand filed December 2018 in the Texas Court of Criminal Appeals and a copy of an expert report dated August 21, 2020, prepared by clinical psychologist Dr. Matthew Mendel, discussed above in addressing Brown's original petition.

After conducting a claim-by-claim comparison of Brown's original federal habeas corpus petition and his proposed amended petition, the undersigned concludes that permitting the filing of Brown's proposed amended petition at this juncture would serve only to delay the denial of Brown's meritless claims for federal habeas relief and achieve no legitimate purpose.

The disposition of this case has been delayed, as Brown correctly points out, by the refusal of the Respondent to furnish this court with copies of all relevant state court records, including the pivotal audio and video recordings played for the jury at trial. The Court's original scheduling order directed the filing of all pertinent state court records within 30 days from the date Respondent filed its Answer (*see* ECF no.

9, at ¶ 8). While the Court later granted both parties multiple extensions on the filing deadlines for pertinent pleadings, the deadline for the filing of the relevant state court records never changed. Despite this, Respondent, who filed an Answer on May 7, 2021, waited until August 16, 2021 to begin filing Brown's state court records (*see* ECF nos. 52-59, 61-62). This Court then undertook the lengthy process of reviewing the contents of Brown's state court records from his trial, direct appeal, and state habeas corpus proceedings.

After the Court's staff informed Respondent's counsel that certain key items were missing from the voluminous state court records transmitted electronically to the Clerk, Respondent refused to furnish the missing records until the Court issued a formal order identifying with specificity the missing video and audio recordings, the absence of which from the record disadvantaged the Court in its efforts to address Brown's motion for stay and abeyance.

But Respondent's intransigence does not entitle Brown to file an amended petition raising new claims premised on new legal theories and new factual assertions more than a year after Respondent filed its Response to Brown's original federal habeas petition (on May 7, 2021, as ECF no. 40) and more than ten months after Brown filed his Reply brief (on July 26, 2021, as ECF no. 48). This is especially so when all of Brown's new claims would be barred by the applicable one-year statute of limitations because they do not relate back to any claims in Brown's original petition.

In addressing a motion for leave to amend in a federal habeas corpus proceeding, the Fifth Circuit has instructed district courts to consider the following

factors: (1) whether the petitioner unduly delayed in raising a new claim; (2) whether the request for leave to amend resulted from bad faith or a dilatory motive; (3) whether the petitioner has been given previous opportunities to cure the deficiencies he seeks to cure through amendment but which he failed to exercise; (4) whether the respondent would suffer undue prejudice from allowing the amendment; and (5) whether an amendment would be futile. *See Flores v. Stephens*, 794 F.3d 494, 504 (5th Cir. 2015).

For the reasons discussed above, permitting the amendment proposed by Brown would result in Brown dropping his multi-faceted and largely exhausted challenges to the validity of the prosecution's punishment phase jury argument (Brown's fifth claim in his original petition) in lieu of presenting a host of new and unexhausted and time-barred claims (Brown's seventh, eighth, ninth, and eleventh claims, as well as new ineffective assistance claims in his fifth and eleventh claims in his proposed amended petition). As explained above, all of Brown's proposed new claims would be either potentially procedurally defaulted and time-barred – depending on whether Respondent raised those defenses. All are also without arguable merit.

Brown's proposed amendment to his petition would be an act of futility. And the undersigned finds that the motive behind Brown's motion for leave to amend appears to be dilatory. Brown has twice previously sought stays of all proceedings in this case. His latest motions, filed long after all operative pleadings have been on file for an extended time period and after the Court managed to obtain the critical trial

exhibits from Respondent, offer new claims that he could have discovered through a diligent review of the state court record from Brown's trial, direct appeal, and state habeas corpus proceedings. In-person interviews of witnesses such as those who furnished the declarations and reports accompanying Brown's proposed amended petition were not necessary for Brown to identify and plead claims such as his fifth, seventh through ninth, and eleventh claims in his proposed amended petition prior to the time Brown filed his original petition.

Contrary to the arguments in Brown's motion for leave to amend, WestLaw has not been down for the count for any extended time period during the current pandemic. A failure to recognize potential legal claims cannot be justified by alleged difficulties contacting witnesses. Brown's new proposed seventh through ninth claims and his new proposed ineffective assistance claims could and should have been recognized by Brown's federal habeas counsel prior to the time that they filed Brown's original petition. All were cognizable from the state court record.

As explained above, Brown's new proposed seventh claim is primarily a legal argument, not one controlled by factual nuance. And any impropriety in the prosecution's presentation of the testimony of the officers who conducted Brown's custodial interrogation was discernable through review of the videotape from that interrogation, a transcript of which was part of the state court record even before Respondent complied with multiple orders to file the videotaped interview.

Brown's new proposed ninth claim is also primarily a legal argument about his trial counsel's failure to assert a meritless constitutional challenge to the Texas

definition of capital murder and the jury's failure to make separate factual findings on each theory of capital murder with which Brown was charged. The new ineffective claims that Brown attempts to present in his new proposed fifth and eleventh claims are inextricably intertwined with substantive claims of which Brown's federal habeas counsel should have been aware at the time that they filed Brown's original petition from their review of the trial, direct appeal, and state habeas record.

The Court should deny Brown's motion for leave to amend, filed June 20, 2022 (ECF no. 76).

## XIII. CERTIFICATE OF APPEALABILITY

Under AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under 28 U.S.C. § 2254, the petitioner must obtain a Certificate of Appealability ("CoA"). *See Miller-El v. Johnson*, 537 U.S. 322, 335-36 (2003); 28 U.S.C. § 2253(c)(2). Likewise, under AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002) (holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted. *See Crutcher*, 301 F.3d at 658 n.10; 28 U.S.C. § 2253(c)(3).

A CoA will not be granted unless a petitioner makes a substantial showing of the denial of a constitutional right. *See Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El v. Johnson*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983). To make such a showing, the petitioner need not show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether – or, for that matter, agree that – the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *See Tennard*, 542 U.S. at 282; *Miller-El*, 537 U.S. at 336. This Court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas petitioner. *See* Rule 11(a), *Rules Governing Section 2254 Cases in the United States District Courts*.

The showing necessary to obtain a CoA on a particular claim is dependent on the manner in which the Court has disposed of a claim. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El*, 537 U.S. at 338 (quoting *Slack*, 529 U.S. at 484). In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and whether this Court was correct in its procedural ruling. *See Slack*, 529 U.S. at 484

(holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

The undersigned is not recommending that the Court dispose of any of Brown's federal habeas corpus claims on procedural grounds but rather that the Court address the merits of all of Brown's claims, including his unexhausted claims.

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *See Thompson v. Davis*, 916 F.3d 444, 453 (5th Cir. 2019); *Halprin*, 911 F.3d at 255. But a CoA is not automatically granted in every death penalty habeas case. *See Miller-El*, 537 U.S. at 337 ("It follows that issuance of a COA must not be *pro forma* or a matter of course."). The deferential standard of review applied to claims of ineffective assistance adjudicated on the merits in the state courts has particular bite in evaluating the appealability of ineffective assistance claims – the Supreme Court requires that federal courts "use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt,* 571 U.S. at 15.

If the Court accepts the recommendations above, reasonable minds could not disagree with the conclusions that (1) all of Brown's complaints of ineffective assistance by his trial counsel fail to satisfy both prongs of *Strickland*, regardless of whether they are examined under the AEDPA standard or a de novo standard of

review; (2) all of Brown's challenges to the constitutionality of the Texas capital sentencing scheme are legally meritless; (3) all of Brown's complaints of alleged defects during his state habeas corpus proceeding are legally frivolous; (4) all of Brown's claims of alleged jury misconduct, alleged *Miranda* violations, and allegedly improper prosecutorial jury argument are without arguable merit; (5) Brown's complaint about the state trial court's failure to *sua sponte* transfer venue is foreclosed by *Teague*; and (6) Brown's cumulative error claim is legally meritless. Likewise, reasonable jurists could not disagree with the conclusion that granting Brown's motion for leave to amend would be futile. And there are no constitutional errors to cumulate in this case.

## RECOMMENDATION

For the reasons explained above, the Court should deny Brown's petition for federal habeas relief (ECF no. 29), as supplemented by his reply brief (ECF no. 48); deny Brown's request for an evidentiary hearing; deny Brown's motion for leave to amend, filed June 20, 2022 (ECF no. 76); and deny Brown a Certificate of Appealability on all his claims for relief.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fᴇᴅ. R. Cɪᴠ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and

specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: August 10, 2022

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE